IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| TARSHA NICKOL HUNTER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No.: 2:07-CV-427-WHA |
| vs. | ) | |
| | ) | |
| MOBIS ALABAMA, LLC, | ) | |
| | ) | |
| Defendant. | ) | |

### DEFENDANT MOBIS' MEMORANDUM OF LAW
### IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

**COMES NOW** the Defendant MOBIS Alabama, LLC (hereinafter "MOBIS") and respectfully submits the following Memorandum of Law in Support of Defendant's Motion for Summary Judgment filed contemporaneously herewith.

### I.    SUMMARY OF PERTINENT FACTS AND LAW

Plaintiff came to work at MOBIS on March 6, 2006, when her employer, Multi Staffing, assigned her to work as a temporary employee ("Temp") in MOBIS' Accounting Department.    During the three (3) months that Plaintiff worked as a Temp, her attendance and punctuality were very poor--she was absent, tardy or left early 17 times in the course of only 90 days.    Regardless, Plaintiff's direct supervisor, Ms. Womack, persuaded the head of Accounting, Mr. Kim, to hire Plaintiff as a probationary employee, and Plaintiff assured them that her attendance issues would improve. Nevertheless, Plaintiff was absent for all or part of the day seven (7) more times in the next two and a half months.

MOBIS' policy for probationary employees provides that such employees are to be terminated after three (3) attendance "occurrences."    An occurrence is defined as an

1

absence for all or part of the day, a tardy, or an early departure from work. This is a so-called "no fault" policy, meaning that probationary employees are allowed two (2) incidences and, with few exceptions, are terminated after the third no matter what the reason for the incident. Plaintiff admits that she understood MOBIS' attendance policy for probationary employees and knew that it applied to her.

Plaintiff should have been terminated on July 27, 2006 after her third attendance occurrence, but she wasn't because Mr. Kim was not familiar with the specific number of attendance incidences allowed for probationary employees. As a result, Plaintiff remained employed almost one month longer than she should have, but her termination on August 25, 2006 ultimately came about as a result of the standard review process that occurs for all probationary employees toward the end of their probationary period.

Plaintiff claims that MOBIS terminated her employment because she was pregnant. She also alleges that Mr. Kim further discriminated against her by communicating with her through her supervisor, Ms. Womack, after she became pregnant. MOBIS can demonstrate conclusively that Mr. Kim's regular preference is to communicate with employees in Accounting through their supervisor when practical, and that nothing changed in that regard after Mr. Kim learned of Hunter's pregnancy. In short, Mr. Kim did not treat Plaintiff more or less favorably than any other similarly-situated employee, and his behavior towards her did not change when he found out that she was pregnant. Plaintiff also alleges that additional evidence of discrimination was Mr. Kim's statement that he "can't take care of a person like [Hunter]." The uncontroverted evidence shows that Mr. Kim uses that phrase to convey that he expects his staff to handle their responsibilities without unnecessarily involving him or others. In

short, Plaintiff's circumstantial evidence that MOBIS terminated her employment for discriminatory reasons is unsubstantiated.

Plaintiff has not identified a similarly situated comparator who was treated more favorably as required to meet her burden of proof for a *prima facie* case of pregnancy discrimination pursuant to Title VII. Additionally, Plaintiff testified that her suspicions on discrimination are based in large part on the terminations of two pregnant employees and the departure of another pregnant employee. MOBIS can show conclusively that Plaintiff's suspicions in this regard are based wholly on rumors and supposition and do not create a genuine issue of fact for purposes of summary judgment.

In sum, Plaintiff admits that she understood MOBIS' attendance policy for probationary employees, knew that it applied to her, and that no one ever told her anything to the contrary. Plaintiff has not identified any similarly situated employee who was not pregnant, and who was allowed to exceed the two incidents permitted by MOBIS' attendance policy. Plaintiff has no evidence that MOBIS' decision to terminate her employment for violating the attendance policy is a pretext for a discriminatory motive. Therefore, because there is no genuine issue of disputed fact that Plaintiff was terminated because she was in clear violation of MOBIS' attendance policy, MOBIS is entitled to judgment as a matter of law.

## II.     STATEMENT OF UNDISPUTED FACTS

### A.     MOBIS BACKGROUND.

MOBIS Alabama, L.L.C. ("MOBIS") maintains its principal place of business at 1395 Mitchell Young Road, Montgomery, Alabama. MOBIS is a Tier I supplier to Hyundai Motor Manufacturing Company ("Hyundai"). As such, MOBIS manufactures

certain original equipment automotive components for use by Hyundai at its vehicle final assembly plant, also located in Montgomery. MOBIS commenced production in 2005 and has approximately 800 employees. MOBIS is an equal opportunity employer and maintains written polices prohibiting discrimination on the basis of gender. Riedler Affidavit at ¶ 2, attached hereto as Ex. A (hereinafter "Riedler Aff.").

**B.    PLAINTIFF'S WORK HISTORY AT MOBIS.**

Plaintiff's first contact with MOBIS was on March 6, 2006, when her employer, Multi Staffing, assigned her to work as a Temp in MOBIS' Accounting Department ("Accounting"). Riedler Aff. at ¶ 7. MOBIS' Chief Financial Officer, Jay Kim ("Mr. Kim")[1], is head of Accounting. Mr. Kim, a Korean citizen, has worked for MOBIS at its Montgomery, Alabama facility for approximately five (5) years. Before coming to Alabama, Mr. Kim was employed by MOBIS or an affiliate in Korea for 20 additional years. Kim Affidavit at ¶ 1, attached hereto as Ex. B (hereinafter "Kim Aff."). When Plaintiff worked at MOBIS, she reported to Sonechka Womack ("Ms. Womack") who in turn reported to Mr. Kim. Plaintiff and Plaintiff's direct supervisor, Ms. Womack, are African American females. *Id.* at ¶ 6.

Plaintiff's title was Accounting Specialist Treasury. Timely and expeditious performance of Plaintiff's duties is critical to the effective operation of Accounting, particularly at the month's end when the books are closed. Therefore, good attendance and reliability are necessary. *Id.* at ¶ 4.

---

[1] Jaekwang Kim is Mr. Kim's full Korean name. Mr. Kim reads and understands basic English well. He also speaks English, but it is broken, and he has a heavy accent, which can make it difficult to understand him, particularly for someone not used to conversing with him. Like most Korean employees of MOBIS, Kim was briefed on American employment laws, including laws prohibiting gender discrimination, before moving to Alabama. Kim has worked extremely hard to get where he is and is adamant that he would never risk his accomplishments by discriminating in the workplace. Kim Depo. at 103, l. 1 – p. 104, l. 11; p. 105, l. 10 – p. 106, l. 24 (all citations to Kim's deposition are attached as Ex. C).

While Plaintiff worked as a Temp, she kept track of her own attendance and hours worked. She recorded her arrival and departure times daily. Plaintiff periodically forwarded this information to Multi-Staffing, who paid her accordingly. The time and attendance records that Plaintiff kept and submitted to Multi-Staffing show that Plaintiff's attendance and punctuality were very poor during the three (3) months she worked as a Temp. She was absent, tardy or left early 17 times in the course of only 90 days. *See* Kim Aff. at ¶ 3; Riedler Aff. at ¶ 8; *see also* Multi-Staffing Attendance Records and Riedler Chart, attached as Ex. 2 to Riedler Aff.

Plaintiff was eligible to be hired by MOBIS after working 360 hours as a Temp[2], but MOBIS did not consider Plaintiff for employment at that time due to her poor attendance. Instead, Mr. Kim decided to wait until she had worked 90 days to see if her attendance might improve. Kim Aff. at ¶ 5. Since Plaintiff continued to miss work during her additional 30 days, Mr. Kim did not favor hiring Plaintiff and decided against it, but Ms. Womack persuaded Mr. Kim to give Plaintiff a chance as a MOBIS probationary employee. Kim Aff. at ¶ 6; Kim Depo. at p. 38, l. 13 – p. 39, l. 21. Ms. Womack testified that Plaintiff's work was good except for the attendance problems, and that she persuaded Mr. Kim to offer Plaintiff probationary employment with MOBIS on the condition that Plaintiff correct her attendance and punctuality problems. Kim Aff. at ¶ 7; Kim Depo. at p. 41, l. 4 – p. 42, l. 3. Accounting was a small department and had experienced significant turnover, so Mr. Kim agreed in deference to Ms. Womack, who did not want to train someone else for Plaintiff's position. Mr. Kim reluctantly agreed to

---

[2] MOBIS often hires Temps who demonstrate that they are well suited for regular employment. This can be done at the end of three hundred sixty (360) hours or nine (9) weeks, depending upon the agreement with the agency involved. At the end of the agreed upon period of time, MOBIS can hire a Temp without paying a fee to the agency. In the case of Multi-Staffing, the agreed upon period was 360 hours or 9 weeks, which in Plaintiff's case would have expired on or about May 5, 2006. Riedler Aff. at ¶ 9.

hire Plaintiff as a probationary employee on the condition that Plaintiff correct her attendance problems. Plaintiff assured Mr. Kim and Ms. Womack that she would have no further attendance issues if she was given a chance as a probationary employee. Kim Aff. at ¶ 7.

On June 5, 2006, MOBIS offered Plaintiff probationary employment. Kim Aff. at ¶ 8; Riedler Aff. at ¶ 10. Plaintiff attended a full day orientation program, during which MOBIS' Employee Handbook and specifically MOBIS' policy for probationary employees were reviewed and explained. Riedler Aff. at ¶ 11. Plaintiff acknowledges that she read and understood the Handbook and the policy governing probationary employees. Plaintiff Depo. at p. 73, l. 3 – p. 74, l. 22; p. 142, l. 1-5 (all citations to Plaintiff's deposition are attached as Ex. D); *see also* MOBIS' Attendance Policy for Probationary Employees and Plaintiff's Handbook Acknowledgement, attached as Exs. 3 and 4 to Riedler's Aff. Plaintiff also acknowledges that no one ever told her she was exempt from the probationary policy or that it would not apply to her in all respects. Plaintiff Depo. at p. 73, l. 3 – p. 74, l. 22; p. 142, l. 1-5.

## C.    MOBIS' ATTENDANCE POLICY FOR PROBATIONARY EMPLOYEES AND PLAINTIFF'S FAILURE TO ADHERE THERETO.

All new employees at MOBIS, including those who have worked as Temps, serve a 90-day probationary period during which their suitability for the fast paced and exacting work environment is evaluated. MOBIS is Hyundai's largest Tier I supplier, and, like all key suppliers, must meet the requirements of Hyundai's "just in time" inventory delivery system. Riedler Aff. at ¶ 12.

Importantly, the policy for probationary employees provides that such employees are to be terminated after three (3) attendance "occurrences."[3] Riedler Depo. at p. 48, l. 17 – p. 49, l. 18 (all citations to Riedler's deposition are attached as Ex. E). An occurrence is defined as an absence for all or part of the day, a tardy, or an early departure from work. *Id.* This is a so-called "no fault" policy, meaning that probationary employees are allowed two (2) incidences and are terminated after the third no matter what the reason for the incident. The only exceptions are for jury duty, bereavement and the like. Riedler Depo. at p. 51, l. 5-16; Riedler Aff. at ¶ 13.

Additionally, MOBIS does not have a sick leave policy that excuses absences or missed work for sickness or injury prior to the time the employee becomes eligible for leave pursuant to the Family Medical Leave Act ("FMLA"). Riedler Depo. at p. 51, l. 5-16. Probationary employees are not covered by FMLA because they have not yet worked for the statutorily-required one year. MOBIS treats pregnancy the same as it treats any illness or injury during the first year of employment. After the first year of employment, MOBIS complies with FMLA, including its provisions providing leave for pregnancy and pregnancy related conditions such as morning sickness. Riedler Aff. at ¶ 14.

Mr. Kim does not keep records of temporary employees' attendance, but he does keep an attendance record for each Accounting employee. Kim Aff. at ¶ 9. Mr. Kim's record of Plaintiff's attendance as a probationary employee shows that she had two (2) absences and was away from work for 3.5 hours or longer on five occasions, for a total of

---

[3] Since Plaintiff was a salaried employee, versus an hourly employee, her attendance was monitored by her supervisor, Mr. Kim, who kept meticulous records of his employees' attendance. Riedler Depo. at p. 28, l. 2 – p. 29, l. 4; p. 50, l. 2 – p. 51, l. 16.

seven occurrences between June 15, 2006 and August 11, 2006.[4]  Kim Aff. at ¶ 10.  Mr.

Kim's spreadsheet summarizing Plaintiff's attendance occurrences while she was a

probationary employee is recreated here for the Court's convenience.

| 2006 Absence Record - Tarsha Hunter | | | | |
|---|---|---|---|---|
| Date | # of Days | Hrs Taken | Accum. Hrs | Note |
| 06/15/2006 | 1 | 8 | 8 | Sick |
| 07/25/2006 | 1 | 3.5 | 11.5 | Doctor's appointment |
| 07/27/2006 | 1 | 3.5 | 15 | Doctor's appointment |
| 07/30/2006 | 1 | 6 | 21 | Sick |
| 08/01/2006 | 1 | 8 | 29 | Sick |
| 08/11/2006 | 1 | 4 | 33 | Doctor's appointment |
| 08/14/2006 | 1 | 4 | 37 | Doctor's appointment |

*See also* Attendance Spreadsheet, attached as Exhibit 1 to Kim Aff.

Plaintiff should have been terminated on July 27, 2006 after her third attendance

occurrence, but she wasn't because Mr. Kim was not familiar with the specific number of

attendance incidences allowed for probationary employees.[5]  Kim Aff. at ¶¶ 8, 11.  As a

result, Plaintiff remained employed almost one month longer than she should have, but

her termination ultimately came about as a result of the standard review process that

occurs for all probationary employees toward the end of their probationary period.  *Id.* at

¶ 11.

It is undisputed that Mr. Kim is a stickler for punctuality, attendance and timely

completion of work by his staff.  Riedler Aff. at ¶ 15; Womack Depo. at p. 53, l. 10-14.

Accounting is a small department and had only 7 to 8 employees during the relevant time.

---

[4] Plaintiff does not dispute the accuracy of Kim's attendance spreadsheet except that she says that the entry
for a half day off on August 14, 2006 actually occurred on August 9, 2006 because she notified Kim of her
need to be out and then changed her plans.  Plaintiff's Depo. at p. 79 l. 4 - p. 80, l. 8.
[5] Mr. Kim did address Plaintiff's attendance problems several times directly with Plaintiff and through Ms.
Womack.  Kim Depo. at p. 39, l. 22 – p. 40, l. 24.  *See* E-mails Concerning Plaintiff's Attendance, attached
as composite Exhibit 2 to Kim Aff.

When an Accounting staff person was absent, other employees had to perform the duties and responsibilities of that absent person. In Plaintiff's case, that person was usually her supervisor, Ms. Womack. Kim Depo. at p. 53, l. 15 – p. 56, l. 14.

### D.    THE NORMAL REVIEW PROCESS FOR PROBATIONARY EMPLOYEES ALERTED MOBIS' HUMAN RESOURCES DEPARTMENT TO THE FACT THAT PLAINTIFF WAS IN CLEAR VIOLATION OF THE ATTENDANCE POLICY.

MOBIS' Human Resources Department automatically sends a "90 Day Work Performance Review Sheet" ("Review Sheet") to the appropriate department head or supervisor prior to the end of an employee's probationary period. At this time, the department head or supervisor evaluates the suitability of the employee for regular employment and makes a recommendation. Riedler Aff. at ¶ 16; Kim Aff. at ¶ 13. Under MOBIS' policy the Review Sheet is required to be returned to Human Resources prior to the end of the probationary period. Riedler Aff. at ¶ 16.

On or about August 18, 2006, MOBIS' Human Resources Department sent Mr. Kim a Review Sheet for him to fill out on Ms. Hunter. Review Sheets are routinely sent to department heads and supervisors well in advance of the expiration of the probationary period so that the recipient can make a judgment prior to the end of 90 days. Riedler Aff. at ¶ 16; Kim Aff. at ¶ 13.

When Mr. Kim received the Review Sheet bearing Plaintiff's name, he consulted with Tracy Riedler, MOBIS' Senior Human Resources Manager ("Ms. Riedler).[6] Riedler Depo. at p. 112, l. 12 – p. 114, l. 12. Mr. Kim told Ms. Riedler that he did not think that

---

[6] MOBIS has taken steps to ensure that no anti-discriminations laws are violated as a result of mistake or misunderstanding. Tracy Riedler, MOBIS' Senior Human Resources Manager, must approve all terminations. Ms. Riedler has a Masters Degree in Human Resources Management and has worked in human resources for over 21 years. Ms. Riedler is well versed in employment law, including Title VII of the Civil Rights Act and the so-called "Pregnancy Act of 1978." Riedler Aff. at ¶¶ 3-6.

MOBIS should offer Plaintiff regular employment because of her poor attendance record. Kim Aff. at ¶ 14. Ms. Riedler inquired what Mr. Kim meant by "poor attendance," whereupon Mr. Kim retrieved his computer spreadsheet showing Plaintiff's seven (7) attendance occurrences. *See* Kim Aff. at ¶ 14 and Ex. 1. Ms. Riedler reviewed the spreadsheet and told Mr. Kim that Plaintiff had to be terminated because she had violated MOBIS' attendance policy for probationary employees by having more than three (3) occurrences. *Id;* Riedler Depo. at p. 112, l. 12 – p. 114, l. 12. She also instructed Mr. Kim that Plaintiff had to be terminated at that time, not at the end of 90 days, which in Hunter's case would have been September 2, 2006. *Id.*; Riedler Aff. at ¶ 17. This was Mr. Kim's first understanding of the specific requirements of the attendance policy for probationary employees. Kim Aff. at ¶ 15; Kim Depo. at p. 14, l. 17 – p. 18, l. 11.[7]

Riedler's meeting with Mr. Kim described above, which took place approximately one (1) week prior to Plaintiff's termination, was her first substantive involvement with Plaintiff's employment. Riedler Depo. at p. 112, l. 12 – 21. Ms. Riedler did not know that Plaintiff was pregnant when she made the decision to terminate Plaintiff's employment. Riedler Depo. at p. 115, l. 16 – p. 116, l. 17. In fact, it was not Mr. Kim who informed Ms. Riedler of Plaintiff's pregnancy, but rather Ms. Womack who told Ms. Riedler that Plaintiff was pregnant in the context of asking Ms. Riedler to reconsider MOBIS' decision to discharge Plaintiff for violating the attendance policy. Riedler Depo. at p. 115, l. 22 – p. 116, l. 17. Ms. Womack did not tell Riedler that Plaintiff was pregnant until on or about August 24, 2006, a day or so before MOBIS terminated

---

[7] The attendance policy for probationary employees, which was in place during Plaintiff's tenure, was not implemented until March of 2005. When Mr. Kim first started working for MOBIS, the policy allowing no more than two occurrences was not in place. Kim Aff. at ¶ 15. This change in policy may have lead to Mr. Kim's confusion. Riedler Aff. at ¶ 18.

Plaintiff.  Riedler Aff. at ¶ 19.  In sum, Ms. Riedler was the individual who made the final decision to terminate Plaintiff's employment, Riedler Depo. at p. 122, l. 15 – p. 123, l. 3, and she had no knowledge of Plaintiff's pregnancy at the time she made the decision.[8]  Ms. Riedler states unequivocally that Plaintiff was discharged for being absent three times in addition to four other occurrences of either being late to work or leaving work early.  Riedler Depo. at p. 127, l. 1-12; Riedler Aff. at ¶ 20.

Plaintiff knew from Ms. Womack that she was about to be terminated, so she asked for a meeting with Mr. Kim and Ms. Womack.  Riedler Depo. at p. 158, l. 1 – 7; Kim Aff. at ¶ 17.  During the meeting Mr. Kim thanked Plaintiff for her contributions to Accounting and told her that her employment was being terminated due to attendance. Plaintiff became loud, argumentative and insubordinate with Mr. Kim.  In essence, she accused him of lying to her about the real reason for her termination.  Mr. Kim was concerned that the meeting was getting out of control, so he summoned Ms. Riedler, who joined the participants.  Riedler Depo. at p. 159, l. 2 – 12; Kim Depo. at p. 89, l. 18 – p. 92, l. 15; Kim Aff. at ¶ 17.  Ms. Riedler reiterated to Plaintiff the attendance policy for probationary employees and informed her that MOBIS could not offer her regular employment and that she was terminated.  Plaintiff stated that she was aware of the policy regarding attendance during the probationary period.  She said she just didn't think that was the reason for her termination.  Plaintiff then left.  Riedler Depo. p. 159, l. 13 – p. 160, l. 20; Kim Aff. at ¶ 17; Riedler Aff. at ¶ 21.

---

[8]  Even if the Court determines that Mr. Kim made the decision to discharge Plaintiff, there still is no evidence that Plaintiff's pregnancy motivated his decision.  Mr. Kim testified unequivocally that Plaintiff's attendance problems led to her termination, not her pregnancy.  Kim Depo. at p. 86, l. 20 – p. 87, l. 8; p. 101, l. 6 – 16; *see also* Kim Aff. at ¶¶ 16, 18, 23.

E.    PLAINTIFF'S PREGNANCY.

Plaintiff became pregnant in May 2006, while still working as a Temp.  On June 5, 2006 Plaintiff discovered that she was pregnant from a home pregnancy test kit. Plaintiff informed Womack of her pregnancy that same day.  Ms. Womack testified that Plaintiff asked her not to tell Mr. Kim about the pregnancy.  Plaintiff Depo. at p. 96, l. 6 – 15; at p. 98, l. 2 – 6; Womack Depo. at p. 21, l. 8-9 (all citations to Womack's deposition are attached as Ex. F).   Plaintiff eventually informed Mr. Kim that she was pregnant on August 9, 2007, and claims that her pregnancy precipitated her termination more than two weeks later on August 25, 2006.[9]

Ms. Womack and Plaintiff discussed that MOBIS had terminated two pregnant employees and that Plaintiff might also be terminated if Mr. Kim learned of her pregnancy.  However, neither of the two terminated women worked in Accounting, and Mr. Kim was not involved in either termination.  Kim Aff. at ¶ 22.  Neither Plaintiff nor Ms. Womack knew the terminated women or any of the circumstances of their terminations.  Plaintiff Depo. at p. 96, l. 9 – p. 100, l. 1; Womack Depo. at p. 21, l. 10-19. Their only knowledge was that both women were pregnant at the time they were terminated and that there were rumors that pregnancy was the reason.  In fact, Plaintiff

---

[9] MOBIS erroneously stated in its EEOC response that Mr. Kim was not aware of Plaintiff's pregnancy when he contacted MOBIS' Human Resources Department about not offering regular employment to Plaintiff due to her attendance problems.  It is now known that Mr. Kim learned of Plaintiff's pregnancy on or about August 9, 2006, when Plaintiff brought an ultrasound picture to work and showed it to Mr. Kim and others, and Mr. Kim congratulated Plaintiff on the news.  Plaintiff Depo. at p. 109, l. 5-12; Kim Depo. at p. 86, l. 16-19; Kim Aff. at ¶ 19.  Mr. Kim did not speak with Ms. Riedler about Plaintiff's Review Sheet and attendance problem until approximately August 18, 2006, one week prior to her termination on August 25, 2006.  Thus, Kim did know that Plaintiff was pregnant when he contacted Ms. Riedler about the Review Sheet.  This error in the EEOC Response resulted from problems the undersigned counsel had communicating verbally with Mr. Kim, as well as from Ms. Riedler's uncertainty about when Mr. Kim learned of Plaintiff's pregnancy.  The excerpts from Mr. Kim's deposition that are cited in this brief clearly illustrate Mr. Kim's limited command of the English language, and the difficulty that both Plaintiff's counsel and MOBIS' own counsel had communicating with him.  *See also* Kim Aff. at ¶ 25.

admits that Ms. Womack never said that Mr. Kim discriminated against another pregnant employee, and Plaintiff admits that she has no reason to believe that Mr. Kim discriminated against another pregnant employee. Plaintiff Depo. at p. 100, l. 9 – 21.

The two women in question are LaJarra Jefferson and Shalonda Gordon, both of whom were pregnant when terminated. Ms. Jefferson was terminated for taking FMLA leave without submitting a proper medical certification that she needed to be on leave. Riedler Depo. at p. 41, l. 15 – p. 42, l. 24. MOBIS warned Ms. Jefferson that her unexcused absences were counting against her under MOBIS' "no fault" attendance policy for regular hourly employees, and that she would be terminated unless she provided proper medical certification. Ms. Jefferson refused to return to work and did not furnish a medical certification stating that she had a medical need for leave. *Id.* To the contrary, her first two physicians recommended work restrictions that MOBIS told Jefferson it could accommodate. Eventually, Jefferson went to a third doctor, who provided a medical certification that designated a start date for Jefferson's leave, which was after Jefferson had been terminated for attendance points. Riedler Aff. at ¶ 22.

Shalonda Gordon was terminated for improper and destructive work techniques. Riedler Depo. at p. 38, l. 6 – p. 39, l. 21. Specifically, she was jerking wires instead of unplugging them and damaging the connections on sensitive diagnostic equipment used to conduct quality tests on cockpit (dashboard) assemblies. The supplemental restraint system (airbags) is among the components involved in the testing. For obvious reasons, Gordon's work techniques posed potential quality and safety issues. MOBIS warned Gordon on several occasions about her misconduct before terminating her. *Id.*; Riedler Aff. at ¶ 23.

F.    PLAINTIFF'S ALLEGATIONS.

Plaintiff alleges that Mr. Kim terminated her because she was pregnant. She also alleges that Mr. Kim further discriminated against her by communicating with her through her supervisor, Ms. Womack, after she became pregnant. Plaintiff Depo. at p. 178, l. 6 – 17. MOBIS can demonstrate conclusively that Mr. Kim's regular preference is to communicate with employees in Accounting through their supervisor when practical. Kim Aff. at ¶ 19. In other words, Mr. Kim, who believes in formality in business discourse, routinely communicates with the employees in his department through their supervisors. *Id.* Nothing changed in that regard after Mr. Kim learned of Hunter's pregnancy. In fact, Plaintiff's own witness, Ms. Womack, testified that Mr. Kim was always "kind of moody" or "distant" and that while she had a "feeling" that he may have been communicating more through her to Plaintiff, "like I said, he's just kind of like that when anything—any kind of changes occur like absence or tardies or anything." Womack Depo. at p. 27, l. 10 – p. 28, l. 16. In short, Mr. Kim did not treat Plaintiff more or less favorably than any other similarly-situated employee, and his behavior towards her did not change when he found out that she was pregnant.

Finally, Plaintiff alleges that additional evidence of discrimination was Mr. Kim's statement that he "can't take care of a person like [Hunter]." Plaintiff Depo. at p. 178, l. 18 – p. 179, l. 9. Mr. Kim uses that phrase to convey that he expects his staff to handle their responsibilities without unnecessarily involving him or others. Kim Aff. at ¶ 20; Kim Depo. at p. 75, l. 9 – p. 76, l. 6 ("that means I don't want to work with her in accounting and financing"). It is Mr. Kim's way of saying that he does not need an employee who is not generally self-sufficient, and frequently necessitates his

involvement and that of other departmental employees.  Kim Aff. at ¶ 20.  Plaintiff's

witness Ms. Womack agreed that the phrase "take care of a person" meant "just their

work."  Womack Depo. at p. 47, l. 11-24.  Kim used the phrase "take care of . . ." eight

times during his deposition, all with reference to getting work done.  Kim Depo. at p. 34,

l. 13; p. 34, l. 18; p. 38, l. 10; p. 41, l. 12-13; p. 41, l. 20-21; p. 51, l. 20-21; p. 54, l. 16-

19; p. 77, l. 25.

### 1. LaToya Williams Cannot be a Similarly Situated Comparator Because She Was Never Offered Probationary Employement Since She Also Had Attendance Problems.

During Mr. Kim and Ms. Womack's depositions, Plaintiff's counsel questioned

Mr. Kim and Ms. Womack about former Accounting employee LaToya Williams.  Kim

Depo. at p. 20, l. 21 – p. 22, l. 11; Womack Depo. at p. 37, l. 14 – p. 38, l. 19.  It was

evident from the questions asked that Plaintiff believed or suspected that Ms. Williams

was a similarly situated female probationary employee who was not pregnant, had

violated the attendance policy, but was not terminated.  This is not the case.

Ms. Williams, an accounting clerk, came to work at MOBIS through a temporary

agency like Plaintiff.  She also had attendance problems as a Temp.  Due to those

attendance problems, MOBIS never offered probationary employment to Ms. Williams,

so as it turns out Plaintiff, was given more favorable consideration than Ms. Williams

because Mr. Kim gave Plaintiff probationary employment despite her attendance

problems as a Temp and his reluctance to hire her.  Riedler Aff. at ¶ 24.

In sum, Plaintiff admits that she understood MOBIS' attendance policy for

probationary employees and knew that it applied to her.  Plaintiff Depo. at p. 73, l. 3 – p.

74, l. 22; p. 142, l. 1-5.  She also acknowledges that no one ever told her anything to the

contrary. *Id.* Plaintiff has not identified any similarly situated employee who was not pregnant, and who was allowed to exceed the two incidents permitted by MOBIS' attendance policy. Because there is no genuine issue of disputed fact that Plaintiff was terminated because she was in clear violation of MOBIS' attendance policy, MOBIS is entitled to judgment as a matter of law.

### III.    SUMMARY JUDGMENT STANDARD

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is proper "if the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Jameson v. Arrow Co.*, 75 F.3d 1528 (11th Cir. 1996). The party asking for summary judgment bears the initial burden of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing, or by pointing out to, the district court that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *Id.* at 322-24.

Once the moving party has met its burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing there is a genuine issue for trial.' " *Id.* at 324. Thus, in response to MOBIS'

submissions, Hunter must, by her own affidavits, deposition excerpts, answers to interrogatories or other proper evidence, designate the specific material facts showing that there is a genuine issue for trial. *Celotex*, 477 U.S. at 324. A dispute about a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Hunter must meet her burden by doing more than "simply show[ing] that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Furthermore, "[i]n an employment discrimination case, the plaintiff must produce sufficient evidence to support an inference that the defendant employer based its employment decision on an illegal criterion." *Jameson*, 75 F.3d at 1531; *see also Alphin v. Sears Roebuck & Co.*, 940 F.2d 1497, 1500 (11th Cir. 1991).

Thus, to the extent that MOBIS shows that Hunter will be unable to offer evidence sufficient to establish an element essential to any of her claims on which she will bear the burden of proof at trial or to the extent that MOBIS argues that such a deficiency exists and Hunter fails to offer the Court sufficient evidence in her responsive summary judgment submissions, MOBIS is entitled to summary judgment.

## IV.    ARGUMENT

### A.    PLAINTIFF'S BURDEN OF PROOF UNDER TITLE VII AND THE PREGNANCY DISCRIMINATION ACT.

In 1978, Congress amended Title VII of the Civil Rights Act of 1964 to include the Pregnancy Discrimination Act (PDA), which provides protection for women against discrimination based on pregnancy or pregnancy related conditions. 42 U.S.C.2000e(k) (1981). Title VII provides, in relevant part, "[i]t shall be an unlawful employment

practice for an employer (1) to fail or refuse to hire or to discharge or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin...."  42 U.S.C.2000e-2(a)(1).   Congress has expanded the Act's definitional section to encompass pregnancy-based discrimination under the definition of sex discrimination:

> The terms "because of sex" or "on the basis of sex" include, but are not limited to, because or on the basis of pregnancy, childbirth, or related medical conditions; and women affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment related purposes ...

*Id.* at 2000e(k).  The analysis required to prove a pregnancy discrimination claim mirrors that of a Title VII sex discrimination claim.  *Maddox v. Grandview Care Center, Inc.,* 780 F.2d 987, 989 (11th Cir. 1986); *Armstrong v. Flowers Hosp., Inc.,* 33 F.3d 1308, 1312-13 (11th Cir. 1994); *Harper v. Blockbuster Entm't Corp.,* 139 F.3d 1385, 1387 (11th Cir. 1998).

Generally, plaintiffs can establish employment discrimination under Title VII using the direct evidence framework set forth in *Price Waterhouse v. Hopkins,* 490 U.S. 228 (1989), or the circumstantial evidence framework set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973).  Under either the direct evidence or circumstantial evidence models, the plaintiff bears the burden of showing that the employer purposely took adverse action against her because of her pregnancy.  *Hipp v. Liberty Nat. Life Ins. Co.,* 252 F.3d 1208, 1230 n. 34 (11th Cir. 2001); *Armstrong v. Flowers Hospital,* 33 F.3d 1308, 1314 (11th Cir. 1994).  In the present case, Plaintiff has not presented any direct

evidence of discrimination.

In Title VII cases based upon circumstantial evidence, such as the case at bar, the Court turns to the burden-shifting framework established in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802-804 (1973). Under this approach, plaintiff initially bears the burden of establishing a *prima facie* case of discrimination. *Texas Dept. of Cmty. Affairs v. Burdine,* 450 U.S. 248, 252-53, 254 (1981). The burden then shifts to defendant to articulate a legitimate, nondiscriminatory reason for its action. *Burdine,* 450 U.S. at 253. If the defendant articulates a legitimate, nondiscriminatory reason, the plaintiff can avoid summary judgment by producing sufficient evidence for a reasonable factfinder to conclude that each of the employer's proffered nondiscriminatory reasons is pretextual. *Chapman v. AI Transport,* 229 F.3d 1012, 1037 (11th Cir. 2000) (citing *Combs v. Plantation Patterns,* 106 F .3d 1519, 1543 (11th Cir.1997).

A plaintiff establishes a *prima facie* case of discrimination under the PDA/Title VII by showing: (1) she belongs to a "protected" class; (2) she was qualified to do her job; (3) she suffered an adverse employment action; and (4) her employer treated similarly situated employees outside her classification more favorably. *Holifield v. Reno,* 115 F.3d 1555, 1562 (11th Cir.1997) (citing *McDonnell Douglas,* 411 U.S. at 802); *see also Armstrong,* 33 F.3d at 1314 (describing the fourth prong as follows: "that she suffered from differential application of work or disciplinary rules"). In other words, "an employer violates the PDA when it denies a pregnant employee a benefit generally available to temporarily disabled workers holding similar job positions." *Spivey,* 196 F.3d at 1313 (citing *Byrd v. Lakeshore Hosp.,* 30 F.3d 1380, 1383-84 (11th Cir. 1994) (finding that, even if plaintiff could not point to specific, disabled employees who were

treated better than she was treated, she could establish a presumption of pregnancy discrimination by showing, for example, that taking advantage of her employer's generally available sick leave policy for her pregnancy-related time off from work was a substantial cause of her discharge)).

Once a plaintiff has established her *prima facie* case and the employer has proffered a legitimate and nondiscriminatory reason for the adverse employment action, to avoid summary judgment, a plaintiff may establish pretext by undermining the credibility of the defendant's proffered explanations. *See Combs,* 106 F.3d at 1538; *Burdine* 450 U.S. at 256 (plaintiff can establish that she was the victim of intentional discrimination by "showing that the employer's proffered explanation is unworthy of credence."). Sufficient evidence that the employer's justification is false can, in appropriate circumstances, allow the trier of fact to reasonably infer that the employer unlawfully discriminated. *Reeves v. Sanderson Plumbing Products, Inc.,* 120 S.Ct. 2097, 2108 (2000). Rather than relying on conclusory allegations of discrimination, the plaintiff must come forward with evidence demonstrating "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable fact finder could find them unworthy of credence." *Combs,* 106 F.3d at 1538.

**B.    PLAINTIFF DOES NOT MAKE OUT A *PRIMA FACIE* CASE FOR PREGNANCY DISCRIMINATION.**

Since Plaintiff has no direct evidence of discrimination, she has to prove the following to establish a *prima facie* case of discrimination under the PDA/Title VII: (1) she belongs to a "protected" class; (2) she was qualified to do her job; (3) she suffered an adverse employment action; and (4) her employer treated similarly situated employees

outside her classification more favorably. *Holifield*, 115 F.3d at 1562. In Plaintiff's Complaint, she alleges that MOBIS "treated similarly situated, non-pregnant employees more favorably than Ms. Hunter," yet she has not identified these comparators. *See* Complaint at ¶ 27. Therefore, Plaintiff fails to make out a *prima facie* case of pregnancy discrimination under the PDA and Title VII because she cannot prove that MOBIS treated a similarly situated employee any differently than it treated her. In other words, Plaintiff cannot show that she suffered, due to her pregnancy, from a differential application of work or disciplinary rules because she has not identified a non-pregnant employee who had more than three attendance occurrences during their probationary period and was hired as a regular employee.

1.    **PLAINTIFF HAS NOT IDENTIFIED A SIMILARLY SITUATED COMPARATOR WHO WAS ALLOWED TO VIOLATE MOBIS' ATTENDANCE POLICY.**

Plaintiff has not identified any other employee at MOBIS who was similarly situated to her, i.e., who had more than two attendance occurrences during their probationary period and who was hired as a permanent employee. At the time of Plaintiff's discharge, she had seven attendance occurrences during her probationary period and the maximum allowed under MOBIS' attendance policy is two occurrences.

During Mr. Kim and Ms. Womack's depositions, Plaintiff's counsel questioned Mr. Kim and Ms. Womack about former Accounting employee LaToya Williams. It was evident from the questions asked that Plaintiff believed or suspected that Ms. Williams was a similarly situated female probationary employee who was not pregnant, had violated the attendance policy, but was not terminated. In reality, however, while Ms. Williams, an accounting clerk, came to work at MOBIS through a temporary agency like Plaintiff, she also had attendance problems as a Temp. Due to those attendance

problems, MOBIS never offered probationary employment to Ms. Williams. Therefore, it turns out that Plaintiff was given more favorable consideration than Ms. Williams because Mr. Kim gave Plaintiff probationary employment despite her attendance problems as a Temp. Riedler Aff. at ¶ 24.

As of the filing of this brief, Plaintiff has not identified a single similarly situated employee who was not pregnant and who received different or more favorable treatment than did Plaintiff. Plaintiff was asked about such comparators during her deposition and could not identify any. Additionally, MOBIS has had an interrogatory outstanding to Plaintiff since August 22, 2007, asking Plaintiff to identify any such comparators. Moreover, Ms. Riedler is not aware of any such comparators and does not believe that any exist.

Plaintiff carries the burden of proving her *prima facie* case, which includes identifying a non-pregnant probationary employee who had attendance problems and who was hired as a regular MOBIS employee, and she fails to meet that burden. There is no genuine issue of fact regarding a similarly situated comparator because Plaintiff has failed to identify a single one. Because Plaintiff cannot identify any similarly situated comparators who were treated more favorably than her (because they do not exist), she fails to make out her *prima facie* case for pregnancy discrimination, and MOBIS is entitled to judgment as a matter of law.

**C.    EVEN IF THE COURT FINDS THAT PLAINTIFF MAKES OUT A *PRIMA FACIE* CASE OF PREGNANCY DISCRIMINATION, MOBIS IS STILL ENTITLED TO SUMMARY JUDGMENT BECAUSE ITS REASON FOR DISCHARGING HUNTER WAS LEGITIMATE AND NOT A PRETEXT FOR DISCRIMINATION.**

Pursuant to the burden-shifting framework established in *McDonnell Douglas,* 411 U.S. at 802-804, plaintiff initially bears the burden of establishing a *prima facie* case

of discrimination, and then the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its action. *Burdine,* 450 U.S. at 253. Once the defendant articulates a legitimate, nondiscriminatory reason, the plaintiff must produce sufficient evidence for a reasonable fact finder to conclude that each of the employer's proffered nondiscriminatory reasons is pretextual to avoid summary judgment. *Chapman,* 229 F.3d at 1037.

Thus, only if the Court finds that Plaintiff has established a *prima facie* case of discrimination does the burden then shift to MOBIS to articulate a legitimate, nondiscriminatory reason for its actions. Since MOBIS can articulate legitimate, nondiscriminatory reasons, Plaintiff must produce sufficient evidence for a reasonable factfinder to conclude that each of MOBIS' proffered nondiscriminatory reasons is pretextual to avoid summary judgment. Plaintiff cannot rely on conclusory allegations of discrimination, but must come forward with evidence demonstrating "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable fact finder could find them unworthy of credence." *Combs,* 106 F.3d at 1538.

MOBIS' reason for terminating Plaintiff was legitimate and not a pretext for discrimination. As described above, all new employees at MOBIS, including those who have worked as Temps, serve a 90-day probationary period during which their suitability for the fast paced and exacting work environment is evaluated. The attendance policy for probationary employees provides that such employees are to be terminated after three

23

(3) attendance "occurrences."[10]    Riedler Depo. at p. 48, l. 17 – p. 49, l. 18.    An occurrence is defined as an absence for all or part of the day, a tardy, or an early departure from work.  *Id.*  This is a so-called "no fault" policy, meaning that probationary employees are allowed two (2) incidences and are terminated after the third no matter what the reason for the incident, with few exceptions such as jury duty or bereavement. Riedler Depo. at p. 51, l. 5-16; Riedler Aff. at ¶ 13.

It is undisputed that Plaintiff read and understood the Handbook and the policy governing probationary employees. Plaintiff Depo. at p. 73, l. 3 – p. 74, l. 22; p. 142, l. 1-5.    Plaintiff also acknowledged that no one ever told her she was exempt from the probationary policy or that it would not apply to her in all respects.  *Id.*  It is undisputed that Mr. Kim is a stickler for punctuality, attendance and timely completion of work by his staff.  Womack Depo. at p. 53, l. 10-14.  And finally, it is undisputed that Plaintiff was in clear violation of the attendance policy because she had seven attendance occurrences comprised of three absences in addition to four tardies or early departures. *See* Kim Aff. at ¶¶ 14, 15  and Ex. 1.

Even Plaintiff's own witness, Ms. Womack, agreed that Plaintiff's termination was due to her attendance problems.  In response to Plaintiff's attorney's inquiry about Mr. Kim's reason for discharging Plaintiff, Ms. Womack responded: "It had to have been because of the tardies, because that's what he kept telling me, because of the absences and the tardies and things."  Womack Depo. at p. 36, l. 19-24; *see also* Womack Depo. at p. 29, l. 22 – p. 30, l. 2.  Ms. Womack also testified that the day before Plaintiff was terminated, Mr. Kim informed her that he was terminating Plaintiff's employment

---

[10]    Since Plaintiff was a salaried employee, versus an hourly employee, her attendance was monitored by her supervisor, Mr. Kim, who kept meticulous records of his employees' attendance.  Riedler Depo. at p. 28, l. 2 – p. 29, l. 4; p. 50, l. 2 – p. 51, l. 16.

"because he hadn't been satisfied through her ninety-day probation, and he had given several warnings about tardies and being absent and things like that." *Id.* at p. 29, l. 10 – p. 30, l. 2.[11]

In sum, MOBIS discharged Plaintiff because she violated the attendance policy. Riedler Aff. at ¶ 20. This legitimate, nondiscriminatory reason entitles MOBIS to summary judgment.

**D.    PLAINTIFF CANNOT SHOW PRETEXT BECAUSE THERE IS NO EVIDENCE THAT MR. KIM OR MS. REIDLER ACTED WITH A DISCRIMINATORY MOTIVE.**

Plaintiff cannot produce any evidence that Ms. Reidler or Mr. Kim discharged her because of a discriminatory motive. Ms. Reidler was the ultimate decision-maker who advised Mr. Kim of the changed attendance policy, as well as the fact that Mr. Kim could not retain Plaintiff as an employee since she was in clear violation of the policy. Riedler Aff. at ¶ 20. As described in detail above, Ms. Riedler's first substantive involvement with Plaintiff's employment was the meeting with Mr. Kim, which took place approximately one week prior to Plaintiff's termination. Riedler Depo. at p. 112, l. 12 – 21. Ms. Riedler did not know that Plaintiff was pregnant when she made the decision to terminate Plaintiff's employment. Riedler Depo. at p. 115, l. 16 – p. 116, l. 17; Riedler Aff. at ¶ 19. In other words, Ms. Riedler was the individual who decided to terminate Plaintiff's employment, Riedler Depo. at p. 122, l. 15 – p. 123, l. 3, and she had no knowledge of Plaintiff's pregnancy. There is no disputed fact that Ms. Riedler

---

[11]    During this meeting with Mr. Kim the day before Plaintiff's discharge, Ms. Womack also states that she told Mr. Kim that she "*felt* like [Plaintiff] was being terminated because she was pregnant." Womack Depo. at p. 35, l. 12-14. Neither Plaintiff nor Ms. Womack offers any evidence to support this *feeling* that she had, and the law on Title VII clearly states that conclusory allegations of discrimination do not create a genuine issue of fact for purposes of summary judgment. *Combs,* 106 F.3d at 1538. Ms. Womack also believes that she shared this sentiment with Ms. Riedler after Ms. Riedler had decided to terminate Plaintiff's employment, but Ms. Riedler has no recollection of any such statement by Ms. Womack, although Ms. Riedler does recall a conversation with Ms. Womack wherein Ms. Womack was upset about Plaintiff's discharge. Riedler Depo. at p. 116, l. 1 – p. 117, l. 7.

discharged Plaintiff for being absent three times in addition to four other occurrences of either being late to work or leaving work early.  Riedler Depo. at p. 127, l. 1-12; Riedler Aff. at ¶ 20.

There is likewise no evidence that Plaintiff's pregnancy motivated Mr. Kim's decision to not want to retain Plaintiff as an employee in Accounting.  Mr. Kim testified unequivocally that Plaintiff's attendance problems led to her termination, not her pregnancy. Kim Depo. at p. 86, l. 20 – p. 87, l. 8; p. 101, l. 6 – 16; Kim Aff. at ¶¶ 14, 15, 18, 23, 24.  Additionally, Plaintiff's allegations of pretext do not create a genuine issue of fact. Plaintiff cannot rely on conclusory allegations or suspicions of discrimination, but must come forward with evidence demonstrating "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable fact finder could find them unworthy of credence." *Combs,* 106 F.3d at 1538.

Plaintiff's allegations that Mr. Kim further discriminated against her by communicating with her through her supervisor Ms. Womack after she became pregnant are unsupported.  Mr. Kim is a Korean businessman whose preference is to communicate with employees in Accounting through their supervisor when practical.  Kim Aff. at ¶ 19. In other words, Mr. Kim, who believes in formality in business discourse, routinely communicates with the employees in his department through their supervisors.  Nothing changed in that regard after Mr. Kim learned of Hunter's pregnancy. *Id;* Womack Depo. at p. 27, l. 10 – p. 28, l. 16 (Mr. Kim was always "kind of moody" or "distant" and "like I said, he's just kind of like that when anything—any kind of changes occur like absence or tardies or anything.").  In fact, when counsel questioned Ms. Womack about whether she

thought Mr. Kim was a "bad person," Ms. Womack responded that "I could tell he has a soft heart . . . ." Womack Depo. at p. 46, l. 18-23. Therefore, Plaintiff's own witness, a person who worked closely with Mr. Kim, thought he has a kind-hearted individual, hardly a person who would discriminate against a pregnant employee. Plaintiff herself admits that she never heard Mr. Kim say anything derogatory about women or pregnancy. Plaintiff Depo. at p. 192, l. 20 – p. 193, l. 4. In short, Plaintiff has not come forward with any evidence that Mr. Kim treated Plaintiff more or less favorably than any other similarly-situated employee, and there is likewise no evidence that his behavior towards her changed when he found out that she was pregnant.

Additionally, the Court should also summarily dismiss Plaintiff's allegation that additional evidence of discrimination is Mr. Kim's statement that he "can't take care of a person like [Hunter]." Mr. Kim uses that phrase to convey that he expects his staff to handle their responsibilities without unnecessarily involving him or others. Kim Depo. at p. 75, l. 9 – p. 76, l. 6; Kim Aff. at ¶ 20. It is Mr. Kim's way of saying that he does not need an employee who is not generally self-sufficient, and frequently necessitates his involvement and that of other departmental employees. *Id.* Plaintiff's witness Ms. Womack agreed that the phrase "take care of a person" meant "just their work." Womack Depo. at p. 47, l. 11- 24. In short, there is no evidence that Mr. Kim's statement had anything to do with Plaintiff's pregnancy. Therefore, Plaintiff's allegations that MOBIS legitimate reason for terminating Plaintiff's employment, her clear violation of the attendance policy, was a pretext for discrimination are unsubstantiated and should be dismissed as a matter of law.

1    **PLAINTIFF'S INSINUATIONS THAT THREE OTHER PREGNANT EMPLOYEES WERE DISCRIMINATORILY DISCHARGED ARE SIMPLY UNSUBSTANTIATED RUMORS.**

Plaintiff testified that her suspicions on discrimination are based in large part on the terminations of two pregnant employees and the departure of another pregnant employee. With regard to the women who were terminated, neither Plaintiff nor Ms. Womack knew the terminated women or any of the circumstances of their terminations. Plaintiff Depo. at p. 96, l. 9 – p. 100, l. 1; Womack Depo. at p. 21, l. 10-19.  Their only knowledge was that both women were pregnant at the time they were terminated and that there were rumors that pregnancy was the reason.

Plaintiff admits that when she told Ms. Womack that she was pregnant, and they discussed not telling Mr. Kim because of the rumors about the other pregnant employees who were terminated, Ms. Womack never said that Mr. Kim discriminated against another pregnant employee, and Plaintiff admits that she has no reason to believe that Mr. Kim discriminated against another pregnant employee.  Plaintiff Depo. at p. 100, l. 9 – 21.  In fact, when questioned about the rumors, Ms. Womack testified that: "I had heard - - I don't know specifically, but I just kind of heard, like, rumors or whatever that other people had been -- and *I'm not saying it was because of being pregnant, but it just so happened the person was pregnant*."  Womack Depo. at p. 21, l. 10-19.  Clearly, this speculation that Mr. Kim would discriminate against Plaintiff because of unsubstantiated supposition that other supervisors at MOBIS terminated other pregnant employees cannot form the basis for Plaintiff's argument that her termination was a pretext for discrimination.

### a) LaJarra Jefferson.

In contrast, the uncontroverted evidence shows that the two women in question are LaJarra Jefferson and Shalonda Gordon, both of whom were pregnant when terminated. Ms. Jefferson was terminated for taking FMLA leave without submitting a proper medical certification that she needed to be on leave. Riedler Depo. at p. 41, l. 15 – p. 42, l. 24. MOBIS warned Ms. Jefferson that her unexcused absences were counting against her under MOBIS' "no fault" attendance policy for regular hourly employees, and that she would be terminated unless she provided proper medical certification. Ms. Jefferson refused to return to work and did not furnished a medical certification stating that she had a medical need for leave. *Id.* To the contrary, her first two physicians recommended work restrictions that MOBIS told Jefferson it could accommodate. Eventually, Jefferson went to a third doctor, who provided a medical certification that designated a start date for Jefferson's leave, which was after Jefferson had been terminated for attendance points. *Id.*; Riedler Aff. at ¶ 22.

### b)    Shalonda Gordon.

Shalonda Gordon was terminated for improper and destructive work techniques. Riedler Depo. at p. 38, l. 6 – p. 39, l. 21. Specifically, she was jerking on wires instead of unplugging them and damaging the connections on sensitive diagnostic equipment used to conduct quality tests on cockpit (dashboard) assemblies. The supplemental restraint system (airbags) is among the components involved in the testing. For obvious reasons, Gordon's work techniques posed potential quality and safety issues. MOBIS warned Gordon on several occasions about her misconduct before terminating her. *Id.*; Riedler Aff. at ¶ 23.

c)    SUJIN LEE.

The third pregnant employee to which Plaintiff alluded during depositions is former MOBIS employee SuJin Lee. Plaintiff's only knowledge of Ms. Lee is based on a conversation that another employee, Nicole Boswell, allegedly overhead between Mr. Kim and Ms. Lee. Plaintiff testified that Ms. Boswell told her that she overheard Mr. Kim saying that Ms. Lee's pregnancy was a disgrace. Plaintiff Depo. at p. 222, l. 22 – p. 224, l. 7.

The uncontroverted facts show that MOBIS hired Ms. Lee in 2006 at Mr. Kim's recommendation. Mr. Kim knew that Ms. Lee was newly pregnant at the time that he hired her, and Mr. Kim told her that he was very happy for her. Ms. Lee voluntarily left MOBIS after a few months because her husband wanted to return to Korea to pursue business opportunities there. Kim Aff. at ¶ 21. When questioned about Plaintiff's allegation that Mr. Kim viewed Ms. Lee's pregnancy as a disgrace, Mr. Kim explained that there must have been a misunderstanding because he was very happy for Ms. Lee since she had experienced two miscarriages and he urged her to be very careful with her third pregnancy. Kim Depo. p. 96, l. 12 – p. 100, l. 23. Additionally, Ms. Womack never observed Mr. Kim treating Ms. Lee any differently than any other employee. Womack Depo. at p. 44, l. 10 – p. 45, l. 7. Clearly, Plaintiff's allegation concerning Mr. Kim's reference to Ms. Lee's pregnancy as a disgrace is unsupported hearsay and cannot be used to show that Plaintiff's termination was a pretext for discrimination. In short, the factual circumstances surrounding Ms. Lee do not support Plaintiff's allegation that Mr. Kim treated pregnant employees any differently.

It cannot be disputed that MOBIS has had many employees take FMLA leave for pregnancy and return to their former positions without incident. MOBIS treats pregnancy the same as any other illness or sickness with regard to its attendance policies. Riedler Aff. at ¶ 25. Plaintiff's only showing in that regard is her misunderstanding based on rumors and hearsay that MOBIS had terminated the two aforementioned pregnant employees, and that Mr. Kim referred to another employee's pregnancy as a "disgrace," none of whom she knew and about which she knew nothing. Plaintiff Depo. at p. 96, l. 9 – p. 100, l. 1. This "evidence" does not create an issue of fact for purposes of summary judgment.

In sum, Plaintiff's allegations of pregnancy discrimination are supported by nothing more than rumors, suspicions, and unsupported supposition. Plaintiff cannot produce any evidence that MOBIS' legitimate reason for discharging Plaintiff, that she was in clear violation of the attendance policy, was a pretext for a discriminatory motive. Therefore, MOBIS is entitled to summary judgment as a matter of law.

## V.    CONCLUSION

In conclusion, MOBIS terminated Hunter's employment for reasons that are objectively legitimate, nondiscriminatory and non-pretextual. Hunter's attendance and dependability were not acceptable the entire time she was an employee at MOBIS, and she was not treated any differently than any other similarly-situated employee. Plaintiff has not shown that she was a victim of discrimination, only that she did not receive preferential treatment. For the foregoing reasons, MOBIS submits that this Court should enter summary judgment in its favor as to all counts against it contained in Hunter's

Complaint, dismiss the Complaint and all claims in this lawsuit against MOBIS with prejudice, and tax costs against Plaintiff.

Respectfully submitted,

/s/ Henry C. Barnett, Jr.
**HENRY C. BARNETT, JR. (BAR 037)**
*ATTORNEY FOR DEFENDANTS*

**OF COUNSEL:**
CAPELL & HOWARD, P.C.
150 South Perry Street
Post Office Box 2069
Montgomery, AL  36102-2069
Telephone:  (334) 241-8000
Facsimile:  (334) 241-8259

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing instrument was served upon the following via CM/ECF Electronic Filing System on this the 31st day of March, 2008.

Heather N. Leonard
Heather N. Leonard, P.C.
2108 Rocky Ridge road
Suite 1
Birmingham, Alabama 35216

/s/ Henry C. Barnett, Jr.
OF COUNSEL

# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| TARSHA NICKOL HUNTER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No.: 2:07-CV-427-WHA |
| vs. | ) | |
| | ) | |
| MOBIS ALABAMA, LLC, | ) | |
| | ) | |
| Defendant. | ) | |

## AFFIDAVIT OF TRACY RIEDLER

STAT E OF ALABAMA    )

COUNTY OF ELMORE    )

**BEFORE ME**, the undersigned authority, personally appeared Tracy Riedler who, after being first duly sworn, states as follows:

1.    My name is Tracy Riedler. I reside in Montgomery, Alabama. I am over 19 years of age and have first-hand knowledge of the matters stated in this affidavit.

2.    MOBIS Alabama, LLC ("MOBIS") is a Tier One supplier of cockpit and chassis module assemblies, plastic bumpers and door trim molding to Hyundai Motor Manufacturing Company ("Hyundai"). MOBIS' headquarters and manufacturing plant are located at 1395 Mitchell Young Road, Montgomery, Alabama. MOBIS commended production in 2005 and has approximately 800 employees.

3.    I have been employed by MOBIS as its Senior Human Resources Manager since January 20, 2004. Prior to that, I was employed by Thermalex, Inc. in Human Resources for

approximately nine (9) years.  Before my employment at Thermalex, I was employed in Human Resources at CH2M Hill for approximately eight and one half (8 ½) years.

4.    As MOBIS' Senior Human Resources Manager, I oversee all human resources, payroll, recruiting, compensation, benefits, environmental health and safety and general administrative functions.  I have a staff of nineteen (19) individuals comprising four (4) departments under the umbrella of Human Resources:  General Administration; HR Functions; Environmental, Health, and Safety; and Team Relations.

5.    I have a B.S. Degree in Business Administration (Management) from Troy State University and a Masters Degree in Human Resources Management also from Troy.

6.    I am familiar with Title VII of the Civil Rights Act of 1964, including what is known as the "Pregnancy Discrimination Act."

7.    I have reviewed Plaintiff's personnel file, which is maintained under my supervision and which shows that Plaintiff first worked at MOBIS on March 6, 2006 as a temporary employee ("Temp") furnished to MOBIS by Multi-Staffing, a local employment agency. Plaintiff was assigned to work in the Accounting Department ("Accounting") as an Accounting Specialist Treasury.   A copy of Plaintiff's job description is attached hereto as Exhibit "1."

8.    Plaintiff's time records from Multi-Staffing for the ninety (90) day period she worked as a Temp are attached as Exhibit "2."   I prepared the cover chart summarizing Plaintiff's attendance using the Multi-Staffing records.   Multi-Staffing's records show that Plaintiff was absent, tardy or left early seventeen (17) times in the course of only ninety (90) days.

9.     MOBIS' agreement with Multi-Staffing allows MOBIS to hire Temps furnished by that agency without paying a fee after the Temp has worked at MOBIS for three hundred sixty (360) hours or nine (9) weeks.

10.     On June 5, 2006, MOBIS offered Plaintiff probationary employment.  All new employees at MOBIS, including those who have worked as Temps served a ninety (90) day probationary period during which their suitability for working in MOBIS' fast paced environment is evaluated.  The probationary period also gives the employee an opportunity to decide whether he/she would be happy working long term at MOBIS.

11.     Plaintiff attended a full day orientation program, during which MOBIS' Employee Handbook and specifically MOBIS' policy on probationary employees were reviewed and explained. Copies of MOBIS' Attendance Policy for Probationary Employees and Plaintiff's Handbook Acknowledgement are attached hereto as Exhibits "3" and "4."

12.     MOBIS is Hyundai's largest Tier I supplier, and must meet the requirements of Hyundai's "just in time" inventory delivery system.  For this reason, probationary employees are evaluated in terms of their reliability and attendance.

13.     The policy for probationary employees provides that such employees are to be terminated after three (3) attendance occurrences.  An occurrence is defined as an absence for all or part of the day, a tardy, or an early departure from work. This is a "no fault" policy, meaning that probationary employees are allowed two (2) incidences and are terminated after their third, no matter what the reason for the incident.  The only exceptions are for jury duty, bereavement and the like.

14.     MOBIS does not have a sick leave policy that excuses absences or missed work for sickness or injury prior to the time the employee become eligible for leave pursuant to the

Family Medical Leave Act ("FMLA"). Probationary employees are not covered by FMLA because they have not yet worked for the required one (1) year. MOBIS treats pregnancy the same as it treats any illness or injury during the first year of employment. After the first year of employment, MOBIS complies with FMLA including its provisions requiring leave for pregnancy and pregnancy related conditions such as morning sickness.

15.    The Human Resources Department does not keep attendance records on probationary employees. Such records are kept by the employee's supervisor. It is well known that Mr. Kim is a stickler for punctuality, attendance and timely completion of work by his staff.

16.    MOBIS' Human Resources Department automatically sends a "90 Day Work Performance Review Sheet" ("Review Sheet") to the appropriate department head or supervisor prior to the end of an employee's probationary period. Review Sheets are routinely sent well in advance of expiration of the probationary period so that a decision can be made prior to the end of ninety (90) days.

17.    Approximately one (1) week before Plaintiff was terminated, MOBIS' Human Resources Department sent to Mr. Kim a Review Sheet for him to complete regarding Plaintiff. Shortly after Mr. Kim received the Review Sheet, he consulted with me. Mr. Kim told me that he did not think he could keep Plaintiff as a regular employee because of her poor attendance record. I asked Mr. Kim what he meant by "poor attendance." Mr. Kim then retrieved and showed to me a computer spreadsheet that showed that Plaintiff had seven (7) attendance occurrences as a probationary employee. I reviewed the spreadsheet with Mr. Kim and told him that Plaintiff had to be terminated because she had violated MOBIS' attendance policy for probationary employees by having more than two (2) occurrences. I also instructed Mr. Kim that

Plaintiff needed to be terminated at that time, not at the end of ninety (90) days, which in Plaintiff's case would have been on or about September 2, 2006.

18.    Mr. Kim explained to me that he was not aware of the specific limitation on the number of absences probationary employees are allowed to have. Mr. Kim's confusion could well have resulted from the fact that MOBIS' original policy on probationary employees did not specify that such employees must be terminated after the third attendance occurrence. That policy did not come into affect until March 2005. (See Exhibit "3", paragraph 2.5). Prior to March 2005, no specified limit of attendance incidence was stated in the policy.

19.    My meeting with Mr. Kim about Plaintiff's attendance took place approximately one (1) week prior to Plaintiff's termination, and was my first substantive involvement with Plaintiff's employment. I did not know that Plaintiff was pregnant when I made the decision that Plaintiff's employment had to be terminated. Pregnancy was not discussed during my meeting with Mr. Kim. In fact, it was not Mr. Kim who informed me of Plaintiff's pregnancy, but rather Plaintiff's direct supervisor, Ms. Womack, who told me that Plaintiff was pregnant on or about August 24, 2006, a day or so before MOBIS terminated Plaintiff.

20.    I made the final decision to terminate Plaintiff's employment, and I had no knowledge of Plaintiff's pregnancy at the time that I made the decision. I based my decision to terminate Plaintiff's employment on the fact that Plaintiff was absent three times in addition to four other occurrences of either being late to work or leaving work early which exceeded the occurrences allowable in the policy.

21.    I am aware that Plaintiff asked for a meeting on August 25, 2006 with Mr. Kim and Ms. Womack. The meeting became contentious, and Mr. Kim was concerned that the meeting was getting out of control, so he summoned me to join the participants. I reiterated to

Plaintiff the attendance policy for probationary employees and informed her that MOBIS could not offer her regular employment and that she was terminated. Plaintiff stated that she was aware of the policy regarding attendance during the probationary period. She said she just didn't think that was the reason for her termination. Plaintiff said that she understood and left.

22.     During discovery, I learned that Plaintiff, and possibly Ms. Womack, suspected that MOBIS terminated two pregnant employees for discriminatory reasons. I know this to be untrue. The two women in question are LaJarra Jefferson and Shalonda Gordon, both of whom were pregnant when terminated. Ms. Jefferson was terminated for taking FMLA leave without submitting a proper medical certification that she needed to be on leave. MOBIS warned Ms. Jefferson that her unexcused absences were counting against her under MOBIS' "no fault" attendance policy for regular hourly employees, and that she would be terminated unless she provided proper medical certification. Ms. Jefferson refused to return to work and did not furnished a medical certification stating that she had a medical need for leave. To the contrary, her first two physicians recommended work restrictions that MOBIS told Jefferson it could accommodate. Eventually, Jefferson went to a third doctor, who provided a medical certification that designated a start date for Jefferson's leave, which was after Jefferson had been terminated for attendance points.

23.     Shalonda Gordon was terminated for improper and destructive work techniques. Specifically, she was jerking wires instead of unplugging them and damaging the connections on sensitive diagnostic equipment used to conduct quality tests on cockpit (dashboard) assemblies. The supplemental restraint system (airbags) is among the components involved in the testing. For obvious reasons, Gordon's work techniques posed potential quality and safety issues. MOBIS warned Gordon on several occasions about her misconduct before terminating her.

24.     It was also evident during depositions that Plaintiff believed or suspected that a former Accounting employee, LaToya Williams, was a similarly situated female probationary employee who was not pregnant, had violated the attendance policy, but was not terminated. This is not the case.  Ms. Williams, an accounting clerk, came to work at MOBIS through a temporary agency like Plaintiff.  She also had attendance problems as a Temp.  Due to those attendance problems, MOBIS, on Mr. Kim's recommendation, never offered probationary employment to Ms. Williams, so as it turns out Plaintiff, was given more favorable consideration than Ms. Williams because Mr. Kim gave Plaintiff probationary employment despite her attendance problems as a Temp and his reluctance to hire her.

25.     MOBIS has had many employees that have taken FMLA leave for pregnancy and returned to their former positions without incident.  MOBIS treats pregnancy the same as any other illness or sickness with regard to its attendance policies.

I declare under penalty of perjury that the foregoing is true and correct.

        Executed on March 28, 2008.

                                                                    _____
                                                                    **TRACY RIEDLER**

Sworn to and subscribed before me on this the 28 day of March, 2008 .

                                                    Notary Public _____
                                                    My Commission Expires: NOTARY PUBLIC STATE OF ALABAMA AT LARGE
                                                    MY COMMISSION EXPIRES: Oct 15, 2010
[SEAL]                                              BONDED THRU NOTARY PUBLIC UNDERWRITERS

7

# EXHIBIT 1
# TRACY RIEDLER
# AFFIDAVIT



**MOBIS Alabama,LLC**

# JOB DESCRIPTION

| | |
|---|---|
| **Job Title:** | Accounting Specialist Treasury |
| **Report to:** | Assistant Manager Treasury |
| **Dept:** | Accounting and Finance |

**Minimum education, skills, and/or experience required:**
- Bachelor's degree in accounting or related field
- Excellent communication skills (oral & written)
- Experience in manufacturing environment will be plus
- Advance knowledge in computer software for windows
- Familiar with General accounting duties
- Computer skills - Excel(Must), SAP (Preferred)

**KEY DUTIES AND RESPONSIBILITIES (Not limited to)**

1. Daily fund and demand schedule - checks and wires.

2. Maintain vendor payment file.

3. Set up vendors for payment.

4. Ensure payment date is correct in SAP.

5. Ensure documents are approved in SAP.

6. Assist with check payments.

7. Handle a variety of Accounts Payable issues such as Aging Report Status, proposal list, outgoing payment clearing (wires, online transfers, ACH files, etc.

8. Handles a variety of Accounts Receivable issues such as Aging Reports, sending collection letters and statements, incoming payment clearing, customer maintenance.

9. Any additional duties associated with collections.

10. Maintaining G/L Entries.

11. Make Bank Deposits.

12. Opening and posting incoming checks.

13. Handling phone calls,faxes and e-mail from supplier regarding to payment.

14. Maintaining files for the Accounting department.

15. All other duties as assigned.

# EXHIBIT 2
# TRACY RIEDLER
# AFFIDAVIT

## TARSHA HUNTER'S ATTENDANCE
## RECORD WITH MULTI STAFFING

| | Date | In | Out |
|---|---|---|---|
| Mon | 3/6/2006 | 8:00 AM | 5:00 PM |
| Tue | 3/7/2006 | 8:00 AM | 5:00 PM |
| Wed | 3/8/2006 | 8:00 AM | 5:00 PM |
| Thu | 3/9/2006 | 8:00 AM | 5:00 PM |
| Fri | 3/10/2006 | 8:00 AM | 5:00 PM |
| Sat | 3/11/2006 | | |
| Sun | 3/12/2006 | | |
| Mon | 3/13/2006 | 8:00 AM | 5:00 PM |
| Tue | 3/14/2006 | 8:30 AM | 5:00 PM |
| Wed | 3/15/2006 | 8:00 AM | 5:00 PM |
| Thu | 3/16/2006 | 8:00 AM | 5:00 PM |
| Fri | 3/17/2006 | 8:00 AM | 5:00 PM |
| Sat | 3/18/2006 | | |
| Sun | 3/19/2006 | | |
| Mon | 3/20/2006 | 8:00 AM | 5:10 PM |
| Tue | 3/21/2006 | 8:00 AM | 5:00 PM |
| Wed | 3/22/2006 | 8:00 AM | 3:40 PM |
| Thu | 3/23/2006 | 8:00 AM | 5:00 PM |
| Fri | 3/24/2006 | Out all day | |
| Sat | 3/25/2006 | | |
| Sun | 3/26/2006 | | |
| Mon | 3/27/2006 | 8:00 AM | 5:05 PM |
| Tue | 3/28/2006 | 8:00 AM | 5:00 PM |
| Wed | 3/29/2006 | 12:00 PM | 5:00 PM |
| Thu | 3/30/2006 | 8:00 AM | 5:00 PM |
| Fri | 3/31/2006 | 8:00 AM | 5:00 PM |
| Sat | 4/1/2006 | | |
| Sun | 4/2/2006 | | |
| Mon | 4/3/2006 | 9:00 AM | 5:00 PM |
| Tue | 4/4/2006 | 8:00 AM | 5:10 PM |
| Wed | 4/5/2006 | 8:00 AM | 5:00 PM |
| Thu | 4/6/2006 | 8:00 AM | 5:00 PM |
| Fri | 4/7/2006 | 8:00 AM | 5:00 PM |
| Sat | 4/8/2006 | | |
| Sun | 4/9/2006 | | |
| Mon | 4/10/2006 | 12:00 PM | 5:00 PM |
| Tue | 4/11/2006 | 8:00 AM | 5:00 PM |
| Wed | 4/12/2006 | Out sick all day | |
| Thu | 4/13/2006 | 8:00 AM | 5:00 PM |
| Fri | 4/14/2006 | Holiday | |
| Sat | 4/15/2006 | | |
| Sun | 4/16/2006 | | |
| Mon | 4/17/2006 | 8:00 AM | 5:00 PM |
| Tue | 4/18/2006 | 8:15 AM | 5:00 PM |
| Wed | 4/19/2006 | 8:00 AM | 5:00 PM |
| Thu | 4/20/2006 | 8:00 AM | 5:00 PM |
| Fri | 4/21/2006 | 8:05 AM | 5:00 PM |
| Sat | 4/22/2006 | | |
| Sun | 4/23/2006 | | |

| | Date | In | Out |
|---|---|---|---|
| Mon | 4/24/2006 | 8:00 AM | 5:00 PM |
| Tue | 4/25/2006 | 8:00 AM | 12:00 PM |
| Wed | 4/26/2006 | 8:00 AM | 5:15 PM |
| Thu | 4/27/2006 | 8:00 AM | 5:00 PM |
| Fri | 4/28/2006 | 9:00 AM | 11:30 AM |
| Sat | 4/29/2006 | | |
| Sun | 4/30/2006 | | |
| Mon | 5/1/2006 | 8:00 AM | 5:00 PM |
| Tue | 5/2/2006 | 8:00 AM | 5:10 PM |
| Wed | 5/3/2006 | 8:15 AM | 5:15 PM |
| Thu | 5/4/2006 | 8:00 AM | 5:15 PM |
| Fri | 5/5/2006 | 8:00 AM | 5:00 PM |
| Sat | 5/6/2006 | | |
| Sun | 5/7/2006 | | |
| Mon | 5/8/2006 | Out sick all day | |
| Tue | 5/9/2006 | 8:00 AM | 5:15 PM |
| Wed | 5/10/2006 | 8:00 AM | 5:00 PM |
| Thu | 5/11/2006 | 8:00 AM | 5:00 PM |
| Fri | 5/12/2006 | 8:00 AM | 5:00 PM |
| Sat | 5/13/2006 | | |
| Sun | 5/14/2006 | | |
| Mon | 5/15/2006 | 8:00 AM | 5:00 PM |
| Tue | 5/16/2006 | 8:06 AM | 5:06 PM |
| Wed | 5/17/2006 | 8:10 AM | 5:08 PM |
| Thu | 5/18/2006 | 8:00 AM | 5:08 PM |
| Fri | 5/19/2006 | 8:00 AM | 5:00 PM |
| Sat | 5/20/2006 | | |
| Sun | 5/21/2006 | | |
| Mon | 5/22/2006 | 8:00 AM | 5:05 PM |
| Tue | 5/23/2006 | 8:00 AM | 5:06 PM |
| Wed | 5/24/2006 | 8:00 AM | 5:00 PM |
| Thu | 5/25/2006 | 8:00 AM | 5:00 PM |
| Fri | 5/26/2006 | 8:02 AM | 5:00 PM |
| Sat | 5/27/2006 | | |
| Sun | 5/28/2006 | | |
| Mon | 5/29/2006 | Holiday | |
| Tue | 5/30/2006 | 8:03 AM | 5:00 PM |
| Wed | 5/31/2006 | 8:00 AM | 5:15 PM |
| Thu | 6/1/2006 | 8:00 AM | 5:15 PM |
| Fri | 6/2/2006 | 8:00 AM | 5:00 PM |
| Sat | 6/3/2006 | | |
| Sun | 6/4/2006 | | |

MAR-28-2008  10:05     MOBIS                                    P.002
Aug 08 2007 9:19AM   MULTI STAFFING SERVICES      334 271 3815      P.5

MAR-10-2006  16:16     MOBIS ALABAMA LLC               334 387 4900     P.001

PLEASE CALL YOUR SERVICE REPRESENTATIVE AS SOON AS YOUR ASSIGNMENT ENDS.

# MULTI-STAFFING SERVICES     EMPLOYEE TIME SHEET

| WEEK ENDING | SOCIAL SECURITY NUMBER | EMP. # |
|---|---|---|
| 3/12/06 | 421 181 19223 | |

**EMPLOYEE LAST NAME** Hunter  **FIRST** Tarsha  **MIDDLE** Nickol

| | DATE | TIME STARTED | TIME FINISHED | LESS LUNCH | HOURS WORKED |
|---|---|---|---|---|---|
| MON | 3/6/06 | 8:00 | 5:00 | 1 hr. | 8 |
| TUE | 3/7/06 | 8:00 | 5:00 | 1 hr. | 8 |
| WED | 3/8/06 | 8:00 | 5:00 | 1 hr. | 8 |
| THU | 3/9/06 | 8:00 | 5:00 | 1 hr. | 8 |
| FRI | 3/10/06 | 8:00 | 5:00 | 1 hr. | 8 |
| SAT | 3/11/06 | | | | |
| SUN | 3/18/06 | | | | |

EMPLOYEES WORKING AT MORE THAN ONE COMPANY DURING THE WEEK (MONDAY - SUNDAY) MAY NOT EXCEED 40 HOURS EXCEPT WITH MULTI-STAFFING SERVICES PERMISSION. ARE YOU RETURNING  ☐ Yes  ☐ No

I UNDERSTAND THAT I AM TO CONTACT THE MULTI-STAFFING SERVICES OFFICE AFTER COMPLETING THIS ASSIGNMENT, AND IF I DO NOT DO SO, MULTI-STAFFING SERVICES MAY ASSUME THAT I AM NOT THEN AVAILABLE FOR WORK.
I CERTIFY THAT I HAVE WORKED THE HOURS LISTED ON THIS TIME SHEET.

I CERTIFY THAT I HAVE NOT BEEN INVOLVED IN AN ACCIDENT OR INJURY WHILE WORKING ON THIS ASSIGNMENT UNLESS NOTED IN THE COMMENTS.

I CERTIFY THAT I HAVE NOT WITNESSED ANY ACCIDENTS OR INJURIES THIS WEEK UNLESS NOTED IN THE COMMENTS.

EMPLOYEE SIGNATURE X _Tarsha Hunter_

COMMENTS: _____

**TOTAL HOURS FOR WEEK**
**TO NEAREST QUARTER HOUR**
4 HOUR MINIMUM PER DAY PER EMPLOYEE

**CLIENT APPROVAL AGREEMENT**
CLIENT AGREES THAT ITS UTILIZATION OF THE ABOVE NAMED MULTI-STAFFING SERVICES EMPLOYEE HAS BEEN MADE AVAILABLE AS A RESULT OF THE TEMPORARY PERSONNEL SERVICE RENDERED BY MULTI-STAFFING SERVICES.

CLIENT CERTIFIES THAT THE ABOVE HOURS WORKED ARE CORRECT AND THAT ALL WORK WAS PERFORMED IN A SATISFACTORY MANNER. CLIENT'S SIGNATURE BELOW CONSTITUTES ACCEPTANCE OF THE TERMS AND CONDITIONS IDENTIFIED ON THE REVERSE OF THIS DOCUMENT.

CLIENT SIGNATURE                             TITLE
X _____   _Asst. Mgr._

**CLIENT COMPANY NAME** Mobis Alabama LLC
**SUPERVISOR'S NAME** HOSANG HWANG

DO NOT WRITE BELOW THIS LINE
FOR ACCOUNTING USE ONLY

| TOTAL HOURS | PAY RATE | O.T. HOURS | BILLING HOURS | BILLING RATE |
|---|---|---|---|---|
| | | | | |

**MULTI-STAFFING SERVICES**
P.O. BOX 160343
MOBILE, AL 36616-2343
Chattanooga FAX (423) 954-1104
Montgomery FAX (334) 271-3815
FAX (251) 343-3915
Gulfport FAX (228)896-0092
Hattiesburg FAX (601)544-0773

HOME OFFICE COPY - WHITE     LEAVE W/CLIENT - CANARY     EMPLOYEE COPY - PINK

mobis

TOTAL P.001

# MULTI-STAFFING SERVICES — EMPLOYEE TIME SHEET

PLEASE CALL YOUR SERVICE REPRESENTATIVE AS SOON AS YOUR ASSIGNMENT ENDS.

**WEEK ENDING** 3/19/06  **SOCIAL SECURITY NUMBER** 421 12 19223

**EMPLOYEE LAST NAME** Hunter  **FIRST** Tarsha  **MIDDLE** N.

**EMP. #**

EMPLOYEES WORKING AT MORE THAN ONE COMPANY DURING THE WEEK (MONDAY - SUNDAY) MAY NOT EXCEED 40 HOURS EXCEPT WITH MULTI-STAFFING SERVICES PERMISSION.
ARE YOU RETURNING?  ☑ Yes  ☐ No

I UNDERSTAND THAT I AM TO CONTACT THE MULTI-STAFFING SERVICES OFFICE AFTER COMPLETING THIS ASSIGNMENT, AND IF I DO NOT DO SO, MULTI-STAFFING SERVICES MAY ASSUME THAT I AM NOT THEN AVAILABLE FOR WORK.

I CERTIFY THAT I HAVE WORKED THE HOURS LISTED ON THIS TIME SHEET.

I CERTIFY THAT I HAVE NOT BEEN INVOLVED IN AN ACCIDENT OR INJURY WHILE WORKING ON THIS ASSIGNMENT UNLESS NOTED IN THE COMMENTS.

I CERTIFY THAT I HAVE NOT WITNESSED ANY ACCIDENTS OR INJURIES THIS WEEK UNLESS NOTED IN THE COMMENTS.

| DATE | | TIME STARTED | TIME FINISHED | LESS LUNCH | HOURS WORKED |
|------|------|--------------|---------------|------------|--------------|
| MON | 3/13 | 8:00 | 5:00 | 1 hr. | 8 hrs |
| TUE | 3/13 | 8:30 | 5:00 | 30 min | 8 hrs |
| WED | 3/14 | 8:00 | 5:00 | 1 hr. | 8 hrs |
| THU | 3/15 | 8:00 | 5:00 | 1 hr. | 8 hrs |
| FRI | 3/16 | 8:00 | 5:00 | 1 hr. 30 min | 6:30 |
| SAT | 3/1 | | | | |
| SUN | 3/18 | | | | |

**TOTAL HOURS FOR WEEK** 38.00
TO NEAREST QUARTER HOUR
1 HOUR MINIMUM PER DAY PER EMPLOYEE

**EMPLOYEE SIGNATURE** x Tarsha Hunter

**COMMENTS:**

**CLIENT APPROVAL/AGREEMENT**
CLIENT AGREES THAT ITS UTILIZATION OF THE ABOVE NAMED MULTI-STAFFING SERVICES EMPLOYEE HAS BEEN MADE AVAILABLE AS A RESULT OF THE TEMPORARY PERSONNEL SERVICE RENDERED BY MULTI-STAFFING SERVICE.

CLIENT CERTIFIES THAT THE ABOVE HOURS WORKED ARE CORRECT AND THAT ALL WORK WAS PERFORMED IN A SATISFACTORY MANNER. CLIENT'S SIGNATURE BELOW CONSTITUTES ACCEPTANCE OF THE TERMS AND CONDITIONS IDENTIFIED ON THE REVERSE OF THIS DOCUMENT.

**CLIENT COMPANY NAME** Mobis Alabama LLC

**SUPERVISOR'S NAME** No Sang Hwang

**CLIENT SIGNATURE** x [signature]  **TITLE**

MULTI-STAFFING SERVICES
P.O. BOX 160343
MOBILE, AL 36616-2343
FAX (251) 343-3915

Chattanooga
FAX (423) 954-1104
Montgomery
FAX (334) 271-3915

Gulfport
FAX (228)868-0082
Hattiesburg
FAX (601)544-0715

HOME OFFICE COPY - WHITE    LEAVE W/CLIENT - CANARY    EMPLOYEE COPY - PINK

**DO NOT WRITE BELOW THIS LINE**
**FOR ACCOUNTING USE ONLY**

| PAY RATE | O.T. HOURS | BILLING RATE |
|----------|------------|--------------|
| TOTAL HOURS | | BILLING HOURS |

MAR-17-2006 16:44    MOBIS ALABAMA LLC    334 387 4900    P.001/001

mob

MAR-28-2008  10:06    MOBIS                                          P.004

03/06/2006  05:08    2713615                    MULTI STAFFING              PAGE  01

PLEASE CALL YOUR SERVICE REPRESENTATIVE AS SOON AS YOUR ASSIGNMENT ENDS.

## MULTI-STAFFING SERVICES    EMPLOYEE TIME SHEET

| WEEK ENDING | SOCIAL SECURITY NUMBER | EMP. # | EMPLOYEE LAST NAME | FIRST | MIDDLE |
|---|---|---|---|---|---|
| 3/26/06 | 421-12-1 | A223 | Hunter | Tarsha | N. |

| | DATE | TIME STARTED | TIME FINISHED | LESS LUNCH | HOURS WORKED |
|---|---|---|---|---|---|
| MON | 3/20 | 8:00 | 5:10 | 1 hr. | 8.10 hr |
| TUE | 3/21 | 8:00 | 5:00 | 1 hr | 8.00 hr |
| WED | 3/22 | 8:00 | 3:40 | 1 hr | 6.40 |
| THU | 3/23 | 8:00 | 5:00 | 1 hr. | 8 hr. |
| FRI | 3/24 | 0:00 | | | |
| SAT | 3/25 | | | | |
| SUN | 3/26 | | | | |

EMPLOYEES WORKING AT MORE THAN ONE COMPANY DURING THE WEEK (MONDAY - SUNDAY) MAY NOT EXCEED 40 HOURS EXCEPT WITH MULTI-STAFFING SERVICES PERMISSION. ARE YOU RETURNING   ☐ Yes   ☐ No

I UNDERSTAND THAT I AM TO CONTACT THE MULTI-STAFFING SERVICES OFFICE AFTER COMPLETING THIS ASSIGNMENT, AND IF I DO NOT DO SO, MULTI-STAFFING SERVICES MAY ASSUME THAT I AM NOT THEN AVAILABLE FOR WORK.

I CERTIFY THAT I HAVE WORKED THE HOURS LISTED ON THIS TIME SHEET.

I CERTIFY THAT I HAVE NOT BEEN INVOLVED IN AN ACCIDENT OR INJURY WHILE WORKING ON THIS ASSIGNMENT UNLESS NOTED IN THE COMMENTS.

I CERTIFY THAT I HAVE NOT WITNESSED ANY ACCIDENTS OR INJURIES THIS WEEK UNLESS NOTED IN THE COMMENTS.

EMPLOYEE SIGNATURE  x  _Tarsha Hunter_

COMMENTS:

TOTAL HOURS FOR WEEK TO NEAREST QUARTER HOUR
4 HOUR MINIMUM PER DAY PER EMPLOYEE

CLIENT APPROVAL/AGREEMENT
CLIENT AGREES THAT ITS UTILIZATION OF THE ABOVE-NAMED MULTI-STAFFING SERVICES EMPLOYEE HAS BEEN MADE AVAILABLE AS A RESULT OF THE TEMPORARY PERSONNEL SERVICE RENDERED BY MULTI-STAFFING SERVICES.

CLIENT CERTIFIES THAT THE ABOVE HOURS WORKED ARE CORRECT AND THAT ALL WORK WAS PERFORMED IN A SATISFACTORY MANNER. CLIENT'S SIGNATURE BELOW CONSTITUTES ACCEPTANCE OF THE TERMS AND CONDITIONS IDENTIFIED ON THE REVERSE OF THIS DOCUMENT.

CLIENT COMPANY NAME  _Mobis Alabama_

SUPERVISOR'S NAME  _Oe Sang Hwang_

CLIENT SIGNATURE  x                    TITLE  _C.T.C_

MULTI-STAFFING SERVICES
P.O. BOX 150343
MOBILE, AL 36616-2343
FAX (251) 343-3915

Chattanooga
FAX (423) 954-1194

Montgomery
FAX (334) 271-3615

Gulfport
FAX (228) 896-0092

Hattiesburg
FAX (601) 544-0775

DO NOT WRITE BELOW THIS LINE FOR ACCOUNTING USE ONLY

| TOTAL HOURS | PAY RATE | O.T. HOURS | BILLING HOURS | BILLING RATE |
|---|---|---|---|---|
| | | | | |

HOME OFFICE COPY - WHITE    LEAVE W/CLIENT - CANARY    EMPLOYEE COPY - PINK

MAR-24-2006  17:00          MOBIS ALABAMA LLC          334 387 4900  P.001/001

MAR-28-2008  10:06        MOBIS                                              P.005

TOTAL P.001
03/06/2006  05:08   2713615              MULTI STAFFING              PAGE  01

**PLEASE CALL YOUR SERVICE REPRESENTATIVE AS SOON AS YOUR ASSIGNMENT ENDS.**

# MULTI-STAFFING SERVICES    EMPLOYEE TIME SHEET

| WEEK ENDING | SOCIAL SECURITY NUMBER | | EMP. # | EMPLOYEE LAST NAME | FIRST | MIDDLE |
|---|---|---|---|---|---|---|
| 4/02/06 | 421·121·19223 | | | Hunter | Tarsha | Nickol |

| | DATE | TIME STARTED | TIME FINISHED | LESS LUNCH | HOURS WORKED |
|---|---|---|---|---|---|
| MON | 3/27 | 8:00 | 5:05 | 1 hr | 8:05 |
| TUE | 3/28 | 7:55 | 5:00 | 1 hr | 8:00 |
| WED | 3/29 | 12:00 | 0:00 | | 5.00 |
| THU | 3/30 | 8:00 | 5:00 | 1 hr | 8.00 |
| FRI | 3/31 | 8:00 | 5:00 | 1 hr | 8.00 |
| SAT | | | | | |
| SUN | | | | | |

EMPLOYEES WORKING AT MORE THAN ONE COMPANY DURING THE WEEK (MONDAY - SUNDAY) MAY NOT EXCEED 40 HOURS EXCEPT WITH MULTI-STAFFING SERVICES PERMISSION. ARE YOU RETURNING  ☑ Yes  ☐ No

I UNDERSTAND THAT I AM TO CONTACT THE MULTI-STAFFING SERVICES OFFICE AFTER COMPLETING THIS ASSIGNMENT, AND IF I DO NOT DO SO, MULTI-STAFFING SERVICES MAY ASSUME THAT I AM NOT THEN AVAILABLE FOR WORK.
I CERTIFY THAT I HAVE WORKED THE HOURS LISTED ON THIS TIME SHEET.

I CERTIFY THAT I HAVE NOT BEEN INVOLVED IN AN ACCIDENT OR INJURY WHILE WORKING ON THIS ASSIGNMENT UNLESS NOTED IN THE COMMENTS.

I CERTIFY THAT I HAVE NOT WITNESSED ANY ACCIDENTS OR INJURIES THIS WEEK UNLESS NOTED IN THE COMMENTS.

EMPLOYEE SIGNATURE x *Tarsha Hunter*

COMMENTS:

**TOTAL HOURS FOR WEEK TO NEAREST QUARTER HOUR**
4 HOUR MINIMUM PER DAY PER EMPLOYEE          **37.10**

**CLIENT APPROVAL/AGREEMENT**
CLIENT AGREES THAT ITS UTILIZATION OF THE ABOVE NAMED MULTI-STAFFING SERVICES EMPLOYEE HAS BEEN MADE AVAILABLE AS A RESULT OF THE TEMPORARY PERSONNEL SERVICE RENDERED BY MULTI-STAFFING SERVICES.

CLIENT CERTIFIES THAT THE ABOVE HOURS WORKED ARE CORRECT AND THAT ALL WORK WAS PERFORMED IN A SATISFACTORY MANNER. CLIENT'S SIGNATURE BELOW CONSTITUTES ACCEPTANCE OF THE TERMS AND CONDITIONS IDENTIFIED ON THE REVERSE OF THIS DOCUMENT.

| CLIENT COMPANY NAME | | |
|---|---|---|
| MOBIS  ALABAMA  LLC | | |

SUPERVISOR'S NAME
Ho Sang Hwang

| CLIENT SIGNATURE | | TITLE |
|---|---|---|

MULTI-STAFFING SERVICES
P.O. BOX 160343
MOBILE, AL 36616-2343
Chattanooga FAX (423) 954-1194
Montgomery FAX (334)271-3615
Gulfport FAX (228)895-0092
FAX (251) 343-3615
Hattiesburg FAX (601)544-2775

**DO NOT WRITE BELOW THIS LINE**
**FOR ACCOUNTING USE ONLY**

| TOTAL HOURS | PAY RATE | O.T. HOURS | BILLING HOURS | BILLING RATE |
|---|---|---|---|---|

HOME OFFICE COPY - WHITE    LEAVE W/CLIENT - CANARY    EMPLOYEE COPY - PINK

MAR-28-2008  10:07    MOBIS                          334 271 3815        P.006

APR-07-2006  16:39    MOBIS ALABAMA LLC              334 397 4900    P.001/001

PLEASE CALL YOUR SERVICE REPRESENTATIVE AS SOON AS YOUR ASSIGNMENT ENDS.

# MULTI-STAFFING SERVICES    EMPLOYEE TIME SHEET

| WEEK ENDING | SOCIAL SECURITY NUMBER | EMP. # | EMPLOYEE LAST NAME | FIRST | MIDDLE |
|---|---|---|---|---|---|
| 04/9/06 | 421 121 19223 | | Hunter | Tarsha | Nickol |

| | DATE | TIME STARTED | TIME FINISHED | LESS LUNCH | HOURS WORKED |
|---|---|---|---|---|---|
| MON | 4/3 | 9:00 | 5:00 | 30 min | 7.70 |
| TUE | 4/4 | 8:00 | 5:10 | 1 hr. | 8.10 |
| WED | 4/5 | 8:00 | 5:00 | 1 hr. | 8.00 |
| THU | 4/6 | 8:00 | 5:00 | 1 hr. | 8.00 |
| FRI | 4/7 | 8:00 | 5:00 | 1 hr. | 8.00 |
| SAT | 4/8 | | | | |
| SUN | 4/9 | | | | |

**TOTAL HOURS FOR WEEK TO NEAREST QUARTER HOUR**
4 HOUR MINIMUM PER DAY PER EMPLOYEE

EMPLOYEES WORKING AT MORE THAN ONE COMPANY DURING THE WEEK (MONDAY-SUNDAY) MAY NOT EXCEED 40 HOURS EXCEPT WITH MULTI-STAFFING SERVICES PERMISSION. ARE YOU RETURNING  ☑ Yes  ☐ NO

I UNDERSTAND THAT I AM TO CONTACT THE MULTI-STAFFING SERVICES OFFICE AFTER COMPLETING THIS ASSIGNMENT, AND IF I DO NOT DO SO, MULTI-STAFFING SERVICES MAY ASSUME THAT I AM NOT THEN AVAILABLE FOR WORK.
I CERTIFY THAT I HAVE WORKED THE HOURS LISTED ON THIS TIME SHEET.

I CERTIFY THAT I HAVE NOT BEEN INVOLVED IN AN ACCIDENT OR INJURY WHILE WORKING ON THIS ASSIGNMENT UNLESS NOTED IN THE COMMENTS.

I CERTIFY THAT I HAVE NOT WITNESSED ANY ACCIDENTS OR INJURIES THIS WEEK UNLESS NOTED IN THE COMMENTS.

EMPLOYEE SIGNATURE x *Tarsha Hunter*

COMMENTS:

**CLIENT APPROVAL/AGREEMENT**
CLIENT AGREES THAT ITS UTILIZATION OF THE ABOVE-NAMED MULTI-STAFFING SERVICES EMPLOYEE HAS BEEN MADE AVAILABLE AS A RESULT OF THE TEMPORARY PERSONNEL SERVICE RENDERED BY MULTI-STAFFING SERVICES.

CLIENT CERTIFIES THAT THE ABOVE HOURS WORKED ARE CORRECT AND THAT ALL WORK WAS PERFORMED IN A SATISFACTORY MANNER. CLIENT'S SIGNATURE BELOW CONSTITUTES ACCEPTANCE OF THE TERMS AND CONDITIONS IDENTIFIED ON THE REVERSE OF THIS DOCUMENT.

CLIENT COMPANY NAME
*Mobis Alabama LLC*
SUPERVISOR'S NAME
*Hosang Hwang*

CLIENT SIGNATURE                    TITLE
*Sgt Mgr*

MULTI-STAFFING SERVICES
P.O. BOX 160543
Chattanooga   MOBILE, AL 36616-2343   Gulfport
FAX (423) 854-1104                    FAX (228)896-0082
Montgomery   FAX (251) 343-3915   Hattiesburg
FAX (334)271-3815                    FAX (601)544-0775

**DO NOT WRITE BELOW THIS LINE FOR ACCOUNTING USE ONLY**

| TOTAL HOURS | PAY RATE | O.T. HOURS | BILLING HOURS | BILLING RATE |
|---|---|---|---|---|
| | | | | |

HOME OFFICE COPY - WHITE    LEAVE W/CLIENT - CANARY    EMPLOYEE COPY - PINK

mobi

APR-13-2006  16:43    MOBIS ALABAMA LLC    334 387 4900    P.001/001

PLEASE CALL YOUR SERVICE REPRESENTATIVE AS SOON AS YOUR ASSIGNMENT ENDS.

# MULTI-STAFFING SERVICES    EMPLOYEE TIME SHEET

| WEEK ENDING | SOCIAL SECURITY NUMBER | | EMP. # | EMPLOYEE LAST NAME | FIRST | MIDDLE |
|---|---|---|---|---|---|---|
| 4/16/06 | 421 1 21 1972 | | | Hunter | Tarsha | Nickol |

EMPLOYEES WORKING AT MORE THAN ONE COMPANY DURING THE WEEK (MONDAY - SUNDAY) MAY NOT EXCEED 40 HOURS EXCEPT WITH MULTI-STAFFING SERVICES PERMISSION. ARE YOU RETURNING ☐ Yes ☐ No

| | DATE | TIME STARTED | TIME FINISHED | LESS LUNCH | HOURS WORKED |
|---|---|---|---|---|---|
| MON | 4/10 | 12:00 | 5:00 | | 5.00 |
| TUE | 4/11 | 8:00 | 5:00 | hr | 8.00 |
| WED | 4/12 | Out Sick | | | |
| THU | 4/13 | 8:00 | 5:00 | 1 hr. | 8.00 |
| FRI | 4/14 | Holiday | | | |
| SAT | 4/15 | | | | |
| SUN | 4/16 | | | | |

I UNDERSTAND THAT I AM TO CONTACT THE MULTI-STAFFING SERVICES OFFICE AFTER COMPLETING THIS ASSIGNMENT, AND IF I DO NOT DO SO, MULTI-STAFFING SERVICES MAY ASSUME THAT I AM NOT THEN AVAILABLE FOR WORK.
I CERTIFY THAT I HAVE WORKED THE HOURS LISTED ON THIS TIME SHEET.

I CERTIFY THAT I HAVE NOT BEEN INVOLVED IN AN ACCIDENT OR INJURY WHILE WORKING ON THIS ASSIGNMENT UNLESS NOTED IN THE COMMENTS.

I CERTIFY THAT I HAVE NOT WITNESSED ANY ACCIDENTS OR INJURIES THIS WEEK UNLESS NOTED IN THE COMMENTS.

EMPLOYEE SIGNATURE ✗ *Tarsha Hunter*

COMMENTS:

| TOTAL HOURS FOR WEEK. TO NEAREST QUARTER HOUR 4 HOUR MINIMUM PER DAY PER EMPLOYEE | 21.00 |
|---|---|

CLIENT APPROVAL/AGREEMENT
CLIENT AGREES THAT ITS UTILIZATION OF THE ABOVE NAMED MULTI-STAFFING SERVICES EMPLOYEE HAS BEEN MADE AVAILABLE AS A RESULT OF THE TEMPORARY PERSONNEL SERVICE RENDERED BY MULTI-STAFFING SERVICES.

CLIENT CERTIFIES THAT THE ABOVE HOURS WORKED ARE CORRECT AND THAT ALL WORK WAS PERFORMED IN A SATISFACTORY MANNER. CLIENT'S SIGNATURE BELOW CONSTITUTES ACCEPTANCE OF THE TERMS AND CONDITIONS IDENTIFIED ON THE REVERSE OF THIS DOCUMENT.

CLIENT SIGNATURE
✗ _____    TITLE  CFO

CLIENT COMPANY NAME  Mobis Alabama, LLC.
SUPERVISOR'S NAME  Ho Sang Hwang

DO NOT WRITE BELOW THIS LINE
FOR ACCOUNTING USE ONLY

| TOTAL HOURS | PAY RATE | O.T. HOURS | BILLING HOURS | BILLING RATE |
|---|---|---|---|---|
| | | | | |

MULTI-STAFFING SERVICES
P.O. BOX 160343
MOBILE, AL 36616-2343
Chattanooga FAX (423) 954-1104
Montgomery FAX (334)271-3515
FAX (251) 343-8915
Gulfport FAX (228)896-0692
Hattiesburg FAX (601)544-0775

HOME OFFICE COPY - WHITE    LEAVE W/CLIENT - CANARY    EMPLOYEE COPY - PINK

03/06/2006  05:08   2713615                      MULTI STAFFING                      PAGE  01

PLEASE CALL YOUR SERVICE REPRESENTATIVE AS SOON AS YOUR ASSIGNMENT ENDS.

# MULTI-STAFFING SERVICES    EMPLOYEE TIME SHEET

| WEEK ENDING | SOCIAL SECURITY NUMBER | EMP. # | EMPLOYEE LAST NAME | FIRST | MIDDLE |
|---|---|---|---|---|---|
| 4/23/06 | 421 21 19223 | | Hunter | Tarsha | Nickol |

| | DATE | TIME STARTED | TIME FINISHED | LESS LUNCH | HOURS WORKED |
|---|---|---|---|---|---|
| MON | 4/17 | 7:50 | 5:00 | 30 min. | 8.40 |
| TUE | 4/18 | 8:15 | 5:00 | 1 hr. | 7.45 |
| WED | 4/19 | 7:50 | 5:00 | | 9.10 |
| THU | 4/20 | 8:00 | 5:00 | 1 hr. | 8.00 |
| FRI | 4/21 | 8:05 | 5:00 | 1 hr. | 7.55 |
| SAT | 4/22 | | | | |
| SUN | 4/23 | | | | |

TOTAL HOURS FOR WEEK
TO NEAREST QUARTER HOUR
4 HOUR MINIMUM PER DAY PER EMPLOYEE            4050

**EMPLOYEES WORKING AT MORE THAN ONE COMPANY DURING THE WEEK (MONDAY - SUNDAY) MAY NOT EXCEED 40 HOURS EXCEPT WITH MULTI-STAFFING SERVICES PERMISSION. ARE YOU RETURNING   ☑ Yes   ☐ No**

I UNDERSTAND THAT I AM TO CONTACT THE MULTI-STAFFING SERVICES OFFICE AFTER COMPLETING THIS ASSIGNMENT, AND IF I DO NOT DO SO, MULTI-STAFFING SERVICES MAY ASSUME THAT I AM NOT THEN AVAILABLE FOR WORK.
I CERTIFY THAT I HAVE WORKED THE HOURS LISTED ON THIS TIME SHEET.

I CERTIFY THAT I HAVE NOT BEEN INVOLVED IN AN ACCIDENT OR INJURY WHILE WORKING ON THIS ASSIGNMENT UNLESS NOTED IN THE COMMENTS.

I CERTIFY THAT I HAVE NOT WITNESSED ANY ACCIDENTS OR INJURIES THIS WEEK UNLESS NOTED IN THE COMMENTS.

EMPLOYEE
SIGNATURE X _Tarsha Hunter_

COMMENTS:

**CLIENT APPROVAL AGREEMENT**
CLIENT AGREES THAT ITS UTILIZATION OF THE ABOVE-NAMED MULTI-STAFFING SERVICES EMPLOYEE HAS BEEN MADE AVAILABLE AS A RESULT OF THE TEMPORARY PERSONNEL SERVICE RENDERED BY MULTI-STAFFING SERVICES.

CLIENT CERTIFIES THAT THE ABOVE HOURS WORKED ARE CORRECT AND THAT ALL WORK WAS PERFORMED IN A SATISFACTORY MANNER. CLIENT'S SIGNATURE BELOW CONSTITUTES ACCEPTANCE OF THE TERMS AND CONDITIONS IDENTIFIED ON THE REVERSE OF THIS DOCUMENT.

CLIENT SIGNATURE                                              TITLE
X _____    Asst. Mgr

CLIENT COMPANY NAME
Mobis Alabama, Llc.
SUPERVISOR'S NAME
HO Sang Hwang

MULTI-STAFFING SERVICES
P.O. BOX 160343
Chattanooga      MOBILE, AL 36616-2343      Gulfport
FAX (423) 954-1134                   FAX (228)865-0092
Montgomery       FAX (251) 343-3915      Hattiesburg
FAX (334)271-3815                    FAX (601)544-0775

DO NOT WRITE BELOW THIS LINE
FOR ACCOUNTING USE ONLY

| TOTAL HOURS | PAY RATE | O.T. HOURS | BILLING HOURS | BILLING RATE |
|---|---|---|---|---|
| | | | | |

HOME OFFICE COPY - WHITE      LEAVE W/CLIENT - CANARY      EMPLOYEE COPY - PINK

Mobi

MAR-28-2008  10:08        MOBIS                                    P.009

MAY-01-2006  10:57        MOBIS ALABAMA LLC              334 387 4900    P.001/001

PLEASE CALL YOUR SERVICE REPRESENTATIVE AS SOON AS YOUR ASSIGNMENT ENDS.

# MULTI-STAFFING SERVICES    EMPLOYEE TIME SHEET

| WEEK ENDING | SOCIAL SECURITY NUMBER | EMP.# |
|---|---|---|
| 4/30/06 | 421-121-1922 | |

EMPLOYEE LAST NAME: Hunter   FIRST: Torsha   MIDDLE: Nickol

| | DATE | TIME STARTED | TIME FINISHED | LESS LUNCH | HOURS WORKED |
|---|---|---|---|---|---|
| MON | 4/24 | 8:00 | 5:00 | 1 hr. | 8.00 |
| TUE | 4/25 | 7:50 | 12:00 | 0 | 4.10 |
| WED | 4/26 | 8:00 | 5:15 | 0 | 9.15 |
| THU | 4/27 | 8:00 | 5:00 | 0 | 9.00 |
| FRI | 4/28 | 9:00 | 11:30 | 0 | 2.30 |
| SAT | 4/29 | | | | |
| SUN | 4/30 | | | | |

EMPLOYEES WORKING AT MORE THAN ONE COMPANY DURING THE WEEK (MONDAY – SUNDAY) MAY NOT EXCEED 40 HOURS EXCEPT WITH MULTI-STAFFING SERVICES PERMISSION. ARE YOU RETURNING  ☐ Yes  ☐ No

I UNDERSTAND THAT I AM TO CONTACT THE MULTI-STAFFING SERVICES OFFICE AFTER COMPLETING THIS ASSIGNMENT, AND IF I DO NOT DO SO, MULTI-STAFFING SERVICES MAY ASSUME THAT I AM NOT THEN AVAILABLE FOR WORK.

I CERTIFY THAT I HAVE WORKED THE HOURS LISTED ON THIS TIME SHEET.

I CERTIFY THAT I HAVE NOT BEEN INVOLVED IN AN ACCIDENT OR INJURY WHILE WORKING ON THIS ASSIGNMENT UNLESS NOTED IN THE COMMENTS.

I CERTIFY THAT I HAVE NOT WITNESSED ANY ACCIDENTS OR INJURIES THIS WEEK UNLESS NOTED IN THE COMMENTS.

EMPLOYEE SIGNATURE  x _Torsha Hunter_

COMMENTS: _Family Emergency / Death in the family._

| TOTAL HOURS FOR WEEK TO NEAREST QUARTER HOUR 4 HOUR MINIMUM PER DAY PER EMPLOYEE | 32.55 |
|---|---|

CLIENT APPROVAL/AGREEMENT
CLIENT AGREES THAT ITS UTILIZATION OF THE ABOVE-NAMED MULTI-STAFFING SERVICES EMPLOYEE HAS BEEN MADE AVAILABLE AS A RESULT OF THE TEMPORARY PERSONNEL SERVICE RENDERED BY MULTI-STAFFING SERVICES.

CLIENT CERTIFIES THAT THE ABOVE HOURS WORKED ARE CORRECT AND THAT ALL WORK WAS PERFORMED IN A SATISFACTORY MANNER. CLIENTS SIGNATURE BELOW CONSTITUTES ACCEPTANCE OF THE TERMS AND CONDITIONS IDENTIFIED ON THE REVERSE OF THIS DOCUMENT.

CLIENT COMPANY NAME: _Mobis Alabama LLC_
SUPERVISOR'S NAME: _Ho Sang Hwang_

CLIENT SIGNATURE  x _____   TITLE _CFO_

DO NOT WRITE BELOW THIS LINE FOR ACCOUNTING USE ONLY

MULTI-STAFFING SERVICES
P.O. BOX 160343
MOBILE, AL 36616-2343

Chattanooga FAX (423) 954-1104
Montgomery FAX (334) 271-3815
Gulfport FAX (228) 896-0032
Hattiesburg FAX (601) 544-0775
FAX (251) 343-3915

| TOTAL HOURS | PAY RATE | O.T. HOURS | BILLING HOURS | BILLING RATE |
|---|---|---|---|---|
| | | | | |

HOME OFFICE COPY - WHITE      LEAVE W/CLIENT - CANARY      EMPLOYEE COPY - PINK

TOTAL P.001  mobis

MAR-28-2008  10:08        MOBIS                                          P.010
Aug 06 2007 9:20AM    MULTI STAFFING SERVICES    334 271 3615            p.9

MAY-05-2006  16:19        MOBIS ALABAMA LLC              334 387 4900  P.001/001

PLEASE CALL YOUR SERVICE REPRESENTATIVE AS SOON AS YOUR ASSIGNMENT ENDS.

# MULTI-STAFFING SERVICES      EMPLOYEE TIME SHEET

| WEEK ENDING | SOCIAL SECURITY NUMBER | EMP. # | EMPLOYEE LAST NAME | FIRST | MIDDLE |
|---|---|---|---|---|---|
| 00/7/06 | 421-121-19223 | | Hunter | Tarsha | Nickol |

| | DATE | TIME STARTED | TIME FINISHED | LESS LUNCH | HOURS WORKED |
|---|---|---|---|---|---|
| MON | 5/1 | 8:00 | 5:00 | 0 | 9.00 |
| TUE | 5/2 | 8:00 | 5:10 | 1hr | 8.10 |
| WED | 5/3 | 8:15 | 5:15 | 1hr | 8.00 |
| THU | 5/4 | 8:00 | 5:15 | 1hr | 8.15 |
| FRI | 5/6 | 8:00 | 5:00 | 1hr | 8.00 |
| SAT | 5/7 | | | | |
| SUN | 5/8 | | | | |

EMPLOYEES WORKING AT MORE THAN ONE COMPANY DURING THE WEEK (MONDAY - SUNDAY) MAY NOT EXCEED 40 HOURS EXCEPT WITH MULTI-STAFFING SERVICES PERMISSION. ARE YOU RETURNING  ☐ Yes  ☐ No

I UNDERSTAND THAT I AM TO CONTACT THE MULTI-STAFFING SERVICES OFFICE AFTER COMPLETING THIS ASSIGNMENT, AND IF I DO NOT DO SO, MULTI-STAFFING SERVICES MAY ASSUME THAT I AM NOT THEN AVAILABLE FOR WORK. I CERTIFY THAT I HAVE WORKED THE HOURS LISTED ON THIS TIME SHEET.

I CERTIFY THAT I HAVE NOT BEEN INVOLVED IN AN ACCIDENT OR INJURY WHILE WORKING ON THIS ASSIGNMENT UNLESS NOTED IN THE COMMENTS.

I CERTIFY THAT I HAVE NOT WITNESSED ANY ACCIDENTS OR INJURIES THIS WEEK UNLESS NOTED IN THE COMMENTS.

EMPLOYEE SIGNATURE  _Tarsha Hunter_

COMMENTS: _____

TOTAL HOURS FOR WEEK TO NEAREST QUARTER HOUR
4 HOUR MINIMUM PER DAY PER EMPLOYEE

CLIENT APPROVAL/AGREEMENT
CLIENT AGREES THAT ITS UTILIZATION OF THE ABOVE NAMED MULTI-STAFFING SERVICES EMPLOYEE HAS BEEN MADE AVAILABLE AS A RESULT OF THE TEMPORARY PERSONNEL SERVICE RENDERED BY MULTI-STAFFING SERVICES.

CLIENT CERTIFIES THAT THE ABOVE HOURS WORKED ARE CORRECT AND THAT ALL WORK WAS PERFORMED IN A SATISFACTORY MANNER. CLIENTS SIGNATURE BELOW CONSTITUTES ACCEPTANCE OF THE TERMS AND CONDITIONS IDENTIFIED ON THE REVERSE OF THIS DOCUMENT.

CLIENT SIGNATURE  X _____    TITLE ___

CLIENT COMPANY NAME  Mobis Alabama, LLC
SUPERVISOR'S NAME _____

MULTI-STAFFING SERVICES
P.O. BOX 160343
MOBILE, AL 36616-2343
FAX (423) 634-1104   Chattanooga
FAX (251) 343-8915
FAX (334) 271-3615   Montgomery
Gulfport FAX (228) 896-0092
Hattiesburg FAX (601) 544-0775

DO NOT WRITE BELOW THIS LINE
FOR ACCOUNTING USE ONLY

| TOTAL HOURS | PAY RATE | O.T. HOURS | BILLING HOURS | BILLING RATE |
|---|---|---|---|---|
| | | | | |

HOME OFFICE COPY - WHITE      LEAVE W/CLIENT - CANARY      EMPLOYEE COPY - PINK

MAR-28-2008  10:09      MOBIS                    334 271 3815              P.011

MAY-15-2006  10:05      MOBIS ALABAMA LLC                   334 387 4900   P.001/001

PLEASE CALL YOUR SERVICE REPRESENTATIVE AS SOON AS YOUR ASSIGNMENT ENDS.

# MULTI-STAFFING SERVICES    EMPLOYEE TIME SHEET

| WEEK ENDING | SOCIAL SECURITY NUMBER | | EMP. # | EMPLOYEE LAST NAME | FIRST | MIDDLE |
|---|---|---|---|---|---|---|
| 5/14/06 | 421 21 19223 | | | HUNTER | TARSHA | NICKOL |

| | DATE | TIME STARTED | TIME FINISHED | LESS LUNCH | HOURS WORKED |
|---|---|---|---|---|---|
| MON | Out Sick | | | | |
| TUE | 5/9 | 8:00 | 5:15 | 1hr | 8:15 |
| WED | 5/10 | 8:00 | 5:00 | 1hr | 8.00 |
| THU | 5/11 | 8:00 | 5:00 | 1hr | 8.00 |
| FRI | 5/12 | 8:00 | 5:00 | 1hr | 8.00 |
| SAT | | | | | |
| SUN | | | | | |

EMPLOYEES WORKING AT MORE THAN ONE COMPANY DURING THE WEEK (MONDAY - SUNDAY) MAY NOT EXCEED 40 HOURS EXCEPT WITH MULTI-STAFFING SERVICES PERMISSION. ARE YOU RETURNING ☑ Yes ☐ No

I UNDERSTAND THAT I AM TO CONTACT THE MULTI-STAFFING SERVICES OFFICE AFTER COMPLETING THIS ASSIGNMENT, AND IF I DO NOT DO SO, MULTI-STAFFING SERVICES MAY ASSUME THAT I AM NOT THEN AVAILABLE FOR WORK.
I CERTIFY THAT I HAVE WORKED THE HOURS LISTED ON THIS TIME SHEET.

I CERTIFY THAT I HAVE NOT BEEN INVOLVED IN AN ACCIDENT OR INJURY WHILE WORKING ON THIS ASSIGNMENT UNLESS NOTED IN THE COMMENTS.

I CERTIFY THAT I HAVE NOT WITNESSED ANY ACCIDENTS OR INJURIES THIS WEEK UNLESS NOTED IN THE COMMENTS.

EMPLOYEE SIGNATURE X *Tarsha Hunter*

COMMENTS:

**TOTAL HOURS FOR WEEK TO NEAREST QUARTER HOUR**
1 HOUR MINIMUM PER DAY PER EMPLOYEE

CLIENT APPROVAL/AGREEMENT
CLIENT AGREES THAT ITS UTILIZATION OF THE ABOVE NAMED MULTI-STAFFING SERVICES EMPLOYEE HAS BEEN MADE AVAILABLE AS A RESULT OF THE TEMPORARY PERSONNEL SERVICE RENDERED BY MULTI-STAFFING SERVICES.

CLIENT CERTIFIES THAT THE ABOVE HOURS WORKED ARE CORRECT AND THAT ALL WORK WAS PERFORMED IN A SATISFACTORY MANNER. CLIENT'S SIGNATURE BELOW CONSTITUTES ACCEPTANCE OF THE TERMS AND CONDITIONS IDENTIFIED ON THE REVERSE OF THIS DOCUMENT.

CLIENT COMPANY NAME: *Mobis Alabama, LLC*
SUPERVISOR'S NAME JAY KIM

CLIENT SIGNATURE X    TITLE

**DO NOT WRITE BELOW THIS LINE FOR ACCOUNTING USE ONLY**

MULTI-STAFFING SERVICES
P.O. BOX 160343
MOBILE, AL 36616-2343
FAX (251) 343-3815

Chickasaw
FAX (423) 801-1104
Montgomery
FAX (334) 271-3815

Gulfport
FAX (228) 866-0002

Hattiesburg
FAX (601) 544-0775

| TOTAL HOURS | PAY RATE | O.T. HOURS | BILLING HOURS | BILLING RATE |
|---|---|---|---|---|
| | | | | |

HOME OFFICE COPY - WHITE    LEAVE W/CLIENT - CANARY    EMPLOYEE COPY - PINK

TOTAL P.001

Mobis

MAY-19-2006  16:38        MOBIS ALABAMA LLC                    334 387 4900    P.001/001

PLEASE CALL YOUR SERVICE REPRESENTATIVE AS SOON AS YOUR ASSIGNMENT ENDS.

# MULTI-STAFFING SERVICES    EMPLOYEE TIME SHEET

| WEEK ENDING | SOCIAL SECURITY NUMBER | | EMP. # | EMPLOYEE LAST NAME | FIRST | MIDDLE |
|---|---|---|---|---|---|---|
| 5/21/06 | 421 1 21 19223 | | | Hunter | Tarsha | Nickol |

| | DATE | TIME STARTED | TIME FINISHED | LESS LUNCH | HOURS WORKED | |
|---|---|---|---|---|---|---|
| MON | 5/15 | 8:00 | 5:05 | 1 hr. | 8.05 | EMPLOYEES WORKING AT MORE THAN ONE COMPANY DURING THE WEEK (MONDAY - SUNDAY) MAY NOT EXCEED 40 HOURS EXCEPT WITH MULTI-STAFFING SERVICES PERMISSION. ARE YOU RETURNING  ☐ Yes  ☐ No |
| TUE | 5/16 | 8:06 | 5:06 | 1 hr. | 8.00 | I UNDERSTAND THAT I AM TO CONTACT THE MULTI-STAFFING SERVICES OFFICE AFTER COMPLETING THIS ASSIGNMENT, AND IF I DO NOT DO SO, MULTI-STAFFING SERVICES MAY ASSUME THAT I AM NOT THEN AVAILABLE FOR WORK. I CERTIFY THAT I HAVE WORKED THE HOURS LISTED ON THIS TIME SHEET. |
| WED | 5/17 | 8:10 | 5:08 | 1 hr. | 7.58 | I CERTIFY THAT I HAVE NOT BEEN INVOLVED IN AN ACCIDENT OR INJURY WHILE WORKING ON THIS ASSIGNMENT UNLESS NOTED IN THE COMMENTS. |
| THU | 5/18 | 8:00 | 5:08 | 1 hr. | 8.08 | I CERTIFY THAT I HAVE NOT WITNESSED ANY ACCIDENTS OR INJURIES THIS WEEK UNLESS NOTED IN THE COMMENTS. |
| FRI | 5/19 | 8:00 | 5:00 | 1 hr. | 8.00 | EMPLOYEE SIGNATURE x  *Tarsha Hunter* |
| SAT | 5/20 | | | | | COMMENTS: Wednesday 5/17 Car |
| SUN | 5/21 | | | | | Problems |

| TOTAL HOURS FOR WEEK TO NEAREST QUARTER HOUR 4 HOUR MINIMUM PER DAY PER EMPLOYEE | 39.71 |
|---|---|

CLIENT APPROVAL/AGREEMENT
CLIENT AGREES THAT ITS UTILIZATION OF THE ABOVE NAMED MULTI-STAFFING SERVICES EMPLOYEE HAS BEEN MADE AVAILABLE AS A RESULT OF THE TEMPORARY PERSONNEL SERVICE RENDERED BY MULTI-STAFFING SERVICES.

CLIENT CERTIFIES THAT THE ABOVE HOURS WORKED ARE CORRECT AND THAT ALL WORK WAS PERFORMED IN A SATISFACTORY MANNER. CLIENT'S SIGNATURE BELOW CONSTITUTES ACCEPTANCE OF THE TERMS AND CONDITIONS IDENTIFIED ON THE REVERSE OF THIS DOCUMENT.

CLIENT SIGNATURE                                    TITLE  Tio
X

CLIENT COMPANY NAME:  Mobis Alabama

SUPERVISOR'S NAME  Tonethka

**MULTI-STAFFING SERVICES**
Chattanooga
FAX (423) 954-1104
P.O. BOX 160043
MOBILE, AL 36616-2043
FAX (251) 343-3915
Montgomery
FAX (334)271-3615
Gulfport
FAX (228)868-0092
Hattiesburg
FAX (601)544-9775

DO NOT WRITE BELOW THIS LINE
FOR ACCOUNTING USE ONLY

| TOTAL HOURS | PAY RATE | O.T. HOURS | BILLING HOURS | BILLING RATE |
|---|---|---|---|---|

HOME OFFICE COPY - WHITE    LEAVE W/CLIENT - CANARY    EMPLOYEE COPY - PINK

TOTAL P.001

mobis

MAY-26-2006  15:58    MOBIS ALABAMA LLC    334 387 4900  P.001/001

PLEASE CALL YOUR SERVICE REPRESENTATIVE AS SOON AS YOUR ASSIGNMENT ENDS.

# MULTI-STAFFING SERVICES    EMPLOYEE TIME SHEET

| WEEK ENDING 5/28/06 | SOCIAL SECURITY NUMBER 421-121-19223 | | | SUP. # | EMPLOYEE LAST NAME HUNTER | FIRST TARSHA | MIDDLE N |
|---|---|---|---|---|---|---|---|
| | DATE | TIME STARTED | TIME FINISHED | LESS LUNCH | HOURS WORKED | | |
| MON | 5/22 | 7:55 | 5:05 | 30min | 8.40 | | |
| TUE | 5/23 | 7:58 | 5:06 | 1hr. | 8.08 | | |
| WED | 5/24 | 8:00 | 5:00 | 30min | 8.30 | | |
| THU | 5/25 | 8:00 | 5:00 | 1hr. | 8.00 | | |
| FRI | 5/26 | 8:02 | 5:00 | 1hr | 7.58 | | |
| SAT | 5/27 | | | | | | |
| SUN | 5/28 | | | | | | |

EMPLOYEES WORKING AT MORE THAN ONE COMPANY DURING THE WEEK (MONDAY - SUNDAY) MAY NOT EXCEED 40 HOURS EXCEPT WITH MULTI-STAFFING SERVICES PERMISSION. ARE YOU RETURNING ☐ Yes ☐ No

I UNDERSTAND THAT I AM TO CONTACT THE MULTI-STAFFING SERVICES OFFICE AFTER COMPLETING THIS ASSIGNMENT, AND IF I DO NOT DO SO, MULTI-STAFFING SERVICES MAY ASSUME THAT I AM NOT THEN AVAILABLE FOR WORK.
I CERTIFY THAT I HAVE WORKED THE HOURS LISTED ON THIS TIME SHEET.

I CERTIFY THAT I HAVE NOT BEEN INVOLVED IN AN ACCIDENT OR INJURY WHILE WORKING ON THIS ASSIGNMENT UNLESS NOTED IN THE COMMENTS.

I CERTIFY THAT I HAVE NOT WITNESSED ANY ACCIDENTS OR INJURIES THIS WEEK UNLESS NOTED IN THE COMMENTS.

EMPLOYEE SIGNATURE X *Tarsha Hunter*

COMMENTS:

TOTAL HOURS FOR WEEK TO NEAREST QUARTER HOUR  40.36
4 HOUR MINIMUM PER DAY PER EMPLOYEE

CLIENT APPROVAL/AGREEMENT
CLIENT AGREES THAT ITS UTILIZATION OF THE ABOVE-NAMED MULTI-STAFFING SERVICES EMPLOYEE HAS BEEN MADE AVAILABLE AS A RESULT OF THE TEMPORARY PERSONNEL SERVICE RENDERED BY MULTI-STAFFING SERVICES.

CLIENT CERTIFIES THAT THE ABOVE HOURS WORKED ARE CORRECT AND THAT ALL WORK WAS PERFORMED IN A SATISFACTORY MANNER. CLIENT'S SIGNATURE BELOW CONSTITUTES ACCEPTANCE OF THE TERMS AND CONDITIONS IDENTIFIED ON THE REVERSE OF THIS DOCUMENT.

CLIENT COMPANY NAME *Mobis (Alabama) LLC*
SUPERVISOR'S NAME *Jay Kim*

CLIENT SIGNATURE X _____    TITLE OTto

MULTI-STAFFING SERVICES
P.O. BOX 160345
MOBILE, AL 36616-2343
Chattanooga FAX (423) 894-1104
Montgomery FAX (334) 271-3815
Gadsden FAX (228) 086-0082
Hattiesburg FAX (601) 544-0775
FAX (251) 343-3815

DO NOT WRITE BELOW THIS LINE
FOR ACCOUNTING USE ONLY

| TOTAL HOURS | PAY RATE | O.T. HOURS | BILLING HOURS | BILLING RATE |
|---|---|---|---|---|
| | | | | |

HOME OFFICE COPY - WHITE    LEAVE W/CLIENT - CANARY    EMPLOYEE COPY - PINK

TOTAL P.001
40.36

MAR-28-2008  10:10    MOBIS                                      P.014

JUN-02-2006  16:19        MOBIS ALABAMA LLC                    334 387 4900    P.001/001

PLEASE CALL YOUR SERVICE REPRESENTATIVE AS SOON AS YOUR ASSIGNMENT ENDS.

# MULTI-STAFFING SERVICES        EMPLOYEE TIME SHEET

| WEEK ENDING | SOCIAL SECURITY NUMBER | EMP. # | EMPLOYEE LAST NAME | FIRST | MIDDLE |
|---|---|---|---|---|---|
| 06/04/06 | 421 121 A223 | | Hunter | Tarsha | Nickol |

| | DATE | TIME STARTED | TIME FINISHED | LESS LUNCH | HOURS WORKED |
|---|---|---|---|---|---|
| MON | 5/29 | Holiday | | | |
| TUE | 5/30 | 8:03 | 5:00 | 1 hr. | 7.57 |
| WED | 5/31 | 8:00 | 5:15 | 1 hr. | 8.15 |
| THU | 6/1 | 8:00 | 5:15 | 1 hr. | 8.15 |
| FRI | 6/2 | 7:55 | 5:00 | 1 hr. | 8.00 |
| SAT | 6/3 | | | | |
| SUN | 6/4 | | | | |

EMPLOYEES WORKING AT MORE THAN ONE COMPANY DURING THE WEEK (MONDAY - SUNDAY) MAY NOT EXCEED 40 HOURS EXCEPT WITH MULTI-STAFFING SERVICES PERMISSION. ARE YOU RETURNING ☑ Yes ☐ No

I UNDERSTAND THAT I AM TO CONTACT THE MULTI-STAFFING SERVICES OFFICE AFTER COMPLETING THIS ASSIGNMENT, AND IF I DO NOT DO SO, MULTI-STAFFING SERVICES MAY ASSUME THAT I AM NOT THEN AVAILABLE FOR WORK. I CERTIFY THAT I HAVE WORKED THE HOURS LISTED ON THIS TIME SHEET.

I CERTIFY THAT I HAVE NOT BEEN INVOLVED IN AN ACCIDENT OR INJURY WHILE WORKING ON THIS ASSIGNMENT UNLESS NOTED IN THE COMMENTS.

I CERTIFY THAT I HAVE NOT WITNESSED ANY ACCIDENTS OR INJURIES THIS WEEK UNLESS NOTED IN THE COMMENTS.

EMPLOYEE SIGNATURE x *Tarsha Hunter*

COMMENTS:

**TOTAL HOURS FOR WEEK**
TO NEAREST QUARTER HOUR
4 HOUR MINIMUM PER DAY PER EMPLOYEE — 31.87

**CLIENT APPROVAL/AGREEMENT**
CLIENT AGREES THAT ITS UTILIZATION OF THE ABOVE-NAMED MULTI-STAFFING SERVICES EMPLOYEE HAS BEEN MADE AVAILABLE AS A RESULT OF THE TEMPORARY PERSONNEL SERVICE RENDERED BY MULTI-STAFFING SERVICES.

CLIENT CERTIFIES THAT THE ABOVE HOURS WORKED ARE CORRECT AND THAT ALL WORK WAS PERFORMED IN A SATISFACTORY MANNER. CLIENT'S SIGNATURE BELOW CONSTITUTES ACCEPTANCE OF THE TERMS AND CONDITIONS IDENTIFIED ON THE REVERSE OF THIS DOCUMENT.

CLIENT COMPANY NAME
*Mobis Alabama, Lic.*
SUPERVISOR'S NAME
*Jay Kim*

CLIENT SIGNATURE x _____ TITLE _____

**MULTI-STAFFING SERVICES**
P.O. BOX 160343
MOBILE, AL 36616-2343
Chattanooga FAX (423) 894-5104
Montgomery FAX (334)271-3615
FAX (251) 343-3915
Gulfport FAX (228)896-0032
Hattiesburg FAX (601)544-7775

| DO NOT WRITE BELOW THIS LINE FOR ACCOUNTING USE ONLY | | | | |
|---|---|---|---|---|
| TOTAL HOURS | PAY RATE | O.T. HOURS | BILLING HOURS | BILLING RATE |

HOME OFFICE COPY - WHITE    LEAVE W/CLIENT - CANARY    EMPLOYEE COPY - PINK

# EXHIBIT 3
# TRACY RIEDLER
# AFFIDAVIT



# MOBIS Alabama, LLC

## ORIENTATION (PROBATIONARY) PERIOD
## POLICY AND PROCEDURES

1. **PURPOSE**

   1.1   It is our policy at MOBIS Alabama, LLC (MOBIS), to help all new Team Members feel a part of our company as quickly as possible and to help them learn more about MOBIS and what we expect from them as a member of our organization. If at any point during the first 90 days of employment, it becomes obvious that continued employment is pointless, the supervisor should recommend termination proceedings. Due to Alabama being an "employment at will" State, an employer can terminate with or without cause at any time. Ninety (90) days is an acceptable amount of time to be able to fairly evaluate a person's performance.

2. **POLICY**

   2.1   The first ninety (90) days of employment are considered an orientation period. This is a critical period in a Team Member's development and success with MOBIS. The orientation period is a trial period during which the supervisor will determine whether the Team Member has proved that he or she can handle their job satisfactorily.

   2.2   There is no reason for the supervisor to endure 90 days of unsatisfactory progress on a new hire. At any point during the 90 days, if it becomes obvious that continued employment is pointless, the supervisor should recommend termination proceedings.

   2.3   Before the end of the Team Member's orientation period, the HR Department will send the supervisor a Performance Review Sheet, on which the supervisor will indicate the Team Member status.

   2.4   During this orientation period, any Team Member's who have three (3) absenteeism occurrences will be terminated. The occurrences can include a tardy, early out, and/or an all day absence. (03/21/05)

Effective Date:     07/20/04, 01/04/05, 03/21/05, 04/24/06
Revision Number:  1, 2, 3, 4
Policy:                 Orientation (Probationary) Period



# MOBIS Alabama, LLC

## ORIENTATION (PROBATIONARY) PERIOD
## POLICY AND PROCEDURES

3.    **PROCEDURE**

3.1    The Supervisor must complete the Performance Review Sheet and return it to the HR Department prior to the end of the 90-Day Orientation Period.

3.2    This procedure does not alter the employment-at-will relationship.  A Team Member can terminate his or her employment at any time with or without reason, and MOBIS has the same right.

Effective Date:     07/20/04, 01/04/05, 03/21/05, 04/24/06
Revision Number:  1, 2, 3, 4
Policy:                 Orientation (Probationary) Period

# EXHIBIT 4
# TRACY RIEDLER
# AFFIDAVIT



# MOBIS Alabama, LLC

## EMPLOYEE HANDBOOK ACKNOWLEDGEMENT

The employee handbook describes important information about MOBIS Alabama, LLC, and I understand that I should consult my supervisor or the Human Resources Department regarding any questions or clarifications about the handbook.

My employment with MOBIS is "at will." I may voluntarily leave employment, and may be terminated by MOBIS at any time, and for any reason permitted by law. The contents of this Handbook are not intended to establish a contract or bind the company or the employee to any enforceable relationship. Any verbal or written statements or promises to the contrary are hereby null and void and should not be relied upon by any prospective or existing employees.

Since the information, policies, rules and benefits described here are necessarily subject to change, I understand that revisions to the handbook may occur. All such changes will be communicated through official notices, and I understand that revised information may supersede, modify, or eliminate existing policies. Only the Senior Manager of Human Resources has the right to adopt any revisions to the policies in this handbook.

Furthermore, I acknowledge that this handbook is neither a contract of employment nor a legal document. I have received the handbook, and I understand that it is my responsibility to read and comply with the policies contained in this handbook and any revisions made to it. A copy of this ACKNOWLEDGEMENT FORM will be placed in my personnel file.

Also, I acknowledge that this handbook is the property of MOBIS and that the handbook must be returned upon my termination.

Your signature below indicates that you have agreed to abide by MOBIS' Policies and Procedures.

Employee Name (Please Print)    *Tarsha Nickol Hunter*

Employee Signature    *Tarsha N. Hunter*

SSN    *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*

Date    *June 5, 2006*

Effective Date:    10/04/04
Revision Number:    1
Policy:    Employee Handbook Acknowledgement

HUNTER V. MOBIS
00138

# EXHIBIT B

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| TARSHA NICKOL HUNTER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No.: 2:07-CV-427-WHA |
| vs. | ) | |
| | ) | |
| MOBIS ALABAMA, LLC, | ) | |
| | ) | |
| Defendant. | ) | |

## AFFIDAVIT OF JAEKWANG (JAY) KIM

STAT E OF ALABAMA    )

COUNTY OF ELMORE    )

**BEFORE ME**, the undersigned authority, personally appeared Jaekwang (Jay) Kim who, after being first duly sworn, states as follows:

My name is Jaekwang (Jay) Kim. I am over the age of eighteen (18) years and have first-hand knowledge of the contents of this affidavit. I reside in Montgomery, Alabama, with my wife and two (2) children. I am a native of Korea.

1.    I have been employed by MOBIS Alabama, LLC ("MOBIS") as its Chief Financial Officer ("CFO") since February 10, 2003. My duties as MOBIS' CFO include overall responsibility for the Accounting Department. Before that I was employed by MOBIS, or affiliates of MOBIS, in Korea, for a total of twenty (20) years.

2.    Before moving from Korea to Alabama, I received training on anti-discrimination laws in the United States, including discrimination on the basis of sex and pregnancy. I have worked very hard to succeed at MOBIS and I would never risk my accomplishments by engaging in discrimination. I did not discriminate against Tarsha Hunter on the basis of her sex

1

or pregnancy.

      3.     Plaintiff first came to work in MOBIS' Accounting Department on March 6, 2006 as a temporary employee ("Temp"). She was assigned to MOBIS by her employer, Multi-Staffing. While working as a Temp, Plaintiff recorded her daily arrival and departure times and submitted that information to Multi-Staffing so that she could be paid. I did not keep records of Plaintiff's attendance while she was a Temp, but I knew that it was poor. I have since learned from Multi-Staffing's records that she was absent, tardy or left work early seventeen (17) times in ninety (90) days.

      4.     Plaintiff's title was Accounting Specialist Treasury. Her job description is attached to Ms. Riedler's Affidavit as Exhibit "1." Accounting is a relatively small department and at the time we had only seven (7) or eight (8) employees. It was very important for Plaintiff's duties to be completed accurately and on time. This was particularly important at month's end when we closed out the books. In addition, I submit daily reports to MOBIS' headquarters in Korea, so Accounting must be current at all times.

      5.     Due to Plaintiff's poor attendance as a Temp, I was not willing to offer her employment with MOBIS at the end of three hundred sixty (360) hours or nine (9) weeks which could have been done under the terms of MOBIS' agreement with Multi-Staffing. Instead, I decided to wait and see if Plaintiff's attendance improved.

      6.     Plaintiff continued to miss work during the next thirty (30) days so I did not favor hiring her, and had decided against it, but Plaintiff's supervisor Sonechka Womack, who worked as MOBIS' Assistant Manager of Treasury, wanted to hire Plaintiff. Ms. Womack was Plaintiff's immediate supervisor and she in turn reported to me. Ms. Womack and Plaintiff are both African American females.

7.     Ms. Womack felt that Plaintiff's work was good except for the attendance problems, and did not want to train another employee to perform Plaintiff's job since we had had turn over in the Accounting Department.   Ms. Womack persuaded me to offer Plaintiff probationary employment with MOBIS on the condition that Plaintiff would correct her attendance and punctuality problems.  Although my better judgment was against hiring Plaintiff as an employee of MOBIS, I agreed to do so in deference to Ms. Womack. I spoke directly with Ms. Womack and Plaintiff and told them that Plaintiff must have no more attendance problems if she was to stay employed at MOBIS.  Plaintiff assured me that she would have no more such problems.

8.     On June 5, 2006, Plaintiff became a probationary employee.  At that time, I knew that all new employees at MOBIS, including those who had worked as Temps, must serve a ninety (90) day probationary period during which MOBIS and the employee determine the employee's suitability for long term employment at MOBIS.  What I did not realize at that time was that MOBIS' policy for probationary employees required that such employees are to be terminated after three (3) attendance occurrences.  For this reason, I allowed Plaintiff to accrue more than three (3) attendance occurrences during her probationary period.

9.     After Plaintiff became a probationary employee, and I started keeping attendance records on her, I only recorded absences and significant time away from work. I did not keep track of minor tardies, which Plaintiff was prone to have.  I only kept up with absences from work for several hours.

10.    Plaintiff's attendance record as a probationary employee shows that she had two (2) absences and was away from work for three and a half (3 1/2) hours or longer on five (5) occasions for a total of seven (7) occurrences between June 15, 2006 and August 11, 2006. A

copy of the spreadsheet I maintained on Plaintiff's attendance is attached to this Affidavit as Exhibit "1."

11.    I now understand that Plaintiff should have been terminated on July 27, 2006 after her third attendance occurrence, but she was not terminated because I was not familiar with the number of attendance incidences allowed for probationary employees. As a result, Plaintiff remained employed one (1) month longer than she should have.

12.    I discussed Plaintiff's poor attendance with Plaintiff and with Ms. Womack on several occasions.  Several emails were generated regarding Plaintiff's attendance, which are attached to this Affidavit as composite Exhibit "2". Ms. Womack told Plaintiff in an email dated August 14, 2006 that I had been more than reasonable about Plaintiff's attendance and that more problems would jeopardize her employment with MOBIS.  See E-mail dated August 14, 2006 at Ex. 2.

13.    In about mid-August 2006, MOBIS' Human Resources Department sent to me a "90 Day Work Performance Review Sheet" to be filled out on Plaintiff.  A copy of the Review Sheet I filled out on Tarsha Hunter is attached to this Affidavit as Exhibit "3."  The purpose of the Review Sheet is to determine whether the employee should be offered regular employment at the end of the ninety (90) day probationary period.

14.    Soon after receiving the Review Sheet, I contacted Tracy Riedler in Human Resources and told her that I did not think that I could keep Tarsha Hunter because of her poor attendance.  Ms. Riedler asked me what I meant by "poor attendance," so I gave her a copy of my attendance record on Plaintiff.  When Ms. Riedler saw that Plaintiff had more than two (2) attendance occurrences, she told me that Plaintiff had to be terminated and that I had no choice in the matter.  Ms. Riedler explained that probationary employees are not allowed to have more

4

than two (2) attendance occurrences and that Plaintiff should have been terminated on her third occurrence. She also told me that Plaintiff needed to be terminated soon and that I could not wait until the end of her probationary period which would have been in early September.

15. This was the first time I had a full understanding of the specific requirements of the attendance policy for probationary employees. When I first started working for MOBIS, there was no specific attendance policy for probationary employees. I have learned that the policy was changed in March 2005 to require termination upon the third attendance incident. The fact that Plaintiff was pregnant at the time made no difference to me and did not influence my decision to speak with Ms. Riedler. I did not mention Plaintiff's pregnancy to Ms. Riedler, and I have no reason to believe that Mrs. Riedler was aware that Plaintiff was pregnant when she told me that she had to be terminated for attendance.

16. Plaintiff's employment was terminated on August 25, 2006. Some time prior to that date (I believe it was the day before, or perhaps two days before), I informed Ms. Womack that Plaintiff was going to be terminated for attendance. Ms. Womack was very upset, but I told her that the rules had to be followed.

17. On August 25, 2006, Plaintiff asked for a meeting with me and Ms. Womack, so we met with her. During the meeting, I thanked Plaintiff for her contributions to the Accounting Department and told her that her employment was being terminated due to attendance. Plaintiff became very loud, argumentative and insubordinate. She accused me of not giving her the real reason for her termination. I was concerned that the meeting was getting out of control, so I sent word for Ms. Riedler to join the meeting. Ms. Riedler joined the meeting and explained to Plaintiff the attendance policy for probationary employees and told Plaintiff that MOBIS could not offer her regular employment, and that she was terminated. Plaintiff told Ms. Riedler that

she was aware of the policy regarding attendance during the probationary period. She said she just didn't think that was the reason for her termination. After that, Plaintiff left the meeting.

18.    I am aware that Plaintiff contends in this lawsuit that she was terminated because she was pregnant. This is not true as I have previously explained.

19.    In early August 2006, Plaintiff brought an ultrasound picture to work, and I saw her showing it around to employees in the Accounting Department. She showed me the ultrasound picture and told me that she was pregnant. I congratulated Plaintiff on her pregnancy. I am also aware that Plaintiff alleges that I treated her differently after learning of her pregnancy. I do not think that is true because I prefer to communicate with Accounting Department employees through their supervisors rather than directly. That has always been my preference. If my behavior towards Plaintiff changed in any respect, it was not conscious on my part. I did not purposely treat Plaintiff any differently after I found out she was pregnant.

20.    I am aware that Plaintiff alleged that I said that I "can't take care of a person like [Hunter]." If I used that phrase, it had nothing to do with Plaintiff's pregnancy. That is a phrase I use to convey my expectations that my staff keep up with their responsibilities without falling behind or unnecessarily involving others. If I used that phrase with reference to Plaintiff, it meant that I did not want to work with her in Accounting and Finance because she was an unreliable employee due to her attendance problems.

21.    During my deposition, I was asked about former MOBIS employee SuJin Lee. MOBIS hired Ms. Lee in 2006 at my recommendation. I knew that Ms. Lee was newly pregnant at the time MOBIS hired her and told her that I was very happy for her. Ms. Lee voluntarily left MOBIS after a few months because her husband wanted to return to Korea to pursue business opportunities there.

22.    I have never supervised and did not know LaJarra Jefferson or Shalonda Gordon. I was not involved in the terminations of their employment, nor do I know anything about the circumstances of their terminations.

23.    I have a family of my own with two (2) children that I love very much. I feel that pregnancy is a natural and wonderful thing. I have no problem with pregnancy in the work place.

24.    To my knowledge, I have supervised three (3) pregnant employees since becoming MOBIS' CFO: SuJin Lee, Plaintiff and Sacouya Robertson, who is currently pregnant and working in Accounting. I did not discriminate against any of these women due to their sex or pregnancy.

25.    My understanding of written English is good. I have more difficulty understanding spoken English, and Americans sometimes have difficulty understanding me until they have worked with me for a while.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on March 28th, 2008.

_____
**JAEKWANG (JAY) KIM**

Sworn to and subscribed before me on this the 28th day of March, 2008 .

Notary Public _____
My Commission Expires: NOTARY PUBLIC STATE OF ALABAMA AT LARGE
MY COMMISSION EXPIRES:  Oct 13, 2010
BONDED THRU  NOTARY PUBLIC UNDERWRITERS

[SEAL]

7

# EXHIBIT 1
# JAY KIM
# AFFIDAVIT

### 2006 Absense Record - Tarsha Hunter

| Date | # of Days | Hrs taken | Accum. Hrs | Note |
|------|-----------|-----------|------------|------|
| 06/15/2006 | 1 | 8 | 8 | Sick |
| 07/25/2006 | 1 | 3.5 | 11.5 | Doctor's appointment |
| 07/27/2006 | 1 | 3.5 | 15 | Doctor's appointment |
| 07/31/2006 | 1 | 6 | 21 | Sick |
| 08/01/2006 | 1 | 8 | 29 | Sick |
| 08/11/2006 | 1 | 4 | 33 | Doctor's appointment |
| 08/14/2006 | 1 | 4 | 37 | Doctor's appointment |

HUNTER V. MOBIS
00115

# EXHIBIT 2
# JAY KIM
# AFFIDAVIT

sonechka.womack@mobis-america.com

| | |
|---|---|
| From: | Jay Kim [jay.kim@mobis-america.com] |
| Sent: | Wednesday, July 26, 2006 8:25 AM |
| To: | 'Tarsha Hunter' |
| Cc: | sonechka.womack@mobis-america.com |
| Subject: | Notification (July 26,2006) |
| Importance: | High |

Tarsha,

This is a notification for tardiness.
On Wednesday the 26th you were noted as being tardy, this was not a first time during 90-day probationary.
I need for you to keep the starting time for business, everyday.

When you return from doctor's office, please submit the doctor's note and schedule for make-up time.
In addition, you are reminded that you are still serving out your probationary period and that attendance is very important.
Please make every effort to correct these deficiencies as your long term employment may be in jeopardy.

Thanks.

*Jay K. (Jae-kwang)  Kim / CFO*

MOBIS Alabama,LLC.
1395 Mitchell Young Road,
Montgomery, AL 36108

Tel : 334-387-4802
Fax : 334-387-4900
E-mail : *jay.kim@mobis-america.com*

HUNTER V. MOBIS
00172

7/26/2006

**sonechka.womack@mobis-america.com**

| | |
|---|---|
| **From:** | Jay Kim [jay.kim@mobis-america.com] |
| **Sent:** | Wednesday, August 02, 2006 8:18 AM |
| **To:** | 'Tarsha Hunter' |
| **Cc:** | sonechka.womack@mobis-america.com |
| **Subject:** | Check out pending works |
| **Importance:** | High |

Tarsha,

I hope that you are getting better.

We are on the month end closing. Please check pending works and reorganize your desk.

There were a bunch of documents which should have been filed.

And, I need for you to submit doctor's note and make-up schedule for your absence.

Thanks.

**Jay K. (Jae-kwang) Kim / CFO**

MOBIS Alabama,LLC.

1395 Mitchell Young Road,

Montgomery, AL 36108

Tel : 334-387-4802

Fax : 334-387-4900

E-mail : *jay.kim@mobis-america.com*

8/2/2006

HUNTER V. MOBIS
00173

**sonechka.womack@mobis-america.com**

**From:** sonechka.womack@mobis-america.com
**Sent:** Wednesday, August 02, 2006 10:35 AM
**To:** 'Tarsha Hunter'
**Cc:** 'Jay Kim'
**Subject:** Invoices/Statements, etc.

Hello Tarsha,

Please remember to make sure that all invoices are entered into SAP on the day received.  It is very important that the invoices are entered and then distributed to the responsible person in a timely manner.  There is a small timeframe that the responsible person has to complete their task and return the invoice to our department for payment.  The President holds each person liable if the invoice is not processed on time.  If they receive the invoice late, they will report to it Jay and the President that accounting did not give it to them on time.

I understand that sometimes you will run into some problems, but please try to have the invoices entered everyday before you leave.  Let me know if you run into any problems.

Also, regarding statements from vendors, please review the statement to see if the invoices listed have been paid/accounting document generated/received by MOBIS.  After doing so, please submit the statement with documentation of your research to me and then I will forward it to Jay.

I completely understand that you are juggling a lot of work.  Jay is working on hiring more people in our department.  But in the meantime, please continue to do your best because everything we do reflects our job evaluation.

Thank you for your hard work!  I appreciate everything that you do!

Sonechka Womack
General Accounting
Assistant Manager
MOBIS Alabama, LLC
334-387-4845 (T)
334-387-4900 (Fax)

HUNTER V. MOBIS
00174

**sonechka.womack@mobis-america.com**

---

**From:**  Tarsha Hunter [Tarsha.Hunter@mobis-america.com]
**Sent:**  Wednesday, August 09, 2006 10:49 PM
**To:**  sonechka.womack@mobis-america.com
**Subject:** RE: Attendance Issues

When I returned on the 3rd of August , I didn't take a lunch break, that's a hour, today I came in @ 7:30, so that's 30 min. and I can stay until 7:00 pm today and starting Monday stay in for lunch thru Wed. and Sat. Aug. 19, come in for 4 hours.

*Tarsha N. Hunter .Account Specialist*
*Mobis Alabama, LLC.*
*1395 Mitchell Young Road*
*Montgomery, AL 36108*
*Ph: 334-387-4878*
*Fx: 334-387-4900*
*Tarsha.Hunter@Mobis-America.com*

**From:** sonechka.womack@mobis-america.com [mailto:sonechka.womack@mobis-america.com]
**Sent:** Thursday, August 10, 2006 10:06 AM
**To:** 'Tarsha Hunter'
**Cc:** 'Jay Kim'
**Subject:** RE: Attendance Issues

Tarsha,
As cited from the below email, please submit a schedule of time that you will be able to make up for your absences.  We completely understand you current health condition, but this policy has been set for us to comply with when away from the office numerous times.  This is not to discourage you; this is just to keep fairness throughout this department.

Thank you,
Sonechka

---

**From:** sonechka.womack@mobis-america.com [mailto:sonechka.womack@mobis-america.com]
**Sent:** Tuesday, May 09, 2006 10:29 AM
**To:** 'Tarsha Hunter'
**Subject:** FW: Attendance Issues
**Importance:** High

**HUNTER V. MOBIS**
**00175**

**From:** Jay Kim [mailto:jay.kim@mobis-america.com]

**Sent:** Wednesday, April 26, 2006 2:43 PM

**To:** nicole.boswell@mobis-america.com; sonechka.womack@mobis-america.com; 'Stephanie Perez'; 'Sandra Goodin'; hosang.hwang@mobis-america.com

**Subject:** Attendance Issues

**Importance:** High

To all of staffs

First of all, I appreciate all of your effort and hard working.

I looked trough the status of individual attendance in accounting department up to now.

And, I asked and discussed with HR department to manage it more effectively.

1. Regular duty hours are 8 AM till 5 PM. Employees are expected to arrive to work in ready to start by 8 AM.

2. Employees are expected to remain at work (Except during the lunch break) until 5 PM.

3. Scheduled appointments outside MOBIS Alabama.

  A. Doctor's appointments

    1) From time to time we expect that employees must request time away from work in order to attend a Doctor's appoint ment.

      Personnel are expected to give ample notification (Minimum 24 Hours notification) prior to the appointment.

      Personnel are expected to schedule appointments for a time period that the results in the least amount of time away fr om work.

    2) If due to a health condition, you are required to be away from work multiple times during any given month,

        we should have an understanding that this time should be made up if you wish not to use your vacation allotment.

        This can be accomplished in many different ways, some examples include; staying late on regular work days to m ake up the number of hours missed, work on

        Saturday, etc.

    3) As salaried employees it is expected that some time in addition to schedule work hours, may be necessary at times.

      Like-wise we need to have an understanding that we must both work together to accomplish the job.

      Please do not take advantage of my cooperative nature as I still have to ensure that the work is completed.

  B. All other situations are adequately covered by company policy such as; Maternity, Family medical Leave, Bereaveme nt leave, Jury Duty etc.

As you are aware of, Closing is very important and primary issue in accounting department.

8/10/2006

HUNTER V. MOBIS
00176

And we should close every each month-end just in time to analysis and report it to the top management group in the head quarters.

Regarding the vacation days, if you want to take vacation days, if possible, please do not use it consecutively over the 3 b usiness days and avoid the month-end closing period, otherwise first or second weeks of every month.

Your great assistance would be much appreciated.

Jay Kim

*Jay K. (Jae-kwang) Kim / CFO*

MOBIS Alabama,LLC.
1395 Mitchell Young Road,
Montgomery, AL 36108

Tel : 334-387-4802
Fax : 334-387-4900
E-mail : *jay.kim@mobis-america.com*

8/10/2006

HUNTER V. MOBIS
00177

## Jay Kim

보낸 사람: Jay Kim [jay.kim@mobis-america.com]
보낸 날짜: 2006년 8월 14일 월요일 오전 7:47
받는 사람: 'sonechka.womack@mobis-america.com'
제목:    RE: Attendance Issues
중요도:   높음
첨부 파일: Tarsha Sonechka.xls

관리:    받는 사람                      읽음
        'sonechka.womack@mobis-america.com' 읽음: 2006-08-14 오전 8:34

Sonechka,

I need to know about the status of her attendance since she has been started permanent employee otherwise during 90-day probationary in company.

**Please fill out the attachment correctly and submit it to me by today.**

**And also, you need to submit it for you to me.**

Jay Kim

---

**From:** sonechka.womack@mobis-america.com [mailto:sonechka.womack@mobis-america.com]
**Sent:** Thursday, August 10, 2006 12:59 PM
**To:** 'Jay Kim'
**Subject:** FW: Attendance Issues

---

**From:** Tarsha Hunter [mailto:Tarsha.Hunter@mobis-america.com]
**Sent:** Wednesday, August 09, 2006 10:49 PM
**To:** sonechka.womack@mobis-america.com
**Subject:** RE: Attendance Issues

When I returned on the 3rd of August , I didn't take a lunch break, that's a hour, today I came in @ 7:30, so that's 30 min. and I can stay until 7:00 pm today and starting Monday stay in for lunch thru Wed. and Sat. Aug. 19, come in for 4 hours.

*Tarsha N. Hunter .Account Specialist*

2006-08-24

HUNTER V. MOBIS
00180

*Mobis Alabama, LLC.*
*1395 Mitchell Young Road*
*Montgomery, AL 36108*
*Ph: 334-387-4878*
*Fx: 334-387-4900*
*Tarsha.Hunter@Mobis-America.com*

**From:** sonechka.womack@mobis-america.com [mailto:sonechka.womack@mobis-america.com]
**Sent:** Thursday, August 10, 2006 10:06 AM
**To:** 'Tarsha Hunter'
**Cc:** 'Jay Kim'
**Subject:** RE: Attendance Issues

Tarsha,

As cited from the below email, please submit a schedule of time that you will be able to make up for your absences. We completely understand you current health condition, but this policy has been set for us to comply with when away from the office numerous times. This is not to discourage you; this is just to keep fairness throughout this department.

Thank you,
Sonechka

---

**From:** sonechka.womack@mobis-america.com [mailto:sonechka.womack@mobis-america.com]
**Sent:** Tuesday, May 09, 2006 10:29 AM
**To:** 'Tarsha Hunter'
**Subject:** FW: Attendance Issues
**Importance:** High

---

**From:** Jay Kim [mailto:jay.kim@mobis-america.com]
**Sent:** Wednesday, April 26, 2006 2:43 PM
**To:** nicole.boswell@mobis-america.com; sonechka.womack@mobis-america.com; 'Stephanie Perez'; 'Sandra Goodin'; hosang.hwang@mobis-america.com
**Subject:** Attendance Issues
**Importance:** High

2006-08-24

HUNTER V. MOBIS
00181

To all of staffs

First of all, I appreciate all of your effort and hard working.

I looked trough the status of individual attendance in accounting department up to now.
And, I asked and discussed with HR department to manage it more effectively.

1. Regular duty hours are 8 AM till 5 PM. Employees are expected to arrive to work in ready to start by 8 AM.

2. Employees are expected to remain at work (Except during the lunch break) until 5 PM.

3. Scheduled appointments outside MOBIS Alabama.

 A. Doctor's appointments

 1) From time to time we expect that employees must request time away from work in order to attend a Doctor's appointment.

 Personnel are expected to give ample notification (Minimum 24 Hours notification) prior to the appointment.

 Personnel are expected to schedule appointments for a time period that the results in the least amount of time away from work.

 2) If due to a health condition, you are required to be away from work multiple times during any given month,

 we should have an understanding that this time should be made up if you wish not to use your vacation allotment.

 This can be accomplished in many different ways, some examples include; staying late on regular work days to make up the number of hours missed, work on

 Saturday, etc.

 3) As salaried employees it is expected that some time in addition to schedule work hours, may be necessary at times.

 Like-wise we need to have an understanding that we must both work together to accomplish the job.

 Please do not take advantage of my cooperative nature as I still have to ensure that the work is completed.

 B. All other situations are adequately covered by company policy such as; Maternity, Family medical Leave, Bereavement leave, Jury Duty etc.

As you are aware of, Closing is very important and primary issue in accounting department.
And we should close every each month-end just in time to analysis and report it to the top management group in the headquarters.
Regarding the vacation days, if you want to take vacation days, if possible, please do not use it consecutively over the 3 business days and avoid the month-end closing period, otherwise first or second weeks of every month.

Your great assistance would be much appreciated.

2006-08-24

HUNTER V. MOBIS
00182

Jay Kim

*Jay K. (Jae-kwang)  **Kim / CFO***

MOBIS Alabama,LLC.
1395 Mitchell Young Road,
Montgomery, AL 36108

Tel : 334-387-4802
Fax : 334-387-4900
E-mail : *jay.kim@mobis-america.com*

2006-08-24

**sonechka.womack@mobis-america.com**

| | |
|---|---|
| **From:** | sonechka.womack@mobis-america.com |
| **Sent:** | Monday, August 14, 2006 9:05 AM |
| **To:** | 'Tarsha Hunter' |
| **Subject:** | Attendance |

Good morning Tarsha,

I received your voicemail regarding you will not be able to drop off your child before 7:30 am. I understand it completely. However, because of the company policy it may be hard to allow you to come in late. I have already spoken to Jay and it is hard for him to understand. I recommend that you get a written letter from your child's school and speak to Jay about this.

There have been quite a few instances that Jay has excused. We all know that Jay is very strict when it comes to tardiness and attendance. I feel that he has been more than understanding for everything (considering this is Jay I am talking about). I really want you to succeed here at MOBIS, so I hope you can do you best to meet the standards of this company. You are getting close to your 90 day probation ending so please try to leave a great impression so that you will be able to continue your employment here at MOBIS. I am here to help you.

Thanks,

Sonechka Womack
General Accounting
Assistant Manager
MOBIS Alabama, LLC
334-387-4845 (T)
334-387-4900 (Fax)

8/14/2006

HUNTER V. MOBIS
00178

**tracy.riedler@mobis-america.com**

| | |
|---|---|
| **From:** | tracy.riedler@mobis-america.com |
| **Sent:** | Wednesday, August 23, 2006 4:13 PM |
| **To:** | 'Jay Kim' |
| **Subject:** | RE: 90 DAY Work Performance Review Sheet |

**Tracking:** **Recipient Read**

   'Jay Kim'    Read: 8/23/2006 4:29 PM

Sounds good.  I will wait to hear word from you.

---

**From:** Jay Kim [mailto:jay.kim@mobis-america.com]
**Sent:** Wednesday, August 23, 2006 3:24 PM
**To:** tracy.riedler@mobis-america.com
**Subject:** RE: 90 DAY Work Performance Review Sheet
**Importance:** High

Tracy,
I am contacting headquarters to cancel my business trip to Korea due to purchasing member's interest from C & A.
But, I am not sure that they would approve it or not.
I need to contact them this evening again.

My concerning for termination of Tarsha is Sonechka wants to keep her.
Because of she might be not like any kind of changes.
Then I do not want to take care of Tarsha anymore.
If I will be stayed in the next week, I need your help to terminate her.
I will let you know whether I am available or not.

Thanks.

---

**From:** tracy.riedler@mobis-america.com [mailto:tracy.riedler@mobis-america.com]
**Sent:** Wednesday, August 23, 2006 10:20 AM
**To:** 'Jay Kim'
**Subject:** 90 DAY Work Performance Review Sheet
**Importance:** High

Here is the 90 Day Performance Review Form.  Please make comments, sign and return to me.  Do you want to terminate her prior to your trip to Korea?  You will interview two Accounting candidates this week.  Please let me know and I will help you with the termination meeting.

8/9/2007

HUNTER V. MOBIS
00198

# EXHIBIT 3
# JAY KIM
# AFFIDAVIT

## 90 DAY WORK PERFORMANCE REVIEW SHEET

Team Member Name          Tarsha Hunter

Title                     Accounting Specialist

Department                Accounting and Finance

Division                  Module

Manager/Supervisor        Sonechka Womack

Date of Hire              06/05/06

Date 90 Day Probationary Period Expires    09/02/06

**Check One**

_____ **A:**    **The employee has successfully passed the probationary period for their present job.**

❖ Attendance is satisfactory.  How many days has the team member been absent, late or left early?

_____

❖ What are the team member's strengths?

_____

❖ What are areas the team member could improve on?

_____

**X     B:**    **The employee should be terminated based on unsatisfactory performance.**

❖ Explain why you recommend termination

Tarsha's attendance and dependability was unstable while she was a temporary employee.
I delayed hiring her for this very reason.  I had several conversations with Tarsha and
her supervisor expressing my concern.  Tarsha ensured me this problem would not continue
after she was hired.  I told her that I would continue to evaluate her performance, to include
attendance, during her 90 day probationary period.  She has not improved.  Her mannerism
is not congenial to our department.  And her lack of dependability has placed strain on our
department as when she is not here her work must be performed by her supervisor
who has responsibilities of her own.  I cannot continue with this situation.

Supervisor/Manager Signature          _[signature]_  8/25/06

Sr. Manager Human Resources            _[signature]_  8/25/06

Executive Vice President               _[signature]_  08-25-06

President                              _____

HUNTER V. MOBIS
00114

EXHIBIT C

00014

1    A. No.

2    Q. -- which may keep you from -- there

3 we go.

4        In front of you is Mobis Alabama's

5 employee handbook. Have you ever reviewed any

6 of the employee handbooks from Mobis?

7    A. Not whole page and details.

8        MR. BARNETT: I'm sorry. I didn't

9 hear that.

10        MS. LEONARD: I think he said not

11 whole thing -- page -- not the whole thing but

12 page and detail.

13        MR. BARNETT: Is that what you got?

14        MS. RIEDLER: Not everything in

15 detail. Not the whole page.

16        THE WITNESS: Not everything.

17    Q. With respect to a salaried employee

18 who is in their first ninety days of

19 employment with Mobis, what is your

20 understanding of Mobis's attendance policy as

21 it applies to that employee?

22    A. Actually, I did not clearly know

23 about, you know -- about your question --

24 about your question.

25    Q. I'll rephrase it. That's what I

**KIM, JAY**                                    **Page 14**

00015

1 want you to do.

2    MR. BARNETT: I think he's

3 testifying. He's not saying --

4    MS. RIEDLER: He's not saying he

5 doesn't understand. He didn't clearly

6 understand the ninety-day question.

7    Q. Okay. So is it your testimony that

8 you did not clearly understand the attendance

9 policy for ninety-day probationary employees?

10    A. Yes.

11    Q. Do you understand that policy now?

12    A. Yes.

13    Q. What is your understanding now of

14 that policy?

15    A. Can I see, you know, the policy?

16    Q. Absolutely. If Ms. Riedler wants

17 to help you --

18    MS. RIEDLER: Yeah. I can actually

19 help find -- I'm actually getting pretty good

20 at finding things in this stuff.

21    MR. BARNETT: I thought you would

22 get one out to give him.

23    A. Yes, ma'am.

24    Q. What is your understanding of the

25 policy today?

**KIM, JAY**               **Page 15**

00016

1     A.  Today?

2     Q.  What's your understanding of the

3 policy now?

4     A.  During the, you know, the probation

5 ninety -- ninety-day probationary period --

6         THE COURT REPORTER:  I missed that.

7 Would you repeat the first part?

8     A.  During the ninety-day probationary

9 period, any problems that we have to -- three

10 absenteeism occurrences will be terminated.

11        (A discussion was held off the

12        record.)

13     Q.  When did you come to understand the

14 attendance policy for probationary period

15 employees that are salaried?

16     A.  When Tarsha, you know, was

17 terminated.

18     Q.  How did you come to gain that

19 understanding?

20     A.  How did you?  I can just understand

21 what it was in here.

22     Q.  Okay.  Did anyone like Ms. Riedler

23 or another employee review the policy with

24 you?

25     A.  I'm sorry?

**KIM, JAY**                          **Page 16**

00017

1     Q.  I think you might see where my

2 question is going.  Did someone explain the

3 attendance policy to you?

4     A.  To me?

5     Q.  Yes, sir.

6     A.  Yes, when I start the work in here.

7     Q.  When you say in here, do you mean

8 with respect to Ms. Hunter?

9     A.  Okay.  Let me explain again.

10     MR. BARNETT:  Tracy -- let me say,

11 do you mind if Tracy helps out when there's a

12 lack of communication?  Tracy and Jay speak

13 with each other.

14     MS. RIEDLER:  All the time.

15     MS. LEONARD:  That's fine.

16     MS. RIEDLER:  Yeah.

17     MS. LEONARD:  Just as long as you

18 don't tell him what to say, we're fine.

19     MS. RIEDLER:  You've read policies

20 basically, but when did you gather better

21 knowledge of what ninety-day policy meant?

22 When did you become more familiar?

23     A.  When I start to work in Mobis, I

24 don't have previous -- plenty -- so many -- so

25 many team members.  So I don't care about, you

**KIM, JAY**                              **Page 17**

00018

1 know, the -- I don't think about the policy.

2        However, the business -- you know,

3 the scale has been growing up, and then I

4 just, you know, check out the policy to

5 administer my team members.

6     Q.  All right.

7        MS. RIEDLER:  When did you become

8 more familiar though with specifically ninety-

9 day probationary period?

10     A.  August 20 -- around the 24th or

11 25th -- after the 25th, 2006.

12        (Plaintiff's Exhibit Number 10 was

13        marked for identification.  A copy

14        is attached.)

15     Q.  I'm going to show you a document

16 that I've marked as Exhibit Number 10.  Have

17 you seen the form that is Plaintiff's Exhibit

18 Number 10?

19     A.  Actually, I made the original of

20 this form to keep -- to keep for my records

21 only.

22     Q.  Okay.

23     A.  My records only.  It's not

24 officially, you know, the provided -- you

25 know, the format from HR department.

00020

1 without, you know, the changing some wording.

2    Q. Were you the manager for

3 Ms. Hunter's department?

4    A. I don't know exactly.

5      MS. RIEDLER: Are you the manager

6 of the accounting department?

7    A. I am a CFO.

8    Q. Okay. Who is the manager for the

9 accounting department?

10    A. When Tarsha worked in Mobis

11 Alabama, we don't have -- we didn't get -- we

12 didn't have manager. We have just only -- I

13 have just only two assistant manager, Ho Sang

14 Hwang and Sonechka Womack. That's it.

15    Q. All right. On forms like Exhibit

16 10, who would fill out the portion for a

17 manager approval?

18    A. Normally, I did.

19    Q. All right.

20    A. Yeah, for my records.

21    Q. Has an employee named Latoya

22 Williams worked in the accounting department?

23    A. Latoya? Yeah, I remember. Yeah.

24    Q. What was her job?

25    A. Account receivables. No. No.

**KIM, JAY**                **Page 20**

00021

1 No.  Account payables.

2      Q.  All right.  Did she come to work

3 for Mobis through Multi-Staffing?

4      A.  I can't remember.

5      Q.  All right.  Did she have more than

6 three absences during her probationary period?

7      A.  I could not remember.

8      Q.  If she did, would you have

9 documented them?

10     A.  I'm sorry?

11     Q.  If Ms. Williams had been absent,

12 would you have documented those absences?

13     A.  I think so.

14     Q.  All right.

15     A.  But I clearly remember that.

16     Q.  Does she still work for Mobis

17 Alabama?  Does she still work for Mobis?

18        MR. BARNETT:  Is she still employed

19 at Mobis?

20        MS. RIEDLER:  Latoya.

21     A.  No.

22     Q.  Why is she not with Mobis?

23     A.  I don't know.

24     Q.  Was she fired?

25     A.  No.

**KIM, JAY**                                    **Page 21**

00022

1    Q.  Was her attendance better than,

2 worse than, or equal to Ms. Hunter's?

3    A.  I don't understand -- I don't -- I

4 couldn't remember.  I cannot remember.

5    Q.  All right.  How long ago did she

6 work for you?

7    A.  I couldn't remember.

8    Q.  Did she work for you after

9 Ms. Hunter worked for you?

10    A.  Latoya.  I don't -- I don't

11 remember.

12    Q.  Okay.  Earlier Ms. Riedler

13 testified that employee discipline for

14 salaried employees should be documented in a

15 memorandum that identifies the issue for

16 discipline and an improvement plan and that it

17 should be clear that the memorandum is

18 disciplinary in nature.

19       Was this information communicated

20 to you before or during Ms. Hunter's

21 employment?

22       MR. BARNETT:  Object to the form.

23    A.  I'm sorry.  I cannot understand

24 that.  The sentence is so long.

25    Q.  Before or during Ms. Hunter's

**KIM, JAY**                           **Page 22**

00034

1     Q. -- did you have any problems with

2 her attendance?

3     A. I think so.

4     Q. Tell me what problems you had with

5 her attendance.

6     A. So many tardy and doctors'

7 appointment or something like that.

8     Q. Any other problems?

9     A. Yeah, I have -- I had a problem.

10 As I explain it, I have only seven or eight --

11 few peoples in accounting.

12        So if one employee -- one team

13 member will not take care of, you know, their

14 work just in a timely manner, accounting

15 department will make a harder situation.

16 Because as you know, accounting has to close

17 the months and every -- each month.  But if

18 somebody will not take care of their work just

19 in a timely manner, it will impact on the

20 accounting department.

21        For instance, I have to report it

22 to -- the financial result to headquarters

23 every -- each month after closing out just in

24 time.

25     Q. Did you have any other problems

**KIM, JAY**                                          **Page 34**

00038

1      A.  In March 2006, if you see

2  organizational chart for accounting and

3  finance department, I have two, you know, the

4  different -- you know, the parts.  One is for

5  general accounting and taxes -- taxes.  The

6  other one is treasury.

7          Treasury has been handled by

8  Sonechka with Tarsha.  But the other partner,

9  Ho Sang Hwang, he is no longer employed with

10  Mobis Alabama.  He has been taking care of the

11  general accounting and the taxes.  So it's

12  different.

13      Q.  All right.  Did you discuss with

14  anyone bringing Ms. Hunter into permanent

15  employment or full-time employment with Mobis

16  when she was a temporary employee?

17      A.  Please --

18      Q.  How did Ms. Hunter go from being a

19  temporary employee to a full-time employee?

20      A.  Oh, yeah.  Let me explain.  As a

21  matter of fact, I wanted to -- I don't want --

22  wanted to hire Tarsha during the temporary

23  employees because I have seen, you know, so

24  many, you know, tardy and attendance issues.

25          And so I talked to Sonechka,

00039

1 assistant manager, I don't want her to

2 start -- I don't want Tarsha to start, you

3 know, the permanent employee.

4        However, Sonechka told me and

5 persuaded me -- persuaded me --

6        MR. BARNETT:  Persuade?

7        THE WITNESS:  Persuade.

8     A.  Yeah, persuaded me.  We will

9 keep -- we will keep Tarsha a little bit more

10 period and then -- and then if Tarsha will

11 not -- Tarsha's tardy and attendance issue

12 will not be improved, at that point we will

13 make a decision or something.

14        She asked me and she persuaded me.

15 So I accepted it.  I accepted it.

16        Okay.  We will see and we will

17 monitor and then -- during the ninety-day

18 probationary.  And then Tarsha's attendance

19 issue will not be improved, I will not, you

20 know, hire her or something.  I told her very

21 strongly.

22     Q.  Okay.  How many times did you talk

23 to Ms. Hunter about her attendance?

24     A.  I couldn't remember.  However, if I

25 have some issues, I talk to Sonechka.

**KIM, JAY**                                  **Page 39**

00040

1    Q.  Okay.

2    A.  Sometimes I talk to Tarsha

3 directly.

4    Q.  All right.

5    A.  But I could not remember how many

6 times did I do this.  I don't know.

7    Q.  Do you remember any of the

8 conversations with Ms. Hunter where you talked

9 about her attendance throughout any time she

10 worked for Mobis?

11    A.  Yeah.  As I explained, I had a

12 time, a couple of times where -- I cannot

13 remember, but I have been talked to Tarsha.  I

14 have been talked to Tarsha.

15    Q.  Did you do anything to -- did you

16 write anything or type anything to show you

17 talked to Ms. Hunter?

18    A.  No.  I just e-mailed her.

19    Q.  Okay.  Would the e-mails in this

20 case reflect when you talked to Ms. Hunter?

21    A.  Sometimes I talk to Tarsha without

22 e-mail.  But sometimes I just e-mailed her --

23 e-mailed her.  But I -- I cannot remember.  I

24 cannot remember clearly.

25    Q.  Did you discuss with Ms. Womack or

**KIM, JAY**                    **Page 40**

00041

1 Ms. Hunter buying out Ms. Hunter's contract

2 with Multi-Staffing?

3     A.  No.

4     Q.  Who made the decision to hire

5 Ms. Hunter as a Mobis employee?

6     A.  As I explained a few minutes ago, I

7 really don't want to hire Tarsha, but

8 Sonechka, you know, asked me and persuaded me

9 to hire her.  Because, as I explained, you

10 know, I have just a few peoples in

11 accounting.  So if somebody would leave --

12 would leave, you know, that person has to take

13 care of the other -- the left person's -- the

14 work or something.  I'm not sure.

15     Q.  What did Sonechka say to you to

16 persuade you to hire Ms. Hunter?

17     A.  I don't really remember that, but

18 in my understanding, if -- if Tarsha will

19 leave, Sonechka will make harder situation

20 because -- because Sonechka has to take care

21 of, you know, two person's work -- two

22 person's work.

23         So in my understanding -- and I

24 remember, you know, okay, we can just, you

25 know, wait during the ninety-day period --

**KIM, JAY**                    **Page 41**

00042

1 ninety-day probationary period until Tarsha

2 will be improved or something.  I was

3 responded to Sonechka.

4     Q.  Do you remember any conversations

5 that you had with Ms. Hunter about the reason

6 she may not have been at work?

7     A.  I don't remember that.

8     Q.  Do you remember Ms. Hunter talking

9 to you about her child's school?

10     A.  Yeah, I remember.

11     Q.  Tell me what you remember about

12 that.

13     A.  I don't clearly remember, you know,

14 the exact date but she went to my office and

15 then she explained why is she late or

16 something.

17     Q.  Okay.

18     A.  Then she brought the school

19 handbook or -- one or two pages -- one or two

20 pages.  She show me.  She showed me then

21 explained.  She said, you know, I could not

22 drop her children -- drop her children off,

23 you know, until 7:30.  I could not remember

24 the time.  But she explained.  I remember

25 that.

**KIM, JAY**                                        **Page 42**

00051

1       MS. LEONARD:  He asked for the

2 handbook.

3       MR. BARNETT:  Do you want to see

4 the attendance policy?

5       THE WITNESS:  Yeah.

6       MS. RIEDLER:  Probationary policy?

7       MS. LEONARD:  I believe it's the

8 stack below.

9       MS. RIEDLER:  Sorry.

10      A.  Attendance, in my -- in my

11 knowledge -- attendance means they are bad

12 tardy or late, didn't show up or -- tardiness

13 or unexcused -- for instance, unexcused off or

14 something like that.

15      Q.  What was lacking in Ms. Hunter's

16 dependability?

17      A.  As I explained, you know, the -- we

18 have, you know -- accounting has, you know,

19 the time deadline or something like that.

20        So if somebody will not take care

21 of -- will not finish, you know, their

22 assigned work in a timely manner -- just in a

23 timely manner, that will impact on the

24 accounting department.

25        I am, you know, the responsible

00053

1 there to do her work?

2     MS. LEONARD:  That's not my

3 question.

4    Q.  My question is:  How many times --

5 tell me the times that you remember Ms. Hunter

6 leaving work undone.

7    A.  You know, we have been closing

8 out -- we have been performing the closing out

9 by every month -- each month.  So we was so

10 busy during the month's end -- month's end --

11 during the month's end and early next month or

12 something.  So probably two or three more.  I

13 could not remember, however, during that

14 period.

15    Q.  Did you document any of the times

16 Ms. Hunter left work undone?

17    A.  As I already explained, you know,

18 the -- I -- I did not know, you know, the --

19 how -- the assistant directly.  So if I had

20 some issues, probably I talked to the two

21 assistants -- two assistant managers, two

22 assistant managers.

23    I did not work, you know, the --

24 with, you know -- I didn't work with the

25 assistant directly every time.  If I had, you

**KIM, JAY**               **Page 53**

00054

1 know, the -- if I have some issues, I have to

2 talk to assistant manager.

3      Q.  Did anyone complain to you about

4 Tarsha?

5      A.  I don't -- I don't know.  I don't

6 know.

7      Q.  So you don't remember anyone

8 complaining about Ms. Hunter?

9      A.  The assistant manager Ho Sang -- Ho

10 Sang Hwang -- I don't remember that name, but

11 he sometimes told me -- told me I did not

12 receive them or something or on time or

13 whatever.

14      Q.  Did Sonechka complain about

15 Ms. Hunter?

16      A.  Sonechka, you know, did take, you

17 know -- told me when Tarsha left early or

18 something she has to -- had to take care of

19 Tarsha's work -- Tarsha's work.

20          So she has been worked over 5:00

21 o'clock until sometimes 7:00 o'clock.

22          So when she work to you, you know,

23 over five, six, sometimes seven, I have to

24 talk to -- ask her, What's wrong?  What

25 happened?

**KIM, JAY**                                    **Page 54**

00055

1     When I asked her, you know, she has

2 to be, you know, the -- has to be, you know,

3 finish Tarsha's work -- Tarsha's work.

4   Q.  Did Ms. -- did Sonechka tell you

5 that she had any problems with Tarsha?

6    A.  I cannot remember.  I don't

7 remember, but -- but -- when I have, you know,

8 some problem on the closing out -- closing

9 out, and I ask -- when I ask Sonechka,

10 Sonechka, what's going on, that -- you know,

11 she said, Oh, it has to be done or something.

12 Why didn't you complete it?  Oh, it has been

13 finished, but I could not do that just in time

14 because Tarsha's, you know, the -- you know,

15 the vacant -- you know, was vacant or, you

16 know, left out.

17    MS. RIEDLER:  Are you talking about

18 early out, leaving early during the day?

19    THE WITNESS:  At that point, you

20 know, that Sonechka has to -- has to, you

21 know, complete, you know, the steps at work.

22    So when I asked her -- when I asked

23 Sonechka -- Sonechka did not, you know, blame,

24 you know, Tarsha.  Sonechka did not blame

25 Tarsha.  However, I -- I clearly understand,

**KIM, JAY**               **Page 55**

00056

1 you know -- understood that Sonechka had some

2 problem, some difficulty to complete several,

3 you know, several -- the work just in a timely

4 manner as I requested or as I, you know,

5 the -- as I assigned.

6      So I have seen her.  She has been

7 worked over 5:00 or over 6:00 or over 7:00

8 o'clock.

9    Q.  How many times?

10   A.  I can't remember.

11   Q.  More than once?

12   A.  Yes.

13   Q.  More than five?

14   A.  I don't know.

15   Q.  What did Tarsha do good?

16   A.  Actually, I think that the -- she

17 worked, you know, the -- she worked good.  As

18 you see the ninety -- the worksheet,

19 regulation sheet, I didn't mention about, you

20 know, to her about the work stuff or something

21 like that.

22      MR. BARNETT:  What was that last, I

23 didn't mention what?

24      THE COURT REPORTER:  Work stuff or

25 something like that.

00075

1 work in Mobis Alabama. That was my, you know,

2 opinion.

3    Q. Had you talked to Sonechka about

4 firing Tarsha?

5    A. I don't remember, but I talked to

6 her verbal. Probably I told her -- I was not

7 pleased with, you know, her -- Tarsha's

8 attendance and tardiness or whatever.

9    Q. What did you mean when you wrote, I

10 do not want to take care of Tarsha anymore?

11    A. Okay. That's, you know, the

12 different language barrier or something like

13 that.

14    I read, you know, that that -- I

15 read this sentence. Normally, I have been

16 wrong about -- taking care of them means keep

17 or something like that.

18    Of course, you know, taking care of

19 them has, you know, several different

20 meanings, but I did not know about that. I

21 didn't know about it.

22    In this exact sentence, that means

23 I don't want to work with her in accounting

24 and financing. I just wrote, you know, this

25 word with that meaning. But I'm not sure how

**KIM, JAY**                                    **Page 75**

00076

1 the other person -- how can they, you know,

2 understand this wording, this idioms?

3          I just, you know, wrote that word.

4 Okay.  I will not -- don't want, you know, to

5 work continuously or something like that.  I

6 just wrote that idioms with that meaning.

7     Q.  All right.  What did you mean when

8 you wrote, I need your help to terminate her?

9     A.  Okay.  I clearly remember the why

10 did, you know, I write this sentence.

11          Even though I can speak English,

12 but it's very hard for me to explain about,

13 you know, the detail or something like that

14 with the correct word and idioms.

15          So I need -- I wanted Tracy to

16 understand what -- what I am -- what I was

17 thinking -- what I was thinking.

18     Q.  So you wanted her to help

19 verbalize?

20     A.  Broken English or something.

21     Q.  So you wanted her to help speak for

22 you?

23     A.  Speak or -- and I want -- I want

24 Tracy to understand that with my broken

25 English -- broken English -- not to, you know,

**KIM, JAY**                           **Page 76**

00077

1 the -- with her like in this occasion,

2 projecting.

3    Q.  Who was hired to replace

4 Ms. Hunter?

5    A.  I'm sorry?

6    Q.  Who did you hire to replace her?

7 Who replaced her?

8    MR. BARNETT:  Who took her job when

9 she left?

10    A.  I don't remember that.

11    Q.  How long did it take to replace

12 her?

13    A.  I have no idea.

14    Q.  Now I thought you said --

15    A.  You say my -- you know, the folder

16 or something in my desk.  I can remember, but

17 right now I don't remember that.

18    Q.  Who did her work until you hired

19 someone to replace her?

20    A.  I don't remember that.

21    Q.  Did it cause any problems after you

22 terminated Ms. Hunter in getting the work done

23 in the department?

24    A.  I think so, because the other

25 person has to take care of all the -- Tarsha's

**KIM, JAY**        **Page 77**

00086

1 from his testimony when the decision to

2 terminate her was made.

3     MR. BARNETT:  Well, we knew going

4 in there were going to be communication

5 problems.

6     MS. LEONARD:  These are fundamental

7 questions that can be anticipated.  When he's

8 called in in a case dealing with her

9 termination when we allege it's due to

10 pregnancy, I don't think it's off the wall for

11 him to anticipate I'm going to ask him when

12 the decision to terminate her was made and why

13 she was going to be terminated.

14     A.  Can I explain?

15     Q.  Yes.

16     A.  I remember, you know, when I saw

17 the ultrasound picture, I told Tarsha,

18 Congratulations.  That's normal.  That's

19 common.  It's great, you know.

20     I clearly, you know, explained --

21 clearly explained why should I make a decision

22 to terminate her.

23     Q.  Okay.

24     A.  Her bad tardiness and attendance,

25 and that --

**KIM, JAY**                    **Page 86**

00087

1      MS. RIEDLER:  The ninety-day

2 performance review sheet.  That's where.

3      MS. LEONARD:  Hold on.  We just

4 made it an exhibit.

5      A.  Yeah.  Attendance and dependability

6 issue.  That's it.  It's not related, you

7 know, to pregnancy -- pregnancy.  It's not

8 related to pregnancy.

9      Q.  Did you consider any absences other

10 than what is on Exhibit 2 or any attendance

11 issues other than what's on Exhibit 2?

12      A.  Yes.

13      Q.  What else did you consider?

14      A.  I'm sorry?

15      Q.  What else did you consider?  Is

16 this everything you considered on her

17 attendance, Exhibit 2?

18      A.  Uh-huh.  When I -- when I made a

19 decision to terminate her, I asked Tracy, Do

20 we have some policy or something like that out

21 of our handbook if somebody will have, you

22 know, bad tardiness or bad attendance, how can

23 we do that or something like that.

24      She explained we have the right --

25 ninety-day probation or something like that.

**KIM, JAY**                                    **Page 87**

00088

1      So Tracy explained to me, Tarsha,

2 okay.  So I showed, you know, this statement

3 to Tracy because -- because I don't want to --

4 I didn't want to mix -- write this -- you

5 know, the legal issues or something like that.

6      Q.  Tell me what you remember about the

7 day Ms. Hunter was fired.

8      A.  August 25th.  August the 25th.

9      Q.  Why was that day the day she was

10 fired?

11      A.  I'm sorry?

12      Q.  Why did you fire her on the 25th as

13 opposed to the 23rd or the 24th?

14      A.  There is not a reason.  There was

15 not a reason.

16      Q.  All right.  And tell me what you

17 remember about how Ms. Hunter was terminated

18 on that day.

19      MR. BARNETT:  What happened?  She

20 wants to know what happened on the 25th.

21      A.  On the 25th?

22      Q.  Uh-huh.

23      A.  In my memory, I had a meeting with

24 Tarsha and Sonechka.

25      Q.  Did you record the meeting?

**KIM, JAY**                                    **Page 88**

00089

1   A. Yeah, I -- I had a meeting with

2 Tarsha and Sonechka.

3   Q. Did you make a tape recording or an

4 electronic recording like Ms. Scott is making

5 for the meeting --

6   A. No.

7   Q. -- so that we could listen to it?

8   A. No. No. No.

9   Q. That's all right. I have to ask.

10   MR. BARNETT: I was wondering what

11 the answer was going to be myself.

12   A. You know -- you know, why should I

13 keep, you know, that record?

14   MR. BARNETT: She's entitled to ask

15 that question. That's okay.

16   Q. Some people do it so there's no

17 confusion about what happened.

18   Tell me what you remember about

19 that meeting.

20   A. Yes. When I was -- when I was

21 meeting with Tarsha and Sonechka and I

22 explained why should I make a decision to

23 terminate Tarsha, at the point, Sonechka, you

24 know, was very -- was not pleased with my

25 decision or something.

**KIM, JAY**           **Page 89**

00090

1      I tried to explain what was, you

2 know, the reason of the termination, but --

3 but Tarsha and Sonechka very strongly, you

4 know, they protested their -- you know, their

5 situation. But -- but I want -- I wanted to

6 try to explain in detail what's going on.

7 However I cannot -- I could not explain --

8 explain in details to make them understand

9 that -- understand that.

10     So I asked -- I asked the other

11 assistant manager Mr. Hwang, Ho Sang, to let

12 Tracy know about that, and then I asked him

13 to -- Tracy come to my office.

14     So Tracy just joined with us --

15 joined us.  As I explained on my summary

16 e-mail, I need Tracy's help.  I need Tracy's

17 help.

18     I wanted -- I wanted to explain to

19 Tarsha and Sonechka.  However, I could not

20 really, you know, fully -- fully explain to

21 them.  So I asked Tracy to explain to them in

22 details -- in details.

23     Q.  What did you try to tell -- do you

24 remember what you tried to say in the meeting?

25     MR. BARNETT:  Before Tracy was

**KIM, JAY**                    **Page 90**

00091

1 there?

2      MS. LEONARD:  Yes.

3      A.  Yeah.  I could remember part --

4 some of the parts, but not whole thing.  Not

5 the whole thing.

6      MR. BARNETT:  Let me see if this

7 agent is here yet.

8      MS. LEONARD:  I'm about done if it

9 helps.

10      (Off-the-record discussion)

11      Q.  Do you have any memory of what you

12 tried to say to Sonechka and Tarsha before

13 Tracy came in the room?

14      A.  Okay.  I could remember about that

15 whole, you know, thing because I already, you

16 know, found out, you know, Tarsha's attendance

17 issues.

18      So -- so I just wanted to explain

19 how many times, you know, that she get -- she

20 got, what's that, the attendance issues

21 through my, you know -- with my worksheet or

22 paper, Excel spreadsheet.

23      But I was not very, you know,

24 pleased with, you know, with them during the

25 meeting because -- because I could not express

**KIM, JAY**                                    **Page 91**

00092

1 my -- you know, the exact reason to them

2 with -- with the limited vocabulary or

3 something like that.

4     Q.  Do you have any memory of anything

5 Tarsha or Sonechka said in the meeting?

6     A.  I couldn't remember.

7     Q.  All right.  Did either Sonechka --

8     A.  I remember, you know, that -- I

9 heard, you know, Tarsha wanted to, you know --

10 wanted to work, you know.  And she asked me

11 what was the exact reason of my termination,

12 very -- she asked me very loudly or very --

13 attentively or something.  What was the reason

14 of my termination, or something like that.  I

15 clearly remember that.

16     Q.  Do you remember anything else?

17     A.  I could not remember.

18     Q.  Have you told me everything that

19 you can recall about the meeting where Tarsha

20 was terminated either before or after Tracy

21 got there?

22     A.  Yeah.  You know, the -- in my

23 memory, I had a brief meeting -- brief meeting

24 because, you know, Tarsha and Sonechka's

25 response was very strong, very, you know,

**KIM, JAY**                    **Page 92**

00096

1    Q.  The employee you're talking about

2 works for you now, today, as we're -- you're

3 giving this deposition?  She's working for you

4 now?

5    A.  Yeah, she is working for now.

6    Q.  I just want to make sure.

7    A.  Yeah.

8    Q.  And she's two months, three months

9 pregnant right now?

10    A.  I couldn't remember but, yeah, but

11 maybe.

12    Q.  Okay.  Other than her and Tarsha,

13 any other employees that have been pregnant

14 who have worked for you?

15    A.  Currently or --

16    Q.  At any time.

17    MS. RIEDLER:  Ever.

18    A.  Okay.  Okay.  I remember the one

19 Korean, Korean lady, she has -- worked 2006 in

20 my memory.

21    Q.  All right.

22    A.  She was the assistant like Tarsha.

23 But she left Mobis Alabama after two or three

24 months.  She is not working.

25    Q.  Okay.

**KIM, JAY**                                    **Page 96**

00097

1      A.  But she was -- she had a

2 pregnant -- pregnancy at that point.

3         I heard from her there's these

4 other times, you know, that pregnant because

5 she failed two times due to what's that --

6 what's that --

7         MS. RIEDLER:  Miscarriage.

8      A.  Yeah, miscarriage.  So she was very

9 nervous to, you know, keep, you know, the

10 pregnancy.

11        And then -- then she left to Mobis

12 after two or three months, you know.  She's

13 not to work because -- because her husband is

14 also Korean.

15        However, she has been adopted --

16 adopted or something from Korea to America

17 when she was, you know, a baby.

18        So he -- her husband has been

19 worked in HMMA Honda Motor Manufacturing

20 Alabama -- Alabama.

21        So in my memory, she was doing good

22 job in accounting -- in accounting.  But she

23 left because her husband got a new job in

24 Korea, ebay.com.  I clearly remember that.

25        So I asked, you know, when she

**KIM, JAY**                    **Page 97**

00098

1 wanted to leave Mobis Alabama. So I asked

2 her, Why do you want to leave Mobis Alabama?

3 She said, I am very sorry. I am very sorry.

4 My husband wanted to find out his parents in

5 Korea -- in Korea.

6         So her husband wanted to get a job

7 in Korea -- in Korea. But at the time, you

8 know, her husband got a job -- got a job. So

9 she has to, you know, to leave Mobis Alabama.

10      Q. What was her --

11      A. At the point that she has -- she

12 had a pregnancy, you know.

13      Q. What was her name?

14      A. Su Jin, S-U, J-I-N, Su Jin.

15      Q. Yesterday, there was some testimony

16 that Nicole Boswell said she heard you make a

17 remark that Su Jin's pregnancy was a disgrace?

18      A. A what?

19      Q. A disgrace. What is your response

20 to that testimony?

21         MR. BARNETT: Hold on. I can see

22 he needs help. I've got to go. This is going

23 to take fifteen minutes. That's it.

24         (Break taken.)

25      Q. Mr. Kim, yesterday, there was

**KIM, JAY**                                    **Page 98**

00099

1 testimony that one of your employees told

2 Ms. Hunter that she had heard you make a

3 remark about the young Korean lady who was

4 pregnant that we just discussed.

5    A.  Yes.

6    Q.  She commented that you made a

7 remark to the effect that the pregnancy may be

8 seen as a disgrace.  What's your response to

9 that testimony?

10    A.  Okay.  Probably she mentioned about

11 Su Jin Lee, I think.  I remember the Su Jin

12 Lee.  I already explained about Su Jin Lee's

13 situation.

14    Q.  Correct.

15    A.  Her pregnancy was, you know, the

16 three times, you know.  So she was very

17 careful, you know, the -- handle that -- the

18 issues because she already got two times, the

19 mis --

20    Q.  Miscarriage?

21    A.  The miscarriage -- miscarriage.

22 She got married.

23       She got married.  And she got a job

24 in the USA.  So in my memory, she was doing a

25 good job, even though in a two month or three

**KIM, JAY**                    **Page 99**

00100

1  month.  But I think America has some -- a

2  different meaning of the expression or

3  something.  I think that it's a big

4  misunderstanding, a big misunderstanding,

5  because probably the quote she heard from, you

6  know, the other colleague there, what did they

7  say or something.

8          When I asked Su Jin about the

9  pregnancy or something, she explained why was

10  she, you know, carefully, you know, handle or

11  something.  This was the three times.  So I

12  was very surprised, you know.

13          So I asked him -- I asked her to be

14  careful, if you have some problem, please let

15  me know.  Or if you need to see a doctor or

16  something, you can go or something like that.

17      Q.  Did Ms. Hunter's pregnancy factor

18  into your opinion as to whether she should

19  continue working for Mobis?

20      A.  I don't think -- you know, the

21  pregnancy, you know, is not a problem in the

22  working place I think.  It's not a problem.

23  It's not a problem.

24      Q.  So Ms. Hunter's pregnancy did not

25  bother you?

**KIM, JAY**                                    **Page 100**

00101

1    A.  Yeah.  Sorry.

2    Q.  That's all right.  Make sure when

3 you answer you lift your head up so Elaine can

4 hear you.

5    A.  Sorry.

6    Q.  That's all right.  I'll ask it

7 again.  Did Ms. Hunter's pregnancy bother you?

8    A.  I don't think so.  I don't think

9 so.

10    Q.  Did you have any concerns about

11 having Ms. Hunter work for you while she was

12 pregnant?

13    A.  I think that -- I want to say to

14 you very clearly, pregnancy is not a problem

15 on the working place.  That's my thinking and

16 opinion.  That's my thinking and opinion.

17    Q.  Yesterday, there was testimony --

18    A.  Yes.

19    Q.  -- that employees told Ms. Hunter

20 not to tell you that she was pregnant because

21 other employees had been fired.

22    Do you know why any -- do you know

23 why any coworkers may have told Ms. Hunter not

24 to tell you?

25    A.  I don't know.  Actually, you know,

**KIM, JAY**                                    **Page 101**

00103

1     Q.  What does Mobis do to employees who

2  discriminate?

3     A.  I don't think -- I have never

4  treated somebody, you know, with

5  discrimination or something.

6     Q.  Okay.

7     A.  And also, I was -- you know, I have

8  been, you know, started work in Mobis Alabama

9  since 2003 -- February 2003.

10      When I worked in Korea almost

11  sixteen years, I have learned about the

12  American culture, basic culture,

13  discrimination, sexual harassment, or

14  something like that.  That's very critical and

15  serious issues.

16      I have learned from headquarters.

17  So I have to be very careful, you know, when I

18  work in USA.

19      When I start to work -- when I

20  start to work that first time, I had two

21  American, you know, assistants.  Yeah, they

22  were ladies.

23      So when I learned -- what I learned

24  in Korea about American culture -- American

25  culture.  So I very carefully -- carefully,

**KIM, JAY**                                    **Page 103**

00104

1 you know, have been worked with, you know, my

2 American assistants in order to avoid, you

3 know, the licensing -- the legal issues or

4 something like that.

5        And also, I have learned there are

6 so many lawsuits in State of Alabama, I had

7 learned that when I worked in Korea. So I

8 never, you know, said -- I never said to none

9 of my people, my accounting people, Well,

10 pregnancy is a big problem in the work or

11 something. I never said.

12    Q. Well, my question is a little

13 different.

14    A. Yeah.

15    Q. Mobis Alabama is your employer,

16 correct?

17    A. Yes.

18    Q. Does Mobis Alabama let its

19 employees, everybody that works for it, know

20 you will get in trouble if you discriminate?

21        THE WITNESS: Tracy, simply ask me.

22        MS. RIEDLER: Can I help?

23    Q. If an employee engages in

24 discrimination, what happens to them at Mobis

25 Alabama? What would the company do?

**KIM, JAY**                    **Page 104**

00105

1    A.  I don't know.

2    Q.  Okay.

3    A.  I'm not an expert in the field of

4 legal or something like that.

5    Q.  All right.  That's fine.  That's

6 fine.  Is there anything in your testimony

7 that you want to clarify or change or add to?

8    A.  Yeah.  I just have one thing.

9    Q.  Okay.

10    A.  I'm a Korean.  When I heard from

11 Tracy, we got in this deposition, I felt that

12 why should I -- why should I, you know,

13 admit -- right, you know, in the situation.

14      So I was very surprised.  I was

15 very surprised.  I'm a foreigner.  I have

16 limited, you know, vocabulary, English.

17      So I was very scared.  I was very

18 scared, you know, of this deposition.  How can

19 I explain or how can I understand what you're

20 asking me.  How can I respond correctly

21 without the interpreter or translator.

22      So the day before yesterday,

23 Mr. Kim, President Mr. Kim asked me, if you

24 don't have any confidence under speaking

25 English, you can, you know, take some

**KIM, JAY**                                    **Page 105**

00106

1 assistance from the Korean lawyer or

2 whatever.

3       But I just, you know, responded to

4 Mr. Kim, I did not make any, you know,

5 mistake. So I can do that. I will try to

6 explain correctly.

7       So this, you know, the deposition

8 as far as the time in my whole life, forty-six

9 years, I have never been to another lawsuit in

10 Korea. I haven't worked so hard.

11       And actually, I was supposed to go

12 back to Korea in the last year because I have

13 been working here five years. That's the

14 expected, you know, working period like, you

15 know, they assign Korean guys. I was just

16 only one person not back to Korea.

17       But I don't know how -- how can I,

18 you know, explain what happened in 2006? So

19 sometimes, you know, I couldn't remember on

20 the exact situation. However, this case is

21 not this -- impacting -- this case is just --

22 an impact to be in a situation on me -- on

23 me. So I don't know my response is enough for

24 you.

25    Q. Have you -- do you feel like you've

# EXHIBIT D

00073

1   Q.   And what page again?

2   A.   131.

3   Q.   Did you read this section of the handbook

4        about probationary period policies and

5        procedures?

6   A.   Yes.

7   Q.   Did you read the part under policy about the

8        ninety days of employment are considered --

9        the first ninety days are considered a

10       probationary period?

11  A.   Yes.

12  Q.   Did you read the part under section 2.5 about

13       any employee who has three absentee

14       occurrences would be terminated?

15  A.   Yes.

16  Q.   And you understood that applied to you,

17       right?  I'm sorry, your answer?

18  A.   Repeat that again.

19  Q.   You knew that this policy applied to you for

20       the first ninety days after June 5th, 2006?

21  A.   Yes.

22  Q.   So you knew that if you had three occurrences

23       you would be terminated?

00074

1   A.   By what the handbook states, yes.

2   Q.   Did anybody tell you anything different at any

3        time?

4   A.   No.

5   Q.   So we don't have a disagreement about the fact

6        that you read this policy on page 131?

7   A.   No.

8   Q.   And you acknowledge that you knew it applied

9        to you once you became a regular employee on

10       June 5th or 6th, right?  You knew it applied

11       to you?

12  A.   Yes.

13  Q.   And you knew about section 2.5?

14  A.   Yes.

15  Q.   And nobody told you anything different from

16       what this piece of paper says that's on page

17       131 and 132?

18  A.   Correct.

19  Q.   And whoever the man was that talked to y'all

20       during the orientation didn't tell you

21       anything different from this policy --

22  A.   Correct.

23  Q.   -- did he?

00079
1           for identification.)

2           MS. SMITH:  That's 13.

3           MR. BARNETT:  Yes.

4  Q.  Let me show you Exhibit 13.  Have you seen

5      that document before?

6  A.  Only through my attorney.

7  Q.  This shows seven attendance incidents.  And my

8      question to you is if you have cause to

9      disagree with any of those as either not

10     having occurred or that you were charged with

11     too much or too little time off.

12  A.  The only thing that stands out is 8/14/06.

13  Q.  Right.

14  A.  The other days I would have to go back to my

15     records.

16  Q.  What stands out about 8/14?

17  A.  I was there at work.  I didn't take off.

18  Q.  All day?

19  A.  Yes.

20  Q.  And what is it that makes that so clear in

21     your memory?

22  A.  Because that was the day that I was supposed

23     to go to my first doctor's appointment for

00080

1 pregnancy, and I had to switch it to another

2 day.

3 Q. Did you put in a slip for the 14th?

4 A. Yes, I did.

5 Q. Do you remember what day you switched it to?

6 A. Yes, August the 9th.

7 Q. Well, did you move it up you're saying?

8 A. It was rescheduled from the 14th to the 9th.

9 Q. Let me show you 17.

10    MS. LEONARD: Did you mean to skip

11      from 13 to 17?

12    MR. BARNETT: Yes, I did.

13    MS. SMITH: 13.

14    MR. BARNETT: Let's not do that.

15      Maybe we shouldn't do that.

16    MS. LEONARD: That's all right. I

17      just want to make sure.

18    MR. BARNETT: Listen, anybody that

19      sees me doing something dumb

20      like that is invited to correct

21      me.

22    MS. LEONARD: I just didn't want us

23      to get into trouble later

**hunter, tarsha, 01-30-2008**          **Page 80**

00096

1  A.  The 6th -- 5th, 6th.

2  Q.  Whatever the day was right after you started

3      probationary --

4         MS. RIEDLER:  6th.

5  A.  Yes.

6  Q.  All right.  And what did she say to you?

7  A.  At that time, she just told me, do not tell

8      Jay Kim.

9  Q.  Did she say why you should not tell Jay Kim?

10 A.  Because of a previous employee that was fired

11     in regards to being pregnant.

12 Q.  And who was that employee?

13 A.  She didn't tell me at the time.

14 Q.  Do you know now?

15 A.  No.

16 Q.  Do you have any idea who it was allegedly?

17 A.  I think I do.  I'm not sure.

18 Q.  And who is that?

19 A.  First name basis, Lajarra.

20 Q.  Lajarra Jefferson, right?

21 A.  That sounds about right.

22 Q.  Have you ever spoken with Lajarra Jefferson?

23 A.  No.

00097

1    Q.  Have you ever spoken with her lawyer?

2    A.  No.

3    Q.  To your knowledge, has your lawyer spoken with

4       her?

5    A.  Not to my knowledge.

6    Q.  To your knowledge, has your lawyer spoken with

7       her lawyer?

8    A.  Not to my knowledge.

9    Q.  Do you know who Lajarra -- what

10      Lajarra Jefferson's job was?

11   A.  No, I don't.

12   Q.  Do you know that she was a production worker?

13   A.  That's what they told me.

14   Q.  Who is they?

15   A.  Some of the other employees that were at Mobis

16      that told me the same thing, do not tell.

17   Q.  And who told you not to tell?

18   A.  Sonechka Womack.  I gave the information --

19      the rest of the information to my attorney.  I

20      can't -- off the top of my tongue -- I mean,

21      the top of my head I can't state their names.

22          MR. BARNETT:  Where are they?  Where

23             are the initial disclosures?

**hunter, tarsha, 01-30-2008**                      **Page 97**

00098

1        MS. SMITH: Here you go.

2  Q.  Tell me again what Sonechka said. She said,

3     don't tell Jay, and what else?

4  A.  She just told me to -- well, she first said

5     congratulations. And then she said, do not

6     tell Jay Kim.

7  Q.  And did she say why?

8  A.  Yes.

9  Q.  And that was?

10  A.  Due to the fact as far as -- because of the

11     firing of the other employee,

12     Lajarra Jefferson.

13  Q.  Other than Lajarra Jefferson, have you ever

14     heard it stated or alleged that any other

15     Mobis employee was fired or discriminated

16     against because of pregnancy?

17  A.  Yes.

18  Q.  Who?

19  A.  First name basis, they told me it was someone

20     by the name of Shundra or Shonda.

21  Q.  Shalanda?

22  A.  That sounds about right.

23  Q.  Do you know anything about Shalanda? Have you

00099

1     ever spoken with her?

2  A.  No.

3  Q.  What about Shalanda Gordon?  Does that sound

4     right?

5  A.  That sounds about right.

6  Q.  Who told you about Shalanda Gordon?

7  A.  It came up in the conversations.  I don't

8     remember exactly who, but I heard it more than

9     once.

10        MR. BARNETT:  Where are the initial

11           disclosures?

12  Q.  Do you know anything about the circumstances

13     of Lajarra Jefferson's termination?

14  A.  No.

15  Q.  Do you know anything about the circumstances

16     of Shanda --

17        MS. RIEDLER:  Shalanda.

18  Q.  -- Shalanda Gordon's?

19  A.  No.

20  Q.  Any other employees that you heard about or

21     claim to know about that claimed they were

22     discriminated against on the basis of being

23     pregnant?

00100

1  A.  No.

2         (Off-the-record discussion.)

3  Q.  And to this day, you don't know of any other

4      people that you have --

5  A.  No.

6  Q.  -- any reason to believe were discriminated

7      against based on pregnancy?

8  A.  No, not that I know of.

9  Q.  Did Sonechka tell you that Jay had ever

10     discriminated against anyone on the basis of

11     pregnancy?

12  A.  No.

13  Q.  Do you have any reason to believe that Jay has

14     ever discriminated against -- I know you said

15     he did against you.  But do you know of any

16     other incidents where you suspect even that he

17     discriminated on the basis of pregnancy?

18  A.  Not that I know of.

19  Q.  And Sonechka didn't tell you that he had

20     discriminated on the basis of pregnancy?

21  A.  No, she did not.

22  Q.  And she did not tell you that she thought he

23     would discriminate on the basis of pregnancy,

00109

1   Q.  All right.  Let me see.  Are we counting the

2       abortion clinic or --

3   A.  No.  It was more than three, along with the

4       abortion clinic and Dr. Lawhon's office.

5   Q.  Okay.  You took that ultrasound to work and

6       showed it around; is that right?

7   A.  That's correct.

8   Q.  Didn't Jay Kim come to you and say

9       congratulations after you did that?

10  A.  I don't remember him saying so.

11  Q.  If he says he did, do you dispute that?

12  A.  No.

13  Q.  When was the first ultrasound?

14  A.  The very first was in the abortion clinic.

15  Q.  Is that the one you took to work?

16  A.  No.

17  Q.  When did you have the one that you took to

18      work?

19  A.  On the 9th.

20          MR. BARNETT:  Is that in the

21              records?

22  Q.  That was August 9th?

23  A.  Correct.

00142

1  Q.  Did you understand that he was warning you

2      that your long-term employment could be in

3      jeopardy if you continued to miss work during

4      your probationary period?

5  A.  Yes.

6  Q.  How late were you on the 26th?

7  A.  I don't remember.

8  Q.  Do you remember why you were late?

9  A.  No, I'm not sure.  I do remember the 26th.

10     That is the day that -- that's the same day

11     that I went in and I gave him the information

12     as far as with my daughter's schoolwork -- not

13     schoolwork, but information for the school.

14 Q.  Was it some information prepared by the school

15     in a booklet?

16 A.  The handbook, yes.

17 Q.  The school handbook?

18 A.  Yes.

19 Q.  So do you now remember how late you were?

20 A.  It was about eight fifteen, I believe, when I

21     got there.

22         (Defendant's Exhibit Number 17 marked

23         for identification.)

00178

1   A.  Correct.

2   Q.  Where?

3   A.  In Jay's office.

4   Q.  All right.  Tell me everything that was said

5        in there.

6   A.  I asked Jay why had he been so different

7        towards me, why hasn't he been talking to me

8        as he stated -- talked to me before?  What was

9        the problem?  And Jay replied -- he just said,

10       I don't know what's up.  I don't know.  What's

11       up with you?  I said, what's going on, Jay?

12       He said, I don't know what's up.  And when I

13       asked him -- I said, okay, what's going on

14       with you as far as your demeanor towards me?

15       You've changed.  You won't come my way.  You

16       won't look at me.  You won't talk to me.

17       Everything is by Sonechka only.

18           And then he -- he sat there for a

19       minute.  And then he said, I can't afford to

20       take care of an employee like you.

21  Q.  I can't what?

22  A.  Take care of a -- I can't take care of an

23       employee like you.

00179

1   Q.  Okay.

2   A.  I asked him what that meant.  He just

3        (indicating).  I can't -- I don't know.  I

4        just can't afford to take care of an employee

5        like you.

6   Q.  What else did you say and what else did he

7        say?

8   A.  Then, once again, I asked him to explain.  And

9        then that's when Sonechka started speaking.

10  Q.  I'm sorry.  I missed the first part.  Who

11       asked who to explain?

12  A.  I asked him to explain what he meant by that.

13       And he ignored the question.  And Sonechka

14       started speaking with him, also said in his

15       face that it was only just because I was

16       pregnant.  And all Jay could do is just get up

17       and go to Tracy's office.  And then the next

18       time him and Tracy came back.

19  Q.  You were raising your voice at him, weren't

20       you?

21  A.  No, I was not.

22  Q.  Did it become a heated discussion?

23  A.  No.

00192

1    as how Jay Kim has been as far as towards her,

2    different situations, and other Mobis

3    employees.

4  Q.  Who is he discriminating against, according to

5    Nicole Boswell?

6  A.  It was talked about even before I left and

7    after I left as far as their -- Korean's

8    demeanor on women regardless.

9  Q.  Even Korean women?

10  A.  Yes.

11  Q.  So that would be -- did Jay Kim have a

12    demeanor problem with women?  Is that what

13    you're saying?

14  A.  Yes.

15  Q.  All women?

16  A.  He would always state as far as his country,

17    how his culture would react in a situation as

18    far as with -- towards women or towards a

19    particular situation.

20  Q.  Did he ever say anything degrading about

21    women?

22  A.  No.  I never heard him say anything degrading.

23  Q.  Okay.  He just talked about the differences in

00193

1     his culture and this culture about women?

2  A.  Correct.

3  Q.  Did he ever mention pregnancy?

4  A.  No.

5  Q.  But he never said anything -- well, what did

6     he say about his culture and women?

7  A.  Women had no place to speak.

8  Q.  Did he endorse that?  Did he think that was

9     good?  Did he say one way or the other?

10  A.  He wouldn't say.  I just remember his

11     reactions towards Sonechka and the difference

12     between Sonechka and Hosang, how he would

13     relate to them.  And they were both managers.

14  Q.  Yes.  And Sonechka was not pregnant, was she?

15  A.  No.

16  Q.  Anything else between you and Nicole Boswell

17     about --

18  A.  No.

19  Q.  -- your discussions about -- that she might

20     testify to or that she knows?

21  A.  No.

22  Q.  Okay.  Have you spoken with Dean Seales since

23     you left Mobis?

00222

1    child getting to school after school let out

2    in May of '06, were you?

3  A.  I don't remember the time that school let out

4    in '06. But after the fact she was out of

5    school, that was not due to school.

6  Q.  Do you remember when school started back?

7  A.  All I can remember is sometime in August.

8  Q.  Were there any problems getting from school to

9    work after she started back in August?

10  A.  Yes.

11  Q.  Anything else about your testimony that you

12    want to change or add to?

13  A.  Nothing that I can think of right now.

14  Q.  All right.

15        MR. BARNETT:  That's all I have.

16        MS. LEONARD:  I have one follow up.

17        When I say one follow up, main

18        topic. It may be more than one

19        question.

20        EXAMINATION

21  BY MS. LEONARD:

22  Q.  Did Nicole Boswell tell you of any remarks

23    that she may have heard Jay Kim make about any

00223

1    pregnant employees?

2  A.  Yes.

3  Q.  Tell me what she told you.

4  A.  The Korean young lady that was hired before

5    I -- a day or two before I was terminated, to

6    my knowledge, Nicole -- I remember her saying

7    that she either got married or she was

8    pregnant, and Jay said it was a disgrace.

9        MS. LEONARD:  That's all I've got.

10        EXAMINATION

11  BY MR. HENRY:

12  Q.  Did you understand that he was referring to

13    the disgrace in the sense that she was

14    pregnant before she was married?

15  A.  No.

16  Q.  Well, what did you understand from Nicole the

17    disgrace to be about?

18  A.  Due to their culture.  Whatever in their

19    culture, as far as a disgrace for being --

20    becoming pregnant.

21  Q.  During wedlock?

22  A.  I don't remember what her status is.  I knew

23    she had a significant other, but I don't know

00224

1    if it was to the extent that she was married

2    or not married. I didn't go into details with

3    Nicole on that.

4  Q.  Tell me everything Nicole said that Mr. Kim

5    said about this young lady -- or this lady.

6  A.  She just mentioned to the fact that he said it

7    was a disgrace to her being pregnant.

8        MR. BARNETT: No further questions.

9        MS. LEONARD: All right. Then we're

10      done.

11

12     (The deposition concluded at

13     approximately 4:40 p.m.)

14

15    * * * * * * * * * * * * *

16    FURTHER DEPONENT SAITH NOT

17    * * * * * * * * * * * * *

18

19

20

21

22

23

# EXHIBIT E

00028

1  for a partial day or for an entire day?

2      A.  For salaried staff, the supervisor

3  or department manager is responsible for just

4  keeping up with their own employees.  So you

5  have some supervisors that are better at

6  documenting than others.

7          In this particular case, Jay

8  happens to be a very, very good documenter.

9      Q.  All right.  So the human resources

10  department, would it have the ability to tell

11  me for any given employee the number of days

12  they've been absent in a period of time?

13          MR. BARNETT:  This is not an

14  objection, but Heather, it ought to be

15  emerging here that they have different systems

16  for hourly and salary.  If you would specify

17  that, it might help.

18          MS. LEONARD:  I'm going for both

19  types of employees.

20      Q.  In your answer, you can break it

21  down for both hourly and salary.  But for any

22  given employee, if I wanted to know days that

23  they had been absent, how would I find that

24  out?

25      A.  The supervisor and manager for

**RIEDLER, TRACY**                                    **Page 28**

00029

1  salaried, and for hourly, the human resources

2  department would have that because we maintain

3  the time sheets whereas an hourly employee has

4  to clock in and out.

5      Q.  For salaried employees, are they

6  paid for the time that they're absent?

7      A.  Yes.

8      Q.  So an employee who is salaried

9  should not have their paycheck docked for a

10  partial day absence?

11      A.  We have not done that, no.

12      Q.  Are there any other records

13  maintained that you're aware of by Mobis

14  relating to employee attendance?

15      A.  No.  Not that I can think of at

16  this time anyway.

17      Q.  Have you told me every way that I

18  could find out an employee's attendance short

19  of interviewing an employee?

20      A.  Sure.  Yes.

21      Q.  Where are documents relating to

22  employee discipline maintained?

23      A.  In the personnel file inside locked

24  cabinets in the human resources department.

25      Q.  All right.  How is discipline

**RIEDLER, TRACY**                    **Page 29**

00038

1      Q.  Has anyone come to human resources

2  or their supervisor and complained about

3  pregnancy discrimination but not gone to the

4  EEOC?

5      A.  Not that I can recall.

6      Q.  What was the nature of Ms. Gordon's

7  complaint?

8      A.  Her complaint, she said that she

9  was terminated because she was pregnant.

10      Q.  When was she terminated?

11      A.  Oh, gosh.  I can't recall.

12      Q.  Was it sometime in early 2006?

13      A.  Oh, no.  I would say hers was more

14  recent.  My guess would be 2007.

15      Q.  Why was she terminated?

16      A.  Job performance.

17      Q.  Who made the decision to terminate

18  her?

19      A.  She had numerous problems with

20  making connections to the passenger air bag,

21  which is a huge safety issue in what we do.

22  That's part of the cockpit module assembly.

23  And she also -- when she -- she was an

24  assembler.  And when she was assembling her

25  parts that she was responsible for, she was --

**RIEDLER, TRACY**                    **Page 38**

00039

1 she actually dealt with wire harnesses, and

2 she was pulling wire harnesses with too much

3 force when you have to be very delicate with

4 them and was snapping them, which would also

5 cause breakage that wouldn't be found until

6 the car was on the lot.

7        This was something that she was

8 warned multiple times for the same issue.

9     Q.  Who made the determination to

10 terminate?

11     A.  Her supervisor -- or excuse me.

12 The production manager wrote her up a number

13 of times.  And then I am the final approval

14 for all terminations.

15        So it was the manager that did make

16 the decision, and then, of course, I have to

17 review that before that happens.

18     Q.  So the decision to terminate

19 Ms. Gordon was recommended by her production

20 manager and you approved the decision?

21     A.  And I approved that.  Uh-huh.

22     Q.  How far along in Ms. Gordon's

23 pregnancy was she at the time that she was

24 terminated?

25     A.  I can't be sure about that.  I

**RIEDLER, TRACY**                              **Page 39**

00041

1 been any kind of correspondence at all for

2 almost a year, I think.

3     Q.  In looking at the court

4 documents -- and you can correct me if I'm

5 wrong -- it appears that her attorney has

6 withdrawn?

7     A.  I think there hasn't been any

8 interaction from -- between the two of them.

9 So it kind of seems to be in -- what's the

10 word for it -- like hibernation, for lack of a

11 better word.

12     Q.  Not a problem.  Did you give a

13 deposition in Ms. Gordon's case?

14     A.  No.

15     Q.  Ms. Jefferson's EEOC charge, what

16 was her complaint?

17     A.  Denial of FMLA leave.

18     Q.  Specifically, was she seeking leave

19 and it was not approved?

20     A.  She was seeking leave.  She

21 actually wanted to go out on leave prior to

22 becoming eligible.  And then once she became

23 eligible, of course there are a number of

24 forms that a physician -- she needs to get a

25 physician's certification, and she did not

**RIEDLER, TRACY**                    **Page 41**

00042

1 have any documentation from a physician

2 stating that she needed to be out at that

3 time.

4    Q.  All right.

5    A.  So they did -- they did not

6 actually -- the doctor I'm referring to did

7 not put her out on medical leave.

8    Q.  How far along in her pregnancy was

9 she when she was terminated?

10    A.  Six months.

11    Q.  Who made the decision to terminate

12 her?

13    A.  She actually was not terminated.

14 She ultimately just ran out of time due to

15 absenteeism because she never returned to

16 work, never produced the documentation that we

17 had requested multiple times.

18       And so the point system -- and

19 again, she was an hourly employee.  So the

20 point system is, if you are out -- absent one

21 day, then you get a point for each day that

22 you're out.  And she reached the maximum.  So

23 it's an automatic termination.  But that

24 would -- that would ultimately be myself.

25    Q.  Is her lawsuit still pending?

**RIEDLER, TRACY**                    **Page 42**

00048

1 any testimony relating to the interpretation

2 application of Mobis's attendance policy?

3     A.  I believe I did.

4     Q.  I apologize.  This may be

5 redundant.  Sometimes you're going to be asked

6 questions and feel like you've already

7 answered it.  But I want to make sure that in

8 the context of reading this transcript, the

9 Court has a good record to be able to see what

10 answers to the questions are and doesn't have

11 to jump around, and more importantly to keep

12 me from having to jump around in the

13 transcript when I'm writing a brief later.

14         What type of attendance policy did

15 Mobis have in place during Ms. Hunter's

16 employment?

17     A.  We have a probationary policy.  It

18 states that during a ninety -- an employee's

19 first ninety days of becoming a regular

20 employee, regular Mobis employee, that they'll

21 be reviewed for their performance and

22 attendance and ability to do the job.  And

23 during that time, a supervisor is supposed to

24 evaluate their performance.

25         And regarding to the being at work

**RIEDLER, TRACY**                    **Page 48**

00049

1 or attendance related, if a person has three

2 occurrences, then they would be terminated

3 during their ninety days.

4    Q.  Would you please define what is

5 meant by occurrence?

6    A.  Yes.  That would be a full day

7 absent, a tardy, being late or an early out,

8 leaving work early before your shift is over.

9    Q.  Is that policy applied consistently

10 among all probationary employees?

11    A.  Yes, as much as I'm aware.  Yes, it

12 is.

13    Q.  Are you aware of any deviations

14 from that policy where someone may have had

15 three occurrences and was not terminated?

16    A.  No.  No, I'm not aware of that.

17    Q.  Who's responsible for monitoring an

18 employee's attendance under that policy?

19    A.  The supervisor or manager.

20    Q.  Okay.  Which training is given to

21 the supervisor or managers on how to monitor

22 the attendance under that policy?

23    A.  They have a copy of the handbook,

24 and when new policies come about, then we

25 share those with managers.  It's their

**RIEDLER, TRACY**                    **Page 49**

00050

1 responsibility to review that.

2    Q.  And I don't want to put words in

3 your mouth, but I believe you've answered my

4 next question already, which is, the

5 supervisor or manager is responsible for

6 maintaining the records of that employee's

7 attendance during their probationary period?

8    A.  They are responsible for

9 maintaining their own records, yes.

10    Q.  Okay.  Is there a set format for

11 how an employee's attendance is to be

12 documented during their probationary period?

13    A.  No.

14    Q.  And human resources does not keep

15 any records of an employee's attendance during

16 their probationary period?

17    A.  No.  Salaried, no.

18    MR. BARNETT:  What did you say?

19    A.  Salaried, no.  Salaried employees.

20 I wanted to clarify versus the hourly.

21    Q.  Do you keep records for the hourly

22 employees during their probationary period

23 with respect to their attendance?

24    A.  Yes.  We have a -- we have an

25 attendance tracker in human resources.

**RIEDLER, TRACY**                        **Page 50**

00051

1    Q.  Is there a different handbook for

2 employees that are probationary and salary and

3 probationary and hourly?  In other words --

4    A.  No.  Same thing.

5    Q.  Does the attendance policy you just

6 described for a probationary employee differ

7 among a salaried employee and an hourly

8 employee?

9    A.  The three occurrences is the same

10 with hourly and with salary.

11    Q.  So with respect to the application

12 of the attendance policy for a probationary

13 employee, that employee status is either

14 hourly or salary and would have no effect on

15 its application?

16    A.  No.

17    Q.  Who has the authority to approve an

18 employee's absence from work during their

19 probationary period?

20    MR. BARNETT:  Object to the form.

21    A.  We have a no-fault system.  So

22 supervisors or managers are not supposed to be

23 giving permission for employees to be out.

24    Q.  Okay.

25    A.  A no-fault system being there are

**RIEDLER, TRACY**               **Page 51**

00112

1 person. And she sent the cover letter,

2 prepared and sent the cover letter to

3 Ms. Hunter.

4    Q. And you said that the information

5 contained on this document came from Mr. Kim

6 as reported to the human resources department?

7    A. We will report the reason why a

8 person is let go.

9    Q. And I apologize if I ask this

10 again -- if I'm being repetitive. I think

11 I've asked this, but I need to make sure.

12       Do you have any personal knowledge

13 of Tarsha Hunter's attendance during the time

14 she was a full-time employee with Mobis?

15    A. No, not prior -- just prior to her

16 termination only.

17    Q. When you say just prior to her

18 termination only, at what period in time are

19 you talking about?

20    A. Roughly, I'd say about a week

21 earlier.

22    Q. So a week prior to her termination

23 what happened?

24    A. Mr. Kim had her ninety-day

25 performance review. And he had received it

00113

1 from our department. And he came to my

2 office, had the performance review in his hand

3 and said, you know, I do not believe that I

4 can keep Tarsha.

5     Q. Okay.

6     A. I said, What's the problem?

7        And he said, She is very

8 unreliable; very undependable. She is out all

9 the time.

10       I said, Out? What do you mean

11 out?

12       And he said that she is absent, not

13 here or --

14       And so I told him, I said, Well, I

15 mean, how many times has she been out, Jay?

16       He said, I have her attendance

17 record.

18     Q. Is that document Exhibit 2?

19     A. Yes.

20     Q. Okay.

21     A. And that is something that he

22 keeps.

23     Q. All right.

24     A. And so I followed him to his office

25 and looked at this record. And I said, Jay,

**RIEDLER, TRACY**                    **Page 113**

00114

1 you can't keep her. You can't keep her. I

2 said, The ninety-day probationary period is

3 that a person can only have three occurrences

4 of any kind, and I clarified what the

5 occurrences were for him.

6     Q. Okay. Anything else?

7     A. No.

8     Q. Okay. What happened next?

9     A. I mean, that was basically our

10 conversation. At that time, we knew that

11 Tarsha would not be able to be a full-time

12 employee.

13     Q. Then what happened?

14     A. What happened over the next few

15 days, I was not involved in. I believe that

16 Jay and Sonechka had many meetings, many

17 discussions because Sonechka did want to keep

18 Ms. Hunter. And I believe that she was asking

19 Jay if she could keep her.

20     Q. Okay.

21     A. But otherwise, specifically, I have

22 no idea.

23     Q. All right. Can you recall anything

24 else that Mr. Kim talked to you about with

25 respect to Ms. Hunter's attendance?

**RIEDLER, TRACY**　　　　　　　**Page 114**

00115

1    MR. BARNETT: Objection. No time

2 frame.

3    Q. Prior to August 26, 2006, have you

4 told me everything you can recall Mr. Kim

5 discussing with you regarding Ms. Hunter's

6 attendance?

7    A. That's correct. That's the only

8 thing I can think of.

9    Q. And you trusted that the attendance

10 record Mr. Kim showed you was truthful and

11 accurate, correct?

12    A. Yes.

13    Q. So in making your decision, you

14 relied on Mr. Kim's representations?

15    A. Yes.

16    Q. At the time that Mr. Kim presented

17 you with Plaintiff's Exhibit 2, were you aware

18 that Ms. Hunter was pregnant?

19    A. My recollection is that I found out

20 a day or two before she was terminated. So at

21 this time, when we were discussing this, no.

22    Q. How did you find out she was

23 pregnant?

24    A. From Sonechka.

25    Q. What did Sonechka tell you?

00116

1      A.  Sonechka was upset that she was not

2 going to be able to keep Tarsha.  And she came

3 to my office and she basically was stating

4 that she wanted -- did want to keep her and --

5 and she was crying.  And she said that Tarsha

6 was pregnant.

7          And, you know, I told her I was

8 sorry, but unfortunately we had to actually --

9 we have to be consistent.  We have to stick to

10 our policies and everything to be fair to

11 everyone else.

12      Q.  Did Ms. Womack share with you or

13 say to you anything along the lines that

14 Ms. Hunter's pregnancy may have been affecting

15 the decision to terminate her?

16      A.  I don't recall anything like that,

17 no.

18      Q.  If she had said something like

19 that, would you have remembered it?

20      A.  I just can't remember in detail

21 what -- our conversation was not long.  I just

22 remember her being visibly upset that she did

23 want to keep her.

24      Q.  If it's her testimony tomorrow that

25 she discussed with you that she felt that

**RIEDLER, TRACY**                              **Page 116**

00117

1 Ms. Hunter was being terminated because of her

2 pregnancy, would you have any reason to

3 disagree with her testimony?

4    A.  I think that I would actually

5 remember if that occurred.  So I would have

6 reasonable belief to doubt if she were to

7 actually say that.

8    Q.  At the time that Ms. Womack told

9 you that Ms. Hunter was pregnant, did it raise

10 any concerns in your mind that maybe you

11 should investigate whether Ms. Hunter's

12 pregnancy was motivating her termination?

13    A.  No.

14    Q.  Did you take any steps to

15 investigate whether Ms. Hunter's pregnancy had

16 influenced Mr. Kim's decision to terminate

17 her?

18    A.  No.

19    Q.  There's another document I want to

20 you flip to in that big stack.  It's document

21 179.  I'm going to give you a sticky to put on

22 it.  We're going to mark that as Plaintiff's

23 Exhibit 4.

24    A.  179?

25    Q.  Yes, ma'am.  We're going to mark

00122

1 think about whether those e-mails constituted

2 discipline.  Is that because you're not sure

3 the e-mails are clear that they're

4 disciplinary actions?

5     A.  No.  I was actually just in my own

6 mind -- earlier you were talking about what I

7 consider discipline and what I don't.  So I

8 was just thinking about warnings or

9 nonwarnings.

10     Q.  Did any of the e-mails to

11 Ms. Hunter inform her that those e-mails

12 constitute disciplinary action?

13     A.  In that exact word, disciplinary

14 action, I'd have to look at them again.  But I

15 don't know.

16     Q.  All right.  Who made the decision

17 to terminate Ms. Hunter?

18     A.  Myself.

19     Q.  Anyone else?

20     A.  After my conversation with Mr. Kim

21 regarding her attendance during the ninety-day

22 probationary period, I was the one that

23 informed him that we could no longer employ

24 her based on the ninety-day policy.

25     Q.  On what date was the decision to

**RIEDLER, TRACY**                      **Page 122**

00123

1 terminate Ms. Hunter made?

2     A.  I could not be exact, but roughly a

3 week before her termination date.

4     Q.  So if her termination date was

5 August 25th, then we're looking somewhere

6 around August 18th?

7     A.  Perhaps, yes.

8        MR. BARNETT:  You're entitled to

9 look at any document you want to.

10     Q.  That's why all the documents are

11 here.

12     A.  Yeah, I know.  I know.  But my

13 recollection --

14        MR. BARNETT:  Don't guess.  Don't

15 guess.  Look at the document.

16     Q.  I promise you, Henry will put

17 documents in front of you at trial.  I don't

18 want to be surprised.

19     A.  But my recollection is a week prior

20 anyway.  I'm not sure there's a document that

21 actually will clear that date up for me.

22     Q.  Okay.

23        MR. BARNETT:  Look.  Let me just

24 ask you to look at the documents then.

25        THE WITNESS:  Which document would

**RIEDLER, TRACY**                    **Page 123**

00127

1    Q.  Give me each and every reason that

2 Ms. Hunter was fired.

3    A.  Attendance as I know it.

4    Q.  Any other reason?

5    A.  No.

6    Q.  Identify each and every attendance

7 incident or occurrence which was considered in

8 terminating Ms. Hunter.

9    A.  Being absent three times and having

10 doctor's appointments which would consist of

11 either coming in to work late or leaving

12 before the shift was over four times.

13    Q.  I notice you're looking at Exhibit

14 Number 4 in answering this question.

15      Are you saying that the dates that

16 are reflected on the bottom of Number 4 are

17 the attendance dates that were used to justify

18 terminating Ms. Hunter?

19    A.  That's correct.

20    Q.  What policy or policies did

21 Ms. Hunter violate that led to her

22 termination?

23    A.  The ninety-day policy in that a

24 person is only able to have three -- actually,

25 only able to have two occurrences.  On the

**RIEDLER, TRACY**                    **Page 127**

00158

1    A.  The day of her termination, my

2  understanding was, in listening to

3  Ms. Hunter's testimony yesterday, she had said

4  that she wanted to talk to Sonechka and Jay

5  Kim in private on the 25th of August.  And so

6  it was a meeting that she, Ms. Hunter, had

7  initiated.

8        So the three of them, Jay,

9  Sonechka, and Tarsha actually met in Jay Kim's

10  office.  And I was not a part of that

11  initially.

12        The meeting, from what I

13  understand, went on for maybe half an hour.

14    Q.  When you say from what you

15  understand, what is your source of information

16  from what transpired in that termination

17  meeting or in that meeting before you got

18  there?

19    A.  And I actually think I found that

20  out in the meeting.  You know, I basically

21  had -- had entered a meeting that's been going

22  on for some time.  And my recollection is that

23  it's been -- you know, I was told that it's

24  been going on approximately that long.

25    Q.  Who told you what transpired in the

**RIEDLER, TRACY**                    **Page 158**

00159

1 meeting before you became present there?

2    A.  Okay.  I was in my office, and Ho

3 Sang Hwang who at the time was an assistant

4 manager -- excuse me, he was accounting

5 manager in the department.  And he came down

6 to my office and he said, Please come to Jay's

7 office.  He needs your help

8        I said, What's going on?

9        Ho Sang said that Tarsha and

10 Sonechka were in his office and the meeting

11 was getting rather loud and he needed my help.

12    Q.  Okay.

13    A.  So I went down to Jay's office

14 immediately.  And the three of them were in

15 the meeting.

16        And when I first walked in, I

17 believe Tarsha was actually talking.  I cannot

18 remember exactly what she was saying, but, you

19 know, basically I said, you know, What's going

20 on?  I had no idea a meeting was going on.

21        And I think that Tarsha said, Jay

22 is terminating me but he won't give me a

23 reason why.

24        So I said, Well, I'm sorry,

25 Tarsha.  I actually -- during your ninety-day

**RIEDLER, TRACY**                    **Page 159**

00160

1 probationary period -- are you aware of the

2 policy?  And I quoted the policy basically

3 about the three occurrences.  And she said

4 that she was aware of the policy, but she

5 didn't feel that that was the reason for her

6 termination.

7          She was visibly agitated during

8 the -- during the meeting.  And so, you know,

9 I just basically told her, you know, that I

10 was sorry but that we had to be consistent

11 with that policy.  She said that she was

12 familiar with it but still didn't believe that

13 that was what the reason was.

14      Q.  Anything else you recall about the

15 termination meeting?

16      A.  No.  And basically, I was only in

17 there for a couple of minutes.  So, you know,

18 I told her that it was time to leave.  She

19 left quietly.  I had her gather her things and

20 then she left.

21      Q.  Did Ms. Hunter communicate what she

22 felt the reason was behind her termination?

23      A.  I can't remember in detail actually

24 what was discussed during that time, whether

25 she even mentioned -- whether she mentioned

**RIEDLER, TRACY**                    **Page 160**

EXHIBIT F

00021

1 conversations with her about whether she

2 should tell Mr. Kim at that time that she was

3 pregnant?

4     A.  Well, she told me that she

5 wasn't -- I guess she may have spoken with

6 someone else.

7     Q.  Right.

8     A.  And she told me she wasn't going to

9 tell.  So she didn't want me to say anything.

10     Q.  Were you aware of any situations of

11 pregnant employees losing their job at Mobis

12 prior to Ms. Hunter telling you she was

13 pregnant?

14     A.  I had heard -- I don't know

15 specifically, but I just kind of heard, like,

16 rumors or whatever that other people had

17 been -- and I'm not saying it was because of

18 being pregnant, but it just so happened the

19 person was pregnant.

20     Q.  Did you and Ms. Hunter discuss any

21 of the rumors relating to employees who had

22 been pregnant who had lost their job?

23     A.  I don't recall.

24     Q.  Did Ms. Hunter ever talk with you

25 that she had considered terminating her

**WOMACK, SONECHKA L.**                    **Page 21**

00027

1 I'm trying to delete them out real quick.

2      Do you know if during the time you

3 worked for Mr. Kim if there were any other

4 pregnant employees in the department other

5 than Ms. Hunter?

6      A.  No.

7      MR. BARNETT:  I'm sorry, what was

8 the answer?

9      A.  No.

10      Q.  Did you observe any changes in the

11 way Mr. Kim treated Ms. Hunter after he

12 learned that she was pregnant from the way he

13 treated her before?

14      A.  He's kind of moody.  So, like, if

15 anybody was absent or whatever, he kind of

16 would be distant or whatever.  And so after

17 the pregnancy --

18      Q.  I'll rephrase.  Did he appear to be

19 more distant from Ms. Hunter after he learned

20 that she was pregnant than he had been with

21 her before he learned that she was pregnant?

22      A.  I can't -- it would just be in

23 spurts.  So maybe that kind of brought him

24 back to being distant, you know.

25      Q.  Okay.  Based on your observation --

**WOMACK, SONECHKA L.**                    **Page 27**

00028

1      MR. BARNETT:  I'm sorry, I didn't

2 hear the answer.  Could you read it to me?

3      (Court Reporter reads back.)

4    Q.  Did you find that after Mr. Kim

5 learned Ms. Hunter was pregnant, he

6 communicated to her through you more than he

7 had prior to that point?

8    A.  That -- that may have been my

9 feeling just because I knew the situation.

10 But like I said, he's kind of like that when

11 anything --

12    Q.  Okay.

13    A.  Any kind of changes occur like

14 absence or tardies or anything.  So whatever

15 comes up that doesn't go along with how -- you

16 know, so --

17    Q.  But it was your feeling or

18 perception --

19    A.  My feeling or perception.

20    Q.  -- that he was talking to

21 Ms. Hunter through you more after he learned

22 that she was pregnant?

23    A.  Yes.

24    Q.  At some time in August 2006, did

25 someone make the decision Ms. Hunter would be

**WOMACK, SONECHKA L.**                    **Page 28**

00029

1 terminated?

2    A. Could you repeat?

3    Q. Sure. And I'll represent to you

4 that -- to make it easy -- would you agree on

5 August 25th, Mobis terminated Ms. Hunter's

6 employment?

7    A. If that was the day, yes.

8    Q. It was.

9    A. Yes.

10    Q. At some point during the month of

11 August, did you learn that Ms. Hunter was

12 going to be terminated?

13    A. The day before.

14    Q. Tell me how you learned about

15 that.

16    A. I think I was in his office.

17    Q. Okay.

18    A. He called me in his office.

19    Q. What happened?

20    A. He let me know that he was

21 terminating her employment.

22    Q. And did he give you any reason why

23 he was terminating her employment?

24    A. Just because he hadn't been

25 satisfied through her ninety-day probation,

**WOMACK, SONECHKA L.**        **Page 29**

00030

1 and he had given several warnings about

2 tardies and being absent and things like that.

3     Q. And I'm going to show you an e-mail

4 in this case that has been previously marked

5 as Plaintiff's Exhibit Number 5.  In

6 Plaintiff's Exhibit Number 5, Mr. Kim

7 communicates in an e-mail to Ms. Riedler that

8 you did not want to see Ms. Hunter

9 terminated.

10        Did Mr. Kim accurately communicate

11 your sentiment in that e-mail?

12     A. Can I see?

13     Q. Take your time to read it.

14        MR. BARNETT:  You can read the

15 whole thing and take your time.  Take as much

16 time as you want.

17     A. It goes up.  Okay.  Now, what was

18 the question?

19     Q. Sure.  Was Mr. Kim accurately

20 conveying your sentiment about Ms. Hunter's

21 termination to Ms. Riedler in his e-mail?

22     A. Yes.  That I wanted to keep her?

23     Q. Correct?

24     A. Yes.

25     Q. Why did you want to keep her?

**WOMACK, SONECHKA L.**               **Page 30**

00035

1 be terminated?

2    A.  Like our conversations during it?

3    Q.  Correct.

4    A.  I mean, there were more

5 conversations than just, you know --

6    Q.  Were there any discussions relating

7 to Ms. Hunter's pregnancy?

8    A.  Yes.

9    Q.  Tell me what you recall.

10    A.  Well, it was me initiating it.

11    Q.  Okay.

12    A.  I just -- I just kept saying I felt

13 like she was being terminated because she was

14 pregnant.

15    Q.  And did you share that concern with

16 Tracy Riedler?

17    A.  Yes.

18    Q.  And what sort of response did you

19 get from Mr. Kim or Ms. Riedler to you saying

20 that you felt Ms. Hunter's pregnancy was being

21 motivated by her termination?  Switch that.

22    A.  Okay.

23    Q.  That her termination was being

24 motivated by her pregnancy?

25    A.  They never said that that was the

**WOMACK, SONECHKA L.**                    **Page 35**

00036

1 reason.

2     Q. Were you present in the meeting

3 where Ms. Hunter was terminated?

4     A. Yes.

5     Q. Tell me what you recall about that

6 meeting.

7     A. I think Tracy, Jay and I and Tarsha

8 was in the meeting.

9     Q. Okay. And tell me what you recall

10 happening. I appreciate that it was almost

11 two years ago. So I'm not going to expect you

12 to reenact the meeting. But just tell us what

13 you can recall.

14     A. Just that she was being terminated.

15     Q. Did -- I'm sorry. You go ahead.

16     A. Go ahead.

17     Q. Don't let me interrupt you.

18     A. That was pretty much it.

19     Q. Did he give her a reason as to why

20 she was being terminated?

21     A. It had to have been because of the

22 tardies, because that's what he kept telling

23 me, because of the absentees and the tardies

24 and things.

25     Q. Do you recall in that meeting

**WOMACK, SONECHKA L.**                    **Page 36**

00037

1 Mr. Kim saying anything to Ms. Hunter along

2 the lines of, I can't take care of a person

3 like you?

4     A.  I can't remember that, but -- I

5 could hear -- I mean, I can hear it -- I mean,

6 you know, I can imagine it being said.

7     Q.  How long after Ms. Hunter was fired

8 did someone come in to replace her, if you

9 remember?

10     A.  I'm not sure.  It wasn't -- I don't

11 think it was a long period.

12     Q.  Okay.

13     A.  I don't think.

14     Q.  Do you remember an employee named

15 Latoya Williams?

16     A.  Yes.

17     Q.  What job did Ms. Williams do?

18     A.  I think she was clerk, accounting

19 clerk, temporary.

20     Q.  Did she work under you or Mr. Hwang

21 or someone else?

22     A.  Supposedly me.

23     Q.  Okay.  And she came to you guys

24 through Multi-Staffing, correct?

25     A.  Yes.

**WOMACK, SONECHKA L.**          **Page 37**

00038

1    Q. What do you recall about her

2 attendance?

3    A. She would kind of be out -- she's

4 called in -- had called in a few times.

5    Q. Was she treated in the same manner

6 as Ms. Hunter?

7    MR. BARNETT: Object to the form.

8    Q. Was she terminated like Ms. Hunter

9 was?

10    A. Yes. Well, she never -- I don't

11 think she ever became --

12    Q. So she never became a permanent

13 employee?

14    A. A permanent employee.

15    Q. Do you know why she didn't become a

16 permanent employee?

17    A. Because of being out.

18    Q. Okay.

19    A. Calling in.

20    Q. I'm getting close. I'm jumping

21 around in my outline.

22    Now, Mr. Kim was not born in

23 Alabama, was he? Mr. Kim wasn't born in

24 Alabama, was he?

25    A. No. No.

**WOMACK, SONECHKA L.**        **Page 38**

00044

1 please don't -- he didn't want her to be out

2 and tardy.

3    Q. Did he say, you know, something to

4 the effect that you're going to be

5 probationary now, but your attendance needs to

6 improve?

7    A. Right.

8    Q. Did you tell Tarsha the same thing?

9    A. Yes.

10    Q. Do you remember a young lady named

11 Su Jin Lee?

12    A. Yes.

13    Q. Are you aware that she was pregnant

14 when she was hired?

15    A. Not when she -- not when she first

16 started.

17    Q. How did you find out she was

18 pregnant?

19    A. She told me.

20    Q. Did she tell you how far along she

21 was?

22    A. She may have been -- just been --

23 kind of just found out she was pregnant.

24    Q. When she was hired?

25    A. Not when she was hired, but --

**WOMACK, SONECHKA L.**                    **Page 44**

00045

1    Q. When she told you?

2    A. Right.

3    Q. Did you ever observe Mr. Kim

4 mistreat her or treat her differently because

5 she was pregnant in an adverse way -- in a

6 negative way?

7    A. No.  Maybe just -- no.

8    Q. How many subordinates did you have

9 reporting to you at the time Ms. Hunter was

10 there?

11    A. Ms. Hunter and Su Jin.  Was

12 Latoya -- I know for sure Tarsha and Su Jin.

13    Q. When Ms. Hunter told you she had

14 become pregnant, did y'all discuss whether she

15 had intended that pregnancy, whether or not it

16 was planned?

17    A. I don't think it was planned.

18    Q. Do you remember a lady named Alecia

19 Gardener?

20    A. Yes.

21    Q. Did she work in IT?

22    A. Yes.

23    Q. Was Dennis Choi her supervisor?

24    A. Yes.

25    Q. Do you know whether she became --

**WOMACK, SONECHKA L.**                    **Page 45**

00046

1 let me stop -- did she work in that same

2 general open office area that you all worked

3 in?

4    A.  Yes.

5    Q.  Do you recall whether she became

6 pregnant while she was at Mobis?

7    A.  Yes.

8    Q.  Do you recall whether she took

9 family medical leave?

10    A.  I don't think I was there when she

11 had the baby.

12    Q.  Did you feel that you were free to

13 speak your mind with Jay Kim about work

14 issues?

15    A.  Yes.

16    Q.  Did he ever say anything to you --

17 never mind.

18    Do you have any reason to believe

19 that Mr. Kim is a bad person?  I didn't ask

20 you if he was easy to work for.

21    A.  I could tell he has a soft heart,

22 but sometimes it's hard to see past -- see

23 that.

24    Q.  Did you keep any notes of anything

25 that happened at Mobis relating to Ms. Hunter

**WOMACK, SONECHKA L.**                    **Page 46**

00047

1 that you took with you?

2    A. No.

3    Q. Did you leave any notes there about

4 her that you know about, other than these

5 forms like Exhibit 15, Plaintiff's Exhibit

6 15? If you did those. I'm not saying you

7 did.

8    A. I know I didn't do those, but

9 maybe, like, other little request sheets. I

10 know I had a file.

11    Q. Do you recall that Mr. Kim used the

12 phrase take care of a person?

13    A. Yes.

14    Q. Was it something that he said on

15 several occasions?

16    A. Yes.

17    Q. Did you understand what -- did you

18 have an understanding of what he meant by

19 taking care of a person?

20    A. Some -- yes.

21    Q. What did you think he meant?

22    A. Just their work. That's how I

23 interpreted it, even though it sounds like

24 baby-sitting or -- you know, but work wise.

25    Q. Did Ms. Hunter share with you any

00053

1    A. Well, other than that, uh-huh.

2 Everyone was permanent.

3    Q. Do you know what prompted Mr. Kim

4 to send this e-mail to his staff?  Well, it

5 now says, To all of staff.

6        So do you know what prompted him to

7 send this e-mail?

8    A. Probably because someone may have

9 been tardy or something.

10    Q. Is it fair to say that Mr. Kim was

11 a stickler about attendance?

12    A. Yes.

13    Q. And about arriving at work on time?

14    A. Yes.

15    Q. Now, it looks to me as though you

16 sent or forwarded this e-mail to Tarsha Hunter

17 with a copy to Jay Kim on or about August

18 10th, '06.  Do you see that?

19    A. Yes.

20    Q. Do you remember why you forwarded

21 that e-mail to her?  That would be several

22 weeks later after Jay sent it out.

23    A. Do you mean this May the -- May

24 9th?

25    Q. It's hard for me to tell.  It looks

**WOMACK, SONECHKA L.**                    **Page 53**