IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| TARSHA NICKOL HUNTER, | ) | |
| | ) | |
| Plaintiff, | ) | CIVIL ACTION NUMBER: |
| | ) | |
| v. | ) | 2:07CV-427-WHA |
| | ) | |
| MOBIS ALABAMA, LLC, | ) | **ORAL ARGUMENT** |
| | ) | **REQUESTED BY** |
| Defendant, | ) | **PLAINTIFF** |

PLAINTIFF'S BRIEF IN OPPOSITION TO
THE DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

OF COUNSEL:

Heather Newsom Leonard
HEATHER LEONARD, P.C.
The Gross Building
2108 Rocky Ridge Road, Suite 1
Birmingham, Alabama 35216
(205) 978-7899 - voice
(205) 278-1400 - facsimile
Heather@HeatherLeonardPC.com

## TABLE OF CONTENTS

STATEMENT OF THE FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    Mobis's Policies and Procedures . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    Hunter's First 90 Days (March - June 2006) . . . . . . . . . . . . . . . . . . . . . 4

    Hunter's Final 90 Days (June 2006 - August 2006) . . . . . . . . . . . . . . . . . 6

    Hunter Learns of Pregnancy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

    Kim Approves Absences . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

    Hunter Informs Kim of Pregnancy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

    Kim Decides to Terminate Hunter . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

    Mobis Responds to Post-Employment Issues . . . . . . . . . . . . . . . . . . . . . 13

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

    I.    MR. KIM DECIDED TO TERMINATE MS. HUNTER AS SOON
        AS HE LEARNED OF HER PREGNANCY. . . . . . . . . . . . . . . . . . 16

        A.    Jay Kim made the decision to terminate Ms. Hunter. . . . . . 16

        B.    The temporal proximity of less than a month between the
            Defendant's knowledge of Ms. Hunter's pregnancy and her
            termination establishes a prima facie case of pregnancy
            discrimination . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

        C.    The Defendant began looking for a justification to fire Ms.
            Hunter when it learned of her pregnancy. . . . . . . . . . . . . . . 25

            1.    The Defendant's misrepresentations establish
                pretext. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

            2.    Jay Kim's conduct and statements after learning of Ms.

Hunter's pregnancy establishes pretext. . . . . . . . . . . 28

3.    Attendance is not a credible reason for Ms. Hunter's termination in light of Mobis's treatment of her absences prior to learning of her pregnancy. . . . . . . . . . . . . . . 31

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

# INTRODUCTION

On August 23, 2006, Jay Kim, the Chief Financial Officer for Defendant Mobis Alabama, LLC ("Mobis"), wrote Tracy Riedler, Mobis's Human Resources Manager, regarding the Plaintiff, Tarsha Hunter, a pregnant employee, "I do not want to take care of her anymore . . I need your help to terminate her."[1]  It was on this day, Mr. Kim and Ms. Riedler decided to terminate Ms. Hunter.[2]  Despite the fact that Ms. Hunter's immediate supervisor, Sonechka Womack, voiced objection to Ms. Hunter's termination to Mr. Kim and Ms. Riedler stating that they were discriminating against Mr. Hunter because of her pregnancy,[3] Mr. Kim terminated Ms. Hunter stating "I can't afford to take care of an employee like you."[4] Less than two weeks passed between Mr. Kim learning of Ms. Hunter's pregnancy, and his decision to fire her.  Ms. Hunter brings this action under Title VII of the Civil Rights Act of 1964, as amended by the Pregnancy Discrimination Act ("PDA") because the Defendant terminated her employment due to her pregnancy.

---

[1]    Plaintiff's Evidentiary Materials, Ex. 2, Deposition of Tracy Riedler, Deposition Ex. 5.

[2]    Plaintiff's Evidentiary Materials, Ex. 7, Defendant's Interrogatory Answers, Answers to Interrogatories 4-6.

[3]    Plaintiff's Evidentiary Materials, Ex. 5, Deposition of Sonechka Womack, p. 35:10-17; Ex. 1, Deposition of Tarsha Hunter, pp. 132:16-133:18.

[4]    Hunter Deposition, p. 178:4-181:22.

1

## STATEMENT OF THE FACTS

Tarsha Hunter began working for Mobis on March 6, 2006, through a temporary agency assignment.[5]  There was no set length for the assignment.[6]  She could have remained a temporary employee, or Mobis could hire her as a full-time employee.[7]  At some point, the accounting department told human resources at Mobis that it wanted to hire her as a full time employee.[8]  Ms. Hunter worked as a general accounting specialist in the accounting department under the supervision of Sonechka Womack.[9]  Ms. Womack, the assistant manger, reported to Jay Kim, Mobis's CFO.[10]

*Mobis's Policies and Procedures*

Tracy Riedler, Mobis's Human Resources Manager, wrote and/or approved all of Mobis's personnel policies.[11]  With respect to employee attendance, Mobis

---

[5]    Hunter Deposition, p. 48:2-11.

[6]    Plaintiff's Evidentiary Materials, Exhibit 3, Deposition of Jay Kim, p. 69:12-23; Riedler Deposition, pp. 93:1-4, 94:6-15, 95:14-96:7;

[7]    Riedler Deposition, pp. 95:14-96:6.

[8]    Riedler Deposition, pp. 95:14-96:6.

[9]    Riedler Deposition, p. 101:2-3; Hunter Deposition, pp. 49:23-50:4.

[10]    Womack Deposition, p. 10:3-15; Riedler Deposition, pp. 20:17-21:4, 22:3-12.

[11]    Riedler Deposition, pp. 13:12-19, 72:1-7.

does not maintain any type of attendance records for salaried employees, such as Ms. Hunter; the only records that could show when an employee arrives or leaves would be the result of the employee's security badge registering on a security panel on the company's doors.[12]  There are no other records which would be maintained for an employee's attendance.[13]

Generally, supervisors or department managers are responsible for keeping up with the attendance for the employees in a department.[14]  It is not clear who was supposed to monitor Ms. Hunter's attendance.  Mr. Kim testified that Ms. Womack was responsible,[15] but Ms. Womack testified she thought Mr. Kim kept was responsible.[16]

The employee handbook given to Ms. Hunter by Mobis,[17] provides "there are no excused absences unless the team member is on an approved leave . . ."[18]

---

[12]    Riedler Deposition, pp. 25:11-26:16.

[13]    Riedler Deposition, p. p. 29:12-20.

[14]    Riedler Deposition, pp. 27:24-28:6.

[15]    Kim Deposition, p. 57:20-25.

[16]    Womack Deposition, pp. 12:5-13:6.

[17]    Hunter Deposition, p. 69:1-23, Deposition Exhibit 12.

[18]    Hunter Deposition, Deposition Exhibit 11, p. 0052.

The handbook sets forth a progressive disciplinary policy.[19]  It applies to probationary employees, and warnings under the policy should be placed in an employee's personnel file.[20]

Even though Mobis considers its employees to be "at will," its handbook sets forth a probationary period where the company considers the first 90 days of an employee's employment to be a probationary period to assess an employee's performance.[21]  Mr. Kim testified in his deposition that when he first started with Mobis, he did not care about the probationary period/policy, and did not become familiar with it until August 24 or 25, 2006.[22]  Mobis terminated Ms. Hunter on August 25.

*Hunter's First 90 Days (March - June 2006)*

During Ms. Hunter's first 90 days working at Mobis, the temporary service which placed her with the company kept records of her attendance.  The

---

[19]     Hunter Deposition, Deposition Exhibit 11, pp. 54-55.

[20]     Riedler Deposition, pp. 67:25-68:13; 69:5-11.

[21]     Reidler Deposition, pp. 58:13-5959:14; 70:4-16; Hunter Deposition, Deposition Exhibit 11, pp. 131-132.  The policy contained in the handbook given to Ms. Hunter, which is attached to her deposition, differs slightly from the policy attached as Exhibit 3 to the Affidavit of Tracy Riedler filed by the Defendant in support of its *Motion for Summary Judgment.*

[22]     Kim Deposition, pp. 17:19-18:11.

company's records reflect that she was absent and tardy on more than one occasion during that first 90 days. Ms. Hunter's tardies resulted from the drop-off schedule for Ms. Hunter's daughter's school.[23] Ms. Hunter's daughter attended a school approximately half an hour away from Mobis's location which would not allow parents to drop children off at the school prior to 7:30 a.m.[24] Ms. Hunter brought the schedule to Mr. Kim's attention during her temporary period, and he communicated to her that we would agree to work with her with the schedule by asking her to get to work as soon as she could after dropping off her daughter.[25]

Sometime in mid-May 2006, after Ms. Womack communicated to Mr. Kim that she was "very pleased with [Ms. Hunter's] job performance," Mr. Kim made the decision to offer Ms. Hunter a full-time position.[26] Mr. Kim knew Ms. Hunter had been absent and tardy to work during her first 90 days.[27]

---

[23]     Hunter Deposition, pp. 58:12-59:9; 65:9-66:8; 157:2-10; 165:18-166:23; Deposition Exhibit 21; Kim Deposition, pp. 42:-43:14; Womack Deposition, pp. 19:20-20:13.

[24]     Hunter Deposition, pp. 58:12-59:9; 65:9-66:8; 153:19 - 1455:15; 157:2-10; 165:18-166:23; Deposition Exhibits 19 and 21; Kim Deposition, pp. 42:-43:14; Womack Deposition, pp. 19:20-20:13.

[25]     Hunter Deposition, pp. 58:12-59:9; 65:9-66:8;134:2-19; 153:19-155:15; 157:2-10; 161:19-162:11; 165:18-166:23; Deposition Exhibits 19 and 21; Kim Deposition, pp. 42:-43:14; Womack Deposition, pp. 19:20-20:13.

[26]     Womack Deposition, p. 17:7-21.

[27]     Kim Deposition, p. 34:4-7.

*Hunter's Final 90 Days (June 2006 - August 2006)*

Mobis's records reflect it hired Ms. Hunter on June 5, 2006.[28]  Mobis did not communicate to Ms. Hunter that she was considered a probationary employee.[29]  Mr. Kim told her that her temporary service might count as her probationary period, and he would try to have the probationary period waived.[30]

*Hunter Learns of Pregnancy*

When Ms. Hunter went to take a drug test for Mobis in early June, she learned she was pregnant.[31]  On either June 5 or 6, Ms. Hunter told Ms. Womack.[32]  Ms. Womack responded that Ms. Hunter should not tell Mr. Kim because other employees who revealed their pregnancies were fired.[33]  Other employees in the department echoed Ms. Womack's concerns.[34]  Based on the communications that the company recently terminated other pregnant employees, Ms. Hunter feared

---

[28]    Riedler Deposition, pp. 94:18-95:5.

[29]    Hunter Deposition, pp. 71:4-72:14.

[30]    Hunter Deposition, pp. 71:4-72:14.

[31]    Hunter Deposition, p. 83:6-9.

[32]    Hunter Deposition, pp. 95:17-96:20.

[33]    Hunter Deposition, pp. 95:17-96:20.

[34]    Hunter Deposition, pp. 97:15-16; 116:22-119:18.

revealing her pregnancy to Mr. Kim and/or Ms. Riedler and kept the information to herself.[35]

### Kim Approves Absences

During the time Ms. Hunter worked under Mr. Kim, he treat Mobis's attendance policy as being a "no fault" policy.[36]   He communicated to the employees in his department, including Ms. Hunter, that he anticipated that they may need to be absent for doctor's appointments or their health, and that such absences would be approved.[37]  From June through August 2006, Mr. Kim approved Ms. Hunter to have partial day and full day absences.[38]  Ms. Hunter made up the time she missed from work.[39]

Mr. Kim testified that he did not deny Ms. Hunter's absence requests for

---

[35]     Hunter Deposition, pp. 101:8-102:18, 120:5-16.

[36]     Hunter Deposition, p. 164:10-21

[37]     Hunter Deposition, Deposition Exhibit 10 (Bates No. 00176); Kim Deposition, pp. 81:6 - 82:22.

[38]     Hunter Deposition, Deposition Exhibits 14 (Absence approved by Jay Kim), 19 (E-mail from Sonecka Womack stating "There have been quite a few instances that Jay has excused."); Womack Deposition, Plaintiff's Deposition Exhibit 15 (Absence request approved by Jay Kim); Vacation Request - Def. Doc. 185; Absence Request - Def. Doc. 187; Kim Deposition, pp. 81:6 - 82:22.

[39]     Womack Deposition, p. 14:13-19; Hunter Deposition, p. 63:16-20, Deposition Exhibit 10.

medical reasons "because if somebody, you know, is sick, they have to go to see a doctor. That is common. That's normal. Then how can I say to, you know, my people, Hey, please sit down and you have to work. You have to complete this work. I didn't say. I didn't say it. How can I say that? . . . the other team members in accounting, if they have, you know, some sickness or something, I always told – told them, hey, go – please go to see a doctor. That's normal, right? That's a common thing."[40]

### Hunter Informs Kim of Pregnancy

Ms. Hunter told Mr. Kim about her pregnancy on Wednesday, August 9, 2006, after she learned she would need a medical procedure.[41] She informed him that she would need to be off from work for the procedure.[42] When Ms. Hunter told him that she was pregnant and needed the procedure to save her pregnancy, Mr. Kim grunted and said "what" "as if in a dismayed sort of way" but allowed her the time off for the procedure.[43]

---

[40]     Kim Deposition, 81:24-82:22.

[41]     Hunter Deposition, pp. 103:4-105:11, 110:19 - 111:18.

[42]     Hunter Deposition, pp. 103:4-105:11, 110:19 - 111:18.

[43]     Hunter Deposition, pp. 114:23-115:2, 122:8-23.

Ms. Hunter does not know of any absences between August 9 and when she was terminated.[44] On August 10, 2006, Ms. Womack sent an e-mail to Ms. Hunter acknowledging Ms. Hunter's pregnancy through the language "we completely understand you [sic] current health condition;" this e-mail contained an April e-mail from Mr. Kim setting forth the types of absences he approved/excused.[45]

Mr. Kim distanced himself from Ms. Hunter following the revelation of her pregnancy; he communicated only through Ms. Womack; he would not speak directly to Ms. Hunter, he would not look at her, and would walk away from her when he saw her.[46] Tracy Riedler testified that it would violate Mobis's EEO policy to treat an employee coldly or distantly due to her pregnancy.[47] Mr. Kim did not treat other employees in a similar manner.[48] On August 14, 2006, Mr. Kim sent an e-mail to Sonechka Womack asking about the status of Ms. Hunter's attendance and requesting her to fill out an excel spreadsheet for Ms. Hunter's

---

[44]    Hunter Deposition, p. 135:9-13.

[45]    Womack Deposition, Deposition Exhibit 12.

[46]    Womack Deposition, 27:10-28:23; Hunter Deposition, p. 77:8-20; 131:1-12; 134:2-19.

[47]    Riedler Deposition, pp. 82:15-83:13.

[48]    Hunter Deposition, p. 77:8-20.

absences.[49]

*Kim Decides to Terminate Hunter*

Prior to learning of Ms. Hunter's pregnancy, Mr. Kim complimented her

performance, and remarked that she was an asset to their team.[50]  Prior to learning

of Ms. Hunter's pregnancy, he did not communicate to her that he had any

problems with any of her absences,[51] and committed to working with her on her

work schedule as it related to taking her daughter to school in the mornings.[52]  Ms.

Hunter did not receive any discipline for any alleged attendance problems.[53]  There

were not any problems with Ms. Hunter completing her work; she did not cause

problems at work nor receive any employee complaints.[54]  Ms. Hunter was not told

that her absences would lead to her termination or that they were causing a

---

[49]    Kim Deposition, Deposition Exhibit 12; Womack Deposition, pp. 25:8-26:11.

[50]    Hunter Deposition, p. 77:2-7.

[51]    Hunter Deposition, p. 115:9-13.

[52]    Hunter Deposition, pp. 161:19-162:11, 1654:18-166:23.

[53]    Riedler Deposition, p. 32:14-20 ("I'm not actually aware of a disciplinary warning that Ms. Hunter has); Defendant's Discovery Responses, Response to Request for Admission One ("Mobis admits only that it did not issue any written "discipline" as such to Plaintiff prior to her termination.).

[54]    Womack Deposition, pp. 18:1-3; 31:7-10; 32:13-15; 32:16-33:14; Riedler Deposition, p. 121:6-13.

problem prior to Mr. Kim learning she was pregnant.[55]

On August 23, 2006, Mr. Kim sent an e-mail to Ms. Riedler writing "I do not want to take care of Tarsha anymore. . . I need your help to terminate her."[56] Mr. Kim testified that "When I – when I made the decision to terminate her, I asked Tracy, Do we have some policy or something like that out of our handbook if somebody will have, you know, bad tardiness or bad attendance, how can we do that or something like that."[57]  Ms. Riedler testified that the decision to terminate Ms. Hunter was made on or shortly before August 23, 2006.[58]

On August 24, 2006, Ms. Hunter learned from Ms. Womack that Mr. Kim planned to terminate her.[59]  Ms. Womack told Ms. Hunter that Mr Kim was being unfair, both Ms. Womack and the other supervisor had discussed with Mr. Kim that they thought he decided to fire Ms. Hunter because of her pregnancy, and Mr.

---

[55]    Hunter Deposition, pp. 115:9-13; 134:2-19; 161:19-162:11; 165:18-166:23.

[56]    Riedler Deposition, p. 125:5-17; Deposition Exhibit 5.

[57]    Kim Deposition, p. 87:18-23.

[58]    Defendant's Discovery Responses, Response to interrogatory 6.  In her deposition, Ms. Riedler testified that she "could not be exact," but that the decision to terminate Ms. Hunter was made "roughly a week before her termination date."  (Riedler Deposition, p. 122:25-123:3). A week before the termination date would be Friday, August 18, 2006.

[59]    Hunter Deposition, pp. 132:16-133:18.

11

Kim responded that it did not matter what they thought.[60]   Ms. Womack did not want Ms. Hunter to be terminated because "she did a really good job."[61]  Ms. Womack complained not only to Mr. Kim, but also Ms. Riedler, that she "felt like [Ms. Hunter] was being terminated because she was pregnant."[62]

Despite Ms. Womack's complaint, Ms. Riedler did not investigate whether Ms. Hunter's pregnancy motivated Mr. Kim's decision.[63]  The only thing she did to verify the information Mr. Kim provided to her about his decision to terminate Ms. Hunter was to review the "absence forms that were signed by Ms. Hunter, Sonecka, and/or Jay."[64]  Ms. Riedler testified that the termination was due to the Plaintiff's full or partial day absences on June 15, July 25, 27, 31, August 1, 11, and 14.[65]  Ms. Hunter did not recall any absences after  August 9,[66] and was at work on August 14.[67]

---

[60]    Id.

[61]    Womack Deposition, pp. 30:19-31:2; Riedler Deposition, p. 114:14-19.

[62]    Womack Deposition, p. 35:6-17.

[63]    Riedler Deposition, p. 117:8-18.

[64]    Riedler Deposition, p. 120:14-19.

[65]    Riedler Deposition, p. 127:1-19; Exhibit 4.

[66]    Hunter Deposition, p. 135:9-13.

[67]    Hunter Deposition, pp. 79:4-80:8; 140:1-6.

On August 25, 2006, Mr. Kim communicated to Ms. Hunter his decision to terminate her.[68]  In a meeting where Ms. Womack was present, Ms. Hunter asked Mr. Kim why his demeanor towards her had changed.  He responded by stating, "I can't afford to take care of an employee like you."[69]  Ms. Womack renewed her objection to the termination complaining that she felt Ms. Hunter's pregnancy motivated the decision.[70]

*Mobis Responds to Post-Employment Issues*

Following her termination, Ms. Hunter applied for unemployment compensation benefits with the Alabama Department of Industrial Relations ("DIR") where she relayed the circumstances leading up to her termination.[71]  In

---

[68]    Hunter Deposition, pp.  178:4-181:22.

[69]    Hunter Deposition, pp.  178:4-181:22.

[70]    Hunter Deposition, pp.  178:4-181:22; Kim Deposition, p. 90:1-5.  Ms. Womack did not agree Ms. Hunter's attendance motivated her termination, as the Defendant represents on page 24 of its summary judgment brief.  The testimony to which the Defendant cites involves Ms. Womack responding to a question as to whether Mr. Kim gave Ms. Hunter a reason for her termination.  Ms. Womack speculated as to what was likely said.  (Womack Deposition, 36:2-24).  Ms. Womack did not express that her opinion was that Ms. Hunter's attendance was the true reason for her termination.  When Ms. Womack testified as to her opinion for the reason, she testified, "I just – I just kept saying I felt like she was being terminated because she was pregnant."  (Womack Deposition 35:12-17).

[71]    Plaintiff's Exhibit 6, Department of Industrial Relations Records, 179-180; 246-247 ("DIR Records").

opposition to her application for benefits, Mobis stated that it terminated Ms. Hunter because her performance was unacceptable.[72]  Mobis further stated that Ms. Hunter had been late or tardy "but we don't know b/c we don't keep documentation."[73]

On November 16, 2006, Mobis responded to the Charge of Discrimination which Ms. Hunter filed with the United States Equal Employment Opportunity Commission ("EEOC").  It opposed her claim of discrimination by stating the decision to terminate Ms. Hunter could not be motivated by her pregnancy because Mr. Kim, who it identified as making the decision to terminate Ms. Hunter, communicated his decision to Ms. Riedler prior to learning of Ms. Hunter's pregnancy.[74]

Mobis also submitted, as Exhibit C to its position statement an Excel spreadsheet[75] documenting the absences it stated it considered in terminating Ms. Hunter.  The attendance spreadsheet submitted by the Defendant to the EEOC contained false information; it showed Ms. Hunter being absent on at least one

---

[72]     DIR Records 179-180; 246-247.

[73]     Id.

[74]     Plaintiff's Exhibit 10, Defendant's EEOC Position Statement, pages 3-4.

[75]     It is also attached to Mr. Kim's summary judgment affidavit as Exhibit 1.

14

date where she was actually at work.[76]  Mr. Kim testified in his deposition that he

"did not make [the chart] by [himself]," and that he gathered the information on it

from either Ms. Hunter or Ms. Womack.[77]  As stated *supra*, Ms. Womack believed

Mr. Kim maintained attendance records.


ARGUMENT

Summary judgment is not proper in this case because a reasonable jury

could find from the evidence that the Defendant did not have a problem with Ms.

Hunter's alleged attendance issues until after it learned she was pregnant, and then

it immediately attempted conceal its discriminatory motive by using absences it

approved and behavior it condoned to justify her termination.  The Defendant

decided to terminate Ms. Hunter less than two weeks after learning of her

pregnancy.  Under Federal Rule of Civil Procedure 56(c), summary judgment is

proper "if the pleadings, depositions, answers to interrogatories, and admissions

on file, together with the affidavits, if any, show that there is no genuine issue as

to any material fact and that the moving party is entitled to judgment as a matter of

law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 91 L. Ed. 2d 265, 106 S. Ct.

---

[76]    Hunter Deposition, pp. 79:4-80:8, 160:1-6.

[77]    Kim Deposition, p. 62:2-22.

2548 (1986).  All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant.  *See Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993).

I.    MR. KIM DECIDED TO TERMINATE MS. HUNTER AS SOON AS HE LEARNED OF HER PREGNANCY.

In 1978, Congress amended Title VII of the Civil Rights Act of 1964 to include a prohibition against pregnancy discrimination.  The PDA protects women against discrimination based on pregnancy or pregnancy related conditions.  42 U.S.C. § 2000e(k).  It designed the PDA specifically to address the stereotype that "women are less desirable employees because they are liable to become pregnant," and to insure that the decision whether to work while pregnant "was reserved for each individual woman to make for herself."  *Maldonado v. U.S. Bank*, 186 F.3d 759, 762 (7th Cir. 1999).  Ms. Hunter's claim for pregnancy discrimination is based on circumstantial evidence.  The familiar *McDonnel Douglas* burden shifting framework, therefore, applies to the analysis of her claims.

A.    Jay Kim made the decision to terminate Ms. Hunter.

16

Jay Kim testified he made the decision to terminate Ms. Hunter.[78]  Mobis represented to both the EEOC and DIR that Mr. Kim made the decision to terminate Ms. Hunter.[79]  From this evidence, a jury could, and should, find that Mr. Kim made the decision to terminate Ms. Hunter.

Despite this evidence, Ms. Riedler attempts to claim responsibility for the termination decision.  At best for the Defendant, Ms. Riedler served as a "cat's paw."  Under a "cat's paw" theory, the discriminatory animus of a non-decisionmaking employee may be imputed to a neutral decisionmaker when the decisionmaker acts on the recommendation or information furnished by a biased party. *See Llampallas v. Mini-Circuits, Lab, Inc.*, 163 F.3d 1236, 1249 (11th Cir. 1998).  "In such a case, the recommender is using the decisionmaker as a mere conduit, or 'cat's paw' to give effect to the recommender's discriminatory animus." *Stimpson v. City of Tuscaloosa*, 186 F.3d 1328, 1332 (11th Cir. 1999).

The Eleventh Circuit recognizes that an employer may be held liable for employment discrimination if the actions of a neutral decision maker are somehow influenced  by the prejudice of a non-decision maker. *See, e.g., Schoenfeld v. Babbitt,* 168 F.3d 1257, 1268 (11th Cir. 1998)*; Weaver v. Casa Gallardo, Inc.,*

---

[78]    Kim Deposition, pp. 82:23-83:9; 87:18-23.

[79]    Defendant's EEOC Position Statement, pp. 3-4; DIR Records 179-180; 246-247.

17

922 F.2d 1515, 1527 (11th Cir. 1991); *Jones v. Gerwens,* 874 F.2d 1534, 1541

n.13 (11th Cir. 1989). In interrogatories, the Defendant identified both Mr. Kim

and Ms. Riedler as making the termination decision on or about August 23, 2006.[80]

Ms. Riedler testified in her deposition that she had no personal knowledge of Ms.

Hunter's attendance, and that she relied solely on Jay Kim's representations in

approving the termination decision.[81]  She did not investigate whether Ms.

Hunter's pregnancy motivated Mr. Kim's recommendation.[82]  Even if this Court

assumes the Defendant's argument is correct, that Ms. Riedler ultimately decided

to terminate Ms. Hunter, Ms. Riedler served as Mr. Kim's "cat's paw" to give

effect to his discriminatory animus.[83]  For purposes of summary judgment, Mr.

Kim must be assumed as the decision maker for Ms. Hunter's termination.


    B.    <u>The temporal proximity of less than a month between the Defendant's</u>

           <u>knowledge of Ms. Hunter's pregnancy and her termination establishes</u>

           <u>a prima facie case of pregnancy discrimination.</u>

---

[80]    Defendant's Discovery Responses, Answer to Interrogatories 4-6.

[81]    Riedler Deposition, pp. 100:20-23

[82]    Riedler Deposition, p. 117:8-18.

[83]    This theory is consistent with Mobis's standard procedure for terminations.  Ms.
Riedler testified that she approves terminations, but that a supervisor/department manager
initiates the process.  (Riedler Deposition, pp. 74:20-75:6; 150:1-9).

In *Schoenfeld v. Babbit*, 168 F.3d 1257, 1268 (11th Cir. 1999), the United States Court of Appeals for the Eleventh Circuit stated that where the traditional model for a prima facie does not fit the situation, it can be adjusted; in "cases where the evidence does not neatly fit into the classic prima facie case formula, for example, we have stated that [a] prima facie case of disparate treatment can be established by any 'proof of actions taken by the employer from which we infer discriminatory animus because experience has provided that in the absence of any other explanation it is more likely than not that those actions were bottomed on impermissible considerations." This is such a case. In this situation, the Defendant terminated Ms. Hunter shortly after learning of her pregnancy. From these facts, a jury could infer discrimination.

A prima facie case of pregnancy discrimination can be established by showing that (1) Ms. Hunter was pregnant, (2) she was qualified for her job, (3) she was subjected to an adverse job action, and (4) there is a nexus between her pregnancy and the adverse decision." *Asmo v. Keane, Inc.*, 471 F. 3d 588, 592 (6th Cir. 2006); *Kerzer v. Kingsly Manuarfacutring*, 156 F.3d 396, 400 (2d Cir. 1998). It is not in dispute that Ms. Hunter was pregnant, that she was qualified for her job,[84] or that her termination amounted to an adverse decision. Mobis argues Ms.

---

[84]    Riedler Deposition, p. 101:2-6.

Hunter cannot establish a nexus between her pregnancy and her termination.

Temporal proximity between the Defendant's learning of Ms. Hunter's pregnancy and its decision to generate a reason to fire her establishes such a nexus. *See Asmo v. Keane, Inc.*, 471 F.3d 588, 593 (6th Cir. 2006) (concluding that a two-moth time span between the employer learning of an employee's pregnancy and its decision to discharge the employee demonstrated a nexus for the purpose of establishing a prima facie case); *Bergman v. Baptist Healthcare Sys.*, 167 Fed. Appx. 441, 446-447 (6th Cir. 2006) (finding an employee established a prima facie case of pregnancy discrimination when her employer learned of her pregnancy, and the decision to terminate her followed); *DeBoer v. Musashi Auto Parts, Inc.*, 124 F.App'x. 387, 391 (6th Cir. 2005) (finding that temporal proximity satisfies the nexus requirement).

Mr. Kim learned of Ms. Hunter's pregnancy less than one to two weeks prior to making the decision to terminate her.[85]  Immediately after Ms. Hunter disclosed her pregnancy to him, Mr. Kim began searching for a justification to terminate her.  He asked Tracy Riedler to advise him of an attendance policy to

---

[85]    The Plaintiff does not concede that Tracy Riedler is the proper decision maker for this analysis.  However, it was her testimony that she learned of Ms. Hunter's pregnancy "a day or two before she was terminated" when Ms. Womack came to her crying about the decision to terminate Ms. Hunter.  (Riedler Deposition, 115:19-116:6).

use to terminate her.  He e-mailed Sonechka Womack for attendance documentation for Ms. Hunter.  From this evidence, a jury could infer a nexus between Mr. Kim's knowledge of Ms. Hunter's pregnancy and his decision to begin making a case to terminate her.

Mr. Kim also remarked in an e-mail to Tracy Riedler,"I do not want to take care of her anymore . . I need your help to terminate her."[86]  When he terminated Ms. Hunter, he remarked "I can't afford to take care of an employee like you."[87]. These remarks, made in the context of Mr. Kim's decision to terminate Ms. Hunter, allow a jury to find a nexus between Ms. Hunter's pregnancy and her termination.  *See Arismendez v. Nightingale Home Health Care, Inc.*, 493 F.3d 602, 607-608 (5th Cir. 2007) (finding remark of plaintiff's supervisor, who informed plaintiff that she was being terminated for excessive absenteeism, that he had a business to run and could not take having a pregnant woman in the office, amounted toevidence of discrimination even though the supervisor did not approve the termination, but rather, initiated the process).

Considering the timing of the actions in this case and Mr. Kim's remarks, the evidence demonstrates a prima facie case of pregnancy discrimination.  The

---

[86]     Riedler Deposition, Deposition Ex. 5.

[87]     Hunter Deposition p. 178:4-181:22.

Defendant's argument that Ms. Hunter cannot establish a nexus between her termination and her pregnancy based on alleged lack of comparative evidence is misplaced. Comparative evidence is not the only method for proving a prima facie case of discrimination. The Eleventh Circuit recently observed that an employee, rather than relying on comparative evidence, may produced "other evidence of discrimination" "from which an inference of discrimination could be found" in establishing a prima facie case of discrimination." *Rioux v. City of Atlanta*, 2008 U.S. App. LEXIS 5683, **13-19 (11th Cir. Ga. Mar. 18, 2008). Ms. Hunter presented this "other evidence of discrimination," as discussed *supra*. There is also evidence of a non-pregnant employees who were not terminated after having two attendance occurrences during their probationary period.

When asked in her deposition to state facts disputing that Mobis applied its attendance policy equally to pregnant and non-pregnant employees, Ms. Hunter testified that Tamika Lee, a non-pregnant employee, "had the same attendance issues," was spoken to by Mr. Kim, but was not terminated.[88] Mr. Kim's tolerance of Ms. Hunter's approved absences prior to learning of her pregnancy further demonstrates the disparity in treatment in how Mobis applied its policy to pregnant and non-pregnant employees.

---

[88]    Hunter Deposition, pp. 129:11-130:14.

22

Ms. Riedler's testimony in another action brought against Mobis provides additional comparative evidence. Lorenzo Daniels, a male employee, had the equivalent of five (5) absences during his 90 day probationary period.[89]  His supervisor found his attendance to be unsatisfactory[90] and communicated to Ms. Riedler that he did not think Mr. Daniels was suitable for long-term employment at Mobis.[91]  Despite these attendance issues, Ms. Riedler met with Mr. Daniels on November 10, 2004, to inform him that Mobis was extending his probationary status for an additional ninety days.[92]  He was told that the company would have "zero tolerance" for attendance issues during that time.[93]

Mr. Daniels's attendance continued to be unsatisfactory.  During the second probationary period, he was tardy November 15, the very first day of the "zero tolerance" period.[94]  Ms. Riedler excused the incident and did not terminate him.[95]

---

[89]    Plaintiff's Evidentiary Materials, Exhibit 4, Affidavit of Tracy Riedler, ¶ 11.

[90]    Riedler Affidavit from *Daniels*, ¶ 11.

[91]    Riedler Affidavit from *Daniels*, ¶ 11.

[92]    Riedler Affidavit from *Daniels*, ¶¶ 12-14.  In contrast, Ms. Riedler testified in her deposition in this action that she could not recall circumstances where an employee's probationary period has been extended beyond ninety days.  (Riedler Deposition, p. 59:18-21).

[93]    Id., ¶ 15.

[94]    Id., ¶ 16.

[95]    Id.

23

He was not terminated after he left work early on December 6, 2004, nor after he was tardy on December 8, 2004.[96]  He left work early and/or was tardy on January 20, 21, 24, 25, and February 1, 2005.[97]  Mobis did not terminate him until February 3, 2005.[98]

Mr. Daniels's situation demonstrates a circumstance where it treated a male probationary employee more favorably than a pregnant employee.  Mobis extended Mr. Daniels's probationary period, rather than terminate him, when his attendance was unacceptable, and continued to excuse many absences during a "zero tolerance" period.  From a comparison of these situations, a jury could find that the Defendant treated Mr. Daniels's absences more favorably because he was not pregnant.

Viewing the evidence in a light most favorable to Ms. Hunter, she established a prima facie case of pregnancy discrimination by showing a nexus between her termination and her pregnancy.  The Defendant's motion for summary judgment, therefore, is due to be denied.

---

[96]    Id., ¶ 16.

[97]    Id., ¶ 18.

[98]    Id., ¶ 20.

C.    <u>The Defendant began looking for a justification to fire Ms. Hunter</u>
      <u>when it learned of her pregnancy.</u>

An employee may demonstrate that a reason proffered by an employer for

her termination is a pretext for unlawful discrimination by pointing to "such

weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in

the employer's proffered legitimate reasons for its action that a reasonable

factfinder could find them unworthy of credence" or by directly persuading the

district court that discrimination is more likely the true notice behind the

challenged action. *Combs v. Plantation Patterns*, 106 F.3d 1519, 1539 (11th Cir.

1997).  As this Court observed, "such cases are only infrequently resolve don

summary judgment because the credibility of the witnesses and the weight of the

evidence, quintessential jury questions, are so central to any ultimate

determination.  *Strickland v. Prime Care of Dothan*, 108 F. Supp. 2d 1329, 1332

(M.D. Ala. 2000) (citing *Hariston v. Gainseville Sun Publ'g Co.*, 9 F. 3d 913, 918

(11th Cir. 1993).


1.    The Defendant's misrepresentations establish pretext.

"A showing that an employer lied about the reasons for its acts -- that he had

a "dishonest belief" in the reasons -- can be strong evidence that a defendant has

acted with discriminatory intent." *Woodard v. Fanboy, L.L.C.*, 298 F.3d 1261, 1265 (11th Cir. 2002) (citing *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 120 S. Ct. 2097, 2108, 147 L. Ed. 2d 105 (2000) ("In appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose. Such an inference is consistent with the general principle of evidence law that the factfinder is entitled to consider a party's dishonesty about a material fact as 'affirmative evidence of guilt.'")).

A defendant's dishonesty about its motives can be affirmative evidence of guilt thereby demonstrating pretext. *See Cleveland v. Home Shopping Network, Inc.*, 369 F.3d 1189, 1196 (11th Cir. 2004) (reversing a trial court's grant of summary judgment finding sufficient evidence of pretext ). Mobis mislead the EEOC about its motives. The evidence demonstrates Mr. Kim learned of Ms. Hunter's pregnancy approximately one to two weeks before terminating her. However, Mobis represented to the EEOC that he did not know Ms. Hunter was pregnant when he made the recommendation to terminate her in order to argue that he could not have acted with a discriminatory motive.[99] Now, the Defendant raises

---

[99] In footnote 9 of the Defendant's brief, it tries to excuse its conduct by attributing it to difficulty in communicating with Mr. Kim. However, Ms. Womack testified that she was able to communicate with and understand Mr. Kim. (Womack Deposition, p. 39:4-14). Mr. Kim

the same argument by placing the decision to terminate Ms. Hunter in Tracy

Riedler's lap, and disavows her knowledge of Ms. Hunter's pregnancy. The

Defendant's misrepresentation to the EEOC about Mr. Kim's motives and its

shifting position as to who made the termination decision both suggest pretext.

Mobis also submitted inaccurate documentation of the absences it claims

justified terminating Ms. Hunter; Ms. Hunter was not absent on at least one date

reflected on the Defendant's chart. The chart appeared after Mobis represented to

DIR that it did not keep documentation of Ms. Hunter's absences. From the

evidence discussed *supra*, a reasonable jury could find that neither Mr. Kim nor

Ms. Womack kept clear records of Ms. Hunter's attendance, and that the

attendance chart submitted to the EEOC , rather than being made

contemporaneously with Ms. Hunter's absences, was created by Mr. Kim after

deciding to terminate her to create a record to shield his discriminatory motive.

A reasonable jury may recognize these misrepresentations as proof of

desperation, and thus evidence of pretext. *See St. Mary's Honor Center v. Hicks*,

509 U.S. 502, 113 S. Ct. 2742, 2749, 125 L. Ed. 2d 407 (1993)("The factfinder's

---

does not have difficulty communicating with the employees in the accounting department, and no
employees have complained to Mr. Kim, or Ms. Riedler, about any alleged difficulty in
communicating with Mr. Kim. (Kim Deposition, pp. 31:12-19; 32:8-12). A jury could find,
therefore, that Mr. Kim's communication skills are adequate and were not the reason that the
Defendant misrepresented key facts surrounding the motivation of Ms. Hunter's pregnancy to the
EEOC.

disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show intentional discrimination. Thus, rejection of the defendant's proffered reasons will permit the trier of fact to infer the ultimate fact of intentional discrimination . . . ."); *Strickland v. Prime Care of Dothan*, 108 F. Supp. 2d 1329, 1333 (M.D. Ala. 2000) (observing that when a defendant was lying about the reasons for its behavior there was evidence of pretext); *see also EEOC v. Sears Roebuck and Co.*, 243 F.3d 846, 853 (4th Cir. 2001) (finding pretext when an employer deceived the EEOC about its motives by hiding key facts related to its decision); *Hargett v. Delta Automotive, Inc.,* 765 F. Supp. 1487, 1491 and 1494 (N.D. Ala. 1991) (concluding that employer's admission of providing forged documents to the EEOC could support conclusions that the reasons given by the employer for the employee's discharge amounted to "exaggerations, or concoctions designed to mask the true reason or reasons" and could "resemble a smoking gun.").

> 2.    Jay Kim's conduct and statements after learning of Ms. Hunter's pregnancy establishes pretext.

Evidence that an employer's demeanor towards an employee changed after learning of the employee's protected status suggests pretext. *See Leffel v. Valley Financial Services*, 113 F.3d 787, 794 (7th Cir.), *cert. denied*, 139 L. Ed. 2d 318, 118 S. Ct. 416 (1997) (observing that a sudden change in attitude upon disclosure that the plaintiff is member of a protected class may raise an inference of discrimination if the plaintiff can establish that the only intervening event was the disclosure); *EEOC v. Rocket Enterprises, Inc.*, 2007 U.S. Dist. LEXIS 85181, *14-16 (E.D. MI 2007) (finding evidence of supervisor's change in demeanor shortly following an employee's complaint of sexual harassment, and the close temporal proximity between the complaint and the employee's termination claim, as establishing pretext).

The Sixth Circuit analyzed when an employer's change in demeanor can establish evidence of pregnancy discrimination in *Asmo v. Keane, Inc.*, 471 F.3d 588 (6th Cir. 2006). In *Asmo*, an employer terminated an employee approximately two (2) months after learning of her pregnancy. In analyzing evidence of pretext, the Sixth Circuit found that the most significant evidence came from the plaintiff's supervisor's conduct following his knowledge of her pregnancy. While other employees congratulated the plaintiff, her supervisor remained silent. The Court found that his silence could be sufficient to find that he possessed discriminatory

29

motives because it could be seen as speculation that her pregnancy would interfere with her job. *Asmo*, 471 at 595.

In this action, when Ms. Hunter informed Mr. Kim of her pregnancy, he grunted and said "what" in a dismayed tone. His demeanor changed towards her; he ignored her and ceased interacting with her directly. He did not treat other employees in a similar manner. From these facts, a jury could infer that Mr. Kim's change in demeanor and dismayed attitude evidenced his discriminatory motives and concern that Ms. Hunter's pregnancy would interfere with her job.[100]

Mr. Kim's subsequent statements also telegraphed his discriminatory motives suggesting pretext. *See Jones v. Bessemer Carraway Medical Ctr*, 151 F.3d 132, 1323 n. 11 (11th Cir. 1998) (holding language not amounting to direct evidence, but showing animus, may be significant evidence of pretext); *Alphin v. Sears, Roebuck & Co.*, 940 F.2d 1497, 1499 (11th Cir. 1991). Mr. Kim's statement at Ms. Hunter's termination, "I can't afford to take care of an employee like you" suggests that he viewed Ms. Hunter's pregnancy as a burden. This statement, when considered in connection with his change in demeanor towards Ms. Hunter, evidences he decided to terminate Ms. Hunter because of her pregnancy.

---

[100]    Sonechka Womack further testified that she heard Mr. Kim making a remark that communicated he had concerns that children may interfere with an employee's ability to get her work done. (Womack Deposition, pp. 15:19-16:18.

30

Ms. Womack's statements to Mr. Kim, Ms. Riedler, and Ms. Hunter also suggest pretext in light of all the circumstances. In *Asmo*, the Sixth Circuit found that a management level employee who did not make the decision to terminate the plaintiff was probative on the issue of discrimination. The management level employee responded to the plaintiff's comment that she was seeking legal counsel for potential pregnancy discrimination claims, "I don't blame you . . . You need to do what you need to do." *Asmo*, 471 F.3d at 595. The Court found this evidence to be relevant to the discriminatory atmosphere in the defendant's workplace. *Id.* Similarly, Ms. Womack's belief that Mobis terminated Ms. Hunter due to her pregnancy is probative to the existence of discrimination in the work environment.

A jury could find from Mr. Kim's statements, Mr. Kim's change in demeanor, and Ms. Womack's impressions of what she observed that Ms. Hunter's pregnancy motivated Mr. Kim to find a way to terminate her employment. Therefore, summary judgment is not proper in light of this evidence.

        3.     Attendance is not a credible reason for Ms. Hunter's termination in light of Mobis's treatment of her absences prior to learning of her pregnancy.

When an employer terminates an employee for a reason which was known to it prior to learning of an employee's protected status, pretext may be inferred. *See Hinson v. Clinch County Bd. of Educ.*, 231 F.3d 821, 831 (11th Cir. 2000) (finding employer's failure to raise performance issues prior to the employee complaining of discrimination suggested pretext); *Hairston v. Gainsville Sun Publ'g Co.*, 9 F.3d 913, 921 (11th Cir. 1993) (plaintiff showed pretext in ADEA retaliation case when he received favorable evaluations historically, but "received numerous unfavorable performance evaluations" after filing administrative complaints); *Bell v. Potter*, 234 F. Supp. 2d 91 (D. Mass) (finding pretext when employer terminated an employee for reasons pre-dating protected activity).

In this case, Mr. Kim knew when he recommended to Mobis to hire her in June 2005 that she did not have perfect attendance during her temporary assignment. Mr. Kim approved absences for Ms. Hunter in June, July and August prior to learning of her pregnancy. He testified, and communicated in an April e-mail to his employees which was forwarded to Ms. Hunter, that he would approve absences for medical reasons for all employees. It was not until after Mr. Kim learned of Ms. Hunter's pregnancy that he began to view her attendance as something to be used to terminate her employment. The evidence shows that after Mr. Kim learned of Ms. Hunter's pregnancy, he began asking Ms. Riedler to find a

32

policy related to attendance which he could use to terminate her, and requesting Ms. Womack to get him information on Ms. Hunter's attendance.  He did not even become aware of Mobis's probationary period policy until the day before, or the day of, Ms. Hunter's termination.  This evidence strengthens the inference of pregnancy discrimination because a jury could infer from Mr. Kim's approval and tolerance of Ms. Hunter's absences prior to learning of her pregnancy suggested that her attendance did not concern him and simply served as an excuse to terminate her once he learned of her pregnancy.

Pretext is further found from the Defendant's deviation from its disciplinary policy.  *See Hurlbert v. St. Mary's Health Care System, Inc.*, 439 F.3d 1286, 1299 (11th Cir. 2006).   As discussed *supra*, Mobis's disciplinary policy applies to probationary employees, and warnings under the policy should be placed in an employee's personnel file.  Ms. Hunter did not receive any discipline for any of her absences.  A jury could infer from Mobis's failure to discipline Ms. Hunter that she did not engage in conduct warranting discipline and/or violating Mobis's policies since her absences had been approved by Mr. Kim.  The lack of discipline for attendance violations suggests pretext.  *See Stanfield Answering Service, Inc.*, 867 F.2d 1290, 1294 (11th Cir. 1989) (finding that a lack of disciplinary action where it could be expected suggests pretext).

33

CONCLUSION

This Court should deny the Defendant's *Motion for Summary Judgment* because a jury could find that as soon as Jay Kim learned of Ms. Hunter's pregnancy, he began looking for a way to terminate her employment.  He wrote to Tracy Riedler,  "I do not want to take care of her anymore . . I need your help to terminate her."  Despite Sonechka Womack's objection of pregnancy discrimination to both Mr. Kim and Ms. Riedler, Mr. Kim terminated Ms. Hunter stating, "I can't afford to take care of an employee like you."

Respectfully submitted,

/s/ *Heather N. Leonard*

Heather Newsom Leonard
Attorney for Plaintiff

OF COUNSEL:

HEATHER LEONARD, P.C.
The Gross Building
2108 Rocky Ridge Road, Suite 1
Birmingham, AL   35216
Telephone:  (205) 978-7899
Facsimile:   (205) 278-1400
Heather@HeatherLeonardPC.com

34

CERTIFICATE OF SERVICE

I hereby certify that a copy of the above and foregoing has been served on the following counsel via the Court's electronic filing system on April 22, 2008, addressed as follows:

Henry C. Barnett, Jr.

CAPELL & HOWARD, P. C.

150 South Perry Street

Post Office Box 2069

Montgomery, AL 36102

Telephone:  (334) 241-8059

Facsimile:    (334) 323-8888


/s/ Heather N. Leonard

Of Counsel

35