IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| TARSHA NICKOK HUNTER, | ) | |
| | ) | |
| Plaintiff, | ) | CIVIL ACTION NUMBER: |
| | ) | |
| v. | ) | 2:07CV-427-WHA |
| | ) | |
| MOBIS ALABAMA, LLC, | ) | |
| | ) | |
| Defendant, | ) | |

PLAINTIFF'S EVIDENTIARY MATERIALS
FILED IN OPPOSITION TO
THE DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

OF COUNSEL:

Heather Newsom Leonard
HEATHER LEONARD, P.C.
The Gross Building
2108 Rocky Ridge Road, Suite 1
Birmingham, Alabama 35216
(205) 978-7899 - voice
(205) 278-1400 - facsimile
Heather@HeatherLeonardPC.com

COMES NOW the Plaintiff and gives notice to this Honorable Court of her filing the following evidentiary materials in opposition to the Defendant's pending *Motion for Summary Judgment*:

1. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Deposition of Tarsha Hunter

2. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Deposition of Tracy Riedler

3. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Deposition of Jay Kim

4. . . . . . . . . . . . . . . . . . . Affidavit of Tracy Riedler from *Daniels v. Mobis*[1]

5. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Deposition of Sonechka Womack

6. . . . . . . . . Department of Industrial Relations Records (179-180; 246-247)

7. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Defendant's Discovery Responses

8. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Vacation Request (Def. Doc. 185)

9. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Absence Request (Def. Doc. 187)

10. . . . . . . . . . . . . . . . . . . . . . . . . . . Defendant's EEOC Position Statement

Respectfully submitted,

/s/ *Heather N. Leonard*
Heather Newsom Leonard
Attorney for Plaintiff

OF COUNSEL:

HEATHER LEONARD, P.C.

---

[1] These excerpts were downloaded from Pacer from the summary judgment materials filed by counsel for the Defendant in support of the Defendant's motion for summary judgment in the *Daniels* case.

The Gross Building
2108 Rocky Ridge Road, Suite 1
Birmingham, AL   35216
Telephone:  (205) 978-7899
Facsimile:   (205) 278-1400
Heather@HeatherLeonardPC.com


## CERTIFICATE OF SERVICE

I hereby certify that a copy of the above and foregoing has been served on the following counsel via the Court's electronic filing system  on April 22, 2008, addressed as follows:

Henry C. Barnett, Jr.
CAPELL & HOWARD, P. C.
150 South Perry Street
Post Office Box 2069
Montgomery, AL 36102
Telephone:  (334) 241-8059
Facsimile:   (334) 323-8888


/s/ Heather N. Leonard
Of Counsel



1

1    IN THE UNITED STATES DISTRICT COURT

2    FOR THE MIDDLE DISTRICT OF ALABAMA

3    NORTHERN DIVISION

4

TARSHA NICKOL HUNTER,

5        Plaintiff,

6

vs.                              CIVIL ACTION NO.
7                                 2:07cv427-WHA

8    MOBIS ALABAMA, L.L.C.,

9        Defendant.

10

11

12              * * * * * * * * * * * *

13

14        DEPOSITION OF **TARSHA NICKOL HUNTER**, taken

15   pursuant to stipulation and agreement before Julie A.

16   Duncan, Certified Court Reporter and Commissioner for

17   the State of Alabama at Large, in the Law Offices of

18   Capell & Howard, 150 South Perry Street, Montgomery,

19   Alabama, on Wednesday, January 30, 2008, commencing at

20   approximately 10:00 a.m.

21

22              * * * * * * * * * * * *

23

2

1                          **APPEARANCES**

2    **ON BEHALF OF THE PLAINTIFF**:

3    Ms. Heather N. Leonard
     HEATHER LEONARD, P.C.
4    Attorney at Law
     2108 Rocky Ridge Road
5    Birmingham, Alabama   35216

6    **ON BEHALF OF THE DEFENDANT**:

7    Mr. Henry C. Barnett, Jr.
     CAPELL & HOWARD
8    Attorneys at Law
     150 South Perry Street
9    Montgomery, Alabama   36104

10   **ALSO PRESENT**:

11   Ms. Tracy Riedler
     Senior Manager Human Resources
12   MOBIS Alabama, L.L.C.
     1395 Mitchell Young Road
13   Montgomery, Alabama   36108

14   Ms. Allegra Smith, Capell & Howard

15

16                  *  *  *  *  *  *  *  *  *  *  *  *

17

18

19

20

21

22

23

HAISLIP, RAGAN, GREEN, STARKIE & WATSON, P.C.
(334) 263-4455

3

## EXAMINATION INDEX

**TARSHA NICKOL HUNTER**

BY MR. BARNETT . . . . . . . . . . . . .    6
BY MS. LEONARD . . . . . . . . . . . .  222
BY MR. BARNETT . . . . . . . . . . . .  223

\* \* \* \* \* \* \* \* \* \* \* \*

## EXHIBIT INDEX

MAR

**DEFENDANT'S EXHIBITS**

1    Records from Multi Staffing    12

2    Records from Troy State University    13

3    Records from Career Personnel    20

4    Records from Alabama Orthopaedic    25
     Specialists

5    Records of Advanced Rehab n/k/a Harmony    31
     Wellness & Rehab

6    Mobis Alabama, Employment Application    38

7    Records from Benchmark Medical, Inc.    40

8    Records from Palmer Psychiatric Services    45

9    Tarsha Hunter's Attendance Record with Multi    54
     Staffing

10   E-Mails from Sonechka Womack to Tarsha    61
     Hunter, In Re:  Attendance Issues, etc.

11   Mobis Alabama, Employee Handbook    68

4

# EXHIBIT INDEX

MAR

**DEFENDANT'S EXHIBITS**

12    Mobis Alabama, Employee Handbook          69
      Acknowledgement

13    2006 Absence Record - Tarsha Hunter        78

14    Mobis Alabama, L.L.C., Absence Request     81

15    Complaint, Hunter vs. Mobis Alabama, L.L.C.   82

16    E-Mail to Tarsha Hunter from Jay Kim,      140
      Subject:  Notification

17    E-Mail to Tarsha Hunter from Sonechka      142
      Womack, Subject:  Invoices/Statements, etc.

18    E-Mail to Tarsha Hunter from Jay Kim,      147
      Subject:  Check Out Pending Works

19    E-Mail to Tarsha Hunter from Sonechka      153
      Womack, Subject:  Attendance

20    August 28, 2006 Letter from Tarsha N.      183
      Hunter, In Re:  Mobis Alabama, L.L.C.

21    Dozier Elementary School Handbook Excerpt  219

* * * * * * * * * * * *

1                           **STIPULATION**

2           It is hereby stipulated and agreed by and

3    between counsel representing the parties that the

4    deposition of **TARSHA NICKOL HUNTER** is taken pursuant

5    to the Federal Rules of Civil Procedure and that said

6    deposition may be taken before Julie A. Duncan, Court

7    Reporter and Commissioner for the State of Alabama at

8    Large, without the formality of a commission, that

9    objections to questions other than objections as to

10   the form of the question need not be made at this time

11   but may be reserved for a ruling at such time as the

12   said deposition may be offered in evidence or used for

13   any other purpose by either party provided for by the

14   Statute.

15          It is further stipulated and agreed by and

16   between counsel representing the parties in this case

17   that the filing of said deposition is hereby waived

18   and may be introduced at the trial of this case or

19   used in any other manner by either party hereto

20   provided for by the Statute regardless of the waiving

21   of the filing of the same.

22          It is further stipulated and agreed by and

23   between the parties hereto and the witness that the

6

1  signature of the witness to this deposition is hereby

2  waived.

3

4                    * * * * * * * * * * * *

5

6                    COURT REPORTER:  Usual

7                         stipulations?

8                    MR. BARNETT:  Yes.

9                    **TARSHA NICKOL HUNTER**

10     The witness, after having first been duly sworn

11  to speak the truth, the whole truth and nothing but

12  the truth, testified as follows:

13                         **EXAMINATION**

14  **BY MR. BARNETT:**

15  Q.   Ms. Hunter, my name is Henry Barnett.  I

16       represent Mobis.  And the purpose of this

17       proceeding today is for me to ask you

18       questions about your lawsuit against Mobis for

19       pregnancy discrimination.

20          If you don't understand the question,

21       please feel free to ask me to rephrase it so

22       that you do.

23          Our purpose here today is to get all of

7

| | | |
|---|---|---|
| 1 | | the facts that we can and get them accurately |
| 2 | | so that we'll know what your contentions |
| 3 | | are -- |
| 4 | A. | Okay. |
| 5 | Q. | -- in this lawsuit. |
| 6 | | Full name, please. |
| 7 | A. | Tarsha Nickol Hunter. |
| 8 | Q. | Where do you live? |
| 9 | A. | ▮▮▮▮▮▮▮▮▮▮▮▮. |
| 10 | Q. | Who else -- let me have your social security |
| 11 | | number, please. |
| 12 | A. | ▮▮▮▮▮▮▮. |
| 13 | Q. | Have you ever gone by any other names? |
| 14 | A. | No. |
| 15 | Q. | Who lives at that address in Hope Hull? |
| 16 | A. | My mother and my stepfather. |
| 17 | Q. | How long have you lived there? |
| 18 | A. | Since last January.  2007. |
| 19 | Q. | '07.  Who else lives in that household? |
| 20 | A. | My two children. |
| 21 | Q. | And their names and ages? |
| 22 | A. | Kayla Alexius Hunter-Simmons. |
| 23 | Q. | All right.  K-A -- |

8

1   A.   K-A-Y-L-A.

2   Q.   I don't need the middle.

3   A.   Okay.

4   Q.   And the last?

5   A.   Hunter-Simmons.   Hunter-Simmons.

6   Q.   All right.   Hunter-Simmons?

7   A.   Uh-huh (positive response).   She's ten.

8   Q.   Your other child?

9   A.   Danielle Hunter.

10  Q.   Spell it, please.

11  A.   D-A-N-I-E-L-L-E.

12  Q.   Hunter?

13  A.   Hunter.   And she's --

14  Q.   Age?

15  A.   -- twelve -- eleven months.

16  Q.   Have you been married?

17  A.   No.

18  Q.   Who is the father of Kayla?

19  A.   Leo T. Simmons.

20  Q.   Where does he live?

21  A.   Atlanta, Georgia.

22  Q.   Do you get any sort of support from him with

23       respect to Kayla?

9

1    A.    Yes.

2    Q.    Child support?

3    A.    Yes.

4    Q.    How much is that?

5    A.    Three hundred a month.

6    Q.    Did the court order that?

7    A.    Yes.

8    Q.    Who is the father of Danielle Hunter?

9    A.    Joel F. Coley.

10   Q.    Joel?

11   A.    Joel.

12   Q.    F. Coley?

13   A.    Yes, C-O-L-E-Y.

14   Q.    Where does he live?

15   A.    Prattville, Alabama.

16   Q.    Do you have an address for either one of these

17         men?

18   A.    Offhand, I don't know it.

19   Q.    Do you get support for Danielle?

20   A.    No.

21   Q.    Have you tried to?

22   A.    No.

23   Q.    Where did you live before you lived in

10

1     Hope Hull?

2  A.   ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

3       (sic).

4  Q.   In Montgomery?

5  A.   Yes.

6  Q.   What years or dates did you live there?

7  A.   April 2007 to January 2007 -- I mean, I'm

8       sorry, 2006 of -- April to January of 2007.

9  Q.   Why did you move?

10 A.   I was forced to be evicted.

11 Q.   For nonpayment of rent?

12 A.   Yes.

13 Q.   Do you contend that Mobis is responsible for

14      that?

15 A.   Yes.

16 Q.   Who lived with you anytime at Perdido Drive?

17 A.   Joel F. Coley.

18 Q.   Did you -- well, if you were evicted, that

19      says you were renting at Perdido, right?

20 A.   Correct.

21 Q.   Have you ever been arrested or charged with

22      any kind of crime?

23 A.   No.

11

1    Q.    Let's talk about your education for a minute.

2    A.    Okay.

3    Q.    What degrees do you hold?

4    A.    Associate degree.

5    Q.    In what?

6    A.    In business administration.

7    Q.    And associate would mean a two-year degree?

8    A.    Yes.

9    Q.    From what institution?

10   A.    Troy University.  It was Troy State University

11         at the time.

12   Q.    What was your grade point average?

13   A.    At this time, I do not remember.

14   Q.    Do you have any idea what it was?

15   A.    I do -- at this time, I do not remember.

16   Q.    Was it under a two point or over a two point?

17   A.    I don't remember.

18   Q.    Do you have any other degrees?

19   A.    No.

20   Q.    Have you worked towards any degrees --

21   A.    Yes.

22   Q.    -- since?  And what was that?

23   A.    Bachelor's degree.

1    Q.    Where?

2    A.    Troy University.

3    Q.    In what?

4    A.    Human resources.

5    Q.    How many courses did you -- how many hours do

6          you have?

7    A.    At this time, I do not know.

8    Q.    Are you anywhere close to completing that?

9    A.    No.

10   Q.    Do you know what your grade point average in

11         that is?

12   A.    It's under two point five right now.

13                    MR. BARNETT:  Where is the Multi

14                        Staffing application?

15                    (Off-the-record discussion.)

16                    (Defendant's Exhibit Number 1 marked

17                    for identification.)

18                    MR. BARNETT:  All right.  Let's give

19                        one to me and one to Heather.

20                    MS. LEONARD:  Wherever you see a

21                        sticker on it --

22                    MR. BARNETT:  Y'all can share.

23                    MS. LEONARD:  That's fine.  I won't

13

1              bite her.

2    Q.    Do you see Defendant's Exhibit 1, Ms. Hunter?

3    A.    Uh-huh (positive response).

4    Q.    Take a look at it and see if this is your

5          application for employment that you filled out

6          for Multi Staffing.

7    A.    It is.

8    Q.    These are Bates stamped numbered.  Look at the

9          bottom of page 72.

10   A.    Okay.

11   Q.    Do you see that you stated to Multi Staffing

12         that you had an associate's degree in business

13         with a two point eight GPA?

14   A.    Uh-huh (positive response).

15   Q.    That's not true, is it?

16   A.    At that time, I'm not sure.

17   Q.    When did you receive your degree from Troy?

18   A.    In '05.  May 5th, '05.

19   Q.    And this was filled out in '06, right?

20   A.    Yes.

21   Q.    March 2nd, '06.  Look at the top left.

22   A.    Yes.

23                   (Defendant's Exhibit Number 2 marked

14

for identification.)

Q.   Let me show you what's been marked as
     Exhibit 2.  I'll represent to you that this is
     your transcript that we received via subpoena
     from Troy State, or from Troy University.
     Excuse me.

                 MR. BARNETT:  Where is that?

                 (Off-the-record discussion.)

Q.   Look on page -- well, let's see.  It's page 4
     of the transcript, but the transcript appears
     to be a little bit out of order.  So it's
     right before page 1.

                 MS. LEONARD:  I think you may be on
                     the right page.

                 MS. RIEDLER:  Uh-huh (positive
                     response).  It looks like a
                     partial page.

Q.   All right.  Do you see on the lower right-hand
     corner that you had a cumulative grade point
     average of 1.859 after completion of your
     associate's degree?

A.   That was in '07.  This is not right after my
     associate's degree.

15

1    MS. SMITH:  That's when they printed

2        out the document and sent it to

3        us.  That's just the date that

4        Troy printed it out and sent it

5        to us.

6    MR. BARNETT:  Do we have the grade

7        point average at the end of the

8        associate's?

9    MS. SMITH:  Yes, that's it right

10        there.

11  Q.  Well, my legal assistant got these documents.

12      And she sees that the '07 date is just the

13      date they printed it for us.

14  A.  These are the '07 classes.

15  Q.  Which ones?

16  A.  (Witness indicating).

17        MS. LEONARD:  Read the classes out

18            for the record.

19  A.  Business statistics, earth and space science,

20      earth and space science lab.

21  Q.  And when did you take those courses?

22  A.  '07.

23  Q.  Okay.

16

1          MS. RIEDLER:  Usually it will have

2                an abbreviation of the semester

3                or something.

4          MR. BARNETT:  I don't know.

5          MS. SMITH:  I don't see it.

6    Q.    So it's your understanding that you did have a

7          2.8 at the end of your associate's degree?

8    A.    Yes.

9    Q.    Give me just a minute and let me find that.

10         And if you can find it, I'll be happy to --

11         show me in here where your courses under your

12         associate's degree end, if you can do that.

13   A.    The last thing I see is fall of 2005, which is

14         on page 3, the last one.  But I do not see the

15         spring semester.

16              MS. SMITH:  That goes on to the next

17                page.

18   A.    Okay.  That has to be here.

19              MR. BARNETT:  We may have to come

20                back to this.

21              (Off-the-record discussion.)

22              MR. BARNETT:  We will try to figure

23                that out and come back to that.

17

1    Q.    Did you see a 2.8 anywhere in there?

2    A.    No, I didn't.

3    Q.    Where did you get the information that you put

4          on that application about a 2.8?

5    A.    I put down the closest thing that I could

6          recollect.

7    Q.    Then you went to the -- or at some point in

8          time you worked at the Barclay Agency?

9    A.    Correct.

10   Q.    What was your reason for leaving there?

11   A.    The new supervisor pretty much got rid of

12         everybody in the department.   Everybody.

13   Q.    What did the Barclay Agency do?

14   A.    It's an insurance -- commercial insurance.

15   Q.    Where is it?

16   A.    It's moved since I've been there, so I'm not

17         sure at this time.   We used to work off of

18         Carmichael.

19   Q.    Do you know if they've changed the name of

20         that agency?

21   A.    I'm not sure.

22   Q.    Do you know who the owner of that agency

23         was -- is?

18

1    A.    I do not remember his full name.

2    Q.    Do you remember anything about his name?

3    A.    Tom.

4    Q.    Tom.  Who was your supervisor?

5    A.    Latresa McGee.

6    Q.    And tell me --

7    A.    The other two --

8    Q.    -- again what -- excuse me.

9    A.    The other two I do not remember.

10   Q.    Pardon?

11   A.    The other two supervisors I do not remember.

12   Q.    Well, who was the supervisor that got rid of

13         everybody in the department, or whatever your

14         testimony was?

15   A.    First name was Susan.

16   Q.    How many people were in the department?

17   A.    Three.

18   Q.    All right.  Did you get along with Susan?

19   A.    No.

20   Q.    No.  Why?

21   A.    She -- the way she approaches you was not

22         professional.

23   Q.    So your testimony is that you left there

19

1          because your job was eliminated?

2     A.   She eliminated me.  They didn't give me a

3          reason.  They just told me it wasn't working

4          out.

5     Q.   So you were terminated?

6     A.   Yes.

7     Q.   Were others terminated at the same time?

8     A.   Not at the same time.

9     Q.   All right.  So she didn't come in and

10         eliminate the department?

11    A.   Yes.

12    Q.   How did she go about doing that?

13    A.   After I was terminated, so were the other

14         ones.

15    Q.   Two others?

16    A.   Yes.  The immediate supervisor that was over

17         us was terminated first.

18    Q.   Who was that?

19    A.   I do not remember her name.

20    Q.   Did you tell the Career Personnel that you

21         left there because of a personality conflict?

22    A.   I will have to see documents to see.

23    Q.   Okay.

20

1           (Defendant's Exhibit Number 3 marked

2           for identification.)

3  Q.   Take a look at that and --

4           MR. BARNETT:  3, right?

5           MS. SMITH:  Yes, sir.

6  Q.   -- tell me if that's your -- I will represent

7       to you we got these as your personnel file

8       from Career.  Look on page 35.  Do you see

9       where it asks you reasons for leaving?

10  A.   Yes.

11  Q.   Do you think that may have given Career the

12       impression that you left voluntarily?

13           MS. LEONARD:  Object to form.

14               You can answer.

15  A.   No.

16  Q.   Did you intend for it to give Career the

17       impression that you left voluntarily?

18  A.   No, it didn't give an impression.  Because the

19       young lady that I met with, I told her.

20  Q.   You told her you had been terminated?

21  A.   Yes.

22  Q.   Okay.  And who was that?

23  A.   Her name was Latricia McNeil.

21

1    Q.    Have you ever filed any sort of claim against

2          an employer before this one?

3    A.    No.

4    Q.    You never claimed any kind of discrimination

5          of any kind?

6    A.    No.

7    Q.    Did you have an attendance problem at the

8          Barclay Agency?

9                    MS. LEONARD:  Object to form.

10                   You can answer.

11   Q.    Were you ever counseled about your attendance

12         at the Barclay Agency?

13   A.    I don't remember.

14   Q.    Let's talk about Extended Arm Physicians for a

15         minute.  Why did you leave Extended Arm?

16   A.    It was a layoff.

17   Q.    How many were laid off?

18   A.    I don't know the exact number.

19   Q.    Do you remember Irene that worked at

20         Extended Arm?

21   A.    Yes.

22   Q.    Did she or anyone else at Extended Arm counsel

23         you or speak to you about what they thought

22

1            was unacceptable attendance?

2    A.    Not that I can remember.

3    Q.    Do you know who Belinda Harris is?

4    A.    Yes.

5    Q.    How do you know Belinda Harris?

6    A.    Former coworker at Extended Arm.

7    Q.    What was her position?

8    A.    She was in medical records while I was there.

9    Q.    She was in charge of them?

10   A.    Yes.

11   Q.    Did you ask her to give you a reference at any

12         time?

13   A.    Yes.

14   Q.    Did you go straight to her and ask for that

15         reference?

16   A.    Yes.

17   Q.    Why did you do that?

18   A.    To be a reference for me, because she knew how

19         I worked, my performance.

20   Q.    Did she supervise anybody?

21   A.    At the time while I was there, no.

22   Q.    Do you know if she was authorized to give

23         references?

1    A.    No, I did not know.

2    Q.    Did she ever tell you whether she was

3          authorized to give references?

4    A.    No, she didn't.

5    Q.    You didn't work for Ms. Harris, did you?

6          Belinda Harris, you didn't work under her

7          supervision?

8    A.    No.

9    Q.    Well, who was the person at Extended Arm who

10         usually gave references?

11   A.    I'm not sure.

12   Q.    What was Irene's position when you were there?

13   A.    She was office manager.

14   Q.    Did you ask her for a reference?

15   A.    No.

16                    MR. BARNETT:  Let me see that

17                         reference.  The reference.

18                    MS. SMITH:  Oh, that's in --

19   Q.    Who was -- while she's looking, who was

20         Ms. Harris' supervisor?

21   A.    I would believe Irene Lewis.

22   Q.    She was, basically, the office manager,

23         correct?  Is that what you said earlier?

24

1    A.    Yes, when she was there.

2    Q.    Was she there when you asked Belinda Harris

3          for a reference?

4    A.    No.

5    Q.    Irene was not there?

6    A.    She was still employed there, but she was not

7          there.

8    Q.    You mean -- I want to be clear with what

9          you're saying.  You mean she wasn't there that

10         day?

11   A.    Correct.

12   Q.    But she was still working there?

13   A.    Yes.

14   Q.    How did you know she was not there the day you

15         asked for a reference?

16   A.    Due to the fact I had been calling checking to

17         see if she was there.  Ms. Lewis would leave

18         and go to Atlanta.

19   Q.    It was Irene Lewis?

20   A.    Yes.

21   Q.    All right.

22   A.    She would leave and go to Atlanta and

23         sometimes come back maybe a week or two

1   later.

2      MR. BARNETT:  Have you got it?  Here

3       is the chart, if that will help

4       you.

5      MS. SMITH:  It was in the other

6       folder.  It's right here.

7     (Defendant's Exhibit Number 4 marked

8     for identification.)

9 Q. This is Exhibit 4.  We got these from Alabama

10  Orthopaedic Specialists in response to a

11  subpoena.  I'll direct your attention to that

12  page, 40 -- no, let's see.  The last page in

13  there, 68, that I turned it to.

14   Is this the reference that you asked

15  Belinda Harris for?

16 A. Yes.

17 Q. Did you ever inform Irene Lewis that you had

18  asked for or received this reference?

19 A. No.

20 Q. Did you ask for it about the time it's dated,

21  August of '04?

22 A. Yes.

23 Q. Was there any reason you couldn't wait for or

26

1          decided not to wait for Ms. Lewis to return?

2     A.    No, there wasn't a reason.

3     Q.    Did you ask Ms. Harris because you thought she

4          would give you a better recommendation than

5          Ms. Lewis would?

6     A.    No.

7     Q.    So it's your testimony that you think

8          Ms. Lewis would have checked excellent for

9          everything in that column?

10                    MS. LEONARD:  Object to form.  It

11                    calls for speculation.  You can

12                    answer.

13    A.    I couldn't say what Ms. Irene would do.

14    Q.    And you don't ever recall being -- well, do

15         you recall ever being counseled or spoken to

16         about attendance problems by Ms. Lewis?

17    A.    I don't remember.

18    Q.    Look at page 55.  I'm sorry.  Forgive me.  Was

19         it your testimony that you were laid off by

20         Extended Arm?

21    A.    Yes.

22    Q.    This is an e-mail that I will give you a

23         minute to read.  But it appears as though

1    someone from an employment agency e-mailed a

2    Mr. O'Neal about you being a good prospect as

3    a medical billing clerk while you were working

4    at Alabama Orthopaedic Specialists.

5         First of all, let me ask you this.  Do

6    you remember Mr. Ron O'Neal?

7    A.   Yes.

8    Q.   Did he work at Orthopaedic --

9    A.   Yes.

10   Q.   -- Specialists?

11   A.   Yes.

12   Q.   What was his title?

13   A.   He was the office manager.

14   Q.   Why did you leave Orthopaedic Specialists?

15   A.   Because I found a permanent position.

16   Q.   And where did you find a permanent position?

17   A.   It was at Benchmark.

18   Q.   Pardon?

19   A.   Benchmark.

20   Q.   What is Benchmark?

21   A.   It was Rehab Associates, doing business as

22        Rehab Associates.

23   Q.   Okay.  But hadn't you just been given a

1        permanent position here at Orthopaedic

2        Specialists?

3   A.   Yes.

4   Q.   So I'm not understanding.  What was it about a

5        permanent position at Rehab that was different

6        than a permanent position at Orthopaedic

7        Specialists?

8   A.   Better pay.  And I applied for that position

9        while I was still temporary here.

10  Q.   Now, is there a difference between Advanced

11       Rehab and Rehab Associates?  There is, isn't

12       there?

13  A.   Yes.

14  Q.   And what -- was it Advanced Rehab that went by

15       another name?

16  A.   Yes.

17  Q.   And that was what again?

18  A.   D & W Management.

19  Q.   DMW?

20  A.   D & W.

21  Q.   D & W.  All right.  What was that last thing I

22       gave you?  Did I mark that as 4?

23  A.   4.

29

1    Q.    Okay.  Had you ever been an office manager

2          anywhere?

3    A.    Yes.

4    Q.    Where was that?

5    A.    D & W Management, which is another name as

6          Advanced Rehab.

7    Q.    Who at Advanced Rehab can verify that you were

8          an office manager?

9    A.    The owner.  The first name is David.  It's

10         not -- Dr. --

11   Q.    Is he --

12   A.    I don't remember his last name.

13   Q.    Is he a medical doctor or --

14   A.    A chiropractor.

15   Q.    -- a certified rehabilitation therapist?

16   A.    Chiropractor.

17   Q.    Chiropractor.  Where is Advanced Rehab

18         located?

19   A.    Wynton Blount Boulevard.

20   Q.    Do you know if it's still there?

21   A.    I'm not sure.

22   Q.    Okay.  By office manager, you had all of the

23         non-medical staff reporting to you?  Or just

1          tell me who reported to you.

2    A.  I was the only -- there was only two people

3          that worked there during the day.

4    Q.  All right.  And who were they?

5    A.  Faye Haygood and myself.

6    Q.  Okay.  And what was Faye's position?

7    A.  Physical therapist.

8    Q.  And your position was office manager?

9    A.  Yes.

10   Q.  But Faye -- did Faye report to you?

11   A.  Yes.

12   Q.  How did David, last name unknown, the

13         chiropractor, fit into this business?

14   A.  He was the owner plus the chiropractor.

15   Q.  So he rendered services there?

16   A.  Yes.

17   Q.  All right.  So you're saying the chain of

18         command was David, last name unknown, owner,

19         you as office manager, and Faye Haygood

20         reporting to you?

21   A.  Yes.  Faye Haygood reported to both of us.

22   Q.  All right.  So there were -- was there a total

23         of three -- let's see.  There was a

31

1          chiropractor, a physical therapist, and

2          yourself working there?

3     A.   And also Dr. Cligan, but he was not there.  He

4          came there two to three times out of a week.

5     Q.   And can you spell his last name?

6     A.   C-L-I-G-A-N.

7     Q.   All right.  And why did you leave

8          Advanced Rehab?

9     A.   It was a layoff, financial reasons.

10    Q.   All right.  Was anybody else let go?

11    A.   No.

12    Q.   Did you receive severance from there?

13    A.   Yes.

14    Q.   Have you ever been asked to sign a release of

15         any kind when you received severance?

16    A.   I don't remember signing anything.

17    Q.   Let's see.  My notes show that you worked at

18         Advanced Rehab from 10/27/03 to 3/19/04, which

19         is a little less than five months; is that

20         about right?

21    A.   It's about right.

22                   (Defendant's Exhibit Number 5 marked

23                    for identification.)

32

1   Q.   Okay.  Let me show you what's been marked as
2        Exhibit 5.  And I've got it turned to the
3        right page.
4                MR. BARNETT:  Do you have another
5                    one for me?
6   Q.   Have you ever seen this document before, the
7        one I've turned to?  And I don't believe it's
8        Bates stamped.  But the page I've turned to is
9        entitled, Alabama Department of Industrial
10       Relations Wage and Separation Information.
11  A.   No.
12  Q.   This lists you as a receptionist/billing clerk
13       on the top.  And then it lists Faye Haygood as
14       the administrator.  Do you know how that came
15       to be?
16  A.   No.
17  Q.   Were you ever given the title office manager
18       by anybody there?
19  A.   Yes.
20  Q.   And who was that?
21  A.   The lady that hired me along with Dr. David,
22       unknown name.
23  Q.   Okay.  Were you the office manager the whole

33

1       time you were there?

2    A.    To my knowledge.

3              (Off-the-record discussion.)

4    Q.    Where did you go after you were laid off at

5       Advanced Rehab?

6    A.    Advanced Rehab.  I think the next

7       place -- that was Dr. Palmer, I believe.  I'm

8       not sure

9              MR. BARNETT:  Where is that little

10             sheet?  Let's see.

11   Q.    How about Alabama Orthopaedic, or somebody in

12      between those two?

13   A.    I don't remember.

14   Q.    Is there any -- let's see.  Can you think of

15      any employment file that might help you

16      remember where you went next?  We've got most

17      of them.

18   A.    Maybe Career Personnel.

19             MS. SMITH:  That one is already over

20             there.

21             MR. BARNETT:  What exhibit number?

22             MS. SMITH:  Exhibit 3.

23             MR. BARNETT:  Here they are.

34

1    Q.    You've got it.  It's 3.  All right.  So you

2          were laid off -- I'm going to ask you, if you

3          don't mind, while you're looking.  You were

4          laid off at Advanced Rehab?

5    A.    Yes.

6    Q.    And our records show that you left there in

7          March of '04, or our -- my notes from looking

8          at their file show that.  And then the next

9          job that we know about is in August.  You went

10         to Alabama Orthopaedic in August of '04.

11               Do you remember if you were unemployed

12         between those two places, if my notes are

13         correct?

14   A.    The only thing I can say, I did temp positions

15         a lot --

16   Q.    During this time frame?

17   A.    Uh-huh (positive response).

18   Q.    Were you ever terminated involuntarily from a

19         temp position?

20   A.    No.

21   Q.    Ever?

22   A.    No.

23   Q.    All right.  And then our records show you went

35

1        to Rehab Associates; is that right?

2  A.    Yes.

3  Q.    Now, why did you leave Rehab Associates?

4  A.    I applied for an administrative position at a

5        psychiatric office.

6  Q.    That would be Clemmie Palmer?

7  A.    Yes.

8  Q.    Let me back up to Rehab.  What were your

9        duties there?

10  A.    Patient account rep.

11  Q.    Okay.

12  A.    I would call clients in regards to their bill,

13        collections, and to assist and set up payment

14        options, if available, and also coding,

15        recoding, if I had to, and --

16  Q.    Coding what if you had to?

17  A.    Coding their medical --

18  Q.    I understand.

19  A.    -- files.

20  Q.    For billing purposes?

21  A.    For billing purposes.

22  Q.    And you were there according to -- well, let's

23        see.  I'm sorry if I've already asked you

36

1        this.  Why did you leave Rehab?

2  A.    Rehab.  I went to Psychiatric -- Palmer

3        Psychiatric Services.

4  Q.    Oh, you left voluntarily for a better job?

5  A.    Yes.

6  Q.    Did you have any attendance issues that you

7        were counseled about at Rehab Associates?

8  A.    I don't remember, sir.

9  Q.    All right.  Before working for Mobis, do you

10       recall ever being counseled about attendance

11       issues by any employer?

12  A.    Yes.

13  Q.    Which one?

14  A.    Vialog Group Communications.

15  Q.    Who?

16  A.    Vialog Group Communications.

17  Q.    Okay.  When did you work there?

18  A.    That was back in '99 --

19  Q.    Okay.  Where else?

20  A.    -- to --

21  Q.    I'm sorry, I interrupted you.

22  A.    '99 to 2001.

23  Q.    Do you remember what month you came and left?

37

1   A.   I do not remember.

2   Q.   Was it two years, more than two years, two

3        years -- or less than two years that you

4        worked there?

5   A.   '99 to 2001.

6   Q.   That's all you remember?

7   A.   Yes.

8   Q.   Do you know where they are located?

9   A.   They no longer exist.  They no longer exist.

10  Q.   Were they in Montgomery?

11  A.   Yes.

12  Q.   Who owned that business?

13  A.   I'm not sure.

14  Q.   Any other job -- were you terminated from

15       Vialog for attendance?

16  A.   No.

17  Q.   Just counseled about it?

18  A.   Yes.

19  Q.   Any other jobs that you had before coming to

20       Mobis where you were counseled about your

21       attendance?

22  A.   None that I can remember right now.

23  Q.   Was there a -- let's see -- see if I can

38

1    figure out my own notes here.

2                   MR. BARNETT:  Let me have the Mobis

3              application.

4    Q.   Do you remember what your employment dates at

5         Rehab Associates were?

6    A.   February --

7                   MR. BARNETT:  That's 6.

8              (Defendant's Exhibit Number 6 marked

9              for identification.)

10   A.   I can remember February '05 until July '05.

11   Q.   Wasn't there a gap in your employment in

12        the -- in that time frame, between February

13        and April of '05, about a three-month gap?

14   A.   Repeat that again.

15   Q.   Well, I'm asking you if there was a

16        three-month gap, plus or minus, in your

17        employment before you started work -- let me

18        find out what I'm trying to ask.

19              (Off-the-record discussion.)

20   Q.   I just gave you Exhibit 6, Ms. Hunter.

21   A.   Uh-huh (positive response).

22   Q.   Do you recognize this as your application to

23        Mobis?

1    A.    Yes.

2    Q.    Do you see that you say you worked for Rehab

3          from February '05 to July '05?

4    A.    Yes.

5    Q.    Their records show that you worked there from

6          April '05 to -- April 25, '05 to July 1, '05.

7               Do you know which is right?

8    A.    Who is their records?  I don't --

9    Q.    Well, let me -- I'm having a hard time with

10         this myself.

11                    MR. BARNETT:  What did you do with

12                        the --

13                    (Off-the-record discussion.)

14                    MS. LEONARD:  If you want, we've

15                        been going close to an hour.  We

16                        can take a short restroom

17                        break.  That way y'all can talk.

18                    MR. BARNETT:  Okay.  That's fine

19                        with me.

20                    (Pause in proceedings.)

21   Q.    (Mr. Barnett continuing) All right.

22         Ms. Hunter, I figured out what I'm trying to

23         ask you.

1          MR. BARNETT:  Which one shows

2          clearly?  That's not in --

3          MS. SMITH:  Right.  That's not.  You

4          need to enter that one.

5          MR. BARNETT:  Right.  I haven't

6          given --

7          MS. SMITH:  That's Rehab Associates'

8          file.

9          (Defendant's Exhibit Number 7 marked

10         for identification.)

11  Q.   All right.  I'm going to give you Exhibit 7.

12      I'll tell you, that's what we got from

13      Rehab -- well, Benchmark Medical, which is

14      also the same as Rehab Associates, right?  Is

15      that right, Ms. Hunter?

16  A.   Yes.  Yes.

17  Q.   On the cover page the -- Pamela Rice, the

18      human resources director, says that you worked

19      there from 4/25/05 to 7/1/05.  Do you have any

20      reason to disagree with that?

21        And I'll tell you why I'm asking.  You

22      put on your Mobis application that you had

23      started there in February '05.  I'm not -- I'm

41

1        just trying to figure this out.  That's all

2        I'm trying to do.

3   A.   Yes, I see that.

4   Q.   Okay.  Wasn't there a two or three-month gap

5        in your employment before you went to

6        Rehab Associates?  Let me try to refresh your

7        recollection.  Look at Exhibit 4, page 54.

8        This is Orthopaedic Specialists, again.

9   A.   Yes.

10  Q.   All right.  Page 54 is your resignation?

11  A.   Correct.

12  Q.   Do you recognize that?

13  A.   Yes.

14  Q.   Okay.  As I recall, this was written either

15       the day that the reference came in to the

16       gentleman that we discussed earlier or the day

17       after; is that your recollection?

18  A.   Yes.

19  Q.   And you say in here:  I have some other

20       obligations that have come to my attention

21       which I need to handle at this time.  Do you

22       see that?

23  A.   Yes.

42

1    Q.    Page 54?

2    A.    Yes.

3    Q.    Do you recall now that you were unemployed for

4          about three months in there, a little less

5          than three months?

6    A.    I see the dates of this.

7    Q.    What I believe is -- and this is not

8          evidence.  It's just what I believe -- you

9          were out of work for about two to three months

10         between Alabama Orthopaedic and

11         Rehab Associates, unless you worked somewhere

12         else.

13   A.    I don't remember working anywhere else.

14   Q.    Do you remember what the obligations were that

15         you had to take care of as expressed in your

16         letter of February 1st to Orthopaedic

17         Specialists?

18   A.    Yes.  Yes.

19   Q.    Tell us about those, please.

20   A.    My child at the time and making a career

21         choice and also better pay.

22   Q.    Your child.  Was there any particular problem

23         with your child?

43

1   A.   No, as far as better -- a better job, a better

2        position.

3   Q.   Did you have a bankruptcy during that period?

4        Did you file for bankruptcy during that

5        period?

6   A.   It was in '05, but I don't remember around

7        that time.

8   Q.   So that's your -- that's your recollection of

9        the obligations that you had -- that you cited

10       to --

11  A.   My children and a better position.

12  Q.   You know, Ms. Hunter, I just want to know what

13       your real -- I mean, if you just told them

14       this to have something to tell them and you

15       really didn't have any obligations, that's

16       fine.  I want to know that.  Of if you had

17       some obligations, I just want to know what

18       they were.

19  A.   I just said them.  My job.

20  Q.   Okay.

21  A.   And then the fact of going to a better job

22       with better pay.

23  Q.   Okay.  So why --

44

1   A.   I just didn't go into details.

2   Q.   That's fine.  Why did you stay out of work

3        then for two or three months?  And -- well, go

4        ahead.  And why did you tell Mobis that there

5        was no gap in your employment?  I mean, that's

6        where I'm going.

7   A.   I don't remember there was a gap.

8   Q.   You see in your Mobis application that you

9        indicate that there was no gap, that you

10       started work at Rehab Associates in

11       February of '05.  Do you see that?

12  A.   Yes, I see that.

13  Q.   Do you know why you said that to Mobis if you

14       had been out of work for a period?

15  A.   Because that's what I believe the time frame

16       of the job position, just like I put in

17       another application the same date frame.

18  Q.   Did you put February instead of April as your

19       start date so that it would look like you had

20       seamless employment without any breaks in

21       there?

22  A.   No.

23  Q.   How much money did you owe when you went into

45

```
 1         bankruptcy?  Do you know what amount was
 2         discharged?
 3    A.   I don't remember.
 4    Q.   It was a straight bankruptcy, right?
 5    A.   Chapter seven.
 6    Q.   All right.  Let me see -- let me get all my
 7         notes here.  And, again, why did you leave
 8         Rehab?
 9    A.   For a better position, to Palmer Psychiatric
10         Services.
11    Q.   That's right.  I'm sorry, you told me that.
12    A.   Uh-huh (positive response).
13    Q.   And that was Dr. Clemmie Palmer?
14    A.   Yes.
15    Q.   Were you counseled or talked to about your
16         attendance at Palmer?
17    A.   No.
18                   MR. BARNETT:  Let me see that file.
19                   (Defendant's Exhibit Number 8 marked
20                   for identification.)
21    Q.   Let me show you Exhibit 8 and represent to you
22         these are records we got from a subpoena -- we
23         just got these -- from Dr. Palmer.  Is there
```

1      anything that Dr. Palmer states in his memo to

2      file of March 4th, 2006 that doesn't --

3   A.   I don't remember --

4                    MS. LEONARD:  Have we gotten a copy

5                       of those?

6                    MR. BARNETT:  Probably not.

7                          When did we get them?

8                    MS. SMITH:  Thursday or Friday of

9                       last week.

10  A.   I don't remember that.

11                   MR. BARNETT:  We had -- off the

12                      record.  Well, yes, off the

13                      record.

14                   (Off-the-record discussion.)

15                   MR. BARNETT:  Well, for the record,

16                      we just got them because we had

17                      a hard time getting a response

18                      from him.

19  Q.   Does he correctly state the circumstances

20       under which you left Palmer Psychiatric

21       Services in this March 4th --

22  A.   No.

23  Q.   Did you have any disagreements with Dr. Palmer

1    or any other -- can you state any reason why

2    he might misstate the record here?

3  A.  No.

4  Q.  Why did you leave Palmer?

5  A.  For Mobis.

6  Q.  All right.

7            MR. BARNETT:  Let's see where we are

8                now.  Let's go off the record a

9                minute and let me clean up and

10               consolidate these exhibits.

11           MS. LEONARD:  All right.

12           (Brief pause.)

13           MR. BARNETT:  Back on the record.

14  Q.  So what I'm understanding about your testimony

15      about the obligations that you've explained to

16      me, other than what you discussed about your

17      child and wanting a better job, you weren't

18      having any crisis in your life or any other

19      problems with your health, your child's

20      health, or anybody else's?

21  A.  No.

22  Q.  All right.  Let's move to your employment at

23      Multi Staffing.

48

1    A.    Uh-huh (positive response).

2    Q.    Do you recall that you started with

3          Multi Staffing in March of 2006?

4    A.    Yes.

5    Q.    Was Mobis your first assignment?

6    A.    I believe it was, yes.

7    Q.    Well, let me do it this way.  Did

8          Multi Staffing assign you to work at Mobis in

9          March -- on or about March 6 --

10   A.    Yes.

11   Q.    -- 2006?

12   A.    Yes.

13   Q.    How did you find out about Mobis, if you knew

14         about Mobis, or was that a suggestion from

15         Multi Staffing?

16   A.    A suggestion from Multi Staffing.

17   Q.    Did you know anything about Mobis before that?

18   A.    Yes.

19   Q.    What did you know?

20   A.    Just that it was a Tier 1 company of Hyundai.

21   Q.    All right.  Did you have any friends or

22         acquaintances working there?

23   A.    No.

1  Q.  What were your duties when you went to Mobis
2      for Multi Staffing as a temp?
3  A.  As a record clerk helping out in the
4      accounting department.  Duties were invoicing,
5      gathering accounting packets together, and
6      other administrative duties.
7  Q.  All right.  So were you -- all right.  Was
8      this a good bit different from what you did
9      after you became a regular probationary
10     employee?
11 A.  Responsibility was added.
12 Q.  Okay.  For the record, Heather and Ms. Hunter,
13     I'm going to try to refer to the period of
14     March 6th or 5th when you went to Mobis as a
15     temp as the temporary period --
16 A.  Okay.
17 Q.  -- or as -- when you were working as a temp.
18     And I'm going to try to refer to the period
19     from June 5th, I believe it is, forward as
20     when you became either a regular or
21     probationary employee; is that agreeable?
22          MS. LEONARD:  That's fine.
23 Q.  Who was your supervisor while you were a temp?

1    A.    Sonechka Womack.

2    Q.    And she remained your supervisor throughout

3          the time you were at Mobis?

4    A.    Correct.

5    Q.    All right.  Did you develop a friendship with

6          Ms. Womack?

7    A.    I wouldn't say it was a friendship, but it was

8          a good working relationship.

9    Q.    Did you ever -- or have you ever socialized or

10         seen Ms. Womack out of work either while --

11         let's start with while you were working at

12         Mobis?

13   A.    No.

14   Q.    Have you socialized with her since?

15   A.    No.

16   Q.    Have you spoken with her at any time since you

17         left Mobis?

18   A.    No.

19   Q.    To your knowledge, has your attorney spoken

20         with her at any time?

21   A.    I'm not sure.

22   Q.    Do you know where she works now?

23   A.    That -- yes, I do.

51

1    Q.    Where is that?

2    A.    She works for AstraZeneca, a pharmaceutical

3          company.

4    Q.    Yes.  Astra -- yes, whatever.

5                    MS. LEONARD:  In my notes it just

6                    says pharmaceutical company.

7                    MS. RIEDLER:  Say that three times

8                    fast.

9                    MR. BARNETT:  Give me that chart,

10                   the attendance thing.

11                   (Off-the-record discussion.)

12   Q.    (Mr. Barnett continuing) All right.  During

13         your period as a temp, were you counseled or

14         cautioned about your attendance issues at

15         Mobis?

16   A.    Yes.

17   Q.    How many times and by whom?

18   A.    Sonechka Womack.  I don't remember how many

19         times.

20   Q.    I'm sorry, you'll have to speak up.  I don't

21         hear that well.

22   A.    I don't remember how many times.

23   Q.    Did Mr. Jay Kim ever -- and you know who Jay

52

```
 1              Kim is, don't you?
 2    A.    Yes.
 3    Q.    He's the CFO --
 4    A.    Yes.
 5    Q.    -- of Mobis.  Did he ever speak with you
 6              directly during your period as a temporary
 7              employee about your attendance?
 8    A.    No.
 9    Q.    Do you know whether he spoke with Ms. Womack
10              about your attendance and asked her to speak
11              to you during your probationary period?
12    A.    I do.  That's correct.
13    Q.    How did you learn that?
14    A.    Sonechka -- she just told me that Jay had
15              concerns with me coming in, the time frame.
16    Q.    I'm sorry.  You coming in, the time frame?
17    A.    As far as attendance, the time.
18    Q.    I'm sorry.  You mean -- time, what do you mean
19              by time?
20    A.    As far as the time of being there, start time
21              to work.
22    Q.    Okay.  Tardies?
23    A.    Yes.
```

53

| 1 | Q. | All right.  Other than tardies, were absences |
| 2 | | discussed? |
| 3 | A. | No. |
| 4 | Q. | What about leaving early? |
| 5 | A. | No. |
| 6 | Q. | Okay.  Did Ms. Womack -- |
| 7 | | MR. BARNETT:  Let me spell Sonechka |
| 8 | | for you, S-O-N-E-C -- |
| 9 | | THE WITNESS:  K -- |
| 10 | | MS. RIEDLER:  H-K-A. |
| 11 | | MR. BARNETT:  -- H-K-A. |
| 12 | | COURT REPORTER:  Thank you. |
| 13 | Q. | Did you ask for regular employment at Mobis |
| 14 | | while you were a temp? |
| 15 | A. | Did I ask? |
| 16 | Q. | Right.  Did you ask to be converted from a |
| 17 | | temp to a regular employee? |
| 18 | A. | It was brought to me. |
| 19 | Q. | Who brought that to you? |
| 20 | A. | Sonechka Womack. |
| 21 | Q. | Had you told her whether you wanted to be |
| 22 | | regular or not? |
| 23 | A. | Well, she came and approached me with it, |

54

```
 1              asked me would I consider being a permanent
 2              employee.
 3        Q.    When did that happen?
 4        A.    It was around two and a half months.  Right
 5              before three months was up, ninety days.
 6        Q.    Did she ever tell you or did Mr. -- well,
 7              you've testified Mr. Kim didn't speak directly
 8              with you about your attendance during the
 9              probationary period, right?
10        A.    Correct.
11        Q.    You've testified that Mr. Kim did not speak
12              with you directly about attendance during your
13              temporary period?
14        A.    Correct.
15        Q.    Did he speak with you at the end of your
16              temporary period when you were making a
17              transition from temporary to probationary?
18        A.    I don't remember.
19                        (Defendant's Exhibit Number 9 marked
20                          for identification.)
21        Q.    Let me show you what I've marked as
22              Exhibit 9.
23                    Now I'll represent to you we prepared
```

55

1          this from Multi Staffing's records.

2    A.    Uh-huh (positive response).

3                    MR. BARNETT:  And they're already in

4                    evidence.

5                    MS. SMITH:  They're Number 1, I

6                    believe.

7    Q.    So you're perfectly free to check this.  But

8          what we've done is we've noted the start date

9          as March 6th, 2006.

10   A.    Uh-huh (positive response).

11   Q.    And your end date as being Sunday, June 4th,

12         2006.  I believe you became a probationary

13         employee that Monday, on June 5th?

14   A.    Correct.

15   Q.    Okay.  And I'll just say to you this -- what

16         we've done is highlighted the days that you

17         had an attendance incident.

18                    MR. BARNETT:  Is that -- off the

19                    record.

20                    (Off-the-record discussion.)

21   Q.    And the way this is set up -- let's just take

22         the first yellow highlight, March 14th, '06.

23         It shows you came in at eight-thirty.  And

56

1              your start time would be eight; is that right?

2    A.    Correct.

3    Q.    Was that your start time throughout your

4          employment at Mobis?

5    A.    Yes.

6    Q.    And since you got in at eight-thirty that day,

7          or at least since Multi Staffing's records

8          show that, you would have been late that day.

9          How did Multi Staffing know your arrival time

10         and departure time from work at Mobis?

11   A.    Because I put my times in and out.

12   Q.    So if this is in Multi Staffing's file, this

13         information would have come from you?

14   A.    Correct.

15   Q.    I know you don't remember everything.  But

16         does anything jump out at you on this list as

17         being inaccurate in terms of the number of

18         times that you were absent, late, or left

19         early?

20   A.    Not -- right now, I can't say.

21   Q.    Well, what we've totaled up is twelve tardies,

22         three early outs, and three absences.  Do you

23         have any recollection of the three absences,

57

```
 1          what they were about?
 2                    MS. LEONARD:  I'm just going to
 3                         object generally to the line of
 4                         questioning to the extent that
 5                         the Multi Staffing attendance
 6                         records would speak for
 7                         themselves.
 8                              Now you can go ahead and
 9                         answer.
10    A.    I'm sorry.  Could you repeat your question?
11    Q.    Pardon?
12    A.    Could you repeat your question?
13                    MS. LEONARD:  I think he was asking
14                         you whether --
15    Q.    Do you know whether you were out three times
16          or not all day?
17    A.    Without looking at my documentation I'm not
18          sure.
19    Q.    Were you -- was there any problem going on in
20          your life that led to these attendance
21          incidents that have been highlighted here?
22    A.    As far as the incident 5/8/2006, I actually
23          had to -- no, I'm sorry.  Scratch that.  I'm
```

58

1       not sure.

2              MR. BARNETT:  Hand me the first

3                memo, the e-mail.

4   Q.   Do you remember anything specific about any of

5       these dates?

6   A.   Right offhand I do not remember anything

7       specific.

8   Q.   Were you having any kind of a chronic illness

9       or sickness during this three-month period

10      that was causing you to miss work or be late

11      for work?

12  A.   As far as the tardies, my daughter couldn't be

13      dropped off until a certain time.  And the

14      evidence was also given to Jay Kim.

15  Q.   What was the drop off time?

16  A.   No later than seven-thirty.

17  Q.   No later than seven-thirty?

18  A.   No.  Excuse me, no earlier than seven-thirty.

19  Q.   Okay.  So that gave you thirty minutes to get

20      from her school to Mobis.

21  A.   Correct.

22  Q.   Where was her school?

23  A.   Her school is off of Eastern Boulevard.

59

```
 1    Q.    When did you alert Jay Kim or Sonechka -- who

 2          did you first tell of this problem?

 3    A.    Sonechka Womack.

 4    Q.    Were you temporary or probationary?

 5    A.    I was temporary.

 6    Q.    And what did she tell you about that?

 7    A.    She just told me to just try to see if I can

 8          get there just as soon as -- after dropping

 9          off my daughter.

10    Q.    Didn't she tell you they couldn't make a

11          special exception for you?

12    A.    No.

13    Q.    Do you know of anyone working at Mobis who has

14          had a special exception made for them in terms

15          of dropping their children off --

16    A.    No.

17    Q.    -- at a certain time and not being able to get

18          to work on time?

19    A.    No.

20    Q.    Did you notice whether during your temporary

21          period you were out or late or left early more

22          than your coworkers in the accounting

23          department?
```

```
1    A.    No.
2    Q.    You knew during your temporary period that Jay
3          Kim was a stickler about attendance and being
4          at work on time, right?
5    A.    Yes.
6    Q.    Sonechka sent you an e-mail about that while
7          you were still a temp, did she not?
8    A.    I don't remember, sir.
9                   (Off-the-record discussion.)
10   Q.    Tell me again, while she's looking for this
11         e-mail, how far you had to drive from your
12         child's school to Mobis?
13   A.    It's about thirty minutes.
14   Q.    Where is your child's school again?
15   A.    It was Dozier Elementary off the Eastern
16         Boulevard by Toys 'R Us.  By Toys 'R Us.
17   Q.    Is that near the Atlanta Highway?
18   A.    Yes.
19   Q.    Is Toys 'R Us still out there?
20   A.    Yes.
21             MS. RIEDLER:  Carol Villa?
22                     Carol Villa?
23             THE WITNESS:  Yes.
```

61

```
 1                    (Off-the-record discussion.)
 2                    (Defendant's Exhibit Number 10 marked
 3                     for identification.)
 4    Q.   This is a composite exhibit.  It's marked as
 5         Number 10.  It's got -- when I say composite,
 6         it's got a chain of e-mails there.  Look on
 7         the back page -- excuse me, the second page.
 8         There's an e-mail, page 176 and 177, from Jay
 9         Kim to people in accounting, Nicole Boswell,
10         Sonechka Womack, Stephanie Perez, Sandra
11         Goodin, Hosang somebody.  That's H-O-S-A-N-G.
12                    MS. RIEDLER:  Hosang.
13    A.   Hosang.  Hosang.
14    Q.   Hosang.  All right.  Do you remember that --
15         did you see this e-mail when it went out in
16         April while you were a temp?
17    A.   I don't remember.
18    Q.   Did Sonechka Womack forward this e-mail to you
19         at some time after you became a probationary
20         employee?
21    A.   I don't remember seeing this.
22    Q.   All right.  Well, you see down here at the
23         bottom of the first page it looks like she may
```

62

```
 1          have forwarded this e-mail to you on Tuesday,

 2          May 9th, 2006?

 3      A.   Yes, I see that.

 4      Q.   Okay.  Now, does that ring any bells about you

 5          seeing this e-mail from Jay while you were

 6          still temporary?  Does that refresh your

 7          recollection?

 8      A.   I don't remember it.

 9      Q.   That's all right.  I forgot to ask you.  Are

10          you taking any kind of medications that might

11          impair your memory or your ability to answer

12          my questions?

13      A.   No.

14      Q.   Now, do you see that this e-mail, apparently,

15          according to this chain here, was sent to you

16          again on August 10th with a copy to Jay Kim?

17      A.   I remember the August 10th.

18      Q.   All right.  Is it your testimony -- I just

19          want to get this clear.  Are you saying you

20          did not receive this e-mail from Sonechka on

21          May 9th or are you saying you just don't

22          remember?

23      A.   I do not remember.
```

1   Q.   But you do recall receiving it on August 10th?

2   A.   I do recall the second one that's dated

3        August 10th:  As cited from the below e-mail,

4        please submit a schedule of time that you will

5        be able to make up your absences.

6   Q.   Now, do you see that you replied on August 9th

7        to one of these e-mails -- well, let's see.

8   A.   The August 10th.

9   Q.   Well, I don't know how you could have replied

10       to an e-mail the day before it was sent.

11            Oh, I see what it is.  It's not a reply.

12       It's an e-mail.  Tell me about the one at the

13       top from you to Sonechka.

14            Do you remember what prompted you to

15       write that e-mail?

16  A.   Just because she stated to me that I needed to

17       start giving her information when I'm making

18       up time, when I'm coming in from lunch or

19       making up hours, making up my hours if I leave

20       early or come in late.

21  Q.   During your temporary period, or at the end of

22       it, did Sonechka ever tell you that your

23       attendance issues as a temporary might keep

64

1        you from becoming a probationary employee?

2   A.   Could you repeat that?

3   Q.   Did Sonechka, or anyone else, tell you during

4        your period as a temporary employee that your

5        attendance as reflected in -- well, that your

6        attendance might be -- might prevent you from

7        becoming a permanent or probationary employee

8        at Mobis?

9   A.   Sonechka, yes.

10   Q.   When did she tell you that?

11   A.   During the time I was still temporary from

12        Multi Staffing.

13   Q.   What did she tell you?

14   A.   That's the time when we talked about the

15        reason why I was late, as far as with my

16        daughter, dropping her off at a specific time,

17        and then having to drive thirty minutes from

18        that point over here to Mobis.

19   Q.   And that was about two months after you

20        started working there?

21   A.   Yes.

22   Q.   So I want to make sure I understand what

23        you're saying.

1   A.   Okay.

2   Q.   You're saying that Sonechka told you in words

3        or substance that your attendance was such

4        that it could keep you from becoming a

5        ninety-day probationary employee, or a regular

6        employee?

7                    MS. LEONARD:   Object to form.

8                    You can answer.

9   A.   Okay.  What she told me is Jay was asking her

10       about me being tardy.  At that time, I told

11       her the reasons why.  And she just told me to

12       get here as soon as possible after dropping

13       off my daughter.

14  Q.   All right.  Did she say to you that if you

15       continued to be tardy you might not be

16       eligible to become a ninety-day probationary

17       employee?

18  A.   Yes.

19  Q.   And she told you that while you were

20       temporary?

21  A.   Correct.

22  Q.   What did you tell her?

23  A.   That's at the time when I told her about the

1          situation with my daughter that we talked

2          about.  And she told me to be there just as

3          soon as possible after dropping off my

4          daughter to school.

5    Q.   Was there any other time that Sonechka or

6          anyone else discussed attendance issues with

7          you during your temporary employment?

8    A.   No.

9    Q.   Just that one time that you testified to?

10   A.   That I can remember.

11   Q.   Did Sonechka tell you that Jay was unhappy

12         about your attendance?

13   A.   Yes.

14   Q.   Did she tell you that he was a stickler for

15         everybody being at work at time?

16   A.   Yes.

17   Q.   Did she tell you that he was a stickler about

18         attendance in general?

19   A.   Yes.

20                MR. BARNETT:  Do y'all want to take

21                   about a five-minute break?

22                MS. LEONARD:  Okay.

23                MR. BARNETT:  Let me get my notes

67

1          together, or maybe a little more

2          than five.  And then we'll go

3          until twelve.

4              Is that all right with you,

5          Ms. Hunter?

6       MS. LEONARD:  That's fine.

7       THE WITNESS:  That's fine.

8       (Pause in proceedings.)

9    Q.   (Mr. Barnett continuing) Ms. Hunter, was the

10        school your daughter was attending a public

11        school?

12   A.   Yes.

13   Q.   Did you ever look into transferring your

14        daughter to a school closer to your place of

15        work?

16   A.   They couldn't unless I was addressed -- if I

17        was -- if I living there.  You have to be

18        zoned.

19   Q.   Right.  Did you ask?

20   A.   Yes.

21   Q.   Did you become acquainted with a person known

22        as Alicia, I believe, Gardner?

23   A.   I knew she was an employee at Mobis.

68

1   Q.   Was she pregnant while you were there?

2   A.   I found out she was pregnant right before I

3        left.  Yes.

4   Q.   She worked right there in the same general

5        open office area that you did, right?

6   A.   Correct.

7   Q.   And she reported to Dennis Choy; is that

8        right?

9              MS. RIEDLER:  Yes.

10  Q.   Is that right, Tarsha?

11  A.   I'm not sure.

12  Q.   Okay.  If you at any time -- if it comes to

13       your recollection that you worked somewhere

14       else during that three-month period in 2005

15       that we talked about earlier, will you tell me

16       about that?

17  A.   Yes.

18  Q.   Even if it comes to you after the deposition,

19       will you tell your lawyer?

20  A.   Yes.

21           (Off-the-record discussion.)

22           (Defendant's Exhibit Number 11 marked

23             for identification.)

69

1    Q.    First we'll start with Exhibit 11,

2          Ms. Hunter.  And I will represent to you that

3          this was produced to us by your lawyer.

4              Do you recognize that as Mobis' employee

5          handbook?

6    A.    Yes.

7    Q.    When were you given this handbook?

8    A.    On the 6th of June during orientation.

9    Q.    Who conducted your orientation?

10   A.    I don't remember his name.

11   Q.    But it was a male?

12   A.    Yes.

13   Q.    Did you sign an acknowledgment for the

14         handbook that day?

15   A.    Yes.

16                      (Defendant's Exhibit Number 12 marked

17                       for identification.)

18   Q.    I'll mark that as Exhibit 12.  Do you

19         recognize that as the handbook acknowledgment

20         that you signed on June 5th, '06?

21   A.    Yes.

22   Q.    Was that the day of your orientation?

23   A.    Yes.

70

1    Q.    All right.  Was the handbook passed out before

2          the orientation?

3    A.    During --

4    Q.    During.

5    A.    -- the orientation.

6    Q.    Did this person, this gentleman, go over the

7          handbook with you?

8    A.    Yes, I do remember him going over it.

9    Q.    How long did orientation last?

10   A.    It was an all-day event.  It started after

11         eight that morning.  I'm thinking until, if I

12         can remember, maybe around two o'clock, two to

13         three o'clock that afternoon.

14   Q.    Were there other people in the class with you?

15   A.    One other gentleman.

16   Q.    Do you remember his name?

17   A.    No.

18   Q.    Did you understand that there was a change in

19         your status that was happening whereby you

20         were no longer going to be a temp for

21         Multi Staffing, that you were going to be an

22         employee of Mobis?

23   A.    Correct.

1  Q.  Did you understand that you were going to be
2      on probation for ninety days?
3  A.  No.
4  Q.  When did you come to understand that you were
5      probationary for ninety days?
6  A.  After speaking with Jay Kim.
7  Q.  When was that?
8  A.  I don't remember the exact date.  It was after
9      the orientation.
10  Q.  How soon after?
11  A.  I would say maybe two weeks after.
12  Q.  So that would have been sometime around the
13      third week in June of '06?
14  A.  Yes.
15  Q.  Tell me about that discussion.
16  A.  Because he mentioned to me about a
17      probationary period.  And he felt that I was
18      already on probationary during -- being temp,
19      since it was ninety days.  And he told me at
20      that time he would try to see if they could
21      waive that.  He had to talk with someone in
22      human resources.
23  Q.  All right.  I'm not understanding that.  Tell

72

1        me again what he said that --

2   A.   He would try to see if it could be waived

3        since I was already on a ninety-day, pretty

4        much, probationary period with the temp

5        service.

6   Q.   He said that he would try waive the ninety-day

7        period?

8   A.   He would talk to human resources.

9   Q.   Did he ever get back with you about that?

10  A.   No, he didn't.

11  Q.   But you were later told by Sonechka -- or told

12       by Sonechka that you were on ninety days

13       probation, weren't you?

14  A.   No.  It just never was brought up again.

15  Q.   Did you read this handbook?

16  A.   Yes.

17  Q.   Let's turn to page 131.  You see where they're

18       numbered at the bottom where your lawyer

19       stamped them?  Look at the small numbers at

20       the bottom of the page.

21             MS. LEONARD:  Right down here

22                (indicating).

23             THE WITNESS:  Okay.

73

| | | |
|---|---|---|
| 1 | Q. | And what page again? |
| 2 | A. | 131. |
| 3 | Q. | Did you read this section of the handbook |
| 4 | | about probationary period policies and |
| 5 | | procedures? |
| 6 | A. | Yes. |
| 7 | Q. | Did you read the part under policy about the |
| 8 | | ninety days of employment are considered -- |
| 9 | | the first ninety days are considered a |
| 10 | | probationary period? |
| 11 | A. | Yes. |
| 12 | Q. | Did you read the part under section 2.5 about |
| 13 | | any employee who has three absentee |
| 14 | | occurrences would be terminated? |
| 15 | A. | Yes. |
| 16 | Q. | And you understood that applied to you, |
| 17 | | right?  I'm sorry, your answer? |
| 18 | A. | Repeat that again. |
| 19 | Q. | You knew that this policy applied to you for |
| 20 | | the first ninety days after June 5th, 2006? |
| 21 | A. | Yes. |
| 22 | Q. | So you knew that if you had three occurrences |
| 23 | | you would be terminated? |

74

1    A.    By what the handbook states, yes.

2    Q.    Did anybody tell you anything different at any

3          time?

4    A.    No.

5    Q.    So we don't have a disagreement about the fact

6          that you read this policy on page 131?

7    A.    No.

8    Q.    And you acknowledge that you knew it applied

9          to you once you became a regular employee on

10         June 5th or 6th, right?  You knew it applied

11         to you?

12   A.    Yes.

13   Q.    And you knew about section 2.5?

14   A.    Yes.

15   Q.    And nobody told you anything different from

16         what this piece of paper says that's on page

17         131 and 132?

18   A.    Correct.

19   Q.    And whoever the man was that talked to y'all

20         during the orientation didn't tell you

21         anything different from this policy --

22   A.    Correct.

23   Q.    -- did he?

75

1    A.    No.

2    Q.    Did you ask any questions about anything

3          during the orientation?

4    A.    No.

5    Q.    Did the other gentleman that was with you?

6    A.    I remember him answering -- asking questions,

7          yes.

8    Q.    Do you remember what they were?

9    A.    No, I do not.

10   Q.    Do you remember if any of them had anything to

11         do with attendance?

12   A.    I do not remember.

13   Q.    Do you know what type of job he was taking?

14   A.    No, I do not.

15   Q.    Do you know if he was coming from a temporary

16         period?

17   A.    He was not.

18   Q.    He was coming straight in?

19   A.    Yes.  Correct.

20   Q.    Now, you mentioned a conversation with Jay Kim

21         that you said happened about two and a half

22         weeks after you became a probationary

23         employee.  Do you remember that?

1  A.  No, I said two weeks, around two weeks.

2  Q.  Okay.  That's right.  Around two weeks.

3      Whenever I misstate your testimony, I'm doing

4      it by mistake; and you feel free to correct

5      me, just like you did.

6  A.  Okay.

7  Q.  Did he discuss with you at that point in time

8      whether your attendance since you had become

9      probationary was acceptable or unacceptable?

10  A.  I don't remember him bringing that

11      conversation up.

12  Q.  Did he tell you that your attendance was going

13      to have to improve over what it was like while

14      you were a temporary?

15  A.  I don't remember that conversation.

16  Q.  You don't remember that being part of the

17      conversation?

18  A.  Not about my attendance, no.

19  Q.  What else do you remember about the

20      conversation other than what you have already

21      told me?

22  A.  That Sonechka still was going to be my

23      immediate supervisor.

1    Q.    Right.

2    A.    He went on to state as well as far as my

3          performance.

4    Q.    I'm sorry?

5    A.    He went on to state information about my

6          performance, how well I was doing and how much

7          of an asset I was, that he felt, to his team.

8    Q.    Was Mr. Kim ever discourteous to you?

9    A.    Yes.

10   Q.    In what respect?

11   A.    Where he wouldn't look at me.  He wouldn't

12         address me.  Anything that needed to be said

13         he would do it from Sonechka.  If I would be

14         coming in an area, he would go the opposite

15         way.

16   Q.    When did that start?

17   A.    After I told him that I was pregnant.

18   Q.    Was Mr. Kim ever discourteous to any of the

19         other employees in accounting?

20   A.    No.

21   Q.    Well, now, he's a pretty high-strung fellow,

22         isn't he?

23   A.    That, he is.

| | | |
|---|---|---|
| 1 | Q. | Did he prefer to deal with his employees |
| 2 | | directly or through their supervisors? |
| 3 | | MS. LEONARD:  Object to form. |
| 4 | Q. | If you know.  Could you tell from his conduct |
| 5 | | of his operation whether he preferred to deal |
| 6 | | directly with you or through Sonechka? |
| 7 | A. | He would do both.  He had no problems with |
| 8 | | going to Sonechka or coming to me hisself. |
| 9 | Q. | But you were never under the impression that |
| 10 | | he had gotten HR, or human resources, to waive |
| 11 | | your probationary period, were you? |
| 12 | A. | No. |
| 13 | | MR. BARNETT:  Give me the little |
| 14 | | attendance chart, the one that |
| 15 | | he had in his file. |
| 16 | | I'm going to stop in just a |
| 17 | | minute. |
| 18 | | MS. LEONARD:  Okay. |
| 19 | Q. | (Mr. Barnett continuing) Were you aware that |
| 20 | | Mr. Kim was keeping track of your attendance |
| 21 | | after you became probationary? |
| 22 | A. | No. |
| 23 | | (Defendant's Exhibit Number 13 marked |

79

```
 1              for identification.)
 2              MS. SMITH:  That's 13.
 3              MR. BARNETT:  Yes.
 4    Q.    Let me show you Exhibit 13.  Have you seen
 5          that document before?
 6    A.    Only through my attorney.
 7    Q.    This shows seven attendance incidents.  And my
 8          question to you is if you have cause to
 9          disagree with any of those as either not
10          having occurred or that you were charged with
11          too much or too little time off.
12    A.    The only thing that stands out is 8/14/06.
13    Q.    Right.
14    A.    The other days I would have to go back to my
15          records.
16    Q.    What stands out about 8/14?
17    A.    I was there at work.  I didn't take off.
18    Q.    All day?
19    A.    Yes.
20    Q.    And what is it that makes that so clear in
21          your memory?
22    A.    Because that was the day that I was supposed
23          to go to my first doctor's appointment for
```

1      pregnancy, and I had to switch it to another

2      day.

3  Q.   Did you put in a slip for the 14th?

4  A.   Yes, I did.

5  Q.   Do you remember what day you switched it to?

6  A.   Yes, August the 9th.

7  Q.   Well, did you move it up you're saying?

8  A.   It was rescheduled from the 14th to the 9th.

9  Q.   Let me show you 17.

10             MS. LEONARD:  Did you mean to skip

11                  from 13 to 17?

12             MR. BARNETT:  Yes, I did.

13             MS. SMITH:  13.

14             MR. BARNETT:  Let's not do that.

15                  Maybe we shouldn't do that.

16             MS. LEONARD:  That's all right.  I

17                  just want to make sure.

18             MR. BARNETT:  Listen, anybody that

19                  sees me doing something dumb

20                  like that is invited to correct

21                  me.

22             MS. LEONARD:  I just didn't want us

23                  to get into trouble later

81

1          looking for three exhibits that

2          may not exist.

3          (Off-the-record discussion.)

4          (Defendant's Exhibit Number 14 marked

5          for identification.)

6          MR. BARNETT:  All right.  Is it 14?

7          MS. LEONARD:  Correct.

8          MS. SMITH:  Yes.

9    Q.   All right.  Did you turn this in, Ms. Hunter?

10   A.   Yes, I did.

11   Q.   And so your testimony is that after the 3rd

12        when you turned this in you rescheduled for an

13        earlier day on the 9th?

14   A.   On the 9th, correct.

15   Q.   I'm just not understanding.  Will you read the

16        reason for absence there.

17   A.   I submitted a request for August the 9th, but

18        the appointment has been rescheduled to August

19        the 14th, nine-thirty a.m.  I still need a

20        half a day.

21   Q.   Well -- and I'm not arguing with you.  But

22        this reads to me like you scheduled it for the

23        9th and then rescheduled for the 14th?

82

A.    On this sheet of paper, that's correct.

Q.    Well, what happened after that?  Did something
      else happen?

A.    Yes.

Q.    What was that?

A.    The doctor that I was going to see on --
      during this time, the 9th and the 14th, was
      another doctor.  And I changed my doctor.

Q.    Okay.  Who were you going to go see?

A.    Zimmerman.  Dr. Zimmerman.

Q.    All right.  Did you ever see Dr. Zimmerman
      with respect to the pregnancy that we're
      talking about now?

A.    No.

Q.    Did you read the complaint that your lawyer
      filed on behalf of you in this lawsuit before
      it was filed?

A.    I would have to look at it to be familiarized.

                MS. SMITH:  That's 15.

                (Defendant's Exhibit Number 15 marked

                for identification.)

Q.    (Mr. Barnett continuing) Do you recognize this
      document, Exhibit 15?

83

A.    Yes.

Q.    When did you first see this?

A.    When my attorney sent it to me.

Q.    Before or after it was filed?

A.    After.

Q.    How did you find out that you were pregnant?

A.    The day I became permanent with Mobis.  I'm
      sorry.  Scratch that.  The day I went for the
      drug test with Mobis.

Q.    We're talking about June 5th?

A.    I'm not sure if it was or not.

Q.    But it's the day you became a ninety-day
      probationary?

A.    Yes.  And within that time frame, I had to
      take a drug test.

Q.    What were you tested for that day?

A.    A drug test.  I took my own personal pregnancy
      test.

Q.    You lost me.  How did you -- you didn't find
      out from the drug test that you were
      pregnant?

A.    No.

Q.    Okay.  So you say you took your own personal

84

1              test.  Do you mean you gave it to yourself?

2    A.    Yes.

3    Q.    The same day?

4    A.    Yes.  The same time.

5    Q.    Did you take it with you to the lab that did

6              your drug test?

7    A.    Yes.

8    Q.    Okay.  Did you have -- so you found out

9              according to a home test --

10   A.    Correct.

11   Q.    -- on or about June 6th?

12   A.    Yes.

13   Q.    Did you tell the lab that you had given

14             yourself a test?

15   A.    Yes.

16   Q.    What did you tell them and what did they say?

17   A.    I actually asked them.

18   Q.    For the equipment -- I mean, for the little

19             kit?

20   A.    I asked them would it be a problem if I tested

21             my own personal -- my own personal --

22   Q.    Sample.

23   A.    -- sample while doing their testing.

85

1   Q.   And they said?

2   A.   There's no problem.

3   Q.   Did you tell them what the results were?

4   A.   Yes.

5   Q.   You don't have any reason to believe they told

6        anyone at Mobis that you were pregnant, do

7        you?

8   A.   No.

9   Q.   Was this test that you gave yourself something

10       you buy in the drugstore?

11  A.   Yes.

12  Q.   Did you suspect that you were pregnant?

13  A.   Yes.

14  Q.   What symptoms were you having, or what

15       symptoms were you not having?  Were you late?

16  A.   Yes.

17  Q.   All right.  Look, I just -- I'm going to ask

18       these questions as un-invasively as I possibly

19       can, but that's what this lawsuit is about.

20            Did you have any follow-up testing done

21       to confirm the test result that you got from

22       your own test on June 5th?

23  A.   Yes.

86

1   Q.   Who did that?

2   A.   Dr. Pou, Belfondia Pou.

3   Q.   Okay.  And he pronounces his name Pou?

4   A.   Pou.

5   Q.   All right.  When you gave yourself this test

6        on the 5th, were you having morning sickness?

7   A.   Yes.

8   Q.   Were you using any type of

9        contraception -- what am I trying to say,

10       contraceptive?  Were you practicing birth

11       control at this time?

12  A.   No.

13  Q.   Now, I notice from your records that you had

14       been taking what's called a depo shot on and

15       off for several years; is that correct?

16  A.   Correct.

17  Q.   And that's a contraceptive shot; is that

18       correct?

19  A.   Correct.

20  Q.   Did that work for you?  Did you have any

21       unexpected pregnancies while you were taking

22       those shots?

23  A.   No.

87

1   Q.   Did you stop contraception during this

2       period?  When did you stop contraception and

3       why?  Did you want to have a baby or some

4       other reason?

5   A.   Some other reason.

6   Q.   And what was that reason?

7   A.   Me and my doctor had been talking, just some

8       feminine issues that I was going through.

9   Q.   I'm sorry, what issues?

10   A.   Feminine issues that I was going through.  I

11       thought at one time that's the reason why I

12       couldn't gain weight.

13   Q.   Okay.  Go ahead.

14   A.   He just said that I could stop and start

15       back.  That's possible.  It would have to take

16       three months to get out of my system.  So I

17       had been off it for about a little over -- I

18       would say four, five months.

19   Q.   Off the depo shot?

20   A.   Yes.

21   Q.   Did you try to replace the shot with any other

22       form of contraception?

23   A.   Condoms.

1   Q.   All right.  Did you want to have a child?

2   A.   Not at this time.

3   Q.   From your orientation, or from the handbook,

4         did you understand that Mobis didn't have any

5         type of medical leave until the employee

6         became eligible for family medical leave?

7   A.   Rephrase it.

8   Q.   What was your understanding, if any, about

9         Mobis' policy on medical leave for employees

10        during their first year of employment?

11   A.   That they had a policy that you had to be

12        there a year after in order to obtain family

13        leave.

14   Q.   And then it was family medical leave that you

15        were entitled to, right?

16   A.   Correct.

17   Q.   Do you know what family medical leave is?

18   A.   Leave of absence for medical illness for

19        yourself.

20   Q.   Do you know where the family medical leave

21        rights come from?

22   A.   No, I do not.

23   Q.   Do you know whether or not the federal laws

89

1      have anything to do with family medical leave?

2  A.  I -- that's where I think they stem from, from

3      federal laws.

4  Q.  Have you had that understanding all along?

5      Did you have that understanding during your

6      employment at Mobis?

7  A.  That it came from federal?

8  Q.  Right.

9  A.  Yes.

10  Q.  All right.

11              MR. BARNETT:  It's time, as far as

12                 I'm concerned, to take a lunch

13                 break.

14              (Off-the-record discussion.)

15              (Lunch recess).

16  Q.  (Mr. Barnett continuing) Ms. Hunter, is

17      everything you've told me so far been

18      accurate, to your knowledge?

19  A.  To my knowledge, yes, it has.

20  Q.  All right.  The court records show that you

21      were evicted from your home on 9/22/06.  Is

22      that about right, September of '06?

23  A.  No.  September of '06?

1   Q.   Well, you tell me when.

2   A.   What address?

3   Q.   The last time you were -- when was the last

4        time you were evicted?

5   A.   Perdido Drive.

6                 MR. BARNETT:  Is that it?

7   Q.   When did you actually leave Perdido Drive?

8   A.   January of '07.

9   Q.   When did they start -- when did the landlord

10       commence eviction proceedings?

11  A.   I think it was -- I just knew it was in '06,

12       late '06.

13  Q.   Was Perdido Drive in the River Parkway

14       Apartments?

15  A.   Correct.

16  Q.   The court records indicate that the

17       proceedings started in September of '06.  Does

18       that sound right?

19  A.   That sounds about right.

20  Q.   So you were already having trouble paying your

21       rent before you lost your job at Mobis; is

22       that correct?  You were already behind on your

23       rent?

91

1    A.    Yes.

2    Q.    Have you been evicted before or had eviction

3          proceedings commenced against you?

4    A.    Yes.

5    Q.    Tell me about those.

6    A.    Back in -- once before was Virginia Meadows.

7          And during the time that I lost my job.

8    Q.    You mean at Mobis?

9    A.    No.

10   Q.    Virginia Meadows.  And what caused you to be

11         evicted there?

12   A.    Nonpayment of rent due to the loss of my job.

13   Q.    Okay.  Which job was that?

14   A.    With Vialog Communications.

15   Q.    Any other eviction notices or eviction

16         proceedings against you?

17   A.    Yes.

18   Q.    Tell me about those.

19   A.    At 5 -- 577 Eastdale Road.

20   Q.    Is that Peppertree Apartments?

21   A.    No.

22   Q.    Were there eviction proceedings commenced

23         against you by Peppertree Apartments?

92

1    A.    Correct.

2    Q.    Where did you live at Eastdale Road?  Was that

3          an apartment?

4    A.    It was a duplex.

5    Q.    What was the name of it?  Did it have one?

6    A.    Just a duplex.

7    Q.    Did you ever have any trouble understanding

8          what Mr. Kim was saying to you with him being

9          Korean?

10   A.    At times I would, but I would ask him to

11         clarify.

12   Q.    Were you tardy -- or were you late getting to

13         work because of your child's school situation

14         after you became probationary?

15   A.    Yes.

16   Q.    Do you know how many times?

17   A.    No, I don't remember.

18   Q.    More than five?

19   A.    Yes.

20   Q.    More than ten?

21   A.    Yes.

22   Q.    More than fifteen?

23   A.    I can't say.

1    Q.    Do you know that Mr. Kim did not record those
2          small tardies?
3    A.    Rephrase the question.
4    Q.    Do you know whether or not Mr. Kim kept a
5          record of the just-a-few-minute tardies due to
6          your child going to school?  Do you know
7          whether he kept up with that or not?
8    A.    No, I do not know.
9    Q.    Were you ever thirty minutes late because of
10         your child after your probationary period
11         started?
12   A.    I don't remember.
13   Q.    Did you ever look into having your child ride
14         the school bus?
15   A.    No.
16   Q.    As far as you know, then, nothing adverse ever
17         happened to you with respect to your
18         employment at Mobis because of you being late
19         taking your child to school?  No discipline
20         was taken against you?
21   A.    No.
22   Q.    You're agreeing with me?
23   A.    Yes, I'm agreeing.

94

1    Q.    Who was giving you the depo shots, which

2          doctor?

3    A.    Dr. Pou.

4    Q.    Anyone else?

5    A.    Dr. -- I don't remember.

6    Q.    Well, Dr. Pou's records -- I'll just represent

7          this to you -- show that you stopped -- or

8          they stopped notating a depo shot sometime in

9          '05.  And earlier I thought you said you had

10         stopped taking them just a few months before

11         you became pregnant in 2006.  Does that change

12         your recollection?

13   A.    No.

14   Q.    You think you took them -- excuse me.  His

15         records stop showing them in 2004.  And your

16         testimony is you continued to take them after

17         that?

18   A.    Yes.

19   Q.    I want to go back to this home pregnancy test.

20   A.    Okay.

21   Q.    Why did you take that -- why did you conduct

22         that test at the drug testing facility as

23         opposed to at home or in privacy somewhere?

95

1    A.    Because at that point I had been having

2          morning sickness.  And I bought the test

3          before -- prior to going there.  And I was

4          going to just take the test and see if I was

5          pregnant.  Because at the time I went there, I

6          asked them if they could do it.  But they said

7          the only thing that Mobis requested was a drug

8          test.

9    Q.    So you purchased the kit, the test kit, right

10         before you went --

11   A.    Yes.

12   Q.    -- down to the test?

13   A.    Yes.

14   Q.    And we've established this was not a planned

15         pregnancy, right?

16   A.    Correct.

17   Q.    Who was the first person associated with Mobis

18         that you told about your pregnancy?

19   A.    Sonechka Womack.

20   Q.    When did you tell Sonechka?

21   A.    The day I took the drug test and the pregnancy

22         test.

23   Q.    That would have been around the 7th?

96

1    A.    The 6th -- 5th, 6th.

2    Q.    Whatever the day was right after you started

3          probationary --

4                    MS. RIEDLER:   6th.

5    A.    Yes.

6    Q.    All right.  And what did she say to you?

7    A.    At that time, she just told me, do not tell

8          Jay Kim.

9    Q.    Did she say why you should not tell Jay Kim?

10   A.    Because of a previous employee that was fired

11         in regards to being pregnant.

12   Q.    And who was that employee?

13   A.    She didn't tell me at the time.

14   Q.    Do you know now?

15   A.    No.

16   Q.    Do you have any idea who it was allegedly?

17   A.    I think I do.  I'm not sure.

18   Q.    And who is that?

19   A.    First name basis, Lajarra.

20   Q.    Lajarra Jefferson, right?

21   A.    That sounds about right.

22   Q.    Have you ever spoken with Lajarra Jefferson?

23   A.    No.

1   Q.    Have you ever spoken with her lawyer?

2   A.    No.

3   Q.    To your knowledge, has your lawyer spoken with

4         her?

5   A.    Not to my knowledge.

6   Q.    To your knowledge, has your lawyer spoken with

7         her lawyer?

8   A.    Not to my knowledge.

9   Q.    Do you know who Lajarra -- what

10        Lajarra Jefferson's job was?

11  A.    No, I don't.

12  Q.    Do you know that she was a production worker?

13  A.    That's what they told me.

14  Q.    Who is they?

15  A.    Some of the other employees that were at Mobis

16        that told me the same thing, do not tell.

17  Q.    And who told you not to tell?

18  A.    Sonechka Womack.  I gave the information --

19        the rest of the information to my attorney.  I

20        can't -- off the top of my tongue -- I mean,

21        the top of my head I can't state their names.

22              MR. BARNETT:  Where are they?  Where

23                 are the initial disclosures?

98

MS. SMITH:  Here you go.

2    Q.    Tell me again what Sonechka said.  She said,

3          don't tell Jay, and what else?

4    A.    She just told me to -- well, she first said

5          congratulations.  And then she said, do not

6          tell Jay Kim.

7    Q.    And did she say why?

8    A.    Yes.

9    Q.    And that was?

10   A.    Due to the fact as far as -- because of the

11         firing of the other employee,

12         Lajarra Jefferson.

13   Q.    Other than Lajarra Jefferson, have you ever

14         heard it stated or alleged that any other

15         Mobis employee was fired or discriminated

16         against because of pregnancy?

17   A.    Yes.

18   Q.    Who?

19   A.    First name basis, they told me it was someone

20         by the name of Shundra or Shonda.

21   Q.    Shalanda?

22   A.    That sounds about right.

23   Q.    Do you know anything about Shalanda?  Have you

1    ever spoken with her?

2    A.    No.

3    Q.    What about Shalanda Gordon?  Does that sound

4          right?

5    A.    That sounds about right.

6    Q.    Who told you about Shalanda Gordon?

7    A.    It came up in the conversations.  I don't

8          remember exactly who, but I heard it more than

9          once.

10                    MR. BARNETT:  Where are the initial

11                        disclosures?

12   Q.    Do you know anything about the circumstances

13         of Lajarra Jefferson's termination?

14   A.    No.

15   Q.    Do you know anything about the circumstances

16         of Shanda --

17                    MS. RIEDLER:  Shalanda.

18   Q.    -- Shalanda Gordon's?

19   A.    No.

20   Q.    Any other employees that you heard about or

21         claim to know about that claimed they were

22         discriminated against on the basis of being

23         pregnant?

100

| | |
|---|---|
| 1 | A. No. |
| 2 | (Off-the-record discussion.) |
| 3 | Q. And to this day, you don't know of any other |
| 4 | people that you have -- |
| 5 | A. No. |
| 6 | Q. -- any reason to believe were discriminated |
| 7 | against based on pregnancy? |
| 8 | A. No, not that I know of. |
| 9 | Q. Did Sonechka tell you that Jay had ever |
| 10 | discriminated against anyone on the basis of |
| 11 | pregnancy? |
| 12 | A. No. |
| 13 | Q. Do you have any reason to believe that Jay has |
| 14 | ever discriminated against -- I know you said |
| 15 | he did against you.  But do you know of any |
| 16 | other incidents where you suspect even that he |
| 17 | discriminated on the basis of pregnancy? |
| 18 | A. Not that I know of. |
| 19 | Q. And Sonechka didn't tell you that he had |
| 20 | discriminated on the basis of pregnancy? |
| 21 | A. No, she did not. |
| 22 | Q. And she did not tell you that she thought he |
| 23 | would discriminate on the basis of pregnancy, |

1       did she?

2   A.    I don't know how to answer that one.

3   Q.    Pardon?  Did you say you want to think about

4       it?

5                 MS. LEONARD:  She said she didn't

6                     know how to answer that one.

7   A.    I don't know how to answer that one.

8   Q.    Well, take your time.  If you remember what

9       she said, just tell me.

10   A.    By the information she gave me, it would be.

11   Q.    All right.  What information --

12   A.    By not telling Jay Kim or anybody else that I

13       was pregnant.

14   Q.    Now, what did she tell you that led you to

15       believe that he would discriminate on the

16       basis of your pregnancy if you told him?

17   A.    Due to the fact to the other individuals that

18       were stated to be discriminated against

19       because they were pregnant; they were

20       terminated or fired due to the fact that --

21   Q.    So Sonechka told you about Shalanda Gordon and

22       Lajarra Jefferson?

23   A.    She didn't give, as far as specific names, out

102

1    of her mouth.  But it was other conversations

2    with other individuals --

3  Q.    Okay.  Well, I'm --

4  A.    -- as well.

5  Q.    Right now -- I understand.  Excuse me.  I

6    didn't mean to interrupt.  I'm trying to

7    understand what it was that Sonechka said to

8    you that made you believe that Jay would

9    discriminate on the basis of pregnancy if he

10    found out you were pregnant.

11  A.    Okay.  Do not tell Jay Kim.

12  Q.    Okay.  Anything else?

13  A.    That I needed to wait due to the fact of other

14    employees being terminated due to pregnancy.

15  Q.    Did she indicate that other people at Mobis

16    were involved in this discrimination?

17  A.    She didn't go into details.  She just said, do

18    not tell.

19  Q.    All right.  So did Sonechka say anything else

20    to you at any time that led you to believe

21    that Jay Kim would discriminate against you on

22    the basis of your pregnancy if he found out

23    about it?

103

1    A.    It was other conversations, just going back to

2          the same information that she told me, but it

3          was said several times.

4    Q.    I have to know about them, how many there were

5          and everything that was said.

6    A.    The other one was on the August -- when I had

7          to inform them of the doctor's appointment.

8          That was August the 9th, after my first

9          doctor's appointment.

10   Q.    So the first conversation with Sonechka was on

11         the day after you did your pregnancy test?

12   A.    The day of.

13   Q.    The day of.  All right.  And the next one was

14         in August of '06.  And when was it?

15   A.    After coming back from the first doctor visit.

16   Q.    And that was on August 9th?

17   A.    Yes.

18   Q.    And what did she tell you on that date?

19   A.    We discussed the situation of me going in and

20         informing Jay Kim.

21   Q.    And what did you say and what did she say?

22   A.    I told her at the time that I think I had to

23         inform him because I had to have a procedure

1          done due to the pregnancy.

2     Q.   And what did she say?

3     A.   She asked me was I sure.  And she said it was

4          my choice, but she also told me the fact that

5          if I wanted -- if I wanted to just keep it in,

6          let him know that it was something else I was

7          doing, not to go into details, to do it that

8          way.

9     Q.   And what did you do?

10    A.   I went in --

11    Q.   What did you say?

12    A.   I told her I think I needed to tell Jay Kim.

13    Q.   And what -- this was before August 9th?

14    A.   No.  That was on August 9th.

15    Q.   All right.  Let me make sure I'm with you

16         here.  That's the day you went to the doctor

17         for the first time --

18    A.   Correct.

19    Q.   -- for your pregnancy?

20    A.   Correct.

21    Q.   Did she discuss the -- either one of these

22         conversations with her, did she mention the

23         fact that you were a probationary employee?

1    A.    No.

2    Q.    Did you have another discussion with Sonechka

3          wherein she led you to believe or said

4          anything that made you believe that Jay Kim

5          would discriminate against you on the basis of

6          your pregnancy?

7    A.    It was in between.

8    Q.    In between what?

9    A.    The day of finding out of pregnancy and the

10         day of actually telling Jay Kim, which is

11         August the 9th.  It was in the month of July.

12   Q.    What prompted that conversation?

13   A.    Because I called her to ask if I could come in

14         a little bit late because I was actually

15         deciding -- contemplating abortion.

16   Q.    What date was that?

17   A.    I don't remember.  It was actually three sets

18         of days I went to abort but didn't.

19   Q.    Three separate days you went to a clinic?

20   A.    Uh-huh (positive response).

21   Q.    Which clinic?

22   A.    I don't remember what -- the name of the

23         clinic, but it's here off of South Hull.

106

1   Q.   Did you have appointments?

2   A.   Yes.

3   Q.   How far apart were the appointments?

4   A.   As far as days or --

5   Q.   Yes.  I mean --

6   A.   The first one was -- it was the first part of

7        July, another one in the middle, and the last

8        one was about the last of July, I think.

9   Q.   Did you seek Sonechka's advice about aborting

10       your pregnancy?

11  A.   Yes, on that last day.

12  Q.   And what was her advice?

13  A.   She advised me not to do it.

14  Q.   And you didn't do it?

15  A.   Uh-huh (positive response).

16  Q.   And you're glad you didn't; is that correct?

17  A.   Yes.

18  Q.   I'm sorry?

19  A.   Yes.

20  Q.   Okay.  Do you have mixed emotions about

21       whether you should have aborted your

22       pregnancy?

23  A.   No.  It's just --

107

1                MS. LEONARD:  Do y'all have a tissue

2                    or anything?

3                MR. BARNETT:  We do.

4   A.   It just bothered me.  Thank you.

5   Q.   Take your time.

6   A.   It just bothered me to the fact that it was a

7       decision between that or telling -- keeping my

8       job.

9   Q.   Now, let me -- in fairness to Jay Kim, he

10      didn't know any of this was going on, did he,

11      as far as you know?

12   A.   Not at this time.

13   Q.   Well, you didn't tell him until August 9th,

14      right?

15   A.   Correct.

16   Q.   Do you have any reason to believe Sonechka

17      told him before then?

18   A.   No.

19   Q.   So you had already decided not to abort the

20      pregnancy before you told him?

21   A.   Yes.

22   Q.   And what did he say when you told him?

23   A.   He just sat there, kind of took everything in

1    and just said uh-huh (positive response). And

2    at the time when I was talking to him, I was

3    telling him about the procedure that I needed

4    to have done, which was on that Friday, the

5    11th, and just working out my schedule for the

6    rest of the week.

7  Q. Didn't he say congratulations to you?

8  A. No.

9  Q. He never did?

10  A. I don't remember.

11  Q. Did you ever take an ultrasound to work?

12  A. Yes.

13  Q. When was that?

14  A. That was after -- I think it was that -- that

15    day, the 9th.

16  Q. How many ultrasounds did you have during this

17    pregnancy?

18  A. I cannot recollect, but it was more than

19    three.

20  Q. All done by Physicians for Women?

21  A. Yes.

22  Q. More than three?

23  A. As well as the abortion clinic.

1  Q.  All right.  Let me see.  Are we counting the

2      abortion clinic or --

3  A.  No.  It was more than three, along with the

4      abortion clinic and Dr. Lawhon's office.

5  Q.  Okay.  You took that ultrasound to work and

6      showed it around; is that right?

7  A.  That's correct.

8  Q.  Didn't Jay Kim come to you and say

9      congratulations after you did that?

10  A.  I don't remember him saying so.

11  Q.  If he says he did, do you dispute that?

12  A.  No.

13  Q.  When was the first ultrasound?

14  A.  The very first was in the abortion clinic.

15  Q.  Is that the one you took to work?

16  A.  No.

17  Q.  When did you have the one that you took to

18      work?

19  A.  On the 9th.

20              MR. BARNETT:  Is that in the

21              records?

22  Q.  That was August 9th?

23  A.  Correct.

110

1   Q.   Did you have -- I don't know much about this.

2        But was there any problem with your pregnancy

3        that required more than three ultrasounds?

4   A.   No problems.

5   Q.   While I'm thinking about it, did you get the

6        prenatal care that you needed?

7   A.   Yes.

8   Q.   Did you get the -- when your baby was born,

9        did you get all of the medical care you

10       needed?

11  A.   Yes.

12  Q.   Did the baby get all of the medical care --

13       it's a she, right --

14  A.   She.

15  Q.   -- she needed?

16  A.   Yes, she did.

17  Q.   Now, was that paid for by Medicaid?

18  A.   Yes.

19  Q.   Now, when you told Jay Kim on the 9th -- did

20       he say anything to you when you told him that

21       you were pregnant and you needed a procedure;

22       and I believe you said you explained what you

23       needed done, or you explained that you needed

111

1          it?

2    A.    I explained that I needed it.  It was

3          something due to the pregnancy, to keep the

4          baby.

5    Q.    Is this the procedure you had to have done on

6          your cervix?

7    A.    Yes.

8    Q.    I don't know how to pronounce it.  Is it

9          cerclage?

10   A.    Cerclage.

11   Q.    Cerclage?

12   A.    Yes.

13   Q.    Okay.  Did you tell him that you were having a

14         cerclage?

15   A.    I didn't go into any depth.  I just ...

16   Q.    All right.  Now, where was he when you told

17         him about your pregnancy?

18   A.    In his office.

19   Q.    So that would have been the same day that you

20         had the ultrasound at work?

21   A.    Yes.

22   Q.    I mean, you got it on the 9th and took it to

23         work on the 9th?

112

1    A.    Yes.

2    Q.    Okay.  Was that a -- I just want to get the

3          sequence here.

4                Did you take off a whole -- what time of

5          day did you have the ultrasound done?

6    A.    I don't remember what time the appointment

7          was.

8    Q.    Did you have another ultrasound after

9          August 9th?

10   A.    Yes.

11   Q.    By whom?

12   A.    The doctors office, Dr. Lawhon's,

13         Women's Physicians.

14   Q.    When was that?

15   A.    The next ultrasound was on the next visit.

16   Q.    About towards the end of August?  Don't let me

17         tell you when it was.  I just --

18   A.    They did the -- every visit they -- every

19         month.  Every month they did another one.

20   Q.    So how many more did you have after

21         August 9th?

22   A.    I'm not sure how many more, but it was more

23         than three.

1  Q.  Okay.  And as far as you know, the doctors

2      weren't worried about your pregnancy?  That's

3      just what they did?

4  A.  Correct.

5  Q.  Do you know whether Jay Kim already knew about

6      your pregnancy when you came in on the 9th?

7  A.  No.

8  Q.  Who at Mobis had you told about your pregnancy

9      prior to August 9th?

10 A.  Sonechka Womack, Nicole Boswell, Hosang,

11     Falandria -- I don't remember her last name.

12 Q.  Hosang?

13 A.  Yes.

14 Q.  Is she a female?

15 A.  It's a he.

16 Q.  It's a he.  Is she a female.

17            MS. RIEDLER:  He would appreciate

18                 that.

19 Q.  Hosang is a he.  Anybody else?

20 A.  Falandria.

21 Q.  Landra?

22 A.  Falandria.

23 Q.  S --

114

1   A.   F-A-L-A-N-D-R-I-A.   I'm not sure what her last

2        name is.

3   Q.   Okay.

4   A.   Lee.

5   Q.   Lee.  Is she Korean?

6   A.   No.

7                  MS. RIEDLER:  No.

8   Q.   Is Hosang Korean?

9   A.   Yes.

10  Q.   Now, when did you tell Hosang?

11  A.   I told Hosang a little bit later.

12  Q.   Hosang.

13  A.   I don't remember when.

14  Q.   Later than what?  Later than August 9th?

15  A.   No, later than Sonechka and Nicole.

16  Q.   You don't have any reason to believe that any

17       of these people that you've mentioned told

18       Jay Kim before you told him?

19  A.   No.

20  Q.   Let's go back to the 9th when you told Mr. Kim

21       in his office, right?

22  A.   Yes.

23  Q.   What did he say, if anything?

1    A.    Nothing.  He made a grunt and just looked at

2          me.

3    Q.    Had y'all had problems in the office with

4          month-end closeouts before August 9th?

5    A.    Problems?

6    Q.    Getting it done.

7    A.    I remember Jay always talking about month-end

8          closing.

9    Q.    Had you been told that your absences during

10         your probationary period were causing problems

11         in the accounting department before

12         August 9th?

13   A.    No.

14   Q.    Did you know that you had more than three

15         absences, tardies, or leave earlies before

16         August 9th?

17   A.    Yes.

18   Q.    Did you wonder why you had not been terminated

19         in view of the policy?

20   A.    No.

21   Q.    Did you ask anybody that?

22   A.    No.

23                    MR. BARNETT:  Did you find the

1                 initial disclosures?

2   Q.   I'm going to read some names.  And a while ago

3        you were trying to remember who may have --

4   A.   Uh-huh (positive response).

5   Q.   -- said something to you that made you suspect

6        or fear that Jay Kim would discriminate

7        against you if he found out you were

8        pregnant.  Do you remember that?

9   A.   Yes.

10   Q.   I'm just going to read you some names.

11        Wanda Davis.  She's on your list.  I don't

12        know why she's on your list.

13   A.   She's not one of them that spoke about that.

14   Q.   Ken Ziegler?

15   A.   He's not one of them that spoke about that.

16   Q.   Nicole Boswell?

17   A.   Yes.

18   Q.   Dean Seales?

19   A.   Yes.

20   Q.   Falandria Lee?

21   A.   Yes.

22   Q.   Now, these are all people that told you Jay

23        would discriminate, or said something that

1    made you think he would?

2  A.  Yes.

3  Q.  I'm not asking who you told.  I'm asking who

4    said something to you that made you afraid to

5    tell Jay Kim.

6  A.  That's correct.

7  Q.  Tamika Lee?

8  A.  Yes.

9  Q.  Natalie Crosskey?

10  A.  No.

11  Q.  All right.  What did Nicole Boswell say to you

12    that made you believe or led you to be

13    concerned that Jay Kim would discriminate

14    against you if he found out you were

15    pregnant?

16  A.  The same information as far as the other two

17    individuals that had been let go due to

18    pregnancy.

19  Q.  All right.  And they said they had been let go

20    due to pregnancy?

21  A.  Yes.

22  Q.  Or did they say they had been pregnant and let

23    go?  Which did they say?

118

1   A.   They said they were pregnant and they were

2        fired.  They were terminated.

3   Q.   Did any of these people you've listed tell you

4        that they were fired because they were

5        pregnant?

6   A.   They told me that's the reason why they were

7        terminated.

8   Q.   Have you ever heard anything different about

9        those two individuals, as to why they were

10       terminated?

11   A.   No.

12   Q.   Did Nicole Boswell say anything else to you

13       about that?

14   A.   No.

15   Q.   The same question for Dean Seales.  And you

16       know what the question is, don't you?  What

17       she --

18   A.   Would you repeat --

19   Q.   -- what she told you that made you believe or

20       fear that Jay Kim would discriminate against

21       you if he found out you were pregnant.

22   A.   Same -- same situation, where she said don't

23       tell anybody else, keep it to yourself until

119

1          you get further along.

2     Q.    Did she mention Jay Kim?

3     A.    No.

4     Q.    Did Nicole Boswell mention Jay Kim by name?

5     A.    I don't remember.

6     Q.    Did Falandria Lee mention Jay Kim by name?

7     A.    Not specifically, no.

8     Q.    What did she say to you?

9     A.    Just to keep the information to myself until I

10         become further along due to the other

11         situations with the other females.

12    Q.    All right.  You don't know if she mentioned --

13         well, did she mention Jay Kim?

14    A.    I don't remember.

15    Q.    Tamika Lee?

16    A.    Just asked about me telling Jay Kim, agreeing

17         that I don't relay the message, keeping my

18         mouth quiet.

19    Q.    Do you have any evidence for the Court that

20         Jay Kim had any role in the terminations of

21         these two other women, Shalanda Gordon and

22         Lajarra Jefferson?

23    A.    Not that I know of.

120

1    Q.    Did anybody tell you at the time that he had

2          any role in those two pregnant women being

3          terminated?

4    A.    No, they did not.

5    Q.    Did you have any reason to believe that

6          Ms. Riedler, or anyone in human resources,

7          would discriminate against you on the basis of

8          your pregnancy at any time before you were

9          terminated?

10   A.    Did I have any reasons?

11   Q.    Yes.  Who were you concerned about, Jay Kim or

12         human resources or both?

13   A.    Both.

14   Q.    Why were you concerned about human resources?

15   A.    Due to the fact of the other two females being

16         terminated.

17   Q.    Maybe I can shorten this.  Other than the fact

18         that you were told about two women being

19         terminated while they were pregnant, being

20         Shalanda Gordon and Lajarra Jefferson, did

21         anybody tell you anything else that made you

22         concerned about pregnancy discrimination by

23         Mobis?

121

| | | |
|---|---|---|
| 1 | A. | No. |
| 2 | Q. | Did you consider speaking with anybody in |
| 3 | | human resources about your pregnancy -- |
| 4 | A. | No. |
| 5 | Q. | -- before or after you told Jay Kim? |
| 6 | A. | No. |
| 7 | Q. | Has anything happened or have you heard about |
| 8 | | anything happening since you left Mobis that |
| 9 | | leads you to believe that Mobis discriminates |
| 10 | | against pregnant women? |
| 11 | A. | No, not that I know of. |
| 12 | Q. | Did you see pregnant women coming and going to |
| 13 | | work at Mobis while you were there? |
| 14 | A. | I don't remember. |
| 15 | Q. | If I told you that they've had dozens that |
| 16 | | have had babies and returned to work, would |
| 17 | | you have any reason to disbelieve that -- |
| 18 | | MS. LEONARD:  Object to the form. |
| 19 | | Foundation. |
| 20 | Q. | -- any evidence to disbelieve that? |
| 21 | | MS. LEONARD:  Same objection. |
| 22 | | You can answer. |
| 23 | A. | I -- I could not believe it. |

122

1    Q.    Pardon?  Let me try it another way.

2    A.    Okay.

3    Q.    If the records show that Mobis has had many

4          women get pregnant, take FMLA leave, and

5          return to work, would you have any reason to

6          disbelieve those records?

7    A.    No.

8    Q.    You said Jay Kim grunted when you told him --

9    A.    Yes.

10   Q.    -- that you were pregnant.  Did he say any

11         words?

12   A.    "What?"

13   Q.    What?

14   A.    Yes, as if in a dismayed sort of way.

15   Q.    What else did he say?

16   A.    Nothing else to the pregnancy, just the fact

17         as far as I asked him if I could work Friday

18         and then take the rest of the day off to have

19         a procedure.

20   Q.    And what did he say?

21   A.    He said yes.

22   Q.    What did he say when you left the room?

23   A.    Nothing.

123

1  Q.   Had that ever happened before?

2            MS. LEONARD:  Object to form.

3                 You can answer.

4  Q.   Did you ever -- never mind.

5            Did you ever find Jay Kim to be a chatty

6       person, a talkative person?

7  A.   No.

8  Q.   All right.  I'm going to ask you about

9       probationary employees who had sicknesses or

10      injuries other than pregnancy.  Do you

11      understand my question?

12 A.   Yes.

13 Q.   Do you know of any probationary employees at

14      Mobis who had sicknesses or injuries and who

15      had three or more absence incidents, or

16      attendance incidents, and kept their jobs?

17 A.   None that I can remember.

18 Q.   Did you become familiar with them, know any

19      other probationary employees at Mobis while

20      you were there?

21 A.   No.

22 Q.   Do you have any evidence that Mobis treated

23      pregnant women differently or worse than they

124

1   treated people, men or women, who had

2   sicknesses or injuries unrelated to pregnancy?

3                    MS. LEONARD:  Object to form.

4                    You can answer.

5   A.   Could you rephrase it?

6   Q.   Do you have any reason -- do you have any

7   evidence for the Court or any reason to

8   believe or any facts that would show that

9   Mobis treated pregnant women differently from

10  the way it treated people -- with respect to

11  attendance, excuse me -- with respect to

12  attendance, treated pregnant women different

13  than they treated people who had absence or

14  attendance incidents due to sickness or

15  injury?

16                    MS. LEONARD:  Same objection.

17  A.   I do not have any facts.

18                    MS. LEONARD:  My objection is just

19                         she may not understand the term

20                         evidence or the legalities that

21                         prove discrimination.  That's

22                         just the objection.

23                    MR. BARNETT:  May not understand

125

1              what?

2                        MS. LEONARD:  She may not understand

3                        the burden of proof for proving

4                        discrimination.  In other words,

5                        she may know the facts, but not

6                        realize that that is part of the

7                        elements of proof of

8                        discrimination.

9                        MR. BARNETT:  Right.

10   Q.   All right.  Do you know of any facts that

11        would indicate that Mobis treats pregnant

12        women any differently with respect to its

13        attendance rules than it treats people who are

14        sick or injured?

15   A.   Not that I know of right now.

16   Q.   Have you ever even heard any rumors to that

17        effect?

18   A.   Yes, I have.

19   Q.   And that would be the two women that you've

20        told me about?

21   A.   Yes.

22   Q.   Anything else?

23   A.   Something other than pregnancy.

126

```
1    Q.   I'm sorry, what?

2    A.   Other discrimination other than pregnancy.

3    Q.   All right.  You lost me on that one.

4         Discrimination other than pregnancy?

5    A.   Yes.

6    Q.   All right.  What type of discrimination, other

7         than pregnancy discrimination, have you heard

8         about?

9    A.   People being off on sick leave and either

10        being terminated on sick leave or them coming

11        back from sick leave.

12   Q.   Who would that be?

13   A.   I just know it was two males.  I'm not sure of

14        their names.

15   Q.   Two males.  And what do you know about those

16        males?  Do you know any of -- either their

17        first or last names?

18   A.   No.

19   Q.   What have you heard about them being

20        discriminated -- about discrimination against

21        them by Mobis?

22   A.   One had an accident and was off work.  He came

23        back, found out he was terminated.
```

1    Q.   Was this a job-related accident?

2    A.   No, a car accident.

3    Q.   All right.  And what about the other male?

4    A.   The other male, it was to the fact of being a

5         cancer patient and had to go to some cancer

6         treatments.  And then when he came back, he

7         was let go.

8    Q.   Do you know if the reason for termination was

9         attendance?

10   A.   That, I'm not sure.

11   Q.   Do you know anything other than the fact that

12        one was involved in an auto accident and was

13        terminated and that the other one had cancer

14        and was terminated?

15   A.   I'm not sure.

16   Q.   Do you know anything else about them, their

17        cases?

18   A.   No, I do not.

19   Q.   Pardon?

20   A.   No, I do not.

21   Q.   And who told you about these two guys, two

22        people?

23   A.   I don't remember who.  I don't remember who

128

1      told me.

2  Q.   Now, this is a little bit of a hypothetical,

3      but let me ask you this.

4  A.   Okay.

5  Q.   If you had found out that you had a sickness,

6      not a pregnancy, but a sickness, that was

7      going to require you to be out of work off and

8      on for a period of time, would you have been

9      afraid to tell Jay Kim that?

10          MS. LEONARD:  Object to form.

11          You can answer.

12  A.   I would have to say no.

13  Q.   Why would you have not been afraid to tell him

14      that?  Isn't that what Sonechka recommended

15      that you do, that you consider telling him it

16      was a sickness?

17  A.   Yes.

18  Q.   Why would you have not been afraid to tell him

19      about a sickness that would require absence --

20      absences?  Excuse me.

21  A.   Because it was nothing ever brought up on me

22      being sick or it would be an issue, only if --

23      the fact that I was pregnant.

129

Q.   And that was based on those two other women
     we've talked about multiple times?

A.   Correct.

Q.   Other than those two women, do you know of any
     person who -- have you heard of any person who
     has been the victim of pregnancy
     discrimination at Mobis?

A.   Unh-unh (negative response).

Q.   Or even allegedly so?

A.   I haven't heard.

Q.   If Mobis takes the position in this lawsuit
     that they treat people with pregnancy -- they
     treat pregnancies exactly the same as they
     treat illness and injury when it comes to
     attendance policies, would you have any basis
     for disagreeing with that statement?

A.   Yes.

Q.   All right.  And what would the facts be that
     support your disagreement?

A.   Due to the fact that it was several people as
     far as attendance issues in the same office.
     No, she was not pregnant, but she had the same
     attendance issues, where she was tardy.  And

1      Jay Kim said something to her, but nothing

2      that was ever -- she was under someone

3      else's -- under somebody else's supervision,

4      but ...

5  Q.  In accounting?

6  A.  I'm not sure what her department was, but she

7      was in the same area.  She sits along where we

8      sat.

9  Q.  What's her name?

10 A.  Lee, Tamika Lee.

11 Q.  Was she in her probationary period when she

12     had these absences?

13 A.  To my understanding, she -- I think she's been

14     there longer than I have.

15 Q.  Anybody else that was treated differently that

16     had sickness or -- illness or injury?

17 A.  Not that I can think of right now.

18 Q.  Did you think about what would happen to you

19     with respect to your employment at Mobis if

20     you remained there until you had your baby and

21     then went out for some period of time

22     postpartum?

23 A.  Yes.

1  Q.   What did you think would happen?

2  A.   How would Jay Kim react to me.

3  Q.   Pardon?

4  A.   How he would react to me.

5  Q.   And how did you think he would react to you?

6  A.   At the time I told Jay Kim, from that point

7       on, he would not talk to me.  He would not

8       address me.  He would not look at me.  If I

9       went towards his direction he would go the

10      opposite way.

11 Q.   Were there any witnesses to that?

12 A.   Sonechka Womack.

13 Q.   Who else?

14 A.   It was pretty much her since she was my

15      immediate supervisor.  Also Hosang.

16 Q.   Did you discuss this, what you say he did or

17      did not do with Sonechka or Hosang?

18 A.   First with Sonechka.

19 Q.   And what did she say?

20 A.   She agreed.

21 Q.   And what else did she say?

22 A.   That was it from that point on.

23 Q.   Other than not addressing you directly and not

1    looking your way, was there any other conduct

2    on his part that you thought was unusual or

3    inappropriate?

4  A.    No.

5              MR. BARNETT:  Do you want to get

6                    those memos now, those e-mails?

7              MS. SMITH:  Yes.  I have got them.

8  Q.    While she's getting those, did you ever hear

9    from Sonechka or anyone else that Jay Kim was

10    planning to terminate you after you told him

11    about your pregnancy on August 9th?

12  A.    Not August 9th, no.

13  Q.    After you told him about your pregnancy on

14    August 9th?

15  A.    Yes.

16  Q.    All right.  What did you hear on or after

17    August 9th about Jay Kim planning to terminate

18    you?

19  A.    On the 24th.

20  Q.    The day before you were terminated?

21  A.    Yes.

22  Q.    Who told you that he was planning to terminate

23    you and what did they say?

133

A.   Sonechka.

Q.   And what did she say?

A.   She just said to me that Jay has been very
     unfair, and it had nothing to do with my job
     performance, that it was -- she discussed with
     him -- her and Hosang discussed with him that
     it had to be because of my pregnancy.

Q.   Discussed with him that what?

A.   Hosang and Sonechka discussed with Jay that it
     was only because of my pregnancy, that all of
     the sudden he had a different demeanor with me
     as far as my job performance.

Q.   Well, when did they have that -- did they
     discuss it with him together?

A.   Yes.

Q.   And what was his response?

A.   By Sonechka's words, he said it didn't matter
     what they said or what they thought.

Q.   He didn't admit pregnancy discrimination to
     either one of them, as far as you know, did
     he?

A.   No.  But that's what they knew from his
     demeanor, how everything took place that it

134

1      was.

2   Q.  How do you know?  You're very quick to accuse

3       him of pregnancy discrimination, which is

4       against the law.  How do you know that it

5       wasn't your attendance problems that had

6       Jay Kim  -- that made Jay Kim decide to

7       terminate you?

8   A.  Because prior to that, like I said, I

9       stated -- I gave Jay Kim my daughter's

10      handbook of her school.  And he said he was

11      willing to work with me.  And he and I and

12      Sonechka was in on that meeting.  Then when I

13      told him as far as the pregnancy, that's when

14      his whole demeanor changed towards me.  And

15      nothing was ever brought up of my job

16      performance or anything.

17          And then the 24th, Sonechka, she went

18      in.  And her and Jay and Hosang were going

19      back and forth on regards to the fact.

20  Q.  Hold on.  Was it on the 24th that you think

21      Sonechka and Hosang talked to Jay about --

22  A.  I don't think.  I know.

23  Q.  Okay.  And that's when you say they said to

1          him it's because she's pregnant?

2     A.   Yes.

3     Q.   Do you know of any occasion that they spoke to

4          him on that subject before the 24th?

5     A.   No.

6     Q.   Do you know if Jay Kim had had any training or

7          education about discrimination?

8     A.   I'm not aware of it.

9     Q.   Do you know how many more absences you had

10         between the 9th and the time Jay Kim decided

11         to terminate you?  Well, do you know when

12         Jay Kim decided to terminate you?

13    A.   No, I do not.

14    Q.   But you heard on the 24th that he had decided?

15    A.   After the fact I told him I was pregnant,

16         correct.

17    Q.   Well, you told him on the 9th, and you found

18         out on the 24th?

19    A.   Uh-huh (positive response).

20    Q.   Do you have any reason for the Court as to why

21         Jay Kim would have waited from the 9th to the

22         25th to terminate your employment if it was

23         because you were pregnant?

136

1    A.    No, I do not.

2    Q.    Pardon?

3    A.    No, I do not.

4    Q.    Has Jay Kim ever lied to you?

5    A.    Yes, he has.

6    Q.    When?

7    A.    The time when he said he would take care of

8          me.

9    Q.    And when was that?

10   A.    When I first started, as far as a full-time

11         employee at Mobis.

12   Q.    Did you expect to be treated better with

13         respect to your attendance, the attendance

14         rules, than people who were sick or injured?

15   A.    No.

16   Q.    Any other lies from Jay Kim other than when he

17         said he would take care of you?  Is that what

18         he said?  I don't --

19   A.    Yes.

20   Q.    I'm getting a little tired.  Any other lies

21         you can think of?

22   A.    I felt that he lied when he stated that he

23         would be willing to work with me with the time

1    frame, as far as with my daughter with the

2    information I gave him from her handbook, her

3    school handbook.

4    Q.    But he did work with you, didn't he?  He

5          didn't charge you -- he didn't charge you with

6          any lates after you became probationary, did

7          he?

8    A.    Not that I know of.  But by the information

9          he's giving you, to me that's a lie.

10   Q.    Okay.  Meaning this colored sheet I showed

11         you?

12   A.    No.  As far as him saying that's the reason

13         why he terminated me.

14   Q.    You lost me on that one.

15   A.    If he's saying the reason why he terminated me

16         was due to attendance after that fact, it was

17         due to that, that's a lie.

18   Q.    Okay.  Have you told me all of the reasons --

19         all of the facts you have to support your

20         allegation that Jay Kim is lying about the

21         reason he terminated you?

22   A.    At this point, I think I've told you

23         everything that's come to mind today.

138

1   Q.  Well, we have to -- if you think of anything

2       else, you need to tell me, if it comes to

3       memory.

4          Let's look at Exhibit 13 again.  Never

5       mind.  I will come to that later.

6               MR. BARNETT:  We have been going at

7                    it an hour.  Do y'all want to

8                    take a short break?

9               MS. LEONARD:  That's fine.

10              MR. BARNETT:  Ten minutes?

11              MS. LEONARD:  Sounds good.

12            (Brief pause in proceedings.)

13   Q.  (Mr. Barnett continuing) Were there any other

14       reasons that you considered having an abortion

15       other than concern about work?

16   A.  No.

17   Q.  Did the father of the child offer to support

18       the child?

19   A.  Yes.

20   Q.  Why did you not accept that?

21   A.  At the time it was not that I didn't accept

22       it.  He doesn't have a job.

23   Q.  And this would be your second child without a

1      marriage, right?

2  A.   Correct.

3  Q.   Was that a factor in your mind about possibly

4       having an abortion?

5  A.   No.

6  Q.   Was anyone else in the room with you and Jay

7       on August 9th when you told him you were

8       pregnant?

9  A.   No.

10 Q.   Now, I asked you earlier about what you

11      thought would have happened if you had stayed

12      at Mobis and had your baby in February.

13 A.   Yes.

14 Q.   Did you know when you became eligible for

15      family medical leave?

16 A.   It would have been a year later, which makes

17      it June, I believe.

18 Q.   Well, whenever it was.  You would not have

19      been eligible for family medical leave when

20      you had your baby, would you?

21            MS. LEONARD:  Object to form.

22                  Foundation.

23 Q.   If you know.

140

1    A.    Unh-unh (negative response).

2    Q.    Did you think one way or another you would be

3          eligible for family medical leave when you

4          had -- at the time you had your baby?  Did you

5          think that far out?  Did you give it any

6          thought one way or another?

7    A.    I thought maternity leave would have been

8          accepted.

9    Q.    Was there any policy or handbook provision

10         that gave you that idea?

11   A.    Due to the fact because of a -- someone being

12         hired and they're pregnant.  There was nothing

13         in there saying they wouldn't give maternity

14         leave.

15   Q.    Anything else?

16   A.    No.

17                    MR. BARNETT:  Let me see these

18                memos.

19                MS. SMITH:  Which ones?

20                (Off-the-record discussion.)

21                (Defendant's Exhibit Number 16 marked

22                for identification.)

23   Q.    Let me show you Exhibit 16.  Okay.  This came

141

1      from Mobis' files.  Do you recall receiving

2      this e-mail?

3                     MS. LEONARD:  Is that 15?

4                     MR. BARNETT:  Exhibit 16.

5   A.   Yes.

6   Q.   Had Sonechka talked to you about your

7        attendance issues between -- do you remember

8        this e-mail?

9   A.   Yes.

10  Q.   Had Sonechka talked to you about your

11       attendance issues between the time you became

12       probationary and the time you received this

13       e-mail?

14  A.   Yes.

15  Q.   Didn't she tell you that you were only allowed

16       two attendance issues as a probationary?

17  A.   No.

18  Q.   Did you understand from this that Mr. Kim was

19       warning you that you were in your probationary

20       period and that your attendance was very

21       important during that period?  Did you

22       understand that?

23  A.   Yes.

142

1    Q.   Did you understand that he was warning you

2          that your long-term employment could be in

3          jeopardy if you continued to miss work during

4          your probationary period?

5    A.   Yes.

6    Q.   How late were you on the 26th?

7    A.   I don't remember.

8    Q.   Do you remember why you were late?

9    A.   No, I'm not sure.  I do remember the 26th.

10         That is the day that -- that's the same day

11         that I went in and I gave him the information

12         as far as with my daughter's schoolwork -- not

13         schoolwork, but information for the school.

14    Q.   Was it some information prepared by the school

15         in a booklet?

16    A.   The handbook, yes.

17    Q.   The school handbook?

18    A.   Yes.

19    Q.   So do you now remember how late you were?

20    A.   It was about eight fifteen, I believe, when I

21         got there.

22                 (Defendant's Exhibit Number 17 marked

23                    for identification.)

143

1    Q.    Let me have you look at 17.  This comes from

2          Mobis' files.  It purports to be an e-mail

3          from Sonechka to you dated August 2nd at

4          ten thirty-five.  Take a minute and read that

5          e-mail.

6    A.    Yes, I remember this.

7    Q.    Did you have any discussions with Sonechka

8          about this e-mail?

9    A.    Yes.

10   Q.    And what did she tell you or what did y'all

11         discuss other than what's in -- what did y'all

12         discuss about it?

13   A.    Due to the fact that invoices sometimes would

14         be at the front desk, because they went

15         through somebody else's hands before getting

16         to me.  And the procedures were that the

17         receptionist will stamp them, and then I was

18         to log them in.  And if I didn't have the

19         correct information to log it in, I would ask

20         or inquire from whoever I needed to get the

21         information in.  So that's why it would not be

22         entered in on that date if I did not get the

23         information.  But as soon as I got the

144

1    information, that it would be entered and

2    given to the appropriate person.

3  Q.   Do you remember that you had been absent on

4    July 31st and August 1st, the two days before

5    this Wednesday, August 2nd?

6  A.   No, I do not remember that.

7  Q.   You don't recall that you took six hours off

8    on July 31st and eight hours off on

9    August 1st?

10  A.   No, I don't remember that.

11  Q.   Would you dispute that if that's what Mr. Kim

12    recorded?

13  A.   I would have to see my records to see.

14  Q.   You and Sonechka didn't discuss that you had

15    just missed work prior to your receiving this

16    e-mail?

17  A.   No.

18  Q.   Well, do you acknowledge that your work was

19    behind --

20  A.   No.

21  Q.   -- when you received this e-mail?

22  A.   No.

23  Q.   I'm not asking you to acknowledge it was your

145

1      fault.  I'm just asking you if your work was

2      behind.

3  A.  No.  I understood you.

4  Q.  When you were out as a probationary employee,

5      who did your work?

6  A.  Sonechka or Nicole, to my knowledge.

7  Q.  Did you know that Sonechka stayed late on

8      several occasions to do your work when you

9      were out?

10 A.  I know Sonechka stayed late sometimes to do

11     her work as well as other things that Jay Kim

12     requested.

13 Q.  You're not aware that she needed to stay late

14     several times because you had been out of

15     work?

16 A.  No.

17 Q.  Did you understand from this e-mail on

18     August 2nd that Mr. Kim was dissatisfied about

19     this aspect of your work that's discussed in

20     here?

21 A.  No.

22 Q.  Did you understand that Sonechka was?

23 A.  No.

146

1    Q.    So you didn't take this as a criticism?

2    A.    No.

3    Q.    You didn't take it as a warning?

4    A.    No.

5    Q.    Were you keeping up with how many times you

6          were late, left early, or absent during your

7          probationary period?

8    A.    Yes, I was.

9    Q.    How were you keeping up with it?

10   A.    Either -- documenting and keeping notes of

11         absentee forms, request-off forms.

12   Q.    Did you keep any records to yourself that you

13         did not turn in?

14   A.    No.

15   Q.    You didn't make notes on your calendar or on

16         any paper at home?

17   A.    No.

18                    MR. BARNETT:  Where did the folder

19                go from the 16th?  That's all

20                right.  Just keep them out.  I

21                may need them.

22             MS. SMITH:  Okay.

23             MR. BARNETT:  Give me the next one.

147

MS. SMITH:  Here's the others.

Which one are you wanting?

MR. BARNETT:  Whichever one came

after August 2nd.

(Off-the-record discussion.)

(Defendant's Exhibit Number 18 marked

for identification.)

Q.  All right.  Let's take a look at Exhibit 18,
which purports to be an e-mail from Jay Kim to
you dated August 2nd, the same date as
Exhibit 17.  Do you recall receiving this
e-mail?

A.  Yes.

Q.  Does the first part refresh your recollection
that you had been out --

A.  Yes.

Q.  -- prior to August 2nd?

A.  Yes.

Q.  Do you now recall that you had been out on the
last day of July and the first day of August?

A.  Yes.

Q.  Do you recall the reason?

A.  Yes.

148

1    Q.    And the reason was what?

2    A.    I became ill at work and had to be immediately

3          taken to the doctor.

4    Q.    All right.  Did that have to do with dizziness

5          and nausea?

6    A.    Yes.

7    Q.    Now, you've had problems with that before,

8          haven't you?

9    A.    Yes.

10   Q.    Do you have any reason to believe this had

11         anything to do with your pregnancy?

12   A.    No.

13   Q.    All right.  Did you take this as a statement

14         from Jay -- first of all, did you believe that

15         he hoped you were getting better?  Did you

16         believe the first sentence?

17   A.    It didn't come across my mind.  To me it was

18         just a statement.

19   Q.    Did you like Jay Kim?

20   A.    Yes.

21   Q.    Did you like working for him?

22   A.    Yes.

23   Q.    Did you ever explore other job opportunities

149

1          while you were working at Mobis?

2     A.   I don't remember doing so.

3     Q.   Well, did you consider exploring other job

4          opportunities?

5     A.   No.

6     Q.   Now, he's telling you there's a bunch of

7          documents that should have been filed.  Did

8          you understand that to mean he thought you

9          were behind?

10    A.   No.

11    Q.   Okay.  What did you take that to mean?

12    A.   That since I've been out things are on my

13         desk, to go back through and get them out.

14    Q.   But --

15    A.   To reorganize it.

16    Q.   They were -- the things that needed to be

17         filed were not filed because you had been out,

18         right?

19    A.   Because I was out and no one else had entered

20         the invoices.

21    Q.   Well, was there anybody designated to do your

22         work when you were out?

23    A.   It either went to Sonechka or Nicole.

150

1    Q.    Did you understand from the second sentence

2          there, or the last paragraph, that Mr. Kim was

3          keeping up with your absences and that he

4          wanted you to document them?

5                 MS. LEONARD:  Object to form.  The

6                    document speaks for itself as to

7                    what he was communicating.

8                    You can answer.

9    Q.    With respect to that last sentence, what did

10         you take from that?

11    A.    He just needed documentation, doctor notes,

12         and my make-up schedule.

13    Q.    Let me show you what I've marked as

14         Exhibit 19.  I'll ask you to take a look at

15         that, Ms. Hunter.  It's an e-mail.

16                 MS. SMITH:  You've already done that

17                    one.

18                 MS. LEONARD:  Yes, this one is

19                    already done.

20                 MR. BARNETT:  I've already done

21                    that?

22                 MS. LEONARD:  Yes.

23                 MR. BARNETT:  Is that a duplicate?

1              MS. LEONARD:  But you did it

2                   earlier.  In your defense, I

3                   think you took it out of order.

4    A.   It was 10.

5              MS. SMITH:  It was 10.

6              MS. RIEDLER:  Can't you just --

7    Q.   Well, look at 10 --

8              MS. RIEDLER:  -- reference Number

9                   10?

10   Q.   -- and give me -- if you'll give me that one

11        back and get 10 before you I'll save the

12        sticker to keep from getting out of order.

13             MR. BARNETT:  Can you find 10 for

14                  me?

15             (Off-the-record discussion.)

16   Q.   All right.  Yours is Exhibit -- look at your

17        Exhibit 10.

18             (Off-the-record discussion.)

19   Q.   Forgive me if I've already asked this

20        question.  But when you received this e-mail

21        on August 10th, that's what it would

22        indicate -- the middle -- see the middle

23        sending from Sonechka to you --

152

```
 1    A.    Uh-huh (positive response).

 2    Q.    -- with a copy to Jay, August 10th at

 3          10:06 a.m.?  Do you see that?

 4    A.    Yes.

 5    Q.    Did you and Sonechka discuss this?

 6    A.    Yes, we had discussed it prior.  But when

 7          I -- the e-mail on -- on the 9th.

 8    Q.    All right.  So the way -- I understand now.

 9          You're saying your 9th, August 9th, e-mail at

10          the top is in response to a conversation that

11          y'all had had?

12    A.    Yes.

13    Q.    And was it on the same subject as her

14          August 10th e-mail to you, Exhibit 10?

15    A.    Yes.

16    Q.    It says:  We completely understand your health

17          condition.  What did you think that to mean?

18    A.    At that time it was due to the fact that she

19          knew of my pregnancy.

20    Q.    And he knew, Jay Kim knew too, didn't he?

21    A.    Yes.

22    Q.    Did he ever tell you anything different, to

23          the effect that he was unhappy with the fact
```

153

| | | |
|---|---|---|
| 1 | | that you were pregnant? |
| 2 | A. | He didn't say word of mouth, but by his |
| 3 | | reaction. |
| 4 | Q. | Did he ever say anything to you that made you |
| 5 | | fear or believe that he was displeased or |
| 6 | | unhappy about the fact that you were pregnant? |
| 7 | A. | Yes. |
| 8 | Q. | And what was that? |
| 9 | A. | After telling him, his comment of what? |
| 10 | Q. | Anything else? |
| 11 | A. | No, that's it. |
| 12 | | (Off-the-record discussion.) |
| 13 | | (Defendant's Exhibit Number 19 marked |
| 14 | | for identification.) |
| 15 | Q. | All right.  Let's look at exhibit -- are we at |
| 16 | | 19 finally? |
| 17 | | MS. SMITH:  Yes. |
| 18 | | MS. LEONARD:  Yes. |
| 19 | Q. | Do you remember receiving Exhibit 19? |
| 20 | A. | Yes. |
| 21 | Q. | Was this any cause for concern to you, this |
| 22 | | e-mail? |
| 23 | A. | Yes. |

154

1    Q.    And what was the cause for concern?

2    A.    Because Jay was still speaking of a situation

3          of me bringing in my daughter after we had

4          already spoken about it.

5    Q.    Did you expect him to change the policy for

6          you?

7    A.    No, I expected him to do what he said he was

8          going to do.

9    Q.    And that was?

10   A.    He was willing to work with me.

11   Q.    Well, would that have given you better

12         treatment, to your knowledge, than other

13         people who had to drop off their children at a

14         certain time?

15   A.    No.

16   Q.    That would not have been better treatment for

17         you?

18   A.    No.

19   Q.    Or special treatment?

20   A.    Because I was the only one in the department

21         with children as far as having to drop them

22         off.

23   Q.    What about other people at Mobis?  Do you know

155

| | | |
|---|---|---|
| 1 | | whether any other people at Mobis had |
| 2 | | problems? |
| 3 | A. | I didn't know any other person's situation. |
| 4 | Q. | Are you feeling okay physically? |
| 5 | A. | Uh-huh (positive response). |
| 6 | Q. | Did the second paragraph give you any concern |
| 7 | | about your attendance record? |
| 8 | A. | Yes. |
| 9 | Q. | All right.  Tell me about your concern. |
| 10 | A. | It was with the entire situation as far as |
| 11 | | talking with Jay earlier about my child's |
| 12 | | departure, going to school, dropping her off; |
| 13 | | and that to me, when we spoke about it in his |
| 14 | | office, it was already supposed to be |
| 15 | | resolved. |
| 16 | Q. | Well, weren't there other absences prior to |
| 17 | | the 14th that she could have been referring |
| 18 | | to?  Were you absent on August 11th, for |
| 19 | | instance? |
| 20 | A. | I don't remember. |
| 21 | Q. | You don't remember half a day for a doctor's |
| 22 | | appointment on the 11th? |
| 23 | A. | It wasn't a complete half a day.  Sometimes |

156

1      the doctor's office was about an hour, come

2      back, and work the rest of the time off.  And

3      Jay would sometimes -- when you clock in, he

4      would go by one watch; and when you clock

5      out -- well, not clock out, but leave, he'll

6      go by another.  So his watch was always either

7      five or ten minutes faster.  And it was made

8      known that if -- we even talked about it one

9      day coming in.  And he was like that with

10     everybody.

11  Q.  He was what?

12  A.  He was that way with everybody, where he would

13     watch his watch coming in and going out.  You

14     had to go by the monitor time, which was

15     either five or ten minutes slower than his

16     watch.  And it was addressed at one time when

17     we all laughed about it.

18  Q.  A monitor?

19  A.  Yes, Jay Kim, he would --

20              MS. RIEDLER:  You're not talking

21                  about like a physical monitor?

22              THE WITNESS:  No, the monitor on

23                  your computer.

1              MS. RIEDLER:  Oh.

2    Q.    To your knowledge, is it true that Jay Kim had

3          excused quite a few instances concerning your

4          attendance as she stated there in the first

5          sentence in paragraph two.

6    A.    Yes.  And as we spoke about that, it was to

7          the fact that prior to me sitting down, coming

8          to him telling him about my situation with my

9          daughter and then traveling from Eastern

10         Boulevard all the way out there.

11   Q.    I'm not sure I understood.  What did you just

12         say?

13   A.    By -- I took this information, what she has

14         given me here, and wrote in this e-mail

15         concerning my attendance and tardiness to the

16         fact of our prior conversation with Jay Kim

17         and myself, telling him about my daughter,

18         dropping her off and handing him the

19         handbook.

20   Q.    That's what you took this to be referring to?

21         Is that what you're saying?

22   A.    Yes.  With the excused -- prior excused, as it

23         states here.

1    Q.    Okay.  And that would be tardiness, right?

2    A.    Yes.

3    Q.    Did you and Sonechka discuss this e-mail?

4    A.    Yes.

5    Q.    What was said?

6    A.    To the point where I questioned her again as

7          far as what Jay -- and she said he just came

8          to her again, even after our conversation with

9          me going in there with her, sitting down

10         talking to him in regards to my daughter and

11         the drop off and giving him the handbook of

12         the school.

13   Q.    Do you disagree that Jay Kim is entitled to

14         require you to be at work at eight o'clock?

15   A.    No, I do not disagree.

16   Q.    You just thought he should have given you

17         slack there?

18   A.    No.  By what he stated that he would do, he

19         didn't do.

20   Q.    And he said that way back, right?

21   A.    Yes.

22   Q.    And that was -- refresh my recollection when

23         that was.

159

1    A.    It was prior to this e-mail.  I don't remember

2          when, even before August the 9th.

3    Q.    Did Sonechka tell you on or about August the

4          14th that Jay Kim had asked her to, basically,

5          tally up your attendance since you became a

6          ninety-day probationary employee?

7    A.    No, I don't remember.

8    Q.    Did you know that -- well, you knew, of

9          course, your ninety-day probationary period

10         was coming up sometime around -- well, after

11         ninety days, after June 6th, right?

12   A.    Correct.

13   Q.    Were all of the times you missed work during

14         your probationary period necessary?

15   A.    Yes.

16   Q.    Did you ever discuss with any of your doctors

17         coming in early or late so that it wouldn't

18         count against you at work?

19   A.    No.

20               (Off-the-record discussion.)

21   Q.    What day did you have that procedure done, the

22         stitch procedure, the cerclage?

23   A.    August the 11th, on Friday.

160

1   Q.   And you said that you were not out, I believe,

2         on one of the days that I had on an attendance

3         chart.

4                MS. RIEDLER:   The 14th.

5   Q.   The 14th?

6   A.   Correct.

7            (Off-the-record discussion.)

8   Q.   How long did you plan to work at Mobis?

9   A.   Actually, I expected for it to be a career in

10        accounting.

11   Q.   Pardon?

12   A.   I expected for it to be a career in

13        accounting.

14   Q.   I'm still not hearing the first part of it.

15   A.   I expected for it to be a career in

16        accounting.

17   Q.   You expected it to be a career in accounting?

18   A.   Yes.

19   Q.   At Mobis?

20   A.   Yes.

21   Q.   Did you ever tell anybody that you were

22        thinking about looking elsewhere or that you

23        did not want to stay there long-term?

1    A.    No.

2    Q.    Do you want to go back to work at Mobis?  Do

3          you want the Court to reinstate you at Mobis

4          under Jay Kim?

5    A.    No, thank you.

6    Q.    Do you want to go back to work at Mobis in any

7          job?

8    A.    No.

9    Q.    At any time did you assure Sonechka that there

10         would be no more attendance problems?

11   A.    I don't remember doing so.

12   Q.    Did you set your mind or make your mind up

13         that there would be no more attendance

14         problems after your temporary -- or no more

15         attendance issues after your temporary

16         employment?

17   A.    Yes.

18   Q.    And what did you do in that regard?

19   A.    That's when I spoke with Jay Kim in regards to

20         the issues with my daughter about her school.

21   Q.    Okay.  And that would be him waiving those

22         tardies, right?

23   A.    Him being able to work with me as he stated he

162

1          would and also getting up earlier.

2      Q.   On some of these days you were tardy taking

3           your child to school, did you ever get there

4           after seven-thirty?

5      A.   Sometimes I did.

6      Q.   Okay.  And was that because you just didn't

7           get up early enough?

8      A.   No.

9      Q.   Why were you late getting your child to

10          school?

11     A.   Traffic.

12     Q.   Well, if you left earlier, was there any

13          reason you couldn't have gotten there by

14          seven-thirty?

15     A.   Traffic.

16     Q.   Are you speaking of wrecks or just traffic?

17     A.   Traffic.  And plus the area where I was living

18          had a train that came.  The earliest that I've

19          seen it, it was seven-fifteen, seven-twenty --

20          well, seven o'clock, seven-fifteen.  So,

21          therefore, if I get caught in there, it

22          delays.

23     Q.   How long did the train keep you blocked on

163

1       average?

2   A.   I really didn't sit and count, but it -- I

3       would say more than five minutes sometimes

4       would go by.

5   Q.   So you're saying some of the reasons you were

6       late -- some of the times you were late in

7       terms of getting your child to school after

8       seven-thirty were because of a five-minute

9       train?

10  A.   Yes.  At seven-thirty, my child -- if she was

11      not eating, she could not go.  She has to --

12      if she was eating breakfast, she can go there

13      at seven-thirty.  If not, they were asked to

14      come no later -- no earlier than seven-fifty.

15      So if she did not go in the lunchroom and eat

16      breakfast, she couldn't have --

17  Q.   So sometimes you took her in at seven-fifty?

18  A.   Uh-huh (positive response).  I would let her

19      out at seven-fifty, out of the car.

20  Q.   What percentage of the time did you take her

21      in at seven-fifty as opposed to seven-thirty?

22  A.   It wasn't a lot due to the fact I had to try

23      to be at work at eight o'clock.

164

1    Q.    Well, while you were working at Mobis, about

2          how many times did you take her in at

3          seven-fifty?

4    A.    I don't remember.

5    Q.    Five?

6    A.    I don't remember.

7    Q.    Did that happen during your probationary

8          period?

9    A.    Yes.

10   Q.    Ms. Hunter, you knew about the three -- the

11         three issues -- three attendance incidents

12         policy, right?

13   A.    I read about them, yes.

14   Q.    And you knew that by getting to work late or

15         leaving early or not coming to work that you

16         were violating that policy, right?

17   A.    Correct.

18   Q.    And you knew that it was no-fault in the sense

19         that it didn't matter whether you had a good

20         reason or no reason, right?

21   A.    Not by Jay Kim's word, no.

22   Q.    But you knew it was no-fault?

23   A.    I knew it was written, yes.

165

1    Q.    Well, did Sonechka tell you it was no-fault?

2    A.    The handbook.

3    Q.    Do you know what no-fault means?

4    A.    No.

5    Q.    Well, you knew that the rule meant there were

6          no excuses, right?  There was no excused

7          lates -- I mean, tardies, leave earlies, or

8          absences, right?

9    A.    By the handbook.

10   Q.    Did you consider moving closer to Mobis?  If

11         I've asked you that, forgive me.  It's been a

12         long day.

13   A.    Yes, I did.

14   Q.    And you decided not to because?

15   A.    I didn't decide not to.  I just moved into

16         River Parkway when I moved there.  And I had

17         just signed a lease.

18   Q.    When Jay said he would work with you -- and

19         I've gotten a little tired.  Did you ever put

20         a timetable on when he told you that?

21   A.    It was before August 9th, so I would say it

22         was around July sometime when I first spoke

23         with him.

1    Q.    And I have really forgotten what your earlier

2          testimony was.  But was that when you had been

3          there for about two months?  Am I remembering

4          right?

5    A.    As far as a full-time position?

6    Q.    Yes.

7    A.    June, July, that wasn't even a month and a

8          half.

9    Q.    And what was the subject matter of that

10         conversation, when he said he would take care

11         of it?

12   A.    The matter was due to the fact of me coming in

13         late maybe five minutes, ten minutes, due to

14         me dropping off my daughter.

15   Q.    And did you expect him to waive those tardies

16         just indefinitely?

17   A.    No, just by what he stated to me.

18   Q.    But did you expect him to take care of you

19         with regard to those tardies?

20                   MS. LEONARD:  Object to form.  Asked

21                       and answered.

22                       You can answer.

23   A.    I expected him to do what he told me he would.

167

1   Q.   No matter how long it went on?  No matter how

2        long you continued to be late?

3                 MS. RIEDLER:  Forever?  I mean --

4   A.   It wasn't a time put on it.

5   Q.   How did your child get home from school?

6   A.   I would go pick her up.

7   Q.   And what time did you --

8   A.   No.  Yes.  I'm sorry.

9   Q.   Is that every day?

10  A.   Yes.

11  Q.   Most every day?

12  A.   Uh-huh (positive response).

13  Q.   What time did you pick her up?

14  A.   Around five-thirty, five forty-five.

15  Q.   What time did she get out of school?

16  A.   Three.

17  Q.   What did she do between three and when you

18       picked her up?

19  A.   Good Times Center, the after-school program.

20  Q.   Did you have to pay for that?

21  A.   Yes.

22  Q.   How much was that?

23  A.   I don't remember.  I think it was around

1       sixty-five dollars.

2    Q.    Sixty-five dollars for how long?

3    A.    A week.

4    Q.    Would that -- could you use it for partial

5          weeks?

6    A.    No.

7    Q.    So if you paid the sixty-five dollars, you

8          could do it for a whole week?

9    A.    Yes.

10   Q.    And what was the deadline to pick up your

11         child under Good Times?

12   A.    Six.

13   Q.    Six?

14   A.    Yes.

15   Q.    How often did you work past five o'clock while

16         you were a probationary employee?

17   A.    Quite a few.

18   Q.    Can you give me an estimate?

19   A.    No.

20   Q.    More than five?

21   A.    Yes.

22   Q.    More than ten?

23   A.    Yes.

169

1   Q.   When you stayed late, what was the -- did you

2         have any typical amount of time that you

3         stayed late?

4   A.   No more than fifteen, because sometimes it

5         would take me just that long to get back over

6         to pick her up.

7   Q.   No more than fifteen minutes?

8   A.   Yes.

9   Q.   You couldn't stay more than fifteen minutes

10        late because of your child, the obligation to

11        pick up your child?

12   A.   Correct.

13   Q.   Were you living with Mr. Coley at the time?

14   A.   Yes.

15   Q.   And you said he wasn't working?

16   A.   Correct.

17   Q.   Did you ask him to pick up your child?

18   A.   He didn't have a car.  I had the car.

19   Q.   Were your parents working at the time?

20   A.   Retired.  No.

21   Q.   Was there any reason they could not have

22        picked up your child?

23   A.   Sometimes they did.

170

1    Q.    And tell me again, was there any reason your
2          child could not have ridden the school bus?
3    A.    After moving, she was not zoned for that
4          school.  And I took her to that school until
5          after the school year.
6    Q.    All right.  When did you move so that she
7          couldn't ride the bus?
8    A.    April.
9    Q.    About a month after you started at Mobis?
10   A.    Uh-huh (positive response).
11   Q.    Had you already been -- had the tardies
12         already been mentioned to you when you changed
13         the school zone?  Had Mobis -- had anybody at
14         Mobis already mentioned those tardies to you?
15   A.    Yes.
16   Q.    So that was just a risk you had to take --
17   A.    Uh-huh (positive response).
18   Q.    -- in moving out of the school bus district?
19   A.    Yes.
20   Q.    What school were you zoned for after you
21         moved?
22   A.    I believe it was Chisholm.
23   Q.    And was there any reason you did not move her

171

1          to Chisholm?

2     A.   Because that was not an appropriate school.

3     Q.   Just the school's overall reputation?

4     A.   Yes.

5     Q.   Did your child -- what did your child do

6          during the summer of 2006 during the day?

7     A.   She went -- she went to her dad's.

8     Q.   Was he no longer living with you?

9     A.   That wasn't her father.

10    Q.   Sorry about that.  All day?

11    A.   She went the whole summer.

12    Q.   To his home?

13    A.   Yes.

14    Q.   So there weren't any school-related tardies

15         after she got out of school?

16    A.   Correct.

17    Q.   And that was May when?  May what?

18    A.   Did they get out in May during that time?  I'm

19         not sure when they got out.  It was either May

20         or in June.

21    Q.   So tardies relating to your daughter's school

22         schedule became a non-issue after she got out

23         of school, right?

172

```
 1    A.    It was maybe one or two that I remember after

 2          the school issue due to the fact of just

 3          traffic.

 4    Q.    Okay.  But it wasn't because of your daughter,

 5          right?

 6    A.    No.

 7    Q.    How did she get to her daddy's house?

 8    A.    He came and picked her up.

 9    Q.    At your home?

10    A.    Yes.

11    Q.    But you still got there late a couple of times

12          or -- on some occasions after she was out of

13          school due to traffic?

14    A.    Yes.

15    Q.    She did not go to summer school of any kind

16          during the summer of '06?

17    A.    I don't remember her going to summer school,

18          no.

19    Q.    Did she go to any Y programs like Good Times

20          or any programs at the YMCA or anyplace like

21          that?

22    A.    No.

23    Q.    And her father was not working in the summer
```

```
 1        of '06?

 2   A.   He was working.

 3   Q.   Pardon?

 4   A.   He was working.

 5   Q.   All right.  You have to speak up just a little

 6        bit, because I'm hard of --

 7   A.   He was working.

 8   Q.   -- hearing and your voice is soft.

 9             Who took care of her during the day if he

10        was working?

11   A.   She went with him.

12   Q.   Where was he working?

13   A.   Construction.

14   Q.   Did he move from job to job or did he have a

15        place that he went every day?

16   A.   Sometimes he had different situations.  I'm

17        not really exact what -- what he did.

18   Q.   Did the school your daughter was going to

19        offer any before-school care?

20   A.   Yes.

21   Q.   For people who couldn't make it work dropping

22        them off at seven-thirty?

23   A.   Yes.
```

174

Q.   And what was the name of that program?  Was
     that Good Times?

A.   Good Times.

Q.   Did you ever utilize that?

A.   No.

Q.   Why not?

A.   I couldn't afford it.

Q.   How much did that cost?

A.   About the same.

Q.   For sixty-five dollars a week you only got one
     or the other; you didn't get both?

A.   No.

Q.   Did you ever discuss before-school care at
     Good Times with your husband -- with her
     father in terms of him helping pay for that?

A.   Yes.

Q.   And what did he say?

A.   He was already giving child support.  He
     wouldn't give any extra.

Q.   He wouldn't or couldn't?

A.   Wouldn't.

Q.   Do you think he could have?

A.   Yes.

175

1    Q.    Is he married?

2    A.    No.

3                    MR. BARNETT:  Do y'all want to take

4                         another ten-minute break?  I

5                         think we've been at it about an

6                         hour, haven't we?

7    Q.    Before we break, is there any part of your

8          testimony you want to change or add to?

9    A.    Not that I can think of right now.

10   Q.    Okay.

11                   (Pause in proceedings.)

12   Q.    (Mr. Barnett continuing) Tell me about the

13         events of August 24th when you said in either

14         your answers to interrogatories or in some

15         document that you saw meetings going on in

16         Jay Kim's office that day, the day before you

17         were terminated.

18   A.    Just he had Sonechka and Hosang in the office

19         pretty much all day.  What they were

20         discussing I didn't know until Sonechka came

21         out right prior to me leaving, getting ready

22         to leave that day.

23   Q.    And what did she tell you that they had been

1       discussing?

2  A.   She didn't go into detail, but she told me

3       that Jay was thinking about terminating me.

4       And she said she wasn't against -- she wasn't

5       for it.  And they -- her and Jay had been

6       having it out, and Hosang, all day.  And she

7       mentioned the fact that it was only just

8       because I was pregnant.  Because it was out of

9       the blue, nothing had been said to her about

10      my performance, nothing derogatory.  Because

11      all of the things that I was doing for the

12      department and also for Jay personally,

13      nothing had been said.

14  Q.   So she told you it was out of the blue even

15      though she had sent you e-mails saying that

16      you needed to watch your attendance during the

17      ninety-day probationary period?

18  A.   Correct.

19  Q.   She didn't -- and I think I've asked you

20      this.  But she didn't say that Jay Kim

21      admitted it was because of pregnancy?

22  A.   No.

23  Q.   What else did you and Sonechka or Hosang

1    discuss after those meetings that you saw

2    going on --

3 A.   She just told me --

4 Q.   -- on the 24th?

5 A.   -- to just come back tomorrow and she will

6    see.  She will sit back in with him and talk

7    to him.

8 Q.   Do you know if she did?

9 A.   She went back into his office.  And then at

10    that time, I approached Sonechka and told her

11    I would like to meet with -- meet with Jay and

12    her.

13 Q.   All right.  Did she arrange that?

14 A.   Yes.

15 Q.   How long did it take for her to do that after

16    you asked?

17 A.   Not long.

18 Q.   All right.  Tell me everything that was said

19    in that meeting.  And that would be the 25th,

20    right?

21 A.   Correct.  I went --

22 Q.   Now, first it was you, Sonechka, and Jay,

23    right?

1    A.    Correct.

2    Q.    Where?

3    A.    In Jay's office.

4    Q.    All right.  Tell me everything that was said

5          in there.

6    A.    I asked Jay why had he been so different

7          towards me, why hasn't he been talking to me

8          as he stated -- talked to me before?  What was

9          the problem?  And Jay replied -- he just said,

10         I don't know what's up.  I don't know.  What's

11         up with you?  I said, what's going on, Jay?

12         He said, I don't know what's up.  And when I

13         asked him -- I said, okay, what's going on

14         with you as far as your demeanor towards me?

15         You've changed.  You won't come my way.  You

16         won't look at me.  You won't talk to me.

17         Everything is by Sonechka only.

18              And then he -- he sat there for a

19         minute.  And then he said, I can't afford to

20         take care of an employee like you.

21    Q.   I can't what?

22    A.   Take care of a -- I can't take care of an

23         employee like you.

179

1    Q.    Okay.

2    A.    I asked him what that meant.  He just

3          (indicating).  I can't -- I don't know.  I

4          just can't afford to take care of an employee

5          like you.

6    Q.    What else did you say and what else did he

7          say?

8    A.    Then, once again, I asked him to explain.  And

9          then that's when Sonechka started speaking.

10   Q.    I'm sorry.  I missed the first part.  Who

11         asked who to explain?

12   A.    I asked him to explain what he meant by that.

13         And he ignored the question.  And Sonechka

14         started speaking with him, also said in his

15         face that it was only just because I was

16         pregnant.  And all Jay could do is just get up

17         and go to Tracy's office.  And then the next

18         time him and Tracy came back.

19   Q.    You were raising your voice at him, weren't

20         you?

21   A.    No, I was not.

22   Q.    Did it become a heated discussion?

23   A.    No.

180

1    Q.    Did you make accusations against him that it

2          was because of your pregnancy?

3    A.    No.

4    Q.    Do you know whether or not Tracy Riedler was

5          supposed to be in the termination meeting?

6    A.    To my knowledge, it wasn't a termination -- it

7          wasn't -- he said he just -- he just went and

8          got Tracy, so I'm not sure.

9    Q.    Didn't he tell you before he got Tracy that

10         your probationary period was coming up and

11         that he was going to terminate your

12         employment?

13   A.    No.  Jay Kim did not.

14   Q.    So all he said, that you can remember, is that

15         he couldn't take care of a person like you, or

16         an employee like you?

17   A.    Yes.

18   Q.    Did he have anybody else working under him

19         that had as many attendance incidents as you

20         did?

21   A.    I'm not sure what everybody else's attendance

22         issues were.

23   Q.    And you don't recall whether -- you don't

181

1          think there was anybody else still on

2          probation at that period of time?

3    A.    No.

4    Q.    All right.  And then Tracy came in.  Do you

5          remember Jay motioning for Hosang to go get

6          Tracy Riedler?

7    A.    No.

8    Q.    Your testimony is that Jay left the room to

9          get her?

10   A.    Yes.

11   Q.    You're sure of that?

12   A.    Yes.

13   Q.    What happened?  Who said what when

14         Tracy Riedler came in the room?

15   A.    Jay just -- I don't remember who started

16         first, but I know Tracy went on and started

17         discussing attendance issues and some other

18         things she was saying.

19   Q.    What did she say?

20   A.    I don't remember specifically.  It was just

21         about attendance, and that's the reason why I

22         was being terminated.

23   Q.    Well, you wrote a letter to the EEOC on

182

1              August 28th, 2006, did you not?

2      A.     Yes.

3      Q.     And that was just three days after you were

4             terminated, right?

5      A.     Correct.

6      Q.     And you said, he brought Tracy Riedler into

7             his office after a heated conversation about

8             his decision to explain to me why he was

9             taking those actions.

10                So there was a heated conversation,

11            wasn't there?

12     A.     To a point where -- what he said to me.

13     Q.     Well, you said in your letter three days after

14            it happened that you informed him -- let's

15            see.  That you told him that --

16                    MS. LEONARD:  May I show her a copy

17                         just while you're reading so she

18                         can see it?

19                    MR. BARNETT:  Yes.  She can have

20                         it.

21                    MS. LEONARD:  Look at this

22                         highlighting.  He's somewhere

23                         around in here (indicating).

183

Q.   You say in here -- well, I'll give you a

     chance to read it.

                    MR. BARNETT:  Do you want to make

                         that an exhibit?

                    MS. SMITH:  It's going to be 20.

                    MS. LEONARD:  If you want to make

                         that an exhibit, that's fine.

                    MR. BARNETT:  I think we've got one.

                    (Off-the-record discussion.)

                    (Defendant's Exhibit Number 20 marked

                         for identification.)

Q.   I have given you Exhibit 20, Ms. Hunter, which

     is a letter dated August 28, 2006 from you

     to -- well, I'm not sure who it is to.

          Did you write this letter?

A.   Yes.

Q.   Who did you send this to?

A.   EEOC.

Q.   All right.  So according to your letter,

     before Tracy was brought in the room on

     August 25th, you confronted him about

     pregnancy discrimination, right?

A.   No.  It states in the letter that I went in to

184

```
 1        confront him in regards to how he was treating
 2        me.
 3   Q.   Well, it says, I told him that I had noticed
 4        his actions towards me, and that since I
 5        informed him of being pregnant he has
 6        changed.  And he began by stating various
 7        excuses and not the reasons and then explained
 8        to me that my probationary period was ending
 9        September the 2nd, '06, per Tracy Riedler, and
10        that I was now terminated at Mobis.
11   A.   Correct.
12   Q.   Those are your words, right?
13   A.   Correct.
14   Q.   And this was before Tracy came in the room,
15        right?
16   A.   Correct.
17   Q.   So you were accusing him of firing you because
18        of your pregnancy, weren't you?
19   A.   No.  As it states here, I confronted him in
20        regards to how he was treating me -- treating
21        me due to the fact that I told him I was
22        pregnant.  So it wasn't as if I was coming off
23        to him.  It just states -- simply states what
```

1          I went in to ask him.

2     Q.   Well, you had already made up your mind that

3          it was your pregnancy that was causing you to

4          be terminated, hadn't you, before you even met

5          with him on the 25th?

6     A.   That was coming up to that point.

7     Q.   Pardon?

8     A.   It wasn't actually agreed to until after he

9          said what he said.

10    Q.   What wasn't agreed to?

11    A.   That wasn't -- it was an assumption until

12         after meeting with him.

13    Q.   That it was pregnancy that --

14    A.   Yes.

15    Q.   -- caused him to terminate you?

16    A.   Yes.

17    Q.   And what was it during this meeting that made

18         it more than an assumption on your part?

19    A.   When he said he could not afford to take care

20         of an employee like me.

21    Q.   But he didn't mention anything about you being

22         pregnant, did he?

23    A.   No.

186

1    Q.   Have you ever heard him use that expression
2         before?
3    A.   What expression?
4    Q.   Take care of someone?
5    A.   No.
6    Q.   Well, he said he would take care of you
7         before, right?
8    A.   Yes.
9    Q.   So you had heard it in the positive rather
10       than the negative, right?
11   A.   The way you just asked me, that he wouldn't
12       take -- he couldn't take care of an --
13   Q.   Okay.  Yes.  I'm not meaning --
14   A.   -- employee I have not heard.
15   Q.   But you had heard him say "take care of" --
16   A.   Yes.
17   Q.   -- in reference to an employee before?
18         All right.  So after all of that was said
19       that you laid out here, he got Tracy Riedler
20       into the room; is that right?
21   A.   Correct.
22   Q.   And she explained to you the ninety-day
23       probationary rule, which you already knew

1        about, right?

2   A.   That I read about, correct.

3   Q.   Then you said it contradicted their handbook.

4        What part of the handbook does it contradict?

5   A.   That it states in there even if you're ill,

6        for whatever reason, you'll be terminated.

7   Q.   I'm not sure I understand the answer.

8        What was it about Tracy Riedler's

9        statements to you when she said -- what was it

10       about this ninety-day policy that she

11       explained to you that contradicted the

12       handbook?

13  A.   The fact that she said regardless if you're

14       sick, whatever it was, whatever issue, being

15       pregnant, that it --

16  Q.   Or ill?

17  A.   -- contradicts. Or ill.

18  Q.   All right.  Now, what part of the handbook

19       says that you won't be terminated for absences

20       due to pregnancy or illness during your

21       probationary period?

22  A.   It doesn't.

23  Q.   Okay.  Then you said, Tracy had been known to

188

| | | |
|---|---|---|
| 1 | | terminate pregnant women before just because |
| 2 | | of being pregnant -- |
| 3 | A. | Correct. |
| 4 | Q. | -- and that hadn't been there an entire year. |
| 5 | | That's all based on just rumors that you heard |
| 6 | | from Sonechka and others, right, in terms of |
| 7 | | her reasons for terminating people? |
| 8 | A. | Correct. |
| 9 | Q. | And we've talked about -- we're still talking |
| 10 | | about just those two individuals, right? |
| 11 | A. | Correct. |
| 12 | Q. | Gordon and Jefferson? |
| 13 | A. | Correct. |
| 14 | Q. | Okay.  Was pregnancy discussed while |
| 15 | | Tracy Riedler was in the room? |
| 16 | A. | I don't remember. |
| 17 | Q. | Was there anything said in that meeting |
| 18 | | attended by you, Sonechka, Jay, and Tracy that |
| 19 | | you have not told me about, either in this |
| 20 | | letter or in your testimony? |
| 21 | A. | At this time, I can't remember. |
| 22 | Q. | And you testified that it went from an |
| 23 | | assumption on your part that it was about |

189

1       pregnancy to, what, knowing that it was about

2       pregnancy after he said I cannot take care of

3       a person like you?

4   A.  It came to me on an assumption of how he

5       reacted, what was being said to me by

6       Sonechka, and what everybody had been telling

7       me from the beginning.

8   Q.  When did it ever become more than an

9       assumption on your part?

10  A.  That day when he told me that he could not

11      afford to take care of an employee like me.

12  Q.  Anything else besides that statement that made

13      it become more than an assumption?

14  A.  Just going back to his reactions toward me

15      after telling him.

16  Q.  Do you have any knowledge that Jay Kim has

17      ever admitted to anybody that he discriminated

18      against you on the basis of pregnancy?

19  A.  No.

20  Q.  Do you know what Sonechka Womack is going to

21      testify to when her deposition is taken?

22  A.  No, I do not.

23  Q.  Have you spoken with Wanda Davis --

190

```
1    A.    No.

2    Q.    -- since you left Mobis?

3    A.    Yes.

4    Q.    All right.  What did y'all discuss?

5    A.    Taxes.  Taxes.  Taxes.

6    Q.    Anything about this lawsuit?

7    A.    No.

8    Q.    Do you know what she's going to testify to?

9    A.    No.

10   Q.    Does she have any information about this

11         lawsuit, to your knowledge?

12   A.    She probably does.  I'm not sure.

13   Q.    How about Ken Ziegler?  Have you spoken to him

14         since you left?

15   A.    Yes.

16   Q.    Did you discuss your employment or this

17         lawsuit?

18   A.    No.

19   Q.    Do you know if he knows anything about your

20         termination or this lawsuit?

21   A.    He knows about my termination.

22   Q.    He worked in logistics, right?

23   A.    Correct.
```

191

1   Q.   Did he tell you that he was terminated?

2   A.   Yes.

3   Q.   Did he tell you why?

4   A.   No.

5   Q.   How about Nicole Boswell?  Have you spoken to

6        her since you left Mobis?

7   A.   Yes.

8   Q.   When and where and what did y'all discuss?

9   A.   I don't remember the last time I spoke with

10       her.  We just discussed as far as how she was

11       doing and how I was doing.

12  Q.   Did y'all discuss this lawsuit or your

13       employment or your termination?

14  A.   My termination.

15  Q.   And what did she say and what did you say?

16  A.   As far as just how things were since I was

17       gone, that they were still doing what they

18       were doing as far as discriminating against

19       other people or ...

20  Q.   What did she say about discriminating against

21       other people?  What did you ask her, if

22       anything?

23  A.   No, I didn't ask her.  She just stated as far

1    as how Jay Kim has been as far as towards her,

2    different situations, and other Mobis

3    employees.

4  Q.  Who is he discriminating against, according to

5    Nicole Boswell?

6  A.  It was talked about even before I left and

7    after I left as far as their -- Korean's

8    demeanor on women regardless.

9  Q.  Even Korean women?

10  A.  Yes.

11  Q.  So that would be -- did Jay Kim have a

12    demeanor problem with women?  Is that what

13    you're saying?

14  A.  Yes.

15  Q.  All women?

16  A.  He would always state as far as his country,

17    how his culture would react in a situation as

18    far as with -- towards women or towards a

19    particular situation.

20  Q.  Did he ever say anything degrading about

21    women?

22  A.  No.  I never heard him say anything degrading.

23  Q.  Okay.  He just talked about the differences in

193

| | | |
|---|---|---|
| 1 | | his culture and this culture about women? |
| 2 | A. | Correct. |
| 3 | Q. | Did he ever mention pregnancy? |
| 4 | A. | No. |
| 5 | Q. | But he never said anything -- well, what did |
| 6 | | he say about his culture and women? |
| 7 | A. | Women had no place to speak. |
| 8 | Q. | Did he endorse that?  Did he think that was |
| 9 | | good?  Did he say one way or the other? |
| 10 | A. | He wouldn't say.  I just remember his |
| 11 | | reactions towards Sonechka and the difference |
| 12 | | between Sonechka and Hosang, how he would |
| 13 | | relate to them.  And they were both managers. |
| 14 | Q. | Yes.  And Sonechka was not pregnant, was she? |
| 15 | A. | No. |
| 16 | Q. | Anything else between you and Nicole Boswell |
| 17 | | about -- |
| 18 | A. | No. |
| 19 | Q. | -- your discussions about -- that she might |
| 20 | | testify to or that she knows? |
| 21 | A. | No. |
| 22 | Q. | Okay.  Have you spoken with Dean Seales since |
| 23 | | you left Mobis? |

194

| | | |
|---|---|---|
| 1 | A. | Yes. |
| 2 | Q. | On what occasion and what did y'all talk |
| 3 | | about? |
| 4 | A. | On what my position is now that I hold, that |
| 5 | | we have to speak to make reservations. |
| 6 | Q. | Do you know what she -- what information she |
| 7 | | might have about this lawsuit? |
| 8 | A. | Not this lawsuit, no. |
| 9 | Q. | Same for Falandria Lee. |
| 10 | A. | I've seen her, but ... |
| 11 | Q. | Have y'all discussed your termination or this |
| 12 | | lawsuit? |
| 13 | A. | No. |
| 14 | Q. | Tamika Lee? |
| 15 | A. | No. |
| 16 | Q. | Natalie Crosskey? |
| 17 | A. | Never met.  Never met. |
| 18 | Q. | You don't know her or you haven't met her |
| 19 | | since you left Mobis? |
| 20 | A. | I met her after Mobis. |
| 21 | Q. | Do you know why your lawyer put her on this |
| 22 | | witness list? |
| 23 | A. | Because she was a -- she's a former Mobis |

195

```
1          employee.

2     Q.   Do you know what she might testify to?

3     A.   No.

4     Q.   Do you know that she was terminated by Mobis?

5     A.   Yes.

6     Q.   Did she tell you why?

7     A.   She didn't go into details.

8     Q.   What department did she work in?

9     A.   I'm not sure.

10    Q.   So she didn't work for Jay Kim, as far as you

11         know?

12    A.   No.

13    Q.   Well, was she pregnant when she was

14         terminated?

15    A.   No.

16    Q.   Are you better off now working where you work

17         than you were when you were working at Mobis,

18         in your opinion?

19    A.   As far as?

20    Q.   Well, are you happier where you are now?

21    A.   I'm content.   I'm content.

22    Q.   Were you ever happy and content at Mobis?

23    A.   Yes.
```

196

1    Q.    For what period of time?

2    A.    When I first started until this incident,

3          August 25th.

4    Q.    You were happy and content from the time you

5          first started until August 25th?

6    A.    Yes.

7    Q.    What's the birth date of your child?

8    A.    February 5th.

9    Q.    When were you first able to work after

10         February 5th?

11   A.    I went back two weeks after.

12   Q.    All right.  Let's see.

13                    (Off-the-record discussion.)

14   Q.    Your testimony is that you were happy and

15         content at Mobis until August 25th?

16   A.    Yes.

17   Q.    You testified earlier that you considered

18         having an abortion because of your employment

19         at Mobis?

20   A.    Correct.

21   Q.    Correct?

22   A.    Yes.

23   Q.    So your testimony still is you were happy and

1          content?

2     A.    Yes.

3     Q.    All right.

4                    (Off-the-record discussion.)

5     Q.    In your --

6                    MR. BARNETT:  Heather, in the

7                         supplemental interrogatory

8                         answers, in that chart --

9                    MS. LEONARD:  Which chart?

10                   MR. BARNETT:  This chart

11                        (indicating).

12                   MS. LEONARD:  The one of the places

13                        she looked for jobs?

14                   MR. BARNETT:  Yes.

15                   MS. LEONARD:  Yes.

16                   MR. BARNETT:  It says that -- Mobis

17                        6, '06 -- oh, I'm sorry.  Excuse

18                        me.  Until August '06.  I

19                        thought it was saying

20                        August 6th.  I've got you.

21                   MS. LEONARD:  That's all right.  I'm

22                        not saying that I didn't make a

23                        typo.  I'm a terrible typist.

| 1 | MR. BARNETT:  No, that's fine. |
| 2 | Q. | Why did you not work between August 25th, '06 |
| 3 | | and December '06 when you went to work for |
| 4 | | Hampton Inn? |
| 5 | A. | Because I was pregnant.  Nobody wanted to hire |
| 6 | | anybody that was pregnant. |
| 7 | Q. | Who turned you down? |
| 8 | A. | A professional temp agency, Professional |
| 9 | | Personnel.  And they actually stated that to |
| 10 | | me, due to the fact that I was pregnant. |
| 11 | Q. | Professional Personnel? |
| 12 | A. | Yes. |
| 13 | | MS. LEONARD:  Now, you should have |
| 14 | | told me that. |
| 15 | | MS. RIEDLER:  They stated that? |
| 16 | | THE WITNESS:  Yes. |
| 17 | Q. | Who is Professional -- is there a place of |
| 18 | | business called Professional Personnel? |
| 19 | A. | Yes.  It's also called Jobs -- Jobs in |
| 20 | | Alabama. |
| 21 | Q. | Who told you that at that agency? |
| 22 | A. | I didn't get her name.  She was a young lady |
| 23 | | that usually -- the one that -- the |

199

1   receptionist that always answered the phone.

2   I knew her voice, because I've dealt with them

3   several times before.

4 Q. Did they send you to any interviews?

5 A. No.

6 Q. Who else did you try to go through other than

7   Professional Personnel?  I take it that you

8   were just cut off by the receptionist because

9   you were pregnant; is that what you're telling

10   the Court?

11 A. Yes.

12 Q. Now -- and when I say the Court -- this is

13   considered part of the process.  What other

14   agency did you try to use between the time you

15   left Mobis and the time you went to

16   Hampton Inn?

17 A. I went back to Multi Staffing, Career

18   Personnel, and Blair.

19 Q. And what happened at Multi Staffing?

20 A. They were just surprised about the whole

21   situation, that I was still looking.

22 Q. Well, did they try to help you find a job?

23 A. At that time, I don't know what happened.  But

```
 1            the lady that I would speak to all of the
 2            sudden wouldn't return my calls.
 3      Q.    When did you first go -- when did you first
 4            attempt to get a job after August 25th?
 5      A.    August 26th.
 6      Q.    Where did you go?
 7      A.    To those places that I had been before the
 8            temp agencies.
 9      Q.    All of them on the 26th?
10      A.    I wouldn't say all on the 26th.  I don't know
11            what particular day, because I didn't write
12            down everything.
13      Q.    Do you remember which one you went to first?
14      A.    Career Personnel and Multi Staffing.
15      Q.    All right.  What happened at Career?
16      A.    Tracy just said if she found anything she'll
17            let me know.
18      Q.    Tracy?
19      A.    Yes.  McNeil.
20      Q.    Did you attempt to go directly to any
21            employers?
22      A.    Yes.
23      Q.    Who?
```

201

1    A.    I don't remember.  I don't remember.

2    Q.    You don't remember any?

3    A.    I went to the mall.  I went to a lot of the

4          clothing stores.  I can't say.

5    Q.    Which mall and which store?

6    A.    Eastdale Mall.

7    Q.    Did you fill out any applications?

8    A.    Yes.

9    Q.    With whom?

10   A.    Learners.  New York & Company.

11   Q.    I didn't hear you.

12   A.    New York & Company.

13   Q.    New York?

14   A.    Yes.

15   Q.    Is that --

16              MS. RIEDLER:  That's Learners.

17   A.    It's the other one.  Express.

18              MS. RIEDLER:  Express.

19   Q.    Express?

20   A.    Express.

21              MS. LEONARD:  E-X-P-R-E-S-S.

22   Q.    I've heard of Learners, but not Express.

23          Anybody else?

202

1   A.   A doctor's office.  I don't remember.  I just

2       got the newspaper and went down the list.

3   Q.   Did you apply for unemployment?  Well, I know

4       you did.  When did your benefits start?

5   A.   Without looking at information from them, I

6       don't remember.

7   Q.   Do you remember how much they were?

8   A.   I think -- if I remember correctly, it was

9       over two hundred dollars, I think.

10      Two O two.  I'm not sure.  Two O six.

11   Q.   So your first job after August 26th was at

12       Hampton Inn?

13   A.   Yes.

14   Q.   What were your duties there?

15   A.   I started out as front desk clerk.

16   Q.   And this says you were there from 12, '06 to

17       2007.  When did you leave Hampton Inn?

18   A.   April 2007.

19   Q.   All right.  And you were front desk?

20   A.   Not at -- not all of the time.  I started out

21       as front desk.

22   Q.   And then what did you do?

23   A.   Assistant general manager.

203

| | | |
|---|---|---|
| 1 | Q. | You left there voluntarily? |
| 2 | A. | Yes. |
| 3 | Q. | What hours did you work there? |
| 4 | A. | It varied. |
| 5 | Q. | It varied? |
| 6 | A. | Yes. |
| 7 | Q. | How did you arrange for child care? |
| 8 | A. | Actually, the owner allowed me to bring my |
| 9 | | daughter. |
| 10 | Q. | That would not have worked out well at Mobis, |
| 11 | | would it? |
| 12 | A. | No. |
| 13 | Q. | Taking a child to work? |
| 14 | A. | No. |
| 15 | Q. | Did you have attendance issues while you were |
| 16 | | at Hampton Inn? |
| 17 | A. | No. |
| 18 | Q. | And you left there voluntarily in April to go |
| 19 | | to Homewood Suites? |
| 20 | A. | I left voluntarily.  I didn't go to |
| 21 | | Homewood Suites until July. |
| 22 | Q. | What did you do between April and July? |
| 23 | A. | I worked out at my dad's store. |

204

1   Q.   Doing what?

2   A.   Keeping books, cashier.

3   Q.   What was the name of your dad's store?

4   A.   Old Kingston Country Store.

5   Q.   Were you working there because you couldn't

6        find anything else to do or because you wanted

7        to work there at your dad's store?

8   A.   At the time, that was all I could do until I

9        found something else.

10  Q.   And why was that all you could do?

11  A.   Because at the time -- well, that was all I

12       was doing until I found something else.

13  Q.   So what I'm understanding is you left

14       Hampton Inn without having anything else lined

15       up other than your dad's store?

16  A.   Correct.

17  Q.   Did you make less at your dad's store than you

18       made at Hampton Inn?

19  A.   No, about the same.

20  Q.   How did it come to be that you went to work

21       for Homewood Suites?

22  A.   My former general manager that was at

23       Hampton Inn referred me.

1    Q.   Are those two companies related?

2    A.   Just that it's a Hilton brand.

3    Q.   They're both Hilton brand?

4    A.   Both Hilton.

5    Q.   Did you ask your former manager to refer you

6         to Homewood?

7    A.   No.

8    Q.   Who contacted whom?  Did you contact Homewood

9         or vice versa?

10   A.   I contacted Homewood.

11   Q.   And are you still employed there?

12   A.   Yes.

13   Q.   What are your duties at Homewood?

14   A.   As to oversee the property, daily deposits.

15   Q.   What's your title?

16   A.   AGM, assistant general manager.

17   Q.   And is Emily Funkhouser still your manager?

18   A.   Yes.

19   Q.   Do you have any plans to leave

20        Homewood Suites?

21   A.   No.

22                   MR. BARNETT:  Heather, did you put

23                       her earnings at her father's

206

1              store in your calculations?

2         MS. LEONARD:  I think they are.  We

3              didn't have them when we were

4              doing the chart, the ending date

5              for Hampton Inn.  So I assumed

6              it was going up to July when I

7              did the chart.  And so if the

8              wages were about the same, then

9              it would be calculated, although

10             I didn't know I was including

11             the father's store.  I just

12             thought it was the Hampton Inn.

13             But yes.

14        MR. BARNETT:  Did she bring her tax

15             returns?

16        MS. LEONARD:  No, I talked to her,

17             and she still can't find them.

18             What we were going to do, if

19             y'all -- the easiest thing to do

20             is we can sign one of those IRS

21             releases that you can send to

22             the IRS to get the copies from

23             them.

207

1          MR. BARNETT:  All right.  You'll

2              furnish that to me?

3          MS. LEONARD:  Yes.  In fact, I was

4              going on the web right now,

5              since y'all have nice wireless,

6              to see if I can find it to

7              download.  And I can print it

8              out tonight.

9    Q.    What about -- do you have any W-2s or 1099s or

10         anything from your taxes for the years of '05

11         and '06?  Did you bring anything like that

12         with you?

13   A.    No, I didn't.

14   Q.    Did you file a tax return for both of those

15         years?

16   A.    Yes.

17   Q.    Did you get money back both of those years?

18   A.    Yes.

19   Q.    Did you get the earned income tax credit?

20   A.    Yes.

21   Q.    And you left Hampton Inn in April '07?

22   A.    Yes.

23   Q.    Did you leave Hampton Inn because of having

208

```
 1            the new baby?
 2   A.    No.
 3   Q.    How did you take care of the new baby and work
 4            at Hampton or Homewood?
 5   A.    Like I stated before, my daughter would be
 6            there with me.
 7   Q.    Your oldest daughter?
 8   A.    No.
 9   Q.    Oh, you took the baby to work?
10   A.    Yes.
11   Q.    Who took care of your oldest daughter when you
12            were working at those places?
13   A.    She went to school.
14   Q.    Okay.  You weren't working there at night
15            then?
16   A.    Yes.  My mother.
17   Q.    What is your current income at Homewood?
18   A.    Twenty-nine a year.
19   Q.    You mentioned these agencies you went to:
20            Multi Staffing, Career, and Blair after you
21            lost your job at Mobis.
22   A.    Uh-huh (positive response).
23   Q.    Did they fill out any paperwork on you of any
```

1            kind?

2    A.    The application.

3    Q.    Okay.  Now, I'm updating your answers to

4          interrogatories.  As I understand it, you've

5          never seen a psychiatrist or a therapist or

6          psychologist?

7    A.    Correct.

8    Q.    You still haven't?

9    A.    I still haven't.

10   Q.    And you never have taken any kind of

11         medications for nervousness or anxiety or

12         depression?

13   A.    Correct.

14   Q.    You still haven't?

15   A.    I still haven't.

16   Q.    After you left Mobis, did you receive -- you

17         said you received Medicaid.  Did you receive

18         other government support, like Aid to Families

19         with Dependent Children or welfare of any

20         kind?

21   A.    Yes.

22   Q.    How much was that a month?

23   A.    That was food stamps.  Food stamps.

210

1    Q.   Anything in addition to Medicaid and food

2          stamps?

3    A.   Unh-unh (negative response).

4    Q.   And unemployment benefits?

5    A.   Unemployment.

6    Q.   No money, no checks other than unemployment?

7    A.   No.

8    Q.   Did you apply?

9    A.   Yes.

10   Q.   As far as you know, you got everything you

11        were entitled to?

12   A.   Repeat that.

13   Q.   Well, as far as you know, you received all of

14        the government benefits you were eligible

15        for --

16   A.   To my knowledge.

17   Q.   -- after you left Mobis?

18   A.   To my knowledge.

19   Q.   Now, did you continue to receive any of those

20        government or social benefits after you

21        started to work at Hampton Inn and then with

22        your dad and then with Homewood?

23   A.   Hampton Inn, yes.

211

| | | |
|---|---|---|
| 1 | Q. | Did that job cause you to lose eligibility for |
| 2 | | those benefits? |
| 3 | A. | It caused me -- no, it was decreased.  It was |
| 4 | | decreased. |
| 5 | Q. | Okay. |
| 6 | A. | Food stamps only. |
| 7 | Q. | Because of your income? |
| 8 | A. | Yes. |
| 9 | Q. | Did you lose your car?  Was it repossessed |
| 10 | | after you left Mobis? |
| 11 | A. | The car in my name, yes. |
| 12 | Q. | You turned it in or it was repossessed? |
| 13 | A. | It was repossessed. |
| 14 | Q. | By whom? |
| 15 | A. | Capital One. |
| 16 | Q. | When did that happen?  When did you actually |
| 17 | | lose possession of it? |
| 18 | A. | It was '07.  I don't remember what month. |
| 19 | | 2007. |
| 20 | Q. | Did you consider bankruptcy again or did you |
| 21 | | talk to anybody about bankruptcy after you |
| 22 | | left Mobis? |
| 23 | A. | No. |

212

1    Q.    Based on your exposure to Jay Kim, would he

2          deliberately break the law, in your opinion,

3          with regard to pregnancy?

4                    MS. LEONARD:  Object to form.

5                         You can answer.

6    A.    Repeat it.

7    Q.    Based on your interactions with Jay Kim, do

8          you think that he is the type of person that

9          would deliberately break the law regarding

10         discrimination for pregnancy?

11                   MS. LEONARD:  Same objection.

12   A.    Are you asking me with my dealings with him

13         would I think he would deliberately break the

14         law --

15   Q.    Right.

16   A.    -- about pregnancy?

17   Q.    Right.

18   A.    I don't know.  I'm not sure.

19   Q.    Well, did he seem to be an honorable person to

20         you?

21                   MS. LEONARD:  Object to the form.

22                        You can answer.

23   A.    I'm not sure.

213

```
 1    Q.   As far as you know, your job is secure at
 2         Homewood now?
 3    A.   Yes.
 4    Q.   Do you get health insurance?
 5    A.   Yes.
 6    Q.   Dental?
 7    A.   Yes.
 8    Q.   Are the benefits roughly the same at Homewood
 9         as they were at Mobis?
10    A.   Yes.
11    Q.   Now, your medical records show that you've had
12         a history of migraines, sinus problems,
13         dizziness, vertigo; is that true?
14    A.   Correct.
15    Q.   Do you still have those problems?
16    A.   I haven't had it.
17    Q.   When did you stop having migraines?  When did
18         you stop having those problems?
19    A.   I can't say.  I don't know.  I don't remember
20         the last time I had one.
21    Q.   Did the migraines and the vertigo and
22         dizziness all come together?
23    A.   No.
```

214

1    Q.    Why did you refuse to give the remote to your
2          automobile to the repo man when he repossessed
3          your car?
4    A.    I didn't.
5    Q.    So your testimony is that he -- oh, what is
6          this?  Did you sue a lady named Sharon Short?
7    A.    Yes.
8    Q.    Why?
9    A.    Due to the fact she was supposed to purchase
10         my car.
11   Q.    Which one?
12   A.    The Impala, '05.
13   Q.    When did she purchase it?
14   A.    Back when I was working at Mobis.  I do not
15         have that information with me to tell you the
16         exact date.
17   Q.    Did you sell her this car while you were
18         working at Mobis?
19   A.    Yes.
20   Q.    Well, you know I asked you in these
21         interrogatories if you had been involved in
22         any lawsuits, and you said no, I thought.
23   A.    I don't remember you asking me that question.

215

1    Q.    Okay.

2                         MR. BARNETT:  Why don't y'all give

3                         me a few minutes to see where I

4                         am.

5                         (Brief pause in proceedings.)

6    Q.    (Mr. Barnett continuing) Do you have any

7          records or documents of any kind that would

8          show that you started looking for a job soon

9          after you left Mobis in August of 2006?

10   A.    No.

11   Q.    Have you found any documents or records of any

12         kind, since your lawyer produced to me the

13         documents that she produced, that relate in

14         any way to this lawsuit?

15   A.    No.

16   Q.    You don't have anything at home that might be

17         relevant to this lawsuit in any respect?

18   A.    Not that I've come across yet.

19   Q.    Your medical records reflect health problems

20         that I've discussed with you earlier in terms

21         of vertigo and so forth.  Did you ever tell

22         Jay Kim about those health problems or did he

23         ever ask?

216

| | | |
|---|---|---|
| 1 | A. | I don't remember. |
| 2 | Q. | Is there anything else that Jay Kim said or |
| 3 | | did that you believe tends to show pregnancy |
| 4 | | discrimination other than what you have |
| 5 | | already told me today? |
| 6 | A. | Not that I can think of. |
| 7 | Q. | Have you had any emotional damages, emotional |
| 8 | | or nervous damages as a result of losing your |
| 9 | | job at Mobis? |
| 10 | A. | I would think so. |
| 11 | Q. | Describe them.  Well, let me ask you this. |
| 12 | | You have lost jobs before and been unemployed |
| 13 | | before; is that correct? |
| 14 | A. | Correct. |
| 15 | Q. | Was there anything unusual about these |
| 16 | | emotional issues you had?  Why don't you |
| 17 | | describe them to me. |
| 18 | A. | Due to the fact that I was being terminated |
| 19 | | due -- I felt since I was pregnant.  I did my |
| 20 | | job.  It never came across to me as if nothing |
| 21 | | was ever wrong with my performance. |
| 22 | Q. | Well, did you ever stop sleeping? |
| 23 | A. | Yes. |

217

| | | |
|---|---|---|
| 1 | Q. | How long? |
| 2 | A. | That went several months.  I really can't |
| 3 | | remember -- put my finger on it to say when it |
| 4 | | stopped.  I would say -- |
| 5 | Q. | When did it start?  I didn't mean to cut you |
| 6 | | off. |
| 7 | A. | It started soon after.  I would say within |
| 8 | | that same -- that weekend. |
| 9 | Q. | Which weekend? |
| 10 | A. | Of the -- the time I was terminated, August |
| 11 | | the 25th.  I would say that weekend. |
| 12 | Q. | Describe the sleeping problems, how long they |
| 13 | | lasted. |
| 14 | A. | I would say probably after January of 2007 it |
| 15 | | was a little better. |
| 16 | Q. | Have you ever talked to any of your doctors |
| 17 | | about your sleeping problems? |
| 18 | A. | No. |
| 19 | Q. | Have you taken any over-the-counter |
| 20 | | medications for it? |
| 21 | A. | No. |
| 22 | Q. | Forgive me if I've asked you this question. |
| 23 | | Do you still see Mr. Coley? |

218

A.    Yes.

Q.    In what way, as the father of your child?

A.    Yes.

Q.    Do you have any kind of dating involvement
      with him?

A.    No.

Q.    Are you dating anyone now?

A.    No.

Q.    Have your parents ever given you financial
      help at any time?

A.    Yes.

Q.    When?

A.    When I moved in with them.

Q.    Did they give you monetary help in addition to
      living there?

A.    No.

Q.    Did your parents help you out when you were in
      bankruptcy or facing bankruptcy?

A.    From time to time.

Q.    Monetary?

A.    Yes.

                    MR. BARNETT:  If y'all will give us

                         a few minutes in here --

1           MS. LEONARD:  Okay.  We'll step out.

2           MR. BARNETT:  -- where we can

3                 shuffle through papers.  I think

4                 I'm about to finish.

5           (Brief pause in proceedings.)

6     Q.   (Mr. Barnett continuing) Ms. Hunter, do you

7           want to add to or change any of your

8           testimony?

9     A.   I just want to bring forth that -- I remember

10          you asking me a question, when did I talk with

11          him about that situation --

12    Q.   Yes.  Let's make that an exhibit.

13          MR. BARNETT:  Is that 21?

14          MS. SMITH:  Yes.

15          (Defendant's Exhibit Number 21 marked

16                 for identification.)

17    A.   -- about my daughter's handbook.  This is the

18          same school she was going to when I started at

19          Mobis.  And that was some of the same

20          stipulations that I was going by during that

21          March time until the ending of that school

22          year.  And then when she started back, that's

23          when the other e-mails -- the new e-mails

220

1      started going.  And at that time, I was full
2      time.
3   Q.  You lost me.
4   A.  Okay.  I remember --
5   Q.  Exhibit 21 --
6   A.  Yes.  I remember you asking me a question when
7      did we even speak about this exhibit.
8   Q.  Yes.
9   A.  It was brought up when I first started after
10     him questioning Sonechka about my tardiness.
11     And I told him about that.  And then when I
12     brought him a paper, that's when he said that
13     he was willing to work with me.
14  Q.  She was at -- your child was at Dozier the
15     whole time you worked at Mobis?
16  A.  Yes.
17  Q.  All right.  I just have a few questions about
18     this.
19  A.  Okay.
20  Q.  I don't see anything in here that says you
21     have to -- you cannot come earlier than
22     seven-thirty.
23  A.  Okay.  As you see, the first bell rings at

221

```
 1              seven-fifty.

 2    Q.        Right.

 3    A.        Prior to that, seven-thirty, I would have

 4              to -- I can get a duplicate, because it is --

 5              they cannot be dropped off before

 6              seven-thirty.  They will be unattended.

 7    Q.        You have seen that in writing from Dozier

 8              School?

 9    A.        Yes.  And, actually, that was -- to my

10              knowledge, at that time I was giving him the

11              information that had that.

12    Q.        Well, do you see now that this -- do you

13              remember now that you just gave him these two

14              pieces of paper?

15    A.        The document that I gave him at the time, it

16              was more.  It had the information with the

17              seven-thirty as well.

18    Q.        Let's try to put a time frame on when school

19              let out in spring of '06.  Wouldn't it be

20              around the mid -- around mid May?

21    A.        I don't remember.

22    Q.        And I'm getting close to the end.  You

23              didn't -- you weren't late because of your
```

222

1          child getting to school after school let out

2          in May of '06, were you?

3     A.    I don't remember the time that school let out

4          in '06.  But after the fact she was out of

5          school, that was not due to school.

6     Q.    Do you remember when school started back?

7     A.    All I can remember is sometime in August.

8     Q.    Were there any problems getting from school to

9          work after she started back in August?

10    A.    Yes.

11    Q.    Anything else about your testimony that you

12         want to change or add to?

13    A.    Nothing that I can think of right now.

14    Q.    All right.

15                   MR. BARNETT:  That's all I have.

16                   MS. LEONARD:  I have one follow up.

17              When I say one follow up, main

18              topic.  It may be more than one

19              question.

20                        **EXAMINATION**

21    **BY MS. LEONARD:**

22    Q.    Did Nicole Boswell tell you of any remarks

23         that she may have heard Jay Kim make about any

223

1     pregnant employees?

2  A.  Yes.

3  Q.  Tell me what she told you.

4  A.  The Korean young lady that was hired before

5      I -- a day or two before I was terminated, to

6      my knowledge, Nicole -- I remember her saying

7      that she either got married or she was

8      pregnant, and Jay said it was a disgrace.

9              MS. LEONARD:  That's all I've got.

10                      **EXAMINATION**

11  **BY MR. BARNETT:**

12  Q.  Did you understand that he was referring to

13      the disgrace in the sense that she was

14      pregnant before she was married?

15  A.  No.

16  Q.  Well, what did you understand from Nicole the

17      disgrace to be about?

18  A.  Due to their culture.  Whatever in their

19      culture, as far as a disgrace for being --

20      becoming pregnant.

21  Q.  During wedlock?

22  A.  I don't remember what her status is.  I knew

23      she had a significant other, but I don't know

224

1          if it was to the extent that she was married

2          or not married.  I didn't go into details with

3          Nicole on that.

4     Q.   Tell me everything Nicole said that Mr. Kim

5          said about this young lady -- or this lady.

6     A.   She just mentioned to the fact that he said it

7          was a disgrace to her being pregnant.

8                    MR. BARNETT:  No further questions.

9                    MS. LEONARD:  All right.  Then we're

10                       done.

11

12                   (The deposition concluded at

13                   approximately 4:40 p.m.)

14

15               * * * * * * * * * * * *

16          FURTHER DEPONENT SAITH NOT

17               * * * * * * * * * * * *

18

19

20

21

22

23

225

1                    REPORTER'S CERTIFICATE

2     STATE OF ALABAMA:

3     BUTLER COUNTY:

4          I, Julie A. Duncan, Court Reporter and

5     Commissioner for the State of Alabama at Large, do

6     hereby certify that I reported the deposition of:

7                    **TARSHA NICKOL HUNTER**

8      who was first duly sworn by me to speak the truth,

9      the whole truth and nothing but the truth, in the

10      matter of:

11                    TARSHA NICKOL HUNTER,

12                    Plaintiff,

13                    vs.

14                    MOBIS ALABAMA, L.L.C.,

15                    Defendant.

16                    In the United States District Court

17                    Middle District of Alabama

18                    Northern Division

19                    2:07cv427-WHA,

20     on Wednesday, January 30, 2008.

21          The foregoing 225 computer-printed pages

22     contain a true and correct transcript of the

23     examination of said witness by counsel for the parties



226

1    set out herein.   The reading and signing of same is

2    hereby not waived.

3              I further certify that I am neither of kin

4    nor of counsel to the parties to said cause nor in any

5    manner interested in the results thereof.

6              This 20th day of February, 2008.

7

8

9    Julie A. Duncan, ACCR#: 256
     Expiration Date:   9-30-2008
10   Certified Court Reporter and
     Commissioner for the State
11   of Alabama at Large

12

13

14

15

16

17

18

19

20

21

22

23

MARSHA HUNTER'S ATTENDANCE
RECORD WITH MULTI-STAFFING

| | Date | In | Out |
|---|---|---|---|
| Mon | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| Sat | | | |
| Sun | | | |
| Mon | | | |
| Tue | 3/14/2006 | 8:30 AM | 5:00 PM |
| Wed | | | |
| Thu | | | |
| Fri | | 8:00 AM | 8:00 PM |
| Sat | | | |
| Sun | | | |
| Mon | | | |
| Tue | | | |
| Wed | 3/22/2006 | 8:00 AM | 3:40 PM |
| Thu | | | |
| Fri | 3/24/2006 | Out all day | |
| Sat | | | |
| Sun | | | |
| Mon | | | |
| Tue | | | |
| Wed | 3/29/2006 | 12:00 PM | 5:00 PM |
| Thu | | | |
| Fri | | | |
| Sat | | | |
| Sun | | | |
| Mon | 4/3/2006 | 9:00 AM | 5:00 PM |
| Tue | | | |
| Wed | | | |
| Thu | | | |
| Fri | | | |
| Sat | | | |
| Sun | | | |
| Mon | 4/10/2006 | 12:00 PM | 5:00 PM |
| Tue | | | |
| Wed | 4/12/2006 | Out sick all day | |
| Thu | | 8:00 AM | 5:00 PM |
| Fri | | Holiday | |
| Sat | | | |
| Sun | | | |
| Mon | 4/17/2006 | 8:00 AM | 5:00 PM |
| Tue | 4/18/2006 | 8:15 AM | 5:00 PM |
| Wed | | | |
| Thu | 4/20/2006 | 8:00 AM | 5:00 PM |
| Fri | 4/21/2006 | 8:05 AM | 5:00 PM |
| Sat | | | |
| Sun | | | |

| | Date | In | Out |
|---|---|---|---|
| Mon | 4/24/2006 | 8:00 AM | 5:00 PM |
| Tue | 4/25/2006 | 8:00 AM | 12:00 PM |
| Wed | | | |
| Thu | | | |
| Fri | 4/28/2006 | 9:00 AM | 11:30 AM |
| Sat | | | |
| Sun | | | |
| Mon | | | |
| Tue | | | |
| Wed | 5/3/2006 | 8:15 AM | 5:15 PM |
| Thu | | | |
| Fri | | | |
| Sat | | | |
| Sun | | | |
| Mon | 5/8/2006 | Out sick all day | |
| Tue | | | |
| Wed | | | |
| Thu | | | |
| Fri | | | |
| Sat | | | |
| Sun | | | |
| Mon | 5/15/2006 | 8:00 AM | 5:00 PM |
| Tue | 5/16/2006 | 8:06 AM | 5:06 PM |
| Wed | 5/17/2006 | 8:10 AM | 5:08 PM |
| Thu | | | |
| Fri | | | |
| Sat | | | |
| Sun | | | |
| Mon | | | |
| Tue | | | |
| Wed | | | |
| Thu | | | |
| Fri | 5/26/2006 | 8:02 AM | 5:00 PM |
| Sat | | | |
| Sun | | | |
| Mon | 5/29/2006 | Holiday | |
| Tue | 5/30/2006 | 8:03 AM | 5:00 PM |
| Wed | | | |
| Thu | | | |
| Fri | | | |
| Sat | | | |
| Sun | | | |



DEFENDANT'S
EXHIBIT
9

sonechka.womack@mobis-america.com

**From:** Tarsha Hunter [Tarsha.Hunter@mobis-america.com]
**Sent:** Wednesday, August 09, 2006 10:49 PM
**To:** sonechka.womack@mobis-america.com
**Subject:** RE: Attendance Issues

When I returned on the 3rd of August , I didn't take a lunch break, that's a hour, today I came in @ 7:30, so tha t's 30 min. and I can stay until 7:00 pm today and starting Monday stay in for lunch thru Wed. and Sat. Aug. 19, come in for 4 hours.

*Tarsha N. Hunter .Account Specialist*
*Mobis Alabama, LLC.*
*1395 Mitchell Young Road*
*Montgomery. AL 36108*
*Ph: 334-387-4878*
*Fx: 334-387-4900*
*Tarsha.Hunter@Mobis-America.com*

**From:** sonechka.womack@mobis-america.com [mailto:sonechka.womack@mobis-america.com]
**Sent:** Thursday, August 10, 2006 10:06 AM
**To:** 'Tarsha Hunter'
**Cc:** 'Jay Kim'
**Subject:** RE: Attendance Issues

Tarsha,
As cited from the below email, please submit a schedule of time that you will be able to make up for your absences. We c ompletely understand you current health condition, but this policy has been set for us to comply with when away from the office numerous times. This is not to discourage you; this is just to keep fairness throughout this department.

Thank you,
Sonechka

**From:** sonechka.womack@mobis-america.com [mailto:sonechka.womack@mobis-america.com]
**Sent:** Tuesday, May 09, 2006 10:29 AM
**To:** 'Tarsha Hunter'
**Subject:** FW: Attendance Issues
**Importance:** High



DEFENDANT'S EXHIBIT 10    PENGAD 800-631-6989

HUNTER V. MOBIS
00175

**From:** Jay Kim [mailto:jay.kim@mobis-america.com]
**Sent:** Wednesday, April 26, 2006 2:43 PM
**To:** nicole.boswell@mobis-america.com; sonechka.womack@mobis-america.com; 'Stephanie Perez'; 'Sandra Goodin';
hosang.hwang@mobis-america.com
**Subject:** Attendance Issues
**Importance:** High


To all of staffs

First of all, I appreciate all of your effort and hard working.

I looked trough the status of individual attendance in accounting department up to now.
And, I asked and discussed with HR department to manage it more effectively.


1. Regular duty hours are 8 AM till 5 PM. Employees are expected to arrive to work in ready to start by 8 AM.
   . Employees are expected to remain at work (Except during the lunch break) until 5 PM.
3. Scheduled appointments outside MOBIS Alabama.
   A. Doctor's appointments
     1) From time to time we expect that employees must request time away from work in order to attend a Doctor's appoint

ment.
     Personnel are expected to give ample notification (Minimum 24 Hours notification) prior to the appointment.
     Personnel are expected to schedule appointments for a time period that the results in the least amount of time away fr

om work.
     2) If due to a health condition, you are required to be away from work multiple times during any given month,
       we should have an understanding that this time should be made up if you wish not to use your vacation allotment.
       This can be accomplished in many different ways, some examples include; staying late on regular work days to m

ake up the number of hours missed, work on
       Saturday, etc.
     3) As salaried employees it is expected that some time in addition to schedule work hours, may be necessary at times.
     Like-wise we need to have an understanding that we must both work together to accomplish the job.
     Please do not take advantage of my cooperative nature as I still have to ensure that the work is completed.
   B. All other situations are adequately covered by company policy such as; Maternity, Family medical Leave, Bereaveme

t leave, Jury Duty etc.


As you are aware of, Closing is very important and primary issue in accounting department.

HUNTER V. MOBIS
00176

And we should close every each month-end just in time to analysis and report it to the top management group in the head quarters.

gerding the vacation days, if you want to take vacation days, if possible, please do not use it consecutively over the 3 business days and avoid the month-end closing period, otherwise first or second weeks of every month.

Your great assistance would be much appreciated.

Jay Kim

*Jay K. (Jae-kwang)* **Kim / CFO**

MOBIS Alabama,LLC.
1395 Mitchell Young Road,
Montgomery, AL 36108

Tel : 334-387-4802
Fax : 334-387-4900
E-mail : *jay.kim@mobis-america.com*

HUNTER V. MOBIS
00177

8/10/2006

# MOBIS
## ALABAMA

# EMPLOYEE HANDBOOK



DEFENDANT'S
EXHIBIT
PENGAD 800-631-6989



# MOBIS Alabama, LLC

## ACCESS TO PERSONNEL FILES
## POLICY AND PROCEDURES

1.  **PURPOSE**

    1.1    Team members have the right to know what type of information is kept in their personnel file. Although they cannot make copies of this information, they can review the file in the presence of Human Resources Management.

2.  **POLICY**

    2.1    MOBIS maintains a personnel file on each team member that includes basic employment information, performance issues, insurance information, training, attendance, etc.

3.  **PROCEDURE**

    3.1.    Team members who wish to review their own files must do so in the presence of Human Resources Management.

    3.2.    There should not be anything in a team member's personnel file that the team member is not aware of first.

    3.3.    Information contained in this file is the property of MOBIS and cannot be duplicated.

    3.4.    Nothing may be placed in the personnel file without prior authorization from the Human Resources (HR) Department.

Effective Date:       06/21/04, 05/16/05
Revision Number:   1, 2
Policy:                    Access To Personnel Files



MOBIS Alabama, LLC

ATTENDANCE POLICY AND PROCEDURES

1.  **PURPOSE**

The purpose of the Attendance Policy is to establish a consistent system of administering acceptable levels of attendance in a fair manner.

2.  **POLICY**

2.1    Regular attendance is the foundation for success of MOBIS.  Absenteeism places a burden on other team member's and on the production process. MOBIS expects team members to be at work on time and to work the full number of hours scheduled.  The company reserves the right to alter a work schedule based on business needs.

2.2    MOBIS has a no-fault Attendance Policy.  This means there are no excused absences, unless the team member is on an approved leave such as holidays, scheduled vacations, jury duty, military leave, catastrophic event, FMLA, bereavement leave, or work-related injury or illness.

3.  **GENERAL PROVISIONS**

3.1.    **Acceptable Attendance**
The minimum acceptable standard of attendance is 98%.

3.2.    **Absence**
Any scheduled workday missed is considered an absence.  However, work time missed due to holidays, scheduled vacations, jury duty, military leave, catastrophic event, FMLA, bereavement leave, or work-related injury or illness shall not be counted as an absence and are not cause for corrective action.

3.3.    **Catastrophic Event**
A legally declared emergency which results in the closure of all    roads in the Team member's county of residence, or if an Team member must drive through such a county on the way to work, such absences will not count against the Team member's attendance, nor be cause for corrective action.

Effective Date:    06/21/04, 01/04/05, 05/02/05, 06/04/05
Revision Number:  1, 2, 3, 4
Policy:    Attendance



# MOBIS Alabama, LLC

## ATTENDANCE POLICY AND PROCEDURES

Final approval as to the declaration of a "Catastrophic event" shall be made by the Sr. Manager of Human Resources.

3.4. **Tardiness**
 Team members who are not in their work area ready for work by their scheduled starting time will be counted as one-half day absent for calculating attendance, excluding a verifiable catastrophic event.

3.5. **Early Out**
3.5.1  Team member's who leave prior to the end of their scheduled shift, including overtime hours, are considered to have left early. An early out will be considered as one-half day of absence for purposes of attendance calculation. If an team member leaves work prior to working four (4) hours of their regularly scheduled work shift, they will be counted as absent for that entire day for calculating attendance.

3.5.2  If a team member is already at work and needs to leave, the team member must contact his/her manager or supervisor and get approval before leaving the plant. (01/04/05)

3.6. **Leaving the Facility without Authorization**
Any situation where an Team member leaves the facility during scheduled work time, including overtime whether scheduled or voluntary, without their supervisor, manager, senior manager, or any other member of management's authorization, the Team member will be considered to have voluntarily resigned from his or her employment at MOBIS.

4. **CALCULATING ATTENDANCE**

4.1  Attendance will be calculated using a rolling calendar year using the following formula.

4.1.1.  Calculate the number of scheduled workdays. Scheduled workdays will include all excused scheduled workdays.

4.1.2.  Calculate the number of unexcused workdays.
4.1.3.  Subtract the number of unexcused workdays from the number of scheduled workdays and divide the remainder by the number of scheduled workdays to arrive at the Team member's attendance percentage.

Effective Date:     06/21/04, 01/04/05, 05/02/05, 06/04/05
Revision Number:  1, 2, 3, 4
Policy:                  Attendance



# MOBIS Alabama, LLC

## ATTENDANCE POLICY AND PROCEDURES

Example:

    151  Scheduled workdays
    -  4  Unexcused workdays
    147/151 = 97.4%

5.    **EXCESSIVE ABSENTEEISM**

5.1.  **Definition**
5.1.1.  When an Team member's attendance falls below 98% at any time during the first year or subsequent years of employment during any rolling twelve-month period, corrective action will take place. The rolling twelve-month period is a 365-day period.

5.2.  **Evaluating Absenteeism**
5.2.1.  Every Team member is expected to notify his or her supervisor or manager in advance of any known absence or future absence. When an absence is not known in advance, the Team member must notify his or her supervisor or manager 30 minutes prior to the start of the shift or no more than 60 minutes after the start of his or her shift.

6.    **CORRECTIVE ACTION**

6.1.  **Accumulative Absences**
When an Team member's attendance percentage falls below 98%, cause for corrective action will take place as follows. Warning points relating to excessive tardiness or early outs, and missed punches will roll off a team member's active record after twelve (12) months from the date of the warning.

6.1.1  **Missed punches** -- For every occurrence that a team member misses an in punch or an out punch in the time clock, they will be accessed with ½ point toward their attendance record.

6.1.2.  **1st Verbal Discussion** -- Supervisor or Manager will document discussion with the team member and place in the Team member's personnel file.

Effective Date:    06/21/04, 01/04/05, 05/02/05, 06/04/05
Revision Number:  1, 2, 3, 4
Policy:            Attendance



# MOBIS Alabama, LLC

## ATTENDANCE POLICY AND PROCEDURES

6.1.3. **2nd Verbal Discussion** - Supervisor or Manager will document discussion with the team member and place in the Team member's personnel file.

6.1.4. **Commitment Discussion** – Supervisor or Manager and the Human Resources Manager will meet with the Team member and will document discussion with the team member and place in the Team member's personnel file. At this time, the Team member will be warned that the next time their attendance falls below 98% in a rolling twelve-month period, they will be terminated.

6.1.5. **Termination** - Supervisor or Manager and the Human Resources Manager will meet with the Team member and terminate their employment.

7.  **NO CALL/NO SHOW**

7.1. A Team member who does not communicate to his or her Supervisor or Manager regarding his or her absence is considered to have voluntarily resigned his or her employment at MOBIS. (01/04/05)

8.  **RECORD KEEPING**

8.1. All Team member Attendance records will be maintained in the Human Resources Office.

9.  **TERMINATION**

9.1. All terminations due to unsatisfactory attendance will be reviewed by the Supervisor or Manager and the Human Resources Manager prior to the final discussion with the Team member.

Effective Date:    06/21/04, 01/04/05, 05/02/05, 06/04/05
Revision Number:   1, 2, 3, 4
Policy:            Attendance



# MOBIS Alabama, LLC

## BASIS OF PAY
## POLICY AND PROCEDURES

1. **PURPOSE**

   The purpose of this policy is to identify the different pay types.

2. **POLICY**

   Federal and state wage and hour regulations govern the wage and salary payments to all employees.

3. **PAY TYPES**

   3.1   Hourly Non-Exempt

       3.1.1   Paid an hourly wage on a bi-weekly basis.
       3.1.2   Overtime is paid for any hours in excess of forty (40) hours during their normal workweek.
       3.1.3   Overtime compensation is calculated at a rate of one and one-half times their regular hourly rate.

   3.2   Salaried Non-Exempt

       3.2.1   All Technician's, and Supervisor's.
       3.2.2   Paid a standard rate on a bi-weekly basis.
       3.2.3   Overtime is paid for any hours in excess of fifty (50) hours during their normal workweek.
       3.2.4   A one (1) hour lunch must be deducted each day.
       3.2.5   Overtime compensation is calculated at a rate of straight time.

Effective Date:      03/21/05
Revision Number:   1
Policy:                 Basis of Pay



## MOBIS Alabama, LLC

### BASIS OF PAY
### POLICY AND PROCEDURES

|           | Hours Worked | Gross Hrs  | Lunch    | Net Hours |                |
|-----------|--------------|------------|----------|-----------|----------------|
| Monday    | 7:00 – 7:00  | 12 hours   | -1 hour  | 11        | hours          |
| Tuesday   | 7:00 – 6:00  | 11 hours   | -1 hour  | 10        | hours          |
| Wednesday | 7:30 – 7:30  | 12 hours   | -1 hour  | 11        | hours          |
| Thursday  | 7:00 – 6:30  | 11.5 hours | -1 hour  | 10.5      | hours          |
| Friday    | 7:00 – 6:00  | 11 hours   | -1 hour  | 10        | hours          |
| Saturday  | 7:00 - 12:00 | 5 hours    | 0 hour   | 5         | hours          |
|           |              |            |          | 57.5      | hours          |
|           |              |            |          | - 50.0    | hours          |
|           |              |            |          | 7.5       | hours Paid OT Hours |

3.3    Salaried Exempt

3.3.1    All other classifications to include but not limited to: Engineer's, Specialist's, Assistant Manager's, Manager's, Senior Manager's, Director's and above.

3.3.2    Paid a standard rate on a bi-weekly basis.

3.3.3    Not eligible for overtime pay.

Effective Date:    03/21/05
Revision Number:   1
Policy:            Basis of Pay



# MOBIS Alabama, LLC

## BEREAVEMENT LEAVE POLICY AND PROCEDURES

1. **PURPOSE**

   1.1   Employees of MOBIS shall be granted up to three consecutive working days "with pay" due to a death in their immediate family. Employees will be granted one working day "without pay" due to the death of other family members as outlined below.

2. **ELIGIBILITY**

   2.1   All regular full-time employees following 90 day probationary period.

3. **POLICY**

   3.1   The following relatives are considered immediate family under the "with pay" bereavement policy.

   > 3.1.1   Parent or in Parental Status
   > 3.1.2   Brother or Sister
   > 3.1.3   Spouse
   > 3.1.4   Son or Daughter
   > 3.1.5   Step Children
   > 3.1.6   Step Brother and Sister
   > 3.1.7   Grandparents
   > 3.1.8   Grandchildren
   > 3.1.9   Spouses Parents
   > 3.1.10  Spouse Brother and Sister
   > 3.1.11  Spouses Grandparents
   > 3.1.12  Spouses Grandchildren

   3.2   The following relatives are considered family under the "without pay" bereavement policy.

Effective Date:   06/21/04, 09/07/05
Revision Number:  1, 2
Policy:           Bereavement



# MOBIS Alabama, LLC

## BEREAVEMENT LEAVE POLICY AND PROCEDURES

3.2.1. Aunts
3.2.2. Uncles
3.2.3. Nieces
3.2.4. Nephews

4. **PROCEDURES**

4.1 The employee must call their supervisor to inform them of the need for bereavement leave.

4.2 The supervisor shall come to the HR Department to complete a Bereavement Leave Form.

4.3 Days must be taken consecutively according to an employees work schedule.

4.4 Days must be taken immediately following the death of the relative; or

4.5 Days must be taken prior to the funeral of the relative; or

4.6 Days must be taken immediately following the funeral of the relative.

4.7 Following an employee's return to work, they must provide the obituary or a program from the funeral, listing them as a relative, to the Human Resources Department.

4.8 These guidelines include paid or unpaid leave.

4.9 Failure to provide this information, immediately upon return from bereavement leave, may result in unexcused absences.

Effective Date:    06/21/04, 09/07/05
Revision Number:   1, 2
Policy:            Bereavement



# MOBIS Alabama, LLC

## BREAK ROOM POLICY AND PROCEDURES

1. **PURPOSE**

    1.1    MOBIS Alabama, LLC wants to provide a clean and comfortable place for our employees to rest during scheduled breaks. We want everyone to take pride in our facility and want to keep the tables clear of unnecessary items.

2. **POLICY**

    2.1    MOBIS has break rooms with vending machines, microwaves, and tables and chairs. All MOBIS employees and contractors currently working at our plant may use these break rooms while on scheduled breaks or lunch time.

    2.2    Guests are discouraged from using the break rooms during scheduled breaks or lunch time as there is limited seating that needs to be reserved for our employees.

    2.3    Meetings between MOBIS employees and vendors, suppliers, contractors or customers may take place in the employee break room if space is not available in the conference rooms.

3. **PROCEDURES**

    3.1    The professional cleaning staff is responsible for the overall sanitation of the break rooms. However, it is everyone's responsibility to maintain the cleanliness of our break room.

    3.2    All employees should discard their leftovers, used plates and napkins when they leave the area.

    3.3    The break room tabletops should be clean and free of debris outside of scheduled breaks.

    3.4    If any of the equipment, such as the microwaves or vending machines is malfunctioning, please report it to General Administration.

Effective Date:    08/02/04
Revision Number:    1
Policy:    Break room



## MOBIS Alabama, LLC

### BREAK ROOM POLICY AND PROCEDURES

3.5    If an employee loses money in vending machines, they should inform the Receptionist.

3.6    The Receptionist will refund the employees lost money.

Effective Date:     08/02/04
Revision Number:    1
Policy:             Break room



# MOBIS Alabama, LLC

## BULLETIN BOARD POLICY AND PROCEDURES

1.    **PURPOSE**

    1.1   MOBIS Alabama, LLC would like to communicate with its' employees as effectively as possible. In an effort to keep employees current on updated information, the bulletin board will be used for posting material.

2.    **POLICY**

    2.1   MOBIS utilizes many ways to communicate with their employees.

    2.2   It is the employee's responsibility to keep informed of information posted on the company bulletin board and to follow any new instructions.

    2.3   The company bulletins boards are located next to the time clocks or in the Employee Break room.

    2.4   Employees are encouraged to check the bulletin board at the beginning or end of each shift.

3.    **ITEMS FOUND ON BULLETIN BOARD**

    3.1   Age Discrimination in Employment Act
    3.2   Americans with Disabilities Act Notice
    3.3   Civil Rights Act of 1964
    3.4   Company Holidays
    3.5   Drug-Free Workplace Notice
    3.6   Emergency Procedures
    3.7   Employee Polygraph Protection Act
    3.8   Equal Pay Act
    3.9   First Aid Instructions
    3.10  Hazardous Communication Poster
    3.11  Minimum Wage
    3.12  Occupational Safety and Health
    3.13  Rehabilitation Act of 1973
    3.14  Reporting Safety Violations Notice Required by Worker's Comp Act

Effective Date:    08/02/04
Revision Number:   1
Policy:          Bulletin Board



# MOBIS Alabama, LLC

## BULLETIN BOARD POLICY AND PROCEDURES

3.15   Vietnam Era Readjustment Assistance Act
3.16   Worker's Compensation Disclosure

4.   **PROCEDURE**

4.1   Only the HR Department is authorized to post items on the company bulletin board.

4.2   These items are required to be posted by Federal and State law.

4.3   These items have an indefinite period of time to remain posted.

4.4   See the Solicitation Policy for related information.

Effective Date:      08/02/04
Revision Number:   1
Policy:                 Bulletin Board



# MOBIS Alabama, LLC

## CELL PHONE POLICY AND PROCEDURES

1. **PURPOSE**

   1. To provide a consistent guideline internally when distributing cell phones to MOBIS Alabama, LLC employees.

2. **POLICY**

   2.1 MOBIS will issue cell phones to certain employees based on the specific needs of their job. The company has identified a cell phone plan with a certain allotment of airtime minutes per month.

   2.2 MOBIS will issue one way cell phones to certain employees based on the specific needs of their job. These phones only have the capability to make internal company calls based on a pre-programmed call list.

3. **ELIGIBILITY**

   3.1 The following employees will be issued cell phones automatically. (01/04/05)

       3.1.1 All Senior Managers
       3.1.2 All Managers

   3.2 The following employees may be issued cell phones following their manager's approval and business need. (01/04/05)

       3.2.1 Assistant Managers
       3.2.2 Specialists

   3.3 Some employees may be issued one way cell phones following their manager's approval and business need. (01/04/05)

4. **PROCEDURE**

   4.1 Sr. Manager and Managers will be issued a cell phone within fourteen (14) days of their hire date or date of eligibility. (01/04/05)

Effective Date:     07/20/04, 01/04/05
Revision Number:    1, 2
Policy:             Cell Phone



# MOBIS Alabama, LLC

## CELL PHONE POLICY AND PROCEDURES

4.2    All other employees deemed eligible for cell phones will be issued one within fourteen (14) days of the signed approval. (01/04/05)

      4.2.1   Department managers or supervisors are responsible for completing an approval document justifying the need for these employees to be issued phones. (01/04/05)

4.3    Employees eligible for one way cell phones will be issued one on an as needed basis following a signed approval. (01/04/05)

      4.3.1   Department managers or supervisors are responsible for completing an approval document justifying the need for these employees to be issued phones.

4.4    All requests for cell phones should be turn into the General Administration Department.

4.5    The General Administration Department will route the approval sheet for any remaining signatures and will place the order with the cell phone company. (01/04/05)

4.6    Employees must immediately report lost or stolen cell phones to the General Administration Department.

4.7    Cell phone owners are expected to stay within the plan allotment of airtime minutes per month.

4.8    If an employee exceeds their number of minutes, they may be asked to justify the overage.

4.9    If the cell phone is used for personal reasons, and exceeds minutes as a result of personal use, the employee may be asked to reimburse the difference of the cost of the plan.

Effective Date:    07/20/04, 01/04/05
Revision Number:   1, 2
Policy:             Cell Phone



# MOBIS Alabama, LLC

## CHANGE IN PERSONAL INFORMATION
## POLICY AND PROCEDURES

1. **PURPOSE**

   1.1  It is important that personnel records for all MOBIS Alabama, LLC employee's be as accurate as possible. We would like our employees to keep us aware of any personal information that changes during the course of their employment.

2. **POLICY**

   2.1  It is important that personnel records for all MOBIS employees be as accurate as possible. If any of the following information changes during a person's employment, they should come to the HR Department to complete a Personal Data Sheet.

      2.1.1  Name
      2.1.2  Address
      2.1.3  Phone Number
      2.1.4  Degree
      2.1.5  Marital Status
      2.1.6  Birth of a Child

   2.2  If a MOBIS employee changes their marital status, it will be necessary to complete the following forms.

      2.2.1  Federal and State Withholdings
      2.2.2  Personal Data Sheet
      2.2.3  Insurance Paperwork when applicable

   2.3  All MOBIS employees must provide the company with a telephone number in case we need to contact them.

Effective Date:     08/02/04
Revision Number:   1
Policy:                   Change in Personal Information



# MOBIS Alabama, LLC

## CHANGE IN PERSONAL INFORMATION
## POLICY AND PROCEDURES

3.   **PROCEDURES**

3.1   Employees should request a Personal Data Sheet from the HR Department when any changes in their personal information occur.

3.2   When completing the Personal Data Sheet, the employee should only complete the portion of the form where information has changed.

3.3   If an employee is no longer with MOBIS at the time W-2 Forms are mailed, they will be sent to the address at the time of termination. It will be necessary to notify the HR Department of any address change.

Effective Date:     08/02/04
Revision Number:   1
Policy:              Change in Personal Information



# MOBIS Alabama, LLC

## CRIMINAL HISTORY

## POLICY AND PROCEDURES

1. **PURPOSE**

   MOBIS will inquire about felony conviction records. Applicants are required to disclose any prior felony convictions on the MOBIS Employment Application.

2. **POLICY**

   2.1    Applicants will not be considered for hire if the have a prior felony conviction record.

   2.2    All criminal history record information shall be maintained in confidence.

   2.3    Failure to disclose criminal history on the employment application will result in immediate termination.

Effective Date:    06/09/05
Revision Number:  1
Policy:              Criminal History



# MOBIS Alabama, LLC

## DIRECT DEPOSIT POLICY AND PROCEDURES

1. **PURPOSE**

   1.1  Mobis Alabama, LLC wants to provide the most convenient form of banking to our employees when involving their paycheck. A Direct Deposit account provides added security for the employee.

2. **POLICY**

   2.1  MOBIS requires that all employee payroll checks be Direct Deposit into a bank account. This service saves the employee time and provides added security. For those employees who do not have a current bank account on their initial hire date, the MOBIS Human Resources department will assist you in identifying and opening one.

3. **PROCEDURES**

   3.1.  **Setting up a Direct Deposit Account**
   3.1.1.  Get a form from the HR Department.
   3.1.2.  The employee's bank account must be currently open.
   3.1.3.  Have proof of the account number and/or routing number.
   3.1.4.  For a checking account, the employee must provide a voided check.

   3.2  **Canceling a Direct Deposit Account**
   3.2.1  Open a new bank account.
   3.2.2.  Get a form from the HR Department.
   3.2.3.  Have proof of the account number and/or routing number.
   3.2.4.  For a checking account, the employee must provide a voided check.
   3.2.5.  Verify that your payroll check has gone into your new bank account (this will take approximately two weeks).
   3.2.6.  Close your old bank account.

   3.3  **Additions or changes to a Direct Deposit Account**
   3.3.1.  A new Direct Deposit Form must be completed to add, change, or cancel a direct deposit.
   3.3.2.  If an employee wants to have two partial direct deposit accounts, a separate form must be completed for both accounts.
   3.3.3.  All changes must be in writing.

Effective Date:    06/21/04
Revision Number:  1
Policy:          Direct Deposit

Tarsha Hunter v. Mobis Alabama, LLC    0069
Plaintiff's Initial Disclosure Documents



## MOBIS Alabama, LLC

### DIRECT DEPOSIT POLICY AND PROCEDURES

    3.3.4.  All changes must be received by the HR/Payroll department, by Friday 12 noon, to take effect on the following payroll.

3.4    **Failure to follow procedures**

    3.4.1.  Failure to alert the HR/Payroll Department of changes to your Direct Deposit Account may result in the employee's pay check being deposited incorrectly. As a result, the employee's paycheck for that week will be delayed.

Effective Date:   06/21/04
Revision Number: 1
Policy:          Direct Deposit



## MOBIS Alabama, LLC

## DRUG AND ALCOHOL FREE WORKPLACE
## POLICY AND PROCEDURES

1. **PURPOSE**

   1.1  MOBIS Alabama, LLC (MOBIS) is committed to protecting the safety, health and well being of all employees and other individuals in our workplace. MOBIS' commitment can be placed in jeopardy when any employee illegally uses drugs on the job, comes to work under the influence, possesses, distributes, sells drugs in the workplace, or abuses alcohol on the job. To provide the highest level of safety, the best possible services, and to maximize the skills and talents of the all employees, it is important that every employee understand the hazards of drug and alcohol abuse and be aware of the state and federal regulations concerning alcohol misuse and controlled substance abuse.

   1.2  Substance abuse can be a serious threat to MOBIS, its employees and customers. It is the belief of MOBIS that the benefits derived from the testing program outweigh the possible inconvenience to employees. MOBIS expects the cooperation of all of its employees in the implementation and enforcement of this policy and procedures. We have established a drug-free workplace program that balances our respect for individuals with the need to maintain an alcohol and drug-free environment.

2. **POLICY**

   2.1  This policy recognizes that employee involvement with alcohol and other drugs can be very disruptive, adversely affect the quality of work and performance of employees, pose serious health risks to users and others, and have a negative impact on productivity and morale.

   2.2  The illegal use, sale or possession of narcotics, or illegal drugs, alcohol or controlled substances while on the job or on MOBIS property parking area is prohibited and is a dischargeable offense.

   2.3  Any illegal substance will be turned over to the appropriate law enforcement agency and criminal prosecution may result.

Effective Date:      07/26/04
Revision Number:   1
Policy:                   Drug and Alcohol Free Workplace



# MOBIS Alabama, LLC

## DRUG AND ALCOHOL FREE WORKPLACE
## POLICY AND PROCEDURES

2.4   All employees are required to report to work without any alcohol, illegal or mind altering substances in their systems.

2.5   No employee shall report for work, or remain on duty, requiring the operation of a motor vehicle, hazardous equipment or performing job duties in a hazardous environment when the employee has consumed or is affected by alcohol or any controlled substance, except when the use is pursuant to the prescription of a physician having advised the employee that the prescribed substance does not affect the employee's ability to perform in a safe fashion.

2.6   No employee shall use alcohol or illegal drugs while on duty.

2.7   No employee shall perform any job-related duties within four hours following consumption of alcohol.

2.8   Off-duty conduct of a substance abuse-related nature, which affects an employee's job performance, MOBIS' relationship with the government, or reflects badly on the reputation of MOBIS, is prohibited.

2.9   Off-the-job illegal drug use is proper cause for disciplinary action up to and including termination of employment.

2.10  Employees convicted of driving under the influence which results in the suspension or revocation of his or her driving privileges who in the course of his or her job duties are required to operate a motorized vehicle, including a forklift, must notify the manager of the department. The suspension or revocation of a driver will result in a job reassignment either temporarily or permanently. Any job reassignment will be to an open position only.

## 3.   COVERED WORKERS

3.1   Any individual who conducts business for MOBIS, is applying for a position or is conducting business on MOBIS' property is covered by our drug-free workplace policy.   Our policy includes, but is not limited to the CEO, executive

Effective Date:     07/26/04
Revision Number:   1
Policy:             Drug and Alcohol Free Workplace



# MOBIS Alabama, LLC

## DRUG AND ALCOHOL FREE WORKPLACE
## POLICY AND PROCEDURES

management, managers, supervisors, full-time employees, part-time employees, off-site employees, temporary employees, contractors, volunteers, interns and applicants.

3.2     Personnel working for MOBIS under a contract either directly or through the service of an outside firm are required to abide by this policy. The contracted vendor providing services must provide documentation to MOBIS agreeing to conduct a drug screen for all of the contracted company's employees that will be working on MOBIS premises.

3.3     The cost for this testing and any retesting will be the responsibility of the employing contracting firm or the individual contract personnel.

## 4.     OBJECTIVES OF THE COMPANY

4.1     To create and maintain a reasonably safe, alcohol-free and drug-free working environment for all employees, visitors and customers.

4.2     To reduce problems such as absenteeism, tardiness, carelessness and/or other unsatisfactory matters related to job performance generally recognized as related to alcohol misuse and drug abuse.

4.3     To meet the criteria of the Department of Transportation 49 C.F.R. Parts 40.1 through 40.39 as amended.

4.4     To diminish the prospect that MOBIS property and work sites will be used for alcohol misuse or illicit drug activities.

4.5     To safeguard the reputation of MOBIS and its employees.

4.6     To assure any employee with a dependence on or addiction to, alcohol or other drugs that help in overcoming the problem is available.

Effective Date:        07/26/04
Revision Number:    1
Policy:                      Drug and Alcohol Free Workplace



# MOBIS Alabama, LLC

## DRUG AND ALCOHOL FREE WORKPLACE
## POLICY AND PROCEDURES

5.    **DEFINITIONS**

5.1    Controlled Substance - For the purpose of the Policy, controlled substance means a controlled substance in Schedules 1 through V of Section 202 of the Controlled Substance Act (21 U.S.C. 812) and as further defined in regulation 21 CFR 1308.11-1308.15.

5.2    Conviction - For the purpose of the Policy, conviction means a finding of guilt or imposition of sentence, or both, by any judicial body charged with the responsibility to determine violations of the federal or state criminal drug statues.

5.3    Criminal Drug Statute - For the purpose of the Policy, criminal drug statute means a federal or state criminal statute involving the manufacture, distribution, dispensing, possessing or use of any controlled substance.

5.4    Illegal drug - Illegal drug means any drug not legally obtainable or legally obtainable but not legally used. Therefore, the term includes prescription drugs obtained illegally and prescription drugs not being used for prescribed purposes. It also includes marijuana, cocaine, heroin and derivatives of those drugs, among other illegal drugs.

5.5    Legal drug - Legal drug includes prescribed and over-the-counter drugs legally obtained and being used for the purpose for which they were prescribed and/or manufactured.

5.6    Premises- Premises includes all buildings and other facilities which includes MOBIS' parking areas used to conduct its operations or a MOBIS sponsored event, plus all work sites to which Employees are assigned in the course of the performance of their duties for the MOBIS.

5.7    Reasonable Suspicion - For all purposes under this policy, reasonable suspicion shall be defined as a belief based on observed, specific, objective facts where the rational inference to be drawn under the circumstances is that the person is under

Effective Date:      07/26/04
Revision Number:   1
Policy:               Drug and Alcohol Free Workplace



# MOBIS Alabama, LLC

## DRUG AND ALCOHOL FREE WORKPLACE
## POLICY AND PROCEDURES

the influence of drugs or alcohol. An unexplained workplace accident may be considered to provide reasonable suspicion.

5.8 Under the Influence - For the purpose of this policy, being under the influence means that the Employee is affected by a drug, alcohol, and/or the combination of drugs and alcohol in any detectable manner. The symptoms of influence are not confined to those consistent with misbehavior, nor to obvious impairment of physical or mental ability, such as slurred speech or

6. **PROCEDURES**

6.1 MOBIS will take steps to prevent and discourage such use, possession, sale, or distribution of stated contraband at any time by any MOBI Employee or contracted vendors. In accordance with this policy, periodic searches, random or annual urinalysis, drug screening or blood testing may be conducted. Such searches and testing will be performed by MOBIS using qualified contracted agents or qualified management.

6.2 Prescription and over-the-counter drugs are not prohibited when taken in standard dosage and/or according to a physician's prescription. Any Employee who is taking medication prescribed by a physician must be able to provide a record of the prescription, including the name of the medication, the prescribing physician's name, and any limitations the prescription may place on the Employee's ability to perform assigned duties. Any employee taking prescribed or over-the-counter medications will be responsible for consulting the prescribing physician and/or pharmacist to ascertain whether the medication may interfere with safe performance of his/her job. If the use of a medication could compromise the safety of the employee, fellow employees or the public, it is the employee's responsibility to use appropriate personnel procedures (e.g., call in sick, use leave, request change of duty, notify supervisor, notify company doctor) to avoid unsafe workplace practices.

6.3 Refusal by an Employee to submit to a search or testing procedure may constitute grounds for termination.

Effective Date:     07/26/04
Revision Number:    1
Policy:             Drug and Alcohol Free Workplace



**MOBIS Alabama, LLC**

## DRUG AND ALCOHOL FREE WORKPLACE
## POLICY AND PROCEDURES

7.    **DRUG ABUSE PROGRAM**

7.1    Consistent with our overall policy on drugs and alcohol, MOBIS has established a detailed program to provide and maintain a drug free work environment.

7.2    MOBIS may test for the following substances and for any other substance as may be required by state law, federal law, regulations or contractual agreement:

 7.2.1    Alcohol Hallucinogens
 7.2.2    Propoxyhene (Darvon)
 7.2.3    Amphetamines
 7.2.4    Marijuana (cannabinoi 1 metabolites)
 7.2.5    Barbiturates
 7.2.6    Methadone
 7.2.7    Benzodiazepine
 7.2.8    Opiate derivatives (heroin, morphine, codeine)
 7.2.9    Cocaine Metabolites Phencyclidine (PCP)

7.3    MOBIS reserves the right to conduct a periodic review of the foregoing list and to add additional drugs to the list, with or without notice.

8.    **SEARCHES**

8.1    MOBIS reserves the right to conduct unannounced searches of its property, vehicles, and facilities, including work areas, desks and lockers assigned to Employees, at any time. No Employee has the right to interfere with or object to such searches of MOBIS property based on expectations of privacy or otherwise.

8.2    MOBIS reserves the right to search personal property belonging to its Employees, such as, but not limited to, lunch boxes or bags, pocketbooks or briefcases if such property is brought onto MOBIS premises or into MOBIS vehicles.

8.3    MOBIS searches of the person, including articles of clothing being worn by Employees, are prohibited.

Effective Date:    07/26/04
Revision Number:   1
Policy:            Drug and Alcohol Free Workplace



# MOBIS Alabama, LLC

## DRUG AND ALCOHOL FREE WORKPLACE
## POLICY AND PROCEDURES

9.    **DRUG TESTING**

9.1    To ensure the accuracy and fairness of our testing program, all testing will be conducted according to DHHS/SAMHSA guidelines where applicable and will include a screening test; a confirmation test; the opportunity for a split sample; review by a Medical Review Officer, including the opportunity for employees who test positive to provide a legitimate medical explanation, such as a physician's prescription, for the positive result; and a documented chain of custody.

9.2    **Pre-employment Testing** – Following an offer of employment and prior to or hair drug screen. Applicants will be asked to read the policy beginning employment.

   9.2.1    Each applicant for employment will be required as a condition of employment to undergo a blood, urine or hair test and sign the Post Offer Employment Offer and Employee Consent to Alcohol and Drug Screening.

   9.2.2    A positive test makes the applicant ineligible for employment.

9.3    **Random Testing** – MOBIS will randomly choose several employees to take a drug and/or alcohol test without advance notice. The employee must take the test at the time MOBIS makes the request. All employees may be tested during the initial implementation of the program.

   9.3.1    A positive test is grounds for immediate termination of employment.

9.4    **Reasonable Suspicion Testing** – If an employee acts in an erratic manner, MOBIS reserves the right to subject the employee to a drug and/or alcohol screening. All employees may be required to submit to screening whenever a supervisor observes behavior indicating reasonable suspicion an employee has used alcohol or a controlled substance or has otherwise violated the substance abuse rules. The supervisor's determination that reasonable suspicion exists is to be based on specific observations concerning the appearance, behavior, speech or

Effective Date:     07/26/04
Revision Number:    1
Policy:             Drug and Alcohol Free Workplace



## MOBIS Alabama, LLC

### DRUG AND ALCOHOL FREE WORKPLACE
### POLICY AND PROCEDURES

body odors of the employee. Patterns of behavior, for example, absenteeism, tardiness or job performance deterioration, by the employee may also be used.

9.4.1   While one supervisor may require a reasonable suspicion test, when feasible, supervisors are encouraged to obtain a second supervisor as a witness. The Sr. Manager of Human Resources must be notified prior to subjecting an employee to such testing.

9.4.2   A positive test is grounds for immediate termination of employment.

9.5   **Post Accident Testing** – Following a work related accident resulting in personal injury or in damage to MOBIS property will be subjected to a drug and/or alcohol test at the Company physicians' office. Any employee, who fails to report an accident, or submit to substance screening, where required by law or this policy, will be in violation of the policy.

9.5.1   A positive test is grounds for immediate termination of employment.

9.6   **Return to Duty Testing** – An employee returning to work following a leave of absence lasting longer than 30 days, must take a drug test prior to returning to work.

9.6.1   A positive test is grounds for immediate termination of employment.

9.7   **Refusal to Test** - An employee will be subject to the same consequences of a positive test if he or she refuses the screening or the test, adulterates or dilutes the specimen, substitutes the specimen with that from another person or sends an imposter, will not sign the required forms or refuses to cooperate in the testing process in such a way that prevents completion of the test.

10.   **TESTING PROCEDURES**

10.1   Collection Site - MOBIS will designate collection sites where individuals may provide specimens.

Effective Date:   07/26/04
Revision Number:   1
Policy:   Drug and Alcohol Free Workplace



# MOBIS Alabama, LLC

## DRUG AND ALCOHOL FREE WORKPLACE
## POLICY AND PROCEDURES

10.2  Collection Procedures - The laboratory will follow procedures developed by the Federal Department of Transportation for collecting, shipping and accessing specimens.

10.3  Direct Observation - MOBIS has adopted the direct observation procedures as set out in Section 40.25 of the Department of Transportation regulations as amended. A medical representative at the collection site may directly observe an employee while providing the specimen where there is reason to believe that an individual may alter or substitute the specimen. Section 40.25 (e)(2) sets out the only four circumstances where direct observation is appropriate:

10.4  Reporting the Results - The laboratory will communicate the results of all tests to the Company's Medical Review Officer (MRO). The MRO will be responsible for reviewing test results of employees. Prior to making a final decision, the MRO should give the individual in question a chance to provide a medical explanation for a positive test result, either face to face or over the telephone. The MRO shall then promptly report to the Sr. Manager of Human Resources applicants or employees tested positive.

10.5  Request for Retest - The MRO shall advise an affected employee that a retest may be requested within 72 hours from the time the MRO and employee discussed the positive result. The "split" sample will be tested by a different certified laboratory from the laboratory testing the "original" sample. Requests must be submitted to the MRO by the employee.

   10.5.1  The employee will be required to pay the costs of a retest in advance.

10.6  Release of Test Results - Test results shall not be released by MOBIS, beyond the MRO and Company's management without the individual's written authorization. However, all employees will be required to execute a release form permitting the Company to release test results and related information to Workers' Compensation, Unemployment Compensation Commission, or relevant government agencies.

Effective Date:     07/26/04
Revision Number:    1
Policy:             Drug and Alcohol Free Workplace



# MOBIS Alabama, LLC

## DRUG AND ALCOHOL FREE WORKPLACE
## POLICY AND PROCEDURES

11. **CONSEQUENCES**

11.1    One of the goals of our drug-free workplace program is to encourage employees to voluntarily seek help with alcohol and/or drug problems.

11.2    In the case of applicants, if he or she violates the drug-free workplace policy, the offer of employment will be withdrawn and the applicant may not reapply.

11.3    If an employee violates the policy, he or she will be terminated from employment.

11.4    Any Employee who is discharged under this policy will not be eligible for rehire.

12. **EMPLOYEE ASSISTANCE**

12.1    MOBIS recognizes that alcohol and drug abuse and addiction are treatable illnesses. We also realize that early intervention and support improve the success of rehabilitation. To support our employees, our drug-free workplace policy also assists employees the following way.

12.2    Encourages employees to seek help if they are concerned that they or their family members may have a drug and/or alcohol problem.

12.3    Encourages employees to utilize the services of qualified professionals in the community to assess the seriousness of suspected drug or alcohol problems and identify appropriate sources of help.

12.4    Offers all employees and their family member's assistance with alcohol and drug problems through the Employee Assistance Program (EAP) offered by our medical carrier.

12.5    Treatment for alcoholism and other drug use disorders are covered by the employee benefit plan.

12.6    The financial responsibility for recommended treatment belongs to the employee.

Effective Date:       07/26/04
Revision Number:   1
Policy:                   Drug and Alcohol Free Workplace



## MOBIS Alabama, LLC

### DRUG AND ALCOHOL FREE WORKPLACE
### POLICY AND PROCEDURES

13. **CONFIDENTIALITY**

13.1   All information received by the organization through the drug-free workplace program is confidential communication. Access to this information is limited to those who have a legitimate need to know in compliance with relevant laws and management policies.

13.2   Alcohol and drug testing information, including test results, received by the employer are confidential communications and may not be used or received in evidence, obtained in discovery, or disclosed in any public or private proceedings except in the following:

13.2.1   As directed by the specific, written consent of the employee authorizing release of the information to an identified person.

13.2.2   To a subsequent employer upon receipt of a written request from a covered employee as expressly authorized by the terms of the employee's written request.

13.2.3   To a covered employee decision-maker in a lawsuit, grievance, or other proceeding initiated by or on behalf of the individual.

13.2.4   To any state agency with authority over the employer and other agencies including, but not limited to, a worker's compensation, unemployment compensation, or other proceeding relating to a benefit sought by the employee.

14.   **SHARED RESPONSIBILITY**

14.1   A safe and productive drug-free workplace is achieved through cooperation and shared responsibility. Both employees and management have important roles to play.

Effective Date:        07/26/04
Revision Number:    1
Policy:                      Drug and Alcohol Free Workplace



## MOBIS Alabama, LLC

### DRUG AND ALCOHOL FREE WORKPLACE
### POLICY AND PROCEDURES

14.2   All employees are required to not report to work or be subject to duty while their ability to perform job duties is impaired due to on- or off-duty use of alcohol or other drugs.

14.3   Employees are encouraged to:

   14.3.1  Be concerned about working in a safe environment.
   14.3.2  Support fellow workers in seeking help.
   14.3.3  Use the Employee Assistance Program.
   14.3.4  Report dangerous behavior to their supervisor.

14.4   It is the supervisor's responsibility to:

   14.4.1  Observe employee performance.
   14.4.2  Investigate reports of dangerous practices.
   14.4.3  Document negative changes and problems in performance.
   14.4.4  Counsel employees as to expected performance improvement.
   14.4.5  Clearly state consequences of policy violations.

15.   **COMMUNICATION**

15.1   Communicating our drug-free workplace policy to both supervisors and employees is critical to our success. To ensure all employees are aware of their role in supporting our drug-free workplace program:

   15.1.1  All employees will receive a written copy of the policy.
   15.1.2  The policy will be reviewed in orientation sessions with new employees.

Effective Date:      07/26/04
Revision Number:   1
Policy:          Drug and Alcohol Free Workplace



# MOBIS Alabama, LLC

## EDUCATION REQUIREMENTS

## POLICY AND PROCEDURES

1. **PURPOSE**

   In order to be eligible for hire with MOBIS, all team members must possess either a High School Diploma or GED.

2. **PROCEDURE**

   Proof of a diploma or GED must be provided to the HR Department prior to hire.

Effective Date:    06/09/05
Revision Number:  1
Policy:              Education Requirements



## MOBIS Alabama, LLC

### EMPLOYEE RELATIONS
### POLICY AND PROCEDURES

1. **PURPOSE**

   1.1    We encourage employees' to work openly and directly with their supervisors to promote excellent communication.

2. **POLICY**

   2.1    MOBIS believes that the work conditions, wages, and benefits it offers to its employees are competitive with those offered by other employers in this area and in this industry.  Our experience has shown that when employee's deal openly and directly with supervisors, the work environment can be excellent, communications can be clear, and attitudes can be positive. We believe that MOBIS amply demonstrates its commitment to employees by responding effectively to employee concerns.

3. **PROCEDURE**

   3.1    If employees have concerns about work conditions or compensation, they are strongly encouraged to voice these concerns openly and directly to their supervisor or manager and the Sr. Manager of Human Resources.

Effective Date:      06/21/04
Revision Number:    1
Policy:                 Employee Relations



# MOBIS Alabama, LLC

## EMPLOYMENT AT WILL
## POLICY

1. **PURPOSE**

   1.1   All MOBIS Alabama, LLC (MOBIS) employees are "at will employees" which means that they may be terminated at any time with or without cause without subjecting the company to a claim for breach of an employment contract.

2. **POLICY**

   2.1   MOBIS is committed to fair, clearly stated and supportive relationships between itself and its employees. The personnel policies of MOBIS have been established in order to provide a guide to the personnel practices of the company and to ensure consistency of personnel decisions. It is the intention of MOBIS to administer the personnel programs in a manner that complies with all applicable federal, state and local regulations. The handbook is designed to provide guidance to all of the employees at MOBIS. It is not a part of any contract between MOBIS and its employees. It is only a set of informal guidelines for personnel practices.

3. **PROCEDURE**

   3.1   Since the information, policies, rules and benefits described here are necessarily subject to change, understand that revisions to the handbook may occur.

   3.2   All such changes will be communicated through official notices, and understand that revised information may supersede, modify, or eliminate existing policies.

   3.3   Only the Sr. Manager of Human Resources of MOBIS, with approval of the President, has the right to adopt any revisions to the policies in the handbook.

   3.4   The handbook is neither a contract of employment nor a legal document. All employees receive a handbook during new employee orientation or when a new edition is released.

   3.5   It is the employee's responsibility to read and comply with the policies contained in the handbook and any revisions made to it.

   3.6   A copy of the ACKNOWLEDGEMENT FORM will be placed in the employee's personnel file.

Effective Date:       06/21/04
Revision Number:   1
Policy:                    Employment At Will



## MOBIS Alabama, LLC

### EMPLOYMENT OF RELATIVES
### POLICY AND PROCEDURES

1. **PURPOSE**

   The purpose of this policy is to establish a practice within MOBIS regarding the employment of relatives.

2. **POLICY**

   2.1   The Human Resources Department is responsible for the administration of this policy.

   2.2   Relatives, as defined below, are permitted to be employed at MOBIS provided they do not work with or come under the direct supervision of another relative.

   2.3   No Production Team Member, Maintenance Team Member, or Administrative Team Member may work with a related team leader.

   2.4   No production team leader, maintenance team leader, or administrative team leader may work under the direct supervision of a supervisor or manager at any level.

   2.5   No salaried team member at any level may work under the direct supervision of a related supervisor or manager at any level.

3. **DEFINITION**

   3.1   For the purpose of this policy, relatives either by birth, adoption, or by marriage are defined as follows:

| | | |
|---|---|---|
| Wife | Husband | Mother |
| Father | Daughter | Son |
| Sister | Brother | Grandchild |
| Grandfather | Grandmother | Mother-in-law |
| Father-in-law | Daughter-in-law | Son-in-law |
| Sister-in-law | Brother-in-law | Ex-spouses |

Effective Date:      08/14/05
Revision Number:   1
Policy:                   Employment of Relatives

Tarsha Hunter v. Mobis Alabama, LLC   0086
Plaintiff's Initial Disclosure Documents



## MOBIS Alabama, LLC

### EMPLOYMENT VERIFICATIONS

### POLICY AND PROCEDURES

**1.   PURPOSE**

1.1   MOBIS will verify team member information as requested by outside entities regarding employment, income verification, etc.

**2.   PROCEDURE**

2.1   All inquiries regarding employment verification must be referred to the HR (HR) Department.

2.2   Only dates of employment, present or last job title, and hourly or annual income will be verified.

2.3   On financial institution verifications, it is necessary to have a written statement, signed by the team member, granting permission to respond to the inquiry.

2.4   The statement "at will" will be entered in the "potential for continued employment" space.

2.5   All requests for information will be handled by mail or by fax.

2.6   No employment verifications will be given over the telephone.

2.7   The HR Department will complete the form within two (2) days of receipt and return it to the team member or agency.

Effective Date:    06/09/05
Revision Number:  1
Policy:               Employment Verification

Tarsha Hunter v. Mobis Alabama, LLC 0087
Plaintiff's Initial Disclosure Documents



# MOBIS Alabama, LLC

## EQUAL EMPLOYMENT OPPORTUNITY
## POLICY AND PROCEDURES

1.  **PURPOSE**

    The purpose of this policy is to communicate our commitment to Equal Employment Practices at MOBIS Alabama, LLC.

2.  **POLICY**

    The policy and intent of MOBIS is to provide Equal Employment Opportunity to all qualified persons regardless of race, color, religion, national origin, marital status, political affiliation, affection orientation or gender identity, status with regard to public assistance, disability, sex, or age.

    MOBIS intends to respond affirmatively in its employment practices. Affirmative Action applies to all aspects of employment practices including, but not limited to, recruiting, hiring, placement, promotion, demotion, transfer, training, compensation, benefits, layoff, recall, and termination. MOBIS seeks to do business with organizations that encourage Equal Employment Opportunity.

3.  **PROCEDURE**

    3.1   Any employees with questions or concerns about any type of discrimination in the workplace are encouraged to bring these issues to the attention of their immediate supervisor/manager and the Sr. Manager of Human Resources.

    3.2   Employees can raise concerns and make reports without fear of reprisal.

    3.3   Anyone found to be engaging in any type of unlawful discrimination will be subject to disciplinary action, up to and including termination.

Effective Date:      06/21/04
Revision Number:   1
Policy:              Equal Employment Opportunity

Tarsha Hunter v. Mobis Alabama, LLC 0088
Plaintiff's Initial Disclosure Documents



## MOBIS Alabama, LLC

**PROMOTION, TRANSFER, DEMOTION
EXEMPT POSITIONS
POLICY AND PROCEDURES**

1. **PURPOSE**

   1.1   The purpose of Promotions and Transfers is to enhance the career advancement opportunities of employees by providing each staff member the opportunity to apply and receive consideration for promotion or transfer.

2. **POLICY**

   2.1   MOBIS encourages the policy of open promotion, transfer and demotion of employees on the basis of qualifications without regard to race, color, religion, sex, national origin, age, disability, or veteran status, and in keeping with federal and state employment laws and regulations.

   2.2   It is the policy of MOBIS to fill exempt positions with the best qualified and best suited candidate either by promoting, transferring or demoting an employee or by hiring from outside the company

3. **DEFINITION OF TERMS**

   3.1   Promotion - Refers to the permanent movement of an employee from a position in one classification or title to another classification having more complex duties and/or responsibilities and salary range with a higher minimum and maximum.

   3.2   Transfer - Refers to the permanent lateral change of an employee from one position to another position of the same classification or title into another department, division, or a different work unit within the same department. A transfer involves no substantial change of duties, responsibilities, or qualifications.  There is no change in salary range and no increase in pay.

Effective Date:      01/01/05
Revision Number:   1
Policy:                  Promotion Transfer Demotion Exempt



**MOBIS Alabama, LLC**

### PROMOTION, TRANSFER, DEMOTION
### EXEMPT POSITIONS
### POLICY AND PROCEDURES

3.3    Demotion - Refers to the permanent movement of an employee from a position in one classification or title to another classification having less complex duties and/or responsibilities and a salary range with a lower minimum and maximum.

4. **PROCEDURE FOR PROMOTION OF TRANSFER**

4.1    Job openings where an employee was promoted as a result of good job performance will not be posted. (Example: Assistant Manager of Quality to Manager of Quality)

4.2    A notice of jobs available will be posted on the company bulletin boards. An employee who wishes to apply for one of these vacant positions must do so through the Human Resources Department.

4.3    Employees may complete an internal application to be considered for a promotion or transfer if they meet the following.

4.3.1    The minimum qualifications for the job, and
4.3.2    Have been employed in their current position for a minimum period of six (6) consecutive months, and
4.3.3    Have a satisfactory record of performance.

4.4    The six (6) month requirement may be waived if the position for which the employee wishes to apply is within the same department and the Sr. Manager of the department and the HR department approves the request.

4.5    If the position for which the employee wishes to apply is outside the department, the employee must secure written permission from both the current first-line supervisor and the current Sr. Manager of the department in order to proceed with discussion of the promotion or transfer request.

Effective Date:    01/01/05
Revision Number:    1
Policy:    Promotion Transfer Demotion Exempt



**MOBIS Alabama, LLC**

## PROMOTION, TRANSFER, DEMOTION
### EXEMPT POSITIONS
### POLICY AND PROCEDURES

4.6   If an employee is being considered for transfer, the current department manager must obtain approval from their manager and the Division Plant Manager. The potential future department manager must obtain approval from their manager and the Division Plant Manager. After each of these approvals is obtained, both department managers will discuss the possible transfer with the Sr. Manager of Human Resources.

4.7   An employee who makes application for a promotion or transfer may be required to take pre-employment tests when applicable.

4.8   The effective date of a promotion or transfer will be determined jointly by the two departments involved.

4.9   Normal notice is two weeks.

4.10  An employee's expressed interest in a position will not jeopardize their current position or future opportunities.

5.   **PROCEDURE FOR DEMOTION**

5.1   A departmental Sr. Manager may demote an employee to a position where he or she will be able to meet performance requirements, to apply disciplinary action for misconduct, or for other reasons.

5.2   If an employee is being considered for demotion, the current department manager must obtain approval from their manager and the Division Plant Manager. The potential future department manager must obtain approval from their manager and the Division Plant Manager. After each of these approvals is obtained, both department managers will discuss the possible demotion with the Sr. Manager of Human Resources.

5.3   The effective date of a demotion will be determined jointly by the two departments involved.

Effective Date:       01/01/05
Revision Number:   1
Policy:                    Promotion Transfer Demotion Exempt



## MOBIS Alabama, LLC

### PROMOTION, TRANSFER, DEMOTION
### EXEMPT POSITIONS
### POLICY AND PROCEDURES

**6.    SALARY ADJUSTMENTS**

6.1    Promotion - The Sr. Manager of Human Resources will make a recommendation of a salary increase based on the experience level of the promoted employee and internal equity of other employee's in the same classification.

    6.1.1    The President will make the final approval of any salary increase.

6.2    Transfer - In order to discourage indiscriminate transfers, job hopping, and unfair competition between departments, a staff member who transfers laterally to another position having the same or a different title, and the same salary range, is not eligible for salary increase.

6.3    Demotion - The Sr. Manager of Human Resources shall determine the new pay rate by consideration of the circumstances related to the demotion, the employee's employment record, job performance and internal equity of other employee's in the same classification.

    6.3.1    The President will make the final approval of any salary decrease.

Effective Date:     01/01/05
Revision Number:    1
Policy:             Promotion Transfer Demotion Exempt



# MOBIS Alabama, LLC

## FLOWERS FOR SPECIAL OCCASION

## POLICY AND PROCEDURES

**1.**
**2.    PURPOSE**

   1.1    MOBIS Alabama, LLC would like to share in the joy of our employee's lives as well as support them during their time of grief.  We will send flowers to our employee's during certain occasions.

**2.    POLICY**

   MOBIS will send flowers to employees for the following events.

   1.1.    If an employee is hospitalized.
   1.2.    If an employee's immediate family member passes away (see qualifying family members under the bereavement leave policy – paid leave only).

**3.    PROCEDURE**

   3.1.    The employee or employee's supervisor should contact the General Administration Department with appropriate details.
   3.2.    The General Administration Department will order flowers from a local florist.

Effective Date:    06/21/04
Revision Number:    1
Policy:    Flowers



## MOBIS Alabama, LLC

### FAMILY MEDICAL LEAVE
### POLICY AND PROCEDURES

**1.  PURPOSE**

    1.    The Family Medical Leave Act (FMLA) entitles eligible team members to take up to 12 weeks of unpaid, job-protected leave each year for specified family and medical reasons due to a "serious health condition".

**2.  POLICY**

    2.1    Serious health condition means an illness, injury, impairment, or physical or mental condition that involves:

        2.1.1    Any period of incapacity or treatment connected with inpatient care (i.e., an overnight stay) in a hospital, hospice, or residential medical care facility.

        2.1.2    Any period of incapacity requiring absence of more than three calendar days from work that also involves continuing treatment by a health care provider.

        2.1.3    Continuing treatment by a health care provider for a chronic or long-term health condition that is incurable or so serious that, if not treated, would likely result in a period of incapacity of more than three calendar days, and for parental care.

    2.2    The law contains provisions relating to employer coverage; team member eligibility for the benefits of the law; entitlement to leave, maintenance of health benefits during leave, and job restoration after leave; notice and certification of the need for FMLA leave; and protection for team members who request or take FMLA leave.

**3.  ELIGIBILITY**

    3.1    Team members are eligible for FMLA benefits after the following:

        3.1.1    Worked for the employer for at least 12 months, and

        3.1.2    Worked at least 1,250 hours during the previous 12 months, and

Effective Date:    05/31/05
Revision Number:  1
Policy:          FMLA



# MOBIS Alabama, LLC

## FAMILY MEDICAL LEAVE
## POLICY AND PROCEDURES

    3.1.3   Worked at a location where at least 50 team members are employed by the employer within 75 miles.

3.2    Temporary Team members

    3.2.1   Any hours worked by a team member at MOBIS, while working through a temporary agency, will count toward their eligibility regarding FMLA. (Example: Temp A starts January 10, 2005 and works FT or 320 hours through a temp agency and is hired March 10, 2002. That team member becomes eligible for FMLA at MOBIS on January 10, 2006 if they meet all other eligibility criteria.)

    3.3   Employer Coverage - Private-sector employers who employ 50 or more team members.

4.    **PROVISIONS**

4.1    Leave Entitlement

    4.1.1   MOBIS must grant an eligible team member up to a total of 12 workweeks of <u>unpaid</u> leave during any 12-month period for one or more of the following reasons:

        4.1.1.1    The birth or placement of a child for adoption or foster care.

        4.1.1.2    To care for an immediate family member (spouse, child, or parent) with a serious health condition.

        4.1.1.3    To take medical leave when the team member is unable to work because of his or her own serious health condition.

4.2    Notice and Certification

    4.2.1   Team members seeking to use FMLA leave are required to provide:

        4.2.1.1    30-day advance notice of the need to take FMLA leave when the need is foreseeable.

Effective Date:    05/31/05
Revision Number:    1
Policy:    FMLA



# MOBIS Alabama, LLC

## FAMILY MEDICAL LEAVE
## POLICY AND PROCEDURES

      4.2.1.2      A medical certification supporting the need for leave due to a serious health condition affecting the team member or an immediate member.

      4.2.1.3      Periodic reports during FMLA leave regarding the team member's status and intent to return to work.

4.3    All remaining vacation must be exhausted when taking family or medical leave. The remainder of the leave will be unpaid.

4.4    Birth or Adoption

    4.4.1  Leave for birth or adoption (including foster care placement) must conclude within 12 months of the birth or placement.

4.5    Married Co-Workers

    4.5.1  Spouses employed by the same employer are jointly entitled to a combined total of 12 workweeks of family leave for the birth or placement of a child for adoption or foster care, and to care for a child or parent (but not a parent "in law") who has a serious health condition.

4.6    Key Team Members

    4.6.1  A "key" team member is a salaried "eligible" team member who is among the highest-paid 10 percent of team members within 75 miles of the worksite. Under specified and limited circumstances, MOBIS may refuse to reinstate certain highly paid "key" team members after using the FMLA leave. In order to do so, MOBIS will:

      4.6.1.1      Notify the team member of his/her status as a "key" team member in response to the team member's notice of intent to take FMLA leave.

      4.6.1.2      Notify the team member as soon as the employer decides to deny job restoration and explain the reasons for this decision.

      4.6.1.3      Offer the team member a reasonable opportunity to return to work from FMLA leave after giving this notice.

Effective Date:    05/31/05
Revision Number:  1
Policy:         FMLA



**MOBIS Alabama, LLC**

### FAMILY MEDICAL LEAVE
### POLICY AND PROCEDURES

4.7    Intermittent Leave

    4.7.1    Under some circumstances, team members may take FMLA leave intermittently, which means taking leave in blocks of time, or by reducing their normal weekly or daily work schedule.

    4.7.2    Where FMLA leave is for birth or placement for adoption or foster care, use of intermittent leave is subject to the employer's approval.

    4.7.3    FMLA leave may be taken intermittently whenever it is medically necessary to care for a seriously ill family member, or because the team member is seriously ill and unable to work.

    4.7.4    Leave for Medical Treatment

        4.7.4.1    When leave is needed to care for an immediate family member or the team member's own illness, and is for planned medical treatment, the team member should schedule treatment so that it will not unduly disrupt the employer's operation.

4.8    Maintenance of Health Benefits

    4.8.1    MOBIS will maintain group health insurance coverage for an team member on FMLA leave whenever such insurance was provided before the leave was taken and on the same terms as if the team member has continued to work.

    4.8.2    The team member may choose to pay their portion of insurance while on leave or wait until they return to reimburse the company.

    4.8.3    If the team member does not return to work from FMLA leave, MOBIS will recover the full premiums, plus 2% administrative fee, it paid to maintain insurance coverage.

4.9    Job Restoration

    4.9.1    Upon return from FMLA leave, a team member will be restored to his or her original job, or to an equivalent job with equivalent pay, benefits, and other employment terms and conditions.

    4.9.2    It may be necessary to change the team member to a different shift. Restoration to the original shift will occur whenever possible.

Effective Date:      05/31/05
Revision Number:   1
Policy:                   FMLA



# MOBIS Alabama, LLC

## FAMILY MEDICAL LEAVE
## POLICY AND PROCEDURES

    4.9.3   A team member's use of FMLA leave cannot result in the loss of any employment benefits that the team member earned or was entitled to before using FMLA leave.

## 5.    PROCEDURE

5.1    As soon as a team member becomes aware of their need to take family/medical leave, they must notify Human Resources.

5.2    The HR Department will discuss the need for such a leave with the team member.

5.3    The HR Department will give the team member a Certification of Physician form, to be completed by the treating physician.

5.4    The team member must return the form within 14 calendar day, , of receipt, or the leave will be denied.

Effective Date:    05/31/05
Revision Number:  1
Policy:         FMLA



## MOBIS Alabama, LLC

### GARNISHMENT
### POLICY AND PROCEDURES

1. **PURPOSE**

   A garnishment is a court order specifying that a portion of an employee's paycheck must be withheld and paid directly to the court.

2. **POLICY**

   MOBIS is required to acknowledge receipt of a garnishment and must then withhold the required amount from the employee's next paycheck.

3. **PROCEDURE**

   3.1   In most cases, garnishments will be delivered to the HR Department by the County Sheriff's Department.

   3.2   The HR Department will make a copy of the garnishment papers and place it in the employee's personnel file.

   3.3   The HR Department will make a copy of the garnishment papers for the employee. This copy will be given to the supervisor in a confidential envelope and forwarded to the employee.

   3.4   The Payroll Department will follow the directions of the garnishment papers, usually instructing them to begin withholdings from the employee's paycheck immediately.

   3.5   Any questions the employee may have regarding the garnishment must be directed to the courts, not a company representative.

Effective Date:      12/07/04
Revision Number:    1
Policy:                   Garnishment



## MOBIS Alabama, LLC
### GRATUITIES ACCEPTANCE
### POLICY AND PROCEDURES

1. **PURPOSE**

   1.1   To outline acceptable guidelines for gratuities from customers, suppliers, vendors or contractors.

2. **POLICY**

   2.1   The direct or indirect solicitation or acceptance by a team member of any gift, gratuity, entertainment, favors, loans, or any other thing of monetary value from any person, corporation, or group is forbidden if the team member has reason to believe the person or group has or is:

   2.1.1   Seeking to obtain contractual or other business or financial relationships.
   2.1.2   Has an interest that may be substantially affected by such team member's performance or nonperformance of his official duty

   2.2   An exception to the general rule is the acceptance of food and refreshments of nominal value on infrequent occasions in the ordinary course of a lunch or dinner meeting or other meeting or on an inspection tour where arrangements are consistent with the transaction of official business.

   2.2.1   Gifts in this type setting should be valued less than twenty-five (25) dollars fair market value.

Effective Date:       05/30/05
Revision Number:   1
Policy:                    Gratuities



# MOBIS Alabama, LLC

## GROUP INSURANCE POLICY AND PROCEDURES

1. **PURPOSE**

   1.1  MOBIS is committed to providing cost-effective insurance for all its full time team members.  MOBIS reserves the right to change the nature of the benefits offered to team members. This includes changing insurance carriers, deductibles, premiums, or other features of any benefit. In addition, MOBIS may decide to discontinue one or more benefits. Covered team members will be notified of such changes or discontinuations as soon as practicable.

2. **ELIGIBILITY**

   2.1  Insurance eligibility begins after thirty (30) calendar days of employment.
   2.2  401k eligibility begins after thirty (30) days of employment and at the beginning of the next quarter.

3. **POLICY**

| Type of Insurance | Responsible Party |
|---|---|
| Basic Life and AD&D Insurance | MOBIS pays cost of premium |
| Long Term Disability | MOBIS pays cost of premium |
| Medical and Dental Insurance | MOBIS and team member share cost of premium |
| Optional Life Insurance | Team member pays the cost of the premium |
| AFLAC | Team member pays the cost of the premium |
| 401k | No match currently available |

*Single and family plans are set at different contribution rates.

4. **PROCEDURE**

   4.1  Specific details on coverage and benefits are outlined in an insurance package given to each team member during new employee orientation by the Human Resources (HR) Department.
   4.2  Team members must elect insurance coverage during their first week of employment, while waiting to become eligible.

Effective Date:      05/31/05
Revision Number:    1
Policy:              Group Insurance



## MOBIS Alabama, LLC

### GROUP INSURANCE POLICY AND PROCEDURES

4.3.  If a team member fails to elect insurance during this time, they must wait for the next open enrollment generally during the month of December.

4.4  Team members will be reminded of upcoming open enrollment each year and informed of any changes to the insurance policies as they occur.

## 5.  CONTINUATION OF INSURANCE

5.1  In the event employment is terminated from MOBIS, a team member may be eligible to elect COBRA.  Once termination is effective, Group Insurance is affected as follows:

5.2  Medical Insurance is cancelled as of the last day of the month termination takes place.

5.3  All other insurance is cancelled as of the last day worked.

5.4  A COBRA letter will be issued to the team member from the Human Resources (HR) Department within two (2) days of a team member's termination date.

Effective Date:      05/31/05
Revision Number:   1
Policy:                    Group Insurance



## MOBIS Alabama, LLC

### HARASSMENT POLICY AND PROCEDURES

1. **PURPOSE**

   1.1 Harassment in the workplace is against the law in the United States. It is a requirement that employer's communicate a policy to all employees regarding their feeling on the issues of harassment.

2. **POLICY**

   2.1 MOBIS is committed to providing a work environment free from all forms of intimidation, hostility, offensive behavior, discrimination and unlawful harassment. Such discrimination or harassment may take the form of offensive verbal or physical conduct or verbal or written derogatory or discriminatory statements that may result in decisions affecting status, promotions, raises, or favorable work assignments. Any action, whether verbal or written, based on an individual's sex, race, ethnicity, age (40+), religion, or any other legally protected characteristic will not be tolerated. Discrimination and unlawful harassment are forms of misconduct that demean another person and undermine the integrity of the employment relationship. This type of behavior is strictly prohibited. Any Employee engaging in unlawful discrimination or harassment may be subject to disciplinary action, up to and including termination of employment.

3. **PROCEDURE**

   3.1 As a MOBIS employee, if a person's behavior makes you uncomfortable, you should feel free to immediately advise the person that the behavior is inappropriate and they would like it to stop.

   3.2 If you are not comfortable discussing the issue with the person, or if the person fails to respect your request, you should report the incident to your supervisor.

   3.3 If you do not feel the supervisor is the appropriate person to report the incident to, you should contact the Sr. Manager of Human Resources (HRM).

   3.4 If you report an incident to your supervisor, the supervisor is then responsible for informing the HRM immediately.

Effective Date:     07/20/04
Revision Number:   1
Policy:             Harassment



## MOBIS Alabama, LLC

### HARASSMENT POLICY AND PROCEDURES

3.5   It is the responsibility of the HRM to investigate all claims of harassment.

3.6   The HRM will record the statement from the employee.

3.7   The HRM will interview the accused employee and any witnesses.

3.8   Based on the evidence, appropriate action will be taken.

3.9   No retaliation will occur because an employee has in good faith reported an incident of suspected harassment.

3.10   MOBIS will work to establish mutually agreed upon safeguards against retaliation while attempting to mediate any sexual harassment complaint.

4.   **DEFINITION OF HARASSMENT**

4.1   Harassment can take many forms.  It may be, but is not limited to, words, signs, jokes, pranks, intimidation, physical contact, or violence.  Harassment is not necessarily sexual in nature.

4.2   One form of illegal discrimination and harassment is sexual harassment.  We may generally categorize "sexual harassment" as unwanted and unwelcome verbal, physical, or visual behavior or conduct that is either, sexual in nature or directed at a person's gender where submission to the behavior may be perceived to be a term or condition of employment.

4.3   Submission to or rejection of the behavior is used as the basis for making employment decisions such as promotions, transfers, annual evaluations, etc.  Such conduct creates an intimidating, hostile, or offensive working environment or interferes with an individual's work performance.

4.4   Examples of sexual harassment include, but are not limited to, the following:

Effective Date:     07/20/04
Revision Number:   1
Policy:                Harassment



## MOBIS Alabama, LLC

### HARASSMENT POLICY AND PROCEDURES

    4.4.1   Innuendoes, jokes, comments, slurs, invitations, or graphic commentary about an individual's body which are either sexual in nature or directed at a person's gender;

    4.4.2   Sexually suggestive or obscene objects, pictures, cartoons, posters, calendars, clothing, notes, letters, emails, or electronic media.

    4.4.3   Sexual gestures, leering, touching, assaulting, or impeding or blocking movements.

## 5. RESPONSIBILITY

5.1   As a MOBIS Employee, you are responsible for keeping our work environment free of harassment.

5.2   Any employee that becomes aware of an incident of harassment, whether by witnessing the incident or being told of it, must report it to the HRM or any member of management of MOBIS with whom you feel comfortable.

5.3   When MOBIS becomes aware that harassment might exist, it will take prompt and appropriate action.

Effective Date:   07/20/04
Revision Number:  1
Policy:          Harassment



## MOBIS Alabama, LLC

### HOLIDAY POLICY AND PROCEDURES

1. **PURPOSE**

   1.1   To provide a guideline for employee's of when the company is closed for business.

2. **POLICY**

   2.1   MOBIS observes and allows time off with pay for the following holidays:

   2.1.1  New Year's Day
   2.1.2  Martin Luther King Day
   2.1.3  Good Friday
   2.1.4  Memorial Day
   2.1.5  Independence Day
   2.1.6  Labor Day
   2.1.7  Thanksgiving Day
   2.1.8  Day after Thanksgiving
   2.1.9  Christmas Eve
   2.1.10 Christmas Day
   2.1.11 Four (4) days between Christmas Day and New Years Day

   2.2   National guidelines are usually followed for scheduling these holidays; however, the company President may alter the day a particular holiday is observed.

3. **ELIGIBILITY**

   3.1   All regular full-time employees.  (01/01/05)

4. **PROCEDURE**

   4.1   Regular full-time employees are eligible for holiday pay. (01/01/05)

   4.2   Employees must work the entire eight-hour work shift preceding and the eight hour work shift on the workday following the holiday.

Effective Date:    07/20/04, 01/01/05
Revision Number:  1, 2
Policy:                Holiday



## MOBIS Alabama, LLC

### HOLIDAY POLICY AND PROCEDURES

4.3    The only exceptions to the full work shift requirement rule shall be if the employee leaves work on the workday before or after the holiday because of an industrial accident.

4.4    Holiday pay will be calculated based on the employee's straight-time pay rate times the number of hours the employee would normally have worked on that day, with a maximum of eight (8) hours pay.

4.5    If an eligible hourly employee works on a recognized holiday, they will receive holiday pay plus wages at their straight-time rate for the hours worked on the holiday. At times, business needs may require employees to work on a holiday. The company reserves the right to require an employee to work on a holiday.

4.6    Paid time off for holidays will be counted as actual hours worked.

4.7    If a holiday falls during an employee's scheduled vacation, the employee will be paid for the holiday instead of deducting time from their vacation hours.

4.8    Employees who are on Disability, Worker's Compensation or Family Medical Leave are not eligible for holiday pay.

4.9    When a salaried employee is required to work on a holiday, his or her department head may authorize time off with pay, at a later date, equal to the amount of time worked on the holiday. Such time off shall be at the mutual convenience of MOBIS and the employee.

Effective Date:    07/20/04, 01/01/05
Revision Number:    1, 2
Policy:    Holiday



# MOBIS Alabama, LLC

## IDENTIFICATION/PROXIMITY BADGES
## POLICY AND PROCEDURES

1. **PURPOSE**

   1.1   The purpose of providing badges for all MOBIS Alabama, LLC employees' is to protect your workforce by requiring that everyone identify who they are and where they work. This will help identify people that possibly do not belong on the premises.

2. **POLICY**

   2.1   All MOBIS employees will be given an identification/proximity badge on their first day of employment.

   2.2   It is the employee's responsibility to bring these badges to work everyday to allow entrance through doors with proximity panels on them. (01/04/05)

   2.3   It is the responsibility of every employee to ensure their badges are working properly. (01/04/05)

3. **PROCEDURE**

   3.1   <u>Lost Badges</u> - If you lose your identification/proximity badge you should report this to the Human Resources (HR) or Safety Department or a supervisor immediately. (01/04/05)

    3.1.1   The supervisor should direct the employee to the HR/Safety Department to receive a new one.
    3.1.2   The HR/Safety Department will provide new one's at a cost of $15 each, which can be payroll deducted.
    3.1.3   Third shift employees should not leave work in the morning until they have gone by the HR/Safety Department to receive their new time badge.

   3.2   <u>Problems with Badges</u> - Any problems with your identification/proximity badge must be reported to the HR/Safety Department or a supervisor immediately.

Effective Date: 08/02/04, 01/04/05
Revision Number: 1, 2
Policy:   ID/Proximity Badges



## MOBIS Alabama, LLC

### IDENTIFICATION/PROXIMITY BADGES
### POLICY AND PROCEDURES

3.2.1   If the supervisor is informed, the employee should be directed to the HR/Safety Department to receive a new one.

3.2.2   HR/Safety will verify the effectiveness of the identification/proximity badge.

3.2.4   If the identification/proximity badge does not work properly, a new one will be provided for the employee at no cost.

Effective Date:      08/02/04, 01/04/05
Revision Number:   1, 2
Policy:                   ID/Proximity Badges



# MOBIS Alabama, LLC

## JURY DUTY POLICY AND PROCEDURES

1. **PURPOSE**

   1.1  To allow people time away from the job to participate in a civic responsibility for the State and/or Federal government..

2. **POLICY**

   2.1  MOBIS considers jury duty a civic responsibility and accordingly approves time off using the following guidelines. Postponements of jury duty shall be requested by MOBIS only in exceptional circumstances when it is determined the employee's absence would create serious operational difficulties. This will be coordinated by the Sr. Manager of Human Resources.

   2.2  MOBIS will provide income protection while an Employee carries out their civic responsibility. MOBIS provides the difference between jury duty pay and the Employee's regular day's pay, not to exceed eight (8) hours a day, for time spent serving on jury duty.

3. **PROCEDURE**

   3.1  MOBIS employees who receive instructions to report for jury duty must notify their supervisor immediately.

   3.2  The supervisor or employee must bring a copy of the summons or subpoena to the Human Resources Department and it will be placed in the employee's personnel file.

   3.3  The employee must bring an attendance slip to the Human Resources Department upon return from jury duty in order to receive income protection compensation.

   3.4  While an employee is serving on jury duty, they will temporarily transfer to an 8:00 a.m. to 4:30 p.m. shift until their obligation is completed.

Effective Date:     07/20/04
Revision Number:   1
Policy:              Jury Duty

Tarsha Hunter v. Mobis Alabama, LLC
Plaintiff's Initial Disclosure Documents
0110



## MOBIS Alabama, LLC

### JURY DUTY POLICY AND PROCEDURES

3.5     If court recesses early on a particular day, the employee is required to report to work if at least two hours of their scheduled shift remain.

3.6     If an employee fails to report to work if court recesses early on a particular day, they will be counted as absent.

3.7     Employees will be paid for the time spent on jury duty, with a maximum of eight (8) hours day.

3.8     An employee will be paid for time spent in court if they are testifying on MOBIS' behalf.

Effective Date:     07/20/04
Revision Number:   1
Policy:            Jury Duty



# MOBIS Alabama, LLC

## MILITARY LEAVE
## POLICY AND PROCEDURES

1. **PURPOSE**

   1.1 Team members absent on their monthly weekend drill duty, annual two-week National Guard or Reserve duty or get called to active duty shall be considered on an excused leave of absence and may elect one of the following options related to their pay.

2. **PROCEDURE**

   2.1 If a team member makes a higher wage at MOBIS, we will make up the difference of pay for up to thirty (30) days.

   2.2 The team member must show a copy of the military pay statement to the Payroll department.

   2.3 Team member benefits will not accumulate during the leave.

   2.4 The team member will be given a Consolidated Omnibus Budget Reconciliation Act (COBRA) notice for election to continue insurance during an extended leave.

   2.5 The team member will reimburse MOBIS for their portion of the insurance paid in their absence, by having the deductions taken from their paycheck.

   2.6 A team member called up to active duty is allowed an unpaid leave of absence to meet his or her military responsibilities.

   2.7 Upon honorable discharge from active duty, the team member will be allowed ninety days to apply for reinstatement to his or her former job.

   2.8 The team member will be reinstated to the same or similar job formerly held, with the same duties, same level of pay, benefits and seniority had they not been on active military duty.

Effective Date:     09/12/05
Revision Number:  1
Policy:                  Military Leave

Tarsha Hunter v. Mobis Alabama, LLC 0112
Plaintiff's Initial Disclosure Documents



## MOBIS Alabama, LLC

### OVERTIME PAY
### POLICY AND PROCEDURES

1. **PURPOSE**

   The purpose of this policy is to identify how overtime if calculated.

2. **POLICY**

   2.1   <u>Overtime</u> - Overtime is defined as more than forty (40) hours worked in a seven (7) day period from Sunday midnight to the following Sunday midnight. Overtime is paid to all Hourly Non-Exempt employees.

   2.1.1   When operating requirements or other needs cannot be met during the employee's regular scheduled working hours, employees may be scheduled to work overtime hours without notice.

   2.1.2   All employees should expect to work some overtime during the week without prior notice. The employee will be notified as soon as reasonably possible for OT during the regular work week.

   2.1.3   A refusal to work this overtime will result in an early out or absence.

   2.1.4   When overtime is necessary on Saturday and/or Sunday, the supervisor will give the employee 24 hours notice from the time the OT is to begin.

   2.1.5   Overtime assignments will be distributed as equitably as practical to all employees qualified to perform the required work.

   2.1.6   Overtime pay is based on actual hours worked.

   2.1.7   Time off for vacation, funeral leave, jury duty, and holiday will be considered hours worked for purposes of performing overtime calculations.

| | |
|---|---|
| Effective Date: | 03/21/05 |
| Revision Number: | 1 |
| Policy: | Overtime |



## MOBIS Alabama, LLC

### OVERTIME PAY
### POLICY AND PROCEDURES

2.1.8    Overtime hours are compensated at one and a-half (1 1/2) times the employee's base hourly rate of pay, excluding add-on pay such as Shift Premium.

2.1.9    All overtime work must receive the President's prior authorization.

2.1.10  Any overtime worked by the employee without the supervisor's authorization will result in disciplinary action and possible non-payment of the overtime worked.

2.2    <u>Double Time</u> - An overtime rate equal to two (2) times the employee's base hourly rate will be paid for work performed on Sunday. Double Time is paid to all Hourly Non-Exempt employees.

2.2.1    To qualify for double time, an employee must have worked a minimum of forty-eight (48) hours during the six (6) CONSECUTIVE WORK DAYS immediately preceding the Sunday work.

2.2.2    In addition the employee's shift must be a Sunday shift.

2.2.3    No double time will be paid for Saturday shift hours that extend into Sunday unless the Saturday shift extends more than four (4) hours into Sunday. Then only those hours in excess of four will be compensated at the double time rate of pay.

2.2.4    To receive credit for a workday, an employee must work a minimum of four (4) hours in a particular shift.

2.2.5    All overtime work must receive the President's prior authorization.

2.2.6    Any overtime worked by the employee without the supervisor's authorization will result in disciplinary action and possible non-payment of the overtime worked.

Effective Date:      03/21/05
Revision Number:     1
Policy:              Overtime



# MOBIS Alabama, LLC

## OVERTIME PAY
## POLICY AND PROCEDURES

2.3 <u>Straight Time</u> – An overtime rate equal to one (1) times the employee's calculated hourly rate defined as more than fifty (50) hours worked in a seven (7) day period from Sunday midnight to the following Sunday midnight.

2.3.1 Straight Time is paid to Salaried Non-Exempt employees in the following job categories: Technician's and Supervisor's.

2.3.2 Manual Time Sheets must be completed by these employees and turned into the Payroll Department each week.

2.3.3 All overtime work must receive the supervisor's prior authorization.

2.3.4 Any overtime worked by the employee without the supervisor's authorization will result in disciplinary action and possible non-payment of the overtime worked.

2.3.5 Casual OT will not be compensated. Example: If an employee's shift is 8:00 am - 5:00 pm and the employee chooses to come in at 7:00 am, the time from 7:00 am - 8:00 am will not be compensated as this is considered casual OT. However, if the supervisor requests the employee to come in early for a special project, the time will be compensated. To expand on the example, if an employee's shift is 8:00 am - 5:00 pm and the employee chooses to stay past 5:00 pm, the time beyond 5:00 pm will not be compensated. However, if the supervisor requests the employee to stay for a special project, the time will be compensated.

## 3. PROCEDURE

3.1 All overtime hours for hourly and salaried non-exempt employees must be approved prior to the overtime being worked.

3.2 Any OT that the supervisor or employee feels is necessary must be approved by 4:00 pm by the President for hourly non-exempt and their immediate supervisor for salaried non-exempt.

Effective Date:    03/21/05
Revision Number:    1
Policy:    Overtime



# MOBIS Alabama, LLC

## OVERTIME PAY
## POLICY AND PROCEDURES

3.3    Overtime approval sheets must be turned into the Payroll department by 5:00 pm of the day the OT is worked.

3.4    Any overtime worked by the employee without the supervisor's authorization will result in disciplinary action and possible non-payment of the overtime worked.

Effective Date:         03/21/05
Revision Number:        1
Policy:                 Overtime

## PRE EMPLOYMENT OFFER AND EMPLOYEE CONSENT
## TO ALCOHOL AND DRUG SCREENING

On this day, a copy of the MOBIS's Drug, Alcohol and Weapons Policy was made available to me. Consistent with that policy, I have been requested by the MOBIS to submit to a screening test for illegal drugs, illegally used legal drugs and/or alcohol which includes the collection of blood, urine, hair and/or breath samples and other necessary medical tests to determine the presence or use of alcohol, drugs or controlled substances. I also understand that in the event I become a MOBIS Employee, I may be subject to future for-cause and random testing in accordance with the Drug, Alcohol and Weapons Policy.

I hereby voluntarily consent to provide MOBIS with samples of blood, urine, hair and/or breath for such purpose at laboratories designated by MOBIS. I consent to having specimens tested at the selected laboratories. Further, I certify that the specimen collected from me will be mine and will not be adulterated or altered in any manner.

The tests will be used to detect the presence of the following substances, in addition to other substances for which MOBIS may be required to test for under Federal or State law or contractual agreement:

- Alcohol Hallucinogens
- Propoxyhene (Darvon)
- Amphetamines Marijuana (cannabinoid metabolites)
- Barbiturates
- Methadone
- Benzodiazepine
- Opiate derivatives (heroin, morphine, codeine)
- Cocaine Metabolites Phencyclidine (PCP)

I understand that all screening tests for drugs will be subject to careful testing procedures with mandatory confirmation of any preliminary positive tests. I further understand that if my test indicates a confirmed positive for illegal drugs, I will not be considered for employment, or in the event I am an Employee at the time of the test I may be subject to discipline including termination, in accordance with the Drug and Alcohol Policy. I will be given reasonable opportunity to explain confirmed positive test for substances other than illegal drugs. If I provide an unacceptable explanation I will be denied employment or may be terminated.

I understand that I may request a copy of any tests taken, as part of the screening tests upon receipt of the results by MOBIS' Sr. Manager of Human Resources, from the laboratory.

Effective Date:      07/26/04
Revision Number:   1
Form:                    HR01

I understand the results of these tests and other relevant medical information may be used for employment decisions. I hereby authorize the designated laboratory to release results to MOBIS' Sr. Manager of Human Resources.

I further agree to hold MOBIS' agents, officers and Employees harmless from, and waive all claims existing and future for any and all liability, including negligence, arising in connection with the testing for drugs and/or alcohol.

AGREED TO SIGN: _____

DATE: _____

WITNESS: _____

REFUSED TO SIGN: _____

DATE: _____

WITNESS: _____

Refusal to sign document makes the applicant ineligible for hire and grounds for immediate termination for employees.

Effective Date:     07/26/04
Revision Number:    1
Form:               HR01



# MOBIS Alabama, LLC

### PROMOTION AND TRANSFER FOR
### NON-EXEMPT POSITIONS
### POLICY AND PROCEDURES

1. **PURPOSE**

   1.1  The intent of this policy is to provide production team members the ability to request an assignment to another work area.

2. **POLICY**

   2.1  This policy allows a team member to request another work assignment.

3. **DEFINITION OF TERMS**

   3.1  Promotion - Refers to the permanent movement of a team member from a position in one classification or title to another classification having more complex duties and/or responsibilities and salary range with a higher minimum and maximum.

   3.2  Transfer - Refers to the permanent lateral change of a team member from one position to another position of the same classification or title into another department, division, or a different work unit within the same department. A transfer involves no substantial change of duties, responsibilities, or qualifications. There is no change in salary range and no increase in pay.

4. **PROCEDURE FOR PROMOTION OR TRANSFER**

   4.1  A notice of jobs available will be posted on the company bulletin boards for a period of forty-eight (48) hours.

   4.2  The requesting eligible team member with the longest length of MOBIS service shall be placed in the open position.

   4.3  The effective date of a promotion or transfer will be determined jointly by the two departments involved.

   4.4  Normal notice is two weeks.

Effective Date:      01/04/05
Revision Number:  1
Policy:                 Promotion and Transfer Non-Exempt



## MOBIS Alabama, LLC

### PROMOTION AND TRANSFER FOR
### NON-EXEMPT POSITIONS
### POLICY AND PROCEDURES

4.5   A team member's expressed interest in a position will not jeopardize their current position or future opportunities.

4.6   If the placement of a transferred team member would result in an ergonomic or safety concern, the team member may be placed in a department which would remove this concern. All such transferees must be reviewed and approved by the Safety Department.

4.7   A team member who submits and is awarded a transfer request must accept the transfer.

4.8   A team member who receives a transfer shall be prohibited from another transfer for a period of twelve (12) months.

## 5.   ELIGIBILITY CRITERIA

5.1   The requesting team member must be a full-time, non-probationary Team member with at least twelve (12) months of service with MOBIS as of the date of the posting.

5.2   The team member requesting transfer must not have transferred within the last twelve (12) months.

5.3   Any team member warning within the past twelve (12) months will eliminate a team member from being considered for transfer or promotion.

5.4   When two or more team members have the same length of service, the last four digits of a team member's social security number will be used as the tiebreaker. The team member with the lowest SSN will be awarded the transfer or promotion.

5.5   Team members will not be considered for any transfer that would result in conflict with the Employment of Relatives Policy.

Effective Date:      01/04/05
Revision Number:   1
Policy:                  Promotion and Transfer Non-Exempt



## MOBIS Alabama, LLC

### PROMOTION AND TRANSFER FOR
### NON-EXEMPT POSITIONS
### POLICY AND PROCEDURES

5.6    To ensure that adequate skill levels are maintained in each department, no more than 5% of the authorized full-time staffing in a department will be allowed to transfer out of the department in a calendar year.

Effective Date:      01/04/05
Revision Number:   1
Policy:                    Promotion and Transfer Non-Exempt

Tarsha Hunter v. Mobis Alabama, LLC
Plaintiff's Initial Disclosure Documents 0121



# MOBIS Alabama, LLC

## OVERTIME PAY
## POLICY AND PROCEDURES

**1.   PURPOSE**

The purpose of this policy is to identify how overtime if calculated.

**2.   POLICY**

2.1   <u>Overtime</u> - Overtime is defined as more than forty (40) hours worked in a seven (7) day period from Sunday midnight to the following Sunday midnight.  Overtime is paid to all Hourly Non-Exempt employees.

2.1.1   When operating requirements or other needs cannot be met during the employee's regular scheduled working hours, employees may be scheduled to work overtime hours without notice.

2.1.2   All employees should expect to work some overtime during the week without prior notice.  The employee will be notified as soon as reasonably possible for OT during the regular work week.

2.1.3   A refusal to work this overtime will result in an early out or absence.

2.1.4   When overtime is necessary on Saturday and/or Sunday, the supervisor will give the employee 24 hours notice from the time the OT is to begin.

2.1.5   Overtime assignments will be distributed as equitably as practical to all employees qualified to perform the required work.

2.1.6   Overtime pay is based on actual hours worked.

2.1.7   Time off for vacation, funeral leave, jury duty, and holiday will be considered hours worked for purposes of performing overtime calculations.

Effective Date:     03/21/05
Revision Number:    1
Policy:             Overtime



## MOBIS Alabama, LLC

### OVERTIME PAY
### POLICY AND PROCEDURES

2.1.8   Overtime hours are compensated at one and a-half (1 1/2) times the employee's base hourly rate of pay, excluding add-on pay such as Shift Premium.

2.1.9   All overtime work must receive the President's prior authorization.

2.1.10  Any overtime worked by the employee without the supervisor's authorization will result in disciplinary action and possible non-payment of the overtime worked.

2.2     <u>Double Time</u> - An overtime rate equal to two (2) times the employee's base hourly rate will be paid for work performed on Sunday. Double Time is paid to all Hourly Non-Exempt employees.

2.2.1   To qualify for double time, an employee must have worked a minimum of forty-eight (48) hours during the six (6) CONSECUTIVE WORK DAYS immediately preceding the Sunday work.

2.2.2   In addition the employee's shift must be a Sunday shift.

2.2.3   No double time will be paid for Saturday shift hours that extend into Sunday unless the Saturday shift extends more than four (4) hours into Sunday. Then only those hours in excess of four will be compensated at the double time rate of pay.

2.2.4   To receive credit for a workday, an employee must work a minimum of four (4) hours in a particular shift.

2.2.5   All overtime work must receive the President's prior authorization.

2.2.6   Any overtime worked by the employee without the supervisor's authorization will result in disciplinary action and possible non-payment of the overtime worked.

Effective Date:     03/21/05
Revision Number:    1
Policy:             Overtime



# MOBIS Alabama, LLC

## OVERTIME PAY
## POLICY AND PROCEDURES

2.3 <u>Straight Time</u> – An overtime rate equal to one (1) times the employee's calculated hourly rate defined as more than fifty (50) hours worked in a seven (7) day period from Sunday midnight to the following Sunday midnight.

    2.3.1 Straight Time is paid to Salaried Non-Exempt employees in the following job categories: Technician's and Supervisor's.

    2.3.2 Manual Time Sheets must be completed by these employees and turned into the Payroll Department each week.

    2.3.3 All overtime work must receive the supervisor's prior authorization.

    2.3.4 Any overtime worked by the employee without the supervisor's authorization will result in disciplinary action and possible non-payment of the overtime worked.

    2.3.5 Casual OT will not be compensated. Example: If an employee's shift is 8:00 am - 5:00 pm and the employee chooses to come in at 7:00 am, the time from 7:00 am - 8:00 am will not be compensated as this is considered casual OT. However, if the supervisor requests the employee to come in early for a special project, the time will be compensated. To expand on the example, if an employee's shift is 8:00 am - 5:00 pm and the employee chooses to stay past 5:00 pm, the time beyond 5:00 pm will not be compensated. However, if the supervisor requests the employee to stay for a special project, the time will be compensated.

3. **PROCEDURE**

    3.1 All overtime hours for hourly and salaried non-exempt employees must be approved prior to the overtime being worked.

    3.2 Any OT that the supervisor or employee feels is necessary must be approved by 4:00 pm by the President for hourly non-exempt and their immediate supervisor for salaried non-exempt.

| | |
|---|---|
| Effective Date: | 03/21/05 |
| Revision Number: | 1 |
| Policy: | Overtime |



# MOBIS Alabama, LLC

## OVERTIME PAY
### POLICY AND PROCEDURES

3.3    Overtime approval sheets must be turned into the Payroll department by 5:00 pm of the day the OT is worked.

3.4    Any overtime worked by the employee without the supervisor's authorization will result in disciplinary action and possible non-payment of the overtime worked.

Effective Date:        03/21/05
Revision Number:    1
Policy:                     Overtime



# MOBIS Alabama, LLC

## PARKING LOT
## POLICY AND PROCEDURES

1. **PURPOSE**

   The MOBIS parking lot is for team members, vendors, contractors, suppliers and temporary visitors and is monitored by a closed circuit surveillance system.

2. **POLICY**

   2.1    MOBIS will make every effort to make the parking areas safe and secure; however, MOBIS will not be liable for fire, theft, damage, or personal injury involving team members' automobiles.

   2.2    Team members should always lock their car doors.

3. **PROCEDURE**

   3.1    Once a car approaches the MOBIS gates, all car stereos must be turned down to a level where only occupants present in the vehicle may hear it.

   3.2    The speed limit in the MOBIS parking lots is 10 mph; 5 mph when directly passing parked cars.

   3.3    All team members are instructed to park in the lot nearest to their workstation.    This will enable adequate parking for all team members.

   3.4    Team members must park their car prior to clocking in.

   3.5    Team members are prohibited from loitering in the parking lot.

   3.6    Team members are prohibited from parking in the visitors or handicapped spaces at all times.

   3.7    The parking lot is marked "one way".    Team members are prohibited from driving in the wrong direction.

Effective Date:    06/21/05
Revision Number:    1
Policy:            Parking Lot



## MOBIS Alabama, LLC

## PARKING LOT

## POLICY AND PROCEDURES

3.8    Failure to follow the parking lot rules may subject a team member to disciplinary action, up to and including termination.

Effective Date:    06/21/05
Revision Number:    1
Policy:    Parking Lot

Tarsha Hunter v. Mobis Alabama, LLC 0127
Plaintiff's Initial Disclosure Documents



## MOBIS Alabama, LLC

### PAY DEDUCTIONS
### POLICY AND PROCEDURES

1. **PURPOSE**

   The law requires that MOBIS make certain deductions from every employee's compensation.

2. **POLICY**

   2.1    Each payday, employees will receive a statement showing gross pay, deductions, and net pay.

   2.2    Taxes will be deducted automatically in accordance with state and federal guidelines, and per the employee's request, as stated on the Federal W-4 and State A-4, which will be maintained in the employee's personnel file.

   2.3    Employees may elect to have additional voluntary deductions taken from their pay only if they authorize the deductions in writing.

   2.4    Other deductions will be made when required by law or employee obligation.

   2.5    No deductions will be made from an employee's paycheck without their knowledge.

3. **TYPE OF DEDUCTIONS**

   3.1    Mandatory by Law Deductions

          3.1.1    Local Tax
          3.1.2    State Tax
          3.1.3    Federal Tax
          3.1.4    Social Security
          3.1.5    Garnishments for Child Support, IRS or demanded by court

Effective Date:    12/07/04
Revision Number:    1
Policy:    Pay Deductions



## MOBIS Alabama, LLC

### PAY DEDUCTIONS
### POLICY AND PROCEDURES

3.2     Company Deductions

  3.2.1   Group Insurance
  3.2.2   Uniforms
  3.2.3   401k
  3.2.4   Miscellaneous

Effective Date:        12/07/04
Revision Number:     1
Policy:                  Pay Deductions



## MOBIS Alabama, LLC

### PERFORMANCE REVIEWS FOR EXEMPT EMPLOYEES
### POLICY AND PROCEDURES

**1.  PURPOSE**

1.1   Each performance review should be a positive and interactive process whereby both MOBIS and the individual being reviewed receive feedback regarding their performance.

**2.  POLICY**

2.1   All Exempt Employees will receive an annual performance review on their Service Anniversary.

**3.  PROCEDURE**

3.1   The Human Resources (HR) Department will send a reviews notice annually to the employee's supervisor two weeks prior to the employee's service anniversary date.

3.2   The supervisor must complete this review prior to the employee's service anniversary date and return it to the HR Department.

3.3   The HR Department will retain the appropriate signatures and the review will be returned to the supervisor.

3.4   The supervisor will go over the review with the employee and have them sign the review.

3.5   The supervisor will return the signed review to the HR Department.

3.6   Any change in salary will be effective on the employees Service Anniversary.

Effective Date:        01/04/05
Revision Number:    1
Policy:                      Performance Reviews Exempt Employees



## MOBIS Alabama, LLC

### PROBATIONARY PERIOD
### POLICY AND PROCEDURES

1. **PURPOSE**

   1.1   It is our policy at MOBIS Alabama, LLC, to help all new employees feel a part of our company as quickly as possible and to help them learn more about the company and what we expect from them as a member of our organization. If at any point during the first 90 days of employment, it becomes obvious that continued employment is pointless, the supervisor should recommend termination proceedings. Due to Alabama being an "employment at will" State, an employer can terminate with or without cause at any time.   Ninety (90) days is an acceptable amount of time to be able to fairly evaluate a person's performance.

2. **POLICY**

   2.1   The first ninety (90) days of employment are considered a probationary period. This is a critical period in an employee's development and success with MOBIS. The probationary period is a trial period during which the supervisor will determine whether the employee has proved that he or she can handle their job satisfactorily.

   2.2   There is no reason for the supervisor to endure 90 days of unsatisfactory progress on a new hire. At any point during the 90 days, if it becomes obvious that continued employment is pointless, the supervisor should recommend termination proceedings.

   2.3   Before the end of the employee's probationary period, the HR Department will send the supervisor a Performance Review Sheet, on which the supervisor will indicate the employee status.

   2.4   During this probationary period, an employee is not eligible to receive vacation pay ~~or bereavement pay~~. (03/21/05)

   2.5   During this probationary period, any employee's who have three (3) absenteeism occurrences will be terminated.  The occurrences can include a tardy, early out, and/or an all day absence. (03/21/05)

Effective Date:   07/20/04, 01/04/05, 03/21/05
Revision Number:  1, 2, 3
Policy:           Probationary Period



# MOBIS Alabama, LLC

## PROBATIONARY PERIOD
## POLICY AND PROCEDURES

3.    **PROCEDURE**

3.1    ~~The HR Department will distribute the Performance Review Sheet to the employee's supervisor after seventy-five (75) days of employment. (03/21/05)~~

3.2    The Supervisor must complete the Performance Review Sheet and return it to the HR Department prior to the end of the 90-Day Probationary Period.

3.3    This procedure does not alter the employment-at-will relationship.  An employee can terminate his or her employment at any time with or without reason, and the company has the same right.

Effective Date:    07/20/04, 01/04/05, 03/21/05
Revision Number:  1, 2, 3
Policy:          Probationary Period



## MOBIS Alabama, LLC

### PROGRESSIVE DISCIPLINE
### POLICY AND PROCEDURES

1. **PURPOSE**

   1.1  The intent of this policy is to use a series of progressive disciplinary actions as a means to notify a team member that misconduct has occurred. This process gives a team member the opportunity to correct their behavior before termination is necessary. The goal should be to encourage the team member to improve job performance and comply with MOBIS policies.

2. **POLICY**

   2.1  On the Spot Verbal Warning - During normal working activities, it is necessary to provide on the spot guidance to team members who are not conforming to good, safe business practices. These on the spot corrections should come from anyone, who witnesses a situation that could cause injury, adversely affect quality, or damage equipment.

   2.2  1st Written Warning - All warning must be documented, signed by the team member and their supervisor and placed in their personnel file.

   2.3  2nd Written Warning - All warning must be documented, signed by the team member and their supervisor and placed in their personnel file.

   2.4  Termination - An accumulation of three (3) warnings in a team member's active file within a 12 month period will result in immediate termination.

3. **PROCEDURE**

   3.1  All warnings will be in writing, with specified date and time of occurrence, and details about the incident.

   3.2  The team member and the supervisor must sign all warnings.

   3.3  Failure of the team member to sign the warning, at the time their supervisor presents it to them, will result in immediate termination.

   3.4  All warnings relating to excessive absenteeism, tardiness or early out or missed punches will be initiated by the HR Department and forwarded to the supervisor.

Effective Date:        05/31/05
Revision Number:   1
Policy:                      Progressive Discipline



# MOBIS Alabama, LLC

## PROGRESSIVE DISCIPLINE
## POLICY AND PROCEDURES

3.5  The supervisor must have the warning signed by the team member and return it to the HR Department within one week of distribution.

3.6  The supervisor must complete all other warnings. Disciplinary action should take place immediately following the violation, or as soon as they become aware of the violation.

3.7  Warning points relating to excessive tardiness or early outs, and missed punches will roll off a team member's active record after twelve (12) months from the date of the warning.

3.8  All other warning points will roll off a team member's active record after twelve (12) months from the date of the warning.

3.9  An accumulation of three (3) warnings on a team member's active record will result in immediate termination.

## 4.  IMMEDIATE TERMINATION

4.1  Assaulting another team member, company vendor, or customer

4.2  Company property - taking company property w/o permission

4.3  Conviction of a felony while employed

4.4  Disorderly conduct

4.5  Drugs/Alcohol - consuming drugs and/or alcohol on company property whether the team member is on the clock or off the clock

4.6  Falsification of records

4.7  Forklift accidents - any accident involving a forklift that results in damage to the forklift or company property or an injury to a team member, to include, the team member driving the forklift.

4.8  Habitual carelessness or recklessness regarding safety

4.9  Insubordination

4.10  Intoxication - reporting to work intoxicated or under the influence of drugs

4.11  Parking your car after you have clocked in. *MOBIS does not pay a team member to park their car.*

4.12  Sleeping on the job

4.13  Three day no call/no show

4.14  Wrongful use of company property

Effective Date:      05/31/05
Revision Number:   1
Policy:                    Progressive Discipline

 **MOBIS Alabama, LLC**

## REFERENCE CHECKS

## POLICY AND PROCEDURES

1. **PURPOSE**

    1.1   MOBIS will verify the previous employment of all potential team members to whom we intend to make an offer of employment.

2. **POLICY**

    2.1   All references will be performed an outside agency, Pre-employment.com.

    2.2   One prior employment record listed on the application will be called on the phone or by fax, by the HR Department, following the receipt of a signed employment application.

    2.3   MOBIS will request dates of employment and job title.

Effective Date:    06/21/04
Revision Number:  1
Policy:                Direct Deposit

Tarsha Hunter v. Mobis Alabama, LLC 0135
Plaintiff's Initial Disclosure Documents



# MOBIS Alabama, LLC

## REHIRE

## POLICY AND PROCEDURES

### 1.   PURPOSE

1.1    There may be times when a terminated team members wishes to be re-hired by MOBIS.

1.2    The Sr. Manager of Human Resources and the past and/or future Department Manager will consider each rehire on a case-by-case basis.

### 2.   PROCEDURE

2.1    The following will be taken into consideration when making a decision to rehire.

2.1.1    The team member's attendance at the time of their termination. Any absences, tardies, early outs, or missed punches will be reinstated on the team member's record.

2.1.2    The team member's performance at the time of their termination.

2.1.3    The team member's Progressive Discipline standing at the time of their termination.

2.1.4    Any progressive discipline points will be reinstated on the team member's record.

2.1.5    The reason the team member left MOBIS.

2.1.6    Voluntary Termination's - Eligible for consideration following a review of an team member's prior employment record and available job openings.  There is no guaranteed re-employment at any time.

2.1.7    Involuntary Termination's - Will not be considered for rehire under any circumstances.

Effective Date:    06/21/05
Revision Number: 1
Policy:    Rehire



# MOBIS Alabama, LLC

## RELOCATION POLICY AND PROCEDURES

**I.    PURPOSE**

To establish MOBIS Alabama, LLC policy guidelines for relocation assistance to eligible team members relocating to the MOBIS Alabama location at the request of the Company.

**II.    POLICY**

1.    Regular full-time exempt team members employed by MOBIS and newly hired team members assuming a position of Sr. Manager, Manager, Assistant Manager, or Specialist with MOBIS are eligible for relocation. The Sr. Manager of Human Resources is responsible for the classification for team members.

If two or more members of the same household are hired as exempt team members, only one will be eligible for relocation assistance and reimbursement.

2.    **Distance Criteria**

The new principle place of work must be greater than 50 miles farther from the team member's old primary residence. Proof of residency must be provided prior to receiving relocation assistance.

3.    **Length of Assignment**

a)    To qualify for relocation assistance and reimbursement, the new assignment must be expected to be at least 12 months long.

b)    If a team member voluntarily leaves MOBIS within 12 months of their date of hire, the team member will be required to reimburse MOBIS for any expenses paid on their behalf, including any tax gross up and all costs incurred during temporary housing.

4.    **Approval**

All team member's relocation must be approved by the Sr. Manager of Human Resources, the CFO, and the President.

Effective Date:      04/05/04, 10/29/04
Revision Number:    1, 2
Policy:                  Relocation Policy



## MOBIS Alabama, LLC

### RELOCATION POLICY AND PROCEDURES

Supporting documents must be provided for all reimbursable expenses.

**III.  PROCEDURE**

1. **House Hunting**

   a)  All qualified team members are eligible to receive one three day house hunting trip for themselves and their spouse.

   b)  Team members will be reimbursed for reasonable expenses incurred during their three day house hunting trip.  Reasonable expenses included:

   - Lodging (the hotel will be chosen by the company)
   - Per Diem ($35/day for an individual; $50/day for a family)
   - Transportation (Personal car mileage reimbursement according to IRS guidelines.  If a person chooses to fly, they will only be reimbursed for the amount it would cost to drive.)

   c)  MOBIS, through an outside relocation agency, provide free independent counsel and assistance in finding, selecting, and purchasing a suitable home at your new location.

   d)  All receipts must be submitted for reimbursement.

2. **Moving Costs**

   a)  **Household goods shipment**

   The Sr. Manager of Human Resources will select a moving company  and contract for the shipment of the team member's household goods.  This agent will arrange for their closet representative to prepare the cost for the move and will contact the team member to let them know of the local arrangements being made.  *A new team member is not allowed to initiate initial contact with the moving company.*

Effective Date:      04/05/04, 10/29/04
Revision Number:  1, 2
Policy:                    Relocation Policy



## MOBIS Alabama, LLC

### RELOCATION POLICY AND PROCEDURES

**b)**   **Mover Services**

MOBIS will assume the cost of a normal mover services for common household items as follows:

Sr. Manager – maximum 12,000 lbs.
Manager – maximum 10,000 lbs.
Assistant Manager – maximum 8,000 lbs.
Specialist – maximum 6,000 lbs.

**c)**   **Packing, Loading, Unloading**

MOBIS will assume the cost of having the mover pack all items that require packing for safe shipment.  Moving charges provided by MOBIS will include the material and containers used plus the labor to pack, load, and unload.  *Charges for unpacking of boxes will not be paid by MOBIS.*

**d)**   **Non-covered moving cost and/or service**

The following are examples but may not be inclusive:

- Unusually large bulky items (i.e. storage buildings, swing sets)
- Boats in excess of 200 pounds or 15 feet in length.
- Airplanes, campers, trailers
- Recreational vehicles
- All flammable materials (i.e. propane gas)
- Livestock
- Cordwood
- Antique automobiles (those over 25 years old)
- Satellite dishes
- Farming equipment

Effective Date:          04/05/04, 10/29/04
Revision Number:      1, 2
Policy:                        Relocation Policy



## MOBIS Alabama, LLC

### RELOCATION POLICY AND PROCEDURES

Team members will be responsible for all charges incurred in shipment of these items as well as the following:

- Waiting time, extra stops, and additional insurance
- Removal or installation of rugs, carpets, blinds or drapes
- Assembly or disassembly of children's playhouse, playground equipment and/or portable swimming pools
- House cleaning or maid service
- Tips for drivers or packers

These charges will be direct billed to the team member from the moving company.

e)      **Temporary Storage of Household Items**

MOBIS will assume storage cost for household goods that have been shipped but are unable to be delivered to the team member's new home until a later date. Storage charges will be paid for a maximum of 30 days. Insurance will be provided through the moving company.

MOBIS Alabama will NOT provide storage for an automobile. Any storage expenses for an automobile are incurred by the employee.

f)      **Moving Insurance**

MOBIS will assume the cost of full replacement value insurance. However, the following items are not covered by the moving insurance:

- Jewelry, watches, precious stones
- Securities, money, collections of stamps or coins
- Furs
- Art collections or other items of unusual value

Effective Date:       04/05/04, 10/29/04
Revision Number:    1, 2
Policy:                    Relocation Policy



## MOBIS Alabama, LLC

### RELOCATION POLICY AND PROCEDURES

These items should be kept in the team member's possession or shipped via insured mail. MOBIS assumes no responsibility for loss or damage for such items.

3. **Automobile Shipment**

MOBIS will reimburse charges incurred for relocation of up to one (1) vehicle per team member. The shipment should be done by the most cost effective way out of the two alternatives describes below. The actual blue book value of the car must be higher than the moving cost of the car. Reimbursable automobile expenses include:

1. Mileage allowance, as provided under MOBIS' travel policy, per mile to drive your automobile to your new location.

or

2. Shipping your automobile by the moving company selected by MOBIS to move your household goods.

4. **Claims**

In the event of loss or damage of household goods during your move, please notify the delivery agent for the van line immediately. Do not rely in the driver to make this notification.

5. **Relocation Allowance**

a) MOBIS will provide each team member one paid day off when household goods are being packed and one paid day off when household goods are being delivered to the new residence.

6. **Temporary Living Expenses**

a) ~~Temporary Housing is defined as the maintenance of two households while in process of relocation, not to exceed 60 days. MOBIS Alabama has sole~~

Effective Date:     04/05/04, 10/29/04
Revision Number:   1, 2
Policy:             Relocation Policy



# MOBIS Alabama, LLC

## RELOCATION POLICY AND PROCEDURES

~~administration of all arrangements for Temporary Housing, i.e. type, location, duration, etc.~~ (10/29/04)

a) Temporary Living assistance of $2,000 will be provided and grossed up for taxes and payable to you on the first Friday following your initial hire date. (10/29/04)

b) Temporary lodging for team members and their family will be provided at your old location by MOBIS for a maximum of one (1) night (standard rate hotel) if it should become necessary for you to vacate your former residence while your goods are being shipped.

- Lodging (the hotel will be chosen by the company)
- Per Diem ($35/day for an individual; $50/day for a family)

c) Non-covered temporary living expenses:

- Car mileage not directly related to relocation.
- Non-food items such as personal toiletries, alcoholic beverages, cigarettes, magazines, newspapers, movies and books, etc.
- Dry cleaning and laundry.

7. **Liability**

MOBIS will not accept liability for actions of the team members beyond the scope or provisions of this policy. If there is any question about a reimbursable expense, the team member must obtain prior written approval before incurring the expense. In all cases, MOBIS reserves the final right to interpret and apply this policy.

8. **Tax Gross-up**

According to IRS tax laws, certain relocation costs are considered taxable income to the team member (i.e. temporary living expenses and house hunting expenses). MOBIS will gross-up these payments in accordance with the Company's "tax

Effective Date:     04/05/04, 10/29/04
Revision Number:   1, 2
Policy:            Relocation Policy



# MOBIS Alabama, LLC

## RELOCATION POLICY AND PROCEDURES

gross-up policy" and will include such gross-up in the year end processing of payroll.

9. **Reimbursement Forms**

Team members are to use the attached relocation expense form for all relocation expenses and submit to the Sr. Manager of Human Resources within 30 days of the household goods being shipped to the new location.

Effective Date:      04/05/04, 10/29/04
Revision Number:  1, 2
Policy:                   Relocation Policy



# MOBIS Alabama, LLC

## RESTORATION OF LENGTH OF SERVICE
## POLICY AND PROCEDURES

1. **POLICY**

   1.1    A team member who voluntarily terminated his or her employment, and who is rehired, will not have any prior service restored as it relates to vacation accrual.

   1.2    The date of rehire will become the new service date.

   1.3    Computation of service, for 401K purposes and the effect of breaks in service on pension rights, however, will be determined in accordance with the provisions of the Plan.

Effective Date:     06/21/05
Revision Number:  1
Policy:                  Restoration of Length of Service



# MOBIS Alabama, LLC

## SHIFT DIFFERENTIAL
## POLICY AND PROCEDURES

### 1.  PURPOSE

1.1  A shift differential will be paid to non-exempt employees who are scheduled to work 2nd or 3rd shift.  MOBIS may, from time to time, change the shift differential or designate different hours.

| Shift | Amount of Shift Differential |
|-------|------------------------------|
| 1ST shift | None |
| 2nd shift | .50 |
| 3rd shift | .50 |

### 2.  PROCEDURE

2.1  Employees will be paid a shift premium for schedule work on 2nd or 3rd shift.

2.2  If a shift pay adjustment is owed, the employee will receive it in the next available payroll check.

2.3  If an employee changes to a different shift, the supervisor must complete a status change form.

2.4  As positions become vacant on 1st shift, employees may request to be moved off 2nd or 3rd shift.

2.5  Shift changes can only be done within the same department within MOBIS without a job posting.

2.6  Shift transferees will be chosen by seniority within MOBIS.

Effective Date:      03/21/05
Revision Number:   1
Policy:                 Shift Differential



# MOBIS Alabama, LLC

## SOLICITATION POLICY AND PROCEDURES

1. **PURPOSE**

   1. To set the guideline regarding unwanted distribution of material on the company premises. This policy will outline MOBIS Alabama, LLC's position on any activity that may disturb our workforce, such as union activity.

2. **POLICY**

   2.1 MOBIS prohibits the solicitation, distribution and posting of materials of any kind on its' property. The only exceptions to this policy are community activities supported by MOBIS or company sponsored events.

3. **PROCEDURE**

   3.1 Non-employees may not solicit employees or distribute literature of any kind on MOBIS premises at any time.

   3.2 Non-employees are prohibited from visiting the work areas without prior approval or as part of a MOBIS sponsored program.

   3.3 A MOBIS employee must escort a non-employee inside the facility at all times.

   3.4 Former employees are not permitted onto MOBIS property unless they are conducting official company business and must sign in through the reception area. (01/04/05)

   3.5 Employees may not distribute literature of any kind during work times, or in any work area at any time, except in connection with a MOBIS sponsored event.

   3.6 Employees may not solicit other Employees during work times, unless it is in connection with a MOBIS sponsored event.

   3.7 All bulletin boards located on the plant floor are intended for team related instruction and production related materials only.

Effective Date:      08/02/04, 01/04/05
Revision Number:  1, 2
Policy:                   Solicitation



# MOBIS Alabama, LLC

## SOLICITATION POLICY AND PROCEDURES

3.8     The posting of materials or electronic announcements may be permitted with prior approval from Human Resources.

3.9     Violation of this policy should be reported to Human Resources.

Effective Date:     08/02/04, 01/04/05
Revision Number:   1, 2
Policy:              Solicitation



# MOBIS Alabama, LLC

## TERMINATION POLICY AND PROCEDURES

**1. PURPOSE**

1.1    This policy defines involuntary and voluntary terminations of employment from MOBIS.

     1.1.1   Involuntary termination occurs when the team member does not initiate the separation.

     1.1.2   Voluntary termination occurs when the team member initiates the separation.

**2. POLICY**

2.1    Once the decision has been made to involuntary terminate an hourly team member, the Assistant Manager of Team Relations will coordinate the termination meeting with the immediate Supervisor. Both the supervisor and Team Relations will be present at all termination meetings.

2.2    Once the decision has been made to terminate a salaried team member, the Sr. Manager of Human Resources will coordinate the termination meeting with the immediate Supervisor and/or Manager. Both the Supervisor and the Sr. Manager of HR will be present at all termination meetings.

2.3    Team members must turn in all company property assigned to them during their employment.

2.4    If an hourly team member gives a notice of intent to voluntarily terminate their employment, Team Relations will schedule an exit interview with the team member.

2.5    If a salaried team member gives a notice of intent to voluntarily terminate their employment, the Sr. Manager of Human Resources will schedule an exit interview with the team member.

2.6    Any team member of MOBIS must resign by submitting a letter of resignation to their supervisor and Human Resources. It is customary to provide a two-week

Effective Date:    05/31/05
Revision Number:   1
Policy:           Termination



# MOBIS Alabama, LLC

## TERMINATION POLICY AND PROCEDURES

notice prior to the effective date of the resignation. However, it is at the company's discretion whether the team member will be able to work out the notice.

3. **EXAMPLES OF INVOLUNTARY TERMINATION**

3.1 Inappropriate behavior
  3.1 Absenteeism
  3.2 Conviction of a felony while employed
  3.3 Insubordination
  3.4 Wrongful use of company property
  3.5 Disorderly conduct
  3.6 Habitual carelessness or recklessness
  3.7 Misbehavior on the job
  3.8 Leaving work before quitting time without permission
  3.9 Falsification of company records
    3.9.1 Employment Application
    3.9.2 Work Orders Completed
    3.9.3 Scrap Count Sheets
    3.9.4 Documentation relating to Quality
    3.9.5 Any work related documentation
  3.10 Assaulting another team member, company vendor or customer
  3.11 Sleeping on the job
  3.12 Refusal to do work reasonably expected
  3.13 Taking company property
  3.14 Violation of any policies or practices of MOBIS

3.2 Unsatisfactory performance
  3.2.1 Failure of a team member to meet performance standards
  3.2.2 Failure to complete tasks in a timely manner
  3.2.3 Failure to complete tasks in a competent way.
  3.2.4 Failure to maintain an adequate attendance record.

Effective Date:     05/31/05
Revision Number:    1
Policy:             Termination



## MOBIS Alabama, LLC

### TERMINATION POLICY AND PROCEDURES

3.3    Release without fault - when a team member, through no fault of his/her own, is unsuited for or incapable of performing work assigned and no appropriate change of assignment is available.

3.4    Lay off for lack of work – when the Company reduces its work force for economic or other reasons with or without the possibility of recall.

3.5    Disability - when, on the basis of medical evidence, a team member is totally and permanently disabled from performing his or her usual work assignment and thus eligible for disability benefits.

3.6    Death of the team member.

## 4.    EXAMPLES OF VOLUNTARY TERMINATION

4.1    Written or oral resignation.
4.2    Absence from work for three consecutive working days without notifying the team member's supervisor.
4.3    Failure to return from an approved leaves of absence at the expiration of the leave.
4.4    Failure to report for work upon recall from a layoff on the date designated.
4.5    Retirement

## 5.    PROCEDURE

5.1    All terminations will take place with the supervisor or manager and a member of the HR Management Team present.

5.2    Only managers, superintendents, and supervisors will be involved in the termination process.

5.3    No terminations will take place between 5:00 p.m. – 7:00 a.m.

5.4    If a situation arises between 5:00 p.m. – 7:00 a.m. that requires immediate removal of the team member from the premises, the supervisor should instruct the

Effective Date:      05/31/05
Revision Number:   1
Policy:                  Termination



## MOBIS Alabama, LLC

### TERMINATION POLICY AND PROCEDURES

team member to clock out and call the Sr. Manager of Human Resources DHR the following morning.

5.5     The team member is not allowed on the premises prior to talking to HR, or trespassing charges may be filed.

5.6     Supervisors will chaperon team members while they gather their personal belongings from the locker.

5.7     The team member will be accompanied outside the plant by dual escort, to include the terminating supervisor, and supervised until they have left the MOBIS property.

5.8     All team members will be paid for any accrued vacation time they are eligible for but not used.

5.9     Payment for this unused vacation will be made on the next available payday following the termination date.

5.10    A salaried team member's pay will be converted to an hourly rate for their final paycheck and only be paid for those days worked.

6.  **COMPANY PROPERTY**

6.1     MOBIS team members are responsible for all property and materials issued to them during their employment. Upon termination, team members must return all property issued to them, to include, but not limited to the following items:

    6.1     Door Keys
    6.2     Team member Handbook
    6.3     Forklift Keys
    6.4     Gate Access Badge
    6.5     Hand Tools
    6.6     Locker Keys
    6.7     Measurement Tools and Gages

Effective Date:     05/31/05
Revision Number:    1
Policy:             Termination



## MOBIS Alabama, LLC

### TERMINATION POLICY AND PROCEDURES

6.8     Parking Pass
6.9     Time Badge
6.10    Uniforms

6.2     Where permitted by law, MOBIS may withhold the cost of any item(s), from the team member's paycheck that are not returned immediately. MOBIS may also take all action deemed appropriate to recover or protect its' property.

Effective Date:     05/31/05
Revision Number:    1
Policy:             Termination



# MOBIS Alabama, LLC

## UNEMPLOYMENT COMPENSATION
## POLICY AND PROCEDURES

1. **PURPOSE**

   1.1 The State of Alabama has an Unemployment Compensation Law that provides for financial assistance to those persons who lose their jobs through no fault of their own and are unable to find other employment.

   1.2 These laws provide for weekly cash benefits to unemployed persons for a designated number of weeks or until such time as they are able to obtain employment.

2. **POLICY**

   2.1 While we have no desire to deny unemployment benefits to any person who is legally entitled to them, it is MOBIS' policy to contest all unemployment claims and apply for relief from charges for those claims that do not comply with the requirements of the law.

3. **PROCEDURE**

   3.1 It is the responsibility of the Human Resources Department to respond to all initial Unemployment Compensation Claims received through the mail.

   3.2 Forms received from the Unemployment Compensation Commission are to be completed, without delay, with the information given strictly in accordance with the payroll and personnel data on file. Special attention should be given to the section requiring details of "reason for separation," ensuring that the correct reason is shown.

   3.3 In the event a team member is denied benefits and appeals the decision, or the Company appeals an adverse decision, the Assistant Manager of HR and the claimant's immediate supervisor are to attend the hearing at which the appeal is reviewed. Credibility and weight of testimony are directly proportionate to the closeness of the relationship between the employer's witness and the claimant. Therefore, the State of Alabama prefers that the employer's witnesses be direct supervisors having first-hand knowledge of the incidents involved.

Effective Date:    10/21/04
Revision Number: 1
Policy:            Unemployment Compensation



## MOBIS Alabama, LLC

### UNIFORM POLICY AND PROCEDURES

1. **POLICY**

   1.1   The intention of this policy is to communicate to all MOBIS Alabama team members the policy regarding approved uniforms.

2. **PURPOSE**

   2.1   The purpose of approved uniforms is to ensure safety for our team members, ensure security and identification of team members and visitors and to protect the final product.

   2.2   Approved uniforms will be worn by all production team members in a neat and appropriate manner during their regular business hours, except when a special business meeting requires other clothing. Uniform shirts should be tucked in at all times.

3. **PROCEDURE**

   3.1   Approved uniforms are provided to team members once every 18 months and will be reissued every 18 month's from the team members hire date.

   3.2   During orientation each team member will order his/her initial set of;

       3.2.1   8 shirts total which consist of 5 short sleeved and 3 long sleeved.
       3.2.2   1 hat
       3.2.3   1 belt

   3.3   Shirt samples will be available for the team member to try on to ensure proper size.

   3.4   If the team member orders the incorrect size, replacement shirts will be ordered at the team member's expense.

   3.5   Department specific requirements may apply based on safety assessments.

Effective Date:   05/31/05
Revision Number:   1
Policy:   Uniform



## MOBIS Alabama, LLC

### UNIFORM POLICY AND PROCEDURES

3.6     Team members will also have the option to purchase, at their own expense, additional shirts from the approved colors and styles as those provided by MOBIS.

3.7     Uniforms are not to be purchased for family members.

3.8     Jeans (blue, black or any other color) are not considered appropriate for work at MOBIS and are not to be worn during normal working hours. All clothing items must conform to the approved MOBIS Uniform Policy.

3.9     Uniforms which are damaged during work hours at MOBIS will be replaced. Replacements will be issued when the team member returns the damaged items to the General Administration Department.

**4.     GENERAL PROVISIONS**

4.1     Other MOBIS apparel that is not considered the uniform should not be worn during normal working hours. Garments such as, jackets, sweaters and sweatshirts not issued or purchased through the approved uniform selection should not be worn over the uniform during business hours.

4.2     Any necessary alterations will be done at the team member's expense. All alterations must be approved by the General Administration Department.

4.3     Uniforms will include the option of long and short sleeves. There are approximately 10 shift colors to select from.

4.4     Team members must provide their own pants in the following colors: khaki, navy, grey and black. No other color choice is acceptable

4.5     MOBIS Uniform
         4.5.1   Uniform Shirt
         4.5.2   Pants in approved color choice
         4.5.3   Hat and belt

Effective Date:      05/31/05
Revision Number:   1
Policy:                  Uniform



# MOBIS Alabama, LLC

## UNIFORM POLICY AND PROCEDURES

5.  **JEWELRY AND PERSONAL GROOMING**

    5.1    Jewelry must be tasteful and limited.

        5.1.1  All team members can wear wedding rings but they must be covered to protect against scratching product.

        5.1.2  Team members who work on energized electrical components must remove all rings

        5.1.3  Necklaces must not be longer than 20 inches.

        5.1.4  Necklaces must be constructed to break away should they be caught in a machine.

        5.1.5  Watches can be worn but must be covered to protect against scratching product.

        5.1.6  Earrings must not dangle making it possible for them to be caught on something.

        5.1.7  Bracelets must not be worn.

        5.1.8  Fingernails should be kept at a reasonable length.  Length of nail is addressed in the Safety Handbook.

Effective Date:   05/31/05
Revision Number:  1
Policy:         Uniform

Tarsha Hunter v. Mobis Alabama, LLC 0156
Plaintiff's Initial Disclosure Documents



**MOBIS Alabama, LLC**

## UNION-FREE BUSINESS
## POLICY AND PROCEDURES

1. **PURPOSE**

   1.1    MOBIS Alabama, LLC is a union-free business. MOBIS and its representatives have had experience with unions and it is our firm belief that a union is not in the best interest of any MOBIS employee. We intend to remain union-free.

   1.2    We want you to know of our union-free policy so that you can respect it. At the same time, we want you to know that MOBIS will continue to respect fully the rights of all employees under all laws, including federal and state labor laws.

2. **BENEFITS OF THE POLICY**

   2.1.    In our union-free company, you can have direct, open, personal dealings with your employer.

   2.2.    In our union-free company, you can be treated as an individual.

   2.3.    In our union-free company, you don't have to join a union or pay union initiation fees or monthly union dues to keep your job.

   2.4.    In our union-free company, you won't lose wages and benefits during expensive union strikes.

   2.5.    In our union-free company, you won't be permanently replaced during a union strike.

   2.6.    In our union-free company, you won't have union rules or union bosses.

   2.7.    In our union-free company, you will have the security that comes from our ability to serve our customers dependably, without disruption from strikes. In addition, we don't have the costly inefficiencies of a union contract. This means that we are more competitive, which in turn means that you have a more secure job.

3. **SIGNING CARDS**

   3.1.    If anyone ever asks you to sign any kind of card or petition, you should read it very carefully and be sure you fully understand what you are getting into. The card may be a union card.

   3.2.    By signing a card, you may automatically become a member of the union.

   3.3.    If you signed such a card, you could be controlled by the union's rules and regulations.

   3.4.    If you signed such a card, you could be required to pay monthly dues, initiation fees,

Effective Date:    06/22/04
Revision Number:    1
Policy:    Union Free



# MOBIS Alabama, LLC

## UNION-FREE BUSINESS
## POLICY AND PROCEDURES

and perhaps fines and assessments.

3.5. If you signed such a card, you could be giving away to a stranger your right to discuss your own job.

3.6. If you signed such a card, you could be obligated to go out on strike without pay if the union called one.

3.7. If you signed such a card, you could even lose your right to vote in a secret ballot election.

3.8. Never sign anything without first reading it carefully and fully understanding what you are getting into.

Effective Date:      06/22/04
Revision Number:  1
Policy:                   Union Free

Tarsha Hunter v. Mobis Alabama, LLC 0158
Plaintiff's Initial Disclosure Documents



# MOBIS Alabama, LLC

## VACATION POLICY AND PROCEDURES

1. **POLICY**

   1.1   MOBIS will provide to each regular full-time employee vacation hours based on longevity.

2. **ELIGIBILITY**

   2.1   All regular full-time employees following 90 day probationary period.

3. **PROCEDURE**

   3.1   Following 90 consecutive days of employment with MOBIS and removal from Probationary Period Status, all regular employees will receive vacation time annually. Find the month you became a regular full-time employee following the Probationary Period. This will be the number of days you are eligible for during your first calendar year.

| Month of Hire | Days | Month of Hire | Days |
|---|---|---|---|
| January | 10 | July | 4 |
| February | 9 | August | 3 |
| March | 8 | September | 2 |
| April | 7 | October | 1 |
| May | 6 | November | 0 |
| June | 5 | December | 0 |

   3.2   Employees will receive one (1) additional day of vacation following each full year of employment with MOBIS. All vacations are awarded on January 1st. If your anniversary falls during the year, you must wait until the following January 1st to be awarded the additional vacation day.

| Years of Service | Days | Years of Service | Days |
|---|---|---|---|
| 1- 2 years | 11 | 6 - 7 years | 16 |
| 2 - 3 years | 12 | 7 - 8 years | 17 |
| 3 - 4 years | 13 | 8 - 9 years | 18 |
| 4 - 5 years | 14 | 9 - 10 years | 19 |
| 5 - 6 years | 15 | 10+ years | 20 |

   3.3   All vacation time must be taken between January 1st – December 31st.

Effective Date:     08/06/04, 01/04/05
Revision Number:   1, 2
Policy:                  Vacation



## MOBIS Alabama, LLC

### VACATION POLICY AND PROCEDURES

3.4    Vacation time <u>may</u> be taken in four (4) hour increments for all hourly employees.

3.5    Vacation time <u>must</u> be taken in eight (8) hour increments for all salaried employees.

3.6    An employee's vacation pay is based on the employee's regular base pay at the time, but not more than eight (8) hours per day. (01/04/05)

3.6    Vacation cannot be taken on Saturdays, Sundays, or holidays. (01/04/05)

3.7    Any vacation hours not taken by December 31st will be forfeited.

4.    **GENERAL PROVISIONS**

4.1    There may be occasions when MOBIS will need to have a summer shutdown period in order to accommodate the OEM or any models changes and or facility up grades. If it is determined a summer shutdown period is needed it will be announced before the scheduling period. (01/04/05)

4.2    When a summer shutdown period is needed, MOBIS will require the Team Member to reserve and utilize a portion of his/her vacation days to be used during MOBIS' summer shutdown. (01/04/05)

4.3    Anticipated unused shutdown vacation days may not be scheduled for dates before the actual shutdown occurs. (01/04/05)

5.    **VACATION ALLOWANCE UPON SEPARATION**

5.1    Upon separation from employment with MOBIS Alabama, LLC, an employee will receive pay for any accrued vacation during the year in which the separation occurs.

5.2    If an employee should die during their term of employment, pay for unused vacation will be paid in a lump sum to the employee's beneficiary.

Effective Date:     08/06/04, 01/04/05
Revision Number:  1, 2
Policy:                 Vacation



# MOBIS Alabama, LLC

## WORK PRODUCT FILES

## POLICY AND PROCEDURES

1.  **PURPOSE**

    1.1   All supplies, materials, and work products of a team member, if purchased by MOBIS, shall remain the property of MOBIS after resignation, discharge, layoff or retirement of that team member. The team member may retain any personal files, but work files and other papers shall remain with MOBIS.

Effective Date:     06/21/04
Revision Number: 1
Policy:              Work Products and Files

Tarsha Hunter v. Mobis Alabama, LLC 0161
Plaintiff's Initial Disclosure Documents



## MOBIS Alabama, LLC

## WORK PRODUCT FILES

## POLICY AND PROCEDURES

1.    **PURPOSE**

1.1    All supplies, materials, and work products of a team member, if purchased by MOBIS, shall remain the property of MOBIS after resignation, discharge, layoff or retirement of that team member. The team member may retain any personal files, but work files and other papers shall remain with MOBIS.

Effective Date:    06/21/04
Revision Number: 1
Policy:    Work Products and Files

Tarsha Hunter v. Mobis Alabama, LLC 0162
Plaintiff's Initial Disclosure Documents



**MOBIS Alabama, LLC**

## WORKERS COMPENSATION

## POLICY AND PROCEDURES

**1.    PURPOSE**

Team members who are injured on the job at MOBIS are covered by Worker's Compensation Insurance as required by state law. By law, a team member's failure to report an injury in a timely manner to their supervisor may result in forfeiting their Worker's Compensation rights.

**2.    PROCEDURE**

2.1    The team member must notify their supervisor immediately of any injuries sustained while on the job at MOBIS.

2.2    The supervisor will notify the EHS department immediately.

2.3    EHS will make an appointment with the company doctor.

2.4    If an accident occurs after 5:00 p.m., supervisors must call the EHS Manager on their beeper to inform him of the accident.

2.5    If after 5:00 p.m. and the accident is a medical emergency, the team member must be taken to Jackson Hospital by the shift supervisor.

2.6    All medical expenses related to the treatment of an injury, sustained on the job, are paid in full direct to the medical providers.

Effective Date:     06/21/05
Revision Number:  1
Policy:                  Workers Compensation



**MOBIS Alabama, LLC**

## EMPLOYEE HANDBOOK ACKNOWLEDGEMENT

The employee handbook describes important information about MOBIS Alabama, LLC, and I understand that I should consult my supervisor or the Human Resources Department regarding any questions or clarifications about the handbook.

My employment with MOBIS is "at will." I may voluntarily leave employment, and may be terminated by MOBIS at any time, and for any reason permitted by law. The contents of this Handbook are not intended to establish a contract or bind the company or the employee to any enforceable relationship. Any verbal or written statements or promises to the contrary are hereby null and void and should not be relied upon by any prospective or existing employees.

Since the information, policies, rules and benefits described here are necessarily subject to change, I understand that revisions to the handbook may occur. All such changes will be communicated through official notices, and I understand that revised information may supersede, modify, or eliminate existing policies. Only the Senior Manager of Human Resources has the right to adopt any revisions to the policies in this handbook.

Furthermore, I acknowledge that this handbook is neither a contract of employment nor a legal document. I have received the handbook, and I understand that it is my responsibility to read and comply with the policies contained in this handbook and any revisions made to it. A copy of this ACKNOWLEDGEMENT FORM will be placed in my personnel file.

Also, I acknowledge that this handbook is the property of MOBIS and that the handbook must be returned upon my termination.

Your signature below indicates that you have agreed to abide by MOBIS' Policies and Procedures.

Employee Name (Please Print)     _Tarsha Nickol Hunter_

Employee Signature     _Tarsha N. Hunter_

SSN     _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_

Date     _June 5, 2006_

DEFENDANT'S EXHIBIT 12

PENGAD 800-631-6989

Effective Date:     10/04/04
Revision Number:    1
Policy:             Employee Handbook Acknowledgement

### 2006 Absense Record - Tarsha Hunter

| Date | # of Days | Hrs taken | Accum. Hrs | Note |
|---|---|---|---|---|
| 06/15/2006 | 1 | 8 | 8 | Sick |
| 07/25/2006 | 1 | 3.5 | 11.5 | Doctor's appointment |
| 07/27/2006 | 1 | 3.5 | 15 | Doctor's appointment |
| 07/31/2006 | 1 | 6 | 21 | Sick |
| 08/01/2006 | 1 | 8 | 29 | Sick |
| 08/11/2006 | 1 | 4 | 33 | Doctor's appointment |
| 08/14/2006 | 1 | 4 | 37 | Doctor's appointment |



DEFENDANT'S
EXHIBIT
13

PENGAD 800-631-6989

HUNTER V. MOBIS
00115

# MOBIS Alabama, LLC

## Absence Request

**Absence Information**

Employee Name: _Tarsha Hunter_

Employee Number: _3103490_    Department: _Accounting + Finance_

Manager: _Sonechka Womack_

Type of Absence Requested:

Sick    (Appointment)    Bereavement    Time Off Without Pay

Military    Jury Duty    Maternity/Paternity    Other

Dates of Absence: From: _August 14, 2006_    To: _____

Reason for Absence:

_I submitted a request for August 9, but that appointment_
_has been rescheduled until August 14, 2006 @ 9:30 am._
_Still need 1/2 a day._

You must submit requests for absences, other than sick leave, two days prior to the first day you will be absent.

_Tarsha Hunter_                    _8/3/06_
Employee Signature                    Date

**Manager Approval**

[✓] Approved

[ ] Rejected

Comments:

_SW_    _8/3_        _8/3/06_
Manager Signature    Date

DEFENDANT'S
EXHIBIT
_14_

PENGAD 800-631-6989

HUNTER V. MOBIS
00189

IN THE UNITED STATES DISTRICT COURT RECEIVED
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

2007 MAY 15 P 3: 34

~~A P. HACKETT CLK
U.S. DISTRICT COURT
MIDDLE DISTRICT ALA

TARSHA NICKOL HUNTER,          )
                              )
          Plaintiff,           )
                              )        CIVIL ACTION NO.:
                              )
vs.                            )        2:07-CV-427-WHA
                              )
MOBIS ALABAMA, LLC,            )
                              )        PLAINTIFF DEMANDS TRIAL BY
          Defendant.           )        STRUCK JURY.

## COMPLAINT

## JURISDICTION AND VENUE

1. This is a suit to obtain relief for pregnancy discrimination under Title VII of the Civil Rights Act of 1964, as amended by the Pregnancy Discrimination Act of 1978.

2. The jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 1331, 1343(4) and 28 U.S.C. §§ 2201 and 2202.

3. Venue is proper in that the Defendant employed the Plaintiff in Montgomery County, Alabama.

DEFENDANT'S EXHIBIT
15
PENGAD 800-631-6989

*Hunter v. MOBIS*
Plaintiff's Complaint
1

## PARTIES

4.    The plaintiff, Tarsha Nickol Hunter, is a female resident of Montgomery County, Alabama.

5.    Defendant, MOBIS Alabama, LLC ("MOBIS"), is a foreign corporation incorporated in the State of Delaware maintaining its principal place of business in Montgomery County, Alabama.

## ADMINISTRATIVE REMEDIES

6.    The defendant terminated Ms. Hunter on August 25, 2006.

7.    Ms. Hunter filed a Charge of Discrimination (420-2006-04825) with the Equal Employment Opportunity Commission ("EEOC") within 180 days of her termination. A copy of said EEOC Charge is attached hereto as "Exhibit 1."

8.    The EEOC issued a Dismissal and Notice of Rights to Ms. Hunter on April 5, 2007. A copy is attached hereto as "Exhibit 2."

9.    Ms. Hunter filed this suit within 90 days of April 5, 2007.

10.    All conditions precedent to the institution of this lawsuit have been

---

*Hunter v. MOBIS*
Plaintiff's Complaint
2

fulfilled.

## FACTUAL ALLEGATIONS

11.    Ms. Hunter began working for the defendant as a temporary employee on March 6, 2006.

12.    Ms. Hunter began working for the defendant on June 5, 2006 as a full time, non-temporary employee.

13.    Ms. Hunter worked for the defendant as an accounting specialist earning an annual salary of $27,594.00.

14.    Ms. Hunter's immediate supervisor was Sonechka Womack.

15.    Ms. Hunter also reported to Ms. Womack's supervisor, J. Kim.

16.    J. Kim is the defendant's Chief Financial Officer.

17.    After Ms. Hunter's employment was converted from temporary status in June 2006, the defendant required Ms. Hunter to take a drug test.

18.    As a result of the drug test ordered by the defendant, Ms. Hunter learned she was pregnant.

19.    Upon learning of her pregnancy, Ms. Hunter informed the Defendant

that she was pregnant.

20. After Ms. Hunter told Mr. Kim about her pregnancy, he terminated her.

21. On August 25, 2006, Mr. Kim terminated Ms. Hunter.

22. As of August 25, 2006, the defendant had not issued any form of formal discipline to Ms. Hunter.

23. Ms. Hunter was physically able to continue performing her job duties for the defendant.

24. Ms. Hunter's doctor had advised her that she could continue working until her due date.

<u>COUNT I</u>

<u>PREGNANCY DISCRIMINATION</u>

25. Ms. Hunter adopts the above facts in support of this Count.

26. The defendant singled out Ms. Hunter for adverse treatment because she was pregnant.

27. The defendant treated similarly situated, non-pregnant employees more favorably than Ms. Hunter.

*Hunter v. MOBIS*
Plaintiff's Complaint
4

HUNTER V. MOBIS
00095

28.    The defendant terminated Ms. Hunter due to her pregnancy.

29.    Pregnancy is a gender specific condition..

30.    The defendant's discriminatory conduct injured Ms. Hunter.

WHEREFORE, PREMISES CONSIDERED, the plaintiff respectfully requests the entry of judgment under Title VII, as amended by the Pregnancy Discrimination Act, against the defendant pursuant to an Order awarding:

a.    compensatory damages;

b.    punitive damages;

c.    injunctive relief, including back-pay (plus interest calculated at the applicable NLRB interest rates), reinstatement and/or front-pay;

d.    that relief which is fair, just, and equitable under the circumstances of this case;

e.    reasonable attorneys fees;

f.    pre-judgment interest; and

g.    the costs of this suit.

HUNTER V. MOBIS
00006

PLAINTIFF REQUESTS A TRIAL BY STRUCK JURY.

*Heather Leonard*

Heather N. Leonard
Attorney Code - NEW018
ASB-1152-061H
ATTORNEY FOR PLAINTIFF

OF COUNSEL:

HEATHER LEONARD, P.C.
The Gross Building
2108 Rocky Ridge Road, Suite 1
Birmingham, AL 35216
Phone:        (205) 978-7899
Facsimile:   (205) 278-1400
E-mail:       Heather@HeatherLeonardPC.Com

SERVE DEFENDANTS VIA CERTIFIED MAIL:

MOBIS Alabama, LLC
c/o The Corporation Company
2000 Interstate Park Drive, Suite 204
Montgomery, AL 36109

*Hunter v. MOBIS*
Plaintiff's Complaint
6

HUNTER V. MOBIS

EEOC Form 5 (5/01)

## CHARGE OF DISCRIMINATION

This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form.

Charge Presented To:     Agency(ies) Charge No(s):

☐ FEPA
☒ EEOC    420-2006-04825

and EEOC

State or local Agency, if any

Name (indicate Mr., Ms., Mrs.)
**Ms. Tarsha Hunter**

Home Phone (Incl. Area Code)
(334) 356-5910

Date of Birth

Street Address
4100 B Perdido Drive, Montgomery, AL 36110 — City, State and ZIP Code

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. (If more than two, list under PARTICULARS below.)

Name
**MOBIS ALABAMA, LLC**

No. Employees, Members
15 +

Phone No. (Include Area Code)
(334) 387-4800

Street Address
1395 Mitchell Young Road, Montgomery, AL 36108   City, State and ZIP Code

No. Employees, Members

Phone No. (Include Area Code)

Name

Street Address   City, State and ZIP Code

DISCRIMINATION BASED ON (Check appropriate box(es).)

☐ RACE ☐ COLOR ☒ SEX ☐ RELIGION ☐ NATIONAL ORIGIN
☐ RETALIATION ☐ AGE ☐ DISABILITY ☐ OTHER (Specify below.)

DATE(S) DISCRIMINATION TOOK PLACE
Earliest 08-25-2006   Latest 08-25-2006

☐ CONTINUING ACTION

THE PARTICULARS ARE (If additional paper is needed, attach extra sheet(s).)

I was employed with the above-named employer on June 5, 2006. I found out that I was pregnant, and the employer discharged me on August 25, 2006.

Because I was ill and needed to be off for medical treatment, I informed Jay Kim that I was pregnant. From that point, Mr. Kim went through Soncchak Womack, my supervisor, in communicating with me. On August 25, 2006, I asked Ms. Womack if I could meet with her and Jay Kim. I was told that my probationary period was ending on September 2, 2006, and that I was terminated. Mr. Kim could not give a firm reason for my termination but stated he "can't take care of a person like me." Tracy Reilder, Human Resources, stated that "if any new employee on their 90-day probation period is absent up to three days, they are automatically terminated." I believe my termination was due to being absent because of my pregnancy related illness.

I believe that I have been discriminated against by being discharged, because of my gender, female, as it relates to my pregnancy, which is in violation of Title VII of the Civil Rights Act of 1964, as amended.

I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures.

I declare under penalty of perjury that the above is true and correct.

X
9/19/06   *Tarsha Hunter*
Date   Charging Party Signature

NOTARY – When necessary for State and Local Agency Requirements

I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.
SIGNATURE OF COMPLAINANT

SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (month, day, year)   SEP 21 2006

EXHIBIT
1

HUNTER V. MOBIS
00098

F   Form 161-B (10/96)

## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

### NOTICE OF RIGHT TO SUE *(ISSUED ON REQUEST)*

To: Tarsha Hunter
    4100-B Perdido Drive
    Montgomery, Alabama 36110

From: Equal Employment Opportunity Commission
      Ridge Park Place
      1130 South 22nd Street South, Suite 2000
      Birmingham, Alabama 35205

[   ]   *On behalf of person(s) aggrieved whose identity is*
        *CONFIDENTIAL (29 CFR § 1601.7(a))*

| Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| 420 2006 04825 | Rita W. Sterling, Investigator | (205) 212-2060 |

*(See also the additional information attached to this form.)*

### NOTICE TO THE PERSON AGGRIEVED:

**Title VII of the Civil Rights Act of 1964 and/or the Americans with Disabilities Act (ADA):** This is your Notice of Right to Sue, issued under Title VII and/or the ADA based on the above-numbered charge. It has been issued at your request. Your lawsuit under Title VII or the ADA must be filed in federal or state court <u>WITHIN 90 DAYS</u> of your receipt of this Notice. Otherwise, your right to sue based on this charge will be lost. (The time limit for filing suit based on a state claim may be different.)

[ X ]   More than 180 days have passed since the filing of this charge.

[   ]   Less than 180 days have passed since the filing of this charge, but I have determined that it is unlikely that the EEOC will be able to complete its administrative processing within 180 days from the filing of the charge.

[ X ]   The EEOC is terminating its processing of this charge.

[   ]   The EEOC will continue to process this charge.

**Age Discrimination in Employment Act (ADEA):** You may sue under the ADEA at any time from 60 days after the charge was filed 90 days after you receive notice that we have completed action on the charge. In this regard, the paragraph marked below applies to your case:

[   ]   The EEOC is closing your case. Therefore, your lawsuit under the ADEA must be filed in federal or state court <u>WITHIN 90 DAYS</u> of your receipt of this Notice. Otherwise, your right to sue based on the above-numbered charge will be lost.

[   ]   The EEOC is continuing its handling of your ADEA case. However, if 60 days have passed since the filing of your charge, you may file suit in federal or state court under the ADEA at this time.

**Equal Pay Act (EPA):** You already have the right to sue under the EPA (filing an EEOC charge is not required.) EPA suits must be brought in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that backpay due for any violations that occurred <u>more than 2 years (3 years)</u> before you file suit may not be collectible.

If you file suit based on this charge, please send a copy of your court complaint to this office.

On behalf of the Commission

*Delner Franklin-Thomas*        4/5/07

Delner Franklin-Thomas, District Director      *(Date Mailed)*

Enclosure(s)

cc:   Heather Leonard, P.C.
      2108 Rocky Ridge Road
      Suite One
      Birmingham, Alabama 35216

Henry C. Barnett, Jr.
CAPELL & HOWARD
Attorneys At Law for Mobis Alabama, LLC

**EXHIBIT**

**2**

HUNTER V. MOBIS
00099

**sonechka.womack@mobis-america.com**

| | |
|---|---|
| **From:** | Jay Kim [jay.kim@mobis-america.com] |
| **Sent:** | Wednesday, July 26, 2006 8:25 AM |
| **To:** | 'Tarsha Hunter' |
| **Cc:** | sonechka.womack@mobis-america.com |
| **Subject:** | Notification (July 26,2006) |
| **Importance:** | High |

Tarsha,

This is a notification for tardiness.
On Wednesday the 26th you were noted as being tardy, this was not a first time during 90-day probationary.
I need for you to keep the starting time for business, everyday.

When you return from doctor's office, please submit the doctor's note and schedule for make-up time.
In addition, you are reminded that you are still serving out your probationary period and that attendance is very important.
Please make every effort to correct these deficiencies as your long term employment may be in jeopardy.

Thanks.

*Jay K. (Jae-kwang)  Kim / CFO*

MOBIS Alabama,LLC.
1395 Mitchell Young Road,
Montgomery, AL 36108

Tel : 334-387-4802
Fax : 334-387-4900
E-mail : *jay.kim@mobis-america.com*



PENGAD 800-631-6989

DEFENDANT'S
EXHIBIT

16

sonechka.womack@mobis-america.com

| | |
|---|---|
| From: | sonechka.womack@mobis-america.com |
| Sent: | Wednesday, August 02, 2006 10:35 AM |
| To: | 'Tarsha Hunter' |
| Cc: | 'Jay Kim' |
| Subject: | Invoices/Statements, etc. |

Hello Tarsha,

Please remember to make sure that all invoices are entered into SAP on the day received. It is very important that the invoices are entered and then distributed to the responsible person in a timely manner. There is a small timeframe that the responsible person has to complete their task and return the invoice to our department for payment. The President holds each person liable if the invoice is not processed on time. If they receive the invoice late, they will report to it Jay and the President that accounting did not give it to them on time.

I understand that sometimes you will run into some problems, but please try to have the invoices entered everyday before you leave. Let me know if you run into any problems.

Also, regarding statements from vendors, please review the statement to see if the invoices listed have been paid/accounting document generated/received by MOBIS. After doing so, please submit the statement with documentation of your research to me and then I will forward it to Jay.

I completely understand that you are juggling a lot of work. Jay is working on hiring more people in our department. But in the meantime, please continue to do your best because everything we do reflects our job evaluation.

Thank you for your hard work! I appreciate everything that you do!


Sonechka Womack
General Accounting
Assistant Manager
MOBIS Alabama, LLC
334-387-4845 (T)
334-387-4900 (Fax)



DEFENDANT'S EXHIBIT
17
PENGAD 800-631-6989

HUNTER V. MOBIS
00174

8/2/2006

**sonechka.womack@mobis-america.com**

| | |
|---|---|
| **From:** | Jay Kim [jay.kim@mobis-america.com] |
| **Sent:** | Wednesday, August 02, 2006 8:18 AM |
| **To:** | 'Tarsha Hunter' |
| **Cc:** | sonechka.womack@mobis-america.com |
| **Subject:** | Check out pending works |
| **Importance:** | High |

Tarsha,

I hope that you are getting better.

We are on the month end closing. Please check pending works and reorganize your desk.
There were a bunch of documents which should have been filed.

And, I need for you to submit doctor's note and make-up schedule for your absence.

Thanks.

*Jay K. (Jae-kwang) Kim / CFO*

MOBIS Alabama,LLC.
1395 Mitchell Young Road,
Montgomery, AL 36108

Tel : 334-387-4802
Fax : 334-387-4900
E-mail : *jay.kim@mobis-america.com*


DEFENDANT'S EXHIBIT
PENGAD 800-631-6989
18

HUNTER V. MOBIS
00173

sonechka.womack@mobis-america.com

**From:**    sonechka.womack@mobis-america.com
**Sent:**    Monday, August 14, 2006 9:05 AM
**To:**    'Tarsha Hunter'
**Subject:** Attendance

Good morning Tarsha,

I received your voicemail regarding you will not be able to drop off your child before 7:30 am. I understand it completely. However, because of the company policy it may be hard to allow you to come in late. I have already spoken to Jay and it is hard for him to understand. I recommend that you get a written letter from your child's school and speak to Jay about this.

There have been quite a few instances that Jay has excused. We all know that Jay is very strict when it comes to tardiness and attendance. I feel that he has been more than understanding for everything (considering this is Jay I am talking about). I really want you to succeed here at MOBIS, so I hope you can do you best to meet the standards of this company. You are getting close to your 90 day probation ending so please try to leave a great impression so that you will be able to continue your employment here at MOBIS. I am here to help you.

Thanks,

Sonechka Womack
General Accounting
Assistant Manager
MOBIS Alabama, LLC
334-387-4845 (T)
334-387-4900 (Fax)



DEFENDANT'S
EXHIBIT
19

PENGAD 800-631-6989

HUNTER V. MOBIS
00178

TO:+2052122105

P.002

AUG-31-2005 08:31 FROM:

04825

August 28, 2006

Tarsha N. Hunter
4100 B Perdido Dr.
Montgomery, AL 36110
(334) 356-5910 Hm.
(334) 538-1978 Ccl.



DEFENDANT'S
EXHIBIT
20
PENGAD 800-631-6989

Re: Mobis Alabama, LLC.
    1395 Mitchell Young Rd.
    Montgomery, AL 36108
    (334) 387-4800
    (334-387-4900 fax

Number of employees is approximately a thousand employees at Mobis Alabama, LLC counting both building #1 and # 2. Jay Kim, CFO and board member of Mobis Alabama, LLC, discriminated me against on August 25, 2006. I found out that I was pregnant around June of 2006 while employed at Mobis. I was informed by several employees not to say anything to anybody about just yet, at least not before my 90 days were up for my probationary period. They really made it clear not to say anything because a previous employee had been terminated because she was pregnant and that she since then has filed a suite against Mobis Alabama because of their actions. I finally had to inform Jay Kim of my situation due to being ill and needing a surgical procedure to take place. After I informed Jay Kim of my status of being pregnant his whole demeanor changed towards me. He wouldn't say anything to me any more anything that he needed me to do, he now went through Sonechak Womack my supervisor at Mobis Alabama. He never even looked my way any more. It seems as though he was upset at the fact that I was pregnant. He always said something to the fact that I was already a single parent, but also informed me before being hired if there was anything that I needed to let him know and he'll help me because I was a good worker. On August 24, 2006, I noticed Jay Kim, Sonechka Womack, and Tracy Reilder (Human Resources) was in his office almost all through out the day. I really knew something was wrong Jay Kim couldn't look me in the eye or when I would by his office he would either go back in his office or go a different direction. His body language told the story. So, on August 25, 2006 I ask Sonechka could I meet with her and Jay Kim. We went into his office and I asked him what was the problem and the reasons for his actions towards me, He first tried to act as if nothing was wrong and asked me what was up a couple of times. I told him that I had notice his actions towards me and that since I informed him of being pregnant he has changed and he began by stating various of excuses and not the reasons and then explain to me that my probationary period was ending by September 2, 2006 per, Tracy Reilder, Human Resources, and that I was now terminated at Mobis Alabama, LLC. He even told me that my job performance was very good, but couldn't really give a firm reason to why he was terminating me. He just mentions that he can't take care of a person like me at Mobis Alabama, LLC. He brought Tracy Reilder in his office after a heated conversation about his decision to explain to me why he was taken those actions. She stated that if any new employee on their 90-day probation period is absence up to three days they are automatically terminated. I asked even I was ill, she mention to me for whatever reason, and that it's stated in the handbook. I explained to them all that it contradicts their handbook then, because it also states that employees, being pregnant or ill is given for a full time employee. Tracy had been known to terminate pregnant women before just because of being pregnant and that hasn't been there an entire year. I was discriminated against by Jay Kim and all Mobis representatives because of me being pregnant.

# Keep

## School Improvement
## Together We Can Make It Happen



**Achieving Excellence and Equality**

### *DOZIER CHIEFS*

### *DOZIER ELEMENTARY SCHOOL*

### *HANDBOOK*

### *2006 – 2007*

*200 Eastern Blvd.*
*Montgomery, Al 36117*
*334-260-1012 Office*
*334-260-1013 Lunchroom*
*fax 334-260-1012*

<u>www.mps.k12.al.us</u>    <u>Dozier :  www.dozier.mps.k12.al.us</u>



DEFENDANT'S
EXHIBIT
21
PENGAD 800-631-6989

## DAILY SCHEDULE

7:50am 1ST Bell          8:05 a.m. Tardy Bell          3:00 p.m. Dismissal

1.  Students may report to their homeroom beginning at 7:50 a.m. The school day officially begins at 8:05 a.m. A student who is not in his/her homeroom by the 8:05 a.m. bell is considered tardy.

2.  Any student entering the building after 8:05 a.m., MUST be accompanied by an adult who will check-in the child at the office.

3.  Students who are tardy cannot purchase snack/juice.

## ARRIVALS AND DISMISSALS

1 . Time of arrival is from 7:50 until 8:05AM. No students without prior approval will be allowed to come in the building before 7:50 A.M.

2. Children in classrooms will enter and exit through the teacher's outside door in the A.M. and P.M. Portables and Kindergarten will enter and exit through the lobby.

3. The dismissal bell will sound at 3:00 P.M. All children must be picked up immediately. If you are coming into the building, please park in the front parking lot and not in the loading zone. Parents are to wait outside for their child unless they have an appointment with the teacher.

4. Please plan with your child the procedure for rainy days. If the child is to walk home, be certain he/she has the necessary apparel. Be sure your child understands about being picked up on rainy days **before leaving for school in the morning. PLEASE DO NOT CALL THE SCHOOL AND REQUEST A MESSAGE BE GIVEN TO YOUR CHILD UNLESS IT IS AN EMERGENCY.**

5. For safety purposes, no child is permitted in the teachers' (back) parking lot. NO PARENT IS TO PARK IN THE TEACHER'S PARKING LOT. Children are to be dispersed from the car in the front parking lot only and are to be picked up from the front parking lot only. Children are not to be picked up from the back parking lot. They are to use sidewalks to their assigned doors. Please observe crosswalks and yellow lines for parking. Please do not block the front circle as it is designated for buses and day care vans.

6. The Dozier Elementary Traffic Police have been trained in executing all safety rules and regulations. Please follow their signals and directions.

## BICYCLES

Children are permitted to ride bicycles to school. They are to be parked in the designated area only and the school accepts no responsibility for lost or damaged bicycles. Bicycles are to be walked, not ridden on the school grounds.

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

NORTHERN DIVISION

TARSHA NICKOL HUNTER,  )

    Plaintiff,  )

V.  ) CASE NO.

MOBIS ALABAMA, LLC,  ) 2:07CV-427-WHA

    Defendant.  )

Deposition of TRACY RIEDLER

January 31, 2008

10:12 a.m.



# EDMONDSON
## Reporting & Video, Inc.
**2119 3rd Avenue North, Suite 205**
**Birmingham, Alabama 35203**

# CONDENSED TRANSCRIPT

Deposition of TRACY RIEDLER
January 31, 2008

---

**Page 2**

1     S T I P U L A T I O N S

2

3       IT IS STIPULATED AND AGREED, by and

4   between the parties through their respective

5   counsel, that the deposition of TRACY RIEDLER,

6   may be taken before Elaine Scott, Notary

7   Public, State at Large, at the offices of

8   Capell & Howard, 150 South Perry Street,

9   Montgomery, Alabama, on January 31, 2008,

10   commencing at approximately 10:12 a.m.

11

12       IT IS FURTHER STIPULATED AND AGREED

13   that the signature to and reading of the

14   deposition by the witness is NOT waived, the

15   deposition to have the same force and effect

16   as if full compliance had been had with all

17   laws and rules of Court relating to the taking

18   of depositions.

19

20       IT IS FURTHER STIPULATED AND AGREED

21   that it shall not be necessary for any

22   objections to be made by counsel to any

23   questions, except as to form or leading

24   questions, and that counsel for the parties

25   may make objections and assign grounds at the

---

**Page 3**

1   time of the trial, or at the time said

2   deposition is offered in evidence, or prior

3   thereto.

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

---

**Page 4**

1     A P P E A R A N C E S

2

3   FOR THE PLAINTIFF:

4   HEATHER LEONARD PC

5     Heather Leonard

6   2108 Rocky Ridge Road

7     Suite 1

8   Birmingham, Alabama 35216

9

10   FOR THE DEFENDANT:

11   CAPELL & HOWARD

12   Henry C. Barnett, Jr.

13   150 South Perry Street

14   Montgomery, Alabama 36104

15

16   ALSO PRESENT:

17   Tarsha Hunter

18

19   COURT REPORTER:

20     Elaine Scott

21   EDMONDSON REPORTING & VIDEO

22   2119 3rd Avenue North

23     Suite 205

24   Birmingham, Alabama 35203

25

---

**Page 5**

1       EXAMINATION INDEX

2

3   TRACY RIEDLER

4     BY MS. LEONARD . . . . . .   7

5     BY MR. BARNETT . . . . . .  163

6

7   REPORTER'S CERTIFICATE . . . .  167

8

9

10       EXHIBIT INDEX

11   Plaintiff's

12   1     Notes                        90

13   2     Chart                       100

14   3     Value of Employee Benefits      106

15   4     Vacation and Absentee          118

16       Information

17   5     E-mail                    125

18   6     Unemployment Form              130

19   7     Unemployment Hearing Final     137

20       Decision

21   8     EEOC Position Statement        142

22   9     Response to Interrogatory No. 7    155

23

24

25

---

EDMONDSON REPORTING & VIDEO, INC.
Email: Edmondsonrpting@bellsouth.net          Phone 205.324.2333  Fax 205.324.2377

Deposition of TRACY RIEDLER
January 31, 2008

Page 6

1      I, Elaine Scott, a court reporter and
2  Notary Public for the State of Alabama, acting
3  as commissioner, certify that there came
4  before me at the law offices of Capell &
5  Howard, 150 South Perry Street, Montgomery,
6  Alabama, on January 31, 2008, beginning at
7  10:12 a.m., TRACY RIEDLER, in the above cause,
8  for oral examination, whereupon the following
9  proceedings were had:
10
11      MR. BARNETT: I want to make a
12  preliminary statement. Before we went on the
13  record, I was speaking with Ms. Leonard about
14  the deponent for this afternoon, Jay Kim.
15      Mr. Kim is Korean. He's been in
16  this country for a few years. He has pretty
17  good comprehension skills, particularly of
18  English, when he's reading. I'd say very good
19  there. It's not so much comprehension as the
20  fact that he's not familiar with many of the
21  terms that might be used in this case and in
22  terms of expressing himself. That's a primary
23  concern I have.
24      So what we've agreed to do is
25  have Ms. Riedler's deposition and start

Page 7

1  Mr. Kim's. And if it appears that he's not
2  able to understand or express himself
3  accurately in this deposition, then Mobis
4  reserves the right to suspend it and get an
5  interpreter.
6      MS. LEONARD: All right.
7      MR. BARNETT: And resume the
8  deposition.
9      THE COURT REPORTER: Would you
10  raise your right hand to be sworn?
11
12      TRACY RIEDLER,
13      being first duly sworn,
14  was examined and testified as follows:
15
16      EXAMINATION
17  BY MS. LEONARD:
18      Q. What do you understand the oath you
19  just took to mean?
20      A. That everything that is discussed
21  today that I tell you as clearly as I can
22  remember and I'll tell the truth on what I can
23  remember. And if I don't understand
24  something, I'll certainly let you know.
25      Q. Okay. Please state your full name

Page 8

1  for the record.
2      A. Tracy Suzanne Allen Riedler.
3      Q. All right. Before we start, I want
4  to go over what I hope can be three ground
5  rules that we agree to today. The first is
6  that if you don't understand my question,
7  you'll explain to me that you don't understand
8  my question and what part of it you don't
9  understand so that I can rephrase it so that
10  you can better understand it. Do you agree to
11  that?
12      A. Agreed.
13      Q. And if you answer the question, I'm
14  going to assume then that you understood the
15  question as it was asked.
16      A. Agreed.
17      Q. The second is that we agree you
18  give oral answers to the depositions.
19  Elaine is very good and very
20  thorough, but sometimes nonverbal responses
21  come naturally, but that might put Henry and
22  me in a position later of me arguing that you
23  may have given me an affirmative answer to the
24  question and him saying you have a neck crick.
25      A. Sure.

Page 9

1      Q. Can we agree to oral answers?
2      A. I might do this, but I will
3  actually answer yes.
4      Q. Not a problem. That's just to keep
5  us from getting in a fight later.
6      Lastly, can we agree that if you
7  need to confer with counsel about any of the
8  questions that I ask, you answer the question
9  and reserve conferring with counsel until
10  after the answer has been asked so that I can
11  make sure I get your testimony. Can we agree
12  with that?
13      A. Sure.
14      Q. All right. And these two stacks
15  I've put in front of you are the documents --
16  these are not the documents we received from
17  Mobis that they subpoenaed. I have those back
18  here if you need them. But these are the
19  documents that Mobis has produced to me in
20  this action.
21      These are here for you to refer to
22  if you need them at any time during the
23  deposition.
24      A. Okay.
25      Q. So those are there. They are

3 (Pages 6 to 9)

Deposition of TRACY RIEDLER
January 31, 2008

Page 10

1  numbered in there. And if you need counsel to
2  help you find them, that's fine, but they are
3  there for your understanding.
4      A. Okay.
5      Q. Do you appreciate that your
6  testimony today is both in your individual
7  capacity and pursuant to Rule 30(b)(6) of the
8  Federal Rules of Civil Procedure as the
9  corporate representative for Mobis?
10     A. Yes.
11     Q. Have you ever given a deposition
12  before?
13     A. Yes.
14     Q. How many times?
15     A. Twice, I think.
16     Q. All right. Were both of those
17  times during your employment with Mobis?
18     A. One with Mobis and one with
19  Thermalex.
20     Q. Did either of those depositions
21  involve situations where there's an allegation
22  of pregnancy discrimination or someone being
23  terminated for attendance?
24     A. No, not that I recall.
25     Q. All right. What is the highest

Page 11

1  level of education you've obtained?
2      A. I have a master's degree.
3      Q. Where did you get your master's?
4      A. Troy State in Montgomery.
5      Q. What was your master's degree in?
6      A. Human resources management.
7      Q. Prior to obtaining your master's,
8  what school did you go to?
9      A. Troy State here in Montgomery.
10     Q. And did you obtain a bachelor's
11  there?
12     A. I did in business administration
13  with a concentration in management.
14     Q. Have you obtained any other
15  degrees, certifications, or certificates?
16     A. No.
17     Q. Do you have any family that lives
18  roughly in the middle part of this state with
19  a last name different than yours?
20     A. My mother.
21     Q. Okay.
22     A. Rose Marie Allen.
23     Q. All right.
24     A. In Montgomery.
25     Q. Is Ms. Allen employed anywhere?

Page 12

1      A. No, she's retired. She is a
2  volunteer though at Baptist South.
3      Q. Are you currently married?
4      A. Yes.
5      Q. What is your spouse -- what's your
6  spouse's name?
7      A. James Brian Riedler.
8      Q. All right. And where does he work?
9      A. A-Plus Quality Fencing.
10     Q. All right. Do you have any
11  children who are over the age of nineteen?
12     A. No.
13     Q. All right. Do you have any
14  children under the age of nineteen?
15     A. No.
16     Q. Do you belong to a church?
17     A. Yes.
18     Q. And I know some of these questions
19  may seem personal. We've requested a jury
20  trial. And one of the things that we're
21  entitled to go into in the deposition is
22  information relating to your acquaintances to
23  ensure that people that might be selected to
24  serve on jury duty aren't familiar with any of
25  the witnesses, parties, or claims. That's why

Page 13

1  I'm asking this.
2      Where do you go to church?
3      A. Holy Comforter Episcopal.
4      Q. Do you belong to any clubs or
5  organizations?
6      A. The Personnel Association, Society
7  for Human Resources Management here in
8  Montgomery.
9      Q. Are you a member of the Junior
10  League?
11     A. No.
12     Q. Who is your current employer?
13     A. Mobis Alabama.
14     Q. All right. How long have you
15  worked for Mobis Alabama?
16     A. Four years.
17     Q. What is your job there?
18     A. I'm the senior human resources
19  manager.
20     Q. Have you held any other jobs other
21  than senior human resources manager?
22     A. No.
23     Q. What does the senior human
24  resources manager do at Mobis Alabama?
25     A. I have ultimate responsibility for

4 (Pages 10 to 13)

Deposition of TRACY RIEDLER
January 31, 2008

Page 14

1  all related human resources functions which
2  include benefits, compensation, payroll,
3  recruiting, training.
4        Also, I have responsibility for
5  general administration, which is really the
6  protocol of the company, environmental health
7  and safety, and facilities and team relations.
8        Q.  Who is your supervisor?
9        A.  The president, Mr. Soon Hwa Kim.
10       Q.  Are you the highest ranking
11  employee in human resources?
12       A.  Yes.
13       Q.  How many people do you have under
14  your supervision?
15       A.  Twenty.
16       Q.  So the human resources department
17  is made up of you and approximately twenty
18  employees?
19       A.  Uh-huh.
20       Q.  Where did you work before working
21  for Mobis?
22       A.  Thermalex.
23       Q.  And how long did you work for
24  Thermalex?
25       A.  Just under nine years.

Page 15

1        Q.  Okay.  What did you do there?
2        A.  I was the human resources director.
3        Q.  Did your employment with Thermalex
4  end voluntarily?
5        A.  No, we were actually a
6  consolidation.  We consolidated the human
7  resources department with multiple locations,
8  and I found out about six months before I
9  left.
10       Q.  Did you receive any discipline
11  during your employment with Thermalex?
12       A.  No.
13       Q.  During your employment with Mobis,
14  have you received any discipline?
15       A.  No.
16       Q.  Did you do anything to prepare for
17  your deposition?
18       A.  I read documents.
19       Q.  Okay.  Were those documents which
20  you chose to review or which were selected for
21  you by counsel?
22       A.  A little bit of both.  I reviewed
23  the entire case.  I kept every document
24  relating to the case and information,
25  interrogatories, the discovery portion, and

Page 16

1  things like that.  So I just read those types
2  of things and --
3        Q.  Okay.
4        A.  -- just more recently older
5  documentation to refresh.
6        Q.  Did you do anything else to
7  prepare?
8        A.  No, just read.
9        Q.  Do you feel adequately prepared to
10  testify today?
11       A.  Sure.
12       Q.  Other than the passage of time, is
13  there any reason which you may not be able to
14  testify fully or truthfully today?
15       A.  No.
16       Q.  I'm going to ask some questions now
17  relating to Mobis and its structure and its
18  organization.  What is its legal name?
19       A.  Mobis Alabama, LLC.
20       Q.  Does it have any d/b/a's,
21  registered, or trade names?
22       A.  There is a holding company called
23  Mobis America here in the U.S., and under
24  Mobis America, you have multiple locations.
25       Q.  Okay.  Does Mobis America have any

Page 17

1  control over how Mobis Alabama, LLC, operates
2  with respect to employee management issues?
3        A.  No, it's in name only --
4        Q.  All right.
5        A.  -- the whole company.
6        Q.  What state -- if I say Mobis, can
7  we agree we're talking about Mobis Alabama,
8  LLC?
9        A.  Yes.
10       Q.  Great.  What state are they
11  incorporated in, if you know?
12       A.  Delaware.
13       Q.  Where is Mobis Alabama's principal
14  place of business?
15       A.  1395 Mitchell Young Road,
16  Montgomery.
17       Q.  Does it have any other locations?
18       A.  Mobis Alabama --
19       Q.  Yes.
20       A.  -- does not.
21       Q.  Are the administrative offices for
22  Mobis Alabama at that location you just
23  shared?
24       A.  Yes.  May I actually say one
25  thing?

5 (Pages 14 to 17)

Deposition of TRACY RIEDLER
January 31, 2008

Page 18

1    Q. Yeah.
2    A. Mobis Alabama has three buildings,
3  but they're at the same location. 1395 is
4  what's referred to as the module building,
5  1391 is the plastics building, and 1385, I
6  believe, is the retribution center. So if you
7  were to see multiple addresses, please
8  understand that they are in the same area.
9    Q. And you just brought up a good
10  point. This is a very formal setting around
11  this beautiful conference room and we have a
12  court reporter here. But just because this is
13  a deposition and it's a formal setting, we can
14  be flexible in the way this proceeds.
15    If I ask you a question and later
16  during the deposition you realize you may need
17  to clarify an earlier answer or you remember
18  something, this is not so rigid and informal
19  that you can't stop and say, Wait a minute, I
20  need to correct earlier testimony. I need to
21  say something.
22    A. Is that okay what I just did?
23    Q. Absolutely. That's what I want you
24  to do. And you don't have to do it
25  immediately following a question. If towards

Page 19

1  the end of your deposition you remember
2  something, a response to one of these earlier
3  questions, this is the only chance I get to
4  talk to you.
5    This record will be the only record
6  I have of what your testimony may be at
7  trial. So I want to make sure it's complete
8  and accurate so that I can be prepared and so
9  that Mobis's lawyer can be prepared. So
10  that's what I want you to do.
11    A. Okay.
12    Q. Approximately how many employees
13  did Mobis have in 2006? I don't need to know
14  the exact number. This is mainly for
15  determining the applicable cap under the law
16  we've brought under.
17    A. My guess would be maybe about six
18  fifty, seven hundred maybe.
19    Q. What type of product or service
20  does Mobis provide? What is its -- what's the
21  function of the company?
22    A. We're an automotive supplier.
23  We're what's referred to as a tier one
24  supplier for Hyundai here in Montgomery. We
25  provide cockpit and chassis modules. We

Page 20

1  assemble those, and we also injection mold
2  paint and fully assemble the bumper in the
3  plastics facility and the seal side for the
4  car. And the redistribution houses service
5  parts for Hyundai vehicles.
6    Q. When you mentioned tier one, what
7  does that mean?
8    A. Tier one means that you're a direct
9  supplier to the OEM, which is the automotive
10  company that builds the cars.
11    Q. Does Hyundai exercise any control
12  over how Mobis operates?
13    A. No.
14    Q. All right. So y'all are just a
15  contractor?
16    A. We're a supplier.
17    Q. Supplier. All right. Later today
18  we're going to be taking the deposition of a
19  gentleman named Jay Kim. What is his position
20  with Mobis?
21    A. The CFO.
22    Q. And as the CFO, what does he do?
23    A. He's responsible for the accounting
24  and finance for the company, which would
25  include taxes and banking and just general

Page 21

1  accounting functions.
2    Q. Do you know who he reports to?
3    A. The same as I do, the president of
4  the company, Mr. Kim.
5    Q. And do you know if he directly
6  supervises any employees?
7    A. Jay?
8    Q. Yes.
9    A. Yes.
10    Q. How many employees does he directly
11  supervise?
12    A. Eight.
13    Q. Do you know what positions report
14  directly to him?
15    A. Uh-huh.
16    Q. What positions report to him?
17    A. There is a general accounting
18  assistant manager, tax and finance assistant
19  manager, and then each of those have employees
20  that report to them, like, for instance, the
21  assistant manager for tax and finance has an
22  accounting assistant that works for him -- or
23  for her actually. And then there are maybe
24  three accounting specialists that work for the
25  general accounting assistant manager.

6 (Pages 18 to 21)

Deposition of TRACY RIEDLER
January 31, 2008

Page 22

1   Q. All right.
2   A. Ultimately, they all work for Jay.
3   Q. Okay. Tomorrow we're going to be
4 taking the deposition of a lady named Sonechka
5 Womack. Did she work for Mobis?
6   A. Yes.
7   Q. What job did she hold for Mobis?
8   A. The general accounting assistant
9 manager.
10   Q. And she reported directly to
11 Mr. Kim?
12   A. Yes.
13   Q. Did she have anyone else to whom
14 she reported?
15   A. No.
16   Q. Did she supervise any employees?
17   A. Yes.
18   Q. How many employees did she
19 typically supervise?
20   A. Typically one, and I believe that's
21 all she did at the time that she left.
22   Q. All right. And what position would
23 she supervise?
24   A. Would have been an accounting
25 specialist.

Page 23

1   Q. Okay.
2   A. A general accounting specialist.
3   Q. And is that the position that
4 Ms. Hunter held?
5   A. Yes.
6   Q. All right. Does Mobis have a
7 document retention policy?
8   A. Yes.
9   Q. Tell me what your understanding of
10 that policy is as it relates to employee
11 records and attendance records.
12   A. There's a length of time -- there's
13 a requirement of a length of time that records
14 are retained by an employer. There are
15 different stages as far as employment
16 documentation, anything that goes into a
17 personnel file, of course, accounting
18 documents and things. So they just kind of
19 stagger.
20   Since we've only been employed for
21 four years, I keep everything. So I have all
22 records. I'm a pack rat.
23   Q. So you've been employed with Mobis
24 since it opened?
25   A. Yes.

Page 24

1   Q. I think you answered my next
2 question, but I want to make sure it's clear
3 for the record. No documents have been
4 destroyed pursuant to that policy?
5   A. No. That's correct.
6   Q. Who's responsible for maintaining
7 and keeping all personnel records relating to
8 attendance, discipline, anything related to an
9 employee's employment with Mobis?
10   A. Myself.
11   Q. All right. Where do you maintain
12 any documents relating to employee attendance?
13   A. Attendance documentation actually
14 is kept in employee files, if there's any type
15 of a warning given.
16   If there are standard attendance
17 records, like, for instance, hourly employees,
18 they are on a point system. So those are kept
19 in a notebook locked in a file in the human
20 resources department.
21   Q. What type of attendance records do
22 you keep beyond what you've just shared with
23 me?
24   A. Time sheets.
25   Q. Okay.

Page 25

1   A. But again, those are for the hourly
2 staff. Salaried staff do not clock in and
3 out. So there are no formal records as far as
4 that goes, for the salaried staff.
5   Q. Was Ms. Hunter considered hourly or
6 salary?
7   A. Salary.
8   Q. So she wouldn't have kept a time
9 sheet?
10   A. No.
11   Q. What sort of records are maintained
12 of the attendance of salaried employees to
13 reflect when they arrive at work and when they
14 leave?
15   A. The only records that you would
16 actually have would be through a security
17 badge, and that would also depend if you had
18 to use it.
19   Everyone -- we have security panels
20 on every door. And so if you were to walk
21 through the reception door into the general
22 office area -- if you're walking in with a
23 group of people, you may not have had to use
24 your personal badge. If you walk in by
25 yourself, you would have to.

7 (Pages 22 to 25)

Deposition of TRACY RIEDLER
January 31, 2008

## Page 26

1    Q. Okay.
2        A. So those would be reported through
3    our security system, but that information
4    actually is maintained for three months and
5    then it's written over.
6        Q. At any time have you requested the
7    security badge information for Ms. Hunter?
8        A. No.
9        Q. Are you aware of anyone at Mobis or
10   on behalf of Mobis requesting that information
11   of Ms. Hunter?
12       A. No.
13       Q. Do you know if that information has
14   ever been reviewed to determine when
15   Ms. Hunter arrived at work and when she left?
16       A. No.
17       Q. I apologize. I'm trying to figure
18   out the best way to ask this question.
19           What sort of documents or records
20   does Mobis keep relating to employee absences
21   for health-related reasons?
22       A. Are we referring to salaried and
23   hourly staff, or are we also referring to
24   people that qualify for family medical leave?
25       Q. All of the above.

## Page 27

1        A. We have a no-fault attendance
2    policy, no fault meaning that there are no
3    excused absences.
4            So we do not keep doctor's records
5    on file -- and I should say formally. The
6    human resources department does not. Those
7    are not maintained in a personnel file or
8    anything else.
9            If a person qualifies for family
10   medical leave, obviously that's covered by the
11   act. And we keep FMLA paperwork separate, but
12   each person has a medical file. And we would
13   keep any doctor's notes or anything under that
14   situation for FMLA.
15           A supervisor may -- and I don't --
16   and I certainly don't have any knowledge of
17   this specifically, but a supervisor may
18   actually keep a doctor's note. If a person is
19   out sick, they may feel like it's more of a
20   moral obligation to bring something in just to
21   verify that they were actually out.
22           I'm referring to non-FMLA covered
23   individuals.
24       Q. Beyond what we just discussed, how
25   does Mobis document when an employee is absent

## Page 28

1    for a partial day or for an entire day?
2        A. For salaried staff, the supervisor
3    or department manager is responsible for just
4    keeping up with their own employees. So you
5    have some supervisors that are better at
6    documenting than others.
7            In this particular case, Jay
8    happens to be a very, very good documenter.
9        Q. All right. So the human resources
10   department, would it have the ability to tell
11   me for any given employee the number of days
12   they've been absent in a period of time?
13       MR. BARNETT: This is not an
14   objection, but Heather, it ought to be
15   emerging here that they have different systems
16   for hourly and salary. If you would specify
17   that, it might help.
18       MS. LEONARD: I'm going for both
19   types of employees.
20       Q. In your answer, you can break it
21   down for both hourly and salary. But for any
22   given employee, if I wanted to know days that
23   they had been absent, how would I find that
24   out?
25       A. The supervisor and manager for

## Page 29

1    salaried, and for hourly, the human resources
2    department would have that because we maintain
3    the time sheets whereas an hourly employee has
4    to clock in and out.
5        Q. For salaried employees, are they
6    paid for the time that they're absent?
7        A. Yes.
8        Q. So an employee who is salaried
9    should not have their paycheck docked for a
10   partial day absence?
11       A. We have not done that, no.
12       Q. Are there any other records
13   maintained that you're aware of by Mobis
14   relating to employee attendance?
15       A. No. Not that I can think of at
16   this time anyway.
17       Q. Have you told me every way that I
18   could find out an employee's attendance short
19   of interviewing an employee?
20       A. Sure. Yes.
21       Q. Where are documents relating to
22   employee discipline maintained?
23       A. In the personnel file inside locked
24   cabinets in the human resources department.
25       Q. All right. How is discipline

EDMONDSON REPORTING & VIDEO, INC.
Email: Edmondsonrpting@bellsouth.net          Phone 205.324.2333  Fax 205.324.2377

Deposition of TRACY RIEDLER
January 31, 2008

Page 30

1 documented?
2       A. Employee discipline is documented.
3 For the hourly staff, you have discipline
4 forms. They are referred to as -- they have
5 different stages. You have discussion
6 planners, which is a form called a discussion
7 planner, and you would actually write down
8 what the issue of discipline would be.
9       It's more of a -- it's formally
10 documented, but it is just an opportunity to
11 express that someone is -- has had a
12 performance issue of some kind. Just an early
13 warning, if you will.
14       Once you get into the corrective
15 action stage -- and again, this is for hourly
16 employees -- you have several different stages
17 before termination. And that would be very
18 light stages of disciplinary things, if
19 you're -- if you continue to have the same
20 performance problem over and over.
21       And for the salaried staff would be
22 in the form of a memo -- always in a memo. We
23 don't use formal documentation because the
24 hourly are on point systems and things for
25 absenteeism, and they're also on point -- not

Page 31

1 a point system for disciplinary, but they are
2 corrective action one, two, and three.
3       Q. Okay.
4       A. So prior to termination.
5       Q. Is there any other reason other
6 than that hourly employees are on a point
7 system that the disciplinary form used for
8 hourly employees is not also used to document
9 discipline for salaried employees?
10       A. No.
11       Q. Is there any specific type of
12 memorandum form that is used to discipline
13 salaried employees?
14       A. No. But since those records are
15 maintained by myself and I read disciplinary
16 issues that the managers or supervisors in the
17 department are having, I'll review those.
18       So I require certain information,
19 you know, being in that memo just so I can be
20 clear exactly what's happening.
21       So that would be, you know, what
22 exactly the issue was, the performance issue
23 was, and you know, what they were -- to work
24 toward an improvement plan, you know, to --
25 for instance, if the person has committed to

Page 32

1 improving whatever the performance issue is
2 and they've kind of made an agreement between
3 the supervisor and the individual.
4       Q. All right. Who has the authority
5 to issue a disciplinary memo like you just
6 described to a salaried employee?
7       A. Supervisors or managers.
8       Q. Would Ms. Womack have that
9 authority?
10       A. Yes.
11       Q. And would Mr. Kim have that
12 authority?
13       A. Yes.
14       Q. Did you communicate to both of them
15 prior to or during Ms. Hunter's employment the
16 things that you wanted contained in the
17 disciplinary memo?
18       A. I'm thinking. I'm not actually
19 aware of a disciplinary warning that
20 Ms. Hunter has.
21       Q. But even prior to that, did you
22 communicate to them what you would like to see
23 in a disciplinary warning or memo?
24       A. Supervisors and managers in general
25 know, and that is something when they're new

Page 33

1 to their position that I will instruct them
2 on.
3       Q. And should that disciplinary memo
4 make clear to an employee that they're being
5 disciplined?
6       A. Yes.
7       Q. And so somewhere within it, you
8 would hope the word discipline pops out?
9       A. Not necessarily the word, but, you
10 know, they're very clear about their
11 performance issues, sure.
12       Q. Is the employee informed that that
13 disciplinary memo will be placed in their
14 personnel file?
15       A. Yes, they should be.
16       Q. We've referenced -- you've
17 referenced a medical file and a personnel
18 file. Are there any other types of files that
19 are maintained for salaried employees?
20       A. Training records.
21       Q. Are those training records also
22 included in their personnel file, or is there
23 a separate file for that?
24       A. There's a separate file for that.
25 They are all consolidated and we maintain them

EDMONDSON REPORTING & VIDEO, INC.
Email: Edmondsonrpting@bellsouth.net          Phone 205.324.2333  Fax 205.324.2377

Deposition of TRACY RIEDLER
January 31, 2008

Page 34

1  in a database.
2       Q. Do you know if all three of those
3  files for Ms. Hunter have been produced to me?
4       A. Yes.
5       Q. With respect to the health file,
6  what type of information goes in that?
7       A. That would be any of their medical,
8  dental, life insurance, disability insurance.
9  So all of the insurance paperwork and FMLA
10 paperwork is also kept in that medical file.
11      Q. All right. With respect to the
12 training file, what is kept in that?
13      A. The training file is not
14 individually set by employee. So those are
15 actually kept in notebooks if there's, you
16 know, documentation other than a roster of
17 attendance. And those rosters and any type of
18 training are kept in notebooks and entered
19 into the SAP training database.
20      Q. Do you know what type of training
21 was provided to Ms. Hunter?
22      A. New employee orientation, which
23 would have included just basic information
24 about the company, of course about the
25 insurance, environmental health and safety

Page 35

1  type of -- hazard communication, if you will,
2  just certain dangers in the work force. And
3  that was probably -- that's probably the
4  extent -- or for the amount of time she was
5  there. That's probably about the amount of
6  training that she had.
7           Otherwise, informally in her
8  department would have been with coworkers and
9  certainly her supervisor.
10      Q. All right. What type of
11 documentation is maintained in the personnel
12 file?
13      A. What type of documentation?
14 Everybody has a new employee packet, and that
15 would be -- for instance, we call it a
16 personal data sheet that just asks, you know,
17 about your name, relatives in case of an
18 emergency, your degree and so on. You know,
19 it's just a general form.
20          And then you would have your direct
21 deposit form for your paycheck, your tax forms
22 for your paycheck and, gosh, any kind of
23 changes that you had just in general.
24      Q. All right. How is documentation
25 relating to internal complaints of

Page 36

1  discrimination, specifically pregnancy
2  discrimination, how are those documents
3  maintained, or are there documents kept for
4  those types of complaints?
5       A. Well, any kind of complaint would
6  be kept in a personnel file.
7       Q. Anywhere else records of internal
8  complaints would be kept other than a
9  personnel file?
10      A. If we had an -- if we had an EEOC
11 charge or anything, I would keep those in the
12 personnel file for the employee.
13      Q. All right. Do you maintain
14 documentation relating to internal complaints
15 of discrimination or EEOC charges separate
16 from personnel files?
17      A. No.
18      Q. Okay. Is there any way short of a
19 review of personnel files then for me to
20 determine any internal complaints of
21 discrimination that have been made?
22      A. No.
23      Q. Have you had any internal
24 complaints of pregnancy discrimination?
25      A. In the basis of an EEOC case, yes.

Page 37

1  We had Sharonda Gordon, and that was after her
2  termination, not during.
3       Q. Okay. Anyone else?
4       A. And then a -- now I can clarify
5  actually something that was said yesterday.
6       Q. Okay.
7       A. Lajarra Jefferson was not -- hers
8  was not specifically relating to pregnancy.
9  Hers was an FMLA case.
10          So it was different in the fact of
11 hers wasn't -- she wasn't being -- she did not
12 suggest that she was being discriminated
13 against because of pregnancy.
14      Q. Did she file an EEOC charge?
15      A. Yes.
16      Q. What did she allege was the basis
17 of discrimination?
18      A. FMLA denial.
19      Q. Anything else?
20      A. Not that I recall.
21      Q. Why was she on FMLA leave?
22      A. Pregnancy.
23      Q. Now, you've told me of these two
24 EEOC charges.
25      A. Uh-huh.

10 (Pages 34 to 37)

Deposition of TRACY RIEDLER
January 31, 2008

Page 38

1    Q.  Has anyone come to human resources
2  or their supervisor and complained about
3  pregnancy discrimination but not gone to the
4  EEOC?
5    A.  Not that I can recall.
6    Q.  What was the nature of Ms. Gordon's
7  complaint?
8    A.  Her complaint, she said that she
9  was terminated because she was pregnant.
10    Q.  When was she terminated?
11    A.  Oh, gosh.  I can't recall.
12    Q.  Was it sometime in early 2006?
13    A.  Oh, no.  I would say hers was more
14  recent.  My guess would be 2007.
15    Q.  Why was she terminated?
16    A.  Job performance.
17    Q.  Who made the decision to terminate
18  her?
19    A.  She had numerous problems with
20  making connections to the passenger air bag,
21  which is a huge safety issue in what we do.
22  That's part of the cockpit module assembly.
23  And she also -- when she -- she was an
24  assembler.  And when she was assembling her
25  parts that she was responsible for, she was --

Page 39

1  she actually dealt with wire harnesses, and
2  she was pulling wire harnesses with too much
3  force when you have to be very delicate with
4  them and was snapping them, which would also
5  cause breakage that wouldn't be found until
6  the car was on the lot.
7    This was something that she was
8  warned multiple times for the same issue.
9    Q.  Who made the determination to
10  terminate?
11    A.  Her supervisor -- or excuse me.
12  The production manager wrote her up a number
13  of times.  And then I am the final approval
14  for all terminations.
15    So it was the manager that did make
16  the decision, and then, of course, I have to
17  review that before that happens.
18    Q.  So the decision to terminate
19  Ms. Gordon was recommended by her production
20  manager and you approved the decision?
21    A.  And I approved that.  Uh-huh.
22    Q.  How far along in Ms. Gordon's
23  pregnancy was she at the time that she was
24  terminated?
25    A.  I can't be sure about that.  I

Page 40

1  don't know because she wasn't very visibly
2  pregnant.  So just -- my estimation would be
3  three months, four maybe.
4    Q.  At the time -- I apologize for
5  cutting you off.
6    A.  No problem.
7    Q.  If I do that and you're not
8  finished, please hold your hand up or tell me,
9  I'm not done; let me keep talking.
10    A.  No problem.
11    Q.  I don't want to cut you off.  At
12  the time of her termination, was Mobis aware
13  that she was pregnant?
14    A.  Yes.
15    Q.  How long after Mobis learned that
16  Ms. Gordon was pregnant was she terminated?
17    A.  I can't recall.
18    Q.  Did Ms. Gordon file a lawsuit
19  alleging pregnancy discrimination?
20    A.  Ms. Gordon -- are we still talking
21  about the same case?
22    Q.  Yes.
23    A.  Yes.
24    Q.  And is that lawsuit still pending?
25    A.  Actually, it is, but there's not

Page 41

1  been any kind of correspondence at all for
2  almost a year, I think.
3    Q.  In looking at the court
4  documents -- and you can correct me if I'm
5  wrong -- it appears that her attorney has
6  withdrawn?
7    A.  I think there hasn't been any
8  interaction from -- between the two of them.
9  So it kind of seems to be in -- what's the
10  word for it -- like hibernation, for lack of a
11  better word.
12    Q.  Not a problem.  Did you give a
13  deposition in Ms. Gordon's case?
14    A.  No.
15    Q.  Ms. Jefferson's EEOC charge, what
16  was her complaint?
17    A.  Denial of FMLA leave.
18    Q.  Specifically, was she seeking leave
19  and it was not approved?
20    A.  She was seeking leave.  She
21  actually wanted to go out on leave prior to
22  becoming eligible.  And then once she became
23  eligible, of course there are a number of
24  forms that a physician -- she needs to get a
25  physician's certification, and she did not

11 (Pages 38 to 41)

Deposition of TRACY RIEDLER
January 31, 2008

Page 42

1  have any documentation from a physician
2  stating that she needed to be out at that
3  time.
4      Q. All right.
5      A. So they did -- they did not
6  actually -- the doctor I'm referring to did
7  not put her out on medical leave.
8      Q. How far along in her pregnancy was
9  she when she was terminated?
10     A. Six months.
11     Q. Who made the decision to terminate
12 her?
13     A. She actually was not terminated.
14 She ultimately just ran out of time due to
15 absenteeism because she never returned to
16 work, never produced the documentation that we
17 had requested multiple times.
18         And so the point system -- and
19 again, she was an hourly employee. So the
20 point system is, if you are out -- absent one
21 day, then you get a point for each day that
22 you're out. And she reached the maximum. So
23 it's an automatic termination. But that
24 would -- that would ultimately be myself.
25     Q. Is her lawsuit still pending?

Page 43

1      A. No.
2      Q. And it looks like it was -- there
3  was a joint stipulation of dismissal filed
4  back in November in her case? Her case was
5  wrapped up sometime in November?
6      A. Yeah. Not a dismissal, but, I
7  mean --
8      Q. Well, joint stipulation of
9  dismissal is usually a joint document that
10 lawyers file that we're agreeing the case will
11 go away.
12     A. I'm sorry.
13     Q. That's okay.
14     A. And yes, November would be the time
15 frame.
16     Q. Did Melissa Sharp ever make an
17 internal complaint to you that she felt she
18 was being treated badly because she was
19 pregnant?
20     A. No.
21     Q. What job does she hold with Mobis?
22     A. I believe she is a molding
23 operator.
24     Q. And isn't it true that earlier this
25 year, she went on FMLA leave for a pregnancy-

Page 44

1  related condition?
2      A. That is true.
3      Q. Is that because she, I believe,
4  maybe lost a child when she was five and a
5  half months pregnant?
6      A. That's my understanding.
7      Q. All right. And at some point,
8  someone terminated her employment before she
9  could return to work; is that correct?
10     A. I can clarify that.
11     Q. Okay.
12     A. Melissa actually did not
13 communicate with her supervisor while she was
14 out; in other words, about her desire or, you
15 know, willingness to come back to work during
16 the time that she was out. So no one heard
17 from her for a period of time.
18         And then about -- before her twelve
19 weeks were up, I think sometime during that
20 last couple of weeks, she had contacted
21 someone. And I'm only going to make an
22 assumption because I do not know who it is.
23 But the supervisor was aware that she was
24 going to come back.
25         So she brought a doctor's note back

Page 45

1  that said that she could be released to duty
2  on a particular date. I do not know the date
3  at this time, but that she could come back.
4  And it would actually bring her back to work
5  on a Friday.
6          And so she just -- she did bring
7  the note, and the note did say that she could
8  come back to work on this date, and she would
9  have actually exhausted FMLA before that
10 Friday date. But it was very close, within a
11 couple of days earlier than the Friday that
12 she could come back.
13         She had made an assumption that,
14 Hey, it's Friday; I'll just come back fresh on
15 a Monday. She came back on a Monday. And
16 human resources has a family medical leave
17 tracker, just a calendar, and said that she
18 exhausted her FMLA.
19         We weren't communicated with in
20 human resources at that time that she was
21 coming back and Curt Bennett is team relations
22 assistant manager. And when she returned, he
23 met with Bill Clifton who is the manager of
24 the molding department --
25     Q. Right.

12 (Pages 42 to 45)

Deposition of TRACY RIEDLER
January 31, 2008

## Page 46

1    A. -- and Melissa and terminated her
2  employment.
3    Q. Okay.
4    A. When that got to my desk, I
5  reviewed that. I reviewed the dates in close
6  proximity and said, Bring her back.
7       So I had Ruth Heard, who is my
8  assistant manager, had her contact Melissa. I
9  met with her that day, that same day, and she
10 returned to work -- my recollection is she
11 returned to work on Wednesday, but she was
12 paid for the time out.
13   Q. All right.
14   A. So she never lost time.
15      MR. BARNETT: Tracy, she might want
16 to interject a question after that.
17      MS. LEONARD: That's all right.
18   Q. Like I said, I'll let you talk. I
19 want to hear anything you have to say.
20      THE WITNESS: Am I talking too
21 much?
22      MR. BARNETT: Well, no.
23   Q. It's all right. I forgot to ask
24 you this: Did you give a deposition in
25 Ms. Jefferson's case?

## Page 47

1    A. No.
2    Q. Earlier, you mentioned giving a
3  deposition during your employment with Mobis.
4    A. Uh-huh.
5    Q. What case was that in?
6    A. Lorenzo Daniels.
7    Q. What type of case was that?
8    A. Race discrimination, I think.
9    Q. Were there any allegations in
10 Mr. Daniel's case relating to pregnancy or
11 using attendance as a pretext to mask a
12 discriminatory motive?
13   A. Okay. No on the pregnancy.
14   Q. Right.
15   A. And gosh, I can't remember. His
16 was related to attendance, but as far as the
17 statement that you made about masking, I -- I
18 couldn't say.
19   Q. So you're not aware if that's an
20 allegation he may have raised in his case?
21   A. He raised that he was terminated
22 due to racial discrimination.
23   Q. Okay.
24   A. But his was related to attendance.
25   Q. Do you know if in his case you gave

## Page 48

1  any testimony relating to the interpretation
2  application of Mobis's attendance policy?
3    A. I believe I did.
4    Q. I apologize. This may be
5  redundant. Sometimes you're going to be asked
6  questions and feel like you've already
7  answered it. But I want to make sure that in
8  the context of reading this transcript, the
9  Court has a good record to be able to see what
10 answers to the questions are and doesn't have
11 to jump around, and more importantly to keep
12 me from having to jump around in the
13 transcript when I'm writing a brief later.
14      What type of attendance policy did
15 Mobis have in place during Ms. Hunter's
16 employment?
17   A. We have a probationary policy. It
18 states that during a ninety -- an employee's
19 first ninety days of becoming a regular
20 employee, regular Mobis employee, that they'll
21 be reviewed for their performance and
22 attendance and ability to do the job. And
23 during that time, a supervisor is supposed to
24 evaluate their performance.
25      And regarding to the being at work

## Page 49

1  or attendance related, if a person has three
2  occurrences, then they would be terminated
3  during their ninety days.
4    Q. Would you please define what is
5  meant by occurrence?
6    A. Yes. That would be a full day
7  absent, a tardy, being late or an early out,
8  leaving work early before your shift is over.
9    Q. Is that policy applied consistently
10 among all probationary employees?
11   A. Yes, as much as I'm aware. Yes, it
12 is.
13   Q. Are you aware of any deviations
14 from that policy where someone may have had
15 three occurrences and was not terminated?
16   A. No. No, I'm not aware of that.
17   Q. Who's responsible for monitoring an
18 employee's attendance under that policy?
19   A. The supervisor or manager.
20   Q. Okay. Which training is given to
21 the supervisor or managers on how to monitor
22 the attendance under that policy?
23   A. They have a copy of the handbook,
24 and when new policies come about, then we
25 share those with managers. It's their

13 (Pages 46 to 49)

Deposition of TRACY RIEDLER
January 31, 2008

Page 50

1  responsibility to review that.
2      Q. And I don't want to put words in
3  your mouth, but I believe you've answered my
4  next question already, which is, the
5  supervisor or manager is responsible for
6  maintaining the records of that employee's
7  attendance during their probationary period?
8      A. They are responsible for
9  maintaining their own records, yes.
10     Q. Okay. Is there a set format for
11 how an employee's attendance is to be
12 documented during their probationary period?
13     A. No.
14     Q. And human resources does not keep
15 any records of an employee's attendance during
16 their probationary period?
17     A. No. Salaried, no.
18     MR. BARNETT: What did you say?
19     A. Salaried, no. Salaried employees.
20 I wanted to clarify versus the hourly.
21     Q. Do you keep records for the hourly
22 employees during their probationary period
23 with respect to their attendance?
24     A. Yes. We have a -- we have an
25 attendance tracker in human resources.

Page 51

1      Q. Is there a different handbook for
2  employees that are probationary and salary and
3  probationary and hourly? In other words --
4      A. No. Same thing.
5      Q. Does the attendance policy you just
6  described for a probationary employee differ
7  among a salaried employee and an hourly
8  employee?
9      A. The three occurrences is the same
10 with hourly and with salary.
11     Q. So with respect to the application
12 of the attendance policy for a probationary
13 employee, that employee status is either
14 hourly or salary and would have no effect on
15 its application?
16     A. No.
17     Q. Who has the authority to approve an
18 employee's absence from work during their
19 probationary period?
20     MR. BARNETT: Object to the form.
21     A. We have a no-fault system. So
22 supervisors or managers are not supposed to be
23 giving permission for employees to be out.
24     Q. Okay.
25     A. A no-fault system being there are

Page 52

1  no excused absences.
2      Q. All right. So you're saying no one
3  has any authority to approve an absence?
4      A. That's correct.
5      Q. If an employee needs to be away
6  from work, who tells them if it's okay for
7  them to be away from work?
8      A. Same response in the fact that
9  being away from work during your ninety days
10 is very clear about that you have to be at
11 work during your shift on time. And you have
12 to be there all day.
13     And if you come up with three
14 occurrences, then you would be terminated.
15     Q. Okay.
16     A. So again, it's a no-fault system.
17 So there are no excused absences.
18     Q. When an employee asks to be absent
19 during their probationary period, what
20 instructions has human resources given the
21 supervisors to tell that employee?
22     A. The same instructions that are in
23 the handbook.
24     Q. Okay. Have you ever given Mr. Kim
25 any direction on what he should communicate to

Page 53

1  an employee in their probationary period if
2  they ask him if they may be absent?
3      A. None different than anyone else,
4  and that would be the handbook.
5      Q. And what should his response be if
6  an employee informs him that they need to be
7  out during their probationary period?
8      A. Just to remind them of what the
9  policy is and, you know, just to basically
10 tell them that he is sorry, but we have a
11 no-fault system and the three occurrences must
12 stick.
13     Q. You were present yesterday for
14 Ms. Hunter's testimony, correct?
15     A. Yes, I was.
16     Q. During her testimony -- again, I
17 may be paraphrasing -- but do you recall her
18 testifying there were times she asked to be
19 absent when she was considered a probationary
20 employee and she was permitted to be absent?
21     A. Yes, I do.
22     Q. Under those circumstances, what
23 should have been told to Ms. Hunter when she
24 was asking to be off?
25     A. That -- just reminded about what

14 (Pages 50 to 53)

Deposition of TRACY RIEDLER
January 31, 2008

Page 54

1 the probationary -- the first ninety days'
2 policy was and that -- just to remind her that
3 there are three occurrences and that her job
4 may be in jeopardy. So, you know, she has to
5 keep that in consideration.
6         We don't want to refuse a person --
7 a person must do what they have to do, but we
8 do actually have to count that as a company so
9 we can be consistent with everyone.
10     Q. Would you agree with me that if
11 that type of information was not communicated
12 to Ms. Hunter when she sought to be off that
13 her supervisor and/or manager may have been
14 putting her in a position where she did not
15 realize there would be a consequence to her
16 absence with respect to her overall
17 employment?
18     A. I could see where that would be
19 confusing to her, yes. But in her own
20 testimony as well, she did say that she had
21 read the handbook, that she was aware of the
22 policy and she was aware of the three
23 occurrences.
24     Q. Would you agree with me that if the
25 supervisor approves her to be absent --

Page 55

1         MR. BARNETT: Object to the form.
2     Q. Are there any forms where an
3 absence would be approved?
4     A. No.
5     Q. So I saw some health documents in
6 here where it looks like Ms. Hunter was absent
7 and at the bottom, I think there's a box
8 that's checked that says approved?
9     A. I'm aware of what form you're
10 referring to. That is not a company-approved
11 form.
12     Q. Who was using that form?
13     A. Jay.
14     Q. So with respect to the forms
15 approving -- that say Ms. Hunter's absences
16 are approved, Mr. Kim was deviating from
17 Mobis's practices and policies?
18     A. In that case, yes.
19     Q. Have you talked to him about using
20 that form?
21     A. I have talked to him about using
22 that form.
23     Q. When did you do that?
24     A. The earliest was not even relating
25 to Tarsha. I couldn't tell you exactly when

Page 56

1 it was. That form has been in existence.
2         He's a heavy documenter, because he
3 is the CFO, and he is very good about writing
4 down things. So I had seen that form and told
5 him that was not a company-approved form and
6 that he should not use that.
7         I was aware after Ms. Hunter's
8 termination that he had used those, and I
9 instructed him again not to use those forms.
10     Q. So before he used those forms in
11 Ms. Hunter's employment, you had instructed
12 him not to use those forms?
13     A. That's correct.
14     Q. And he continued to use those
15 forms?
16     A. He uses them as a form of his own
17 documentation.
18     Q. Do you know whether a copy of those
19 forms is given to the employee who's being
20 absent?
21     A. I'm unaware of that.
22     Q. If Ms. Hunter received any of those
23 forms from Mr. Kim, would you have any reason
24 to dispute that he may share those with
25 employees?

Page 57

1     A. I have no knowledge of that.
2     Q. So you have no basis for saying
3 that didn't happen?
4     A. That's correct.
5     Q. Have you disciplined or has anyone
6 disciplined Mr. Kim for continuing to use
7 forms which you have told him not to use?
8     A. Discipline in a formality, no, just
9 a reminder that that is not a company-approved
10 form and it is not something that he should be
11 using.
12     Q. Are you aware of any other
13 circumstances where Mr. Kim has deviated from
14 the policies and/or practices of Mobis's?
15     A. Not that I can think of right now.
16     Q. For an employee that has worked for
17 Mobis for less than one year, what type of
18 employee leave is available for that employee?
19     A. None.
20     Q. None? And is that true for --
21     A. May I clarify actually?
22     Q. Completely.
23     A. In that, military leave.
24     Q. Don't forgot USERRA, U-S-E-R-R-A.
25         MR. BARNETT: Are y'all about ready

15 (Pages 54 to 57)

Deposition of TRACY RIEDLER
January 31, 2008

## Page 58

1  for a break?
2      MS. LEONARD: We can do that.
3      (Recess taken.)
4      Q. Is there anything in your
5  testimony, now that we've come back from a
6  break, that you would like to change, modify,
7  or correct or add to?
8      A. (Witness shakes head.)
9      Q. That was a no?
10     A. That's correct.
11     Q. You don't want Henry and me
12  fighting about whether you have a neck crick.
13     There's been use of the term
14  probation period, probationary employee,
15  probation. Tell me what Mobis's policy is
16  with respect to an employee's probationary
17  period. What's the probation policy?
18     A. The probation policy is during a
19  person's first ninety days of employment,
20  their performance and ability to do their job,
21  that they're the appropriate person for that
22  job, you know based, on their skills. Overall
23  adaptability to the company, attitude.
24     Q. What's the purpose of the
25  probationary period?

## Page 59

1      A. That gives a person or the company
2  a chance to evaluate a person's fit for the
3  organization and really vice versa.
4      Q. Okay.
5      A. Gives a person -- the individual an
6  opportunity.
7      Q. How long is that probationary
8  period?
9      A. It is the first ninety days;
10  however, any time during that ninety-day
11  period if a supervisor feels like it is not a
12  good fit, then an employee can be terminated
13  at that time. So it can be anytime during the
14  ninety days.
15     Q. So no more than ninety days?
16     A. Generally, ninety days is what the
17  policy specifies.
18     Q. Okay. Are there circumstances
19  where an employee's probationary period has
20  been extended beyond ninety days?
21     A. Not that I can recall.
22     Q. Okay. What's the difference
23  between a probationary employee and a
24  nonprobationary employee?
25     A. Well, a nonprobationary employee

## Page 60

1  then qualifies for -- for instance, after
2  their ninety days and they are removed from
3  probation, they qualify for vacation. And
4  that, I think, is the only thing actually that
5  a person doesn't qualify. They get insurance
6  and everything else after thirty days. So --
7      Q. Any other differences between a
8  probationary employee and a nonprobationary
9  employee?
10     MR. BARNETT: Any other differences
11  than what?
12     Q. Any other differences. I want to
13  know the difference between a probationary
14  employee and a nonprobationary employee.
15     A. It's more in timing and just an
16  evaluation period.
17     Q. Do the policies of Mobis apply
18  differently to nonprobationary employees than
19  they do to probationary employees?
20     A. As it relates to attendance.
21  Attendance is the one difference.
22     Q. Other than that, every other policy
23  in place at Mobis should apply the same to a
24  probationary and nonprobationary employee?
25     A. That's correct.

## Page 61

1      Q. Is the attendance policy for
2  probationary --
3      A. Other than -- other than, for
4  instance, like FMLA, because that is time in a
5  job, the twelve-month requirement.
6      So no one would qualify for that in
7  a probationary period. Nonprobationary, less
8  than a year.
9      Q. Have you ever had an employee who
10  qualified for protection under the Americans
11  with Disabilities Act who was given time off
12  during their probationary period as a
13  reasonable accommodation?
14     A. No. I'm unaware of that.
15     Q. Okay. Is that something Mobis
16  would do?
17     A. No.
18     Q. All right. And as -- I just want
19  to -- I think you've answered this, but I want
20  to make sure that I didn't hear what I wanted
21  to hear versus what you actually said.
22     Is the attendance policy for
23  probationary employees applied objectively and
24  consistently across the board?
25     A. As I'm aware.

16 (Pages 58 to 61)

Deposition of TRACY RIEDLER
January 31, 2008

Page 62

1    Q. Is there any flexibility or leeway
2  that a supervisor or human resources might
3  have in applying the attendance policy to
4  probationary employees?
5    A. There should not be.
6    Q. Is there any subjectivity to the
7  policy such that a supervisor could manipulate
8  it to terminate an employee during pregnancy
9  that did not want a pregnant employee working
10  for them?
11    A. No.
12    Q. Now, earlier I asked you some
13  questions about discipline. And I apologize
14  for not asking one of the most important
15  questions, which is, when I use the term
16  discipline, what do you understand that to
17  mean?
18    A. A performance-related issue.
19    Q. When you say a performance-related
20  issue, what does it mean for an employee to be
21  disciplined?
22    A. When they would actually have a
23  conversation with their supervisor or manager
24  about what the performance issue is. And if
25  it's something that needs to be corrected --

Page 63

1  something that they're doing wrong and it
2  needs correction.
3    Q. So under all circumstances, if an
4  employer or if a supervisor at Mobis tells an
5  employee that they're doing something that
6  they do not feel is proper and directs them on
7  how to correct that behavior, does that
8  conversation constitute discipline?
9    A. Not always.
10    Q. Okay.
11    A. Because there are, like, on the
12  spot corrections. And so, you know,
13  discipline somewhat has a negative connotation
14  to it. So not everything -- if a person does
15  something wrong, just a mild correction is not
16  what I would consider a discipline.
17    Q. Are employees being made aware that
18  they're being disciplined when they receive
19  discipline?
20    A. When they receive discipline? I
21  mean, to my knowledge, yes.
22    Q. That's something that should happen
23  is that the employee should know that they are
24  receiving discipline, correct?
25    A. When a person actually has an issue

Page 64

1  that needs -- that needs addressing, I believe
2  it should be made clear to them, yes.
3    Q. All right. Are the reasons for
4  which an employee can be disciplined set forth
5  in Mobis's employee handbook?
6    A. The reasons?
7    Q. Yes, ma'am.
8    A. Not specifically.
9    Q. Okay. For what reasons may an
10  employee in their probationary period be
11  disciplined?
12    A. Other than attendance, there's not
13  one that's actually specified.
14    Q. Who has the authority to discipline
15  an employee?
16    A. Supervisors or managers.
17    Q. Does Mobis apply any type of
18  progressive disciplinary policy?
19    A. It's not called progressive
20  discipline and -- for the hourly work force,
21  they actually have what's called corrective
22  action.
23    Q. In reviewing Mobis's handbook, I
24  noticed that it discussed a progression of
25  discipline along the lines of first verbal

Page 65

1  discussion, second verbal discussion,
2  commitment discussion, and termination.
3    Is it your testimony that that
4  process only applies to hourly employees?
5    A. That policy is actually not in
6  place anymore.
7    Q. Okay.
8    A. It was replaced with the corrective
9  action.
10    Q. The policies that I just described,
11  was that in place during Ms. Hunter's
12  employment, or was the corrective action
13  policy in place during Ms. Hunter's
14  employment?
15    A. My recollection would be the
16  progressive discipline policy would have been.
17    Q. I'm going to ask some questions
18  relating to that policy.
19    MR. BARNETT: Do you want to see
20  it?
21    THE WITNESS: Sure. Yeah, because
22  it's been awhile. It's been actually two
23  years probably. Or do you have that in here?
24    Q. You can look through there. These
25  are the documents you gave us. I'm not sure

17 (Pages 62 to 65)

Deposition of TRACY RIEDLER
January 31, 2008

Page 66

1  if it's in there though. I know I have got a
2  copy of Ms. Hunter's handbook that she gave
3  me.
4         I'm handing you the Mobis employee
5  handbook that was given to Ms. Hunter.
6      A. I don't see it, unless it's out
7  in -- hold on just a second. I can't spell.
8      Q. Take your time. Don't feel rushed.
9      A. Okay.
10     Q. Take a second to review that policy
11 to refresh your memory.
12        MR. BARNETT: Did we make that an
13 exhibit yesterday?
14        MS. LEONARD: We did. I believe
15 it's the one you've got your big clip on at
16 the bottom.
17        MR. BARNETT: Will you find it in
18 here for me?
19        THE WITNESS: Yeah. I think
20 it's --
21     Q. All right. Does that progressive
22 discipline policy set forth in that employee
23 handbook apply to both hourly and salaried
24 employees?
25     A. No.

Page 67

1      Q. Does the handbook clarify that it
2  does not apply to salaried employees?
3      A. No.
4      Q. During employee orientation, are
5  salaried employees told that the progressive
6  discipline policy does not apply to them?
7      A. I'm not sure.
8      Q. Is there a reason that the
9  progressive discipline policy does not apply
10 to salaried employees?
11     A. Because -- well, ultimately, I
12 mean, what's common practice is that there's a
13 difference between production employees and
14 professional employees.
15        So professional employees are not
16 treated the same in specific -- like, for
17 instance, production employees are doing a
18 particular task and may need adjustments
19 during that time. So they're not as rigid.
20     Q. All right. Are you aware of any
21 document that sets forth the progressive
22 discipline policy does not apply to salaried
23 employees?
24     A. No.
25     Q. Does that progressive discipline

Page 68

1  policy apply to probationary employees?
2      A. Yes.
3      Q. All right.
4         MR. BARNETT: What was the answer?
5         THE WITNESS: Yes.
6         MR. BARNETT: Yes?
7         THE WITNESS: Uh-huh.
8      Q. And are the stages of that
9  progressive discipline policy to be documented
10 in the employee's personnel file in the manner
11 we discussed earlier today?
12     A. For instance, warnings actually
13 would be placed in the personnel file.
14     Q. Would documentation of the
15 discussions be placed in a personnel file?
16     A. Discussion planners, that I was
17 referring to?
18     Q. Okay.
19     A. Is that what you were referring
20 to? Not always.
21     Q. Okay. For what reason would
22 documentation not be placed in an employee's
23 personnel file?
24     A. I'm not -- I'm not completely sure,
25 but I see quite a few discussion planners, and

Page 69

1  that may or may not be all of them. I don't
2  think that there's a specific time or a
3  specific issue where they wouldn't be placed
4  in there.
5      Q. But you would agree that when the
6  progressive discipline policy is in place,
7  each step should be documented in an
8  employee's personnel file?
9      A. According to this policy, the first
10 warning, second warning, are placed in the
11 personnel file.
12     Q. Are employees at Mobis considered
13 to be employees at will?
14     A. Yes.
15     Q. When I say an employee at will or
16 employment at will, what do you understand
17 that to mean?
18     A. Employment at will is there's
19 not -- there's -- a company actually has an
20 agreement that I will pay an employee a sum of
21 money to do a particular task; you agree to
22 come to work and do that task. If at any time
23 either party decides to part ways, then that's
24 allowable.
25     Q. Based on your understanding of

18 (Pages 66 to 69)

Deposition of TRACY RIEDLER
January 31, 2008

## Page 70

1  employment at will, is Mobis free to terminate
2  a probationary employee at any time?
3      A.  Yes.
4      Q.  And based on your standard of
5  employment at will, is Mobis free to terminate
6  a nonprobationary employee at any time?
7      A.  Yes.
8      Q.  In light of the application of the
9  employment at will doctrine to the employees
10  at Mobis, what purpose does the probationary
11  period serve?
12      A.  Probationary period, say, is a
13  period of time to -- for -- just a point in
14  time for supervisors to evaluate performance.
15      Q.  Okay.
16      A.  Legally, it doesn't have a purpose.
17      Q.  That's fine.  I just wanted to
18  check.  I didn't know if somehow there's a
19  special protection once you got out.
20          In the handbook in front of you,
21  there's a statement that all terminations due
22  to unsatisfactory attendance will be reviewed
23  by the supervisor or manager and the human
24  resources manager prior to the final
25  discussion with the team member.

## Page 71

1          Is that an accurate statement of
2  what should happen with respect to
3  terminations due to unsatisfactory attendance?
4      MR. BARNETT:  Object to the form.
5      A.  I'm not aware of where that is.
6      MR. BARNETT:  You're not
7  specifying --
8      A.  I'm not sure where that is.
9      MR. BARNETT:  -- what kind of
10  employment you're referring to.
11      Q.  If you'll hand that to me, I'll
12  show you.  Now, this employee handbook was in
13  effect for how long?
14      A.  We have different -- we update
15  those once a year.
16      Q.  So this Mobis Alabama handbook that
17  was given to Ms. Hunter would have been in
18  effect for the year that --
19      A.  2006.
20      Q.  Correct.  Were you familiar with
21  the handbook at that time?
22      A.  Certainly.
23      Q.  In fact, part of your job would be
24  to ensure that the policies in this handbook
25  are adhered to, correct?

## Page 72

1      A.  I'm the one actually that either
2  writes and/or approves all policies.
3      Q.  So everything contained in this
4  handbook either would be authored by you or
5  approved by you, correct?
6      A.  Sure.  Sometimes I just need a
7  recollection, just a refresher.
8      Q.  I'm going to show you what is
9  policy 9.1 that is maybe about five pages into
10  the handbook where it says termination.  That
11  was the policy which I just read to you.
12      A.  Okay.
13      Q.  Is that an accurate statement of
14  how terminations for attendance should be
15  conducted?
16      A.  For hourly or salary?
17      Q.  Does the policy specify?
18      A.  No.
19      Q.  So reading --
20      A.  What would you like your answer to
21  be though?
22      Q.  The truth.  Is it an accurate
23  statement of how terminations for
24  unsatisfactory performance should be handled?
25      A.  For an hourly employee, yes, with a

## Page 73

1  minor exception in that the human resources
2  manager here is the assistant manager of human
3  resources because she tracks attendance for
4  me.  And so those are reviewed by these
5  parties.  And she'll do that and let me know
6  when someone is going to be terminated.  And
7  ultimately, I will approve that.
8      Q.  All right.  With respect to
9  salaried employees, is policy 9.1 an accurate
10  statement of what should happen?
11      A.  No.
12      Q.  Why is it not clarified within this
13  policy that that is not what should happen
14  with salaried employees?
15      A.  No reason.
16      Q.  Would you agree that a salaried
17  employee reading this handbook would infer
18  that that policy applies to their employment?
19      A.  I couldn't say.
20      Q.  Does the handbook give any
21  indication to salaried employees that policy
22  9.1 would not apply to their employment?
23      A.  There's nothing specific there, no.
24      Q.  What policy or procedure is
25  supposed to take place when a salaried

19 (Pages 70 to 73)

Deposition of TRACY RIEDLER
January 31, 2008

Page 74

1 employee is terminated for unsatisfactory
2 attendance?
3     A. An employee -- a salaried employee
4 that is having an attendance problem,
5 unsatisfactory attendance, would be counseled
6 by their supervisor and/or manager, because
7 when a salaried employee is not at work,
8 generally their work is not being done. And
9 their tasks are just waiting until they return
10 to work.
11        And so it becomes much more of a
12 performance issue on the salaried side than it
13 does actually on the hourly side.
14     Q. That's not my question though. My
15 question is slightly different.
16        With respect to terminations for
17 unsatisfactory attendance for salaried
18 employees, who is supposed to review that
19 termination before it occurs?
20     A. Ultimately -- very similar, very
21 similar to this, and ultimately myself. I
22 would be the final.
23     Q. With respect to the procedure
24 that's delineated in policy 9.1, how is that
25 policy different or modified with respect to

Page 75

1 the termination of salaried employees?
2     A. The manager would be more involved
3 at the salaried level whereas at the hourly
4 level the supervisor would be. There's layers
5 in management. And so on the salaried side,
6 certainly the department manager.
7     Q. Are you aware prior to the
8 termination of Tarsha Hunter if there was a
9 discussion between you and either her manager
10 or supervisor about her attendance?
11     A. Prior to?
12     Q. Yes, ma'am.
13     A. Yes.
14     Q. When did you have that discussion?
15     A. When did I have that discussion?
16     Q. Well first, with whom?
17     A. With Jay Kim.
18     Q. Did you have any discussions with
19 Ms. Sonechka Womack, her supervisor?
20     A. The week prior to her being out,
21 yes.
22     Q. And we're going to get to all of
23 those discussions later. When did these
24 discussions happen?
25     A. The week prior to Tarsha being

Page 76

1 terminated.
2     Q. Okay. Where did the conversation
3 happen?
4     A. Best I can remember, with Jay.
5 Is -- human resources will send a ninety-day
6 form -- ninety-day work performance evaluation
7 form, and Jay brought that form to me on
8 Tarsha.
9        We had sent it to him. So he
10 brought it to my office. And so the
11 conversation took place there.
12     Q. Where did your conversation with
13 Ms. Womack occur?
14     A. I believe also in my office.
15     Q. Okay. Like I said, we're going to
16 get to all of those details in a little bit.
17        What's your understanding of what
18 Mobis does to ensure that employees do not
19 experience discrimination based on pregnancy?
20     A. Could you clarify the question a
21 little bit more? In other words --
22     Q. I'll try. What does Mobis do to
23 ensure that employees are not discriminated
24 against because of pregnancy or pregnancy-
25 related conditions? How do you ensure that

Page 77

1 happens?
2     A. Well, our managers are trained on
3 discriminatory EEO issues, and I actually do
4 that training myself.
5     Q. Okay.
6     A. So they're familiar with overall
7 policies like that. And certainly pregnancy
8 is in those -- in that training.
9     Q. Okay. Anything else?
10     A. I mean, that's basically --
11     Q. All right. What is the consequence
12 for an employee who is found to have violated
13 Mobis's discrimination policy?
14     A. I'm not aware that that actually
15 has happened.
16     Q. And I appreciate that. But does
17 Mobis -- has Mobis made a decision as to what
18 consequence there would be if an employee
19 violates its policy prohibiting
20 discrimination?
21     A. No.
22     Q. Are employees told that there is a
23 consequence to violating the policy
24 prohibiting discrimination?
25     A. No.

20 (Pages 74 to 77)

Deposition of TRACY RIEDLER
January 31. 2008

Page 78

1    Q. How much training do you provide to
2  the managers on EEO issues?
3    A. Annually.
4    Q. Okay. What do you do
5  specifically? If you can, walk me through the
6  training you provide.
7    A. Well, I mean, I have a
8  presentation, a Power Point presentation. It
9  just covers the main topics of
10 discrimination.
11   Q. Do you save those Power Point
12 presentations from year to year?
13   A. I should have them.
14   Q. What do you recall covering in the
15 Power Point presentation relating to the
16 pregnancy discrimination?
17   A. I mean, just overall of what is
18 illegal to discriminate on what grounds, and
19 pregnancy just happens to be one of them.
20   Q. Other than telling the managers
21 don't discriminate based on pregnancy, do you
22 tell them anything else?
23   A. I think if somebody actually, you
24 know, has a pregnant person, there have
25 probably been times where perhaps someone had

Page 79

1  to go to the bathroom maybe more often or
2  somewhere along that line, how you would
3  have -- you know, to make accommodations for
4  something like that.
5    Or if they would go to the doctor
6  and the doctor would actually give them, you
7  know, eight-hour limitation, something that we
8  have to accommodate, those types of things.
9    Q. Do you go through and explain to
10 the employees what types of conduct can
11 constitute discrimination?
12   A. I mean, during the training,
13 certainly you -- I try to do my best in giving
14 examples of things and perceptions and things
15 like that. So --
16   Q. How long --
17   A. It's an overall discussion as
18 well. It's an open discussion.
19   Q. Okay. Do you recall any questions
20 that have been brought to you during these
21 open discussions relating to pregnancy
22 discrimination?
23   A. No.
24   Q. Typically, how long does this
25 training session last?

Page 80

1    A. An hour.
2    Q. About an hour?
3    A. One hour.
4    Q. Okay. We had talked earlier about
5  how you document and maintain complaints of
6  discrimination.
7    Do you have a method in place that
8  would allow you to know if there is a repeat
9  offender discriminator?
10   In other words, if multiple
11 employees brought to you a complaint of
12 pregnancy discrimination related to a specific
13 manager or supervisor, do you have a way of
14 consolidating those complaints without pulling
15 each employee's specific file?
16   A. No.
17   Q. Would you agree with me that
18 because of that practice, it might make it
19 difficult for your successor to be able to
20 determine if they have a problem employee with
21 respect to EEO policies?
22   A. No.
23   Q. How then would your successor know
24 if a manager has been the subject of multiple
25 EEO complaints?

Page 81

1    A. My successor would actually look
2  through personnel files, particularly of
3  managers or supervisors.
4    Q. How many managers or supervisors
5  are there?
6    A. Oh, my gosh. Probably, maybe
7  thirty.
8    Q. How often do you sit down and
9  review those thirty personnel files?
10   A. Not often. But I was hired in the
11 beginning. So I'm pretty familiar with them.
12   Q. All right. Is there a method in
13 place that your successor would be able to
14 determine if you have a repeat offender hourly
15 employee?
16   A. An easier method than going through
17 the --
18   Q. Than going through the several
19 hundred personnel files?
20   A. No.
21   Q. Who is responsible for enforcing
22 the EEO policy at -- when I say EEO policy,
23 you understand I'm talking about an anti-
24 discrimination policy, correct?
25   A. Correct.

21 (Pages 78 to 81)

Deposition of TRACY RIEDLER
January 31, 2008

Page 82

1    Q. Who is responsible for enforcing
2 those policies at Mobis?
3    A. Ultimately myself, but certainly
4 through the help of managers.
5    Q. Okay. Do you know who wrote the
6 policy?
7    A. I wrote that policy, and certainly
8 it's pretty standard from -- ours doesn't
9 deviate very much from kind of a canned
10 policy, if you will. I can't take complete
11 authorship of the entire verbiage.
12    Q. Don't worry. I've yet to see an
13 EEO policy that is --
14    A. Much different from another.
15    Q. Do you understand how to apply that
16 EEO policy in day-to-day situations at Mobis?
17    A. I'd like to think so.
18    Q. Do you understand the policy well
19 enough to identify violations of the EEO
20 policy?
21    A. Sure.
22    Q. With respect to the application of
23 the EEO policy to pregnant employees, what's
24 your understanding of conduct that would
25 violate it?

Page 83

1    A. Treating them any different than
2 any other employee.
3    Q. Based on your understanding and
4 interpretation of Mobis's EEO policy, would it
5 violate that employee -- would it violate that
6 policy to treat an employee more coldly or
7 distantly after learning of their pregnancy?
8    A. Just any kind of difference. I
9 mean, if there was -- if there was a
10 difference in treating them.
11    Q. Okay.
12    A. It should be treated like anything
13 else.
14    Q. Could it violate that policy to
15 tell a pregnant employee that I cannot afford
16 an employee like you?
17    A. I'm not sure what that statement
18 means.
19    Q. If that statement was a reference
20 to the employee's pregnancy, would that
21 violate the policy?
22    A. That would be hard to say.
23    Q. Would it violate the policy to fire
24 an employee because the manager did not want a
25 pregnant employee in the office?

Page 84

1    A. If that were the sole reason for a
2 person actually not wanting some employee,
3 yes, that's wrong.
4    Q. Now, you used the term sole reason
5 or phrase. If it was part of the reason,
6 would that be acceptable?
7    A. That would not be acceptable.
8    Q. I have to ask.
9    A. Part or partial.
10    Q. Sure. Would it violate the EEO
11 policy to call an employee's pregnancy a
12 disgrace?
13    A. Sure.
14    Q. Yesterday, you heard Ms. Hunter's
15 testimony that Nicole Boswell had shared with
16 her that Mr. Kim had said something similar to
17 that referencing an employee who was pregnant
18 and calling it a disgrace. Is that something
19 that you have investigated?
20    A. I did actually ask if that had
21 taken place.
22    Q. And what was his response?
23    A. Nicole Boswell grossly
24 misunderstood a conversation.
25    Q. What happened?

Page 85

1    A. First of all, that exact phrase
2 never took place saying that the pregnancy was
3 a disgrace or anything. He was referring to
4 an employee in his department and -- but there
5 was no -- he's not even aware of a
6 conversation that Nicole could have heard. I
7 mean, obviously Nicole could possibly overhear
8 many, many conversations. But we do know
9 what -- what employee only because you were
10 pretty specific with who it was.
11    Q. I'm sorry. You said it was a
12 misunderstanding. What does he contend he
13 said?
14    A. Actually, there's no particular
15 conversation. He's not aware of a
16 conversation that took place with -- with this
17 employee that Nicole Boswell actually could
18 have overheard.
19    Q. Who's the employee we're talking
20 about?
21    A. Su Jin Lee.
22    Q. Was she pregnant?
23    A. Yes.
24    Q. Does she still work for Mobis?
25    A. No.

22 (Pages 82 to 85)

Deposition of TRACY RIEDLER
January 31, 2008

Page 86

1    Q.  How did her employment come to an
2  end?
3    A.  Two months after she started work,
4  she left the country.  She was Korean, and her
5  husband got a job in Korea.  So they moved to
6  Korea.
7    Q.  Have you spoken to Ms. Boswell to
8  see if perhaps Mr. Kim may not be telling you
9  the truth?
10   A.  No.
11   Q.  So based on his word, you're
12 assuming Ms. Boswell's representation would be
13 false?
14   A.  Yes.
15   Q.  Did he share with you any remarks
16 he may have made about this pregnant female
17 employee referencing her pregnancy or her
18 situation?
19   A.  No.
20   Q.  Do salaried employees have a right
21 to know what type of information is in their
22 personnel file?
23   A.  Yes.
24   Q.  Why is that?
25   A.  Do they have -- why do they have a

Page 87

1  right to know?  All employees have a right to
2  know what's in their personnel file.  There
3  are -- there are no secrets in there.
4    Q.  Is it possible that there could be
5  incorrect information at times in their
6  personnel file?
7    A.  I don't see how.
8    Q.  Okay.  Is anything ever placed in a
9  personnel file without the authorization of
10 the human resources department?
11   A.  No.
12   Q.  Who in the human resources
13 department authorizes what can go in a
14 personnel file?
15   A.  My staff actually is aware of what
16 goes into a personnel file.  And outside of
17 standard -- anything outside of standard paper
18 would go through me.
19   Q.  Are --
20   A.  Most of the time, it's just
21 standard stuff though.
22   Q.  Are personnel files maintained in a
23 confidential manner?
24   A.  Yes.  They are locked in -- I have
25 some files actually locked in my office.  When

Page 88

1  I ran out of room -- there are now actually
2  locked cabinets in another room.
3    Q.  One person doesn't have the right
4  or ability to look at another employee's
5  personnel file, do they?
6    A.  My gosh, no.
7    Q.  So the only way that an employee
8  might any know of another employee's
9  attendance problems and discipline related
10 therewith would be if they have been permitted
11 to review those files?
12   A.  People have a tendency to gossip a
13 lot.  So that's probably --
14   Q.  Let me rephrase it.  The only way I
15 could find out if someone had attendance
16 problems and was not fired would be by
17 reviewing their personnel files?
18       MR. BARNETT:  If somebody what now?
19 Excuse me.
20   Q.  The only way I could find out if
21 there was an employee who may have had
22 attendance problems equal to or worse than
23 those alleged that Ms. Hunter had but yet was
24 not fired would be through a review of those
25 files?

Page 89

1    A.  Yes.
2    Q.  Does Mobis have any plans to cease
3  doing business in Alabama or relocate its
4  facility?
5    A.  No.  I hope not.
6    Q.  We're getting close to going two
7  hours.  I'm three-quarters of the way through
8  my outline.  Actually, you've answered a lot
9  of my questions.  Do you need to take a break
10 at this time or do you want me to keep going a
11 little bit further?
12       THE WITNESS:  Do you want to take a
13 break?
14       MR. BARNETT:  I want to take a
15 lunch.
16       MS. LEONARD:  Whatever y'all want
17 to do works for me.
18       (Recess taken.)
19   Q.  What is Multi-Staffing?
20       MR. BARNETT:  Hold on just a
21 minute.  I want to say something.  The
22 questions this morning was a little fast for
23 me to follow.  We're not going to waive the
24 right to read and sign.
25       MS. LEONARD:  Okay.

23 (Pages 86 to 89)

Deposition of TRACY RIEDLER
January 31, 2008

Page 90

1    A. And can I actually clarify
2  something, too? We spent a lot of time this
3  morning talking about certain policies,
4  progressive discipline and attendance
5  policies. And I just kind of drew -- I just
6  did this at lunchtime.
7    Q. We'll make this an exhibit just so
8  we'll know -- put this little sticky on it.
9    We're marking your notes as
10 Plaintiff's Exhibit 1. If you can, tell us
11 what that is.
12     (Plaintiff's Exhibit Number 1 was
13     marked for identification. A copy
14     is attached.)
15    A. This is just to clarify progressive
16 discipline and attendance as far as to who it
17 relates to.
18    The progressive discipline policy
19 is nonattendance-related issues. Okay. An
20 then the attendance policy is attendance-
21 related issues only.
22    Q. Okay.
23    A. Then for progressive discipline and
24 attendance are hourly only, and then
25 progressive discipline is probation and

Page 91

1  nonprobation employees because there are more
2  misconduct or quality-related issues and
3  things. And then attendance is
4  nonprobationary.
5    Q. All right.
6    A. So that's just --
7    Q. Let me give this to Elaine so I
8  don't run off with it.
9    She'll be attaching that to your
10 deposition so that when we're looking at it,
11 we'll be able to see the exhibit. So that's
12 why she holds on to them.
13    What is Multi-Staffing?
14    A. Multi-Staffing is an employment
15 agency that we sometimes use for temporary
16 work force. It could be a temp to perm, and
17 in Tarsha's case, yes.
18    Q. Did Multi-Staffing assign
19 Ms. Hunter to work at Mobis?
20    A. Yes.
21    Q. Do you know when Multi-Staffing
22 assigned her to begin working at Mobis?
23    A. When?
24    Q. That's correct. I'm going to look
25 and see if we've got -- I don't see where I've

Page 92

1  got any documents from Multi-Staffing in my
2  box over here.
3    A. March 2006 though.
4    Q. What were the terms of her
5  assignment?
6    A. I'm not sure what you mean by
7  terms.
8    Q. Sure. You mentioned that sometimes
9  you have people that are temp to perm, which I
10 assume means they come in as temporary with a
11 look towards being permanent, or they might
12 just be temporary where they're coming in to
13 fill a specific need --
14    A. Right.
15    Q. -- and when that assignment is
16 done, their employment is over. What was
17 Ms. Hunter's assignment?
18    A. There was a position open in the
19 accounting department. And if -- this would
20 be in any case. If a person actually works
21 out well in that position, of course they may
22 be permanent.
23    Q. Do you know if her assignment was
24 designated as a temp to perm assignment?
25    A. I don't know.

Page 93

1    Q. What was the length of her
2  assignment through Multi-Staffing?
3    A. There's no clarification on length,
4  not that I'm aware of anyway.
5    Q. Who set her work hours during the
6  time that she was assigned to work at Mobis
7  through Multi-Staffing?
8    A. Standard work hours in the office
9  area for all departments is 8:00 a.m. to
10 5:00 p.m.
11    Q. Let me rephrase that. Was
12 Ms. Hunter told what hours she needed to be at
13 work when she came to Mobis through her
14 assignment at Multi-Staffing?
15    A. I'm not sure.
16    Q. Did Multi-Staffing or Mobis set
17 Ms. Hunter's work hours?
18    A. Mobis would definitely do that.
19    Q. That's where my question was
20 going. Did Multi-Staffing provide a
21 supervisor for Ms. Hunter or did Mobis?
22    A. Mobis would provide that.
23    Q. Who was her supervisor at that
24 time?
25    A. I'm going to -- I'm going to say

24 (Pages 90 to 93)

Deposition of TRACY RIEDLER
January 31, 2008

Page 94

1  Sonechka, but that's just my recollection.
2      Q. Was there any type of contract
3  between Multi-Staffing and Mobis that governed
4  Ms. Hunter's assignment?
5      A. There is no contract.
6      Q. Was there any type of agreement
7  between Multi-Staffing and Mobis relating to
8  Ms. Hunter's assignment?
9      A. There's only a verbal agreement
10  that, you know, we request a temporary
11  employee. They show up. And as long as we
12  want them to be there -- if we are not
13  satisfied with the person, then we will
14  contact Multi-Staffing and tell them that
15  their assignment had ended.
16      Q. At some point in time, did Mobis
17  hire Ms. Hunter as a permanent employee?
18          When I use the term permanent
19  employee, that's subject to employment at
20  will. I mean it more to mean a direct
21  employee, that she was no longer a temporary
22  assignment.
23      A. We call it a regular full time.
24      Q. That's what we'll call it. At some
25  point, did Mobis hire Ms. Hunter as a regular

Page 95

1  full-time employee?
2      A. Yes.
3      Q. When did that happen?
4      A. If I recall, June 5th, if I'm not
5  mistaken, 2006.
6      Q. Were you involved in the decision
7  to hire Ms. Mobis as a regular full-time
8  employee?
9      A. Only that I actually approved the
10  paperwork. There's just an approval sheet
11  that says what a person's name is and what
12  position they'll be covering and what their
13  salary will be. And I sign that document.
14      Q. Walk me through how Ms. Hunter went
15  from being a temporary employee to a full-time
16  employee.
17      A. At some point -- temporary --
18  temporary agencies make money on temporaries,
19  of course. So they require for a certain
20  period of time for that person to be a
21  temporary employee, roughly three months.
22          And then, of course, if you're
23  satisfied, they can remain temps or they can,
24  you know, roll over and be a full-time
25  employee and not cost an additional fee for

Page 96

1  the company.
2          And at some point, the accounting
3  department must have been -- must have wanted
4  to hire Tarsha and told human resources that
5  they wanted to hire her and then we just
6  completed an approval sheet.
7      Q. Do you know what happened to the
8  approval sheet?
9      A. Approval sheets are actually kept
10  in an approval sheet notebook.
11      Q. What sort of information is on that
12  approval sheet?
13      A. It has the person's name,
14  education, the job title that they'll hold and
15  the salary that is recommended, probably like
16  work hours, you know, 8:00 to 5:00.
17  Basically, it's just a very basic approval
18  sheet. It just has a few items on there.
19      Q. When would Ms. Hunter have been
20  eligible for FMLA leave? Do you know that
21  date?
22      A. That would have been from the time
23  that she became a temporary employee, because
24  temporary time is included. So roughly March
25  2000 -- March 2007.

Page 97

1      Q. How does the FMLA calendar at Mobis
2  run? Is it an annual calendar that's applied,
3  a rolling calendar from hire date? How does
4  Mobis follow the FMLA calendar?
5      A. The calendar itself is -- or at the
6  time that Ms. Hunter was employed would have
7  been twelve weeks per calendar year once you
8  qualify. You know, now we've actually changed
9  that.
10      Q. Okay. So at that time, once she
11  would have become eligible -- if she became
12  eligible with twelve weeks remaining in that
13  calendar year, she could have taken those
14  twelve weeks?
15      A. Once she qualified, she could
16  take -- in 2007, she could have taken those
17  twelve weeks.
18      Q. Who made the decision to hire
19  Ms. Hunter as a full-time employee?
20      A. I do not know.
21      Q. How could I find that out?
22      A. Perhaps Mr. Kim.
23      Q. How did you become aware that the
24  accounting department wanted Ms. Hunter to
25  become a full-time employee?

25 (Pages 94 to 97)

Deposition of TRACY RIEDLER
January 31, 2008

Page 98

1    A. What likely -- more than likely
2 happens, what's normal is that they will ask
3 the human resources department for an
4 application for, in this case, Ms. Hunter, and
5 a regular employment application at that
6 point. They don't complete one any sooner
7 than that. And so that seems like that's
8 probably what would have happened. That's the
9 normal procedure.
10    Q. Do you know who made the request
11 for the employment application?
12    A. I don't.
13    Q. Does anyone in the accounting
14 department, other than Mr. Kim, have the
15 authority to hire an employee?
16    A. No.
17    Q. Based on that, is it safe to assume
18 that Mr. Kim made the decision to hire her?
19    A. He would have approved the decision
20 if someone would have recommended someone --
21 if someone else would have recommended her,
22 but he would have had the approval authority.
23    Q. Okay. At the time that she was
24 hired, was Mobis aware of her attendance
25 during the period that she was assigned to

Page 99

1 work there through her temporary agency?
2    A. I was not. I cannot speak for
3 others.
4    Q. Would the people working side by
5 side with her know when she's there and not
6 there?
7    A. I wouldn't know.
8    Q. Yesterday, there were a lot of
9 questions that were prefaced with Mr. Kim is a
10 stickler and likes to document things. Based
11 on your knowledge and understanding of
12 Mr. Kim, would he have been documenting her
13 attendance during her temporary period?
14    A. I don't know.
15    Q. Does he document attendance of
16 employees that are not temporary?
17    A. It appears that he does.
18    Q. Are you aware of any employees
19 other than Ms. Hunter where he has documented
20 an employee's attendance?
21    A. To my knowledge, he actually -- and
22 it's an exhibit, you know, I know yesterday,
23 but they're where he writes early outs,
24 tardies, you know, just any kind of attendance
25 issues.

Page 100

1    Q. Give me a moment. I'm going to
2 find it in these documents and we'll make it
3 an exhibit.
4    A. And he has that on everyone.
5    (Plaintiff's Exhibit Number 2 was
6    marked for identification. A copy
7    is attached.)
8    Q. I think it's document 115. Yeah.
9 I'm showing you what's been produced by the
10 defendant in this case as document 115. Have
11 you seen that before? Is that the chart
12 you're referring to?
13    A. Yes.
14    Q. I'm going to hand you a little
15 sticker that's Plaintiff's Exhibit 2.
16    MS. LEONARD: I'm sorry. I don't
17 have a copy for you to look at.
18    Q. Who created that chart?
19    A. Jay Kim.
20    Q. Do you have any personal knowledge
21 of Ms. Hunter's attendance during her
22 employment?
23    A. No.
24    Q. And we're going to come back to
25 that document later. So just hold on to it.

Page 101

1    A. Okay.
2    Q. What job did Ms. Hunter hold?
3    A. General accounting specialist.
4    Q. And was she qualified to hold that
5 job?
6    A. Yes.
7    Q. What does a general accounting
8 specialist do?
9    A. There are a variety of things that
10 they could do. And frankly, I couldn't tell
11 you specifically what her duties were.
12    General accounting is responsible
13 for accounts payable, accounts receivable,
14 invoice tracking -- in other words, when
15 invoices come into the company and making sure
16 they get circulated to the proper person for
17 approval.
18    Those are some of just the basic
19 things. But they have several people in that
20 department. So specifically what she did, I
21 wouldn't know.
22    Q. Is there a job description for her
23 job?
24    A. Yes.
25    Q. And to the best of your knowledge,

26 (Pages 98 to 101)

Deposition of TRACY RIEDLER
January 31, 2008

Page 102

1  does that accurately reflect the duties and
2  responsibilities of her job?
3      A. It's a very -- job descriptions are
4  pretty generic. But yes, I believe so.
5      Q. Do you know who created the job
6  description for her job?
7      A. The supervisors will actually write
8  what the responsibilities -- the tasks,
9  duties -- key duties and responsibilities of a
10 job description. And then -- oh, no -- so
11 basically then --
12     Q. You may want to take a second.
13         (A discussion was held off the
14         record.)
15     A. So generally they would -- the
16 supervisor would write the key duties and
17 responsibilities. That would be reviewed by
18 the manager and then sent to me and I would
19 review that. Then it would go into the job
20 description folder.
21     Q. Do you have any knowledge of when
22 the job description for Ms. Hunter's job was
23 created?
24     A. No, I don't.
25     Q. Do you know if she was ever given a

Page 103

1  copy of it?
2      A. No, I don't.
3      Q. I believe you said earlier that the
4  typical work schedule for employees at Mobis
5  is 8:00 to 5:00?
6      A. In the general office area, yes.
7      Q. When salaried employees are absent,
8  are they supposed to make up the hours that
9  they've missed?
10     A. Salaried and -- and normally, they
11 do. And the reason they do is because their
12 work usually has timelines. And as I
13 expressed earlier, the work is usually
14 there -- not being done while they're there.
15 So a lot of times, they have to work extended
16 hours when they come back to make up for that
17 time.
18     Q. Do you have any knowledge of
19 whether Ms. Hunter made up any hours which she
20 missed from work?
21     A. I don't have exact knowledge on
22 that, no.
23     Q. Do you have any knowledge on that
24 issue?
25     A. Not really. I mean, no, that's not

Page 104

1  something I'm involved in.
2      Q. I heard you. I didn't know if
3  Elaine got it. She's good but I'm just making
4  sure.
5          What was Ms. Hunter's rate of pay
6  or salary?
7      A. Gosh, I couldn't say.
8      Q. Here are all the documents that
9  y'all have produced if that helps.
10     A. I'm not sure that would actually be
11 in here unless her offer letter is in here.
12 Does anybody have a calculator? 27,540.
13     Q. And how did you calculate that
14 amount?
15     A. I took her gross pay for a two-week
16 pay period. And we have twenty-six pay
17 periods in a year. So that's an annual sum.
18     Q. All right. Since Ms. Hunter's
19 termination, have the employees that worked in
20 her department received any type of cost-of-
21 living raises?
22         Let me rephrase that. Had her
23 employment with Mobis not ended and continued
24 through today, would she have been eligible
25 for any type of raise in her pay?

Page 105

1      A. July 1st we increased time for
2  salaried employees.
3      Q. What type of increase would she
4  have been eligible for?
5      A. It's hard to say because it's not
6  just cost of living. It's a merit system. So
7  I couldn't say exactly what our average was
8  this year.
9      Q. Do you know what the cost-of-living
10 raise was that was awarded in July?
11     A. I think the cost of living is
12 roughly like 3.3 percent or something.
13     Q. Is that given every year?
14     A. It has been in the past, yes.
15     Q. All right. And is there a standard
16 range in terms of a percentage raise for merit
17 raises?
18     A. There's not a standard, no.
19     Q. In this large stack of documents,
20 there's a Bates stamp number in the bottom
21 corner and there's document that is number 4
22 that appears to be a calculation of
23 employee -- value of employee benefits
24 available to Ms. Hunter.
25         If you want, I'll give you a

27 (Pages 102 to 105)

Deposition of TRACY RIEDLER
January 31, 2008

Page 106

1 sticker and you can make that Exhibit Number
2 3.
3      A. This one?
4      Q. Yes, ma'am. I'll give you a
5 sticker.
6         (Plaintiff's Exhibit Number 3 was
7         marked for identification. A copy
8         is attached.)
9      Q. Have you seen that document before?
10     A. I believe so, yes.
11     Q. Do you agree with the information
12 reflected on that document as being accurate
13 of the value of employee benefits being
14 offered to Ms. Hunter?
15     A. Yes.
16     Q. Are you aware of any other employee
17 benefits that were available to her that are
18 not reflected on that sheet?
19     A. No.
20     Q. Do you know who created Plaintiff's
21 Exhibit 4?
22     A. I think I did.
23     Q. Okay. Good. I ask that simply
24 because if we need to use it as an exhibit, we
25 need the person who created it to testify to

Page 107

1 it.
2         Where did you get the information
3 that that document is -- that is reflected in
4 that document?
5      A. I believe on her pay statements
6 which are also attached here. And I know --
7         MR. BARNETT: Let the record show
8 she said here, and --
9         MS. LEONARD: Referenced all the
10 documents.
11         THE WITNESS: All the documents.
12         MR. BARNETT: The big response to
13 interrogatory number 7 file -- well, all the
14 documents that we've produced.
15     Q. So you got that information from
16 documents which have already been produced?
17     A. Yes.
18     Q. During her employment with Mobis or
19 her assignment with Multi-Staffing to Mobis,
20 did Ms. Hunter ever receive any type of
21 written performance evaluation?
22     A. I don't believe so.
23     Q. Is that something that normally
24 would have happened?
25     A. No, not based on the time period

Page 108

1 that she worked.
2      Q. Was there any type of evaluation
3 given to her when she went from being a
4 temporary employee to a full-time employee?
5      A. No, I don't believe so.
6      Q. All right. Do you have any
7 personal knowledge of Ms. Hunter's job
8 performance?
9      A. No.
10     Q. In the stack of documents that have
11 been produced, there's a ninety-day
12 performance review sheet that was signed on
13 what appears to be August 25th for
14 Ms. Hunter. Do you know who typed that
15 document or prepared it?
16     A. Do you know what number it is on
17 here?
18     Q. Not off of the top of my head. It
19 may also be in the small stack.
20     A. Okay.
21     Q. All right. Do you know who typed
22 that document?
23     A. The form is actually -- the form
24 itself was done by me.
25     Q. And the information contained in

Page 109

1 the form?
2      A. The information contained here
3 comes from my staff.
4      Q. So at the top part of the form, the
5 general information about the employee, their
6 name, position, all that --
7      A. Comes from my staff, the human
8 resources staff. And then this is actually
9 normally prepared by the supervisor.
10     Q. And when you said this, you were
11 putting your hand over the part that is under
12 section B that says explain?
13     A. Explain why.
14     Q. And whose signatures are at the
15 bottom of that page?
16     A. Jay Kim, myself, and Mr. Rhyoo who
17 was the president and CEO at that time. No,
18 at that time he was vice president.
19     Q. Would you spell his name for the
20 court reporter?
21     A. R-H-Y-O-O.
22     Q. Do you know when that document was
23 created?
24     A. Not exactly, but it is our practice
25 to -- human resources's practice to send the

28 (Pages 106 to 109)

Deposition of TRACY RIEDLER
January 31, 2008

Page 110

1  ninety-day performance sheet roughly about
2  three weeks prior to the person's evaluation
3  or, excuse me, their ninety-day probationary
4  period being over.
5      Q. And I believe I remember from the
6  documents Ms. Hunter's ninety-day probationary
7  period should have been up September 2nd,
8  2006?
9      A. That's what it says on here, yes.
10     Q. Do you know if the ninety-day
11  evaluation was shown to Ms. Hunter?
12     A. I don't know.
13     Q. Is that something that would have
14  normally been done?
15     A. I think it is something that is
16  normally discussed with employees.
17     Q. Okay.
18     A. But, I mean, I would actually say
19  it's discussed with employees if they're
20  passing their probationary period just as a
21  formality.
22     Q. All right. Now, in the small
23  folder below that stack of documents, there
24  are four pages. I've got to be careful
25  because the numbering is actually redundant

Page 111

1  from the big stack. But in that small folder,
2  there is a status change form which is Bates
3  numbered 0004.
4      Do you know who completed that
5  document?
6      A. This would have actually been
7  traditionally human resources. And they get
8  their information from the manager.
9      Q. Do you know who in human resources
10  created that document?
11     A. No.
12     Q. There's some initials at the bottom
13  of the page. Whose initials, are those?
14     A. Ruth Heard who works in my
15  department. And what she is coding here is
16  SAP, means that she entered this information,
17  this form into our human resources database.
18     Q. I think there's one other set of
19  initials at the bottom of the page.
20     A. It would have been the payroll
21  clerk and -- I want to say Eleanor, but that's
22  actually not correct. Let me come back with
23  the name.
24      But anyway, it is another person
25  that worked in HR. And she was the payroll

Page 112

1  person. And she sent the cover letter,
2  prepared and sent the cover letter to
3  Ms. Hunter.
4      Q. And you said that the information
5  contained on this document came from Mr. Kim
6  as reported to the human resources department?
7      A. We will report the reason why a
8  person is let go.
9      Q. And I apologize if I ask this
10  again -- if I'm being repetitive. I think
11  I've asked this, but I need to make sure.
12      Do you have any personal knowledge
13  of Tarsha Hunter's attendance during the time
14  she was a full-time employee with Mobis?
15     A. No, not prior -- just prior to her
16  termination only.
17     Q. When you say just prior to her
18  termination only, at what period in time are
19  you talking about?
20     A. Roughly, I'd say about a week
21  earlier.
22     Q. So a week prior to her termination
23  what happened?
24     A. Mr. Kim had her ninety-day
25  performance review. And he had received it

Page 113

1  from our department. And he came to my
2  office, had the performance review in his hand
3  and said, you know, I do not believe that I
4  can keep Tarsha.
5      Q. Okay.
6      A. I said, What's the problem?
7      And he said, She is very
8  unreliable; very undependable. She is out all
9  the time.
10      I said, Out? What do you mean
11  out?
12      And he said that she is absent, not
13  here or --
14      And so I told him, I said, Well, I
15  mean, how many times has she been out, Jay?
16      He said, I have her attendance
17  record.
18     Q. Is that document Exhibit 2?
19     A. Yes.
20     Q. Okay.
21     A. And that is something that he
22  keeps.
23     Q. All right.
24     A. And so I followed him to his office
25  and looked at this record. And I said, Jay,

29 (Pages 110 to 113)

Deposition of TRACY RIEDLER
January 31, 2008

Page 114

1  you can't keep her.  You can't keep her.  I
2  said, The ninety-day probationary period is
3  that a person can only have three occurrences
4  of any kind, and I clarified what the
5  occurrences were for him.
6      Q.  Okay.  Anything else?
7      A.  No.
8      Q.  Okay.  What happened next?
9      A.  I mean, that was basically our
10 conversation.  At that time, we knew that
11 Tarsha would not be able to be a full-time
12 employee.
13     Q.  Then what happened?
14     A.  What happened over the next few
15 days, I was not involved in.  I believe that
16 Jay and Sonechka had many meetings, many
17 discussions because Sonechka did want to keep
18 Ms. Hunter.  And I believe that she was asking
19 Jay if she could keep her.
20     Q.  Okay.
21     A.  But otherwise, specifically, I have
22 no idea.
23     Q.  All right.  Can you recall anything
24 else that Mr. Kim talked to you about with
25 respect to Ms. Hunter's attendance?

Page 115

1      MR. BARNETT:  Objection.  No time
2  frame.
3      Q.  Prior to August 26, 2006, have you
4  told me everything you can recall Mr. Kim
5  discussing with you regarding Ms. Hunter's
6  attendance?
7      A.  That's correct.  That's the only
8  thing I can think of.
9      Q.  And you trusted that the attendance
10 record Mr. Kim showed you was truthful and
11 accurate, correct?
12     A.  Yes.
13     Q.  So in making your decision, you
14 relied on Mr. Kim's representations?
15     A.  Yes.
16     Q.  At the time that Mr. Kim presented
17 you with Plaintiff's Exhibit 2, were you aware
18 that Ms. Hunter was pregnant?
19     A.  My recollection is that I found out
20 a day or two before she was terminated.  So at
21 this time, when we were discussing this, no.
22     Q.  How did you find out she was
23 pregnant?
24     A.  From Sonechka.
25     Q.  What did Sonechka tell you?

Page 116

1      A.  Sonechka was upset that she was not
2  going to be able to keep Tarsha.  And she came
3  to my office and she basically was stating
4  that she wanted -- did want to keep her and --
5  and she was crying.  And she said that Tarsha
6  was pregnant.
7          And, you know, I told her I was
8  sorry, but unfortunately we had to actually --
9  we have to be consistent.  We have to stick to
10 our policies and everything to be fair to
11 everyone else.
12     Q.  Did Ms. Womack share with you or
13 say to you anything along the lines that
14 Ms. Hunter's pregnancy may have been affecting
15 the decision to terminate her?
16     A.  I don't recall anything like that,
17 no.
18     Q.  If she had said something like
19 that, would you have remembered it?
20     A.  I just can't remember in detail
21 what -- our conversation was not long.  I just
22 remember her being visibly upset that she did
23 want to keep her.
24     Q.  If it's her testimony tomorrow that
25 she discussed with you that she felt that

Page 117

1  Ms. Hunter was being terminated because of her
2  pregnancy, would you have any reason to
3  disagree with her testimony?
4      A.  I think that I would actually
5  remember if that occurred.  So I would have
6  reasonable belief to doubt if she were to
7  actually say that.
8      Q.  At the time that Ms. Womack told
9  you that Ms. Hunter was pregnant, did it raise
10 any concerns in your mind that maybe you
11 should investigate whether Ms. Hunter's
12 pregnancy was motivating her termination?
13     A.  No.
14     Q.  Did you take any steps to
15 investigate whether Ms. Hunter's pregnancy had
16 influenced Mr. Kim's decision to terminate
17 her?
18     A.  No.
19     Q.  There's another document I want to
20 you flip to in that big stack.  It's document
21 179.  I'm going to give you a sticky to put on
22 it.  We're going to mark that as Plaintiff's
23 Exhibit 4.
24     A.  179?
25     Q.  Yes, ma'am.  We're going to mark

30 (Pages 114 to 117)

Deposition of TRACY RIEDLER
January 31, 2008

Page 118

1  that as Plaintiff's Exhibit 4.
2      (Plaintiff's Exhibit Number 4 was
3      marked for identification. A copy
4      is attached.)
5      Q. What is Plaintiff's Exhibit 4?
6      A. It appears -- this is, of course,
7  something else that Jay has kept up with. And
8  the top part is vacation information, and the
9  bottom part is absenteeism information.
10     Q. Okay.
11     A. The only thing I can assume on here
12 is that this was copied from another employee
13 because all of this information is incorrect
14 on Ms. Hunter. Everything.
15     Q. So you're saying everything on
16 Exhibit --
17     A. On the top -- on the top part of
18 this form, all of that.
19     Q. Specify what is at the top.
20     A. The vacation. The vacation status
21 information on Ms. Hunter is incorrect on this
22 form.
23     Q. So on that form, at least the part
24 of the information maintained by Mr. Kim you
25 recognize as being incorrect?

Page 119

1      A. That's correct.
2      Q. Does that raise any concerns that
3  the information at the bottom part of the
4  sheet may be incorrect?
5      A. No, because what I actually saw in
6  Mr. Kim's office only had absenteeism
7  information on there. I have not seen -- I
8  have not seen this form.
9      Q. Now, my question is a little
10 different. Today, knowing that the
11 information at the top of the sheet is
12 incorrect, do you have any concerns that
13 Mr. Kim may have not reflected correct
14 information at the bottom of the sheet?
15     A. No.
16     Q. Sitting here in Ms. Hunter's
17 testimony yesterday, you heard her testimony
18 that one of the dates reflected on the bottom
19 part of the sheet that it says she was not at
20 work is incorrect.
21     In light of her testimony, do you
22 have any concerns that the information
23 contained relating to her absences is
24 incorrect?
25     A. My recollection from yesterday is

Page 120

1  that according to paperwork that -- and I'm
2  talking about absence forms -- that her
3  testimony was incorrect yesterday, at least by
4  the information that was in the file. The
5  dates didn't match.
6      Q. So the fact that that document
7  reflects an absence on the 14th, I believe,
8  and her testimony was that she was at work all
9  day on the 14th, that doesn't raise concerns
10 in your mind that the information on that
11 sheet is incorrect?
12     A. Again, just going back to the
13 information that's in the file.
14     Q. What did you do before Ms. Hunter
15 was terminated to verify the information
16 Mr. Kim was providing to you relating to her
17 attendance?
18     A. He had absence forms that were
19 signed by Ms. Hunter, Sonechka, and/or Jay.
20 And it appeared with doctor's notes and things
21 that were in the file that these dates were
22 accurate.
23     Q. Did you talk with Ms. Womack about
24 Ms. Hunter's attendance?
25     A. Yes.

Page 121

1      Q. What did Ms. Womack say about
2  Ms. Hunter's attendance?
3      A. That he knew -- that she knew that
4  she had actually been out a lot but still
5  wanted to work with her.
6      Q. Did Womack have any complaints
7  about Ms. Hunter's job performance?
8      A. Not to me.
9      Q. To anyone?
10     A. I don't know.
11     Q. So sitting here today, you're not
12 aware of any performance-related complaints?
13     A. No.
14     Q. Are you aware of any discipline
15 Ms. Hunter received prior to her termination?
16     A. Only e-mails asking her to please
17 improve.
18     Q. Are those e-mails considered
19 discipline?
20     A. Somewhat warnings, yes, to say that
21 her ninety-day probationary period -- I
22 believe there's one that actually says that
23 her ninety-day probationary period or long-
24 term employment could be in jeopardy.
25     Q. I notice you paused and had to

31 (Pages 118 to 121)

Deposition of TRACY RIEDLER
January 31, 2008

Page 122

1  think about whether those e-mails constituted
2  discipline. Is that because you're not sure
3  the e-mails are clear that they're
4  disciplinary actions?
5      A. No. I was actually just in my own
6  mind -- earlier you were talking about what I
7  consider discipline and what I don't. So I
8  was just thinking about warnings or
9  nonwarnings.
10     Q. Did any of the e-mails to
11  Ms. Hunter inform her that those e-mails
12  constitute disciplinary action?
13     A. In that exact word, disciplinary
14  action, I'd have to look at them again. But I
15  don't know.
16     Q. All right. Who made the decision
17  to terminate Ms. Hunter?
18     A. Myself.
19     Q. Anyone else?
20     A. After my conversation with Mr. Kim
21  regarding her attendance during the ninety-day
22  probationary period, I was the one that
23  informed him that we could no longer employ
24  her based on the ninety-day policy.
25     Q. On what date was the decision to

Page 123

1  terminate Ms. Hunter made?
2      A. I could not be exact, but roughly a
3  week before her termination date.
4      Q. So if her termination date was
5  August 25th, then we're looking somewhere
6  around August 18th?
7      A. Perhaps, yes.
8      MR. BARNETT: You're entitled to
9  look at any document you want to.
10     Q. That's why all the documents are
11  here.
12     A. Yeah, I know. I know. But my
13  recollection --
14     MR. BARNETT: Don't guess. Don't
15  guess. Look at the document.
16     Q. I promise you, Henry will put
17  documents in front of you at trial. I don't
18  want to be surprised.
19     A. But my recollection is a week prior
20  anyway. I'm not sure there's a document that
21  actually will clear that date up for me.
22     Q. Okay.
23     MR. BARNETT: Look. Let me just
24  ask you to look at the documents then.
25     THE WITNESS: Which document would

Page 124

1  you like me to look at?
2      MR. BARNETT: Let's see. And this
3  may not --
4      MS. LEONARD: If you want, we can
5  make an exhibit of whatever document you're
6  showing her.
7      MR. BARNETT: Well --
8      THE WITNESS: I don't know if it
9  will clear it up.
10     MR. BARNETT: If it doesn't clear
11  it up, it doesn't clear it up.
12     After that, I can't find it.
13     THE WITNESS: Hold on. Keep going
14  because I think there actually is one more in
15  there.
16     MR. BARNETT: She is asking the
17  questions not me.
18     THE WITNESS: Well, I mean, but my
19  recollection is still a week prior. Because
20  on the 23rd --
21     Q. I'm going to give you a sticker
22  because I'm not sure what y'all are looking
23  at. We're going to mark this as Plaintiff's
24  Exhibit 5, which is a document --
25     MR. BARNETT: We took this out of

Page 125

1  your stack.
2      MS. LEONARD: That's all right.
3  I've got these documents scanned at the
4  office. These are ours to play with.
5      (Plaintiff's Exhibit Number 5 was
6      marked for identification. A copy
7      is attached.)
8      A. Okay. This is an e-mail to me from
9  Jay. And it's on the 23rd of August. And he
10  is referencing that my concern -- my concern
11  for termination of Tarsha is Sonechka wants to
12  keep her because she might not like any kind
13  of changes. Then I don't want to take care of
14  Tarsha anymore.
15     Q. Then didn't he request your help in
16  terminating her?
17     A. Yes.
18     Q. Is it your testimony that he had
19  discussed with you before the e-mail
20  terminating Ms. Hunter?
21     A. Yes.
22     Q. If you had discussed terminating
23  Ms. Hunter prior to this e-mail, why was he
24  writing you asking you for help?
25     A. As a reminder.

32 (Pages 122 to 125)

Deposition of TRACY RIEDLER
January 31, 2008

Page 126

1    Q. All right.
2    A. Just a formality because he was
3  going out of town.
4        MR. BARNETT: I don't know where
5  this came from.
6        MS. LEONARD: That little folder.
7        MR. BARNETT: Did this come from
8  the little folder?
9        MS. LEONARD: It did.
10       Q. Before terminating Ms. Hunter, did
11 you consult with legal counsel about the
12 decision to fire her?
13       A. I don't believe so.
14       Q. Did you do any type of legal
15 research to ensure that in terminating
16 Ms. Hunter you would not be violating the
17 federal law prohibiting pregnancy
18 discrimination?
19       A. No.
20       Q. At the time she was terminated, you
21 knew she was fired, correct? Of course you
22 knew she was fired. You knew she was
23 pregnant, correct?
24       A. Just before she was terminated,
25 yes.

Page 127

1        Q. Give me each and every reason that
2  Ms. Hunter was fired.
3        A. Attendance as I know it.
4        Q. Any other reason?
5        A. No.
6        Q. Identify each and every attendance
7  incident or occurrence which was considered in
8  terminating Ms. Hunter.
9        A. Being absent three times and having
10 doctor's appointments which would consist of
11 either coming in to work late or leaving
12 before the shift was over four times.
13       Q. I notice you're looking at Exhibit
14 Number 4 in answering this question.
15       Are you saying that the dates that
16 are reflected on the bottom of Number 4 are
17 the attendance dates that were used to justify
18 terminating Ms. Hunter?
19       A. That's correct.
20       Q. What policy or policies did
21 Ms. Hunter violate that led to her
22 termination?
23       A. The ninety-day policy in that a
24 person is only able to have three -- actually,
25 only able to have two occurrences. On the

Page 128

1  third, they would be terminated. And
2  occurrences -- I clarified this morning, but
3  that would be tardies, early outs or absences.
4        Q. Is Ms. Hunter eligible for rehire?
5        A. No.
6        Q. Why is that?
7        A. Because she was involuntarily
8  terminated.
9        Q. In your testimony this morning, you
10 mentioned having conversations with both
11 Mr. Kim and Ms. Womack about Ms. Hunter's
12 attendance and termination. Have you told me
13 everything about these conversations?
14       A. As I can remember, yes.
15       Q. Is there anything in the documents
16 which have been produced that would help
17 refresh your memory?
18       A. I don't believe so.
19       Q. Do you anticipate reviewing any
20 additional information beyond what you
21 reviewed to prepare for your deposition if
22 you're called as a witness in the trial of
23 this action?
24       A. Having to review anything else?
25       Q. Yes, ma'am. I'll tell you where

Page 129

1  I'm going. You pop up in trial and say
2  something a little different and say, Ha, I
3  reviewed this magic document.
4        Are there any documents which you
5  may feel you need to review to prepare for
6  trial which you may not have reviewed for
7  today which might refresh your testimony?
8        A. I don't believe so.
9        Q. As of the time of Mr. Kim's e-mail
10 of August 23rd, were you aware that Ms. Hunter
11 was pregnant?
12       A. My recollection is that I know I
13 found out from Sonechka. And my recollection
14 is a couple of days prior to Ms. Hunter being
15 terminated.
16       Q. So that is --
17       A. So I could not tell you with great
18 certainty the timing. It could have been --
19 it could have been the same day, but from what
20 I knew first, I'm not sure.
21       Q. But that e-mail coincides around
22 the time Ms. Womack shared with you that
23 Ms. Hunter was pregnant?
24       MR. BARNETT: Around the time
25 what?

33 (Pages 126 to 129)

Deposition of TRACY RIEDLER
January 31, 2008

Page 130

1       MS. LEONARD:  That Ms. Womack
2  shared that Ms. Hunter was pregnant.
3       Q.  A few questions about Ms. Hunter's
4  application for unemployment.  What is Mobis's
5  policy on when it will oppose an employee's
6  application for unemployment?
7       A.  Our practice is to complete the
8  form that comes from the unemployment office,
9  the very initial form when someone applies for
10 unemployment.
11      Q.  Do y'all keep a copy of the form
12 that you fill out?
13      A.  Yes.
14      Q.  Do you know if a copy of that form
15 with respect to Ms. Hunter has been produced
16 in this case?
17      A.  I believe I saw a form in here, but
18 it appeared blank.  I saw it just yesterday.
19 I think this is the initial form.
20      (Plaintiff's Exhibit Number 6 was
21      marked for identification.  A copy
22      is attached.)
23      Q.  I'm going to give you Plaintiff's
24 Exhibit sticker number 6 so that you can make
25 it an exhibit so later we'll know what you're

Page 131

1  talking about.
2       And Plaintiff's Exhibit 6 is the
3  blank form that's a notice of claim from the
4  Department of Industrial Relations; is that
5  correct?
6       A.  Yes, that's correct.
7       Q.  Do you know if Plaintiff's
8  Exhibit -- if a version of Plaintiff's Exhibit
9  Number 6 exists in Mobis's file that was
10 completed and sent in response to Ms. Hunter's
11 application for unemployment?
12      A.  There is not.
13      Q.  Okay.
14      A.  Ours is blank.
15      Q.  Who was responsible for completing
16 the information on that form?
17      A.  Lurie Hallford who works in my
18 department.
19      Q.  Is Lurie a man or woman?
20      A.  Woman.
21      Q.  Where does Ms. Hallford get the
22 information to put on that form?
23      A.  From the personnel file, from the
24 status change form as far as for the reason.
25      Q.  Do you know what reason was given

Page 132

1  to the Department of Industrial Relations for
2  Ms. Hunter's termination on that form?
3       A.  No.  No.  I'm not sure.
4       Q.  Do you know if the Department of
5  Industrial Relations initially approved
6  Ms. Hunter to receive unemployment
7  compensation benefits?
8       A.  I don't recollect, no.
9       Q.  What policy does Mobis have with
10 respect to appealing a decision to awarding
11 unemployment compensation benefits?
12      A.  If a person is awarded, then we
13 will actually -- our standard is to appeal if
14 a person is allowed unemployment.  And, of
15 course, if they've been involuntarily
16 terminated, then we'll actually give them the
17 reason why they were terminated.
18      Q.  In every circumstance where an
19 employee has been terminated and received
20 unemployment compensation benefits, did Mobis
21 appeal?
22      A.  It is our practice to do it.
23      Q.  Who is responsible for handling the
24 unemployment appeal?
25      A.  Unemployment appeal is Curt

Page 133

1  Bennett.
2       Q.  Do you remember if there was an
3  appeal made of Ms. Hunter's unemployment
4  benefits?
5       A.  Yes.
6       Q.  Who is Curt Bennett again?
7       A.  Assistant manager of team
8  relations.
9       Q.  What is that job?  What does that
10 do?
11      A.  The team relations is employee
12 relations.  Basically, they spend a lot of
13 time on the production floor.  If people -- if
14 employees have a need or concern or something,
15 they will initially bring it to team
16 relations.
17      Q.  Did he have any interaction or
18 supervisory authority over Ms. Hunter?
19      A.  No.
20      Q.  Did he have any firsthand knowledge
21 of the facts or circumstances surrounding her
22 termination?
23      A.  No.
24      Q.  Why was he handling her
25 unemployment appeal?

34 (Pages 130 to 133)

Deposition of TRACY RIEDLER
January 31, 2008

---

**Page 134**

1  A. He handles all of the
2  unemployment -- all of the unemployment
3  appeals, and he will utilize information
4  generally in the file. It was very obvious he
5  wasn't prepared for this unemployment hearing.
6  Q. That's my next question, which is,
7  where did he get the information that he used
8  in the unemployment hearing with respect to
9  Ms. Hunter's application for benefits?
10  A. I do not know.
11  Q. Would you agree that in the
12  unemployment appeal, he identified Mr. Kim as
13  the decision-maker for Ms. Hunter's
14  termination?
15  A. I am aware.
16  Q. Was his testimony under oath as to
17  Mr. Kim making that decision truthful?
18  A. He was not informed. He was not
19  informed about actually what happened in that
20  case.
21  Q. Were you aware that when he was
22  going to the appeal for Ms. Hunter, he was
23  going to be giving testimony under oath?
24  A. I didn't know this appeal was
25  going -- was actually being handled. So, I

---

**Page 135**

1  mean, I know unemployment hearings are being
2  held under oath, yes, but I did not know this
3  appeal was actually going on and when it was
4  scheduled.
5  Q. Would you agree that the issue that
6  the hearing officer was hearing was whether
7  Ms. Hunter had been terminated for deliberate
8  misconduct after a previous warning?
9  A. I have to actually read the --
10  Q. Okay.
11  MR. BARNETT: What are you looking
12  for?
13  THE WITNESS: The appeal
14  transcript.
15  MR. BARNETT: Well, we got that
16  from a tape Ms. Leonard had.
17  Q. I can show you the decision if that
18  helps.
19  A. Well, I was actually looking for
20  the verbiage on the tape -- from the
21  transcript from the unemployment office.
22  THE WITNESS: Do you know where
23  that is?
24  Q. Well, we'll then just agree that
25  the tape states the issue. How is that?

---

**Page 136**

1  MR. BARNETT: Pardon?
2  Q. Do you want to just agree that the
3  tape states the issue?
4  A. I would have to actually refresh my
5  memory, because I only saw the transcript just
6  recently. I hadn't seen it before then.
7  Q. Was Mobis given an opportunity to
8  present evidence at this hearing?
9  A. I would assume so.
10  Q. In fact, actually Ms. Hunter didn't
11  participate in the hearing, did she?
12  A. She was absent during the hearing.
13  Q. So the only evidence that the
14  hearing officer had to make their decision
15  came from Mobis, correct?
16  A. I would assume. I don't know. I
17  wasn't involved in the hearing.
18  Q. Was there any discussion of
19  Ms. Hunter's pregnancy in the hearing?
20  A. I don't know, and I don't recall
21  from the transcript.
22  Q. Do you have any knowledge of
23  whether the hearing officer considered whether
24  Ms. Hunter's pregnancy was a factor in her
25  termination?

---

**Page 137**

1  A. I have no idea.
2  Q. Do you agree that the hearing
3  officer found that the evidence did not show
4  that Ms. Hunter committed misconduct connected
5  with work repeated after previous warning?
6  A. The final decision -- let me read
7  the final decision.
8  Q. I'm going to mark this as Exhibit
9  7, just to make it easier.
10  (Plaintiff's Exhibit Number 7 was
11  marked for identification. A copy
12  is attached.)
13  A. Okay. Now, what was your question
14  again?
15  Q. Do you agree that the hearing
16  officer concluded that the evidence does not
17  show that Ms. Hunter committed misconduct
18  connected with the work repeated after
19  previous warning?
20  A. Yes, that is what the officer said.
21  Q. Did Mobis appeal this hearing
22  officer's finding?
23  A. I have to have the -- the problem
24  I'm having is, there's several stages in an
25  appeal. And I have no idea the date of that

---

35 (Pages 134 to 137)

Deposition of TRACY RIEDLER
January 31, 2008

Page 138

1  transcript. Is that from this appeal? I
2  don't know.
3      Q. I'll represent to you --
4      A. I don't know which comes first or
5  anything.
6      Q. I'll represent to you that the tape
7  that we produced in this action, which I'm
8  assuming is what you read the transcript of --
9      A. That's correct.
10     Q. -- is from the first-level appeal
11  where the hearing officer conducts a telephone
12  hearing.
13     A. Okay.
14     Q. And that's -- the determination
15  that you have in front of you, which is
16  Exhibit 7, was the result of that appeal.
17     A. Okay.
18     Q. Do you know --
19        MR. BARNETT: So you're saying that
20  Exhibit 7 is the result of the hearing that
21  went on on the phone?
22        MS. LEONARD: Correct.
23     A. Okay.
24     Q. Do you know if there was an appeal
25  made from the determination in Exhibit 7 to

Page 139

1  the board of appeals?
2      A. I don't know. I don't -- I don't
3  recall, but I don't think so.
4      Q. Is it Mobis's standard practice to
5  appeal an adverse hearing result beyond the
6  front-line hearing?
7      A. Not necessarily.
8      Q. Did Mobis accept the finding of the
9  hearing officer?
10        MR. BARNETT: Object to the form.
11     A. I don't know if there's anything
12  else that exists beyond this. So I would
13  actually have to review the policy --
14        MR. BARNETT: What are you pointing
15  to when you say this?
16        THE WITNESS: The decision of the
17  unemployment --
18        MR. BARNETT: Exhibit number?
19        THE WITNESS: Oh, the Exhibit
20  Number 7?
21     Q. Correct.
22     A. I don't -- I don't know actually if
23  there's anything that exists beyond Exhibit
24  Number 7.
25     Q. Who would know that?

Page 140

1      A. Well, I mean, I would just have to
2  review the file. That's all.
3      Q. All right. If an appeal was made
4  beyond that decision, would documents relating
5  to that appeal have been produced to us?
6      A. Yes. They would be in the
7  personnel file. And you would have them.
8      Q. If the file doesn't reflect any
9  type of document showing an appeal from that
10  decision, can we assume no appeal was made?
11     A. That's correct.
12     Q. Who was hired to replace
13  Ms. Hunter?
14     A. I don't know.
15     Q. Do you recall Ms. Hunter filing an
16  EEOC charge following her termination?
17     A. Yes.
18     Q. Who received her EEOC charge?
19        MR. BARNETT: I didn't hear the
20  question.
21     Q. Who received her EEOC charge?
22        MS. LEONARD: I'll speak up.
23     A. I believe they were actually
24  addressed to Mr. Kim, but I actually received
25  those.

Page 141

1      Q. What happened when you received her
2  charge? What did you do?
3      A. Read it and sent it to my attorney.
4      Q. Did you do any type of
5  investigation independent of or prior to the
6  charge being given to counsel?
7      A. No.
8      Q. So you hired and authorized a
9  lawyer to respond to Ms. Hunter's charge on
10  behalf of Mobis?
11     A. Yes.
12     Q. And that lawyer is Mr. Barnett?
13     A. Present.
14     Q. And Mobis authorized him to speak
15  on the company's behalf with respect to
16  Ms. Hunter's claim that she had been
17  terminated due to her pregnancy?
18     A. That's correct.
19     Q. Did you review the EEOC position
20  statement which was prepared on behalf of
21  Mobis and submitted to the Equal Employment
22  Opportunity Commission?
23     A. Yes.
24     Q. Did you agree with its contents?
25     A. Yes.

36 (Pages 138 to 141)

Deposition of TRACY RIEDLER
January 31. 2008

Page 142

1        MR. BARNETT: If she needs to -- do
2 you want to review it?
3        THE WITNESS: Yeah.
4        MS. LEONARD: I'll mark it as an
5 exhibit.
6        (Plaintiff's Exhibit Number 8 was
7        marked for identification.  A copy
8        is attached.)
9     Q.  I'm handing you what's been marked
10 as Plaintiff's Exhibit 8 which I'll represent
11 comes from Ms. Hunter's EEOC investigative
12 file, a position statement from Mobis.
13     A.  Okay.  And yes, I would have
14 reviewed this.
15     Q.  In fact, you're carbon copied on
16 that, on Exhibit 8, aren't you?
17     A.  Uh-huh.  Yes.
18     Q.  When you reviewed Exhibit 8, did
19 you see any information contained in it which
20 you felt needed to be corrected?
21     A.  At the time that I reviewed this,
22 no.
23     Q.  As we're doing it today, is there
24 any information which you feel needs to be
25 corrected?

Page 143

1     A.  On page two, into page three, the
2 bottom part of page two where -- Mobis's
3 response to the specifics of the charge, it
4 says, Most important, the charging party's
5 allegation that Mr. Kim terminated her because
6 she was pregnant, this is not possible because
7 Mr. Kim had communicated his decision not to
8 offer the charging party regular employment to
9 Mobis human resources, Tracy Riedler, before
10 he became aware of the charging party's
11 pregnancy.
12     Q.  And what needs to be corrected in
13 that statement?
14     A.  Well, at the time -- the timing of
15 when Mr. Kim actually found out was not
16 completely -- I didn't have complete knowledge
17 of that, and I'm not sure I actually still
18 do.  But I had only discussed her termination
19 a week prior to her actually being terminated,
20 and that being based, of course, on
21 absenteeism.
22        And ultimately, again, I was the
23 decision-maker because of the absenteeism.  So
24 I would have just stated that differently.
25     Q.  Anything else that you feel needs

Page 144

1 to be corrected?
2        MR. BARNETT:  Read it.
3        THE WITNESS:  We'll be here for
4 awhile.
5        MR. BARNETT:  Do you want to take a
6 break and let her read that?
7        MS. LEONARD:  We'll take a break.
8 We've been going right at about an hour, too.
9 So it's good timing.
10        (A discussion was held off the
11        record.)
12        MR. BARNETT:  Isn't this a
13 restatement of what you clarified earlier?
14        THE WITNESS:  Of this?
15        MR. BARNETT:  Yeah.
16        MS. LEONARD:  If I accidentally
17 clipped on the wrong document, I'm sorry.  I
18 was trying to make sure I got all the exhibits
19 in there.
20        MR. BARNETT:  No.  I'm just saying
21 that --
22        THE WITNESS:  They're not exact.
23        MR. BARNETT:  This is the same
24 thing stated another way, isn't it?
25        THE WITNESS:  Stated another way,

Page 145

1 yes.  But no.  I don't want to change anything
2 else.
3     Q.  All right.  Give me just a second
4 to get back to my -- in terms of the EEOC
5 charges which you received from Sharonda
6 Gordon and Lajarra --
7     A.  Lajarra Jefferson.
8     Q.  Lajarra Jefferson, where in the
9 timing of the receipt of those two charges did
10 the receipt of Ms. Hunter's EEOC charge fall?
11     A.  Gosh, I don't know.  I'd have to
12 look at dates.  I couldn't even venture to
13 guess.
14     Q.  Do you recall if you had received
15 Ms. Gordon and Mr. Jefferson's EEOC charges
16 before Ms. Hunter's?
17     A.  My recollection would be before.
18     Q.  When you received Ms. Hunter's EEOC
19 charge, did you have any concerns that it was
20 the third charge filed by --
21     A.  Excuse me.  Excuse me.  Sharonda
22 Gordon's would be after.
23     Q.  Okay.
24     A.  Lajarra Jefferson's would be
25 before.  That would be my recollection.

37 (Pages 142 to 145)

Deposition of TRACY RIEDLER
January 31, 2008

Page 146

1    Q. Upon receipt of the third EEOC
2  charge, did you have any concerns that it was
3  the third pregnant employee of Mobis that was
4  filing a discrimination claim with the EEOC?
5    A. No.
6    Q. I don't really want to go into the
7  details, but I need to ask the foundational
8  questions just to get to where I'm going.
9      Does Mobis -- in 2006, had Mobis
10 received more than just those three EEOC
11 charges?
12    A. I don't think they were all three
13 in 2006. I think Sharonda Gordon's was in
14 2007, but I cannot be sure.
15    Q. That's all right. In 2006 and
16 2007, do you have any recollection of any EEOC
17 charges coming in other than those three?
18    A. No.
19    Q. So did it concern you then that in
20 2006 and 2007, when a hundred percent of the
21 EEOC charges received by the company came from
22 pregnant employees?
23      MR. BARNETT: Listen to that
24 question. I think you assumed something in
25 your first question.

Page 147

1    A. The first question you asked about
2  pregnancy EEOC charges. So the second time
3  when you asked, you didn't ask about all EEOC
4  charges. You actually said pregnancy in your
5  first one, unless I'm incorrect in remembering
6  that.
7    Q. Let's start over. How many EEOC
8  charges in the four years you've been at Mobis
9  have you received?
10    A. I couldn't tell you. I couldn't
11 tell you, but maybe -- ten maybe.
12    Q. So approximately ten charges over
13 ten years -- over four years?
14    A. Uh-huh.
15    Q. Of those approximate ten charges,
16 how many were received in 2006 and 2007?
17    A. I wouldn't be able to guess. I
18 don't know.
19    Q. Okay. Did you have any concerns
20 that approximately slightly less than -- no,
21 actually if it's ten -- thirty percent of the
22 charges that you were receiving during the
23 four-year history of being at Mobis were
24 coming from pregnant employees?
25    A. No, because I was familiar with the

Page 148

1  other two cases.
2    Q. After receiving three EEOC charges
3  from pregnant employees, did you take any
4  steps to meet with your managers and
5  supervisors to review policies relating to
6  pregnancy discrimination?
7    A. We have had EEO -- an EEO training
8  again as we do that annually.
9    Q. Okay.
10    A. And pregnancy was addressed during
11 that time.
12    Q. And did you address anything beyond
13 what we discussed this morning?
14    A. No, just the general items.
15    Q. We're in the home stretch. What
16 background check, if any, was performed in
17 making the decision to hire Ms. Hunter as a
18 full-time employee?
19    A. We will do a background check from
20 a company called preemployment.com who will
21 verify Social Security for us, Social Security
22 numbers and accounting. They'll do a credit
23 check, because they'll possibly be handling
24 money transactions or something, and criminal
25 background.

Page 149

1    Q. Is it Mobis's policy and/or
2  practice in hiring salaried employees for the
3  accounting department to do any type of
4  employment background check?
5    A. Just to verify their employment at
6  other agencies. Multi-Staffing had actually
7  done that. And so they -- they did, I
8  believe, reference checks. They generally do
9  reference checks, at least two.
10    Q. All right. For employees that
11 come -- for salaried employees coming into
12 accounting that are coming to you not from
13 Multi-Staffing but are straight application to
14 Mobis, is it Mobis's policy and/or practice to
15 do any type of employment background check?
16    A. Not at the time that Ms. Hunter was
17 hired, but today we do.
18    Q. How many employees have been
19 terminated by Mobis in 2007?
20    A. I have no idea.
21    Q. A lot, a little? We can stick with
22 those terms. How is that?
23    A. I don't know. I really do not
24 know.
25    Q. As -- in your role in human

38 (Pages 146 to 149)

Deposition of TRACY RIEDLER
January 31, 2008

Page 150

1  resources, do you have to be the final sign-
2  off on any termination?
3      A. Yes.
4      Q. So all terminations would cross
5  your desk?
6      A. Yes.
7      Q. And you have the ultimate authority
8  of approving them?
9      A. Yes.
10     Q. Based on your knowledge, have any
11 employees been terminated because there was
12 inaccurate information on their job
13 application?
14     A. I don't recall.
15     Q. So sitting here today, you can't
16 recall terminating anyone for inaccurate
17 information on their job application?
18     A. I don't recall doing that, no.
19     Q. Are you aware of any terminations
20 that would result in information that may have
21 been learned about that employee's prior
22 employment? In other words, you found out
23 they had been fired from another job or had
24 attendance issues at another job?
25     A. I don't recall that as well.

Page 151

1      Q. Can you recall any employees being
2  terminated because Mobis learned they had
3  attendance problems at prior jobs?
4      A. No.
5      Q. Have you learned anything through
6  this lawsuit that had you known during
7  Ms. Hunter's employment you felt would have
8  led to her termination?
9      A. Say that one more time, please.
10     Q. Sure. Assuming that Ms. Hunter's
11 employment had continued with Mobis, have you
12 learned anything in this lawsuit that would
13 have justified her termination?
14     We're not talking about the reasons
15 you fired her. Did you learn anything through
16 discovery that had you known you would have
17 fired her?
18     A. Other than attendance, no.
19     Q. When you say other than attendance,
20 do you mean her attendance at Mobis?
21     A. Her attendance at Mobis.
22     Q. Okay.
23     A. That's correct.
24     Q. And all the facts relating to her
25 attendance at Mobis were known to you at the

Page 152

1  time of her termination?
2      A. At the time that she was
3  terminated, yes. I found out just before.
4      Q. I'm not trying to be tricky.
5  There's a defense that's been pled in this
6  case, and that's where those facts are going,
7  related to that.
8      In this case, the defendant has
9  pled in its thirteenth defense to the extent
10 that the plaintiff's claims have been waived,
11 are you aware of any waiver Ms. Hunter has
12 made of her claims?
13     Has she signed any type of release
14 or agreed not to sue for pregnancy
15 discrimination?
16     MR. BARNETT: We'll stipulate that
17 she hasn't.
18     Q. I'm going to go through a few more
19 of these. This is just something -- this is
20 something we have to do as lawyers to limit
21 the scope of where we're looking.
22     The fifteenth defense pled was, The
23 plaintiff complains about decisions made by
24 different decision-makers.
25     Was there anyone involved in the

Page 153

1  decision to terminate Ms. Hunter other than
2  you and/or Mr. Kim?
3      A. No.
4      Q. In this case, did the same person
5  make the decision to hire Ms. Hunter and fire
6  Ms. Hunter?
7      A. No.
8      Q. Now, in the big stack of documents
9  we put in front of you, behind the first sheet
10 is a chart that is made in response to
11 interrogatory number seven. Do you know who
12 created that chart?
13     A. Are you talking about this one?
14     Q. Yes, ma'am. It's of terminated
15 employees.
16     A. No, I don't know who made this one.
17     Q. Do you know where the information
18 contained on that chart came from?
19     A. That would have actually come from
20 us, from HR.
21     Q. Would it likely have come from
22 personnel files?
23     A. Yes.
24     Q. All right. Would you agree with me
25 that with the exception of Ms. Hunter's

39 (Pages 150 to 153)

Deposition of TRACY RIEDLER
January 31. 2008

Page 154

1  personnel files, the documents relating to the
2  termination of those other employees have not
3  been produced to me?
4      A.  Yes.
5      Q.  So I would have no way of knowing
6  whether the information contained on that
7  chart is accurate, correct, other than just
8  trusting you?
9      A.  I suppose.
10     Q.  All right.  And from that chart, I
11 would have no way of knowing the circumstances
12 surrounding the terminations of the other
13 three employees?
14     MR. BARNETT:  You're not
15 suggesting you requested those files, are you?
16     MS. LEONARD:  No.  I just --
17     MR. BARNETT:  Okay.
18     MS. LEONARD:  You wouldn't give
19 them to me even if I had.
20     Q.  But you would agree with me that
21 based on the information contained in that
22 chart, I have no way of knowing the
23 circumstances surrounding the terminations of
24 those other employees?
25     A.  Correct.

Page 155

1      Q.  Who made the decision to fire the
2  other three employees identified on the chart,
3  which is Bates number 2, which was produced in
4  response to interrogatory seven?
5      A.  Actually, I think it's Bruce
6  DeWalt.  And he actually did not return at
7  first from a -- from his FMLA.  He had
8  exhausted his FMLA.
9      Q.  All right.
10     A.  And then Ms. Brewer actually left.
11 She was not terminated.  She voluntarily
12 left.  Ms. Merz was due to attendance.
13     Q.  I'm going to give you a sticker
14 since you're referring to it.  I'm going to
15 refer to that as Plaintiff's Exhibit 9.
16     (Plaintiff's Exhibit Number 9 was
17     marked for identification.  A copy
18     is attached.)
19     Q.  Who made the decision to terminate
20 Ms. Merz?
21     A.  After we verified her attendance
22 with her supervisor, myself.
23     Q.  All right.  When you say yourself,
24 were you just affirming the decision
25 recommended by the supervisor, or did you make

Page 156

1  the decision independent of the supervisor?
2      A.  No, affirming.
3      Q.  Was your role in Ms. Merz's
4  termination any different than your role in
5  Ms. Hunter's termination?
6      A.  In the sense that in Ms. Hunter's,
7  I was the decision-maker.  And Ms. Merz, I was
8  the final sign-off on hers.  She actually did
9  not return because she knew she had exhausted
10 her amount of absenteeism, if you will, that
11 is allowed.
12     Q.  All right.
13     A.  So hers was not a formal
14 termination.
15     Q.  Almost done.  Do you know an
16 employee named Latoya Williams?
17     A.  That name sounds familiar.
18     Q.  Do you know if she was hired to
19 work in the accounting department through
20 Multi-Staffing?
21     A.  I couldn't recall.
22     Q.  So you basically don't know who she
23 is?
24     A.  It sounds like a familiar name, but
25 I'd have to verify that.

Page 157

1      MS. LEONARD:  If you can give me
2  just a second to talk to my client, we may be
3  done.
4      (Break taken.)
5      Q.  Now, there are a lot of documents
6  in front of you.  Are you aware of any
7  documents beyond those that are in front of
8  you that have been produced to me that relate
9  to Ms. Hunter's employment with Mobis or her
10 termination?
11     A.  No, I'm not aware of anything.
12     Q.  Have you told me everything that
13 you can recall surrounding the circumstances
14 of Ms. Hunter's termination?
15     MR. BARNETT:  Well, I object to
16 that.
17     A.  You've asked a lot of questions.
18     MR. BARNETT:  You haven't asked her
19 any questions about the actual termination.
20     Q.  All right.  Well, tell me about her
21 actual termination.
22     THE WITNESS:  Thanks, Henry.  Like
23 I needed another question.
24     MR. BARNETT:  Well, I mean, I just
25 want to be fair.

40 (Pages 154 to 157)

Deposition of TRACY RIEDLER
January 31, 2008

Page 158

1  A. The day of her termination, my
2  understanding was, in listening to
3  Ms. Hunter's testimony yesterday, she had said
4  that she wanted to talk to Sonechka and Jay
5  Kim in private on the 25th of August. And so
6  it was a meeting that she, Ms. Hunter, had
7  initiated.
8  So the three of them, Jay,
9  Sonechka, and Tarsha actually met in Jay Kim's
10  office. And I was not a part of that
11  initially.
12  The meeting, from what I
13  understand, went on for maybe half an hour.
14  Q. When you say from what you
15  understand, what is your source of information
16  from what transpired in that termination
17  meeting or in that meeting before you got
18  there?
19  A. And I actually think I found that
20  out in the meeting. You know, I basically
21  had -- had entered a meeting that's been going
22  on for some time. And my recollection is that
23  it's been -- you know, I was told that it's
24  been going on approximately that long.
25  Q. Who told you what transpired in the

Page 159

1  meeting before you became present there?
2  A. Okay. I was in my office, and Ho
3  Sang Hwang who at the time was an assistant
4  manager -- excuse me, he was accounting
5  manager in the department. And he came down
6  to my office and he said, Please come to Jay's
7  office. He needs your help
8  I said, What's going on?
9  Ho Sang said that Tarsha and
10  Sonechka were in his office and the meeting
11  was getting rather loud and he needed my help.
12  Q. Okay.
13  A. So I went down to Jay's office
14  immediately. And the three of them were in
15  the meeting.
16  And when I first walked in, I
17  believe Tarsha was actually talking. I cannot
18  remember exactly what she was saying, but, you
19  know, basically I said, you know, What's going
20  on? I had no idea a meeting was going on.
21  And I think that Tarsha said, Jay
22  is terminating me but he won't give me a
23  reason why.
24  So I said, Well, I'm sorry,
25  Tarsha. I actually -- during your ninety-day

Page 160

1  probationary period -- are you aware of the
2  policy? And I quoted the policy basically
3  about the three occurrences. And she said
4  that she was aware of the policy, but she
5  didn't feel that that was the reason for her
6  termination.
7  She was visibly agitated during
8  the -- during the meeting. And so, you know,
9  I just basically told her, you know, that I
10  was sorry but that we had to be consistent
11  with that policy. She said that she was
12  familiar with it but still didn't believe that
13  that was what the reason was.
14  Q. Anything else you recall about the
15  termination meeting?
16  A. No. And basically, I was only in
17  there for a couple of minutes. So, you know,
18  I told her that it was time to leave. She
19  left quietly. I had her gather her things and
20  then she left.
21  Q. Did Ms. Hunter communicate what she
22  felt the reason was behind her termination?
23  A. I can't remember in detail actually
24  what was discussed during that time, whether
25  she even mentioned -- whether she mentioned

Page 161

1  pregnancy or anything else. I'm not sure. I
2  can't recall.
3  Q. Who is Ho Sang Hwang?
4  A. He was the accounting manager.
5  Q. Does he still work for Mobis?
6  A. No.
7  Q. Where does he work now?
8  A. I don't know. I think he moved to
9  San Francisco.
10  Q. Do you have an address for him such
11  that if I requested it, I would be able to
12  find out his last available address and phone
13  number?
14  A. I would have to check our database.
15  Q. Do you know if Mr. Hwang has given
16  any type of statement relating to what
17  happened during Ms. Hunter's termination
18  meeting?
19  A. I have no idea.
20  Q. Do you know if he's given any type
21  of statement relating to Ms. Hunter's
22  employment?
23  A. I don't know.
24  Q. When did his employment with Mobis
25  end?

41 (Pages 158 to 161)

Deposition of TRACY RIEDLER
January 31. 2008

Page 162

1    A. I don't recall exactly.
2    Q. Did it end within the last year?
3    A. It had to be a little longer than a
4 year.
5    Q. So sometime late --
6    A. His replacement has been here
7 already a year. So --
8    Q. So maybe sometime late in 2006, his
9 employment ended?
10    A. Correct.
11    Q. Did his employment end voluntarily?
12    A. Yes.
13    Q. Why did Sonechka Womack's
14 employment with Mobis end?
15    A. She voluntarily left. I can't
16 remember the exact date, but it was 2007. And
17 she has actually changed occupations.
18    Q. Have you told me everything that
19 you can recall which relates to the reason
20 supporting Tarsha Hunter's termination?
21    A. Yes.
22    Q. Have you told me everything you can
23 recall surrounding the circumstances of her
24 termination?
25    A. Yes.

Page 163

1    Q. Is there anything in your testimony
2 in which you would like to change, modify,
3 clarify, or add to?
4    A. I don't believe so.
5    MS. LEONARD: Then I am done.
6    MR. BARNETT: I have a few.
7
8        EXAMINATION
9 BY MR. BARNETT:
10    Q. Tracy, you were asked some
11 questions about repeat offenders with respect
12 to discriminators at Mobis. Do you remember
13 those questions?
14    A. What would happen to somebody who
15 had --
16    Q. Well, do you remember being asked
17 about repeat offenders?
18    A. I mean, I remember -- I remember a
19 question earlier today about if someone were
20 to discriminate.
21    Q. Right.
22    A. You know, and I guess multiple
23 times. I don't remember the repeat offender.
24    Q. Has Mobis, to your knowledge, ever
25 had a person who discriminated on more than

Page 164

1 one occasion?
2    A. No.
3    Q. What would Mobis's reaction be if
4 they discovered that they did have a repeat
5 offender, somebody that had discriminated on
6 impermissible bases more than once?
7    A. They would be terminated.
8    Q. You were asked questions about
9 investigating Nicole Boswell's apparent
10 statement about the young Korean woman that
11 worked at Mobis in accounting?
12    A. Uh-huh.
13    Q. When did you first learn that
14 Nicole Boswell had allegedly found out or
15 overheard a conversation about that young
16 woman?
17    A. Yesterday afternoon.
18    Q. When?
19    A. Yesterday afternoon.
20    Q. In terms of the personnel documents
21 that we have produced, I'm going to ask you if
22 all of the documents that we've produced as a
23 personnel file were actually maintained in the
24 human resources office?
25    A. Human resources actually does not

Page 165

1 keep absence records on salaried employees.
2 That is actually maintained -- if a manager or
3 supervisor keeps absenteeism records, they
4 keep those in a separate file, and they are
5 not made available to human resources.
6    As a matter of fact, I'm not even
7 aware they keep them -- until this.
8    MR. BARNETT: What I'm saying for
9 the record, Heather, is we produced a pile of
10 documents, and not all of them came from the
11 human resources department.
12    MS. LEONARD: My main concern is, I
13 don't want to get surprised by documents
14 later. I want to make sure I've got them all.
15    THE WITNESS: I don't have anything
16 else.
17    MR. BARNETT: I'll be happy to tell
18 you after the deposition or now which ones
19 weren't in the human resources department.
20 But I just don't want there to be any --
21    MS. LEONARD: That's all right. My
22 questions are more concerned with making sure
23 I have everything I'm supposed to have.
24    Q. You were asked for accommodation
25 for ADA cases, I believe, in connection with

42 (Pages 162 to 165)

Page 166

1   probationary employees. Do you remember that?
2      A. Uh-huh.
3      Q. Have you ever been asked for an
4   accommodation under the ADA for a probationary
5   employee?
6      A. No.
7      Q. What would you do if you were asked
8   for that?
9      A. I mean, we have to -- on ADA, you
10  need to look at though on a case-by-case
11  basis.
12        MR. BARNETT: That's all.
13        MS. LEONARD: Nothing from me.
14
15     Deposition of TRACY RIEDLER
16       Concluded at 2:34 p.m.
17         January 31, 2008
18
19
20
21
22
23
24
25

Page 167

1        C E R T I F I C A T E
2
3
4   STATE OF ALABAMA  )
5   JEFFERSON COUNTY  )
6
7        I hereby certify that the above and
8   foregoing deposition was taken down by me in
9   stenotype, and the questions and answers
10  thereto were reduced to computer print under
11  my supervision, and that the foregoing
12  represents a true and correct transcript of
13  the deposition given by said witness upon said
14  hearing.
15
16        I further certify that I am neither
17  of counsel nor of kin to the parties to the
18  action, nor am I in anywise interested in the
19  result of said cause.
20
21
22
23
24        Elaine Scott, ABCR 354

EDMONDSON REPORTING & VIDEO, INC.
Email: Edmondsonrpting@bellsouth.net     Phone 205.324.2333  Fax 205.324.2377

## Progressive discipline

non-Attendance related issues
Hourly employees only
probation/non probation employees

## Attendance

Attendance issues only
Hourly employees only
non-probationary employees

PLAINTIFF'S
EXHIBIT

FENGAD 800-631-6989

**2006 Absense Record - Tarsha Hunter**

| Date | # of Days | Hrs taken | Accum. Hrs | Note |
|---|---|---|---|---|
| 06/15/2006 | 1 | 8 | 8 | Sick |
| 07/25/2006 | 1 | 3.5 | 11.5 | Doctor's appointment |
| 07/27/2006 | 1 | 3.5 | 15 | Doctor's appointment |
| 07/31/2006 | 1 | 6 | 21 | Sick |
| 08/01/2006 | 1 | 8 | 29 | Sick |
| 08/11/2006 | 1 | 4 | 33 | Doctor's appointment |
| 08/14/2006 | 1 | 4 | 37 | Doctor's appointment |

PLAINTIFF'S
EXHIBIT

PENGAD 800-631-6989

HUNTER V. MOBIS
00115

**MONTHLY COST OF BENEFITS**

|                     | Employee |       | Employer |        |
|---------------------|----------|-------|----------|--------|
| Medical             | $        | 15.00 | $        | 212.00 |
| Dental              | $        | 10.00 | $        | 9.46   |
| Basic Life          | $        | -     | $        | 9.91   |
| LTD                 | $        | -     | $        | 7.34   |
| Optional Life Self  | $        | 1.20  | $        | -      |
| Optional Life Child | $        | 1.23  | $        | -      |
|                     | $        | 27.43 | $        | 238.71 |



PLAINTIFF'S
EXHIBIT
3

PENGAD 800-631-6989

**HUNTER V. MOBIS**
**00004**

## 2006 Vacation Status - Tarsha Hunter

| Date | # of Days | Hrs taken | Given | Available |
|------|-----------|-----------|-------|-----------|
| 01/13/2006 | 1 | 4 | 96 | 92 |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | 0 |
| | | | | 0 |
| | | 4 | | |

## 2006 Absense Request - Tarsha Hunter

| Date | # of Days | Hrs taken | Accum. Hrs | Note |
|------|-----------|-----------|------------|------|
| 06/15/2006 | 1 | 8 | 8 | Sick |
| 07/25/2006 | 1 | 3.5 | 11.5 | Doctor's appointment |
| 07/27/2006 | 1 | 3.5 | 15 | Doctor's appointment |
| 07/31/2006 | 1 | 6 | 21 | Sick |
| 08/01/2006 | 1 | 8 | 29 | Sick |
| 08/11/2006 | 1 | 4 | 33 | Doctor's appointment |
| 08/14/2006 | 1 | 4 | 37 | Doctor's appointment |



PLAINTIFF'S
EXHIBIT
4

PENGAD 800-631-6989

HUNTER V. MOBIS
00179

**tracy.riedler@mobis-america.com**

| | |
|---|---|
| **From:** | tracy.riedler@mobis-america.com |
| **Sent:** | Wednesday, August 23, 2006 4:13 PM |
| **To:** | 'Jay Kim' |
| **Subject:** | RE: 90 DAY Work Performance Review Sheet |

**Tracking:** Recipient Read

'Jay Kim'    Read: 8/23/2006 4:29 PM

Sounds good.  I will wait to hear word from you.

**From:** Jay Kim [mailto:jay.kim@mobis-america.com]
**Sent:** Wednesday, August 23, 2006 3:24 PM
**To:** tracy.riedler@mobis-america.com
**Subject:** RE: 90 DAY Work Performance Review Sheet
**Importance:** High

Tracy,
I am contacting headquarters to cancel my business trip to Korea due to purchasing member's interest from C & A.
But, I am not sure that they would approve it or not.
I need to contact them this evening again.

My concerning for termination of Tarsha is Sonechka wants to keep her.
Because of she might be not like any kind of changes.
Then I do not want to take care of Tarsha anymore.
If I will be stayed in the next week, I need your help to terminate her.
I will let you know whether I am available or not.

Thanks.

**From:** tracy.riedler@mobis-america.com [mailto:tracy.riedler@mobis-america.com]
**Sent:** Wednesday, August 23, 2006 10:20 AM
**To:** 'Jay Kim'
**Subject:** 90 DAY Work Performance Review Sheet
**Importance:** High

Here is the 90 Day Performance Review Form.  Please make comments, sign and return to me.  Do you want to terminate her prior to your trip to Korea?  You will interview two Accounting candidates this week.  Please let me know and I will help you with the termination meeting.



PLAINTIFF'S
EXHIBIT
5

PENGAD 800-631-6989

HUNTER V. MOBIS
00198

ALABAMA DEPARTMENT OF INDUSTRIAL RELATIONS
UNEMPLOYMENT COMPENSATION DIVISION

**IMPORTANT NOTE:** If your response is not received by 10/19/06 a determination may be made based solely on information furnished by the claimant.

B241F

    

# NOTICE OF CLAIM AND REQUEST FOR SEPARATION INFORMATION

Return to:

MOBIS AMERICA INC
MOBIS ALABAMA LLC
1395 MITCHELL YOUNG RD
MONTGOMERY AL 36102

ADJUDICATION SUPPORT
ROOM 3438
649 MONROE STREET
MONTGOMERY, AL 36131
FAX NUMBER 334 353-1265

The individual identified below has filed a claim for Unemployment Compensation benefits.

1. CLAIMANT'S NAME: HUNTER/TARSHA NICK
2. SOCIAL SECURITY NO: 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
3. CLAIM DATE: 10/08/06
4. ACCT NUMBER: 0029680302

5. DATE MAILED: 10/11/06
6. EFFECTIVE DATE: 10/08/06
7. CALL-CENTER: 6001
8. TYPE OF CLAIM: N-01

The claimant identified you as his/her last employer and alleges the reason for separation to be:
LDW 08/25/06
48    NO REASON GIVEN CLAIMANT

EMPLOYER RESPONSE (INSTRUCTIONS FOR COMPLETION ON REVERSE)

9. Claimant's last day employed was _____
   (If temporary layoff, enter expected date of recall: _____

10. If the claimant earned wages or was paid vacation and/or sick pay or will receive a pension upon termination with you **on or after the date shown in item #6.** above, complete the applicable space(s) below:
    a. GROSS WAGES    for hours worked. (AFTER DATE IN #6) $ _____

    b. HOLIDAY $ _____ paid for which holiday ? _____
    c. VAC, SICK $ _____ Was vacation pay for a specific time period following separation ?
    (circle one) Yes  No If Yes what was the period ? _____ to _____
    d. WARN PAY $ _____ paid for period _____ to _____
    e. PENSION $ _____ per month.  Effective date: _____

11. DISCHARGED. What was the date of the final incident that caused the discharge: _____

12. WARNING FOR SAME OR SIMILAR INCIDENT :(CIRCLE ONE)  YES  NO  WARNING DATE: _____

13  QUIT: Date quit _____ Reason for quit _____
14. REASON FOR SEPARATION: (ATTACH ADDITIONAL SHEET IF NECESSARY)
_____
_____
_____

15. Enter your federal identification number: _____

_____        _____        _____  _____
Print Name                     Title                  Telephone No.      Date

PENGAD 800-631-6989
PLAINTIFF'S
EXHIBIT
6

HUNTER V. MOBIS
00162

12-13-2008 12:57 WILLIE & CAROLYN MORRRSI 5016534614 Case 2:07-cv-00427-WHA-TFM Document 22-10 Filed 04/22/2008 Page 50 of 63

AT-107

# STATE OF ALABAMA
## DEPARTMENT OF INDUSTRIAL RELATIONS
## HEARINGS AND APPEALS DIVISION
## MONTGOMERY, ALABAMA 36130



## DECISION ON UNEMPLOYMENT COMPENSATION CLAIM

**CLAIMANT**

TARSHA NICKOL HUNTER
4100 B PERDIDO DR
MONTGOMERY AL 36110

**EMPLOYER**

MOBIS AMERICA INC
MOBIS ALABAMA LLC
1395 MITCHELL YOUNG RD
MONTGOMERY AL 36102

**APPELLANT** : EMPLOYER
**LOCATION** : MONTGOMERY
           (TELEPHONE)
**OC NO.** : 00-70

**DATE MAILED** : 12/05/06
**CASE NO.** : 13143-AT-06
**S. S. NO.** : 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
**HEARING DATE** : 11/27/06

**APPEARANCES AT THE HEARING:** Employer representative

**ISSUE(S):** Discharge from most recent bona fide work for actual or threatened deliberate misconduct committed in connection with work after previous warnings. Section 25-4-78(3)(b) Code of Alabama 1975

Discharge from most recent bona fide work for misconduct committed in connection with work. Section 25-4-78(3)(c) Code of Alabama 1975

**FINDINGS:** This employer, with whom the claimant had most recent bona fide work, appealed an Examiner's determination on a claim for unemployment benefits.

The claimant worked for the listed employer from March 1, 2006, until August 25, 2006, and last worked as a support account staff member. The employer has a no fault attendance policy. The claimant was given a handbook during orientation when hired. The handbook included the policy to report off to management one hour prior to the beginning of her shift when absent. She was absent on August 14, 2006, for a doctor's appointment. The employer had not knowledge as to whether or not she reported off according to policy and had no knowledge whether or not she had been granted prior approval for the absence. She had received a verbal warning on July 26, 2006, for an attendance violation. She was discharged as a result of this incident.

**CONCLUSIONS:** Section 25-4-78(3)(b) of the Law requires a disqualification if an individual is discharged from her most recent bona fide work for actual or threatened misconduct committed in connection with her work repeated after previous warning. "Misconduct" is defined as conduct evincing a deliberate, willful, or wanton disregard of an employer's interests or of the standards of behavior which he has a right to expect of his employee. An employer has a right to reasonably expect an employee to work as scheduled unless there is a justifiable or compelling reason with proper notification to the employer. The preponderance of evidence based solely on the employer's sworn

PLAINTIFF'S
EXHIBIT

7

PENGAD 800-631-6989

testimony showed the claimant was discharged for absenteeism. The evidence shows she had been previously warned for the same or similar offense. The evidence does not show she committed misconduct connected with the work repeated after previous warning. Therefore, she is not subject to a disqualification under the provisions of this section of Law.

Section 25-4-78(3)(c) of the Law requires a disqualification if an individual is discharged from her most recent bona fide work for misconduct committed in connection with her work. The preponderance of evidence shows the claimant was discharged for misconduct connected with the work repeated after previous warning. Therefore, she is not subject to a disqualification under the provisions of this section of Law.

**DECISION:** The Examiner's determination is affirmed. The claimant is eligible for benefits. The employer's experience rating account is chargeable for this period of employment.

No disqualification is imposed under the provisions of Section 25-4-78(3)(c) of the Law.

**APPEAL RIGHTS:** This decision becomes final unless an application for leave to appeal to the Board of Appeals is received in writing at the Department address above or by fax at 334-242-0539 on or before the **FINAL DATE OF December 20, 2006**.

Patricia D. Moore
Administrative Hearing Officer

PDM/ars

FRANK H. McFADDEN
JOHN F. ANDREWS
WILLIAM D. COLEMAN
WILLIAM K. MARTIN
GEORGE L. BECK, JR.
BRUCE J. DOWNEY III
HENRY C. BARNETT, JR.
K. PALMER SMITH
ROBERT T. MEADOWS III
HENRY H. HUTCHINSON
SHAPARD D. ASHLEY
D. KYLE JOHNSON
ROBERT F. NORTHCUTT

JAM    S. WALTER, JR.
JAMES H. McLEMORE
CONSTANCE SMITH BARKER
W. HOLT SPEIR III
CHRISTOPHER W. WELLER
DEBRA DEAMES SPAIN
C. CLAY TORBERT III
R. BROOKE LAWSON III
J. SCOTT PIERCE
ROBERT D. RIVES
RICHARD H. ALLEN
M. COURTNEY WILLIAMS

LEE M. RUSSELL, JR.
CHAD W. BRYAN
MICHAEL P. DALTON
CATY HOUSTON RICHARDSON
ARDEN REED PATHAK
TERRIE SCOTT BIGGS

OF COUNSEL:
JAMES M. SCOTT
THOMAS S. LAWSON, JR.

# CAPELL & HOWARD P.C.
### ATTORNEYS AT LAW

November 16, 2006

Ms. Rita Sterling, Investigator
U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
Birmingham District Office
Ridge Park Place, Suite 2000
1130 22nd Street, South
Birmingham, AL 35205

> **RE:** **Charging Party:** *Tarsha Hunter*
> **Respondent:** *Mobis Alabama, LLC*
> *EEOC Charge No. 420-2006-04825*
> **Our File No.: 25503-008**

Dear Ms. Sterling:

## INTRODUCTION

This letter is in response to the EEOC Charge of Discrimination filed by Tarsha Hunter against MOBIS Alabama, LLC. The Charge is based on Title VII of the Civil Rights Act of 1964.

MOBIS Alabama, LLC ("MOBIS") maintains its principal place of business at 1395 Mitchell Young Road, Montgomery, Alabama. MOBIS is a first-tier supplier to Hyundai Motor Manufacturing Company ("HMMA"). As such, MOBIS manufactures certain original equipment automotive components for use by Hyundai at its vehicle final assembly plant, also located in Montgomery. MOBIS commenced operations in 2005. MOBIS is an equal opportunity employer and maintains written polices prohibiting discrimination on the basis of sex or pregnancy.

Charging Party was employed by MOBIS in its Accounting Department as an Accounting Specialist. Her supervisor was Sonechka Womack, MOBIS' Assistant Manager of Treasury. Womack reports to J. Kim, MOBIS' Chief Financial Officer.

MOBIS hired Charging Party on June 5, 2006 as a probationary employee. MOBIS terminated Charging Party's employment on August 25, 2006 near the end of her 90 day probationary period.

PLAINTIFF'S
EXHIBIT

PENGAD 800-631-6989

MONTGOMERY • OPELIKA / AUBURN

150 SOUTH PERRY STREET (36104), POST OFFICE BOX 2069, MONTGOMERY, ALABAMA 36102-2069
334 241 8000 *tel*    334 323 8888 *fax*    www.capellhoward.com

Ms. Rita Sterling, Investigator
EEOC Charge No. 420-2006-04825
Page 2 of 4

---

## STATEMENT OF THE FACTS

Charging Party first worked at MOBIS as a temporary employee in the accounting department under the supervision of Ms. Womack. Her start date was in April, 2006. Charging Party demonstrated poor attendance and dependability. For this reason, Mr. Kim delayed offering her employment with MOBIS. He had several conversations with Charging Party and Ms. Womack about Charging Party's dependability problems. Charging Party assured Mr. Kim that her attendance would improve if MOBIS hired her. Mr. Kim decided to offer employment to Charging Party, but told her that he would continue to monitor her attendance (*see* Ex. A).

All MOBIS employees are hired on probationary status. The terms and conditions of the ninety (90) day probationary period are stated in MOBIS' employee handbook (*see* "the Policy" attached hereto as Ex. B). During the probationary period, MOBIS, closely evaluate a person's skills, abilities and overall suitability to successfully perform the functions of the job. The new employee also has an opportunity to learn more about the company and what is expected of him/her. Attendance is one of the primary factors MOBIS evaluates during the probationary period.

MOBIS' Policy provides that any probationary employee who has three (3) absenteeism occurrences (*i.e.* an absence, tardy, or early departure from work) during the first ninety (90) days of employment will be terminated. Charging Party had seven attendance incidents in the first sixty (60) days of her employment (*see* Ex. C).

Charging Party's poor attendance caused problems for the accounting department. Her work was not getting done on time and others, including her supervisor, had to pick up the slack. In addition, Mr. Kim did not believe that Charging Party's work ethic or her interaction with others in the department was satisfactory.

For these reasons, Mr. Kim terminated Charging Party's employment on August 25, 2006 (Charging Party's probationary period would have expired week later on September 2, 2006) (*see* Ex. A).[1]

## MOBIS' RESPONSE TO THE SPECIFIC
## OF THE CHARGE

Some specific aspects of Charging Party's Charge of Discrimination necessitate rebuttal. Most important, is Charging Party's allegation that Mr. Kim terminated her because she was

---

[1] It is not uncommon at MOBIS for probationary employees to be terminated before the expiration date of their probationary period. In fact, the Policy encourages supervisors to proceed with termination during the 90 day period if it becomes apparent that regular employment will not be offered.

Ms. Rita Sterling, Investigator
EEOC Charge No. 420-2006-04825
Page 3 of 4

pregnant. This is not possible because Mr. Kim had communicated his decision not to offer Charging Party regular employment to MOBIS Sr. Human Resources Manager, Tracy Riedler, before he became aware of Charging Party's pregnancy.[2]

Charging Party also alleges that Mr. Kim communicated with her through her supervisor Womack after she became pregnant. MOBIS can demonstrate conclusively that Mr. Kim's regular preference is to communicate with employees in the accounting department through their supervisor when practical. In other words, Mr. Kim, who believes in formality in business discourse, routinely communicates with the employees in his department through their supervisors rather than directly. Nothing changed in that regard after Mr. Kim learned of Charging Party's pregnancy.

Finally, Charging Party makes reference to Mr. Kim's use of the phrase that he "can't take care of a person like [Charging Party]." Mr. Kim uses that phrase to convey that he expects his staff to handle their responsibilities without unnecessarily involving him or others. It is Mr. Kim's way of saying that he does not need an employee who is not generally self sufficient, and frequently necessitates his involvement and that of other departmental employees.

## OTHER RELEVANT CONSIDERATIONS

Charging Party was a salaried employee therefore, she did not punch a time clock. Rather, her attendance was tracked manually by her supervisor. Under this system, it is not unusual for attendance problems of salaried probationary employees to be addressed after the maximum of three (3) instances has been exceeded. In this case, Charging Party had seven (7) instances in a period of just two (2) months.

MOBIS' no fault Policy on attendance for probationary employees is not discriminatory with respect to pregnancy. Pregnancy is treated the same as any other illness or medical condition. In other words, Charging Party would have been treated the same if her absences were due to some other illness or medical condition. Once an employee becomes eligible for FMLA leave, he or she becomes entitled to all of the rights and benefits afforded by that statute.[3]

## CONCLUSION

In conclusion, MOBIS terminated Charging Party's employment for reasons which are objectively legitimate, nondiscriminatory and non-pretextual. Charging Party's attendance and dependability were not acceptable while she was a temporary employee. As a result, Mr. Kim

---

[2]  Consequently, Charging Party's pregnancy could not have motivated Mr. Kim's decision.

[3] MOBIS' attendance Policy for regular employees is likewise "no fault." Such employees must maintain 98% attendance irrespective of the reasons for their absences.

Ms. Rita Sterling, Investigator
EEOC Charge No. 420-2006-04825
Page 4 of 4

delayed offering Charging Party employment. After several counseling sessions with Charging Party and her supervisor, Charging Party was offered employment on the condition that her attendance and dependability improve during her probationary period. Charging Party assured Mr. Kim that this would be the case. Charging Party's attendance and dependability did not improve. Charging Party had more than twice the allowable attendance incidences in a period of just two (2) months. Moreover, Mr. Kim determined that her interaction with other departmental employees was not suitable. For these reasons, MOBIS terminated Charging Party's employment.

Mr. Kim did learn of Charging Party's pregnancy shortly before Charging Party was terminated, but Mr. Kim had already made the decision to terminate Charging Party, and communicated that decision to MOBIS' Sr. Human Resources Manager well before he was aware of Charging Party's pregnancy. Consequently, it is not possible that Charging Party's pregnancy was a motivating factor in Mr. Kim's decision.

MOBIS respectfully submits that this Charge is due to be dismissed without a finding of discrimination.

Yours very truly,

Henry C. Barnett, Jr.

HCB,jr/mmc
Enclosure
cc:    Ms. Tracy Riedler

1079733

# EXHIBIT "A"

## 90 DAY WORK PERFORMANCE REVIEW SHEET

Team Member Name    Tarsha Hunter

Title    Accounting Specialist

Department    Accounting and Finance

Division    Module

Manager/Supervisor    Sonechka Womack

Date of Hire    06/05/06

Date 90 Day Probationary Period Expires    09/02/06

**Check One**

_____ **A:**    **The employee has successfully passed the probationary period for their present job.**

❖ Attendance is satisfactory. How many days has the team member been absent, late or left early?

_____

❖ What are the team member's strengths?

_____

❖ What are areas the team member could improve on?

_____

**X** **B:**    **The employee should be terminated based on unsatisfactory performance.**

❖ Explain why you recommend termination

Tarsha's attendance and dependability was unstable while she was a temporary employee. I delayed hiring her for this very reason. I had several conversations with Tarsha and her supervisor expressing my concern. Tarsha ensured me this problem would not continue after she was hired. I told her that I would continue to evaluate her performance, to include attendance, during her 90 day probationary period. She has not improved. Her mannerism is not congenial to our department. And her lack of dependability has placed strain on our department as when she is not here her work must be performed by her supervisor who has responsibilities of her own. I cannot continue with this situation.

Supervisor/Manager Signature    _M. B. Ra_  8/25/06

Sr. Manager Human Resources    _____  8/25/06

Executive Vice President    _F. M. Rhys_  08-25-06

President    _____

# EXHIBIT "B"



# MOBIS Alabama, LLC

## ORIENTATION (PROBATIONARY) PERIOD
## POLICY AND PROCEDURES

1.    **PURPOSE**

1.1    It is our policy at MOBIS Alabama, LLC (MOBIS), to help all new Team Members feel a part of our company as quickly as possible and to help them learn more about MOBIS and what we expect from them as a member of our organization. If at any point during the first 90 days of employment, it becomes obvious that continued employment is pointless, the supervisor should recommend termination proceedings. Due to Alabama being an "employment at will" State, an employer can terminate with or without cause at any time. Ninety (90) days is an acceptable amount of time to be able to fairly evaluate a person's performance.

2.    **POLICY**

2.1    The first ninety (90) days of employment are considered an orientation period. This is a critical period in a Team Member's development and success with MOBIS. The orientation period is a trial period during which the supervisor will determine whether the Team Member has proved that he or she can handle their job satisfactorily.

2.2    There is no reason for the supervisor to endure 90 days of unsatisfactory progress on a new hire. At any point during the 90 days, if it becomes obvious that continued employment is pointless, the supervisor should recommend termination proceedings.

2.3    Before the end of the Team Member's orientation period, the HR Department will send the supervisor a Performance Review Sheet, on which the supervisor will indicate the Team Member status.

2.4    During this orientation period, any Team Member's who have three (3) absenteeism occurrences will be terminated. The occurrences can include a tardy, early out, and/or an all day absence. (03/21/05)

Effective Date:    07/20/04, 01/04/05, 03/21/05, 04/24/06
Revision Number:  1, 2, 3, 4
Policy:    Orientation (Probationary) Period





# MOBIS Alabama, LLC

## ORIENTATION (PROBATIONARY) PERIOD
## POLICY AND PROCEDURES

3.    **PROCEDURE**

3.1    The Supervisor must complete the Performance Review Sheet and return it to the HR Department prior to the end of the 90-Day Orientation Period.

3.2    This procedure does not alter the employment-at-will relationship. A Team Member can terminate his or her employment at any time with or without reason, and MOBIS has the same right.

Effective Date:    07/20/04, 01/04/05, 03/21/05, 04/24/06
Revision Number:  1, 2, 3, 4
Policy:              Orientation (Probationary) Period

# EXHIBIT "C"

### 2006 Absense Record  - Tarsha Hunter

| Date | # of Days | Hrs taken | Accum. Hrs |
|------------|-----------|-----------|------------|
| 06/15/2006 | 1 | 8 | 8 |
| 07/25/2006 | 1 | 3.5 | 11.5 |
| 07/27/2006 | 1 | 3.5 | 15 |
| 07/31/2006 | 1 | 6 | 21 |
| 08/01/2006 | 1 | 8 | 29 |
| 08/11/2006 | 1 | 4 | 33 |
| 08/14/2006 | 1 | 4 | 37 |

RESPONSE TO
INTERROGATORY NO. 7

| Last Name | First Name | Reason | Job | Employment Status | Date of Termination |
|---|---|---|---|---|---|
| Merz | Stephanie | Attendance | Procurement | Salary/Non-Exempt | 08/20/2007 |
| Hunter | Tarsha | Attendance | Accounting | Salary/Non-Exempt | 08/25/2006 |
| Brewer | Heidi | Attendance | Production Control | Salary/Non-Exempt | 03/02/2007 |
| Dewatt | Bruce | Attendance | Assembly | Salary/Non-Exempt | 05/29/2006 |



PLAINTIFF'S
EXHIBIT

PENGAD 800-631-6989

9

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

NORTHERN DIVISION

TARSHA NICKOL HUNTER,        )

    Plaintiff,        )

V.        )   CASE NO.

MOBIS ALABAMA, LLC,        )   2:07CV-427-WHA

    Defendant.        )

Deposition of JAY KIM

January 31, 2008

2:41 p.m.



**EDMONDSON**

Reporting & Video, Inc.

2119 3rd Avenue North, Suite 205
Birmingham, Alabama 35203

**CONDENSED TRANSCRIPT**

Deposition of JAY KIM
January 31, 2008

Page 2

1        S T I P U L A T I O N S
2
3        IT IS STIPULATED AND AGREED, by and
4   between the parties through their respective
5   counsel, that the deposition of JAY KIM may be
6   taken before Elaine Scott, Notary Public,
7   State at Large, at the offices of Capell &
8   Howard, 150 South Perry Street, Montgomery,
9   Alabama, on January 31, 2008, commencing at
10  approximately 2:41 p.m.
11
12        IT IS FURTHER STIPULATED AND AGREED
13  that the signature to and reading of the
14  deposition by the witness is NOT waived, the
15  deposition to have the same force and effect
16  as if full compliance had been had with all
17  laws and rules of Court relating to the taking
18  of depositions.
19
20        IT IS FURTHER STIPULATED AND AGREED
21  that it shall not be necessary for any
22  objections to be made by counsel to any
23  questions, except as to form or leading
24  questions, and that counsel for the parties
25  may make objections and assign grounds at the

Page 3

1   time of the trial, or at the time said
2   deposition is offered in evidence, or prior
3   thereto.
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 4

1        A P P E A R A N C E S
2
3        FOR THE PLAINTIFF:
4        HEATHER LEONARD PC
5          Heather Leonard
6          2108 Rocky Ridge Road
7            Suite 1
8        Birmingham, Alabama 35216
9
10       FOR THE DEFENDANT:
11         CAPELL & HOWARD
12       Henry C. Barnett, Jr.
13       150 South Perry Street
14       Montgomery, Alabama 36104
15
16         ALSO PRESENT:
17         Tarsha Hunter
18         Tracy Riedler
19
20         COURT REPORTER:
21         Elaine Scott
22       EDMONDSON REPORTING & VIDEO
23         2119 3rd Avenue North
24           Suite 205
25         Birmingham, Alabama 35203

Page 5

1        EXAMINATION INDEX
2
3   JAY KIM
4     BY MS. LEONARD . . . . . .   7
5
6   REPORTER'S CERTIFICATE . . . .  109
7
8
9        EXHIBIT INDEX
10  Plaintiff's
11  10    Absentee Request        18
12  11    E-mail            30
13  12    E-mails           36
14  13    Performance Review        57
15
16
17
18
19
20
21
22
23
24
25

EDMONDSON REPORTING & VIDEO, INC.
Email:  Edmondsonrpting@bellsouth.net          Phone 205.324.2333  Fax 205.324.2377

Deposition of JAY KIM
January 31, 2008

Page 6

```
 1        I, Elaine Scott, a court reporter and
 2  Notary Public for the State of Alabama, acting
 3  as commissioner, certify that there came
 4  before me at the law offices of Capell &
 5  Howard, 150 South Perry Street, Montgomery,
 6  Alabama, on January 31, 2008, beginning at
 7  2:41 p.m., JAY KIM, in the above cause, for
 8  oral examination, whereupon the following
 9  proceedings were had:
10
11            JAY KIM,
12        being first duly sworn,
13    was examined and testified as follows:
14
15        THE COURT REPORTER:  Usual
16  stipulations?
17        (Affirmed by counsel.)
18
19        MR. BARNETT:  Jay, you must give
20  verbal answers instead of motions so that she
21  can get down a word, yes or no, or a longer
22  answer.
23        THE WITNESS:  Okay.
24
25
```

Page 7

```
 1            EXAMINATION
 2  BY MS. LEONARD:
 3        Q.  Mr. Kim, my name is Heather
 4  Leonard, and I represent Tarsha Hunter in a
 5  lawsuit which she has brought against Mobis in
 6  which she alleges that she was terminated due
 7  to her pregnancy.  I'm going to be asking you
 8  some questions today relating to her claims as
 9  well as the defenses raised by Mobis.
10        Do you appreciate that the
11  testimony that you're giving today is being
12  given under oath subject to the penalty of
13  perjury just as if we were in a courtroom in
14  front of a judge and jury?
15        A.  I'm not really with you on the
16  whole -- you know, as you said, the whole
17  regulation or something.
18        Q.  Do you appreciate that you have to
19  tell the truth in this deposition today?
20        A.  Uh-huh.  Yes.
21        Q.  And that if you do not tell the
22  truth, that that would violate the law?
23        A.  Okay.
24        Q.  All right.  I know I tend to speak
25  softly and quickly as well as sometimes in
```

Page 8

```
 1  very poor English.  So if there are any
 2  questions which I ask you that you do not
 3  understand, can we agree that you'll tell me
 4  that you don't understand them, and if
 5  possible help me understand what part of the
 6  question is confusing?  Can we agree to that?
 7        A.  Yes.
 8        Q.  I'm prone to ask bad questions.  So
 9  if you don't understand my question, don't
10  assume it's you.  Assume it's my bad phrasing
11  of the question and ask me to rephrase it.
12  Can we agree to that?
13        A.  Okay.
14        Q.  If at any time you need a break,
15  please feel free to ask for one.  All that I
16  ask is that if you're in the middle of
17  answering a question or if a question has been
18  posed to you that you answer that question
19  before requesting a break.  Can we agree to
20  that?
21        A.  Okay.
22        MR. BARNETT:  I'm not necessarily
23  agreeing to that under these circumstances,
24  but we can go ahead.
25        Q.  All right.  Please state your full
```

Page 9

```
 1  name for the record.
 2        A.  My Korean name is Jaekwang Kim,
 3  J-A-E-K-W-A-N-G.
 4        Q.  Okay.
 5        A.  Last name is K-I-M.
 6        Q.  Do you go by Jay Kim?
 7        A.  It's just, you know, American name.
 8        Q.  I understand.  In front of you are
 9  two stacks of documents which have been
10  produced in this case by the parties.  This
11  first stack that my hand is on is the employee
12  handbook that was in place during Ms. Hunter's
13  employment.  Next to them are several folders
14  that contain the documents which Mobis has
15  presented to us in this case.
16        These are here for your reference.
17  If you need to refer to a document in your
18  testimony or to refresh your memory, I want
19  you to feel free to look at these documents
20  and use them when necessary.
21        A.  Okay.
22        Q.  This third stack is a group of
23  exhibits from Ms. Riedler's deposition, and
24  we're going to be looking at these documents
25  as well during your deposition.
```

3 (Pages 6 to 9)

Deposition of JAY KIM
January 31, 2008

Page 10

1      MR. BARNETT: Jay, what she's
2  saying is, if there's a document that relates
3  to this case that you need to look at to
4  remind you of the facts or the dates, you're
5  free to do that.
6      THE WITNESS: Okay.
7      Q. Correct. And if for some reason
8  there's a document you need and we don't have
9  it here, let us know and between Henry and me,
10 we may be able to find it.
11      I want to make sure that I have
12 your full testimony about the facts of this
13 case. And so I want to make sure we give you
14 every opportunity to give me full and complete
15 answers.
16      What is the highest level of
17 education that you've achieved?
18      A. College, university.
19      Q. Where did you go to college?
20      A. Hankuk University of Foreign
21 Studies in Korea.
22      Q. Did you obtain any type of degree?
23      A. P -- Japanese P.S.
24      Q. Okay. Does that have an equivalent
25 degree in the American education system?

Page 11

1      A. No.
2      Q. Okay. Have you pursued any
3  education in the United States?
4      A. No.
5      Q. Do you have any family members
6  residing in this area with a last name
7  different than yours?
8      MR. BARNETT: She wants to know if
9  you have any family members in Alabama with a
10 last name other than Kim.
11      A. Okay. I have -- I have wife and
12 two sons. My wife's name is Young Hee Choi.
13 Last name is Choi, not Choi Kim.
14      Q. Okay.
15      A. It's Korean tradition, you know.
16      Q. So her last -- C-H-O-Y?
17      A. O-I.
18      Q. O-I. All right. I'm not asking to
19 be invasive of your privacy. We've asked for
20 a jury trial which means people living in the
21 area could be called to serve on the jury.
22      A. Okay.
23      Q. And this is a way of making sure
24 that people who might serve on the jury are
25 not associated with the case in one way or

Page 12

1  another.
2      This next question is in that
3  similar vein. Where do your children attend
4  school?
5      A. The eldest is starting at Baldwin.
6      Q. Okay.
7      A. He is nine -- eighth grader.
8      Q. All right. And your youngest
9  child?
10      A. Halcyon Elementary School.
11      Q. All right.
12      A. First grade.
13      THE COURT REPORTER: What school?
14      THE WITNESS: Halcyon.
15      Q. H-A-L --
16      A. C-Y-O-N, Halcyon.
17      Q. Does your wife work outside of the
18 home?
19      A. No.
20      Q. Notice I said outside of the home.
21 I'm sure she works plenty inside the home.
22      Do you and your family attend a
23 church regularly?
24      A. Korean church, yeah.
25      Q. Do you belong to any clubs or

Page 13

1  organizations in the area?
2      A. No.
3      Q. Have you had any employer in the
4  United States other than Mobis?
5      A. No.
6      Q. Did you do anything to prepare for
7  your deposition?
8      A. No.
9      Q. Do you feel adequately -- do you
10 feel able to testify about the facts
11 surrounding Ms. Hunter's termination?
12      A. I'm sorry. I couldn't understand.
13      Q. Can you think of any reason today
14 that you should not be able to testify fully
15 and truthfully about the facts surrounding the
16 decision to terminate Ms. Hunter and her
17 termination?
18      MS. RIEDLER: Do you think
19 preparation is okay for today? Are you
20 comfortable?
21      THE WITNESS: Yes.
22      MS. RIEDLER: To answer questions?
23      THE WITNESS: Yeah.
24      Q. That's what we're asking. Do you
25 suffer from any health conditions --

4 (Pages 10 to 13)

Deposition of JAY KIM
January 31, 2008

Page 14

1      A. No.
2      Q. -- which may keep you from -- there
3   we go.
4         In front of you is Mobis Alabama's
5   employee handbook. Have you ever reviewed any
6   of the employee handbooks from Mobis?
7      A. Not whole page and details.
8      MR. BARNETT: I'm sorry. I didn't
9   hear that.
10     MS. LEONARD: I think he said not
11  whole thing -- page -- not the whole thing but
12  page and detail.
13     MR. BARNETT: Is that what you got?
14     MS. RIEDLER: Not everything in
15  detail. Not the whole page.
16     THE WITNESS: Not everything.
17     Q. With respect to a salaried employee
18  who is in their first ninety days of
19  employment with Mobis, what is your
20  understanding of Mobis's attendance policy as
21  it applies to that employee?
22     A. Actually, I did not clearly know
23  about, you know -- about your question --
24  about your question.
25     Q. I'll rephrase it. That's what I

Page 15

1   want you to do.
2      MR. BARNETT: I think he's
3   testifying. He's not saying --
4      MS. RIEDLER: He's not saying he
5   doesn't understand. He didn't clearly
6   understand the ninety-day question.
7      Q. Okay. So is it your testimony that
8   you did not clearly understand the attendance
9   policy for ninety-day probationary employees?
10     A. Yes.
11     Q. Do you understand that policy now?
12     A. Yes.
13     Q. What is your understanding now of
14  that policy?
15     A. Can I see, you know, the policy?
16     Q. Absolutely. If Ms. Riedler wants
17  to help you --
18     MS. RIEDLER: Yeah. I can actually
19  help find -- I'm actually getting pretty good
20  at finding things in this stuff.
21     MR. BARNETT: I thought you would
22  get one out to give him.
23     A. Yes, ma'am.
24     Q. What is your understanding of the
25  policy today?

Page 16

1      A. Today?
2      Q. What's your understanding of the
3   policy now?
4      A. During the, you know, the probation
5   ninety -- ninety-day probationary period --
6      THE COURT REPORTER: I missed that.
7   Would you repeat the first part?
8      A. During the ninety-day probationary
9   period, any problems that we have to -- three
10  absenteeism occurrences will be terminated.
11     (A discussion was held off the
12     record.)
13     Q. When did you come to understand the
14  attendance policy for probationary period
15  employees that are salaried?
16     A. When Tarsha, you know, was
17  terminated.
18     Q. How did you come to gain that
19  understanding?
20     A. How did you? I can just understand
21  what it was in here.
22     Q. Okay. Did anyone like Ms. Riedler
23  or another employee review the policy with
24  you?
25     A. I'm sorry?

Page 17

1      Q. I think you might see where my
2   question is going. Did someone explain the
3   attendance policy to you?
4      A. To me?
5      Q. Yes, sir.
6      A. Yes, when I start the work in here.
7      Q. When you say in here, do you mean
8   with respect to Ms. Hunter?
9      A. Okay. Let me explain again.
10     MR. BARNETT: Tracy -- let me say,
11  do you mind if Tracy helps out when there's a
12  lack of communication? Tracy and Jay speak
13  with each other.
14     MS. RIEDLER: All the time.
15     MS. LEONARD: That's fine.
16     MS. RIEDLER: Yeah.
17     MS. LEONARD: Just as long as you
18  don't tell him what to say, we're fine.
19     MS. RIEDLER: You've read policies
20  basically, but when did you gather better
21  knowledge of what ninety-day policy meant?
22  When did you become more familiar?
23     A. When I start to work in Mobis, I
24  don't have previous -- plenty -- so many -- so
25  many team members. So I don't care about, you

5 (Pages 14 to 17)

Deposition of JAY KIM
January 31, 2008

---

Page 18

1  know, the -- I don't think about the policy.
2       However, the business -- you know,
3  the scale has been growing up, and then I
4  just, you know, check out the policy to
5  administer my team members.
6       Q. All right.
7       MS. RIEDLER: When did you become
8  more familiar though with specifically ninety-
9  day probationary period?
10      A. August 20 -- around the 24th or
11  25th -- after the 25th, 2006.
12      (Plaintiff's Exhibit Number 10 was
13      marked for identification. A copy
14      is attached.)
15      Q. I'm going to show you a document
16  that I've marked as Exhibit Number 10. Have
17  you seen the form that is Plaintiff's Exhibit
18  Number 10?
19      A. Actually, I made the original of
20  this form to keep -- to keep for my records
21  only.
22      Q. Okay.
23      A. My records only. It's not
24  officially, you know, the provided -- you
25  know, the format from HR department.

---

Page 19

1       Q. But you created the form that is
2  this document?
3       A. Yes. I -- yes.
4       Q. All right. Did Ms. Riedler ever
5  talk to you about whether this form should be
6  used?
7       A. Yes. She mentioned in the last
8  time. I couldn't remember when she say about
9  that.
10      Q. All right. Do you still use a form
11  like Plaintiff's Exhibit Number 10?
12      A. I didn't use that.
13      Q. Why did you create the form that is
14  shown in Exhibit 10?
15      A. I just want to keep, you know, my
16  team members, you know, their records for my
17  records only, not to submit to the HR
18  department.
19      Q. At the bottom, there's a section
20  that says manager approval. Who is the
21  manager?
22      A. As I explained, you know, that I
23  just, you know, revised, you know, this
24  format. As to title, I could not remember
25  exactly. I just used, you know, this one

---

Page 20

1  without, you know, the changing some wording.
2       Q. Were you the manager for
3  Ms. Hunter's department?
4       A. I don't know exactly.
5       MS. RIEDLER: Are you the manager
6  of the accounting department?
7       A. I am a CFO.
8       Q. Okay. Who is the manager for the
9  accounting department?
10      A. When Tarsha worked in Mobis
11  Alabama, we don't have -- we didn't get -- we
12  didn't have manager. We have just only -- I
13  have just only two assistant manager, Ho Sang
14  Hwang and Sonechka Womack. That's it.
15      Q. All right. On forms like Exhibit
16  10, who would fill out the portion for a
17  manager approval?
18      A. Normally, I did.
19      Q. All right.
20      A. Yeah, for my records.
21      Q. Has an employee named Latoya
22  Williams worked in the accounting department?
23      A. Latoya? Yeah, I remember. Yeah.
24      Q. What was her job?
25      A. Account receivables. No. No.

---

Page 21

1  No. Account payables.
2       Q. All right. Did she come to work
3  for Mobis through Multi-Staffing?
4       A. I can't remember.
5       Q. All right. Did she have more than
6  three absences during her probationary period?
7       A. I could not remember.
8       Q. If she did, would you have
9  documented them?
10      A. I'm sorry?
11      Q. If Ms. Williams had been absent,
12  would you have documented those absences?
13      A. I think so.
14      Q. All right.
15      A. But I clearly remember that.
16      Q. Does she still work for Mobis
17  Alabama? Does she still work for Mobis?
18      MR. BARNETT: Is she still employed
19  at Mobis?
20      MS. RIEDLER: Latoya.
21      A. No.
22      Q. Why is she not with Mobis?
23      A. I don't know.
24      Q. Was she fired?
25      A. No.

6 (Pages 18 to 21)

Deposition of JAY KIM
January 31, 2008

---

Page 22

1    Q. Was her attendance better than,
2  worse than, or equal to Ms. Hunter's?
3    A. I don't understand -- I don't -- I
4  couldn't remember. I cannot remember.
5    Q. All right. How long ago did she
6  work for you?
7    A. I couldn't remember.
8    Q. Did she work for you after
9  Ms. Hunter worked for you?
10   A. Latoya. I don't -- I don't
11  remember.
12   Q. Okay. Earlier Ms. Riedler
13  testified that employee discipline for
14  salaried employees should be documented in a
15  memorandum that identifies the issue for
16  discipline and an improvement plan and that it
17  should be clear that the memorandum is
18  disciplinary in nature.
19       Was this information communicated
20  to you before or during Ms. Hunter's
21  employment?
22       MR. BARNETT: Object to the form.
23   A. I'm sorry. I cannot understand
24  that. The sentence is so long.
25   Q. Before or during Ms. Hunter's

Page 23

1  employment, did Ms. Riedler communicate to you
2  that for salaried employees, discipline should
3  be in a memo that states what the issue is and
4  what the improvement plan should be and that
5  it's a disciplinary memo?
6       MR. BARNETT: Object to the form.
7    A. I don't remember.
8    Q. All right. Have you disciplined
9  any employees in your department?
10   A. What kind of discipline do you
11  mean? I don't --
12   Q. And that's a good question. What
13  do you understand discipline to mean?
14   A. Discipline means that improvement
15  or something like that.
16   Q. Okay. Do you document employee
17  discipline?
18   A. I don't understand. What does it
19  mean exactly?
20   Q. Using your definition of
21  discipline, have you disciplined any employees
22  in your department?
23   A. I don't know. What do you mean,
24  discipline?
25       MS. RIEDLER: May I --

Page 24

1       MR. BARNETT: Let's just let them
2  work it out.
3    Q. Let me rephrase it. Have you ever
4  performed any type -- have you ever done -- if
5  I use the term write-up, do you know what I
6  mean?
7    A. Uh-huh.
8    Q. Have you issued any write-ups to
9  any employees in your department?
10   A. Yeah. I have been -- made an
11  e-mail to one of my staff.
12   Q. All right.
13   A. If I have some issues, I have been
14  known to send e-mail to them to improve or
15  something.
16   Q. What do you do with those e-mails?
17   A. I don't remember everything. I
18  don't remember everything.
19   Q. Do you copy Ms. Riedler on the
20  e-mails or anyone in human resources?
21   A. Not really. If I have some issues
22  which has been related to HR issues, I always,
23  you know, let -- have been -- talk to Tracy.
24       THE COURT REPORTER: I'm sorry?
25  You always --

Page 25

1    A. Have to talk Tracy.
2    Q. Do you print out a copy of the
3  e-mails?
4    A. What kind of e-mail do you mean?
5    Q. The e-mails you were just talking
6  about?
7       MS. RIEDLER: Do you keep hard
8  copy, Jay, of e-mail, hard copy of e-mail? Do
9  you keep?
10   Q. Do you keep a paper copy of your
11  e-mails?
12   A. In my -- in my office or
13  something?
14   Q. Yes.
15   A. No.
16   Q. Do you give a paper copy of the
17  disciplinary e-mails to anyone?
18   A. I don't know what -- what you're
19  saying.
20   Q. Do you ever -- do you print out
21  your e-mail to paper and give a copy of it to
22  human resources if you're disciplining an
23  employee?
24   A. No. I just, you know, have the --
25  that e-mail in my computer.

7 (Pages 22 to 25)

Deposition of JAY KIM
January 31, 2008

Page 26

1    Q. Okay. Do you recall issuing any
2 discipline to Ms. Hunter?
3    A. I don't understand what is it
4 exactly your question.
5    Q. Did you discipline Tarsha Hunter?
6    A. Uh-huh.
7    Q. Did you?
8    A. Yeah. I sent, you know, the
9 several e-mail to Tarsha.
10    Q. All right.
11    A. To her supervisor.
12    Q. Did you consider those e-mails to
13 be discipline?
14    MR. BARNETT: Object to the form,
15 and object to the semantics that are going on
16 here. I just don't -- if you're willing to
17 stipulate that you're not using the word
18 discipline with any sort of legal
19 significance, that's fine. But --
20    MS. LEONARD: Let me rephrase the
21 question then.
22    MR. BARNETT: Yeah.
23    Q. Throughout the employee handbook
24 that's in front of Ms. Riedler, the word
25 discipline is used. Do you understand what

Page 27

1 that word means when you read the employee
2 handbook?
3    A. I can understand it.
4    Q. Using your understanding of the
5 word discipline as it's used in the employee
6 handbook, did you issue any discipline to
7 Ms. Hunter?
8    A. It's very hard for me to, you know,
9 explain what exactly you mean about, you know,
10 the discipline or something.
11    Q. I mean --
12    A. I am -- I have, you know, limited
13 English, you know, vocabulary. So I don't --
14 it's very hard for me to, you know, explain.
15    Q. Now, Mr. Kim, it's your testimony
16 that you understand the word discipline as
17 it's used in the employee handbook, correct?
18    A. More --
19    MR. BARNETT: Object. I mean,
20 he -- he may think you're asking him if he
21 knows what the word discipline means.
22    Q. What I'm asking you is: As the
23 word discipline is used in this handbook, do
24 you understand what Mobis means by discipline?
25    A. I think that, you know, that Mobis,

Page 28

1 the handbook, is just our policy. That's what
2 I understand it.
3    Q. And you would agree with me that in
4 the policy the word discipline is used,
5 correct?
6    A. I don't know.
7    Q. Have you not -- okay.
8    A. Yeah. My understanding, you know,
9 our handbook is provided for all the
10 employees. That is what I understand.
11    Q. Did you ever tell Ms. Hunter she
12 was being disciplined?
13    A. Yeah, I sent, you know, the
14 e-mail -- e-mail to improve, you know, the
15 tardiness and attendance.
16    Q. And did you communicate to her
17 either orally or in writing that she should
18 consider those e-mails to be disciplinary in
19 nature?
20    A. Yeah. I have some e-mail.
21 Probably there is somewhere. I just want to
22 see that.
23    MR. BARNETT: Do you want to let
24 him see them?
25    MS. LEONARD: I know you had some

Page 29

1 pulled together. I don't object to you
2 showing them to him. I don't mind you pulling
3 them out of here, but I know you had some
4 pulled together. If not, I'll see if I can
5 find them in here.
6    MS. RIEDLER: I think he's got them
7 because I found them earlier.
8    MR. BARNETT: How many did you
9 find?
10    MS. LEONARD: I just opened to
11 where they started. I'm going through to make
12 sure I haven't skipped any.
13    I believe it's starting -- one
14 e-mail is going to be missing because it's in
15 this stack.
16    MR. BARNETT: Okay. I found four
17 total.
18    MS. LEONARD: If yours are Bates-
19 stamped, I think they start at --
20    MR. BARNETT: I found 172, 174
21 and -- 172, 173, 174 and 178, but it seems
22 like there's another one.
23    MS. RIEDLER: There's one that is
24 already in here.
25    MS. LEONARD: Right. There's one

8 (Pages 26 to 29)

Deposition of JAY KIM
January 31, 2008

Page 30

1  in here. I'll let you find it.
2      A. I have sent -- you know, write this
3  e-mail to all my team members since, you know,
4  2005. I could not remember the exact date.
5  However, you know, as you'll see, 2006, April
6  26th, I already sent the records of attendance
7  issues to let my -- all my team members know
8  about, you know, these issues.
9      Q. All right.
10     MR. BARNETT: Do you want to mark
11 that one that he's --
12     MS. LEONARD: Sure.
13     MS. RIEDLER: That one actually was
14 to me, not to Tarsha.
15     Q. I'm giving you a sticker which is
16 marked as Plaintiff's Exhibit 11. And with
17 Mr. Barnett's help, if you can, put it on the
18 first page of the e-mail you just referenced.
19     (Plaintiff's Exhibit Number 11 was
20     marked for identification. A copy
21     is attached.)
22     A. Can I --
23     MS. LEONARD: Do you need a break?
24     THE WITNESS: Can I talk with
25 Tracy?

Page 31

1      MS. LEONARD: Sure. We can take a
2  brief break.
3      MR. BARNETT: Maybe we can get
4  these e-mails sorted out during our break,
5  too.
6      (Recess taken.)
7      MR. BARNETT: Mr. Kim asked for a
8  break because he requested Ms. Leonard that
9  she make shorter questions. And we discussed
10 that. She's going to attempt to do that.
11     MS. LEONARD: All right.
12     Q. Mr. Kim, do you have any problems
13 communicating with the people working in the
14 accounting department?
15     A. On the just accounting issues, I
16 don't have any problems. But in this case
17 like, you know, the legal issues, whatever
18 something, I'm not very familiar with legal,
19 you know, problems and something like that.
20     Q. Okay.
21     A. I am very -- it's very hard for me,
22 too difficult.
23     Q. Do you have any trouble
24 understanding your employees if they're
25 communicating to you their reasons for being

Page 32

1  away from work?
2      A. If my staff will talk to me about,
3  you know, their detail, you know, medical
4  terms or whatever something, I could not
5  understand what does it mean or something.
6  But accounting issues, I don't have any
7  trouble.
8      Q. Have you had any employees complain
9  either to you or to Ms. Riedler or to anybody
10 else that they have a hard time understanding
11 what you are saying to them?
12     A. No.
13     Q. All right. How did Ms. Hunter come
14 to work for you?
15     A. Tarsha's title was assistant. So I
16 have, you know, the seven or eight peoples
17 when she worked in accounting and finance
18 department. So I could not really, you know,
19 know about in details their performance or
20 something like that.
21     MR. BARNETT: What she wants to
22 know is --
23     MS. RIEDLER: Where did she come
24 from? How did you find her? How did you find
25 her?

Page 33

1      A. I always, you know, asked my
2  assistant manager to find out her stuff,
3  what's gong on or something like that.
4      Q. Did --
5      MR. BARNETT: She wants to know --
6      MS. RIEDLER: How did you meet
7  Tarsha?
8      MR. BARNETT: How did you meet
9  her? How did you first meet her? How did she
10 first come to Mobis? How did she first come
11 to work for Mobis?
12     MS. RIEDLER: How did you meet
13 Tarsha Hunter?
14     Q. I can --
15     A. She started to work, you know, as a
16 temporary -- temporary employee.
17     Q. How long was her temporary
18 assignment supposed to be?
19     A. For Tarsha or --
20     Q. Correct.
21     A. Two -- two months or three months.
22 I didn't really, you know, remember, but two
23 or three months.
24     Q. During that temporary period --
25     A. Yes.

EDMONDSON REPORTING & VIDEO, INC.
Email: Edmondsonrpting@bellsouth.net          Phone 205.324.2333  Fax 205.324.2377

Deposition of JAY KIM
January 31, 2008

---

Page 34

1    Q. -- did you have any problems with
2  her attendance?
3    A. I think so.
4    Q. Tell me what problems you had with
5  her attendance.
6    A. So many tardy and doctors'
7  appointment or something like that.
8    Q. Any other problems?
9    A. Yeah, I have -- I had a problem.
10  As I explain it, I have only seven or eight --
11  few peoples in accounting.
12      So if one employee -- one team
13  member will not take care of, you know, their
14  work just in a timely manner, accounting
15  department will make a harder situation.
16  Because as you know, accounting has to close
17  the months and every -- each month. But if
18  somebody will not take care of their work just
19  in a timely manner, it will impact on the
20  accounting department.
21      For instance, I have to report it
22  to -- the financial result to headquarters
23  every -- each month after closing out just in
24  time.
25    Q. Did you have any other problems

Page 35

1  with Ms. Hunter during --
2    A. Yes. I want to see, you know, the
3  e-mail.
4    Q. Hold on, Mr. Kim. I'm breaking --
5  my questions are going to deal with her as a
6  temporary employee and then as a full-time
7  employee. And right now, I'm asking just
8  about when she was there as a temporary
9  employee.
10      You mentioned you had a problem
11  with her attendance when she was a temporary
12  employee. Did you have any other problems
13  with her during her temporary time?
14    A. May I see, you know, the e-mail?
15    Q. Absolutely. I think your lawyer
16  has pulled some of them out. I'll go on and
17  we'll make them Exhibit 12, if you want, so
18  that they'll all be in front of you.
19    MS. RIEDLER: Are any of them
20  before June?
21    MR. BARNETT: I don't think so.
22    MS. RIEDLER: I don't think so
23  either.
24    MS. LEONARD: Let's still make them
25  an exhibit. That way it's clear.

Page 36

1    MR. BARNETT: Do you want to make
2  them a composite?
3    MS. LEONARD: That's fine. Let's
4  just make it one big e-mail Exhibit 12.
5    MR. BARNETT: These are all 12.
6    (Plaintiff's Exhibit Number 12 was
7    marked for identification. A copy
8    is attached.)
9    Q. All right. You're showing me part
10  of Exhibit 12 which is Bates-stamp numbered
11  document 175, and it's an e-mail at the top
12  that says from Tarsha Hunter. I'm just
13  identifying it for the record so I'll have
14  it.
15    MR. BARNETT: Do you want to make
16  these separate exhibits?
17    MS. LEONARD: I figured it would be
18  easier just as one so they will all be in
19  front of him.
20    Q. You're pointing to the bottom of
21  this e-mail, which appears to be a May 9,
22  2006, e-mail to Tarsha Hunter from Sonechka
23  Womack?
24    A. Yeah.
25    Q. I would assume the rest of the

Page 37

1  e-mail follows on the next page?
2    A. (Witness nods.)
3    Q. Okay.
4    A. So let me explain --
5    Q. Go right ahead.
6    A. -- the e-mail of May 9th. Probably
7  Tarsha was on the temporary employee. So you
8  probably have some -- you know, the attendance
9  issues. I had talked to Sonechka or the
10  other -- you know, the assistant manager.
11      But if you will see the
12  organizational chart here -- I made, you know,
13  an organizational chart for accounting and
14  financial department.
15    MR. BARNETT: Are you getting that?
16    THE COURT REPORTER: Yes.
17    Q. These are the exhibits. I don't
18  know --
19    A. Can I --
20    MS. RIEDLER: The organizational
21  chart I believe is in there.
22    MS. LEONARD: Feel free to find it.
23  I'm not sure what --
24    A. Yeah, accounting --
25    MS. RIEDLER: You can keep talking.

10 (Pages 34 to 37)

Deposition of JAY KIM
January 31, 2008

Page 38

1      A.  In March 2006, if you see
2  organizational chart for accounting and
3  finance department, I have two, you know, the
4  different -- you know, the parts.  One is for
5  general accounting and taxes -- taxes.  The
6  other one is treasury.
7          Treasury has been handled by
8  Sonechka with Tarsha.  But the other partner,
9  Ho Sang Hwang, he is no longer employed with
10  Mobis Alabama.  He has been taking care of the
11  general accounting and the taxes.  So it's
12  different.
13      Q.  All right.  Did you discuss with
14  anyone bringing Ms. Hunter into permanent
15  employment or full-time employment with Mobis
16  when she was a temporary employee?
17      A.  Please --
18      Q.  How did Ms. Hunter go from being a
19  temporary employee to a full-time employee?
20      A.  Oh, yeah.  Let me explain.  As a
21  matter of fact, I wanted to -- I don't want --
22  wanted to hire Tarsha during the temporary
23  employees because I have seen, you know, so
24  many, you know, tardy and attendance issues.
25          And so I talked to Sonechka,

Page 39

1  assistant manager, I don't want her to
2  start -- I don't want Tarsha to start, you
3  know, the permanent employee.
4          However, Sonechka told me and
5  persuaded me -- persuaded me --
6          MR. BARNETT:  Persuade?
7          THE WITNESS:  Persuade.
8      A.  Yeah, persuaded me.  We will
9  keep -- we will keep Tarsha a little bit more
10  period and then -- and then if Tarsha will
11  not -- Tarsha's tardy and attendance issue
12  will not be improved, at that point we will
13  make a decision or something.
14          She asked me and she persuaded me.
15  So I accepted it.  I accepted it.
16          Okay.  We will see and we will
17  monitor and then -- during the ninety-day
18  probationary.  And then Tarsha's attendance
19  issue will not be improved, I will not, you
20  know, hire her or something.  I told her very
21  strongly.
22      Q.  Okay.  How many times did you talk
23  to Ms. Hunter about her attendance?
24      A.  I couldn't remember.  However, if I
25  have some issues, I talk to Sonechka.

Page 40

1      Q.  Okay.
2      A.  Sometimes I talk to Tarsha
3  directly.
4      Q.  All right.
5      A.  But I could not remember how many
6  times did I do this.  I don't know.
7      Q.  Do you remember any of the
8  conversations with Ms. Hunter where you talked
9  about her attendance throughout any time she
10  worked for Mobis?
11      A.  Yeah.  As I explained, I had a
12  time, a couple of times where -- I cannot
13  remember, but I have been talked to Tarsha.  I
14  have been talked to Tarsha.
15      Q.  Did you do anything to -- did you
16  write anything or type anything to show you
17  talked to Ms. Hunter?
18      A.  No.  I just e-mailed her.
19      Q.  Okay.  Would the e-mails in this
20  case reflect when you talked to Ms. Hunter?
21      A.  Sometimes I talk to Tarsha without
22  e-mail.  But sometimes I just e-mailed her --
23  e-mailed her.  But I -- I cannot remember.  I
24  cannot remember clearly.
25      Q.  Did you discuss with Ms. Womack or

Page 41

1  Ms. Hunter buying out Ms. Hunter's contract
2  with Multi-Staffing?
3      A.  No.
4      Q.  Who made the decision to hire
5  Ms. Hunter as a Mobis employee?
6      A.  As I explained a few minutes ago, I
7  really don't want to hire Tarsha, but
8  Sonechka, you know, asked me and persuaded me
9  to hire her.  Because, as I explained, you
10  know, I have just a few peoples in
11  accounting.  So if somebody would leave --
12  would leave, you know, that person has to take
13  care of the other -- the left person's -- the
14  work or something.  I'm not sure.
15      Q.  What did Sonechka say to you to
16  persuade you to hire Ms. Hunter?
17      A.  I don't really remember that, but
18  in my understanding, if -- if Tarsha will
19  leave, Sonechka will make harder situation
20  because -- because Sonechka has to take care
21  of, you know, two person's work -- two
22  person's work.
23          So in my understanding -- and I
24  remember, you know, okay, we can just, you
25  know, wait during the ninety-day period --

11 (Pages 38 to 41)

Deposition of JAY KIM
January 31, 2008

Page 42

1  ninety-day probationary period until Tarsha
2  will be improved or something. I was
3  responded to Sonechka.
4      Q. Do you remember any conversations
5  that you had with Ms. Hunter about the reason
6  she may not have been at work?
7      A. I don't remember that.
8      Q. Do you remember Ms. Hunter talking
9  to you about her child's school?
10     A. Yeah, I remember.
11     Q. Tell me what you remember about
12 that.
13     A. I don't clearly remember, you know,
14 the exact date but she went to my office and
15 then she explained why is she late or
16 something.
17     Q. Okay.
18     A. Then she brought the school
19 handbook or -- one or two pages -- one or two
20 pages. She show me. She showed me then
21 explained. She said, you know, I could not
22 drop her children -- drop her children off,
23 you know, until 7:30. I could not remember
24 the time. But she explained. I remember
25 that.

Page 43

1      Q. All right. Did you tell her you
2  would work with her?
3      A. I'm sorry?
4      Q. Did you tell her you would work
5  with her so that she could drop her child at
6  school and she could still work?
7      A. I don't understand what you mean.
8      Q. Did you tell her --
9      THE WITNESS: Can I have some --
10     Q. Let me rephrase it. Did you tell
11 her that you understood she might be a few
12 minutes late because of dropping her child
13 off?
14     A. Yeah, I agreed. Yeah.
15     Q. Did you ever tell --
16     A. Not every day. Not every day. If
17 her daughter -- her children will have a
18 summer vacation, she doesn't needs, you know,
19 to drop her children off at school, right? So
20 not every day.
21     Q. Did you tell her you would try to
22 get her probationary period waived since she
23 had worked as a temporary employee?
24     A. I don't think so.
25     Q. Is it possible you may have?

Page 44

1      THE WITNESS: What does she mean?
2      Q. Let me rephrase. When you say I
3  don't think so, are you saying no or you do
4  not remember?
5      A. Let's see.
6      MR. BARNETT: Maybe you better
7  explain what waived means in terms of --
8      A. Yeah, I did not, you know, waive
9  her attendance or whatever.
10     Q. When I use the word waived, what do
11 you understand it to mean?
12     A. I cannot understand what you're
13 saying.
14     Q. Did you see -- did you tell
15 Ms. Hunter you would check on whether her
16 probationary period could be excused?
17     A. No.
18     Q. Did you consider her temporary
19 assignment to be a probationary period?
20     A. Let me explain one thing. In my
21 memory, she starts, you know, the -- starts
22 the permanent June or something. June -- from
23 June to, you know -- June is the summer
24 vacation. How can I waive, you know, that
25 late -- you know, how can I waive her -- waive

Page 45

1  her late during summer vacation?
2      Q. My question is a little different.
3  When I say probationary period, do you
4  understand what I mean?
5      A. Yes.
6      Q. Did you discuss with Ms. Hunter
7  whether she might be excused from being a
8  probationary employee when Mobis hired her?
9      A. No.
10     Q. Okay.
11     A. No.
12     Q. Other than her attendance, did you
13 have any problems with how Ms. Hunter did her
14 job?
15     A. During the ninety-day probation
16 period?
17     Q. During any time?
18     A. Yes.
19     Q. What problem --
20     A. Can I see the e-mail?
21     Q. All of these documents are here for
22 you to look at whenever you want.
23     MR. BARNETT: Do you want to show
24 him the ninety-day sheet, too?
25     A. On August the 2nd, 2006, I e-mailed

12 (Pages 42 to 45)

Deposition of JAY KIM
January 31, 2008

Page 46

1  Tarsha through Sonechka. Tarsha, I hope that
2  you are getting better. Probably she might
3  be -- go to see a doctor. I could not
4  remember. We are one month end closing.
5  Please check pending works and reorganize your
6  desk. There were a bunch of documents which
7  should have been filed. And I need for you to
8  submit doctor's note and make-up schedule for
9  your absence.
10      Q. Which documents should have been
11 filed?
12      A. I could not remember what is the
13 exact document, but normally we have receive
14 huge, you know, the accounting documents.
15      Q. How many documents were left
16 unfiled?
17      A. I don't remember that, you know.
18      Q. What did they relate to?
19      MR. BARNETT: He gestured eight
20 inches worth of documents.
21      MS. LEONARD: I'm going to object
22 to that. I didn't see him gesture to eight
23 inches worth of documents.
24      MS. RIEDLER: How many documents,
25 Jay? How big is the stack?

Page 47

1      A. Something like this, but I could
2  not really remember.
3      Q. What happened as a result of those
4  documents not being filed?
5      A. As I already explained, you know,
6  those documents, accounting documents, when
7  not posted into our system, we will meet a
8  harder situation. That means we have to
9  extend the closing out period -- period. But
10 I did not have no time to extend, you know,
11 our closing out because Mobis Alabama has two
12 reports that -- you know, our total accounting
13 to the headquarters just in time every -- each
14 month.
15      Q. Isn't it true that Ms. Hunter held
16 documents to be boxed due to storing in the
17 storage area?
18      A. I'm sorry. I couldn't remember
19 that.
20      Q. The stack of documents you
21 referenced, weren't those due to go to
22 storage?
23      A. Yeah. Normally we will have, you
24 know, the documents. But we have, you know,
25 the -- some kind of -- the documents in -- if

Page 48

1  we will have documents. But if we -- those
2  documents should be posted into the system,
3  you know, the accounting has to post it into
4  the system at first, and then they should be
5  stored beside -- you know, beside -- on the
6  desk. And then, and then we have to wait
7  until the payment date.
8      Q. How do you know those documents had
9  not been entered?
10      A. Because if we're seeing -- you
11 know, our accounting system, SAP, the manager
12 can, you know, check out the screen -- the
13 screen. But if I see the -- one of the
14 documents out of the bunch of the stack, if I
15 would see the document number and then if I
16 would check out the manager's screen
17 somewhere, I can find out, you know, how those
18 documents should be filed or entered into the
19 system. I can easily find out that.
20      Q. Did you do that?
21      A. Yes.
22      Q. Do employees always bring documents
23 to the accounting department as instructed?
24      A. I'm sorry?
25      Q. Do employees always bring documents

Page 49

1  to the accounting department as instructed?
2      A. There was some different case
3  there. There were some different case there.
4  Different case there. If we will receive
5  invoice -- invoices that should be -- at first
6  that should be posted into the system on a
7  tracking screen.
8      However, if we will receive --
9  received -- received, you know, their signed
10 accounting documents -- accounting documents,
11 they should be approved by the tech and the
12 manager. We have two different approval
13 processes.
14      And then, if manager will approve,
15 you know, those documents, they should be kept
16 by, you know, accounting guy, that treasury
17 guy, in order to make a payment.
18      In some case, you know, we have,
19 you know, the directory, the file, we have to
20 make a binder or make a file.
21      However, some of the cases they
22 should be able to keep on the desk.
23      Q. Did you talk to Ms. Hunter about
24 the e-mail you referenced which you just --
25 we've been discussing?

13 (Pages 46 to 49)

Deposition of JAY KIM
January 31, 2008

Page 50

1    A. I don't understand what --
2    Q. Did you talk to Ms. Hunter about
3 the e-mail you said you sent to her through
4 Sonechka saying there were documents on her
5 desk which had not been entered?
6    A. I didn't say, you know, those
7 documents, you know, has to be entered or
8 something like that.
9       I just mentioned there were a bunch
10 of documents which should have been filed.
11 That means, you know, that to pay the
12 document, it should be filed.
13    Q. Did you talk to Tarsha, yes or no?
14    A. No. No.
15    Q. Any other complaints about her
16 performance?
17    A. Attendance and dependability.
18 That's it.
19    Q. And when you say attendance, what
20 do you mean?
21    A. Attendance. Can I see the
22 handbook?
23       MS. LEONARD: Sure. It is under --
24       MS. RIEDLER: I think actually you
25 want to see your notes.

Page 51

1       MS. LEONARD: He asked for the
2 handbook.
3       MR. BARNETT: Do you want to see
4 the attendance policy?
5       THE WITNESS: Yeah.
6       MS. RIEDLER: Probationary policy?
7       MS. LEONARD: I believe it's the
8 stack below.
9       MS. RIEDLER: Sorry.
10    A. Attendance, in my -- in my
11 knowledge -- attendance means they are bad
12 tardy or late, didn't show up or -- tardiness
13 or unexcused -- for instance, unexcused off or
14 something like that.
15    Q. What was lacking in Ms. Hunter's
16 dependability?
17    A. As I explained, you know, the -- we
18 have, you know -- accounting has, you know,
19 the time deadline or something like that.
20       So if somebody will not take care
21 of -- will not finish, you know, their
22 assigned work in a timely manner -- just in a
23 timely manner, that will impact on the
24 accounting department.
25       I am, you know, the responsible

Page 52

1 person in accounting.
2    Q. So when you say dependability,
3 you're saying that Ms. Hunter left work
4 undone?
5    A. Yeah, it's one of the reasons.
6    Q. Anything else?
7    A. I can -- I cannot remember right
8 now.
9    Q. You said it's one of the reasons.
10 Tell me all of the reasons.
11    A. I cannot remember is what I'm
12 saying.
13    Q. This is the only chance I have to
14 ask you. So I need you to remember.
15    A. I need some time to -- you know, to
16 remember but --
17    Q. Other than the occasion referenced
18 in the e-mail we've been discussing, when --
19 tell me other times that Ms. Hunter left work
20 undone.
21    A. I cannot remember all of the
22 things. I cannot remember all of the things.
23    Q. Tell me what you remember.
24       MR. BARNETT: Do you want to tell
25 her what happened when Ms. Hunter was not

Page 53

1 there to do her work?
2       MS. LEONARD: That's not my
3 question.
4    Q. My question is: How many times --
5 tell me the times that you remember Ms. Hunter
6 leaving work undone.
7    A. You know, we have been closing
8 out -- we have been performing the closing out
9 by every month -- each month. So we was so
10 busy during the month's end -- month's end --
11 during the month's end and early next month or
12 something. So probably two or three more. I
13 could not remember, however, during that
14 period.
15    Q. Did you document any of the times
16 Ms. Hunter left work undone?
17    A. As I already explained, you know,
18 the -- I -- I did not know, you know, the --
19 how -- the assistant directly. So if I had
20 some issues, probably I talked to the two
21 assistants -- two assistant managers, two
22 assistant managers.
23       I did not work, you know, the --
24 with, you know -- I didn't work with the
25 assistant directly every time. If I had, you

14 (Pages 50 to 53)

Deposition of JAY KIM
January 31, 2008

Page 54

1  know, the -- if I have some issues, I have to
2  talk to assistant manager.
3       Q. Did anyone complain to you about
4  Tarsha?
5       A. I don't -- I don't know. I don't
6  know.
7       Q. So you don't remember anyone
8  complaining about Ms. Hunter?
9       A. The assistant manager Ho Sang -- Ho
10  Sang Hwang -- I don't remember that name, but
11  he sometimes told me -- told me I did not
12  receive them or something or on time or
13  whatever.
14       Q. Did Sonechka complain about
15  Ms. Hunter?
16       A. Sonechka, you know, did take, you
17  know -- told me when Tarsha left early or
18  something she has to -- had to take care of
19  Tarsha's work -- Tarsha's work.
20       So she has been worked over 5:00
21  o'clock until sometimes 7:00 o'clock.
22       So when she work to you, you know,
23  over five, six, sometimes seven, I have to
24  talk to -- ask her, What's wrong? What
25  happened?

Page 55

1       When I asked her, you know, she has
2  to be, you know, the -- has to be, you know,
3  finish Tarsha's work -- Tarsha's work.
4       Q. Did Ms. -- did Sonechka tell you
5  that she had any problems with Tarsha?
6       A. I cannot remember. I don't
7  remember, but -- but -- when I have, you know,
8  some problem on the closing out -- closing
9  out, and I ask -- when I ask Sonechka,
10  Sonechka, what's going on, that -- you know,
11  she said, Oh, it has to be done or something.
12  Why didn't you complete it? Oh, it has been
13  finished, but I could not do that just in time
14  because Tarsha's, you know, the -- you know,
15  the vacant -- you know, was vacant or, you
16  know, left out.
17       MS. RIEDLER: Are you talking about
18  early out, leaving early during the day?
19       THE WITNESS: At that point, you
20  know, that Sonechka has to -- has to, you
21  know, complete, you know, the steps at work.
22       So when I asked her -- when I asked
23  Sonechka -- Sonechka did not, you know, blame,
24  you know, Tarsha. Sonechka did not blame
25  Tarsha. However, I -- I clearly understand,

Page 56

1  you know -- understood that Sonechka had some
2  problem, some difficulty to complete several,
3  you know, several -- the work just in a timely
4  manner as I requested or as I, you know,
5  the -- as I assigned.
6       So I have seen her. She has been
7  worked over 5:00 or over 6:00 or over 7:00
8  o'clock.
9       Q. How many times?
10       A. I can't remember.
11       Q. More than once?
12       A. Yes.
13       Q. More than five?
14       A. I don't know.
15       Q. What did Tarsha do good?
16       A. Actually, I think that the -- she
17  worked, you know, the -- she worked good. As
18  you see the ninety -- the worksheet,
19  regulation sheet, I didn't mention about, you
20  know, to her about the work stuff or something
21  like that.
22       MR. BARNETT: What was that last, I
23  didn't mention what?
24       THE COURT REPORTER: Work stuff or
25  something like that.

Page 57

1       MS. LEONARD: Work stuff or
2  something like that.
3       A. That work performance anyway.
4       MR. BARNETT: Okay.
5       Q. I'm going to make this document an
6  exhibit since you referenced it, which is the
7  ninety-day performance review.
8       (Plaintiff's Exhibit Number 13 was
9       marked for identification. A copy
10       is attached.)
11       Q. Is this Exhibit Number 13 the
12  performance -- ninety-day performance review
13  the only performance review that you did of
14  Ms. Hunter?
15       A. Yes.
16       Q. Did you do any performance
17  evaluation of her when she was hired as a
18  full-time employee?
19       A. No.
20       Q. Who monitored Ms. Hunter's
21  attendance?
22       A. My understanding, Sonechka has to
23  do.
24       Q. Okay.
25       A. I had her to do it.

15 (Pages 54 to 57)

Deposition of JAY KIM
January 31, 2008

Page 62

1     A. Okay.
2     Q. I'm talking about Tarsha. Where
3  did you get the information in this chart on
4  Exhibit 2?
5         MR. BARNETT: He's already
6  answered, but we'll let him answer one more
7  time. He's already said verbal --
8         MS. LEONARD: Hold on. He can
9  answer again. I don't want to hear your
10  summary of his testimony. I want to hear his
11  testimony.
12         MR. BARNETT: Well, I mean, this is
13  the third time and he's answered it.
14         MS. LEONARD: And I've gotten
15  different answers every time.
16     A. I already -- I already talked to
17  you.
18     Q. Tell me again.
19     A. I gathered that information from
20  Tarsha or Sonechka.
21     Q. Okay.
22     A. I did not make it by myself.
23     Q. All right.
24     A. On this question.
25     Q. Okay. I'm going to show you

Page 63

1  Exhibit 4.
2     A. Yes.
3     Q. Who created this document?
4     A. I made it.
5     Q. Where did you get the information
6  in the top chart?
7     A. Okay. Let me explain.
8     Q. Okay.
9     A. I have -- I have, you know, the
10  exact -- the exact same form for each
11  employee. So I made, you know, the copy, but
12  I did not delete this one.
13         Normally, you know, if a permanent
14  employee will start, you know, their work, at
15  that point I always ask HR to get, you know,
16  the -- their, you know, vacation days. And
17  then I will -- I have them put the total
18  vacation days on the top.
19         But I didn't delete it all on this
20  one. It's not Tarsha's records, because she
21  didn't start, you know, the work from January.
22     Q. So you would agree that at least
23  part of Exhibit 4, which is a business record
24  or document produced in this lawsuit, is
25  inaccurate? This is wrong, the top part of

Page 64

1  Exhibit 4 is wrong?
2     A. Yeah. This is wrong.
3     Q. All right.
4         MR. BARNETT: Let the record show
5  that he is --
6         MS. LEONARD: The top part.
7         MR. BARNETT: He's pointed out that
8  the date of -- that starts with 1-13-2006 and
9  goes out one, two, three, four columns is
10  incorrect, or it doesn't apply to her.
11     Q. When did you find out Tarsha was
12  pregnant?
13     A. I cannot really remember the exact
14  dates.
15     Q. How did you find out she was
16  pregnant?
17     A. In the partition area. When I
18  passed, you know, the -- Tarsha's, you know --
19  beside the IT department, at that point some
20  of, you know, the employees gather in the
21  partition area.
22     Q. Okay.
23     A. So I -- but I didn't know about,
24  you know, the pregnancy, even though, you
25  know, there's several employees gathered at

Page 65

1  her desk.
2         But when I returned to my office --
3  office, she brought -- in my memory, she
4  brought the small picture.
5     Q. Ultrasound?
6     A. Yes, ultrasound.
7     Q. You can call it a picture.
8     A. Yeah, ultrasound. Yeah, I saw that
9  picture.
10     Q. Did Tarsha sit down and tell you
11  she was pregnant?
12     A. Probably she did.
13     Q. How long before she was fired did
14  you find out she was pregnant?
15     A. I really don't understand --
16  remember the exact date -- the exact date.
17     Q. I'm not asking for an exact date.
18  Do you have an opinion as to whether it was a
19  week, two weeks, three weeks, a month, or more
20  than a month before she was fired that you
21  knew she was pregnant?
22     A. Probably before, you know -- when
23  was her termination?
24     Q. August 25th.
25     A. 25th. I --

17 (Pages 62 to 65)

EDMONDSON REPORTING & VIDEO, INC.
Email: Edmondsonrpting@bellsouth.net          Phone 205.324.2333  Fax 205.324.2377

Deposition of JAY KIM
January 31, 2008

---

Page 70

1  there?
2      A. Okay. I did not hire, you know,
3  the temporary employee. I just, you know, got
4  a temporary employee from HR. I didn't
5  arrange anything.
6      MS. RIEDLER: May I?
7      MS. LEONARD: I'm going to try to
8  rephrase it. I'm going to ask it a different
9  way.
10      MS. RIEDLER: Can you draw a
11  picture of the time line?
12      MS. LEONARD: Wait a second.
13      Q. Tarsha became a Mobis employee in
14  June 2006, correct?
15      MR. BARNETT: Object to the form.
16  That's when she started her probationary
17  period.
18      Q. She was a full-time -- I'm using
19  the term full-time employee to mean she was
20  employed by Mobis.
21      Tarsha became employed by Mobis in
22  June 2006, correct?
23      A. Probably, right.
24      Q. At the time she became a Mobis
25  employee, was Multi-Staffing going to assign

---

Page 71

1  her to a new job away from Mobis?
2      A. Away from Mobis?
3      Q. At the time Mobis hired her, had
4  Mobis not hired her in June, what would have
5  happened to Tarsha?
6      A. I don't know.
7      Q. Would she have stayed as a
8  temporary employee?
9      A. I'm sorry. I'm not, you know, the
10  expert here in the field of hiring or
11  something like that.
12      Q. Okay. That's fine.
13      A. It's not my business, I think.
14      Q. When Mobis hired Tarsha in June, is
15  it your testimony that you never intended her
16  to work more than ninety days?
17      A. I don't know. What is your exact
18  question?
19      Q. In June 2006, had you decided to
20  fire Tarsha?
21      A. I think that you -- you have some
22  misunderstanding due to my, you know,
23  incorrect expression.
24      Q. When did you decide to fire Tarsha?
25      A. I didn't make her, you know, the --

---

Page 72

1  okay. I just want to revise my expression, my
2  expression correctly.
3      She was a temporary employee.
4      Q. Okay.
5      A. But -- during the two or three
6  months. But during that period, I was not
7  very pleased with, you know, her attendance
8  and tardy or something.
9      So I did not want her to start the
10  Mobis employee -- Mobis employee. Yeah. That
11  is my opinion.
12      Q. All right. I'm showing you an
13  e-mail --
14      A. Yes.
15      Q. -- that is Exhibit 5 to
16  Ms. Riedler's deposition that's an e-mail
17  exchanged between you and Ms. Riedler around
18  August 23rd, 2006.
19      A. Yes.
20      Q. Before this e-mail, had you talked
21  to Tracy about firing Tarsha?
22      A. I had, you know, the meeting with
23  Tracy before August the 23rd, yeah.
24      Q. On what day did you have that
25  meeting?

---

Page 73

1      A. I don't remember the exact date.
2      Q. How could I find out that date?
3      A. I'm sorry?
4      Q. How could I find out that date?
5      A. I don't know.
6      Q. In this e-mail, do you reference an
7  earlier meeting?
8      A. Yeah. Yes.
9      Q. What did you mean by -- I'm reading
10  upside down. It's not as easy. Why were you
11  canceling your trip to Korea?
12      A. I clearly remembered -- why did I
13  cancel my business trip? Actually, we were
14  supposed to merge -- achieve, you know, the
15  membership interest from the CNA -- CNA. It
16  was an up-beat deal in Mobis Alabama.
17      Q. It had nothing to do with
18  Ms. Hunter?
19      A. I'm sorry?
20      Q. Did you cancel your trip because of
21  Ms. Hunter?
22      A. No.
23      Q. That's all I care about.
24      A. No. No.
25      Q. I don't need to know all of Mobis's

---

Deposition of JAY KIM
January 31, 2008

Page 74

1  business.
2      A.  Let me appreciate --
3          MR. BARNETT:  She don't want to
4  know.
5          MS. RIEDLER:  She doesn't need to
6  know.  It's not important to her.  Don't
7  worry.
8          THE WITNESS:  I didn't cancel.
9          MS. RIEDLER:  There's kind of like
10 a sketch for you, if you want it.
11     Q.  When you sent this e-mail, did you
12 know Ms. Hunter was pregnant?
13     A.  Probably I already knew that, you
14 know.  She showed me small picture, yeah.
15     Q.  How did you know Sonechka wanted to
16 keep Ms. Hunter?  In your e-mail, you say that
17 Sonechka wants to keep her.  How did you know
18 that?
19     A.  Sonechka asked me when Tarsha stops
20 Mobis employee, at that point she, you know,
21 strongly asked me to keeping Tarsha.  Very
22 strongly she asked me and persuaded me.
23         If Sonechka would not persuade me,
24 probably already, you know, made a decision.
25 I will not let Tarsha start, you know, the

Page 75

1  work in Mobis Alabama.  That was my, you know,
2  opinion.
3      Q.  Had you talked to Sonechka about
4  firing Tarsha?
5      A.  I don't remember, but I talked to
6  her verbal.  Probably I told her -- I was not
7  pleased with, you know, her -- Tarsha's
8  attendance and tardiness or whatever.
9      Q.  What did you mean when you wrote, I
10 do not want to take care of Tarsha anymore?
11     A.  Okay.  That's, you know, the
12 different language barrier or something like
13 that.
14         I read, you know, that that -- I
15 read this sentence.  Normally, I have been
16 wrong about -- taking care of them means keep
17 or something like that.
18         Of course, you know, taking care of
19 them has, you know, several different
20 meanings, but I did not know about that.  I
21 didn't know about it.
22         In this exact sentence, that means
23 I don't want to work with her in accounting
24 and financing.  I just wrote, you know, this
25 word with that meaning.  But I'm not sure how

Page 76

1  the other person -- how can they, you know,
2  understand this wording, this idioms?
3          I just, you know, wrote that word.
4  Okay.  I will not -- don't want, you know, to
5  work continuously or something like that.  I
6  just wrote that idioms with that meaning.
7      Q.  All right.  What did you mean when
8  you wrote, I need your help to terminate her?
9      A.  Okay.  I clearly remember the why
10 did, you know, I write this sentence.
11         Even though I can speak English,
12 but it's very hard for me to explain about,
13 you know, the detail or something like that
14 with the correct word and idioms.
15         So I need -- I wanted Tracy to
16 understand what -- what I am -- what I was
17 thinking -- what I was thinking.
18     Q.  So you wanted her to help
19 verbalize?
20     A.  Broken English or something.
21     Q.  So you wanted her to help speak for
22 you?
23     A.  Speak or -- and I want -- I want
24 Tracy to understand that with my broken
25 English -- broken English -- not to, you know,

Page 77

1  the -- with her like in this occasion,
2  projecting.
3      Q.  Who was hired to replace
4  Ms. Hunter?
5      A.  I'm sorry?
6      Q.  Who did you hire to replace her?
7  Who replaced her?
8          MR. BARNETT:  Who took her job when
9  she left?
10     A.  I don't remember that.
11     Q.  How long did it take to replace
12 her?
13     A.  I have no idea.
14     Q.  Now I thought you said --
15     A.  You say my -- you know, the folder
16 or something in my desk.  I can remember, but
17 right now I don't remember that.
18     Q.  Who did her work until you hired
19 someone to replace her?
20     A.  I don't remember that.
21     Q.  Did it cause any problems after you
22 terminated Ms. Hunter in getting the work done
23 in the department?
24     A.  I think so, because the other
25 person has to take care of all the -- Tarsha's

20 (Pages 74 to 77)

Deposition of JAY KIM
January 31, 2008

|  | Page 78 |
|---|---|

1 work.
2     Q. Have you seen Exhibit 8 before?
3     A. I thought, you know, that this --
4 the letter, but I did not, you know,
5 completely, you know, read the letter.
6     Q. Okay. That's fine.
7     A. I have - I have seen this -- this
8 one.
9     Q. Referring to Exhibit 2?
10     A. Yes.
11     Q. Did Ms. Hunter ask you or Sonechka
12 if she could be off work on June 15th, 2006?
13     A. Yes.
14     Q. Who did she ask?
15     A. Who?
16     Q. Who did she ask if she could be off
17 work?
18     A. I could not really remember what
19 happened exactly on June 15th. However, I
20 just put eight hours. That means one day.
21     Q. Okay.
22     A. Probably Tarsha was not show up on
23 that date, I think.
24     Q. Had she asked permission to be off
25 on that day?

|  | Page 79 |
|---|---|

1     A. I think that it's not, you know,
2 the work, you know.
3     Q. Before she was off, did she let
4 anyone know that she couldn't be at work that
5 day?
6     A. How can I remember that exact
7 date?
8     Q. So you don't remember?
9     A. I can't just remember, you know. I
10 can read, you know, the number. Probably she
11 was not in office due to all the sickness or
12 something. I strongly believe in my -- that
13 this -- in this number.
14     Q. Did anyone tell her that she could
15 not be off work on June 15th?
16     A. I couldn't remember.
17     Q. On July 25th, 2006, did she let
18 anyone know that she might be off for three
19 point five hours before she took off?
20     A. Probably -- I probably received the
21 format, excuse format. And I, you know,
22 probably remember when she leave office. And
23 then I could remember when is she back, when
24 did she leave, when did she return to office.
25     Q. Before she left the office, did

|  | Page 80 |
|---|---|

1 anyone tell her she could not leave?
2     A. Yeah. Normally, you know, my
3 people will want to leave early. You know,
4 their assistant manager or let me know or a --
5 their team member told me -- told me when I
6 want to leave or something like that.
7     And also, if you know like this
8 three point five, you know, off or something,
9 I have normally ask the assistant manager or
10 the other -- you know, the colleagues there,
11 did she come back or didn't she or something.
12     Q. For any of the dates on Exhibit 2?
13     A. Yes.
14     Q. For any of these, was Ms. Hunter
15 absent without telling Mobis first that she
16 would be off?
17     A. I don't understand what you mean.
18     Q. Did she fill out a form to be off
19 before each one of these dates?
20     A. If I can see -- if I can see, you
21 know, the excuse format, I can find out. But
22 sometimes --
23     Q. They're in the documents.
24     A. Sometimes -- sometimes -- sometimes
25 my team member will not know the subject of

|  | Page 81 |
|---|---|

1 this kind of format sometimes, because my team
2 member has, you know, some emergency or
3 something like that.
4     They -- they cannot -- they could
5 not, you know, make or write this format.
6     Q. For any of the dates on Exhibit 2,
7 was Ms. Tarsha -- was Ms. Hunter told you
8 can't be off?
9     A. You can't be off?
10     Q. Right. Did you ever tell her, no,
11 you have to stay at work at this date and
12 time?
13     A. Let me explain.
14     Q. Well, first answer my question.
15     A. I couldn't really remember -- I
16 could not really understand what exactly do
17 you want -- do you want to know.
18     Q. For any of these absences --
19     A. Right.
20     Q. -- before she was absent, did you
21 tell her, No, you can't be absent?
22     A. I did not say. I didn't say.
23     Q. Okay.
24     A. Because -- because if somebody, you
25 know, is sick, they have to go to see a

21 (Pages 78 to 81)

Deposition of JAY KIM
January 31, 2008

## Page 82

1  doctor. That is common. That's normal. Then
2  how can I say to, you know, my people, Hey,
3  please sit down and you have to work. You
4  have to complete this work. I didn't say. I
5  didn't say it. How can I say that?
6      Q. Did you tell --
7      A. If I'm sick, I have to go to see a
8  doctor. And I also have to report it to my
9  immediate supervisor, like, you know,
10  Mr. Kim. I have to let him know I am very
11  sick. I have to go see a doctor.
12      Then how, Mr. Kim, tell me, Please,
13  sit down and you have to complete this work by
14  today or something. It's the common thing,
15  right?
16      Q. Did you --
17      A. Let me explain even though the
18  other team members in accounting, if they
19  have, you know, some sickness or something, I
20  always told -- told them, hey, go -- please go
21  to see a doctor. That's normal, right?
22  That's a common thing.
23      Q. Who made the decision to terminate
24  Ms. Hunter?
25      A. I already explained, you know, I

## Page 83

1  made a decision. I made a decision at first.
2  And then I wanted to discuss with Tracy
3  because I don't really want to be the right --
4  you know, the legal thing, whatever,
5  something.
6      I am a foreigner. So I don't want,
7  you know, to make some trouble in the USA. So
8  I need Tracy, you know, to help. I need
9  Tracy's help.
10      Q. Okay. And so the record is clear
11  so that Henry and I don't have to jump
12  throughout your transcript, why did you
13  terminate, or why did you make the decision to
14  terminate Ms. Hunter?
15      MR. BARNETT: I don't think that's
16  a fair characterization of his testimony.
17      MS. LEONARD: Elaine, can you read
18  back his testimony?
19      MR. BARNETT: I just -- I think
20  it's too many inferences that could be drawn
21  from that given his understanding of what
22  you're trying to ask him.
23      MS. LEONARD: And your objection is
24  noted for the record.
25      Q. Why did you make the decision to

## Page 84

1  terminate Ms. Hunter?
2      MR. BARNETT: Object to the form.
3      A. I already told you how many times
4  why -- why did you ask me the same question?
5  I already explained that.
6      Q. Because I'm paying for this
7  transcript, and I get to ask the questions.
8  Why did you terminate Ms. Hunter?
9      MR. BARNETT: Object to the form.
10      A. Tardiness and --
11      MR. BARNETT: Why don't you ask him
12  a fair question, if anybody else was involved
13  in the decision.
14      Q. Why was Ms. Hunter terminated?
15      A. I'm sorry?
16      Q. Why was she terminated?
17      A. I've already explained to you.
18      Q. Please do again.
19      MR. BARNETT: I object. That's
20  enough of that.
21      MS. LEONARD: No, the record is not
22  clear.
23      Q. Why was Ms. Hunter terminated?
24      A. I already explained to you.
25      Q. Please do it again.

## Page 85

1      A. I already explained to you.
2      Q. Please do it again.
3      MS. LEONARD: I was more than
4  patient yesterday. Ms. Hunter got asked a lot
5  of the same questions over and over again, and
6  there wasn't a language barrier.
7      MR. BARNETT: But this -- I think
8  he's answered this one five times.
9      MS. LEONARD: Well, great. He can
10  answer it six.
11      MR. BARNETT: You can answer you've
12  already told them. That's enough.
13      THE WITNESS: Should I answer?
14      MR. BARNETT: No, you don't have to
15  answer that.
16      Q. So you're refusing to tell me why
17  Ms. Hunter was terminated?
18      A. No. I already responded to you.
19      Q. I don't understand your answer
20  then. Tell me what it -- the reason was.
21      A. The reason?
22      Q. Right.
23      MR. BARNETT: You don't understand
24  what he answered earlier as to --
25      MS. LEONARD: I don't understand

EDMONDSON REPORTING & VIDEO, INC.
Email: Edmondsonrpting@bellsouth.net    Phone 205.324.2333  Fax 205.324.2377

Deposition of JAY KIM
January 31, 2008

Page 86

1  from his testimony when the decision to
2  terminate her was made.
3      MR. BARNETT: Well, we knew going
4  in there were going to be communication
5  problems.
6      MS. LEONARD: These are fundamental
7  questions that can be anticipated. When he's
8  called in in a case dealing with her
9  termination when we allege it's due to
10 pregnancy, I don't think it's off the wall for
11 him to anticipate I'm going to ask him when
12 the decision to terminate her was made and why
13 she was going to be terminated.
14     A. Can I explain?
15     Q. Yes.
16     A. I remember, you know, when I saw
17 the ultrasound picture, I told Tarsha,
18 Congratulations. That's normal. That's
19 common. It's great, you know.
20     I clearly, you know, explained --
21 clearly explained why should I make a decision
22 to terminate her.
23     Q. Okay.
24     A. Her bad tardiness and attendance,
25 and that --

Page 87

1      MS. RIEDLER: The ninety-day
2  performance review sheet. That's where.
3      MS. LEONARD: Hold on. We just
4  made it an exhibit.
5      A. Yeah. Attendance and dependability
6  issue. That's it. It's not related, you
7  know, to pregnancy -- pregnancy. It's not
8  related to pregnancy.
9      Q. Did you consider any absences other
10 than what is on Exhibit 2 or any attendance
11 issues other than what's on Exhibit 2?
12     A. Yes.
13     Q. What else did you consider?
14     A. I'm sorry?
15     Q. What else did you consider? Is
16 this everything you considered on her
17 attendance, Exhibit 2?
18     A. Uh-huh. When I -- when I made a
19 decision to terminate her, I asked Tracy, Do
20 we have some policy or something like that out
21 of our handbook if somebody will have, you
22 know, bad tardiness or bad attendance, how can
23 we do that or something like that.
24     She explained we have the right --
25 ninety-day probation or something like that.

Page 88

1      So Tracy explained to me, Tarsha,
2  okay. So I showed, you know, this statement
3  to Tracy because -- because I don't want to --
4  I didn't want to mix -- write this -- you
5  know, the legal issues or something like that.
6      Q. Tell me what you remember about the
7  day Ms. Hunter was fired.
8      A. August 25th. August the 25th.
9      Q. Why was that day the day she was
10 fired?
11     A. I'm sorry?
12     Q. Why did you fire her on the 25th as
13 opposed to the 23rd or the 24th?
14     A. There is not a reason. There was
15 not a reason.
16     Q. All right. And tell me what you
17 remember about how Ms. Hunter was terminated
18 on that day.
19     MR. BARNETT: What happened? She
20 wants to know what happened on the 25th.
21     A. On the 25th?
22     Q. Uh-huh.
23     A. In my memory, I had a meeting with
24 Tarsha and Sonechka.
25     Q. Did you record the meeting?

Page 89

1      A. Yeah, I -- I had a meeting with
2  Tarsha and Sonechka.
3      Q. Did you make a tape recording or an
4  electronic recording like Ms. Scott is making
5  for the meeting --
6      A. No.
7      Q. -- so that we could listen to it?
8      A. No. No. No.
9      Q. That's all right. I have to ask.
10     MR. BARNETT: I was wondering what
11 the answer was going to be myself.
12     A. You know -- you know, why should I
13 keep, you know, that record?
14     MR. BARNETT: She's entitled to ask
15 that question. That's okay.
16     Q. Some people do it so there's no
17 confusion about what happened.
18     Tell me what you remember about
19 that meeting.
20     A. Yes. When I was -- when I was
21 meeting with Tarsha and Sonechka and I
22 explained why should I make a decision to
23 terminate Tarsha, at the point, Sonechka, you
24 know, was very -- was not pleased with my
25 decision or something.

23 (Pages 86 to 89)

Deposition of JAY KIM
January 31, 2008

Page 90

1    I tried to explain what was, you
2 know, the reason of the termination, but --
3 but Tarsha and Sonechka very strongly, you
4 know, they protested their -- you know, their
5 situation. But -- but I want -- I wanted to
6 try to explain in detail what's going on.
7 However I cannot -- I could not explain --
8 explain in details to make them understand
9 that -- understand that.
10    So I asked -- I asked the other
11 assistant manager Mr. Hwang, Ho Sang, to let
12 Tracy know about that, and then I asked him
13 to -- Tracy come to my office.
14    So Tracy just joined with us --
15 joined us. As I explained on my summary
16 e-mail, I need Tracy's help. I need Tracy's
17 help.
18    I wanted -- I wanted to explain to
19 Tarsha and Sonechka. However, I could not
20 really, you know, fully -- fully explain to
21 them. So I asked Tracy to explain to them in
22 details -- in details.
23    Q. What did you try to tell -- do you
24 remember what you tried to say in the meeting?
25    MR. BARNETT: Before Tracy was

Page 91

1 there?
2    MS. LEONARD: Yes.
3    A. Yeah. I could remember part --
4 some of the parts, but not whole thing. Not
5 the whole thing.
6    MR. BARNETT: Let me see if this
7 agent is here yet.
8    MS. LEONARD: I'm about done if it
9 helps.
10    (Off-the-record discussion)
11    Q. Do you have any memory of what you
12 tried to say to Sonechka and Tarsha before
13 Tracy came in the room?
14    A. Okay. I could remember about that
15 whole, you know, thing because I already, you
16 know, found out, you know, Tarsha's attendance
17 issues.
18    So -- so I just wanted to explain
19 how many times, you know, that she get -- she
20 got, what's that, the attendance issues
21 through my, you know -- with my worksheet or
22 paper, Excel spreadsheet.
23    But I was not very, you know,
24 pleased with, you know, with them during the
25 meeting because -- because I could not express

Page 92

1 my -- you know, the exact reason to them
2 with -- with the limited vocabulary or
3 something like that.
4    Q. Do you have any memory of anything
5 Tarsha or Sonechka said in the meeting?
6    A. I couldn't remember.
7    Q. All right. Did either Sonechka --
8    A. I remember, you know, that -- I
9 heard, you know, Tarsha wanted to, you know --
10 wanted to work, you know. And she asked me
11 what was the exact reason of my termination,
12 very -- she asked me very loudly or very --
13 attentively or something. What was the reason
14 of my termination, or something like that. I
15 clearly remember that.
16    Q. Do you remember anything else?
17    A. I could not remember.
18    Q. Have you told me everything that
19 you can recall about the meeting where Tarsha
20 was terminated either before or after Tracy
21 got there?
22    A. Yeah. You know, the -- in my
23 memory, I had a brief meeting -- brief meeting
24 because, you know, Tarsha and Sonechka's
25 response was very strong, very, you know,

Page 93

1 negative or something --
2    MR. BARNETT: Strong or what?
3    MS. LEONARD: Negative.
4    A. Negative, on my -- my explanation.
5 So I thought, you know, that I need to let
6 Tracy know about that.
7    And then, probably I thought Tracy
8 can, you know, more smoothly, you know,
9 explain to them.
10    So I asked Ho Sang to, you know, to
11 let Tracy know, and then Tracy, you know, came
12 into my office.
13    Q. Have you told me everything that
14 you remember about the entire termination
15 meeting?
16    A. On August the 25th, right?
17    Q. Correct.
18    A. Yeah.
19    Q. Was there another one?
20    A. No. In my memory --
21    Q. I just want to make sure. You
22 never know.
23    MS. RIEDLER: Both of you are
24 exhausted. I can't figure who -- who more.
25    MR. BARNETT: She wants to know if

24 (Pages 90 to 93)

Deposition of JAY KIM
January 31, 2008

Page 94

1  you remembered anything else about that
2  meeting.
3      THE WITNESS:  No, because, you
4  know, I had a brief, you know, meeting.
5      Q.  Have you told me everything that
6  you remember about the reasons Ms. Hunter was
7  terminated?
8      Have you told me everything you
9  remember about why Tarsha was fired?
10     A.  Yeah, I told you, you know.
11     Q.  I'm not asking you to say it
12  again.
13     MR. BARNETT:  Just say yes.
14     A.  Yes.
15     Q.  Have you had any employees that
16  were pregnant work for you?
17     A.  Right -- currently?
18     Q.  At Mobis.
19     MR. BARNETT:  Have you had any
20  employees at Mobis who were pregnant while
21  they were working for you?
22     A.  Yeah.  Currently, you know --
23  currently, you know -- at this point I have
24  one girl that -- assistant, she has a
25  pregnancy now.

Page 95

1      Q.  Okay.
2      A.  One or two months along.
3      Q.  All right.
4      A.  So --
5      MS. RIEDLER:  Really, who is
6  pregnant?
7      THE WITNESS:  Sacouya.
8      MS. RIEDLER:  Okay.
9      A.  So really, you know, when I heard
10  from, you know, that person, that employee, at
11  that point I told her, Congratulations or
12  something.  It's her second baby.  So --
13     Q.  How long has she worked for you?
14     A.  Almost two -- two months.
15     Q.  Okay.
16     A.  Two or three months.
17     Q.  All right.  Is she going to --
18     A.  I'm sorry.  She just, you know,
19  completed, you know, the ninety-day probation
20  in my memory.  So almost three or four months
21  right now, I think.
22     Q.  All right.  And this is going on
23  now while Ms. Hunter's lawsuit is pending,
24  correct?
25     A.  I'm sorry?

Page 96

1      Q.  The employee you're talking about
2  works for you now, today, as we're -- you're
3  giving this deposition?  She's working for you
4  now?
5      A.  Yeah, she is working for now.
6      Q.  I just want to make sure.
7      A.  Yeah.
8      Q.  And she's two months, three months
9  pregnant right now?
10     A.  I couldn't remember but, yeah, but
11  maybe.
12     Q.  Okay.  Other than her and Tarsha,
13  any other employees that have been pregnant
14  who have worked for you?
15     A.  Currently or --
16     Q.  At any time.
17     MS. RIEDLER:  Ever.
18     A.  Okay.  Okay.  I remember the one
19  Korean, Korean lady, she has -- worked 2006 in
20  my memory.
21     Q.  All right.
22     A.  She was the assistant like Tarsha.
23  But she left Mobis Alabama after two or three
24  months.  She is not working.
25     Q.  Okay.

Page 97

1      A.  But she was -- she had a
2  pregnant -- pregnancy at that point.
3      I heard from her there's these
4  other times, you know, that pregnant because
5  she failed two times due to what's that --
6  what's that --
7      MS. RIEDLER:  Miscarriage.
8      A.  Yeah, miscarriage.  So she was very
9  nervous to, you know, keep, you know, the
10  pregnancy.
11     And then -- then she left to Mobis
12  after two or three months, you know.  She's
13  not to work because -- because her husband is
14  also Korean.
15     However, she has been adopted --
16  adopted or something from Korea to America
17  when she was, you know, a baby.
18     So he -- her husband has been
19  worked in HMMA Honda Motor Manufacturing
20  Alabama -- Alabama.
21     So in my memory, she was doing good
22  job in accounting -- in accounting.  But she
23  left because her husband got a new job in
24  Korea, ebay.com.  I clearly remember that.
25     So I asked, you know, when she

EDMONDSON REPORTING & VIDEO, INC.
Email:  Edmondsonrpting@bellsouth.net        Phone 205.324.2333  Fax 205.324.2377

Deposition of JAY KIM
January 31, 2008

Page 98

1  wanted to leave Mobis Alabama. So I asked
2  her, Why do you want to leave Mobis Alabama?
3  She said, I am very sorry. I am very sorry.
4  My husband wanted to find out his parents in
5  Korea -- in Korea.
6       So her husband wanted to get a job
7  in Korea -- in Korea. But at the time, you
8  know, her husband got a job -- got a job. So
9  she has to, you know, to leave Mobis Alabama.
10     Q. What was her --
11     A. At the point that she has -- she
12 had a pregnancy, you know.
13     Q. What was her name?
14     A. Su Jin, S-U, J-I-N, Su Jin.
15     Q. Yesterday, there was some testimony
16 that Nicole Boswell said she heard you make a
17 remark that Su Jin's pregnancy was a disgrace?
18     A. A what?
19     Q. A disgrace. What is your response
20 to that testimony?
21         MR. BARNETT: Hold on. I can see
22 he needs help. I've got to go. This is going
23 to take fifteen minutes. That's it.
24         (Break taken.)
25     Q. Mr. Kim, yesterday, there was

Page 99

1  testimony that one of your employees told
2  Ms. Hunter that she had heard you make a
3  remark about the young Korean lady who was
4  pregnant that we just discussed.
5      A. Yes.
6      Q. She commented that you made a
7  remark to the effect that the pregnancy may be
8  seen as a disgrace. What's your response to
9  that testimony?
10     A. Okay. Probably she mentioned about
11 Su Jin Lee, I think. I remember the Su Jin
12 Lee. I already explained about Su Jin Lee's
13 situation.
14     Q. Correct.
15     A. Her pregnancy was, you know, the
16 three times, you know. So she was very
17 careful, you know, the -- handle that -- the
18 issues because she already got two times, the
19 mis --
20     Q. Miscarriage?
21     A. The miscarriage -- miscarriage.
22 She got married.
23         She got married. And she got a job
24 in the USA. So in my memory, she was doing a
25 good job, even though in a two month or three

Page 100

1  month. But I think America has some -- a
2  different meaning of the expression or
3  something. I think that it's a big
4  misunderstanding, a big misunderstanding,
5  because probably the quote she heard from, you
6  know, the other colleague there, what did they
7  say or something.
8       When I asked Su Jin about the
9  pregnancy or something, she explained why was
10 she, you know, carefully, you know, handle or
11 something. This was the three times. So I
12 was very surprised, you know.
13      So I asked him -- I asked her to be
14 careful, if you have some problem, please let
15 me know. Or if you need to see a doctor or
16 something, you can go or something like that.
17     Q. Did Ms. Hunter's pregnancy factor
18 into your opinion as to whether she should
19 continue working for Mobis?
20     A. I don't think -- you know, the
21 pregnancy or something, is not a problem in the
22 working place I think. It's not a problem.
23 It's not a problem.
24     Q. So Ms. Hunter's pregnancy did not
25 bother you?

Page 101

1      A. Yeah. Sorry.
2      Q. That's all right. Make sure when
3  you answer you lift your head up so Elaine can
4  hear you.
5      A. Sorry.
6      Q. That's all right. I'll ask it
7  again. Did Ms. Hunter's pregnancy bother you?
8      A. I don't think so. I don't think
9  so.
10     Q. Did you have any concerns about
11 having Ms. Hunter work for you while she was
12 pregnant?
13     A. I think that -- I want to say to
14 you very clearly, pregnancy is not a problem
15 on the working place. That's my thinking and
16 opinion. That's my thinking and opinion.
17     Q. Yesterday, there was testimony --
18     A. Yes.
19     Q. -- that employees told Ms. Hunter
20 not to tell you that she was pregnant because
21 other employees had been fired.
22         Do you know why any -- do you know
23 why any coworkers may have told Ms. Hunter not
24 to tell you?
25     A. I don't know. Actually, you know,

26 (Pages 98 to 101)

Deposition of JAY KIM
January 31, 2008

Page 102

1  the -- I heard it from the -- when I heard
2  about that, I was very surprised. I was very
3  surprised. So Mobis Alabama is the --
4  legally -- legally the company in the USA.
5  Then obviously should you, you know,
6  accommodate pregnant people, it's awesome.
7  It's awesome.
8         MR. BARNETT: It's what?
9         MS. LEONARD: Awesome.
10        MS. RIEDLER: Awesome.
11        MR. BARNETT: What's awesome? Did
12 you hear it?
13        A. It's a very surprising thing.
14        Q. Do you understand that -- would
15 something bad have happened to you if you had
16 fired Ms. Hunter for being pregnant?
17        A. I don't understand what --
18        Q. Sure. Would Mobis have fired
19 you --
20        A. Fired me?
21        Q. -- if you fired her for being
22 pregnant?
23        A. You know, common sense there, how
24 can, you know, Mobis, you know, fire pregnant
25 people.

Page 103

1         Q. What does Mobis do to employees who
2  discriminate?
3         A. I don't think -- I have never
4  treated somebody, you know, with
5  discrimination or something.
6         Q. Okay.
7         A. And also, I was -- you know, I have
8  been, you know, started work in Mobis Alabama
9  since 2003 -- February 2003.
10        When I worked in Korea almost
11 sixteen years, I have learned about the
12 American culture, basic culture,
13 discrimination, sexual harassment, or
14 something like that. That's very critical and
15 serious issues.
16        I have learned from headquarters.
17 So I have to be very careful, you know, when I
18 work in USA.
19        When I start to work -- when I
20 start to work first time, I had two
21 American, you know, assistants. Yeah, they
22 were ladies.
23        So when I learned -- what I learned
24 in Korea about American culture -- American
25 culture. So I very carefully -- carefully,

Page 104

1  you know, have been worked with, you know, my
2  American assistants in order to avoid, you
3  know, the licensing -- the legal issues or
4  something like that.
5         And also, I have learned there are
6  so many lawsuits in State of Alabama, I had
7  learned that when I worked in Korea. So I
8  never, you know, said -- I never said to none
9  of my people, my accounting people, Well,
10 pregnancy is a big problem in the work or
11 something. I never said.
12        Q. Well, my question is a little
13 different.
14        A. Yeah.
15        Q. Mobis Alabama is your employer,
16 correct?
17        A. Yes.
18        Q. Does Mobis Alabama let its
19 employees, everybody that works for it, know
20 you will get in trouble if you discriminate?
21        THE WITNESS: Tracy, simply ask me.
22        MS. RIEDLER: Can I help?
23        Q. If an employee engages in
24 discrimination, what happens to them at Mobis
25 Alabama? What would the company do?

Page 105

1         A. I don't know.
2         Q. Okay.
3         A. I'm not an expert in the field of
4  legal or something like that.
5         Q. All right. That's fine. That's
6  fine. Is there anything in your testimony
7  that you want to clarify or change or add to?
8         A. Yeah. I just have one thing.
9         Q. Okay.
10        A. I'm a Korean. When I heard from
11 Tracy, we got in this deposition, I felt that
12 why should I -- why should I, you know,
13 admit -- right, you know, in the situation.
14        So I was very surprised. I was
15 very surprised. I'm a foreigner. I have
16 limited, you know, vocabulary, English.
17        So I was very scared. I was very
18 scared, you know, of this deposition. How can
19 I explain or how can I understand what you're
20 asking me. How can I respond correctly
21 without the interpreter or translator.
22        So the day before yesterday,
23 Mr. Kim, President Mr. Kim asked me, if you
24 don't have any confidence under speaking
25 English, you can, you know, take some

27 (Pages 102 to 105)

Deposition of JAY KIM
January 31, 2008

Page 106

1  assistance from the Korean lawyer or
2  whatever.
3       But I just, you know, responded to
4  Mr. Kim, I did not make any, you know,
5  mistake. So I can do that. I will try to
6  explain correctly.
7       So this, you know, the deposition
8  as far as the time in my whole life, forty-six
9  years, I have never been to another lawsuit in
10 Korea. I haven't worked so hard.
11      And actually, I was supposed to go
12 back to Korea in the last year because I have
13 been working here five years. That's the
14 expected, you know, working period like, you
15 know, they assign Korean guys. I was just
16 only one person not back to Korea.
17      But I don't know how -- how can I,
18 you know, explain what happened in 2006? So
19 sometimes, you know, I couldn't remember on
20 the exact situation. However, this case is
21 not this -- impacting -- this case is just --
22 an impact to be in a situation on me -- on
23 me. So I don't know my response is enough for
24 you.
25      Q. Have you -- do you feel like you've

Page 107

1  been able to say what you wanted to say
2  today?
3       A. No.
4       Q. What would you like to add that
5  you've not been allowed to say?
6       A. I already explained it.
7       Q. Pardon?
8       A. I've already explained it.
9       Q. So you have been allowed to say
10 what you wanted to say?
11      MR. BARNETT: Have you said what
12 you wanted to say today? Have you been able
13 to say what you wanted to say?
14      MS. RIEDLER: Do you want to add
15 anything else?
16      A. No.
17      Q. Have I denied you a chance to say
18 anything that you want to say?
19      A. No. I just, you know, know very --
20 you know, explained as best I could.
21      Q. Anything else in your testimony
22 that you want to add to or clarify so that I
23 understand your position on Ms. Hunter's
24 termination?
25      A. I already explained. That's

Page 108

1  enough.
2       Q. Have you been treated fairly today?
3       A. I think so.
4       MS. LEONARD: That's all that I
5  have.
6       MR. BARNETT: No questions.
7       MS. LEONARD: You're done. Run
8  before we change our mind.
9
10
11      Deposition of JAY KIM
12      Concluded at 5:21 p.m.
13          January 31, 2008
14
15
16
17
18
19
20
21
22
23
24
25

Page 109

1          C E R T I F I C A T E
2
3
4  STATE OF ALABAMA  )
5  JEFFERSON COUNTY  )
6
7       I hereby certify that the above and
8  foregoing deposition was taken down by me in
9  stenotype, and the questions and answers
10 thereto were reduced to computer print under
11 my supervision, and that the foregoing
12 represents a true and correct transcript of
13 the deposition given by said witness upon said
14 hearing.
15
16      I further certify that I am neither
17 of counsel nor of kin to the parties to the
18 action, nor am I in anywise interested in the
19 result of said cause.
20
21
22
23
24      _____
         Elaine Scott, ABCR 354

28 (Pages 106 to 109)

# MOBIS Alabama, LLC

## Absence Request

**Absence Information**

Employee Name: Tarsha Hunter

Employee Number: _____ Department: Accounting & Finance

Manager: Sonechka Womack

Type of Absence Requested:

Sick          (Appointment)          Bereavement          Time Off Without Pay

Military          Jury Duty          Maternity/Paternity          Other

Dates of Absence: From: 8/11/06          To: 8/11/06

Reason for Absence:

I have a procedure (surgical) appointment is scheduled
@ 1:00 pm. I will return on Monday. I will make up time
during next week for 4 hours.

*You must submit requests for absences, other than sick leave, two days prior to the first day you will be absent.*

Tarsha Hunter                                          8/10/06
*Employee Signature*                                  *Date*

---

**Manager Approval**

☐ Approved

☐ Rejected

Comments:

_____          Date
*Manager  Signature*



PLAINTIFF'S
EXHIBIT
10

*Mobis Alabama, LLC.*
*1395 Mitchell Young Road*
*Montgomery, AL 36108*
*Ph: 334-387-4878*
*Fx: 334-387-4900*
*Tarsha.Hunter@Mobis-America.com*



---

**From:** sonechka.womack@mobis-america.com [mailto:sonechka.womack@mobis-america.com]
**Sent:** Thursday, August 10, 2006 10:06 AM
**To:** 'Tarsha Hunter'
**Cc:** 'Jay Kim'
**Subject:** RE: Attendance Issues

Tarsha,

As cited from the below email, please submit a schedule of time that you will be able to make up for your absences. We completely understand you current health condition, but this policy has been set for us to comply with when away from the office numerous times. This is not to discourage you; this is just to keep fairness throughout this department.

Thank you,
Sonechka

---

**From:** sonechka.womack@mobis-america.com [mailto:sonechka.womack@mobis-america.com]
**Sent:** Tuesday, May 09, 2006 10:29 AM
**To:** 'Tarsha Hunter'
**Subject:** FW: Attendance Issues
**Importance:** High

---

**From:** Jay Kim [mailto:jay.kim@mobis-america.com]
**Sent:** Wednesday, April 26, 2006 2:43 PM
**To:** nicole.boswell@mobis-america.com; sonechka.womack@mobis-america.com; 'Stephanie Perez'; 'Sandra Goodin'; hosang.hwang@mobis-america.com
**Subject:** Attendance Issues
**Importance:** High

2006-08-24

HUNTER V. MOBIS
00181

To all of staffs

First of all, I appreciate all of your effort and hard working.

I looked trough the status of individual attendance in accounting department up to now.
And, I asked and discussed with HR department to manage it more effectively.

1. Regular duty hours are 8 AM till 5 PM. Employees are expected to arrive to work in ready to start by 8 AM.

2. Employees are expected to remain at work (Except during the lunch break) until 5 PM.

3. Scheduled appointments outside MOBIS Alabama.

 A. Doctor's appointments

   1) From time to time we expect that employees must request time away from work in order to attend a Doctor's appointment.

    Personnel are expected to give ample notification (Minimum 24 Hours notification) prior to the appointment.

    Personnel are expected to schedule appointments for a time period that the results in the least amount of time away from work.

   2) If due to a health condition, you are required to be away from work multiple times during any given month,

      we should have an understanding that this time should be made up if you wish not to use your vacation allotment.

      This can be accomplished in many different ways, some examples include; staying late on regular work days to make up the number of hours missed, work on

        Saturday, etc.

   3) As salaried employees it is expected that some time in addition to schedule work hours, may be necessary at times.

    Like-wise we need to have an understanding that we must both work together to accomplish the job.

    Please do not take advantage of my cooperative nature as I still have to ensure that the work is completed.

 B. All other situations are adequately covered by company policy such as; Maternity, Family medical Leave, Bereavement leave, Jury Duty etc.

As you are aware of, Closing is very important and primary issue in accounting department.
And we should close every each month-end just in time to analysis and report it to the top management group in the headquarters.
Regarding the vacation days, if you want to take vacation days, if possible, please do not use it consecutively over the 3 business days and avoid the month-end closing period, otherwise first or second weeks of every month.

Your great assistance would be much appreciated.

2006-08-24

HUNTER V. MOBIS
00182

Jay Kim

*Jay K. (Jae-kwang)  Kim / CFO*

MOBIS Alabama,LLC.
1395 Mitchell Young Road,
Montgomery, AL 36108

Tel : 334-387-4802
Fax : 334-387-4900
E-mail : *jay.kim@mobis-america.com*

2006-08-24

HUNTER V. MOBIS
00183

sonechka.womack@mobis-america.com

| | |
|---|---|
| **From:** | Jay Kim [jay.kim@mobis-america.com] |
| **Sent:** | Wednesday, July 26, 2006 8:25 AM |
| **To:** | 'Tarsha Hunter' |
| **Cc:** | sonechka.womack@mobis-america.com |
| **Subject:** | Notification (July 26,2006) |
| **Importance:** | High |

Tarsha,

This is a notification for tardiness.
On Wednesday the 26th you were noted as being tardy, this was not a first time during 90-day probationary.
I need for you to keep the starting time for business, everyday.

When you return from doctor's office, please submit the doctor's note and schedule for make-up time.
In addition, you are reminded that you are still serving out your probationary period and that attendance is very important.
Please make every effort to correct these deficiencies as your long term employment may be in jeopardy.


Thanks.

*Jay K. (Jae-kwang)  Kim / CFO*

MOBIS Alabama,LLC.
1395 Mitchell Young Road,
Montgomery, AL 36108



PLAINTIFF'S
EXHIBIT
PENGAD 800-631-6989

Tel : 334-387-4802
Fax : 334-387-4900
E-mail : *jay.kim@mobis-america.com*

HUNTER V. MOBIS
00172

7/26/2006

**sonechka.womack@mobis-america.com**

| | |
|---|---|
| **From:** | Jay Kim [jay.kim@mobis-america.com] |
| **Sent:** | Wednesday, August 02, 2006 8:18 AM |
| **To:** | 'Tarsha Hunter' |
| **Cc:** | sonechka.womack@mobis-america.com |
| **Subject:** | Check out pending works |
| **Importance:** | High |

Tarsha,

I hope that you are getting better.

We are on the month end closing. Please check pending works and reorganize your desk.
There were a bunch of documents which should have been filed.

And, I need for you to submit doctor's note and make-up schedule for your absence.

Thanks.

*Jay K. (Jae-kwang)* **Kim / CFO**

MOBIS Alabama,LLC.
1395 Mitchell Young Road,
Montgomery, AL 36108

Tel : 334-387-4802
Fax : 334-387-4900
E-mail : *jay.kim@mobis-america.com*

HUNTER V. MOBIS
00173

**sonechka.womack@mobis-america.com**

**From:** sonechka.womack@mobis-america.com
**Sent:** Wednesday, August 02, 2006 10:35 AM
**To:** 'Tarsha Hunter'
**Cc:** 'Jay Kim'
**Subject:** Invoices/Statements, etc.

Hello Tarsha,

Please remember to make sure that all invoices are entered into SAP on the day received. It is very important that the invoices are entered and then distributed to the responsible person in a timely manner. There is a small timeframe that the responsible person has to complete their task and return the invoice to our department for payment. The President holds each person liable if the invoice is not processed on time. If they receive the invoice late, they will report to it Jay and the President that accounting did not give it to them on time.

I understand that sometimes you will run into some problems, but please try to have the invoices entered everyday before you leave. Let me know if you run into any problems.

Also, regarding statements from vendors, please review the statement to see if the invoices listed have been paid/accounting document generated/received by MOBIS. After doing so, please submit the statement with documentation of your research to me and then I will forward it to Jay.

I completely understand that you are juggling a lot of work. Jay is working on hiring more people in our department. But in the meantime, please continue to do your best because everything we do reflects our job evaluation.

Thank you for your hard work! I appreciate everything that you do!

Sonechka Womack
General Accounting
Assistant Manager
MOBIS Alabama, LLC
334-387-4845 (T)
334-387-4900 (Fax)

HUNTER V. MOBIS
00174

**sonechka.womack@mobis-america.com**

**From:**    Tarsha Hunter [Tarsha.Hunter@mobis-america.com]
**Sent:**    Wednesday, August 09, 2006 10:49 PM
**To:**      sonechka.womack@mobis-america.com
**Subject:** RE: Attendance Issues

When I returned on the 3rd of August , I didn't take a lunch break, that's a hour, today I came in @ 7:30, so that's 30 min. and I can stay until 7:00 pm today and starting Monday stay in for lunch thru Wed. and Sat. Aug. 19, come in for 4 hours.

*Tarsha N. Hunter Account Specialist*
*Mobis Alabama, LLC.*
*1395 Mitchell Young Road*
*Montgomery, AL 36108*
*Ph: 334-387-4878*
*Fx: 334-387-4900*
*Tarsha.Hunter@Mobis-America.com*

**From:** sonechka.womack@mobis-america.com [mailto:sonechka.womack@mobis-america.com]
**Sent:** Thursday, August 10, 2006 10:06 AM
**To:** 'Tarsha Hunter'
**Cc:** 'Jay Kim'
**Subject:** RE: Attendance Issues

Tarsha,

As cited from the below email, please submit a schedule of time that you will be able to make up for your absences. We completely understand you current health condition, but this policy has been set for us to comply with when away from the office numerous times. This is not to discourage you; this is just to keep fairness throughout this department.

Thank you,
Sonechka

**From:** sonechka.womack@mobis-america.com [mailto:sonechka.womack@mobis-america.com]
**Sent:** Tuesday, May 09, 2006 10:29 AM
**To:** 'Tarsha Hunter'
**Subject:** FW: Attendance Issues
**Importance:** High

8/10/2006

HUNTER V. MOBIS
00175

**From:** Jay Kim [mailto:jay.kim@mobis-america.com]

**Sent:** Wednesday, April 26, 2006 2:43 PM

**To:** nicole.boswell@mobis-america.com; sonechka.womack@mobis-america.com; 'Stephanie Perez'; 'Sandra Goodin'; hosang.hwang@mobis-america.com

**Subject:** Attendance Issues

**Importance:** High

To all of staffs

First of all, I appreciate all of your effort and hard working.

I looked trough the status of individual attendance in accounting department up to now.
And, I asked and discussed with HR department to manage it more effectively.

1. Regular duty hours are 8 AM till 5 PM. Employees are expected to arrive to work in ready to start by 8 AM.

2. Employees are expected to remain at work (Except during the lunch break) until 5 PM.

3. Scheduled appointments outside MOBIS Alabama.

  A. Doctor's appointments

    1) From time to time we expect that employees must request time away from work in order to attend a Doctor's appoint ment.

    Personnel are expected to give ample notification (Minimum 24 Hours notification) prior to the appointment.

    Personnel are expected to schedule appointments for a time period that the results in the least amount of time away fr om work.

    2) If due to a health condition, you are required to be away from work multiple times during any given month,

      we should have an understanding that this time should be made up if you wish not to use your vacation allotment.

      This can be accomplished in many different ways, some examples include; staying late on regular work days to m ake up the number of hours missed, work on

        Saturday, etc.

    3) As salaried employees it is expected that some time in addition to schedule work hours, may be necessary at times.

      Like-wise we need to have an understanding that we must both work together to accomplish the job.

      Please do not take advantage of my cooperative nature as I still have to ensure that the work is completed.

  B. All other situations are adequately covered by company policy such as; Maternity, Family medical Leave, Bereaveme nt leave, Jury Duty etc.

As you are aware of, Closing is very important and primary issue in accounting department.

8/10/2006

HUNTER V. MOBIS
00176

And we should close every each month-end just in time to analysis and report it to the top management group in the head quarters.

Regarding the vacation days, if you want to take vacation days, if possible, please do not use it consecutively over the 3 business days and avoid the month-end closing period, otherwise first or second weeks of every month.

Your great assistance would be much appreciated.

Jay Kim

**Jay K. (Jae-kwang)  Kim / CFO**

MOBIS Alabama,LLC.
1395 Mitchell Young Road,
Montgomery, AL 36108

Tel : 334-387-4802
Fax : 334-387-4900
E-mail : *jay.kim@mobis-america.com*

HUNTER V. MOBIS
00177

8/10/2006

**sonechka.womack@mobis-america.com**

**From:**    sonechka.womack@mobis-america.com
**Sent:**    Monday, August 14, 2006 9:05 AM
**To:**    'Tarsha Hunter'
**Subject:** Attendance

Good morning Tarsha,

I received your voicemail regarding you will not be able to drop off your child before 7:30 am. I understand it completely. However, because of the company policy it may be hard to allow you to come in late. I have already spoken to Jay and it is hard for him to understand. I recommend that you get a written letter from your child's school and speak to Jay about this.

There have been quite a few instances that Jay has excused. We all know that Jay is very strict when it comes to tardiness and attendance. I feel that he has been more than understanding for everything (considering this is Jay I am talking about). I really want you to succeed here at MOBIS, so I hope you can do you best to meet the standards of this company. You are getting close to your 90 day probation ending so please try to leave a great impression so that you will be able to continue your employment here at MOBIS. I am here to help you.

Thanks,

Sonechka Womack
General Accounting
Assistant Manager
MOBIS Alabama, LLC
334-387-4845 (T)
334-387-4900 (Fax)

8/14/2006

HUNTER V. MOBIS
00178

## Jay Kim

보낸 사람: Jay Kim [jay.kim@mobis-america.com]
보낸 날짜: 2006년 8월 14일 월요일 오전 7:47
받는 사람: 'sonechka.womack@mobis-america.com'
제목:       RE: Attendance Issues
중요도:     높음
첨부 파일: Tarsha Sonechka.xls

관리:       받는 사람                          읽음
            'sonechka.womack@mobis-america.com' 읽음: 2006-08-14 오전 8:34

Sonechka,

I need to know about the status of her attendance since she has been started permanent employee otherwise during 90-day probationary in company.

**Please fill out the attachment correctly and submit it to me by today.**

**And also, you need to submit it for you to me.**

Jay Kim

---

**From:** sonechka.womack@mobis-america.com [mailto:sonechka.womack@mobis-america.com]
**Sent:** Thursday, August 10, 2006 12:59 PM
**To:** 'Jay Kim'
**Subject:** FW: Attendance Issues

---

**From:** Tarsha Hunter [mailto:Tarsha.Hunter@mobis-america.com]
**Sent:** Wednesday, August 09, 2006 10:49 PM
**To:** sonechka.womack@mobis-america.com
**Subject:** RE: Attendance Issues

When I returned on the 3rd of August , I didn't take a lunch break, that's a hour, today I came in @ 7:30, so that's 30 min. and I can stay until 7:00 pm today and starting Monday stay in for lunch thru Wed. and Sat. Aug. 19, come in for 4 hours.

*Tarsha N. Hunter Account Specialist*

2006-08-24

HUNTER V. MOBIS
00180

 

## 90 DAY WORK PERFORMANCE REVIEW SHEET

Team Member Name                    Tarsha Hunter

Title                                            Accounting Specialist

Department                               Accounting and Finance

Division                                      Module

Manager/Supervisor                 Sonechka Womack

Date of Hire                               06/05/06

Date 90 Day Probationary Period Expires      09/02/06

**Check One**

_____ **A:**      **The employee has successfully passed the probationary period for their present job.**

❖ Attendance is satisfactory. How many days has the team member been absent, late or left early?

   _____

❖ What are the team member's strengths?

   _____

❖ What are areas the team member could improve on?

   _____

**X** **B:**      **The employee should be terminated based on unsatisfactory performance.**

❖ Explain why you recommend termination

Tarsha's attendance and dependability was unstable while she was a temporary employee.
I delayed hiring her for this very reason. I had several conversations with Tarsha and
her supervisor expressing my concern. Tarsha ensured me this problem would not continue
after she was hired. I told her that I would continue to evaluate her performance, to include
attendance, during her 90 day probationary period. She has not improved. Her mannerism
is not congenial to our department. And her lack of dependability has placed strain on our
department as when she is not here her work must be performed by her supervisor
who has responsibilities of her own. I cannot continue with this situation.

Supervisor/Manager Signature      _____ _M. _Pi_____ 8/25/06

Sr. Manager Human Resources      _____ 8/25/06

Executive Vice President              _____ M. Rhy__ 08-25-06

President                                       _____

PLAINTIFF'S
EXHIBIT
13
PENGAD 800-631-6989

HUNTER V. MOBIS
00001

## AFFIDAVIT OF TRACY RIEDLER

**BEFORE ME**, the undersigned authority, personally appeared Tracy Riedler who, after being first duly sworn, states as follows:

1.      My name is Tracy Riedler.  I reside at 7060 Ace Lane, Montgomery, Alabama.  I am over 19 years of age and have first-hand knowledge of the matters stated in this affidavit.

2.      MOBIS Alabama, LLC ("MOBIS") is a Tier One supplier of cockpit and chassis module assembly, plastic bumpers and door trim molding, paint and assembly to Hyundai Motor Company.  MOBIS' headquarters and manufacturing plant are located at 1395 Mitchell Young Road, Montgomery, Alabama.

3.      I have been employed by MOBIS as its Senior Human Resources Manager since January 20, 2004.  Prior to that, I was employed by Thermalex, Inc. in Human Resources for approximately nine (9) years.  Before my employment at Thermalex, I was employed in Human Resources at CH2M Hill for approximately eight and one half (8 ½) years.

4.      As MOBIS' Senior Human Resources Manager, I oversee all human resources, payroll, recruiting, compensation, benefits, environmental health and safety and general administrative functions.  I have a staff of twenty-one individuals comprising four (4) departments under the umbrella of Human Resources:  General Administration; HR Functions; Environmental, Health, and Safety; and Team Relations.

5.      MOBIS hired Lorenza Daniels ("Daniels") on August 15, 2004 as a Material Handler in the Assembly Department.  At that time, MOBIS was in its start-up phase, meaning that our personnel were focused on preparing MOBIS to start full production simultaneously with Hyundai.  Hyundai, and consequently MOBIS, did not commence regular full production until the summer of 2005, several months after Daniels left MOBIS.

6.     MOBIS hired Daniels on probationary status, which remains MOBIS' standard practice with respect to hourly production employees.  During the ninety (90) day probationary period, MOBIS evaluates the new employee's skills, dependability and over all suitability for long-term employment.  MOBIS uses a high-tech assembly line process that requires concentration, reliability and considerable team work.  Our production schedule is dictated by Hyundai's production schedule and MOBIS must remain ready to respond to Hyundai's demands promptly.

7.     The duties of a Material Handler in the assembly department consist primarily of stocking the production line with the necessary parts and components.  Some forklift driving is involved.  The fact that Daniels knew how to operate a forklift was a consideration in classifying him as a Material Handler.

8.     On September 27, 2004, MOBIS hired Jeff Rinehart as a Production Supervisor in the Assembly Department.  Rinehart became Daniels' immediate supervisor.

9.     Rinehart reported to Johnny Sung, a Korean National.  Mr. Sung was Manager of the Assembly Department.  Mr. Sung recently completed his assignment at MOBIS Alabama and returned to a position with MOBIS in South Korea.

10.    During Daniels' probationary employment at MOBIS, there was no specific policy on the number of absences probationary employees were allowed to have without receiving discipline.  Rather, the supervisors were responsible for monitoring the attendance and dependability of each employee he/she supervised and taking appropriate corrective action.[1]

11.    Daniels' attendance during his probationary period was unacceptable.  He was absent from work three times, tardy two times and left early two times.  Tardies and early departures are counted as one-half (1/2) of an absence, unless they are for four (4) or more hours in which case they count as a full absence.  Consequently, Daniels had the equivalent of five (5) absences.  In addition to

---

[1] MOBIS has since adopted a no fault attendance policy for probationary employees.  The new policy provides that three attendance incidents (absences, tardies, leaving work early) will result in termination (jury duty, military leave, etc. are not counted).

unsatisfactory attendance, Rinehart was not satisfied with Daniels' performance. Rinehart reported to me on several occasions that Daniels was argumentative and unstable. According to Rinehart, Daniels often resisted taking instructions from Rinehart and had a tendency to go around Rinehart to Sung when he did not agree with Rinehart's instructions. This caused confusion and dissention. In sum, Rinehart did not believe Daniels was suitable for long-term employment at MOBIS.

12.    The direct supervisors and department managers decide which probationary employees are suitable for retention as regular employees. Although I sign off on the supervisor's and manager's decisions, my role in that regard is perfunctory. I leave the actual decision making process to the supervisors and managers who have worked closely with their employees.

13.    The decision whether to retain a probationary employee is usually made just prior to the end of the ninety (90) day period. I was aware prior to the end of Daniels' probationary period that Rinehart planned to terminate his employment. I also learned that Sung agreed that Daniels had not performed well enough to receive regular employment status, but wanted to extend Daniels' probation for an additional ninety (90) days rather than terminate him.

14.    As a result of Sung's preferences, MOBIS extended Daniels' probationary status for an additional ninety (90) days to commence on November 15, 2004.

15.    On November 10, 2004, Rinehart and I met with Daniels and explained that he would remain on probation for an additional ninety (90) days. We told Daniels that he must have perfect attendance and that there would be "zero tolerance" for attendance issues. Daniels stated that he understood what was required of him. The status change form evidencing this meeting and Rinehart's comments on Daniels' attendance and performance issues is attached hereto as Tab 1.

16.    Unfortunately, Daniels' attendance, dependability, and performance did not improve during his extended probation. On November 15, 2004, the very first day of his extended probation, Daniels had an automobile accident on the way to work and was tardy (bumped into the rear of a

*Affidavit of Tracy Riedler*
*Page 3 of 7*

motorcycle officer stopped at a stoplight).  *See* Accident Report, attached hereto as Tab 2.  After the accident Daniels came to my office and pleaded for another chance.  I told Daniels that I would overlook the incident and that he could report to his department for duty.  I did not excuse the tardy or remove it from Daniels' attendance record.  I just did not terminate his employment.

17.    Daniels left work early on December 6, 2004, and two days later, on December 8, 2004, he was tardy because he got a speeding ticket for driving 65 mph in a 45 mph speed zone with workers present.  *See* Speeding Ticket, attached hereto as Tab 3.

18.    In early 2005, Daniels missed work on several days in short succession.  Specifically, he left work early on January 20, 21, 24, 25 and February 1, 2005.  He was also tardy on January 25, 2005.  Daniels told Rinehart that these absences were for medical appointments and tests relating to a shoulder injury he had sustained at a prior place of employment.

19.    On February 2, 2005, Daniels told Rinehart that his physician, Dr. Chung, had scheduled shoulder surgery for Daniels on February 17, 2005 and he would miss a substantial amount of work.  MOBIS terminated Daniels' employment for failure to adhere to the terms of his extended probation.  In addition to the attendance issues, Rinehart and I continued to have serious reservations about Daniels' suitability for long-term employment at MOBIS.

20.    On or about February 3, 2005, Rinehart and I met with Daniels and informed him that MOBIS was terminating his employment for failure to adhere to the terms of his extended probation. I explained to Daniels that he was not FMLA eligible and that MOBIS has no sick leave policy to cover (excuse) his past and future absences.[2]

---

[2]  Once an employee completes his or her probationary period, MOBIS' "98%" no fault attendance policy applies. This policy requires that an employee maintain 98% attendance.  If attendance falls below 98% on four (4) occasions the employee is terminated.  Absences for FMLA covered illness, jury duty, military leave, and the like do not count in calculation of the employee's attendance.  If Daniels had been a regular employee as opposed to probationary, his attendance would have been below 98% virtually the entire time he was at MOBIS.  So, Daniels would have been terminated for unsatisfactory attendance even if his probation had not been extended.  *See* Daniels' Attendance Charts, attached hereto as Tab 6.

21.    I am aware that Daniels has alleged that he was replaced by Jason Davenport, a Caucasian male. Daniels is simply mistaken. Daniels was replaced by Floyd Upshaw, an African American male. Davenport was hired on or about February 7, 2005 as an Assembler and resigned after a short time on March 17, 2005, because he could not adjust to his job. Davenport never operated a forklift and was never classified as a Material Handler. In fact, in the period immediately following Daniels' termination, all of MOBIS' Material Handlers were African Americans. Upshaw's and Davenport's employee status sheets showing their job classifications are attached hereto as composite Tabs 4 and 5.

22.    I am also aware that Daniels compares himself to Rae Bazzell, a Caucasian female, whom MOBIS hired on September 13, 2004 as a Material Handler in the Shipping Department. Bazzell's direct supervisor was Austin Oh, a Korean National.

23.    Bazzell had two and one-half (2 ½) absences in the first six (6) weeks of her probationary period. She was reprimanded and told her that her attendance must improve or she would face termination. After that, Bazzell missed no work for six (6) consecutive weeks. Although Bazzell missed work once due to illness during the last week of her probation, she had already demonstrated a commitment to improving her attendance. Bazzell's performance and suitability were highly regarded by Mr. Oh. Additionally, I had worked with Bazzell at Thermalex and knew her to be a dependable and skilled worker. Consequently, it never occurred to me to question Mr. Oh's decision to give Bazzell regular employment status at the end of her probation. I never considered Daniels' and Bazzell's situations as comparable and assure the Court that race, gender, and/or age played no role whatsoever in their treatment at MOBIS.

24.    When MOBIS finally terminated Daniels' employment on February 3, 2005, he had ten (10) absences after twenty-five (25) weeks of employment. On that date Bazzell had four (4) absences after twenty-one (21) weeks of employment. She had one point (*i.e.* two half point

incidences) assessed for attendance during the entire eight (8) months of her regular employment status. Bazzell voluntarily resigned her employment on July 16, 2005, with a total of four and one-half (4 ½) absences after forty-four (44) weeks of employment. *See* Bazzell's Attendance Chart, attached as Tab 7.

25.     Daniels did not suffer any loss in pay or benefits due to extension of his probation. Probationary employees do not receive a pay increase upon obtaining regular status at the end of probation and Daniels was afforded all benefits offered by MOBIS at the end of his first probation. The only distinction that resulted from extending Daniels' probation was that he did not come under the 98% attendance rule applied to regular employees. As demonstrated by the charts attached as Tab 6, Daniels would have been terminated anyway had the 98% rule applied to him.

26.     During the course of this litigation I have learned that Daniels deliberately submitted a false employment application to MOBIS when he was hired in August, 2004. Specifically, Daniels admitted in his deposition that he had intentionally failed to list several prior employers, including TRA Transportation Company for whom Daniels worked until May 10, 2004 (immediately prior to working as a temp for Labor Finders, Inc. and only three (3) months before MOBIS hired him). Daniels testified that he was fired from his position as a long haul truck driver because he tested positive for cocaine and marijuana in a DOT mandated drug screen. He also admitted that he omitted TRA from his application because he did not want MOBIS to know about the drug test. MOBIS would not have hired Daniels to begin with if he had disclosed this information. Additionally, MOBIS does not tolerate application fraud and Daniels' employment would have been terminated immediately had he still been employed when this deliberate omission was discovered. *See* Ex. C to Memorandum. MOBIS' application states that the applicant certifies all information entered on the form as true and correct and that material omissions are grounds for termination. Also, MOBIS'

employee handbook specifically lists falsification of an employment application as grounds for immediate involuntary termination.

Further Affiant sayeth not.

_____
**TRACY RIEDLER**, Affiant

STATE OF ALABAMA            )
COUNTY OF _MONTGOMERY_      )

I, _James S. Bellamy_, a notary public in and for the State of Alabama at Large, hereby certify that TRACY RIEDLER, whose name is signed to the foregoing Affidavit and who is known to me, acknowledged before me on this day that, being informed of the contents of said Affidavit, she executed same voluntarily on the day same bears date.

GIVEN under my hand and seal on this, the _21_ day of July 2006.

(Seal)

_____
NOTARY PUBLIC

Commission Expires May 31, 2009

*Affidavit of Tracy Riedler*
*Page 7 of 7*

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

NORTHERN DIVISION

TARSHA NICKOL HUNTER,     )

    Plaintiff,            )

V.                        ) CASE NO.

MOBIS ALABAMA, LLC,       ) 2:07CV-427-WHA

    Defendant.            )

Deposition of SONECHKA WOMACK

February 1, 2008

1:08 p.m.



## EDMONDSON
### Reporting & Video, Inc.
2119 3rd Avenue North, Suite 205
Birmingham, Alabama 35203

## CONDENSED TRANSCRIPT

Deposition of SONECHKA L. WOMACK
February 1, 2008

| Page 2 | Page 4 |
|---|---|

**Page 2**

1   S T I P U L A T I O N S
2
3       IT IS STIPULATED AND AGREED, by and
4   between the parties through their respective
5   counsel, that the deposition of SONECHKA
6   WOMACK, may be taken before Elaine Scott,
7   Notary Public, State at Large, at the offices
8   of Capell & Howard, 150 South Perry Street,
9   Montgomery, Alabama, on February 1, 2008,
10  commencing at approximately 1:08 p.m.
11
12      IT IS FURTHER STIPULATED AND AGREED
13  that the signature to and reading of the
14  deposition by the witness is waived, the
15  deposition to have the same force and effect
16  as if full compliance had been had with all
17  laws and rules of Court relating to the taking
18  of depositions.
19
20      IT IS FURTHER STIPULATED AND AGREED
21  that it shall not be necessary for any
22  objections to be made by counsel to any
23  questions, except as to form or leading
24  questions, and that counsel for the parties
25  may make objections and assign grounds at the

**Page 4**

1       A P P E A R A N C E S
2   FOR THE PLAINTIFF:
3       HEATHER LEONARD PC
4       Heather Leonard
5       2108 Rocky Ridge Road
6       Suite 1
7       Birmingham, Alabama 35216
8
9   FOR THE DEFENDANT:
10      CAPELL & HOWARD
11      Henry C. Barnett, Jr.
12      150 South Perry Street
13      Montgomery, Alabama 36104
14
15      ALSO PRESENT:
16      Tarsha Hunter
17      Tracy Riedler
18      Allegra Smith
19
20      COURT REPORTER:
21      Elaine Scott
22      EDMONDSON REPORTING & VIDEO
23      2119 3rd Avenue North
24      Suite 205
25      Birmingham, Alabama 35203

**Page 3**

1   time of the trial, or at the time said
2   deposition is offered in evidence, or prior
3   thereto.
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**Page 5**

1           EXAMINATION INDEX
2
3   SONECHKA WOMACK
4       BY MS. LEONARD . . . . . .  6
5       BY MR. BARNETT . . . . . .  40
6       FURTHER BY MS. LEONARD . .  57
7       FURTHER BY MR. BARNETT . .  59
8
9   REPORTER'S CERTIFICATE . . . .  61
10
11
12          EXHIBIT INDEX
13
14  Plaintiff's
15  15   Absentee Request        13
16
17
18
19
20
21
22
23
24
25

EDMONDSON REPORTING & VIDEO, INC.
Email:  Edmondsonrpting@bellsouth.net          Phone 205.324.2333  Fax 205.324.2377

Deposition of SONECHKA L. WOMACK
February 1, 2008

Page 6

1     I, Elaine Scott, a court reporter and
2 Notary Public for the State of Alabama, acting
3 as commissioner, certify that there came
4 before me at the law offices of Capell &
5 Howard, 150 South Perry Street, Montgomery,
6 Alabama, on February 1, 2008, beginning at
7 1:08 p.m., SONECHKA WOMACK, in the above
8 cause, for oral examination, whereupon the
9 following proceedings were had:
10
11     SONECHKA WOMACK,
12   being first duly sworn,
13 was examined and testified as follows:
14
15    THE COURT REPORTER:  Usual
16 stipulations?
17    (Affirmed by counsel.)
18
19    EXAMINATION
20 BY MS. LEONARD:
21   Q.  Ms. Womack, as I explained, my name
22 is Heather Leonard.  I'm Tarsha Hunter's
23 lawyer.  Sitting next to you is Henry Barnett
24 who represents Mobis.  We're going to be
25 asking you questions today just to find out

Page 7

1 what you know about the case.
2   A.  Okay.
3   Q.  Elaine Scott, the court reporter,
4 is going to be taking down your testimony.
5   A.  Okay.
6   Q.  You have the right, if you would
7 like, to review her transcript when it's
8 prepared, to review it for accuracy and then
9 sign it to say if you agree with it or if you see a
10 mistake that's been made, you get an errata
11 sheet where you can make the changes.
12   A.  Okay.
13   Q.  You don't have to do that, but you
14 can do that.  That is your personal choice.
15 If you know now whether you would like to read
16 and sign, you can let Ms. Scott know or you
17 can let her know at the end of the
18 deposition.
19   A.  Okay.
20   Q.  All right.  Have you ever given a
21 deposition before?
22   A.  Maybe five or six years ago.  Maybe
23 longer than that.
24   Q.  What this is, this is a process
25 where we're going to be interviewing you about

Page 8

1 the information you have relevant to this
2 case, and the record that Ms. Scott is taking
3 down will be what we rely on in preparing the
4 case and potentially submitting evidence to
5 the Court to show the Court what witnesses
6 will say.
7   A.  Okay.
8   Q.  It's important, therefore, that you
9 give oral answers rather than -- you know,
10 sometimes we talk with our body, as I'm doing
11 right now.
12   A.  I do it all the time.
13   Q.  Exactly.  But that's just to make
14 sure that we've got a record of what your
15 responses are.
16   A.  Okay.
17   Q.  It's also important if you don't
18 understand my question or Mr. Barnett's
19 question that you let us know.
20   A.  Okay.
21   Q.  If you answer, we're going to
22 assume that you understood the question.  So
23 if you don't understand it, let us know.
24   A.  Okay.
25   Q.  It's rare that I ask a very clear

Page 9

1 question, so you're not going to offend me if
2 you don't understand it.
3   A.  Okay.
4   MR. BARNETT:  May I say something?
5   MS. LEONARD:  Go ahead.
6   MR. BARNETT:  Ms. Womack, one of
7 the lawyers may object to a question or
8 something that happens in the deposition.  And
9 when that happens, if you would just wait
10 until that lawyer is through speaking, then
11 you go ahead and answer the question.
12   THE WITNESS:  Okay.
13   MR. BARNETT:  But don't be
14 surprised if there are several objections.
15   THE WITNESS:  Okay.
16   Q.  Would you please state your full
17 name for the record?
18   A.  Sonechka Latrese Womack.
19   Q.  And if you could, please state your
20 address.
21   A.  ▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒
22 ▒▒▒▒▒▒▒▒▒
23   Q.  All right.  Other than the passage
24 of time, can you think of anything that might
25 affect your ability to testify about the facts

3 (Pages 6 to 9)

Deposition of SONECHKA L. WOMACK
February 1, 2008

---

Page 10

1 surrounding Ms. Hunter's employment?
2     A.  No.
3     Q.  All right.  When did you work for
4 Mobis Alabama?  The years are fine, if you
5 don't recall the exact date.
6     A.  2004 to 2007.
7     Q.  All right.  What job did you have
8 there?
9     A.  The last position?
10     Q.  Yes, ma'am.
11     A.  Assistant manager in treasury.
12     Q.  During the time that you were the
13 assistant manager in treasury, did you have
14 the opportunity to work with Tarsha Hunter?
15     A.  Yes.
16     Q.  What did you do when you were the
17 assistant manager in treasury?  Just tell us
18 what that job was.
19     A.  Just manage all incoming and
20 outgoing funds, accounting documents,
21 corresponding to different departments in the
22 company, managing the internal budgets of each
23 department in the company.
24     Q.  Did you supervise any employees?
25     A.  Yes.

---

Page 11

1     Q.  Was Ms. Hunter one of the employees
2 you supervised?
3     A.  Yes.
4     Q.  Did you ever issue any formal
5 discipline to her?
6     A.  Maybe like verbal or whatever.
7     Q.  Okay.  Do you have any memory of
8 any of the discipline you may have given to
9 her?
10     A.  Just on tardiness and absentees.
11     Q.  All right.  When you worked at
12 Mobis, were you familiar with any policies
13 that -- I forgot to mention this.
14         We've got as many documents as I
15 think we can have.  These are documents which
16 have been produced by Mobis that relate to
17 Ms. Hunter's employment.
18     A.  Okay.
19     Q.  And if there's anything I can show
20 you to help refresh your memory --
21     A.  Okay.
22     Q.  -- please let me know.  I've got a
23 handbook back here if you need to look at that
24 at any time.
25     A.  Okay.

---

Page 12

1     Q.  Generally though, who had the
2 authority to terminate employees in the
3 accounting department?
4     A.  Jay Kim.
5     Q.  All right.  Who was responsible for
6 monitoring Ms. Hunter's attendance?
7     A.  Myself, and Jay would do it as
8 well.
9     Q.  Okay.  What would y'all do to track
10 for attendance?
11     A.  I think Jay kept an Excel
12 spreadsheet or something like that.
13     Q.  All right.  I'm going to show you a
14 document that has been an exhibit in another
15 deposition.  It's been previously marked as
16 Plaintiff's Exhibit Number 10.  Have you ever
17 seen a form like --
18     A.  That's it.
19     Q.  Okay.
20     A.  I forgot about that.
21     Q.  That's all right.  When you say
22 that's it, what do you mean?
23     A.  That's the page.  I mean, he would
24 keep up with Excel, but I -- but this is an
25 absentee request.

---

Page 13

1     Q.  So absences or tardies or leaving
2 earlies would be documented on forms like
3 Plaintiff's Exhibit Number 10?
4     A.  Absentees, and I don't know for
5 sure about tardies.  I think he would just
6 keep that on his spreadsheet or whatever.
7     Q.  The section at the bottom that says
8 manager's approval, who typically would
9 approve -- would fill that out?
10     A.  Sometimes I would sign it or Jay
11 or --
12     Q.  All right.  I'm going to actually
13 show you a document that I'm going to mark as
14 Plaintiff's Exhibit 15, which is Defendant's
15 Bates number 184.
16         (Plaintiff's Exhibit Number 15 was
17         marked for identification.  A copy
18         is attached.)
19     A.  Okay.
20     Q.  Have you ever seen that document
21 before?
22     "    MR. BARNETT:  I'm going to look
23 with you, if that's all right.
24     A.  Just this one in -- just this one
25 specifically?

---

4 (Pages 10 to 13)

Deposition of SONECHKA L. WOMACK
February 1, 2008

Page 14

1    Q. Yeah.
2    A. No, not that I know of or can
3 remember.
4    Q. Do you recognize the signature at
5 the bottom?
6    A. Yes.
7    Q. Whose signature is that?
8    A. Jay Kim.
9    Q. From reading that document, can you
10 conclude whether Mr. Kim approved Ms. Hunter's
11 absence?
12    A. He approved it.
13    Q. Thank you. Do you know if
14 Ms. Hunter made up the eight hours necessary
15 for that absence?
16    A. I'm not sure.
17    Q. Okay.
18    A. I'm sure she may have, like, stayed
19 some time, but I just can't recall.
20    Q. That's all right. Again, as I said
21 before, if you can't remember something,
22 that's what you need to tell us.
23    A. Okay.
24    Q. We're not expecting you to --
25    A. Okay.

Page 15

1    Q. Tell me how Ms. Hunter came to work
2 for Mobis.
3    A. Temporary service.
4    Q. Who did she replace, if you
5 remember?
6    A. I think that was a position for
7 Lakeyshia Johnson.
8    Q. Do you know how long the position
9 had been vacant when Ms. Hunter came there for
10 a temporary service?
11    A. I would be guessing, just saying a
12 month or so. I really don't know.
13    Q. That's all right. Do you know why
14 Ms. Johnson left?
15    A. She found another job.
16    Q. Okay. Had Ms. Johnson had any
17 problems with Mr. Kim before leaving?
18    A. Would you --
19    Q. Sure. I'll rephrase it. Had
20 Mr. Kim said anything to Ms. Johnson about her
21 being a single parent or imply that he didn't
22 like having a single parent working in the
23 department?
24    A. Saying that to her?
25    Q. To her or to anyone else.

Page 16

1        MR. BARNETT: Let me -- Ms. Womack,
2 I'm a little hard of hearing. If you will
3 speak up just a bit, it will help, so I don't
4 have to strain to hear it.
5    A. I have remembered him saying
6 something, I guess, in a playful manner, like,
7 everyone has children, you know, something
8 like that.
9    Q. Basically kind of implying that
10 people's child care needs might be
11 interrupting the workplace?
12        MR. BARNETT: Object to the form.
13    Q. I'll rephrase it. What did you
14 interpret that to mean when he said, Everyone
15 has children?
16    A. I interpreted that he may have had
17 a problem -- not a problem with children, but
18 concerned if the work would be done.
19    Q. All right. When Ms. Hunter came to
20 work at Mobis through Multi-Staffing, the temp
21 service, do you know if her assignment had a
22 specific period of time that it was to last?
23    A. Like, from the actual temporary
24 company?
25    Q. Right. Correct.

Page 17

1    A. I think it was -- this is a
2 guess -- temp to hire maybe if she worked out,
3 I think.
4    Q. Do you know normally how long those
5 assignments last?
6    A. No.
7    Q. That's all right. Did Mr. Kim ever
8 discuss with you buying out Ms. Hunter's
9 contract with the temp service?
10    A. Yes.
11    Q. Tell me what you recall.
12    A. Well, he was kind of wavering on it
13 and told -- he was kind of wavering back and
14 forth on whether to keep her on. And I told
15 her I was very pleased with -- told him I was
16 very pleased with her job performance. So --
17    Q. Do you know who made the decision
18 to hire her as a permanent employee? When I
19 say permanent, I just mean as a Mobis employee
20 as opposed to a temporary service employee.
21    A. Jay.
22    Q. All right. During the time that
23 Ms. Hunter was a temporary employee, did you
24 experience any problems with her
25 dependability?

5 (Pages 14 to 17)

Deposition of SONECHKA L. WOMACK
February 1, 2008

Page 18

1      A. Meaning getting the work done?
2      Q. Correct.
3      A. Well, she would get the work done.
4      Q. All right. Were there any
5  attendance issues during that time?
6      A. Yes.
7      Q. Tell me what you recall.
8      A. Just, like, calling out or -- I
9  don't know, like, maybe sick, calling in sick
10 or something like that, and some tardies.
11     Q. All right. I apologize. My
12 outline is not in good order, so it's taking
13 me a second.
14        When Ms. Hunter came to work for
15 Mobis, were you still her supervisor?
16     A. Yes.
17     Q. All right. During that -- are you
18 aware of any employees who during their first
19 ninety days of employment with Mobis had an
20 attendance that was comparable to or worse
21 than Ms. Hunter's and were not terminated?
22     A. In my department? In the
23 department?
24     Q. Yes, ma'am.
25        MR. BARNETT: Object. There's no

Page 19

1  foundation that she knows other employees'
2  attendance records.
3      Q. You can answer.
4      MR. BARNETT: Go ahead. You can
5  answer.
6      A. No. No. No.
7      Q. Do you know of any employees who
8  worked outside of your department who may have
9  had attendance that was equal to or worse than
10 Ms. Hunter's and may not have been fired
11 during their first ninety days of employment?
12     MR. BARNETT: Same objection. Go
13 ahead and answer the question.
14     A. I can't recall.
15     Q. That's all right. It's not a
16 problem. Like I said, this is -- part of what
17 we're trying to figure out today is what you
18 know and what you don't know.
19     A. Okay.
20     Q. Do you recall any conversations
21 that Ms. Hunter may have had with you and/or
22 Mr. Kim about her child's school's drop off
23 time affecting her ability to get to work by
24 8:00 o'clock?
25     A. Yes.

Page 20

1      Q. Tell me what you know about that.
2      A. She just told us that -- I don't
3  remember time, but there's just a certain
4  cutoff time, and that's why she would be late
5  to come in, because of taking her child to
6  school.
7      Q. Do you remember what Mr. Kim's
8  response was?
9      A. He eventually agreed.
10     Q. Okay. So he agreed that he would
11 try to work with her child's start time at
12 school?
13     A. Yes. Uh-huh.
14     Q. All right. When Ms. Hunter came on
15 as a permanent employee in early June, 2006 --
16 and again, when I say permanent, I just mean
17 she's a Mobis employee.
18        Did you learn any time after that
19 that she was pregnant?
20     A. Yes.
21     Q. Tell me how you learned she was
22 pregnant.
23     A. She came to me in confidence and
24 let me know.
25     Q. Okay. Did you have any

Page 21

1  conversations with her about whether she
2  should tell Mr. Kim at that time that she was
3  pregnant?
4      A. Well, she told me that she
5  wasn't -- I guess she may have spoken with
6  someone else.
7      Q. Right.
8      A. And she told me she wasn't going to
9  tell. So she didn't want me to say anything.
10     Q. Were you aware of any situations of
11 pregnant employees losing their job at Mobis
12 prior to Ms. Hunter telling you she was
13 pregnant?
14     A. I had heard -- I don't know
15 specifically, but I just kind of heard, like,
16 rumors or whatever that other people had
17 been -- and I'm not saying it was because of
18 being pregnant, but it just so happened the
19 person was pregnant.
20     Q. Did you and Ms. Hunter discuss any
21 of the rumors relating to employees who had
22 been pregnant who had lost their job?
23     A. I don't recall.
24     Q. Did Ms. Hunter ever talk with you
25 that she had considered terminating her

6 (Pages 18 to 21)

Deposition of SONECHKA L. WOMACK
February 1, 2008

Page 22

1 pregnancy?
2     A. She may have in the beginning. I
3 can't really --
4     Q. That's all right.
5     A. I can't really remember.
6     Q. Do you remember how long after she
7 started as a full-time Mobis employee that
8 Ms. Hunter shared with you that was pregnant?
9     A. I'm not -- I'm not sure. I mean,
10 it wasn't like toward the end, but I guess I
11 would say I knew for more than maybe -- I
12 don't know.
13     Q. That's all right.
14     A. I'll just say that.
15     Q. That's all right. Do you remember
16 any occasion in August where Ms. Hunter may
17 have put in an absence request form for a
18 doctor's appointment and then later come to
19 you to let you know that she no longer needed
20 to be off on that day, that the appointment
21 had changed?
22     A. Wait. Could you repeat that
23 question?
24     Q. Sure. Do you remember any
25 circumstance in August of 2006 where

Page 23

1 Ms. Hunter had requested to be off on one day
2 for a doctor's appointment for a procedure and
3 then came to you to let you know that the
4 doctor had changed the date for the procedure?
5     A. I think so.
6     Q. All right. And to the best of your
7 knowledge, did -- I don't know how to ask that
8 question. So I'll come up with a different
9 one.
10         Do you know if Ms. Hunter ever
11 shared with Mr. Kim that she was pregnant?
12     A. Yes.
13     Q. Tell me what you know about that.
14     A. It may have been after an
15 appointment or whatever. She had to be out
16 for an appointment, and then she came back
17 with a -- with a sonogram.
18     Q. Okay.
19     A. And showed it to him.
20     Q. All right. Were you present when
21 she did that?
22     A. I wasn't in there, but she -- I
23 think she told me that she showed it to him, I
24 think.
25     Q. I'm going to show you another

Page 24

1 document in this case that is an e-mail. It's
2 Plaintiff's Exhibit 12. And there's some
3 numbers at the bottom, turning to page 175 of
4 this document. And -- give me just one
5 second.
6         In your e-mail which is the middle
7 part of the e-mail, you write: We completely
8 understand your current health condition.
9 Were you referencing her pregnancy?
10     A. Yes.
11     Q. And the we, is that you and
12 Mr. Kim?
13     A. Yes.
14     Q. All right. Would it be fair to say
15 that probably by that date, Ms. Hunter had
16 told both you and Mr. Kim that she was
17 pregnant then?
18     A. Yes. Uh-huh.
19     Q. All right. And then I've got
20 another part of the --
21         MR. BARNETT: Can you wait just a
22 minute and see if I can do something about the
23 heat that is building up now?
24         MS. LEONARD: Not a problem.
25     Q. While he's doing that, I forgot to

Page 25

1 mention, if you need a break at any time, ask
2 for it.
3     A. Okay.
4     Q. It's not an endurance contest.
5     A. Okay.
6         (A discussion was held off the
7         record.)
8     Q. I'm now showing you the last page
9 of Exhibit 12, which is document Bates number
10 180. At the top, it appears to be an e-mail
11 from Jay Kim to you, correct?
12     A. Uh-huh.
13     Q. Can you tell from looking at this
14 e-mail when he sent the top part of the
15 document to you?
16     A. I guess that says August 14th.
17     Q. I just wanted -- that's what it
18 looked like to me, but I wasn't sure because
19 of some of the Korean alphabet around it.
20         Do you recall receiving this
21 e-mail?
22     A. I think so.
23     Q. The e-mail references an
24 attachment. From reading that e-mail, do you
25 know what the attachment was that is being

7 (Pages 22 to 25)

Deposition of SONECHKA L. WOMACK
February 1, 2008

Page 26

1 referenced?
2    A. Probably that Excel spreadsheet.
3    Q. Okay. I'm going to show you what's
4 been previously marked as Plaintiff's Exhibit
5 Number 2. Does that appear to be the Excel
6 spreadsheet?
7    A. Yes. Uh-huh.
8    Q. What was Mr. Kim asking you to do
9 in that August 14th e-mail?
10    A. Just to fill out the times that
11 she's been absent.
12    Q. All right. Can you tell from that
13 e-mail whether Mr. Kim was keeping information
14 on Ms. Hunter's attendance prior to that date?
15    A. He would ask, like -- he would
16 ask -- because for everybody he's always
17 wanted to keep up with that. But I think he
18 kind of was keeping up with something just to
19 make sure I had the same thing.
20    Q. Okay.
21    A. I'm not --
22    Q. That's all right.
23    A. I'm not sure.
24    Q. That's fine. I'm trying to go
25 through -- you've answered some questions. So

Page 27

1 I'm trying to delete them out real quick.
2        Do you know if during the time you
3 worked for Mr. Kim if there were any other
4 pregnant employees in the department other
5 than Ms. Hunter?
6    A. No.
7        MR. BARNETT: I'm sorry, what was
8 the answer?
9    A. No.
10    Q. Did you observe any changes in the
11 way Mr. Kim treated Ms. Hunter after he
12 learned that she was pregnant from the way he
13 treated her before?
14    A. He's kind of moody. So, like, if
15 anybody was absent or whatever, he kind of
16 would be distant or whatever. And so after
17 the pregnancy --
18    Q. I'll rephrase. Did he appear to be
19 more distant from Ms. Hunter after he learned
20 that she was pregnant than he had been with
21 her before he learned that she was pregnant?
22    A. I can't -- it would just be in
23 spurts. So maybe that kind of brought him
24 back to being distant, you know.
25    Q. Okay. Based on your observation --

Page 28

1        MR. BARNETT: I'm sorry, I didn't
2 hear the answer. Could you read it to me?
3        (Court Reporter reads back.)
4    Q. Did you find that after Mr. Kim
5 learned Ms. Hunter was pregnant, he
6 communicated to her through you more than he
7 had prior to that point?
8    A. That -- that may have been my
9 feeling just because I knew the situation.
10 But like I said, he's kind of like that when
11 anything --
12    Q. Okay.
13    A. Any kind of changes occur like
14 absence or tardies or anything. So whatever
15 comes up that doesn't go along with how -- you
16 know, so --
17    Q. But it was your feeling or
18 perception --
19    A. My feeling or perception.
20    Q. -- that he was talking to
21 Ms. Hunter through you more after he learned
22 that she was pregnant?
23    A. Yes.
24    Q. At some time in August 2006, did
25 someone make the decision Ms. Hunter would be

Page 29

1 terminated?
2    A. Could you repeat?
3    Q. Sure. And I'll represent to you
4 that -- to make it easy -- would you agree on
5 August 25th, Mobis terminated Ms. Hunter's
6 employment?
7    A. If that was the day, yes.
8    Q. It was.
9    A. Yes.
10    Q. At some point during the month of
11 August, did you learn that Ms. Hunter was
12 going to be terminated?
13    A. The day before.
14    Q. Tell me how you learned about
15 that.
16    A. I think I was in his office.
17    Q. Okay.
18    A. He called me in his office.
19    Q. What happened?
20    A. He let me know that he was
21 terminating her employment.
22    Q. And did he give you any reason why
23 he was terminating her employment?
24    A. Just because he hadn't been
25 satisfied through her ninety-day probation,

8 (Pages 26 to 29)

Deposition of SONECHKA L. WOMACK
February 1, 2008

Page 30

1 and he had given several warnings about
2 tardies and being absent and things like that.
3 Q. And I'm going to show you an exhibit
4 in this case that has been previously marked
5 as Plaintiff's Exhibit Number 5. In
6 Plaintiff's Exhibit Number 5, Mr. Kim
7 communicates in an e-mail to Ms. Riedler that
8 you did not want to see Ms. Hunter
9 terminated.
10      Did Mr. Kim accurately communicate
11 your sentiment in that e-mail?
12      A. Can I see?
13      Q. Take your time to read it.
14      MR. BARNETT: You can read the
15 whole thing and take your time. Take as much
16 time as you want.
17      A. It goes up. Okay. Now, what was
18 the question?
19      Q. Sure. Was Mr. Kim accurately
20 conveying your sentiment about Ms. Hunter's
21 termination to Ms. Riedler in his e-mail?
22      A. Yes. That I wanted to keep her?
23      Q. Correct?
24      A. Yes.
25      Q. Why did you want to keep her?

Page 31

1      A. Well, besides being, you know,
2 tardy and absent, she did a really good job.
3      Q. Did any of her absences or being
4 tardy affect how you did your job?
5      A. I mean, I would just do whatever
6 needed to be done.
7      Q. Were you aware of any employees,
8 including supervisors, that may have
9 complained about Ms. Hunter to anyone?
10      A. No.
11      Q. Was there a gentleman named Ho Sang
12 Hwang who also worked in your department?
13      A. Yes.
14      Q. Do you know if Mr. Hwang had any
15 complaints about Ms. Hunter?
16      A. Not to me. He didn't complain to
17 me.
18      Q. Was she her supervisor?
19      A. No. No.
20      Q. All right.
21      A. I mean, no. It's a long story.
22      Q. She worked directly under you?
23      A. Yes.
24      Q. I believe Mr. Kim testified
25 yesterday that the accounting department is

Page 32

1 divided into two parts?
2      A. Right.
3      Q. And you and Ms. Hunter were one
4 part?
5      A. Right.
6      Q. Mr. Hwang and his subordinate were
7 another?
8      A. Right.
9      Q. All right. And this may be
10 redundant, but sometimes as lawyers we have to
11 ask questions to make sure the record is
12 clear.
13      Did you ever complain to Mr. Kim
14 about Ms. Hunter?
15      A. No.
16      Q. Are you aware of any problems that
17 Ms. Hunter caused for the accounting
18 department?
19      A. Like took -- could you rephrase
20 it?
21      Q. Sure. Were there any situations
22 that occurred with Ms. Hunter where work was
23 not done?
24      A. Not like a major -- nothing like
25 major, what happened, you know.

Page 33

1      Q. Right.
2      A. Everyone kind of knew what to do.
3 So if she was out, we would just do it. But I
4 don't recall anything major where it was just,
5 like, a bad thing.
6      Q. Did you ever have to stay hours
7 late at work to do Ms. Hunter's work when she
8 was absent?
9      A. I stayed hours anyway. So I can't,
10 like, correlate. I can't put --
11      Q. So if you stayed late, you couldn't
12 say necessarily it was because of Ms. Hunter's
13 attendance?
14      A. Right.
15      Q. Did you ever find that other
16 employees were sometimes late or tardy in
17 turning documents into the accounting
18 department?
19      A. Like out of other departments?
20      Q. Yes, ma'am.
21      A. Yes.
22      Q. And would that sometimes push you
23 guys behind and affect your ability to get
24 your work done in a timely manner?
25      A. Yes.

EDMONDSON REPORTING & VIDEO, INC.
Email: Edmondsonrpting@bellsouth.net
Phone 205.324.2333  Fax 205.324.2377

Deposition of SONECHKA L. WOMACK
February 1, 2008

Page 34

1    Q. Is that something that was made
2 known to Mr. Kim?
3    A. Yes.
4    Q. Did you ever hear Mr. Kim express a
5 negative opinion of the human resources
6 department, either calling the department
7 names or implying he didn't like to work with
8 the department?
9    A. Yes.
10    Q. Tell me what you heard.
11    A. He just didn't like to work with
12 HR -- human resources.
13    Q. Did he give you any impression why
14 he didn't like to work with HR?
15    A. Because documents were always late,
16 and he didn't feel like they knew everything
17 or -- anyway --
18    Q. That's all right. Do you recall
19 anything else beyond what you've already told
20 me about the meeting where Mr. Kim told you
21 that he wanted to terminate Ms. Hunter?
22    A. Could you repeat it?
23    Q. Sure. Have you told me everything
24 that you can recall about the meeting in which
25 Mr. Kim told you that Ms. Hunter was going to

Page 35

1 be terminated?
2    A. Like our conversations during it?
3    Q. Correct.
4    A. I mean, there were more
5 conversations than just, you know --
6    Q. Were there any discussions relating
7 to Ms. Hunter's pregnancy?
8    A. Yes.
9    Q. Tell me what you recall.
10    A. Well, it was me initiating it.
11    Q. Okay.
12    A. I just -- I just kept saying I felt
13 like she was being terminated because she was
14 pregnant.
15    Q. And did you share that concern with
16 Tracy Riedler?
17    A. Yes.
18    Q. And what sort of response did you
19 get from Mr. Kim or Ms. Riedler to you saying
20 that you felt Ms. Hunter's pregnancy was being
21 motivated by her termination? Switch that.
22    A. Okay.
23    Q. That her termination was being
24 motivated by her pregnancy?
25    A. They never said that that was the

Page 36

1 reason.
2    Q. Were you present in the meeting
3 where Ms. Hunter was terminated?
4    A. Yes.
5    Q. Tell me what you recall about that
6 meeting.
7    A. I think Tracy, Jay and I and Tarsha
8 was in the meeting.
9    Q. Okay. And tell me what you recall
10 happening. I appreciate that it was almost
11 two years ago. So I'm not going to expect you
12 to reenact the meeting. But just tell us what
13 you can recall.
14    A. Just that she was being terminated.
15    Q. Did -- I'm sorry. You go ahead.
16    A. Go ahead.
17    Q. Don't let me interrupt you.
18    A. That was pretty much it.
19    Q. Did he give her a reason as to why
20 she was being terminated?
21    A. It had to have been because of the
22 tardies, because that's what he kept telling
23 me, because of the absentees and the tardies
24 and things.
25    Q. Do you recall in that meeting

Page 37

1 Mr. Kim saying anything to Ms. Hunter along
2 the lines of, I can't take care of a person
3 like you?
4    A. I can't remember that, but -- I
5 could hear -- I mean, I can hear it -- I mean,
6 you know, I can imagine it being said.
7    Q. How long after Ms. Hunter was fired
8 did someone come in to replace her, if you
9 remember?
10    A. I'm not sure. It wasn't -- I don't
11 think it was a long period.
12    Q. Okay.
13    A. I don't think.
14    Q. Do you remember an employee named
15 Latoya Williams?
16    A. Yes.
17    Q. What job did Ms. Williams do?
18    A. I think she was clerk, accounting
19 clerk, temporary.
20    Q. Did she work under you or Mr. Hwang
21 or someone else?
22    A. Supposedly me.
23    Q. Okay. And she came to you guys
24 through Multi-Staffing, correct?
25    A. Yes.

10 (Pages 34 to 37)

Deposition of SONECHKA L. WOMACK
February 1, 2008

Page 38

1    Q.  What do you recall about her
2 attendance?
3    A.  She would kind of be out -- she's
4 called in -- had called in a few times.
5    Q.  Was she treated in the same manner
6 as Ms. Hunter?
7        MR. BARNETT:  Object to the form.
8    Q.  Was she terminated like Ms. Hunter
9 was?
10    A.  Yes.  Well, she never -- I don't
11 think she ever became --
12    Q.  So she never became a permanent
13 employee?
14    A.  A permanent employee.
15    Q.  Do you know why she didn't become a
16 permanent employee?
17    A.  Because of being out.
18    Q.  Okay.
19    A.  Calling in.
20    Q.  I'm getting close.  I'm jumping
21 around in my outline.
22        Now, Mr. Kim was not born in
23 Alabama, was he?  Mr. Kim wasn't born in
24 Alabama, was he?
25    A.  No.  No.

Page 39

1    Q.  He doesn't speak with a southern
2 accent, does he?
3    A.  No.
4    Q.  Did you ever find that it was
5 difficult to communicate with him in the
6 workplace?
7    A.  When I first started, but I started
8 understanding him.  So --
9    Q.  Did you experience any situations
10 where you had a hard time understanding what
11 you wanted to communicate to him?
12    A.  Sometimes, but we would keep going
13 over and over and over until he would
14 understand.
15    Q.  If you can give me just a minute,
16 we may be getting close.
17    A.  Okay.
18        (A discussion was held off the
19        record.)
20    Q.  I've got an easy question.
21    A.  Okay.
22    Q.  Is there anything in your testimony
23 which you would like to clarify, change, or
24 add to?
25    A.  No.

Page 40

1        MS. LEONARD:  Then I'm finished.
2 I'm going to turn you over to Mr. Barnett.
3        MR. BARNETT:  I propose we take a
4 brief break.
5        (Break taken.)
6
7        EXAMINATION
8 BY MR. BARNETT:
9    Q.  Ms. Womack, I'm going to ask you
10 some questions on behalf of Mobis.  And if you
11 don't understand a question, please feel free
12 to ask me to repeat it or clarify it.
13    A.  Okay.
14    Q.  First, I want to talk about the
15 period when Ms. Hunter was a temporary
16 employee.
17    A.  Okay.
18    Q.  You testified earlier that there
19 were issues about her attendance?
20    A.  Yes.
21    Q.  Did you and Mr. Kim discuss those
22 issues?
23    A.  Yes.
24    Q.  You testified earlier that he went
25 back and forth about whether to make her a

Page 41

1 probationary employee.  Are you clear about
2 what that means?
3    A.  Yes.
4    Q.  Did he go back and forth in terms
5 of whether he wanted to give her a ninety-day
6 probationary period?
7    A.  Yes.
8    Q.  Did he tell you why?
9    A.  Because of her absences and
10 tardies.
11    Q.  Would it be fair to say that you
12 were in favor of giving her the ninety-day
13 probationary period?
14    A.  Yes.
15    Q.  Would it be fair to say that you
16 tried to persuade him to do that?
17    A.  Yes.
18    Q.  And you felt that way because she
19 did a good job other than attendance?
20    A.  Yes.
21    Q.  This is Defendant's 9 from another
22 deposition.
23        Ms. Womack, I'll represent to you
24 that this document was prepared by Mobis from
25 Multi-Staffing's records.

11 (Pages 38 to 41)

Deposition of SONECHKA L. WOMACK
February 1, 2008

Page 42

1    A. Okay.
2    Q. I'll ask you some questions before
3 I ask you about this.
4        During a temporary employment, how
5 does Multi-Staffing know how many hours a
6 temporary employee has worked?
7    A. I think they have to fill out a
8 time sheet, and then have someone sign it.
9    Q. The temporary employee fills it
10 out?
11   A. Yes.
12   Q. And then has somebody from Mobis
13 sign it?
14   A. Yes.
15   Q. And then it goes to Multi-Staffing?
16   A. Yes.
17   Q. As far as you know, that's how they
18 know how much to pay that employee?
19   A. Yes.
20   Q. Now, as I say, we compiled
21 Defendant's 9 from Multi-Staffing's records
22 based on what Ms. Hunter turned into them.
23 And we've highlighted in yellow tardies,
24 absences and so forth.
25       What was Ms. Hunter's regular start

Page 43

1 time in the morning?
2    A. 8:00 o'clock.
3    Q. Now, I'm just going to ask you to
4 look at this. You can pay it as much
5 attention as you want to or as little.
6        But do you have any reason to
7 believe that she was absent, tardy, or late
8 significantly less times or fewer times than
9 is shown on Defendant's 9? I think there are
10 one, two, three, four, five -- seventeen
11 incidents on here.
12   A. That may be correct.
13       THE COURT REPORTER: I'm sorry?
14 That may be --
15       THE WITNESS: That may be correct.
16   Q. Nothing jumps out at you as being
17 substantially overstated or understated?
18   A. That looks correct.
19   Q. What did -- how did Mr. Kim
20 communicate to you his decision to go ahead
21 and give her a ninety-day probationary period?
22   A. I think he called us both -- we
23 discussed it, and then he called us, me and
24 Tarsha, in his office and stated that he
25 was -- she was on probation but, you know,

Page 44

1 please don't -- he didn't want her to be out
2 and tardy.
3    Q. Did he say, you know, something to
4 the effect that you're going to be
5 probationary now, but your attendance needs to
6 improve?
7    A. Right.
8    Q. Did you tell Tarsha the same thing?
9    A. Yes.
10   Q. Do you remember a young lady named
11 Su Jin Lee?
12   A. Yes.
13   Q. Are you aware that she was pregnant
14 when she was hired?
15   A. Not when she -- not when she first
16 started.
17   Q. How did you find out she was
18 pregnant?
19   A. She told me.
20   Q. Did she tell you how far along she
21 was?
22   A. She may have been -- just been --
23 kind of just found out she was pregnant.
24   Q. When she was hired?
25   A. Not when she was hired, but --

Page 45

1    Q. When she told you?
2    A. Right.
3    Q. Did you ever observe Mr. Kim
4 mistreat her or treat her differently because
5 she was pregnant in an adverse way -- in a
6 negative way?
7    A. No. Maybe just -- no.
8    Q. How many subordinates did you have
9 reporting to you at the time Ms. Hunter was
10 there?
11   A. Ms. Hunter and Su Jin. Was
12 Latoya -- I know for sure Tarsha and Su Jin.
13   Q. When Ms. Hunter told you she had
14 become pregnant, did y'all discuss whether she
15 had intended that pregnancy, whether or not it
16 was planned?
17   A. I don't think it was planned.
18   Q. Do you remember a lady named Alecia
19 Gardener?
20   A. Yes.
21   Q. Did she work in IT?
22   A. Yes.
23   Q. Was Dennis Choi her supervisor?
24   A. Yes.
25   Q. Do you know whether she became --

12 (Pages 42 to 45)

Deposition of SONECHKA L. WOMACK
February 1, 2008

Page 46

1  let me stop -- did she work in that same
2  general open office area that you all worked
3  in?
4      A. Yes.
5      Q. Do you recall whether she became
6  pregnant while she was at Mobis?
7      A. Yes.
8      Q. Do you recall whether she took
9  family medical leave?
10     A. I don't think I was there when she
11 had the baby.
12     Q. Did you feel that you were free to
13 speak your mind with Jay Kim about work
14 issues?
15     A. Yes.
16     Q. Did he ever say anything to you --
17 never mind.
18        Do you have any reason to believe
19 that Mr. Kim is a bad person? I didn't ask
20 you if he was easy to work for.
21     A. I could tell he has a soft heart,
22 but sometimes it's hard to see past -- see
23 that.
24     Q. Did you keep any notes of anything
25 that happened at Mobis relating to Ms. Hunter

Page 47

1  that you took with you?
2      A. No.
3      Q. Did you leave any notes there about
4  her that you know about, other than these
5  forms like Exhibit 15, Plaintiff's Exhibit
6  15? If you did those. I'm not saying you
7  did.
8      A. I know I didn't do those, but
9  maybe, like, other little request sheets. I
10 know I had a file.
11     Q. Do you recall that Mr. Kim used the
12 phrase take care of a person?
13     A. Yes.
14     Q. Was it something that he said on
15 several occasions?
16     A. Yes.
17     Q. Did you understand what -- did you
18 have an understanding of what he meant by
19 taking care of a person?
20     A. Some -- yes.
21     Q. What did you think he meant?
22     A. Just their work. That's how I
23 interpreted it, even though it sounds like
24 baby-sitting or -- you know, but work wise.
25     Q. Did Ms. Hunter share with you any

Page 48

1  information about her health problems, if she
2  had any?
3      A. The pregnancy.
4      Q. Anything else?
5      A. I don't know that that's a health
6  problem, but --
7      Q. Do you remember anything about
8  vertigo?
9      A. Yes.
10     Q. Dizziness?
11     A. Yes.
12     Q. Did she tell you how long she had
13 suffered from vertigo and dizziness?
14     A. I don't know how long.
15     Q. Have you spoken with Ms. Hunter
16 since you left Mobis?
17     A. Maybe one time, like, when she
18 first left. Maybe one time when she first
19 left.
20     Q. Okay. What did she say?
21     A. She had gotten another job.
22     Q. Anything else?
23     A. Not that I can remember.
24     Q. Have you given either side any
25 written statements of any kind?

Page 49

1      A. No.
2      Q. Did Ms. Hunter ever tell you or
3  confide in you that she might -- that she
4  might be thinking about leaving her job at
5  Mobis?
6      A. Not -- not that I know of.
7      Q. Let me show you Exhibit 13,
8  Defendant's Exhibit 13.
9        I believe you saw this earlier as
10 one of Ms. Leonard's exhibits. Do you
11 remember looking at that?
12     A. Yes.
13     Q. Other than Ms. Leonard's question
14 about an appointment being scheduled and then
15 rescheduled that you testified you had a
16 memory about, looking at Exhibit 13 here, does
17 anything appear to be inaccurate or
18 overstated --
19        MS. LEONARD: Object.
20     Q. -- as far as her attendance record?
21        MS. LEONARD: Object to the form.
22 Foundation. You can answer.
23     A. It looks correct.
24     Q. Does there appear to be anything on
25 there that he recorded relating to Ms. Hunter

13 (Pages 46 to 49)

Deposition of SONECHKA L. WOMACK
February 1, 2008

Page 50

1  being late because she was taking her child to
2  school?
3      MS. LEONARD:  Object to form.
4  Foundation.  You can answer.
5      A.  No.
6      Q.  Was she ever as much as three and a
7  half hours -- well, strike that.
8          Do you have any reason to believe
9  that Mr. Kim was keeping up -- after she
10 became ninety-day probationary, do you have
11 any reason to believe that he was keeping up
12 with how many times she was late because her
13 child went to school?
14     A.  He may have been keeping up.
15     Q.  But do you know that, that he was?
16     A.  No, I don't know.  I didn't see
17 him.
18     Q.  At any time during Ms. Hunter's
19 ninety-day probationary period before you
20 learned that she was going to be terminated,
21 were you concerned that she was not going to
22 be hired on permanently at the end of that
23 period?
24     A.  Was I concerned?
25     Q.  Yes.

Page 51

1      A.  Yes.
2      Q.  And why were you concerned that she
3  might not be kept after her ninety-day
4  probationary period?
5      A.  Just because of some of the
6  absentees and tardies.
7      Q.  I'll show you what's been
8  previously marked as Defendant's Exhibit 16.
9          Do you recall receiving Defendant's
10 Exhibit 16?
11     A.  Yes.
12     Q.  You're shown as a copied
13 recipient.  Did you and Ms. Hunter -- let me
14 ask you this:  What did you understand Mr. Kim
15 to be trying to impress on Ms. Hunter by this
16 e-mail?
17     A.  That if she continued to be tardy,
18 she would not keep her job.
19     Q.  Was there any time of the month
20 that was more demanding in the accounting
21 department -- department than other times?
22     A.  Yes.
23     Q.  What time of the month was that?
24     A.  Month end, closing.
25     Q.  Closing?

Page 52

1      A.  Yes.
2      Q.  Did everything get kind of tense
3  around closing time?
4      A.  Yes.
5      Q.  Let me show you what's previously
6  been marked as Defendant's Exhibit 10 and ask
7  you to take a look at that, both pages of
8  that.
9          Let me ask you first about the
10 second two pages.  They are numbered at the
11 bottom 176 and 177.
12     A.  Okay.
13     Q.  You see that that's dated April 26,
14 '06?
15     A.  Uh-huh.
16     Q.  Is there any particular thing that
17 these recipients have in common?  Were they
18 all managers or did they all supervise people
19 or were they just employees or a mixture?
20     A.  A mixture.
21     Q.  Were any of them temporary
22 employees at the time?
23     A.  I can't even remember Sandra
24 Gooden.
25     Q.  Okay.  I'm not --

Page 53

1      A.  Well, other than that, uh-huh.
2  Everyone was permanent.
3      Q.  Do you know what prompted Mr. Kim
4  to send this e-mail?  Well, it
5  now says, To all of staff.
6          So do you know what prompted him to
7  send this e-mail?
8      A.  Probably because someone may have
9  been tardy or something.
10     Q.  Is it fair to say that Mr. Kim was
11 a stickler about attendance?
12     A.  Yes.
13     Q.  And about arriving at work on time?
14     A.  Yes.
15     Q.  Now, it looks to me as though you
16 sent or forwarded this e-mail to Tarsha Hunter
17 with a copy to Jay Kim on or about August
18 10th, '06.  Do you see that?
19     A.  Yes.
20     Q.  Do you remember why you forwarded
21 that e-mail to her?  That would be several
22 weeks later after Jay sent it out.
23     A.  Do you mean this May the -- May
24 9th?
25     Q.  It's hard for me to tell.  It looks

EDMONDSON REPORTING & VIDEO, INC.
Email: Edmondsonrpting@bellsouth.net    Phone 205.324.2333  Fax 205.324.2377

Deposition of SONECHKA L. WOMACK
February 1, 2008

Page 54

1  like you may have sent it to her on May 9th
2  and then again on August 10th. I'm just
3  asking you.
4      A. Oh, okay.
5      Q. Read what you say right here.
6      A. As cited from the below e-mail,
7  please submit a schedule of time that you'll
8  be able to make up for your absences. We
9  completely understand your current health
10  condition, but this policy has been set for us
11  to comply with. You've been away from the
12  office numerous times. This is not to
13  discourage you. This is just to keep fairness
14  throughout this department.
15      Q. Right. Now, does that give you
16  any -- does that refresh your recollection as
17  to whether you forwarded this -- pages 76 and
18  77 -- 176 and 177 to Tarsha Hunter on August
19  10th?
20      A. Yes.
21      Q. Look below that. On May 9th, it
22  looks like you forwarded something without any
23  comment.
24      A. Uh-huh.
25      Q. Do you know what you were

Page 55

1  forwarding to her at that point in time? What
2  I'm trying to find out is whether you may have
3  forwarded that memorandum to her on two
4  occasions.
5      A. Yes. I think this one may have
6  been -- Jay may have wanted me to send it --
7      Q. This one being?
8      A. In May, because I don't know when
9  she became a permanent employee.
10      Q. She became permanent on or about
11  June the 5th.
12      A. Okay. He may have told me to
13  submit that to her.
14      Q. Let me show you Exhibit 19 -- once
15  again, Defendant's Exhibit 19 from a prior
16  deposition.
17      Did you recall sending this e-mail
18  to Tarsha on or about August 14th?
19      A. Yes.
20      Q. When you say there had been quite a
21  few instances that Jay has excused, what were
22  you referring to?
23      A. Being tardy.
24      Q. Did you feel that considering --
25  well, you stated here that I feel that he,

Page 56

1  meaning Jay, has been more than understanding
2  for everything considering this is Jay.
3      Did you mean what you said, that
4  you felt like he had been more than
5  understanding concerning the topic of this
6  e-mail?
7      A. Right. Well, considering how
8  strict he is. That's why I put that.
9      MS. RIEDLER: I just need a couple
10  of minutes with my group. I'm probably
11  through.
12      (Break taken.)
13      Q. Ms. Womack, do you recall whether
14  Mobis had a ninety-day probation policy for
15  probationary employees that was in paper form,
16  a written policy? A policy that applied --
17      A. I know it's a policy, a ninety-day.
18      Q. Do you remember what, if anything,
19  that policy says about attendance during your
20  probationary period?
21      A. Just by -- I mean, reading it -- I
22  mean, I haven't -- I can't remember reading
23  it, but I know -- I mean, I know that was
24  a key issue.
25      Q. Okay.

Page 57

1      A. I think. I think. I know Jay said
2  it. I can't remember reading it though.
3      Q. All right.
4      MR. BARNETT: I don't have anything
5  else.
6      MS. LEONARD: I just have a few.
7
8      FURTHER EXAMINATION
9  BY MS. LEONARD:
10      Q. Do you remember getting any type of
11  training from Ms. Riedler during your
12  employment on Mobis's EEO policy relating to
13  discrimination?
14      A. Training?
15      Q. Yes, ma'am. Did she have any type
16  of meetings where she would go over that
17  policy with the supervisors and managers?
18      A. No.
19      Q. The lady we were talking about
20  earlier, Su Jin Lee, how did her employment at
21  Mobis come to an end? Did she resign?
22      A. Yes.
23      Q. In fact, she resigned early into
24  her pregnancy, didn't she?
25      A. Yes, she did.

15 (Pages 54 to 57)

Deposition of SONECHKA L. WOMACK
February 1, 2008

Page 58

1    Q. And that was because she was moving
2  to Korea?
3    A. Right.
4    Q. All right. At the time she
5  resigned, could you physically tell that she
6  was pregnant by looking at her?
7    A. No.
8    Q. All right. In the e-mail that's in
9  front of you that's Defendant's Exhibit Number
10  10, in reviewing that e-mail, would you agree
11  that when Ms. Hunter was out from work, she
12  would make up her time that she missed?
13    A. I would say she would make up --
14  she would stay late or, like, work through her
15  lunch.
16    Q. And I forgot to ask, Alecia
17  Gardener, she was not under Mr. Kim's
18  supervision, or he was not her manager?
19    A. Right.
20    Q. And also, back to Defendant's
21  Exhibit Number 10, did Mr. Kim direct you that
22  you needed to forward his April e-mail that
23  sets forth his policies and procedures for
24  attendance to Ms. Hunter?
25    A. Could you repeat that?

Page 59

1    Q. I'll rephrase. Based on your
2  communications with Mr. Kim, did you get the
3  impression that he wanted you to communicate
4  the information to Ms. Hunter that was in his
5  April e-mail that I think is the second two
6  pages of Exhibit 10?
7    A. Yes.
8    Q. And did you get the impression that
9  he felt that those policies and procedures
10  applied to Ms. Hunter?
11    A. Yes.
12    MS. LEONARD: That's all I have.
13
14    FURTHER EXAMINATION
15  BY MR. BARNETT:
16    Q. Did you and Ms. Hunter ever have
17  any discussion about what Mobis's handbook
18  meant or said, what was in it?
19    A. I can't say, quote, Mobis handbook,
20  but Jay's handbook -- I mean, you know --
21    Q. Jay's --
22    A. Jay's way, policy. Yeah, because
23  he would say, This is not my policy; this is
24  Mobis's policy. He would always say that. So
25  yes.

Page 60

1    MR. BARNETT: That's it.
2    MS. LEONARD: Run and hide.
3
4    Deposition of SONECHKA WOMACK
5    Concluded at 2:28 p.m.
6    February 1, 2008
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 61

1    C E R T I F I C A T E
2
3
4  STATE OF ALABAMA  )
5  JEFFERSON COUNTY  )
6
7    I hereby certify that the above and
8  foregoing deposition was taken down by me in
9  stenotype, and the questions and answers
10  thereto were reduced to computer print under
11  my supervision, and that the foregoing
12  represents a true and correct transcript of
13  the deposition given by said witness upon said
14  hearing.
15
16    I further certify that I am neither
17  of counsel nor of kin to the parties to the
18  action, nor am I in anywise interested in the
19  result of said cause.
20
21
22
23
24    Elaine Scott, ABCR 354

16 (Pages 58 to 61)

Fact Finding

Claimant Name [HUNTER/TARSHA NICKOL]     Claimant SSN [421219223]     Claim Date [10/08/06]

| Statements | Discharge-Emp | Discharge-Clmt | Quit | Absent/Tardy | Summary | Attempts |

BEN241 Status:  ○ Timely Received   ○ Timely Mailed, Late Received   ○ Mailed Late   ○ Not Received

**Claimant's Statement**

Left message on [ ] [ ] to return call no later than [ ] [ ] or decision will be made based on available information.

Separation resulted from:  ○ Voluntary Quit   ○ Discharge   ○ No Work Available   ○ Other

I was told I was told that they could not take care of an employee like me
CLMT'S REBUTTAL 10/24/06@ 4:52PM: I told my supervisor who was over me that I was pregnant she told me not to tell
anyone b/c I could possibly loose my job. But I told Mr. Kim, CFO, on 08/09/06 b/c I needed to have surgery b/c of my
pregnancy and he didn't say anything and he never talk to me anymore. My supervr asked me after I told Mr. Kim how did it
go. I told her that he, Mr. Kim, didn't say anything she said he will. On 08/25/06 Mr. Kim told me that he couldn't afford to take
care of an employee like me. There was no prior warnings for anything during the whole time I worked for them.

**Employer's Statement**

see attempts screen///
10/23/06@9:36am  Employee was discharged b/c her work was unsatisfactory during the probation period
Employer rebuttal stmt as req via 220-A,10/24/06 (Laurie Hofler-Training Specialist) Yes, employees misconduct was
intentional.

Person Interviewed [ ]     Phone Number: [ ]

Interviewer [L. Fulton]     Title [Training Specialist]     Date [10/24/2006]

Person Interviewed [Laurie Hofler]     Date [10/24/2006]

[Print]   [Save]   [Cancel]

CERTIFIED AND TRUE COPY OF ALA.
DEPT OF INDUSTRIAL RELATIONS
RECORDS.

AUG - 7 2007

DANIEL J. SOMERS
CUSTODIAN OF RECORDS

Fact Finding

| Statements | Discharge-Empl | Discharge-Clmt | Quit | Absent/Tardy | Summary | Attempts |

Claimant Name |HUNTER/TARSHA NICKOL          Claimant SSN |421219223          Claim Date |10/08/06

Person Interviewed |Laurie Holler          Title |Training Specialist          Date |10/23/2006 |▾|

Claimant Discharged by |Jay Kim          Title/Position |Senior Mgr

What incident caused his/her discharge?
No final incident. Her work performance during the 90 day probation period was not satisfactory.

Date of Final Incident |   /   /   | |▾|          Date of Discharge |08/25/2006 |▾|

How? |Her performance was not acceptable.

Was policy violated? |Yes| |No

Is there a rule, policy or agreement regarding this type of behavior? |Yes| |No|

Was claimant aware of the policy? |Yes| |No|

How/when was the claimant made aware? |upon hire 06/05/06

Did claimant attempt to comply? |Yes| |No|

Had claimant previously been warned about/suspended for this type of behavior? |Yes| |No|

By whom? |Jay Kim          When? |   /   /   | |▾|     ⊙ Verbal  ○ Written

Other Information |employee was late or tardy but we don't know b/c we don't keep documentation. We just consider it under her
overall performance. Warning dates unknown

|Print|          |Save|          |Cancel|

CERTIFIED AND TRUE COPY OF ALA.
DEPT OF INDUSTRIAL RELATIONS
RECORDS.

AUG - 7 2007

DANIEL J. SOMERS
CUSTODIAN OF RECORDS

11/8/2006

# Daily Appeals Report

**HUNTER/TARSHA NICKOL**                                       421219223

When were you warned?
Type of warning you received
Other information from claimant
Reason for discharge
Discharged by
Date claimant was discharged
Last day claimant worked
Date of final absence
What was the reason for the final absence?
Were you treated by a doctor?
Is a doctor's statement required to justify absence for
personal/family illness?
Was doctor's statement provided?
What is company policy regarding absence or tardiness?
Should a particular person be notified when calling in?
Whom should claimant notify?
Was this person notified?
If not, why?
At what time did shift start?
Date called in
Time called in
Was prior approval given for absence/tardiness?
If yes, explain
Previous warnings for attendance/tardiness problems?
Type of warning you gave the claimant
Dates of warnings
Name and title of person issuing warning
Other important information
Why did you quit your job?
Explain if other
Did you tell your employer the reason you quit?
If yes, whom did you tell?
If no, explain why you did not tell your employer
If quit due to working conditions, explain conditions
How long did these conditions exist?
If you quit for personal or other reasons, explain
What action did you take to resolve the problem?
What action did your employer take to resolve the problem?
Person interviewed (Employer)
Claimant discharged by
Title/position of person who discharged claimant
What incident caused the claimant's discharge?

Date of final incident that caused you to discharge claimant
Date you discharged claimant
Do you have a rule, policy or agreement regarding this type of
behavior?
Did claimant violate policy?
How did the claimant violate the policy?
Was claimant aware of the policy?
How/when was claimant made aware?
Did claimant attempt to comply?
Had claimant previously been warned about/suspended for
this type of behavior?
Who warned the claimant?
When was the claimant warned?
Type of warning you gave claimant

CERTIFIED AND TRUE COPY OF ALA.
DEPT OF INDUSTRIAL RELATIONS
RECORDS.

AUG - 7 2007

*Daniel A. Somers*

DANIEL J. SOMERS
CUSTODIAN OF RECORDS

Laurie Hoffer
Jay Kim
Senior Mgr
No final incident. Her work performance during the 90 day
probation period was not satisfactory.

08/25/2006
0

0
Her performance was not acceptable.
0
upon hire 06/05/06
1
0

Jay Kim

0

87

# Daily Appeals Report

**HUNTER/TARSHA NICKOL**                          **421219223**

| | |
|---|---|
| Other information from employer | employee was late or tardy but we dont know b/c we dont keep documentation. We just consider it under her overall performance. Warning dates unknown |
| Ben-241 status | |
| Separation resulted from | |
| Claimant statement | I was told I was told that they could not take care of an employee like me. |
| | CLMTS REBUTTAL: 102406@ 4:52PM: I told my supervisor who was over me that I was pregnant she told me not to tell anyone b/c I could possibly loose my job. But I told  Mr. Kim, CFO, on 080906 b/c I needed to have surgery b/c of my pregnancy and he didnt say anything and he never talk to me anymore. My supervr asked me aft |
| Employer statement | see attempts screen/// |
| | 102306@9:36am:  Employee was discharged b/c her work was unsatisfactory during the probation period. |
| | Employer rebuttal stmt as req via 220-A, 10/24/06 (laurie Hoffer-Training Specialist) Yes, employees misconduct was intentional. |
| Employer phone number | 3343874800 |
| Person interviewed | Laurie Hoffer |
| Title of person being interviewed | Training Specialist |
| Date of interview | 10/23/2006 |
| Usual occupation | ACCOUNTANTS |
| Type of work seeking | ACCOUNTANTS |
| ES referral required? | Y |
| ESO Office | Montgomery |
| Was BRI booklet received? | Y |
| Interview date | |

CERTIFIED AND TRUE COPY OF ALA.
DEPT OF INDUSTRIAL RELATIONS
RECORDS

AUG - 7 2007

DANIEL J. SOMERS
CUSTODIAN OF RECORDS

Tarsha Hunter v. Mobis Alabama
Plaintiff's Initial Disclosure Documents        0247



## Vacation Request

Employee Name: _Taisha Hunter_     Date Submitted: _7-25-06_

Department: _Accounting & Finance_     Division: _____

Start date: _7-25-06_     End date: _7-25-06_     Total hours taken: _____

Dr. Appointment scheduled today @ 2:00 pm.

1:30 PM (7/25/06)

Please fill out one (1) form for each week of Vacation taken

_Taisha Hunter_     _7-25-06_
Employee Signature     Date

→ _please make up time._

_JW_ 7/25     _J. M. Lim_     7/25/06
Supervisor Signature     Date

_____     _____
Human Resources  Signature     Date

HUNTER V. MOBIS
00185

# MOBIS Alabama, LLC

**Absence Request**

**Absence Information**

Employee Name: _Yaisha Hunter_    Department: _Accounting & Finance_

Employee Number: _____

Manager: _Sonechka Womack_

Type of Absence Requested:

(Sick)    Appointment    Bereavement    Time Off Without Pay

Military    Jury Duty    Maternity/Paternity    Other

Dates of Absence:  From: _7/31/06_    To: _8/1/06_

Reason for Absence:

_7/31/06 I had to leave work due to illness and returned 8/2/06._

*You must submit requests for absences, other than sick leave, two days prior to the first day you will be absent.*

_Yaisha N. Hunter_    Date _08/02/06_
Employee Signature

**Manager Approval**

☐ Approved

☐ Rejected

Comments:

_SW_    _8/2_    _____    _____    _8/2/06_
Manager Signature    Date

FRANK H. McFADDEN
JOHN F. ANDREWS
WILLIAM D. COLEMAN
WILLIAM K. MARTIN
GEORGE L. BECK, JR.
BRUCE J. DOWNEY III
HENRY C. BARNETT, JR.
K. PALMER SMITH
ROBERT T. MEADOWS III
HENRY H. HUTCHINSON
SHAPARD D. ASHLEY
D. KYLE JOHNSON
ROBERT F. NORTHCUTT

JAMES N. WALTER, JR.
JAMES H. McLEMORE
CONSTANCE SMITH BARKER
W. HOLT SPEIR III
CHRISTOPHER W. WELLER
DEBRA DEAMES SPAIN
C. CLAY TORBERT III
R. BROOKE LAWSON III
J. SCOTT PIERCE
ROBERT D. RIVES
RICHARD H. ALLEN
M. COURTNEY WILLIAMS

LEE M. RUSSELL, JR.
CHAD W. BRYAN
MICHAEL P. DALTON
CATY HOUSTON RICHARDSON
ARDEN REED PATHAK
TERRIE SCOTT BIGGS

OF COUNSEL:
JAMES M. SCOTT
THOMAS S. LAWSON, JR.

# CAPELL & HOWARD P.C.
### ATTORNEYS AT LAW

November 16, 2006

Ms. Rita Sterling, Investigator
U.S. Equal Employment Opportunity Commission
Birmingham District Office
Ridge Park Place, Suite 2000
1130 22nd Street, South
Birmingham, AL 35205

RE:    **Charging Party:** *Tarsha Hunter*
**Respondent:** *Mobis Alabama, LLC*
*EEOC Charge No. 420-2006-04825*
**Our File No.:** 25503-008

Dear Ms. Sterling:

## INTRODUCTION

This letter is in response to the EEOC Charge of Discrimination filed by Tarsha Hunter against MOBIS Alabama, LLC. The Charge is based on Title VII of the Civil Rights Act of 1964.

MOBIS Alabama, LLC ("MOBIS") maintains its principal place of business at 1395 Mitchell Young Road, Montgomery, Alabama. MOBIS is a first-tier supplier to Hyundai Motor Manufacturing Company ("HMMA"). As such, MOBIS manufactures certain original equipment automotive components for use by Hyundai at its vehicle final assembly plant, also located in Montgomery. MOBIS commenced operations in 2005. MOBIS is an equal opportunity employer and maintains written polices prohibiting discrimination on the basis of sex or pregnancy.

Charging Party was employed by MOBIS in its Accounting Department as an Accounting Specialist. Her supervisor was Sonechka Womack, MOBIS' Assistant Manager of Treasury. Womack reports to J. Kim, MOBIS' Chief Financial Officer.

MOBIS hired Charging Party on June 5, 2006 as a probationary employee. MOBIS terminated Charging Party's employment on August 25, 2006 near the end of her 90 day probationary period.

MONTGOMERY • OPELIKA / AUBURN

150 SOUTH PERRY STREET (36104), POST OFFICE BOX 2069, MONTGOMERY, ALABAMA 36102-2069
334 241 8000 *tel*    334 323 8888 *fax*    www.capellhoward.com
Tarsha Hunter v. Mobis Alabama, LLC
Plaintiff's Initial Disclosure Documents        0016

Ms. Rita Sterling, Investigator
EEOC Charge No. 420-2006-04825
Page 2 of 4

## STATEMENT OF THE FACTS

Charging Party first worked at MOBIS as a temporary employee in the accounting department under the supervision of Ms. Womack. Her start date was in April, 2006. Charging Party demonstrated poor attendance and dependability. For this reason, Mr. Kim delayed offering her employment with MOBIS. He had several conversations with Charging Party and Ms. Womack about Charging Party's dependability problems. Charging Party assured Mr. Kim that her attendance would improve if MOBIS hired her. Mr. Kim decided to offer employment to Charging Party, but told her that he would continue to monitor her attendance (*see* Ex. A).

All MOBIS employees are hired on probationary status. The terms and conditions of the ninety (90) day probationary period are stated in MOBIS' employee handbook (*see* "the Policy" attached hereto as Ex. B). During the probationary period, MOBIS, closely evaluate a person's skills, abilities and overall suitability to successfully perform the functions of the job. The new employee also has an opportunity to learn more about the company and what is expected of him/her. Attendance is one of the primary factors MOBIS evaluates during the probationary period.

MOBIS' Policy provides that any probationary employee who has three (3) absenteeism occurrences (*i.e.* an absence, tardy, or early departure from work) during the first ninety (90) days of employment will be terminated. Charging Party had seven attendance incidents in the first sixty (60) days of her employment (*see* Ex. C).

Charging Party's poor attendance caused problems for the accounting department. Her work was not getting done on time and others, including her supervisor, had to pick up the slack. In addition, Mr. Kim did not believe that Charging Party's work ethic or her interaction with others in the department was satisfactory.

For these reasons, Mr. Kim terminated Charging Party's employment on August 25, 2006 (Charging Party's probationary period would have expired week later on September 2, 2006) (*see* Ex. A).[1]

## MOBIS' RESPONSE TO THE SPECIFIC
## OF THE CHARGE

Some specific aspects of Charging Party's Charge of Discrimination necessitate rebuttal. Most important, is Charging Party's allegation that Mr. Kim terminated her because she was

---

[1] It is not uncommon at MOBIS for probationary employees to be terminated before the expiration date of their probationary period. In fact, the Policy encourages supervisors to proceed with termination during the 90 day period if it becomes apparent that regular employment will not be offered.

Ms. Rita Sterling, Investigator
EEOC Charge No. 420-2006-04825
Page 3 of 4

pregnant.  This is not possible because Mr. Kim had communicated his decision not to offer Charging Party regular employment to MOBIS Sr. Human Resources Manager, Tracy Riedler, before he became aware of Charging Party's pregnancy.[2]

Charging Party also alleges that Mr. Kim communicated with her through her supervisor Womack after she became pregnant. MOBIS can demonstrate conclusively that Mr. Kim's regular preference is to communicate with employees in the accounting department through their supervisor when practical.  In other words, Mr. Kim, who believes in formality in business discourse, routinely communicates with the employees in his department through their supervisors rather than directly.  Nothing changed in that regard after Mr. Kim learned of Charging Party's pregnancy.

Finally, Charging Party makes reference to Mr. Kim's use of the phrase that he "can't take care of a person like [Charging Party]." Mr. Kim uses that phrase to convey that he expects his staff to handle their responsibilities without unnecessarily involving him or others.  It is Mr. Kim's way of saying that he does not need an employee who is not generally self sufficient, and frequently necessitates his involvement and that of other departmental employees.

## OTHER RELEVANT CONSIDERATIONS

Charging Party was a salaried employee therefore, she did not punch a time clock. Rather, her attendance was tracked manually by her supervisor.  Under this system, it is not unusual for attendance problems of salaried probationary employees to be addressed after the maximum of three (3) instances has been exceeded.  In this case, Charging Party had seven (7) instances in a period of just two (2) months.

MOBIS' no fault Policy on attendance for probationary employees is not discriminatory with respect to pregnancy.  Pregnancy is treated the same as any other illness or medical condition.  In other words, Charging Party would have been treated the same if her absences were due to some other illness or medical condition.  Once an employee becomes eligible for FMLA leave, he or she becomes entitled to all of the rights and benefits afforded by that statute.[3]

## CONCLUSION

In conclusion, MOBIS terminated Charging Party's employment for reasons which are objectively legitimate, nondiscriminatory and non-pretextual.  Charging Party's attendance and dependability were not acceptable while she was a temporary employee.  As a result, Mr. Kim

---

[2]  Consequently, Charging Party's pregnancy could not have motivated Mr. Kim's decision.

[3]  MOBIS' attendance Policy for regular employees is likewise "no fault."  Such employees must maintain 98% attendance irrespective of the reasons for their absences.

1079733

Ms. Rita Sterling, Investigator
EEOC Charge No. 420-2006-04825
Page 4 of 4

delayed offering Charging Party employment. After several counseling sessions with Charging Party and her supervisor, Charging Party was offered employment on the condition that her attendance and dependability improve during her probationary period. Charging Party assured Mr. Kim that this would be the case. Charging Party's attendance and dependability did not improve. Charging Party had more than twice the allowable attendance incidences in a period of just two (2) months. Moreover, Mr. Kim determined that her interaction with other departmental employees was not suitable. For these reasons, MOBIS terminated Charging Party's employment.

Mr. Kim did learn of Charging Party's pregnancy shortly before Charging Party was terminated, but Mr. Kim had already made the decision to terminate Charging Party, and communicated that decision to MOBIS' Sr. Human Resources Manager well before he was aware of Charging Party's pregnancy. Consequently, it is not possible that Charging Party's pregnancy was a motivating factor in Mr. Kim's decision.

MOBIS respectfully submits that this Charge is due to be dismissed without a finding of discrimination.

Yours very truly,

Henry C. Barnett, Jr.

HCB,jr/mmc
Enclosure
cc:    Ms. Tracy Riedler

1079733

# EXHIBIT "A"

# 90 DAY WORK PERFORMANCE REVIEW SHEET

Team Member Name _____ Tarsha Hunter _____

Title _____ Accounting Specialist _____

Department _____ Accounting and Finance _____

Division _____ Module _____

Manager/Supervisor _____ Sonechka Womack _____

Date of Hire _____ 06/05/06 _____

Date 90 Day Probationary Period Expires _____ 09/02/06 _____

## Check One

_____ **A:** **The employee has successfully passed the probationary period for their present job.**

❖ Attendance is satisfactory. How many days has the team member been absent, late or left early?

_____

❖ What are the team member's strengths?

_____

❖ What are areas the team member could improve on?

_____

**X** _____ **B:** **The employee should be terminated based on unsatisfactory performance.**

❖ Explain why you recommend termination

Tarsha's attendance and dependability was unstable while she was a temporary employee. I delayed hiring her for this very reason. I had several conversations with Tarsha and her supervisor expressing my concern. Tarsha ensured me this problem would not continue after she was hired. I told her that I would continue to evaluate her performance, to include attendance, during her 90 day probationary period. She has not improved. Her mannerism is not congenial to our department. And her lack of dependability has placed strain on our department as when she is not here her work must be performed by her supervisor who has responsibilities of her own. I cannot continue with this situation.

Supervisor/Manager Signature _____ _(signed)_ 8/25/06 _____

Sr. Manager Human Resources _____ _(signed)_ 8/25/06 _____

Executive Vice President _____ _(signed)_ 08-25-06 _____

President _____

# EXHIBIT "B"



# MOBIS Alabama, LLC

## ORIENTATION (PROBATIONARY) PERIOD
## POLICY AND PROCEDURES

1. **PURPOSE**

   1.1  It is our policy at MOBIS Alabama, LLC (MOBIS), to help all new Team Members feel a part of our company as quickly as possible and to help them learn more about MOBIS and what we expect from them as a member of our organization. If at any point during the first 90 days of employment, it becomes obvious that continued employment is pointless, the supervisor should recommend termination proceedings. Due to Alabama being an "employment at will" State, an employer can terminate with or without cause at any time. Ninety (90) days is an acceptable amount of time to be able to fairly evaluate a person's performance.

2. **POLICY**

   2.1  The first ninety (90) days of employment are considered an orientation period. This is a critical period in a Team Member's development and success with MOBIS. The orientation period is a trial period during which the supervisor will determine whether the Team Member has proved that he or she can handle their job satisfactorily.

   2.2  There is no reason for the supervisor to endure 90 days of unsatisfactory progress on a new hire. At any point during the 90 days, if it becomes obvious that continued employment is pointless, the supervisor should recommend termination proceedings.

   2.3  Before the end of the Team Member's orientation period, the HR Department will send the supervisor a Performance Review Sheet, on which the supervisor will indicate the Team Member status.

   2.4  During this orientation period, any Team Member's who have three (3) absenteeism occurrences will be terminated. The occurrences can include a tardy, early out, and/or an all day absence. (03/21/05)

Effective Date:   07/20/04, 01/04/05, 03/21/05, 04/24/06
Revision Number:  1, 2, 3, 4
Policy:           Orientation (Probationary) Period



# MOBIS Alabama, LLC

## ORIENTATION (PROBATIONARY) PERIOD
## POLICY AND PROCEDURES

3.  **PROCEDURE**

3.1   The Supervisor must complete the Performance Review Sheet and return it to the HR Department prior to the end of the 90-Day Orientation Period.

3.2   This procedure does not alter the employment-at-will relationship. A Team Member can terminate his or her employment at any time with or without reason, and MOBIS has the same right.

Effective Date:     07/20/04, 01/04/05, 03/21/05, 04/24/06
Revision Number:   1, 2, 3, 4
Policy:                     Orientation (Probationary) Period

Tarsha Hunter v. Mobis Alabama, LLC
Plaintiff's Initial Disclosure Documents     0024

# EXHIBIT "C"

| 2006 Absense Record  - Tarsha Hunter | | | |
|---|---|---|---|
| Date | # of Days | Hrs taken | Accum. Hrs |
| 06/15/2006 | 1 | 8 | 8 |
| 07/25/2006 | 1 | 3.5 | 11.5 |
| 07/27/2006 | 1 | 3.5 | 15 |
| 07/31/2006 | 1 | 6 | 21 |
| 08/01/2006 | 1 | 8 | 29 |
| 08/11/2006 | 1 | 4 | 33 |
| 08/14/2006 | 1 | 4 | 37 |

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

TARSHA NICKOL HUNTER,    )
                         )
        Plaintiff,       )
                         )       Civil Action No.: 2:07-CV-427-WHA
vs.                      )
                         )
MOBIS ALABAMA, LLC,      )
                         )
        Defendant.       )

DEFENDANT'S RESPONSES TO
PLAINTIFF'S FIRST REQUEST FOR ADMISSIONS,
REQUESTS FOR PRODUCTION OF DOCUMENTS
AND INTERROGATORIES

**COMES NOW** the Defendant, **MOBIS ALABAMA, L.L.C.** (hereinafter **"MOBIS"**) and responds to Plaintiff's First Request for Admissions, Requests for Production of Documents and Interrogatories as follows:

GENERAL OBJECTIONS

1.    Defendant, objects to each and every paragraph of the Plaintiff's discovery requests to the extent that they request information or documents, that are protected from discovery by the attorney-client relationship, work product, or self-critical analysis privileges or because such information or documents were prepared in anticipation of litigation.

2.    Defendant, objects to each and every paragraph of the Plaintiff's discovery requests to the extent that they request information or documents that are of a confidential, proprietary or personal nature.  Subject to the entry of a satisfactory Protective Order that restricts the use of the information/documents solely to the prosecution of the claims of the

1100512

named Plaintiff and that protects adequately the confidentiality of the information/documents, Defendant shall provide the requested information/documents not otherwise objected herein.

3.     Defendant objects to any and all discovery requests that are not reasonably limited in time or scope.

4.     Defendant objects to each and every request in Plaintiff's discovery to the extent that it seeks information that is equally available to Plaintiff and the burden on Plaintiff to obtain the requested information is no greater than the burden on Defendant.

5.     Defendant objects to each and every request in Plaintiff's discovery to the extent that it seeks an answer involving an opinion or contention that related to fact or the application of law to fact before discovery has been completed or a pre-trial conference has been conducted.

6.     Formal discovery has just begun in this civil action; therefore, Defendant reserves that right to supplement its responses to Plaintiff.

7.     Defendant's general objections to Plaintiff's discovery requests are made without waiving, or prejudice to, any additional objections Defendant may make.

8.     All such objections are hereby expressly preserved, as is the right to move for a protective order.

9.     Defendant reserves all objections as to the admissibility at trial of any information provided.

10.     Defendant objects to each and every discovery request to the extent that the information called for, if any, was obtained and prepared in anticipation of litigation or for trial and Plaintiff have made no showing that she has substantial need for the materials in the preparation of

her case and that she is unable, without undue hardship, to obtain the substantial equivalent of the materials by other means.

11.    The supplying of any information does not constitute an admission by Defendant that such information is relevant or admissible in this lawsuit.  All information provided by Plaintiff is for use in the litigation only and for no other purpose.

These "General Objections" are applicable to and incorporated into each of this Defendant's responses, *infra*, as if specifically stated therein.  The stating of specific objections to a particular request shall not be construed as a waiver of this Defendant's "General Objections."  The stating of a response to a particular request shall not be construed as a waiver of this Defendant's "General Objections" or any specific objection to any particular request.  Unless otherwise specifically stated, this Defendant's objections to each discovery request apply to the entire request, including each and every subsection and/or subpart of the request.

Notwithstanding the objections above, Defendant offers the following specific responses to Plaintiff's requests:

## REQUESTS FOR ADMISSIONS

1.    Please admit that you did not issue any written form of discipline to the Plaintiff prior to her termination.

**RESPONSE:  MOBIS admits <u>only</u> that it did not issue written "discipline" as such to Plaintiff prior to her termination. MOBIS qualifies its answer to Request for Admission No. 1, and states that it's no fault attendance policy  for probationary employees does not provide for formal written "discipline" respecting attendance issues.  Plaintiff was notified verbally and in writing that her attendance was unsatisfactory both while she was a temporary employee and after she became a probationary employee.**

1100512

2.      Please admit that J. Kim made the decision to terminate the Plaintiff.

**RESPONSE:  Denied.  Jay Kim participated in the decision making process along with Tracy Riedler.**

3.      Please admit that you did not learn that the Plaintiff was pregnant until after you hired her.

**RESPONSE:  Denied.**

4.      Please admit that Ms. Hunter filed her EEOC Charge within 180 days of her termination by the Defendant.

**RESPONSE:  Admitted.**

5.      Please admit that Ms. Hunter began performing work for you on or about March 6, 2006.

**RESPONSE:  Admitted with the condition that Plaintiff was working through temporary agency.**

6.      Please admit that the _____.

**RESPONSE:  Request not complete; therefore, it is denied.**

## REQUEST FOR PRODUCTION OF DOCUMENTS

1.      For any Request for Admission as set forth herein that you deny produce all documents relied upon in support of your denial of each Request for Admission.

**RESPONSE:  MOBIS relies on its Employee Handbook as its response to this Request.**

2.      Any and all documents relied upon in answering the Plaintiff's interrogatories.

**RESPONSE:  All unprivileged documents relied upon in answering Plaintiff's Interrogatories have been produced in MOBIS' Initial Disclosures or in response to these Requests for Production.**

3. The personnel file(s) and any other personnel information, as defined above, for:

  a. Tarsha Hunter

  b. J. Kim

  c. Tracy Riedler

  d. Any individual(s) involved in the decision to terminate Ms. Hunter.

**RESPONSE: (a-c) Upon entry of a Confidentiality Order acceptable to both parties, MOBIS will produce the personnel files of J. Kim and Tracy Riedler.  The personnel file of Tarsha Hunter is produced herewith.  (d)  Kim and Riedler made the decision to terminate Plaintiff.  Plaintiff's personnel file is attached.**

4. All documents which reflect the reason(s) that the Defendant terminated Ms. Hunter.

**RESPONSE:  All non-privileged documents responsive to this Request will be produced.**

5. Any non-privileged documents reflecting communications which reference the Plaintiff in any way.  This includes, but is not limited to, memoranda, letters, and/or emails and is limited to the last five (5) years.

**RESPONSE:  All non-privileged documents responsive to this Request will be produced.**

6.    Any and all documents reflecting policies and procedures in effect during the Plaintiff's employment with the Defendant relating to:

    a.    Probation

    b.    Discipline

    c.    Employee Leave

    d.    Performance

    e.    Termination

**RESPONSE: All documents responsive to this Request will be produced. (See Handbook.)**

7.    All documents, statements, notices, or otherwise which reflect complaints and/or concerns about pregnancy discrimination from employees of the Defendant during the past five (5) years at the location at which the Plaintiff worked. This request includes, but is not limited to, lawsuits, Charges of Discrimination filed with the Equal Employment Opportunity Commission, reports of discrimination and harassment pursuant to the defendants' policies, and/or informal communications (including, but not limited to, verbal communications) from employees to the defendant that they believe they have witnessed and/or experienced discrimination, and/or harassment.

**RESPONSE: All non-privileged documents responsive to this Request will be produced.**

8.    All documents reflecting the defendant's record retention policy.

**RESPONSE: MOBIS has not yet adopted a formal records retention policy, but, to its knowledge, has not disposed of any records relevant to this case.**

9.    Any and all documents reflecting the plaintiff's job description.

1100512

**RESPONSE:  Plaintiff's job description will be produced.**

10.    All documents related to the Plaintiff's EEOC Charge.

**RESPONSE:  All non-privileged documents responsive to this Request will be produced.**

11.    All documents related to the Plaintiff's application for unemployment compensation benefits.

**RESPONSE:  All such documents are contained in Plaintiff's personnel file and will be produced.**

12.    Any and all documents related to the Plaintiff's attendance.

**RESPONSE:  All such documents are contained in Plaintiff's personnel file and will be produced.**

13.    All documents which support your contention that you are not liable for the claims set forth in the complaint.

**RESPONSE:  All non-privileged documents responsive to this Request will be produced.**

14.    All documents received pursuant to a subpoena in this matter.

**REPONSE:  All such documents will be produced.**

15.    Any and all statements you have taken which are related to the Plaintiff's claims.

**RESPONSE:  None.**

16.    Any and all documents you may use (a) in support of a dispositive motion filed in this action; (b) in a deposition in this action; and/or (c) at the trial of this action.

**RESPONSE:  MOBIS objects to this Request for Production of Documents as being overly broad, ill defined and premature.  MOBIS does not know at this point in time what documents it will use in the contexts listed in Request for Production of Documents No. 16.**

17.    Any documents you have withheld from you initial disclosures on the grounds that you feel that they are solely for impeachment.

**RESPONSE:  None known at this time.**

18.    Any and all documents reflecting the earnings paid to the Plaintiff and the employee benefits (including their value) available to the Plaintiff.

**RESPONSE:  See attached.**

19.    Any and all recordings related to this case and/or bearing the image and/or voice of the Plaintiff.

**RESPONSE:  None are known to exist with the exception of the unemployment compensation hearing.**

## INTERROGATORIES

1.    Identify and state the job title, duties, and responsibilities of each person providing assistance in answering these interrogatories.

**RESPONSE:  Tracy Riedler, Senior Manager of Human Resources.  Mrs. Riedler oversees all aspects of human resources management.**

2.    Are you properly identified in the plaintiff's complaint?  If not, please state your proper legal name.

**RESPONSE:  Yes.**

3.      Please identify, as defined above, the person(s) who made the decision to hire the Plaintiff.

**RESPONSE:  J. Kim, MOBIS' Chief Financial Officer, made the decision to hire Plaintiff as a probationary employee effective June 5, 2006, after Plaintiff worked as a temporary employee referred by Multi Staffing.**

4.      Please identify, as defined above, the person(s) who made the decision(s) to discipline the Plaintiff.

**RESPONSE:  Tracy Riedler and Jay Kim jointly decided to terminate Plaintiff's employment.**

5.      Please identify, as defined above, the person(s) who made the decision to terminate the Plaintiff.

**RESPONSE:  See previous answer.**

6.      Please state the date on which the decision to terminate the Plaintiff was made.

**RESPONSE:  The final decision was made on or shortly before August 23, 2006.**

7.      Please identify, as defined above, any and all person working for the Defendant who have been disciplined in the last five (5) years for attendance.

**RESPONSE:  See attached.  MOBIS has furnished the requested information for salaried employees, but objects to doing so for hourly employees on the grounds that such information is not relevant to the claims or defenses of any party.  Hourly employees have a separate attendance policy.**

8.      For each person identified in the preceding interrogatory, please state (a) the date(s) of discipline, (b) whether the employee was terminated, and if so, when and for what reason.

**RESPONSE:  See previous answer and list.  All were terminated.**

9.      Please identify, as defined above, any and all person working for the Defendant who have been disciplined in the last five (5) years for poor dependability.

**RESPONSE:  Poor dependability is essentially the same as poor attendance.**

10.      For each person identified in the preceding interrogatory, please state (a) the date(s) of discipline, (b) whether the employee was terminated, and if so, when and for what reason.

**RESPONSE:  See previous response to No. 8 above.**

11.      For each Request for Admission you denied, state the factual basis for the denial and identify (as defined above) any and all documents supporting the denial(s) and/or individual(s) with knowledge of the facts supporting the denial(s).

**RESPONSE:  11a.  (Request No. 2).  MOBIS denies Request for Admission No. 2 because it implies that Kim alone made the decision to terminate Plaintiff, which is not correct.  See MOBIS' response to Interrogatory No. 5.**

**11b. (Request No. 3).  The term "you" could be read to refer to MOBIS and/or its employees.  MOBIS' Senior Management, including Ms. Riedler and Mr. Kim, do not know when Plaintiff became pregnant or when she may have told other MOBIS employees or supervisors about her pregnancy.**

**RESPONSE: Yes.**

16.    Describe in detail any internal complaints or grievances alleging race discrimination and/or retaliation during the last five (5) years.

**RESPONSE: Objection.  Complaints and/or grievances based on alleged race discrimination are not relevant to the claims or defenses of any party to this action.**

17.    For any and all documents, information, or otherwise which you have withheld from production on the basis of a privilege, please state the nature of the documents, communication, or things not produced and state the basis for the privilege asserted.

**RESPONSE: MOBIS has withheld only documents consisting of communications with its attorney, Henry C. Barnett, Jr.**

18.    For any and all documents you have produced in response to the plaintiff's request for production of documents, plead identify by Bastes Stamp Number which documents are responsive to each of the requests for production.

**RESPONSE: MOBIS will furnish this information in its Responses to Plaintiff's Request for Production.**

19.    Please identify, as defined above, the individual(s) who responded to the Department of Industrial Relations inquiry for information regarding the Plaintiff's application for unemployment compensation benefits.

**RESPONSE: MOBIS' records indicate that is may not have responded to the initial Notice of Claim and Request for Separation Information sent by the Department of Industrial Relations.  This was an oversight.  Lurie Hallford, Human Resources Specialist,**

responded to a memo from the Department of Industrial Relations dated October 20, 2006, concerning Plaintiff.

20.     Please identify, as defined above, the individual(s) who participated on your behalf in the telephone hearing with the Department of Industrial Relations regarding the Plaintiff's application for unemployment compensation benefits.

**RESPONSE: MOBIS is attempting to determine who participated in the telephone hearing with the Department of Industrial Relations. It is MOBIS' understanding that Plaintiff has a tape of that hearing. Access to that tape would help MOBIS identify its representative.**

21.     Please describe the accommodations the defendant offered to employees with a temporary disability for the period of January 1, 2006, to the date of the plaintiff's termination at the facility at which the plaintiff worked.

**RESPONSE: Objection. This Interrogatory is overly broad, does not relate to the claims or defenses of any party, and MOBIS does not understand what information Plaintiff is seeking. The foregoing objection notwithstanding, MOBIS states that the most common accommodation requested and afforded respecting pregnancy is restricting work to eight (8) hours per day and no lifting over twenty-five (25) pounds. Pregnant employees are treated the same as employees who are suffering from any other medical condition. Plaintiff never requested an accommodation.**

**SIGNED AS TO INTERROGATORY RESPONSES:**

By: _____

**TRACY RIEDLER**
**Senior Human Resources Manager, MOBIS**


**STATE OF ALABAMA** )
**COUNTY OF MONTGOMERY** )

    I, the undersigned, a Notary Public in and for said county in said state, hereby certify that TRACY RIEDLER, whose name as SENIOR HUMAN RESOURCES MANAGER for MOBIS, an Alabama corporation, is signed to the foregoing instrument and who is known to me, acknowledged before me on this date that, being informed of the contents of the foregoing instrument, she, as such officer and with full authority, executed the same voluntarily on behalf of said corporation on the date of this acknowledgment.

    Sworn to and subscribed before me this 5th day of September, 2007.


_____

**NOTARY PUBLIC**

NOTARY PUBLIC STATE OF ALABAMA AT LARGE
MY COMMISSION EXPIRES:  Oct 13, 2010
**My Commission Expires:** BONDED THRU NOTARY PUBLIC UNDERWRITERS
_____

**[SEAL]**


**SIGNED AS TO ALL OBJECTIONS, RESPONSES TO REQUESTS FOR PRODUCTION AND REQUESTS FOR ADMISSIONS:**

_____

**HENRY C. BARNETT, JR. (BAR037)**

*Attorneys for Defendant*


1100273

**OF COUNSEL**:
Capell & Howard, P. C.
150 South Perry Street
Post Office Box 2069
Montgomery, AL 36102
Telephone: (334) 241-8059
Facsimile: (334) 323-8888

## CERTIFICATE OF SERVICE

I hereby certify that on the __6th__ day of September 2007, I served a copy of the foregoing document on those persons listed below via email transmission and by placing same in the United States Mail postage prepaid and properly addressed.

Heather N. Leonard
Heather N. Leonard, P.C.
2108 Rocky Ridge road
Suite 1
Birmingham, Alabama 35216

_____
OF COUNSEL

1100273