**IN THE UNITED STATES DISTRICT COURT**

**FOR THE MIDDLE DISTRICT OF ALABAMA**
**NORTHERN DIVISION**

| | |
|---|---|
| **TARSHA NICKOL HUNTER,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) **Civil Action No.: 2:07-CV-427-WHA** |
| **vs.** | ) |
| | ) |
| **MOBIS ALABAMA, LLC,** | ) |
| | ) |
| **Defendant.** | ) |

**DEFENDANT MOBIS' MEMORANDUM OF**
**LAW IN REPLY TO PLAINTIFF'S OPPOSITION**
**TO MOTION FOR SUMMARY JUDGMENT**

**COMES NOW** the Defendant MOBIS Alabama, LLC (hereinafter "MOBIS") and respectfully submits the following Memorandum of Law in Reply to Plaintiff's Opposition to Defendant's Motion for Summary Judgment.  Although MOBIS' Motion for Summary Judgment and supporting Memorandum of Law show that there is no genuine issue of disputed fact and that MOBIS is entitled to judgment as a matter of law, Plaintiff raises several issues to which MOBIS will respond.

**SUMMARY OF THE ARGUMENT**

There are several undisputed facts and legal principles that compel summary judgment in MOBIS' favor.  The following is a summary of those points.

Not a single person with three (3) or more attendance occurrences has been converted from probationary status to regular employment since MOBIS revised its probationary attendance policy (and the related 90 Day Review Form) in March 2005 for purposes of implementing an objective, no fault attendance system.  There is, therefore, no evidence that any other "temporarily disabled employee[s]" were treated differently

than Plaintiff (i.e. no differential application of the rules to Plaintiff). Consequently, Plaintiff is actually seeking preferential treatment due to her pregnancy, something not required by the PDA. Riedler Supple. Aff. at ¶ 19, attached as Ex. A.

The undisputed facts also preclude application of the so called "cat's paw" paradigm because the "direct causal link" element required by the 11th Circuit cannot be met in this case. Specifically, Tracy Riedler must approve all terminations and all transitions from probationary to regular employment. MOBIS' Human Resources Department sent a 90 Day Review Form to Mr. Kim approximately a week or so prior to August 25, 2006, per standard practice (Human Resources does this automatically in advance of the end of ninety (90) days of employment). The undisputed facts reveal that Mr. Kim then consulted Ms. Riedler about not wanting to retain Plaintiff due to attendance problems. Ms. Riedler asked Mr. Kim what he meant by attendance problems and then accompanied him to his office whereupon she reviewed his records, which showed seven (7) attendance occurrences. The records Ms. Riedler reviewed included an Excel spreadsheet that Mr. Kim had contemporaneously maintained in his computer on Plaintiff's attendance, along with hard copies of various emails, absentee request forms, and doctors' notes he accumulated throughout Plaintiff's probationary employment. Upon verifying that Plaintiff had three (3) or more attendance occurrences, Ms. Riedler instructed Mr. Kim that Plaintiff had to be terminated under MOBIS' revised attendance policy of which Mr. Kim was not aware at that time. When Ms. Riedler made this statement to Mr. Kim, she was not aware of Plaintiff's pregnancy so it could not have been a motivating factor in her decision.

A day or so before Plaintiff was terminated, Plaintiff's direct supervisor, Ms. Womack, visited Ms. Riedler and told her that Plaintiff was pregnant. Ms. Womack pleaded with Ms. Riedler not to terminate Plaintiff. Ms. Riedler told Ms. Womack that the objective attendance policy required termination irrespective of the reason for Plaintiff's absences.

The pivotal importance of this is, of course, that irrespective of Mr. Kim's alleged, but vigorously denied, bias or improper motive for consulting Ms. Riedler, the objective attendance policy and Ms. Riedler's consistent application of it after verifying from Mr. Kim's records that Plaintiff had three (3) attendance occurrences completely defeats the notion of her being used as an unwitting "cat's paw." The objective policy, the lack of differential treatment of others, and Ms. Riedler's directive that Plaintiff be terminated given before, and reaffirmed after, she learned of Plaintiff's pregnancy preclude a finding of a causal link with regard to any motivation Mr. Kim may have had.

Additionally, temporal proximity alone is not enough to establish a *prima facie* case of pregnancy discrimination in the 11th Circuit, and in this case it should be given even less weight. A substantial element of temporal proximity is inherent in any ninety (90) day probationary work period, at the end of which an employee will either be terminated or retained. This is condensed even more so when the Plaintiff has an unplanned pregnancy in May of 2006, starts her probationary period on June 5, 2006, and does not inform her department head (Mr. Kim) of her pregnancy until August 9, 2006, three (3) weeks prior to the end of ninety (90) days and about the same time that Human Resources sends out the 90 Day Review Sheet. MOBIS respectfully submits that this

timetable so deeply discounts the probative value of temporal proximity that it should be given very little weight in terms of establishing a *prima facie* case or evidence of pretext.

Finally, a substantial portion of this Reply Brief is devoted to putting the record and undisputed facts in proper order and context. To show that there is no genuine issue of fact precluding an award of summary judgment, MOBIS provides somewhat lengthy excerpts of deposition testimony in context to illustrate the true meaning of that testimony.

## ARGUMENT

### A. PLAINTIFF MUST SHOW MORE THAN TEMPORAL PROXIMITY TO PROVE HER *PRIMA FACIE* CASE FOR PREGNANCY DISCRIMINATION.

Plaintiff admits in her Opposition Brief that she only has circumstantial evidence of discrimination and that the burden-shifting framework established in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802-804 (1973) applies. Thus, Plaintiff initially bears the burden of establishing a *prima facie* case of discrimination. *Texas Dept. of Cmty. Affairs v. Burdine,* 450 U.S. 248, 252-53, 254 (1981). Only if Plaintiff successfully bears this burden does the burden then shift to MOBIS to articulate a legitimate, nondiscriminatory reason for its action. *Burdine,* 450 U.S. at 253.

In the Eleventh Circuit, a plaintiff bears the burden of establishing a *prima facie* case of discrimination under the PDA/Title VII by showing: (1) she belongs to a "protected" class; (2) she was qualified to do her job; (3) she suffered an adverse employment action; and (4) her employer treated similarly situated employees outside her classification more favorably. *Holifield v. Reno,* 115 F.3d 1555, 1562 (11th Cir.1997) (citing *McDonnell Douglas,* 411 U.S. at 802); *see also Armstrong v. Flowers Hosp., Inc.,* 33 F.3d 1308, 1313-14 (11th Cir.1994) (describing the fourth prong as follows: "that she

suffered from differential application of work or disciplinary rules"). The fourth element is critical because the plaintiff must prove that the employer violated the PDA by denying "a pregnant employee a benefit generally available to temporarily disabled workers holding similar job positions." *Spivey,* 196 F.3d at 1313 (citing *Byrd v. Lakeshore Hosp.,* 30 F.3d 1380, 1383-84 (11th Cir. 1994) (plaintiff established a presumption of pregnancy discrimination by showing differential application of generally available sick leave policy for her pregnancy-related time off from work)).

Since Plaintiff cannot meet this burden, she urges the Court to adopt another *prima facie* case paradigm from another Circuit. *See* Plaintiff's Opposition Brief at p. 19. Plaintiff cannot unilaterally decide that the law in this Circuit should not apply to her simply because she fails to meet the fourth element of her PDA claim because she has no evidence that MOBIS' attendance policy was applied any differently to a non-pregnant employee. The reason that Plaintiff cannot prove her case is because MOBIS' no-fault attendance policy has been strictly enforced since its inception in 2005. *See* Ex. A at ¶ 16. This Court should reject Plaintiff's attempt to apply a different legal standard to this case simply because she fails to prove that the attendance policy was applied to her any differently and because she believes that she should have gotten preferential treatment because her absences were due to her pregnancy.

1.    **PLAINTIFF CITES CASES FROM THE 6TH CIRCUIT THAT ARE DISTINGUISHABLE AND INAPPOSITE FROM 11TH CIRCUIT CASE LAW.**

Plaintiff cites *Asmo v. Keane, Inc.*, 471 F.3d 588, 593 (6th Cir. 2006), for the proposition that the temporal proximity alone between the disclosure of Plaintiff's pregnancy and her discharge is enough evidence to establish her *prima facie* case of pregnancy discrimination. In *Asmo*, the Sixth Circuit, applying a paradigm different from

the Eleventh Circuit for a *prima facie* case of pregnancy discrimination and looking only to Sixth Circuit law, held in the context of a reduction in force ("RIF") that temporal proximity could show the "nexus" between the plaintiff's pregnancy and termination. *Id.* at 593-94. The *Asmo* plaintiff, who worked as a traveling recruiter for an IT company, was considered along with four other employees for the RIF, and there was no comparison of the performance amongst the employees because the employer considered them all to be "solid performers." *Id.* at 591. Thus, the fact that the plaintiff informed her employer that she was pregnant with twins approximately two months prior to the RIF established the nexus element for pregnancy discrimination under Sixth Circuit law.[1] The other two Sixth Circuit cases cited by Plaintiff are likewise distinguishable on their facts, and since both cases are unreported decisions from another jurisdiction, are not even persuasive in the Eleventh Circuit. *See Bergman v. Baptist Healthcare System, Inc.*, 167 Fed. Appx. 441 (6th Cir. 2006)(applying Sixth Circuit law, temporal proximity established nexus for *prima facie* case, but failure to show pretext resulted in summary judgment for employer); *Deboer v. Musashi Auto Parts, Inc.*, 124 Fed. Appx. 387 (6th Cir. 2005)(temporal proximity considered with other evidence to prove *prima facie* case and pretext).

In the Eleventh Circuit, temporal proximity alone is not enough to establish a *prima facie* case of pregnancy discrimination. If a pregnancy discrimination plaintiff only had to show that the employer knew she was pregnant and then she suffered an adverse employment action, then every pregnant employee would be summarily insulated

---

[1]    In *Asmo*, temporal proximity was not inherently built into the time frame as the case at bar since this case involved a probationary employee who was close to the end of her probationary period when she announced her pregnancy. Furthermore, the only thing that distinguished the *Asmo* plaintiff from the other four employees considered for the RIF was the fact that she had announced her pregnancy two months prior to being discharged.

from discipline or discharge regardless of job performance or workplace rule violations because the pregnancy would eventually become obvious in every instance.   In this jurisdiction, temporal proximity is considered along with other evidence to show a differential application of work rules, or is considered with other evidence to show pretext.  In *McCullen v. RDR, LLC*, 2007 WL 2071362 (M.D. Fla. 2007), citing Eleventh Circuit law, the court applied the following standard for a *prima facie* case of pregnancy discrimination:

> The first step under the *McDonnell Douglas* burden-shifting analysis focuses on establishing a *prima facie* case, which creates a rebuttable presumption that the employer acted illegally. This burden rests with the Plaintiff, who must show that: (1) she is a member of a group protected by Title VII; (2) she was qualified for the position; (3) she suffered an adverse effect on her employment; and (4) she suffered from differential application of work or disciplinary rules. *Armstrong,* 33 F.3d at 1314.

*McCullen*, 2007 WL 2071362 at *5.   The court held that plaintiff proved elements one through three, and then considered whether the employer had applied work rules differently to plaintiff.  The *McCullen* plaintiff was able to show that she suffered from a differential application of work rules concerning her work hours because she was the only employee whose work hours were drastically reduced after announcing her pregnancy, while other employees' work hours were slightly reduced or even increased. Thus, the court found that the facts demonstrated that the defendant "applied its seasonal slowdown rule to the pregnant plaintiff in a much more severe-*i.e.* disparate-manner."  *Id.* at *5.   The court considered the temporal proximity between when the plaintiff announced her pregnancy and the reduction in her hours, and held that:

> Contrary to the Defendant's position, the Plaintiff's hours remained relatively steady until July 2005, when they

> plunged dramatically. This close temporal proximity
> between when the Plaintiff announced her pregnancy and
> when her hours began to drop is sufficient to establish an
> inference that this "seasonal slowdown policy," to the
> extent it does, in fact, exist, was applied more severely to
> the Plaintiff because of her pregnancy.

*Id.* at *6. Thus, while temporal proximity is certainly a factor to consider when analyzing a disparate treatment case, a pregnant plaintiff cannot meet her *prima facie* burden by showing a close proximity alone. In the Eleventh Circuit, the PDA plaintiff must show that she suffered from a disparate application of work or disciplinary rules. *See also Rosales v. Keyes Co.*, 2007 WL 29245 at *5-6 (In pregnancy discrimination case, close temporal proximity is insufficient to establish pretext by itself, but can serve as some evidence of pretext. The Court held that plaintiff created a genuine issue of fact regarding pretext with evidence that she was given an alternate, false reason for her termination, her denials with respect to her performance and retraining, the timing of her dismissal, and the comments made by plaintiff's supervisor regarding the pregnancy).[2]

In the case at bar, temporal proximity should factor in even less since temporal proximity is inherent in any ninety (90) day probationary work period, at the end of

---

[2]  In the Eleventh Circuit, close temporal proximity can be used to prove the third element of causation required in the context of a Title VII retaliation case, but not in a disparate treatment case, such as the case at bar. In other words, causal relation, for purposes of the *prima facie* retaliation case, is satisfied by a showing of a "close temporal proximity" between the decision maker's awareness of the protected conduct and the adverse employment action. *See Farley v. Nationwide Mutual Insurance Co.,* 197 F.3d 1322, 1337 (11th Cir. 1999) (when the plaintiff's EEOC charge was filed May 19, 1995, the plaintiff's supervisors learned of the charge "shortly after its filing," and the plaintiff was terminated on July 10, 1995, "[w]e find this timeframe sufficiently proximate to create a causal nexus for purposes of establishing a prima facie case."); *Goldsmith v. City of Atmore,* 996 F.2d 1155, 1163 (11th Cir. 1993) (evidence that the plaintiff was involuntarily transferred three weeks after the mayor learned of her intent to look into the possibility of filing an EEOC charge "was sufficient to satisfy [her] initial burden to show a 'causal link' between her statements and her transfer"); *Donnellon v. Freuhauf Corp.,* 794 F.2d 598, 601 (11th Cir. 1986) (where the plaintiff was terminated one month after filing an EEOC charge, "[t]he short period of time ... between the filing of the discrimination complaint and the plaintiff's discharge belies any assertion by the defendant that the plaintiff failed to prove causation."). However, this paradigm has not been applied in this Circuit to prove a *prima facie* case in the context of disparate treatment.

which an employee will either be terminated or retained. This timing is even more condensed when the Plaintiff has an unplanned pregnancy in May of 2006, starts her probationary period on June 5, 2006, and does not inform her department head (Mr. Kim) of her pregnancy until August 9, 2006, three (3) weeks prior to the end of ninety (90) days and about the same time that Human Resources sends out the 90 Day Review Sheet. MOBIS respectfully submits that this timetable so deeply discounts the probative value of temporal proximity that it should be given very little weight in terms of establishing a *prima facie* case or evidence of pretext.

> ### 2.   PLAINTIFF'S DISCHARGE WAS TRIGGERED BY THE APPROACHING END OF HER PROBATIONARY PERIOD, NOT THE DISCLOSURE OF HER PREGNANCY.

As was explained in MOBIS' Summary Judgment Brief, MOBIS' Human Resources Department automatically sends a "90 Day Work Performance Review Sheet" ("Review Sheet") to the appropriate department head or supervisor prior to the end of an employee's probationary period. Ex. A at ¶ 18. At this time, the department head or supervisor evaluates the suitability of the employee for regular employment and makes a recommendation. Riedler Aff. at ¶ 16, attached hereto as Ex. B; Kim Aff. at ¶ 13, attached hereto as Ex. C. Under MOBIS' policy, the Review Sheet is required to be returned to Human Resources prior to the end of the probationary period. Ex. B at ¶ 16.

Approximately a week before Plaintiff's termination on August 25, 2006, MOBIS' Human Resources Department sent Mr. Kim a 90 Day Review Sheet for him to fill out on Ms. Hunter. Mr. Kim then consulted with Ms. Riedler. Riedler Depo. at p. 112, l. 12 – p. 114, l. 12.[3] Mr. Kim told Ms. Riedler that he did not want to offer Plaintiff regular employment because of her poor attendance record. Ex. C at ¶ 14. Ms. Riedler

---

[3] Ms. Riedler's deposition citations are attached as Ex. D.

inquired what Mr. Kim meant by "poor attendance," whereupon Mr. Kim showed Ms. Riedler his computer spreadsheet showing Plaintiff's seven (7) attendance occurrences. *See* Ex. C at ¶ 14 and Ex. 1. Ms. Riedler reviewed the spreadsheet and the supporting documents Mr. Kim had and told Mr. Kim that Plaintiff had to be terminated because she had violated MOBIS' attendance policy for probationary employees by having more than three (3) occurrences. *Id;* Riedler Depo. at p. 112, l. 12 – p. 114, l. 12. She also instructed Mr. Kim that Plaintiff had to be terminated at that time, not at the end of 90 days, which in Hunter's case would have been September 2, 2006. *Id.*; Ex. B at ¶ 17. This was Mr. Kim's first understanding of the specific requirements of MOBIS' revised attendance policy for probationary employees. Ex. C at ¶ 15; Kim Depo. at p. 14, l. 17 – p. 18, l. 11. [4]

### 3. PLAINTIFF'S DISCHARGE WAS ALREADY INEVITABLE BEFORE SHE INFORMED MR. KIM OF HER PREGNANCY.

It was inevitable that Plaintiff would be terminated at or near the end of her probationary period when she accrued her third absenteeism occurrence, even if Womack had succeeded in persuading Kim to retain her for regular employment despite her attendance problems. Plaintiff should have been terminated on July 27, 2006 after her third attendance occurrence, but she wasn't because Mr. Kim was not familiar with the specific number of attendance incidences allowed for probationary employees.[5] Kim Supple. Aff. at ¶ 3, attached hereto as Ex. F; Ex. C at ¶¶ 8, 11. As a result, Plaintiff remained employed almost one month longer than she should have, but her termination

---

[4] Mr. Kim's deposition citations are attached as Ex. E.
[5] Mr. Kim did address Plaintiff's attendance problems several times directly with Plaintiff and through Ms. Womack. Kim Depo. at p. 39, l. 22 – p. 40, l. 24. *See* E-mails Concerning Plaintiff's Attendance, attached as composite Ex. 2 to Ex. C.

ultimately came about as a result of the standard review process that occurs for all probationary employees toward the end of their probationary period. *Id.* at ¶ 11.

Assuming for demonstrative purposes only that Ms. Womack had persuaded Mr. Kim to retain Plaintiff when he received the 90 Day Review Sheet from Human Resources, something to which she certainly devoted her best efforts, Mr. Kim still would have had to fill out the 90 Day Review Sheet and include Plaintiff's seven (7) absenteeism occurrences. The form requires specific information about attendance. The form would have then been submitted to Human Resources and the decision would have been out of Mr. Kim's hands, just as it was in the actual facts before the Court. Ms. Riedler would have terminated Plaintiff anyway under the objective provisions of the revised Attendance Policy. Ex. A at ¶¶ 9, 10, 15.

The review process at the end of the probationary period is automatic. The attendance policy was a "no fault" policy and there was no progressive discipline set up for it. *Id.* at ¶ 14. In other words, no employees were entitled to a warning when they violated the policy. Additionally, it is undisputed that Plaintiff read and understood the policy governing probationary employees. Plaintiff Depo. at p. 73, l. 3 – p. 74, l. 22; p. 142, l. 1-5.[6]  Plaintiff also acknowledged that no one ever told her she was exempt from the probationary policy or that it would not apply to her in all respects. *Id.*

**B.    TRACY RIEDLER WAS NOT A "CAT'S PAW" THAT RUBBER-STAMPED MR. KIM'S DECISION NOT TO HIRE PLAINTIFF AS A PERMANENT EMPLOYEE.**

Plaintiff raises an argument that Ms. Riedler was a "cat's paw" -- i.e., the decision maker acting in accordance with the discriminating supervisor's decision without herself evaluating the employee's situation. This argument should be disregarded by the Court.

---

[6] Plaintiff's deposition citations are attached as Ex. G.

In *Llampallas v. Mini-Circuits Lab, Inc.*, 163 F.3d 1236 (11th Cir. 1998), the court rejected the plaintiff's argument that her supervisor, with whom she had had a lesbian relationship, used the company's president as a "cat's paw" to effectuate a discriminatory discharge.  In *Llampallas,*, the harassing supervisor threatened plaintiff, telling her that if plaintiff did not resume their sexual relationship then she would have her fired.  The supervisor then told the company president that she was resigning because she refused to continue to work with plaintiff because of "personal" issues.  *Id.* at 1239-40.  The company president, who was not aware of the relationship, suspended plaintiff with full pay, had meetings with plaintiff wherein they discussed plaintiff working at another facility, and then ultimately terminated plaintiff's employment.  *Id.*    The court held that the company president discharged plaintiff because he wanted to retain the supervisor, not because of any discriminatory motive towards plaintiff, thus breaking the chain of causation between the harassment and plaintiff's discharge.  *Id.* at 1250.  First, the court discussed the "cat's paw" line of cases:

> Several courts have held that even when the harasser in a Title VII case is not the decisionmaker, if the plaintiff shows that the harasser employed the decisionmaker as her "cat's paw"-i.e., the decisionmaker acted in accordance with the harasser's decision without herself evaluating the employee's situation, *see Shager v. Upjohn Co.,* 913 F.2d 398, 405 (7th Cir. 1990)-causation is established. *See, e.g., Long v. Eastfield College,* 88 F.3d 300, 307 (5th Cir. 1996) ("If ... [the decisionmaker] did not conduct his own independent investigation, and instead merely 'rubber stamped' the recommendations of [those who held a discriminatory animus], the causal link between [the plaintiffs'] protected activities and their subsequent termination, would remain intact."). In a cat's paw situation, the harasser clearly causes the tangible employment action, regardless of which individual actually signs the employee's walking papers. *See Shager,* 913 F.2d at 405 (stating that in such a situation "[t]he

> [decisionmaker] would no more be a nonconductor [for discriminatory animus] ... than would be the secretary who typed [the plaintiff's] discharge papers knowing nothing of the [ ] discrimination that lay behind the discharge"); *Burlington Indus.,* 524 U.S. at ----, 118 S.Ct. at 2269. In effect, the harasser *is* the decisionmaker, and the titular "decisionmaker" is a mere conduit for the harasser's discriminatory animus.

The *Llampallas* court declined to apply the "cat's paw" principle because, while the plaintiff's supervisor had a discriminatory motive, the ultimate decision maker discharged the plaintiff for a non-discriminatory reason.  *See also Stimpson v. City of Tuscaloosa*, 186 F.3d 1328, 1331-32 (11th Cir. 1999) (even assuming reasonable jury could find discriminatory animus on part of city in recommending termination of female police officer, causal link between that animus and her termination was broken by civil service board's hearing and independent decision to actually terminate her, thus defeating officer's sex discrimination claim).

Like *Llampallas*, this is not a "cat's paw" case.  Mr. Kim came to Ms. Riedler's office after receiving the probationary review sheet on which he was asked about Plaintiff's attendance record.  When he went to Ms. Riedler's office after receiving the Review Sheet he told her that he did not want to hire Plaintiff as a permanent employee because of her poor attendance history.  Ms. Riedler informed him that Plaintiff COULD NOT be hired because she was in clear violation of MOBIS' no-fault attendance policy.  Ms. Riedler did not "rubber stamp" Mr. Kim's decision, but asked him to show her his attendance records on Plaintiff.   Ms. Riedler knew that Mr. Kim was a stickler on attendance issues and that he kept meticulous attendance records for all of his employees.  She had no reason to doubt the veracity of his records, especially since the issue was not even close.  Plaintiff was in excess of the allowed absences by five (5) occurrences.

Since Mr. Kim was the supervisor responsible for keeping track of Plaintiff's attendance, he would have been Ms. Riedler's source for verifying Plaintiff's attendance. Importantly, Plaintiff does not dispute that she did in fact have at least seven attendance occurrences during her probationary period. Thus, there is no dispute that the information provided to Ms. Riedler, upon which she based her decision to terminate Plaintiff's employment, was accurate as to the number of attendance occurrences. Ms. Riedler's investigation revealed the truth about the number of Plaintiff's absences, and that was the only issue that needed investigating. In short, there is no evidence that Ms. Riedler was a "cat's paw" simply ratifying a termination based on an alleged discriminatory animus.

### 1.    MS. RIEDLER WAS AN INTERVENING DECISION MAKER WHO BROKE THE CHAIN OF CAUSATION BETWEEN MR. KIM AND PLAINTIFF.

Plaintiff cannot produce any evidence that Ms. Riedler or Mr. Kim discharged her because of a discriminatory motive. Ms. Riedler was the ultimate decision maker who advised Mr. Kim of the changed attendance policy, as well as the fact that MOBIS could not retain Plaintiff as an employee since she was in clear violation of the policy. Ex. B at ¶ 20; Ex. A at ¶ 10. Mr. Kim has explained that he had already decided that he did not want to retain Plaintiff as a permanent employee because of her attendance problems, but Ms. Riedler is the ultimate decision maker on terminations at MOBIS. As described in detail in MOBIS' first brief, Ms. Riedler's first substantive involvement with Plaintiff's employment was the meeting with Mr. Kim, which took place approximately one week prior to Plaintiff's termination. Riedler Depo. at p. 112, l. 12 – 21. Ms. Riedler did not know that Plaintiff was pregnant when she told Mr. Kim that Plaintiff had to be terminated. Riedler Depo. at p. 115, l. 16 – p. 116, l. 17;Ex. B at ¶ 19. Ms. Womack

informed Ms. Riedler that Plaintiff was pregnant a day or two before Plaintiff's termination. *Id.*[7] In other words, Ms. Riedler was the individual who decided to terminate Plaintiff's employment, Riedler Depo. at p. 122, l. 16 – p. 123, l. 3, and she had no knowledge of Plaintiff's pregnancy. There is no dispute about the fact that Ms. Riedler discharged Plaintiff for being absent three times in addition to four other occurrences of either being late to work or leaving work early. Riedler Depo. at p. 127, l. 1-12; Riedler Aff. at ¶ 20.

Thus, even if the Court were to determine, in the absence of evidence to that effect, that Mr. Kim did have a discriminatory motive when he decided that he did not want to keep Plaintiff, Ms. Riedler broke the chain of causation between Mr. Kim and Plaintiff's termination when she independently determined that Plaintiff had to be terminated for attendance reasons.

C.    **LORENZA DANIELS AND TAMIKA LEE ARE NOT SIMILARLY SITUATED COMPARATORS.**

    1.    **NOT ONLY IS LORENZA DANIELS NOT A SIMILARLY SITUATED COMPARATOR, BUT HIS CASE WAS THE PRIMARY REASON MOBIS CHANGED ITS ATTENDANCE POLICY FOR PROBATIONARY EMPLOYEES IN 2005.**

MOBIS did not anticipate that Plaintiff would offer Lorenza Daniels ("Daniels") as a comparator because he is not similarly situated to Plaintiff in any material respect.

---

[7]  Specifically, Ms. Womack came to Ms. Riedler's office a day or two before Plaintiff's termination, upset because she wanted to keep Plaintiff, and told Ms. Riedler about Plaintiff's pregnancy, probably in an attempt to justify Plaintiff's attendance issues. Riedler Depo. at p. 115, l. 16 – p. 117, l. 18. Ms. Riedler informed Ms. Womack that MOBIS had to stick to its policies to be fair to all of the employees. *Id.* While Ms. Womack believes that she told Ms. Riedler that she thought that Plaintiff's discharge had something to do with her pregnancy, Ms. Riedler does not recall any discussion along those lines. *Id.* Ms. Riedler made the ultimate decision to discharge Plaintiff based on her clear violation of the attendance policy for probationary employees. Ms. Riedler did not even know that Plaintiff was pregnant when she made that decision, and she had no reason to question the veracity of Mr. Kim's attendance records. When Ms. Womack came to her office to tell her about Plaintiff's pregnancy, Ms. Riedler had already had the meeting with Mr. Kim about Plaintiff's performance during her 90 day probationary period, and had seen his attendance records and e-mails to Plaintiff about her attendance. Ms. Riedler had no reason to revisit the issue because she knew Plaintiff was being terminated for attendance reasons.

Daniels worked in a different department for a different supervisor during a time period when MOBIS operated under a different attendance policy for probationary employees. Consequently, MOBIS did not address Daniels in its initial memorandum.

MOBIS hired Daniels on August 14, 2004, as a probationary, hourly paid Material Handler. Daniels had attendance problems during his 90-day probationary period. His immediate supervisor, MOBIS' Assembly Supervisor, Mr. Reinhardt, was of the opinion that he should not be offered regular employment. However, MOBIS' Assembly Department Manager, Mr. Sung, did not want to terminate Daniels because he thought Daniels had the potential to be a good employee. Ex. A at ¶¶ 3 – 4.

The resulting compromise was that MOBIS extended Daniels' probationary period for an additional 90 days on the condition that he not have any further attendance issues.[8] *Id.* at ¶ 5. It is of utmost importance to note this was before the adoption of the no fault policy. At that time, MOBIS' policy for probationary employees did not specify that termination would result if the employee had any particular number of absenteeism occurrences. The policy was subjective as to what constituted "satisfactory attendance." *Id.* at ¶¶ 7-9, 11.

Daniels continued to miss work during his extended probationary period, so MOBIS terminated his employment on or about February 3, 2005. Daniels filed a Charge of Discrimination against MOBIS less than a month later alleging disparate treatment based on race, age and gender. The EEOC issued a "no cause" finding and Daniels subsequently filed suit in Federal Court.[9] *Id.* at ¶ 6.

---

[8] *See* Daniels' 90 Day Review Sheet, attached as Ex. 1 to Ex. A.
[9] MOBIS moved for summary judgment, and Daniels voluntarily dismissed his suit.

MOBIS, which had been in production for less than a year when Daniels filed his EEOC charge, learned from Daniels' claims that subjectivity in an attendance policy is dangerous.    Therefore, on March 21, 2005, with the concurrence of legal counsel, MOBIS amended its policy for probationary employees to provide an objective standard: Any probationary employee who accrues three (3) or more absenteeism occurrences (tardy, early out and/or all day absence) will be terminated.    *Id.* at ¶7-9.    As explained in MOBIS' initial memorandum, this is a no fault policy, meaning that there are just a few exceptions, such as military leave, jury duty, bereavement and the like.    The new policy for probationary employees was in effect throughout Plaintiff's entire employment.    This fact alone is enough to eliminate Daniels as a similarly situated comparator.

When MOBIS revised its probationary policy in March of 2005, it also revised the 90 Day Review Sheet form.    The revised form requires the supervisor to state the specific number of days the probationary employee has been absent, late or left early if he/she (the supervisor) wants MOBIS to offer regular employment.    MOBIS' purpose in revising the form was to ensure that all probationary employees receive the same objective treatment with respect to attendance, and that no one with three (3) or more attendance issues would be retained.    The form also requires more specificity about why the supervisor is recommending that the probationary employee be hired for regular employment.    Similarly, the new form requires a supervisor who has "recommended" termination to explain the reasons for the recommendation. [10]    This change was made to reduce the possibility that a probationary employee would be terminated unfairly or for

---

[10] Daniels' and Plaintiff's 90 Day Review Sheet Forms are attached for comparison as composite Ex. 1 to Ex. A.

impermissible reasons.  Ms. Riedler must approve all terminations, so in that respect, she is the ultimate or final decision maker.  Ex. A at ¶¶ 9-10.

### 2.    TAMIKA LEE WAS ALSO EMPLOYED UNDER A DIFFERENT SUPERVISOR WHEN THERE WAS A DIFFERENT ATTENDANCE POLICY.

Tamika Lee was not similarly situated to Plaintiff for the same reason Lorenza Daniels was not and for additional substantial reasons as well.  MOBIS hired Tamika Lee ("Lee") on December 6, 2004 as a Purchasing Assistant in the Purchasing Department. She reported to Johnny Yun ("Yun"), MOBIS' Senior Manager of Purchasing, not to Mr. Kim.  Mr. Yun and Mr. Kim are not even in the same departments, although the departments are in close proximity.  *Id.* at ¶ 12.

Hunter does not allege that Ms. Lee was probationary when she allegedly had attendance issues (tardies) allegedly similar to Plaintiff's.[11]  Even if Lee was probationary when she had attendance problems allegedly similar to Plaintiff's, she is not a valid comparator.  Lee's probationary period expired in early March 2005, before MOBIS revised its attendance policy.  *Id.* at ¶ 13.

In short, Lee cannot be a similarly situated comparator because she was under a different attendance policy during her probationary period, worked in a different department, and reported to a different supervisor.  If Ms. Lee had attendance problems, they would have been addressed by Yun not Kim.

### 3.    PLAINTIFF CANNOT IDENTIFY ANYONE WHO WAS TREATED MORE FAVORABLY BECAUSE HAD MOBIS NOT TERMINATED PLAINTIFF, SHE WOULD HAVE BEEN THE FIRST AND ONLY PROBATIONARY EMPLOYEE WITH THREE OR MORE ATTENDANCE OCCURRENCES TO BE HIRED FOR

---

[11] Hunter's exact testimony about Lee was "No, she was not pregnant, but she had the same attendance issues, where she was **tardy**."  Plaintiff Depo. p. 129, ls. 20-23 (emphasis added).  As previously stated, Kim however, never recorded Hunter's tardiness unless it was for a substantial period of time, so once again Hunter is attempting to compare apples to oranges.

**REGULAR EMPLOYMENT AFTER MOBIS CHANGED ITS PROBATIONARY ATTENDANCE POLICY ON MARCH 21, 2005.**

If Riedler had made an exception for Plaintiff due to her pregnancy, or otherwise, as Ms. Womack strongly advocated, she would have been the first and only probationary employee offered regular employment after MOBIS changed its attendance policy on March 21, 2005. *See* Ex. A at ¶ 16. Ms. Riedler reviews every 90 Day Review Sheet. She has updated her records and confirms in her supplemental Affidavit that no salaried employee with three (3) or more attendance occurrences has been offered regular employment since the new policy went into effect. The only way such an employee could escape termination would be for the supervisor to submit inaccurate attendance information in the 90 Day Review Sheet. Riedler has no reason to believe that has happened.[12] *Id.*

Therefore, Plaintiff fails to make out a *prima facie* case of pregnancy discrimination under the PDA and Title VII because she cannot prove that MOBIS treated a similarly situated employee any differently than it treated her. In other words, Plaintiff cannot show that she suffered, due to her pregnancy, from a differential application of work or disciplinary rules because she has not identified a non-pregnant employee who had more than three attendance occurrences during their probationary period and was hired as a regular employee.

Plaintiff carries the burden of proving her *prima facie* case, which includes identifying a non-pregnant probationary employee who had attendance problems and who was hired as a regular MOBIS employee, and she fails to meet that burden. There is no

---

[12] Hourly employees use an automated time clock, which generates attendance records monitored by Human Resources continuously, so the chances of an hourly employee avoiding the objective attendance policy are virtually zero. Ex. A at ¶ 16.

genuine issue of fact regarding a similarly situated comparator. Because Plaintiff cannot identify any similarly situated comparators who were treated more favorably than her (because they do not exist), she fails to make out her *prima facie* case for pregnancy discrimination, and MOBIS is entitled to judgment as a matter of law.

**D.    MOBIS DID NOT INTENTIONALLY MISLEAD THE EEOC, AND MOBIS' COUNSEL'S MISTAKE CANNOT BE USED AS EVIDENCE OF PRETEXT.**

Plaintiff urges this Court to consider the undersigned counsel's error in the EEOC Response as evidence showing pretext. MOBIS finds no precedent in this jurisdiction for characterizing an honest mistake made by counsel who misunderstood his Korean client because of a language barrier as evidence of a discriminatory motive on behalf of his client.

As stated in Footnote 9 of MOBIS' Memorandum of Law in Support of Motion for Summary Judgment, when the undersigned prepared and submitted MOBIS' response to Plaintiff's EEOC Charge, he understood that Mr. Kim communicated his decision not to retain Plaintiff to MOBIS' Human Resources Department before he learned of Plaintiff's pregnancy.[13] Mr. Kim did not, in fact, communicate with Human Resources about Plaintiff's attendance problems until after learning of Plaintiff's pregnancy. The undersigned respectfully points to a deposition colloquy between Plaintiff's counsel and Mr. Kim, which illustrates how a miscommunication of this nature could easily occur. *See* Kim Depo. p.64, l. 11 - p. 72, l. 12; p. 86, l. 16-19; Ex. C at ¶ 19. MOBIS is providing an excerpt below of the exchange between Mr. Kim and Plaintiff's counsel to illustrate how MOBIS' counsel could have been mistaken about when Mr. Kim made the

---

[13] When Kim learned of Plaintiff's pregnancy on August 9, 2006, Plaintiff had six (6) attendance occurrences, including the one for the day the ultrasound was taken (August 9, 2006).

decision to terminate Ms. Hunter in relation to finding out she was pregnant: [14]

Additionally, Mr. Kim did not read MOBIS' response to the EEOC Charge before it was

submitted.  Kim Depo. at p. 78, l. 2-5.

*Q.     Which came first, your decision to fire Tarsha or finding out she was pregnant?*

*A.      Okay. Let me explain.*

*Q.     Okay.*

*A.      As I already explained, you know, I don't want -- want to hire, you know, Tarsha,
even though during the probate -- temporary employee, I already made a decision during
that period.  I made a decision.*

*Actually, I don't -- I don't want to work with her during the probationary
employee.  But as I already explained a minute ago, Sonechka, her supervisor, asked me
and persuaded me -- persuaded me to keeping her.*

*That's the reason, you know, her starting -- her starting.*

*Q.     That's not my question.  I'll break it down.*

*When was the decision to end Tarsha's employment made?*

*A.      I made a decision in probationary -- temporary employment.  I had already made
a decision at that point.*

*Q.     Why not keep her on as a temporary employee then?*

*A.      Okay.  I'll explain. I don't want her to start, you know, the permanent employee.*

*Q.     That's my question.*

*A.      Yah. I don't want her, you know, to start permanent employee even though, you
know, she complete -- finished the temporary employment.  But I didn't want her to start
the permanent employee.*

Kim Depo. at p. 67, l. 4 - p. 68, l.12.

This line of questioning continued:

---

[14]    For the Court's convenience, and to avoid any further distortion of Mr. Kim's testimony, MOBIS has
transcribed several lengthy passages from his deposition on this issue and several issues forthcoming.

*Q.      When Mobis hired Tarsha in June, is it your testimony that you never intended her to work more than ninety days?*

*A.      I don't know. What is your exact question?*

*Q.      In June 2006, had you decided to fire Tarsha?*

*A.      I think that you -- you have some misunderstanding due to my, you know, incorrect expression.*

*Q.      When did you decide to fire Tarsha?*

*A.      I didn't make her, you know, the -- okay. I just want to revise my expression, my expression correctly.*

*She was a temporary employee.*

*Q.      Okay.*

*A.      But -- during the two or three months.  But during that period, I was not very pleased with, you know, her attendance and tardy or something.*

*So I did not want her to start the Mobis employee -- Mobis employee.  Yeah. That is my opinion.*

Kim Depo. at p. p. 71, l. 14 - p. 72, l. 11.  Thus, as explained by Mr. Kim, he was already

displeased with Plaintiff's performance because of her attendance issues and had decided

early on during her time as a temporary employee that he did not want her as a permanent

employee.  When he was questioned about whether he knew Plaintiff was pregnant when

he made the decision to not recommend that she become a permanent employee, he

honestly answered "no" because, in his mind, he had made the decision long before he

knew about her pregnancy.

In short, when the undersigned counsel drafted MOBIS' EEOC Response, he

misunderstood the timing of when Mr. Kim learned of Plaintiff's pregnancy and when

Mr. Kim decided that he did not want Plaintiff as a permanent employee and

communicated that to Human Resources.  It is completely accurate, however, that Ms.

Riedler was not aware of Plaintiff's pregnancy when she decided to terminate Plaintiff. Ms. Riedler did not catch the error because she herself was not clear about when Mr. Kim learned that Plaintiff was pregnant as compared to when he first consulted her about Plaintiff's attendance problems.  Ex. A at ¶ 17.  This unintentional misunderstanding is not evidence of pretext on behalf of MOBIS.

**E.    PLAINTIFF MISCHARACTERIZES MR. KIM'S STATEMENTS AND CONDUCT, WHICH ARE WHOLLY ATTRIBUTABLE TO HIS LIMITED COMMAND OF THE ENGLISH LANGUAGE AND DIFFERENCES IN CULTURE.**

Plaintiff appears to hinge her entire case on two statements made by Plaintiff's supervisor, Jaekwang Kim, a Korean national who does not speak perfect English, as evidenced by his deposition transcript.  As explained previously, while Mr. Kim reads and understands basic English well, his spoken English is broken, and he has a heavy accent, which can make it difficult to understand him, particularly for someone not used to conversing with him.  Plaintiff's counsel's difficulty communicating with Mr. Kim during his deposition illustrates this well.  Regardless, Plaintiff attempts to build her entire case around innocuous statements made by Mr. Kim, the meanings of which MOBIS has already explained.

**1.    "I do not want to take care of Tarsha anymore" and "I need your help to terminate her."**

For example, Plaintiff claims in her Opposition Brief that on August 23, 2006, Mr. Kim sent an email to Ms. Riedler writing 'I do not want to take care of Tarsha anymore . . .  I need your help to terminate her.'"  Plaintiff's Opposition Brief at p. 1. However, by taking this statement out of context, Plaintiff attempts to create the illusion that prior to Plaintiff's termination, Mr. Kim enlisted Ms. Riedler's aid to carry out some alleged discriminatory animus.  As has been explained previously, approximately a week

before August 25, 2006 (Hunter's termination date), Ms. Riedler met with Mr. Kim, reviewed the spreadsheet and other records detailing Plaintiff's absenteeism occurrences, and told Mr. Kim that Plaintiff had to be terminated. Mr. Kim had consulted Ms. Riedler in person on other occasions in the past when he was not sure of company human resources policies. Ex. F. at ¶ 3. On August 23, 2006, Ms. Riedler followed up on that meeting with an email to Mr. Kim asking if he was going to terminate Plaintiff's employment before his upcoming trip to Korea and ending with "Please let me know and I will help you with the termination meeting." Riedler Depo. at Pl. Ex. 5, 8/23/06 E-mail exchange between Riedler to Kim, attached as Ex. H. Mr. Kim responded several hours later that he might be out of town the following week, but that if he was not, then "I need your help to terminate her." In its entirety, Mr. Kim's e-mail in response to Ms. Riedler is as follows:

> *My concerning for termination of Tarsha is Sonechka wants to keep her.*
> *Because of she might be not like any kind of changes.*
> *Then I do not want to take care of Tarsha anymore.*
> *If I will be stayed in the next week, I need your help to terminate her.*
> *I will let you know if I am available or not.*

*Id.*

In fact, Plaintiff's counsel questioned Mr. Kim about this e-mail during his deposition and received the following explanation.

*Q.* *All right. What did you mean when you wrote, I need your help to terminate her?*

*A.* *Okay. I clearly remember the why did, you know, I write this sentence.*

*Even though I can speak English, but it's very hard for me to explain about, you know, the details or something like that with the correct word and idioms.*

*So I need -- I wanted Tracy to understand what -- what I am -- what I was thinking -- what I was thinking.*

*Q.    So you wanted her to help verbalize?*

*A.    Broken English or something.*

*Q.    So you wanted her to help speak for you?*

*A.    Speak or -- and I want -- I want Tracy to understand that with my broken English- - broken English -- not to, you know, the -- with her like in this occasion, projecting.*

Kim Depo. at p. 76, l. 7 – p. 77, l. 2.  Clearly, Mr. Kim's reference to "I need your help to terminate her" meant that he needed help with the termination process.  In fact, Mr. Kim's statement turned out to be true since he did have to get Ms. Riedler's assistance during the termination meeting.

*Q.    Some people do it so there's no confusion about what happened.*

*Tell me what you remember about that meeting.*

*A.    Yes.  When I was -- when I was meeting with Tarsha and Sonechka and I explained why should I make a decision to terminate Tarsha, at that point, Sonechka, you know, was very -- was not pleased with my decision or something.*

*I tried to explain what was, you know, the reason of the termination, but -- but Tarsha and Sonechka very strongly, you know, the protested their -- you know, their situation.  But -- but I want -- I wanted to try to explain in detail what's going on. However I cannot -- I could not explain -- explain in details to make them understand that -- understand that.*

*So I asked -- I asked the other assistant manager Mr. Hwang, Ho Sang, to let Tracy know about that, and then I asked him to -- Tracy come to my office.*

*So Tracy just joined with us -- joined us. As I explained on my summary e-mail, **I need Tracy's help. I need Tracy's help.***

*I wanted -- I wanted to explain to Tarsha and Sonechka.  However, I could not really, you know, fully -- fully explain to them.  So I asked Tracy to explain to them in details -- in details.*

*Q.    What did you try to tell -- do you remember what you tried to say in the meeting?*

*MR. BARNETT:  Before Tracy was there?*

*MS. LEONARD:  Yes.*

A.      Yeah. I could remember part -- some of the parts, but not whole thing. Not the whole thing.

Kim Depo. at p. 89, l. 16 – p. 91, l. 5 (emphasis added).

Q.      Do you have any memory of what you tried to say to Sonechka and Tarsha before Tracy came in the room?

A.      Okay.  I could remember about that whole, you know, thing because I already, you know, found out, you know, Tarsha's attendance issues.

        So -- so I just wanted to explain how many times, you know, that she get -- she got, what's that, the attendance issues through my, you know -- with my worksheet or paper, Excel spreadsheet.

        But I was not very, you know, please with, you know, with them during the meeting because -- because I could not express my -- you know, the exact reason to them with -- with the limited vocabulary or something like that.

Q.      Do you have any memory of anything Tarsha or Sonechka said in the meeting?

A.      I couldn't remember.

Q.      All right.  Did either Sonechka --

A.      I remember, you know, that -- I heard, you know, Tarsha wanted to, you know -- wanted to work, you know.  And she asked me what was the exact reason of my termination, very -- she asked me very loudly or very -- attentively or something.  What was the reason of my termination, or something like that.  I clearly remember that.

Q.      Do you remember anything else?

A.      I could not remember.

Q.      Have you told me everything that you can recall about the meeting where Tarsha got terminated either before or after Tracy got there?

A.      Yeah.  You know, the -- in my memory, I had a brief meeting -- brief meeting because, you know. Tarsha and Sonechka's response was very strong, very, you know, negative or something.

        MR. BARNETT:  Strong or what?

        MS. LEONARD:  Negative.

A.      *Negative, on my -- my explanation.  So I thought, you know, that I need to let Tracy know about that.*

*And then, probably I thought Tracy can, you know, more smoothly, you know, explain to them.*

*So I asked Ho Sang to, you know, to let Tracy know, and then Tracy, you know, came into my office.*

Kim Depo. at  p. 91, l. 11 – p. 93, l. 12

In short, Mr. Kim accepted Ms. Riedler's offer to help in terminating Plaintiff because he knew that he would have difficulty verbalizing the reasons.  His testimony concerning the contentious termination meeting illustrates how correct he was about needing Ms. Riedler's assistance.  *See also* Ex. A at ¶¶ 20-21.  By taking his statement in his e-mail to Ms. Riedler out of context and by neglecting to include his honest explanation of its meaning, Plaintiff mischaracterizes his testimony.

Plaintiff also hopes to establish her *prima facie* case and create an issue of fact with Mr. Kim's innocuous statement that he "can't take care of a person like [Hunter]." Plaintiff Depo. at p. 178, l. 18 – p. 179, l. 9.  Plaintiff insinuates that this statement means that Mr. Kim doesn't want to "take care of" a pregnant employee.  As explained previously, Mr. Kim uses that phrase to convey that he expects his staff to handle their responsibilities without unnecessarily involving him or others.  Ex. C at ¶ 20; Kim Depo. at p. 75, l. 9 – p. 76, l. 6 ("that means I don't want to work with her in accounting and financing").  It is Mr. Kim's way of saying that he does not need an employee who is not generally self-sufficient, and frequently necessitates his involvement and that of other departmental employees.  Ex. C at ¶ 20.  Plaintiff's own witness Ms. Womack agreed that the phrase "take care of a person" meant "just their work."  Womack Depo. at p. 47, l.

11- 24.[15]   Additionally, Ms. Womack does not even recall Mr. Kim saying "I can't take care of a person like [Plaintiff]" during the termination meeting on August 25, 2006 like Plaintiff claims.  *Id.* at p. 36, l. 25 – p. 37, l. 6.   Kim used the phrase "take care of . . ." eight times during his deposition, all with reference to getting work done.  Kim Depo. at p. 34, l. 13; p. 34, l. 18; p. 38, l. 10; p. 41, l. 12-13; p. 41, l. 20-21; p. 51, l. 20-21; p. 54, l. 16-19; p. 77, l. 25.

In fact, Mr. Kim explained his use of this phrase several times when questioned by Plaintiff's attorney:

*Q.     What did you mean when you wrote, I do not want to take care of Tarsha anymore?*

*A.     Okay.  That's, you know, the different language barrier or something like that.*

*I read, you know, that that -- I read this sentence.  Normally, I have been wrong about -- taking care of them means keep or something like that.*

*Of course, you know, taking care of them has, you know, several different meanings, but I did not know about that.  I didn't know about it.*

*In this exact sentence, it means I don't want to work with her in accounting and financing.  I just wrote, you know, this word with that meaning.  But I'm not sure how the other person -- how can they, you know, understand this wording, this idioms?*

*I just, you know, wrote that word.*

*Okay. I will not -- don't want, you know, to work continuously or something like that. I just wrote that idioms with that meaning.*

Kim Depo. at p. 75, l. 9 – p. 76, l. 6.

And in another line of questioning:

*Q.     During that temporary period --*

*A.     Yes.*

*Q.     -- did you have any problems with her attendance?*

---

[15]  Ms. Womack's deposition citations are attached as Ex. I.

*A.     I think so.*

*Q.     Tell me what problems you had with her attendance.*

*A.     So many tardy and doctors' appointments or something like that.*

*Q.     Any other problems?*

*A.     Yeah, I have -- I had a problem. As I explain it, I have only seven or eight -- few peoples in accounting.*

*So if one employee -- one team member **will not take care of, you know, their work** just in a timely manner, accounting department will make a harder situation. Because as you know, accounting has to close the months and every -- each month.  But if somebody **will not take care of their work** just in a timely manner, it will impact on the accounting department.*

*For instance, I have to report it to -- the financial result to headquarters every -- each month after closing out just in time.*

Kim Depo. at p. 33, l. 24 -p. 34, l. 24 (emphasis added).

The only evidence that Plaintiff has presented that this statement shows a discriminatory motive is her own supposition.  The Court should reject Plaintiff's attempt to mischaracterize this statement as referencing Plaintiff's pregnant condition.

**2.     The Alleged Change in Mr. Kim's Demeanor.**

Plaintiff claims that Mr. Kim's demeanor towards her changed after she informed him that she was pregnant.  As explained previously, Mr. Kim is a Korean businessman whose preference is to communicate with employees in Accounting through their supervisor when practical.  Ex. C at ¶ 19.  In other words, Mr. Kim, who believes in formality in business discourse, routinely communicates with the employees in his department through their supervisors.  Nothing changed in that regard after Mr. Kim learned of Hunter's pregnancy.  *Id*

Plaintiff's own witness, Ms. Womack, who has more direct interaction with Kim than Plaintiff, testified that Mr. Kim was always "kind of moody" or "distant" and that while she had a "feeling" that he may have been communicating more through her to Plaintiff,  "like I said, he's just kind of like that when anything—any kind of changes occur like absence or tardies or anything."  Womack Depo. at p. 27, l. 10 – p. 28, l. 16. The evidence shows that Plaintiff had at least two more attendance occurrences after August 9.  In short, Plaintiff has not offered any credible evidence that Mr. Kim treated Plaintiff more or less favorably than any other similarly-situated employee,[16] and his behavior towards her did not change when he found out that she was pregnant.

Mr. Kim testified that when Plaintiff showed him an ultrasound picture on or about August 9, 2006, he congratulated her. Kim Depo. at 86, l. 16-22.  Plaintiff states in her deposition that when she told Mr. Kim about her pregnancy, "[h]e made a grunt and just looked at me."[17]   Plaintiff Depo. at p. 115, l. 1-2.  Later on in her deposition when questioned further by her attorney, she added that he said "what?" "as if in a dismayed sort of way" and that she asked him "if I could work on Friday and then take the rest of the day off to have a procedure."  Id. at p. 122, l. 8-23.   This testimony is uncorroborated and denied by Mr. Kim.  Even if taken in the light most favorable to Plaintiff, it could be construed as Mr. Kim being "dismayed" at Plaintiff's additional request for more time off after being warned to improve on her attendance.

When MOBIS' counsel questioned Ms. Womack about whether she thought Mr. Kim was a "bad person," Ms. Womack responded that "I could tell he has a soft heart . . .

---

[16]  *See* Ex. F. at ¶ 7 (chart identifying probationary period attendance records of Accounting Department employees).
[17]  Plaintiff did not recall whether Kim ever congratulated her at any time as he testified he did.  Plaintiff Depo. p. 108, l. 9-10.

." Womack Depo. at p. 46, l. 18-23. Therefore, Plaintiff's own witness, a person who worked closely with Mr. Kim, thought he has a kind-hearted individual, hardly a person who would discriminate against an employee because she was pregnant.[18]   Plaintiff herself admits that she never heard Mr. Kim say anything derogatory about women or pregnancy. Plaintiff Depo. at p. 192, l. 20 – p. 193, l. 4. In short, Plaintiff has not come forward with any significant or substantive evidence that Mr. Kim treated Plaintiff more or less favorably than any other similarly-situated employee, and there is likewise no evidence, other than Plaintiff's own unsubstantiated personal perception, that his behavior towards her changed when he found out that she was pregnant.

Plaintiff's allegations of pretext do not create a genuine issue of fact. Plaintiff cannot rely on conclusory allegations or suspicions of discrimination, but must come forward with evidence demonstrating "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable fact finder could find them unworthy of credence." *Combs,* 106 F.3d at 1538.

**F.    ADDITIONALLY, PLAINTIFF'S OPPOSITION BRIEF IS REPLETE WITH RANDOM STATEMENTS/ALLEGATIONS THAT ARE IMMATERIAL, NOT IN PROPER OR FULL CONTEXT OR SIMPLY INCORRECT. IN RESPONSE, MOBIS WILL RESTATE THE STATEMENTS/ALLEGATIONS VERBATIM AND FOLLOW WITH ITS GROUNDS FOR WHY THESE MATTERS ARE IMMATERIAL, OUT OF CONTEXT, OR DO NOT RAISE A GENUINE ISSUE OF MATERIAL FACT.**

**Statement/Allegation:** "On August 23, 2006, Jay Kim, the Chief Financial Officer for Defendant Mobis Alabama, LLC ("Mobis"), wrote Tracy Riedler, Mobis' Human Resources Manager, regarding Plaintiff, Tarsha Hunter, a pregnant employee, "I

---

[18]    In fact, Mr. Kim currently has a pregnant employee in his department who just finished her probationary period and was retained as a permanent employee. When Mr. Kim found out the news, he congratulated her on her second child. Kim Depo. at p. 94. l. 19 – p. 96, l. 11.

do not want to take care of her anymore…I need your help to terminate her." **It was on this day, Mr. Kim and Ms. Riedler decided to terminate Ms. Hunter**." Plaintiff's Opposition Brief at p. 1.

      **Response:** This is the opening sentence of Plaintiff's Opposition Brief. Concerning the first sentence, MOBIS has already explained in detail how Plaintiff has taken this e-mail out of context and mischaracterized Mr. Kim's statements. The second sentence is simply false, and is an apparent attempt to distort the facts of the case. The undisputed testimony in this case is that Mr. Kim approached Ms. Riedler about Plaintiff's attendance problems approximately a week, not two (2) days, before Plaintiff's termination on August 25, 2006, and that Ms. Riedler informed Mr. Kim at that time that he had to terminate Plaintiff's employment because of her violation of the attendance policy. In fact, Plaintiff's counsel questioned Mr. Kim about the timing of this e-mail in relation to Mr. Kim's meeting with Ms. Riedler and Mr. Kim unequivocally stated that the meeting took place before the e-mail. Kim Depo. at p. 72, l. 12 – p. 73, l. 8 ("I had, you know, the meeting with Tracy before August the 23rd, yeah."). Plaintiff's distortion of the timeline in this case only serves to confuse the facts.

      **Statement/Allegation:** "It was not until after Mr. Kim learned of Ms. Hunter's pregnancy that he began to view her attendance as something to be used to terminate her employment." Plaintiff's Opposition Brief at p. 32. "Ms. Hunter was not told that her absences would lead to her termination or that they were causing a problem prior to Mr. Kim learning she was pregnant." Plaintiff's Opposition Brief at p. 10.

      **Response:** Again, there is nothing in the record to support these two statements. Mr. Kim and Ms. Womack told Plaintiff in no uncertain terms when she was offered

probationary employment after serving as a temp that she could have no more attendance problems or she would not be retained as a regular employee.  Womack Depo. at p. 43, l. 19 - 44, l. 9.  Plaintiff then went through MOBIS' orientation program for probationary employees and reviewed and understood the Probationary Period Policy and Procedures and the fact that she would be terminated if she had three (3) absentee occurrences. Plaintiff Depo. at p. 73, l. 3 – p. 74, l. 22; p. 142, l. 1-5.  Therefore, the undisputed evidence in this case is that Mr. Kim was unhappy about Plaintiff's attendance record when she was a temporary employee, and that he reluctantly agreed, upon heavy persuasion from Ms. Womack, to hire Plaintiff as a probationary employee under the condition that her attendance improve.  Ex. F. at ¶¶ 5-6.  Plaintiff had been warned about her attendance issues in May by her immediate supervisor, Ms. Womack.  Womack Depo. at p. 53, l. 15 – p. 55, l. 13.  For Plaintiff to state that Plaintiff's attendance problems were not an issue until she was pregnant is flatly wrong.

One e-mail from Mr. Kim to Plaintiff in particular illustrates the inaccuracy of this statement.  On July 26, 2006, approximately two weeks before Plaintiff disclosed her pregnancy to Mr. Kim, Mr. Kim sent Plaintiff the following e-mail and copied Ms. Womack:

*This is a notification for tardiness.*

*On Wednesday the 26th, you were noted as being tardy, this was not a first time **during 90 day probationary**.  I need for you to keep the starting time for business, everyday.*

*When you return from doctor's office, please submit the doctor's note and schedule for make-up time.  In addition, you are **reminded that you are still serving out your probationary period** and that the attendance is very important.  Please make every effort to correct these deficiencies as **your long term employment may be in jeopardy**.*

Plaintiff Depo. at Def. Ex. 16 (emphasis added), 7/26/06 E-mail from Kim to Plaintiff, attached hereto as Ex. J.  Additionally, on August 2, 2006, Plaintiff received e-mails from both Ms. Womack and Mr. Kim referencing incomplete work, unfiled papers, and un-entered invoices from the prior month's end.  Plaintiff Depo. at Def. Exs. 17 & 18, 8/2/06 E-mails from Kim and Womack to Plaintiff, attached hereto as Ex. K.  The e-mail from Mr. Kim states that he "hope[s] you are getting better," presumably a reference to her absence on August 1, 2006.  *Id.*  For Plaintiff to claim that her attendance was not a serious issue with Kim before August 9th is simply not supported by the record.

Additionally, Plaintiff's own witness, Ms. Womack, testified that Mr. Kim was reluctant to hire Plaintiff as a probationary employee because of her attendance problems, that Ms. Womack persuaded Mr. Kim to hire Plaintiff, that they informed Plaintiff that her attendance had to improve while she was a probationary employee, and that Ms. Womack herself was concerned that Plaintiff would not be hired as a permanent employee:

*Q.*     *First, I want to talk about the period when Ms. Hunter was a temporary employee.*

*A.*     *Okay.*

*Q.*     *You testified early that there were issues about her attendance?*

*A.*     *Yes.*

*Q.*     *Did you and Mr. Kim discuss those issues?*

*A.*     *Yes.*

*Q.*     *You testified earlier that he went back and forth about whether to make her a probationary employee.  Are you clear about what that means?*

*A.*     *Yes.*

Q.    *Did he go back and forth in terms of whether he wanted to give her a ninety-day probationary period?*

A.    *Yes.*

Q.    *Did he tell you why?*

A.    *Because of her absences and tardies.*

Q.    *Would it be fair to say that you were in favor of giving her the ninety-day probationary period?*

A.    *Yes.*

Q.    *Would it be fair to say that you tried to persuade him to do that?*

A.    *Yes.*

……………………………..

Q.    *What did -- how did Mr. Kim communicate to you his decision to go ahead and give her a ninety-day probationary period?*

A.    *I think he called us both -- we discussed it, and then he called us, me and Tarsha, in his office and stated that he was -- she was on probation but, you know, please don't -- he didn't want her to be out and tardy.*

Q.    *Did he say, you know, something to the effect that you're going to be probationary now, but your attendance needs to improve?*

A.    *Right.*

Q.    *Did you tell Tarsha the same thing?*

A.    *Yes.*

……………………………..

Q.    *At any time during Ms. Hunter's ninety-day probationary period before you learned that she was going to be terminated, were you concerned she was not going to be hired on permanently at the end of that period?*

A.    *Was I concerned?*

Q.    *Yes.*

A.    *Yes.*

*Q.    And why were you concerned that she might not be kept after her ninety-day probationary period?*

*A.    Just because of some of the absentees and tardies.*

*Q.    I'll show you what's been previously marked as Defendant's Exhibit 16.*

*Do you recall receiving Defendant's Exhibit 16?* (This email, dated July 26, 2006), is attached to this Memorandum as Ex. J.)

*A.    Yes.*

*Q.    You're shown as a copied recipient.  Did you and Ms. Hunter -- let me ask you this:  What did you understand Mr. Kim to be trying to impress on Ms. Hunter by this email?*

*A.    That if she continued to be tardy, she would not keep her job.*

Womack Depo. at p. 40, l. 14 - 41, l. 17; p. 43, l. 19 - 44, l. 9; p. 50, l. 18 - p. 51, l. 18.

In short, the undisputed record shows that Plaintiff had problems with her attendance the entire time she was employed at MOBIS, and she was informed that her attendance issues could prevent her from being hired as a permanent employee before she disclosed her pregnancy.  Evidence in the form of the sworn testimony of her own witness and written communications to her from both Ms. Womack and Mr. Kim confirm this fact.  Therefore, the Court should summarily discard Plaintiff's unsubstantiated allegation that Mr. Kim used Plaintiff's poor attendance record as an excuse to discharge her after learning that she was pregnant.

**Statement/ Allegation:**  "MOBIS did not communicate to Ms. Hunter that she was considered a probationary employee.  Mr. Kim told her that her temporary service might count as her probationary period, and that he would try to have the probationary period waived."  Plaintiff's Opposition Brief at p. 6.

**Response:** The first sentence is incorrect. The second sentence is immaterial. It is beyond a good faith dispute that MOBIS communicated to Plaintiff on several occasions that she was probationary and that she understood.

The testimony Plaintiff references as support for the statement that MOBIS did not communicate to her that she was a probationary employee relates to a conversation Plaintiff allegedly had with Kim approximately two (2) weeks after starting her probationary period. Plaintiff says Kim told her that he would consult with Human Resources and try to have her probationary period waived, but never got back with her on the subject and never brought it up again. Even though Womack and Kim dispute that this conversation took place, and even though MOBIS has never waived a probationary period for any employee, including Plaintiff, MOBIS feels compelled to respond. *See* Heard Depo. at p. 21, l. 20-24 (MOBIS has never waived a probationary period), attached hereto as Ex. L. As shown below, Plaintiff's subsequent testimony establishes beyond a doubt that she was not mislead in any way by the alleged conversation and fully understood her probationary status.

After describing the alleged conversation with Kim, Plaintiff went on to testify that she went through the orientation MOBIS gives its probationary employees and that the Handbook was reviewed. She also testified that she read the handbook section on probationary employees and specifically, that she read and understood Section 2.5 (the three occurrence rule). She understood that the rule applied to her for the first 90 days after June 5, 2006, her hire date, and that she knew she would be terminated if she had three attendance occurrences during that period. No one ever told her differently.[19]

---

[19] Mr. Kim wrote Plaintiff in his July 26, 2008 email that her tardy on that day was not the first ". . . during her 90 day **probationary**." Ms. Womack emailed Plaintiff on August 14, 2006 that she needed to watch

**Statement/Allegation:**  "Mr. Kim testified in his deposition that when he first started with MOBIS he did not care about the probationary period/policy and did not become familiar with it until August 24 or 25, 2006."  Plaintiff's Opposition Brief at p. 4.

**Response:**  This is an incomplete rendition of Mr. Kim's testimony, which must be considered in full context in light of his language difficulties.  The statement in isolation could lead the reader to infer that Mr. Kim flippantly ignored MOBIS' rules. There is no evidence at all that this is the case.

Mr. Kim's complete statement was as follows:

A.    *When I start to work in Mobis, I don't have previous -- plenty-- so many -- so may team members.  **So I don't care about, you know, the -- I don't think about the policy**. However, the business -- you know, the scale has been growing up, and then I just, you know, check out the policy to administer my team members.* Kim Depo. at p. 17, l. 23 - p. 18, l. 5.

Clearly, Kim was trying to say that when he first started to work at MOBIS in 2004, more than a year before MOBIS commenced production, and approximately two (2) years before Plaintiff was hired (when MOBIS had a mere skeleton office staff), that he did not "think" about the probationary policy.  He did initially use the word "care" then paused and changed his phraseology to "think."  In short, Plaintiff's characterization of Mr. Kim's testimony is inaccurate.  *See also* Ex. F. at ¶ 3.

**Statement/Allegation:**    "The Handbook sets forth a progressive disciplinary policy.  It applies to probationary employees, and warnings under the policy should be placed in an employee's personnel file."  Plaintiff's Opposition Brief at p. 4.

---

her attendance because she was ". . . getting close to your 90 day **probation** ending so please try to leave a great impression so that you will be able to continue your employment here at MOBIS."  8/14/06 E-mail from Womack to Plaintiff, attached as Ex. M (emphasis added).

**Response:**  This statement is immaterial because, as Ms. Riedler made clear in her deposition, the progressive discipline policy in MOBIS' Handbook does not apply to attendance related issues.  Riedler Depo. at  p. 90, l. 15 – p. 91, l. 5.  Ms. Riedler even prepared a chart during her deposition for Plaintiff's counsel indicating which classifications of MOBIS employees are subject to the progressive discipline and attendance policies set forth in the MOBIS Employee Handbook.  Riedler Depo. at Pl. Ex. 1, Handwritten Chart, attached hereto as Ex. N.  Importantly, when she was explaining this chart to Plaintiff's counsel, Ms. Riedler stated that "***the progressive discipline policy is non-attendance related issues.***"  Riedler Depo. at p. 90, l. 15 – p. 91, l. 5 (emphasis added).   The substance of Ms. Riedler's testimony was that salaried employees are not subject to the progressive discipline policy and that probationary employees have their own attendance policy limiting them to two (2) occurrences.  *Id. See also* Ex. B at ¶ 12.  In sum, the progressive discipline policy did not apply to Plaintiff, and Ms. Riedler articulated that policy during her deposition.

**Statement/Allegation:**   "It is not clear who was supposed to monitor Ms. Hunter's attendance.  Mr. Kim testified that Ms. Womack was responsible, but Ms. Womack testified that she thought Mr. Kim kept [sic] was responsible."  Plaintiff's Opposition Brief at p. 3.

**Response:**  These statements distort the deposition testimony of Mr. Kim and Ms. Womack.  The only way to give fair consideration to this testimony is to read all of Mr. Kim's testimony in response to the question "Who monitored Ms. Hunter's attendance."  Whether it was Mr. Kim's misunderstanding of the world "monitored" or some other miscommunication, it is clear from his testimony that he personally maintained an Excel

spreadsheet on each Accounting Department employee, not just Plaintiff, and that he did so by personal observation and made the entries on the spreadsheet on the day of the occurrence or within a day of the occurrence. He also gathered information from Plaintiff and her supervisor Ms. Womack in this regard. Kim Depo. at p. 57, l. 20 - p. 62, l. 24.

Ms. Womack's testimony is not inconsistent with Mr. Kim's. Womack testified that she and Mr. Kim both monitored Hunter's attendance and that Mr. Kim kept an Excel spreadsheet in that regard. Womack Depo. p. 12, l. 5 - p. 13, l. 11. She also testified that she and Mr. Kim had the authority to sign written requests from employees to be out of work. *Id.*

**Statement/Allegation:** "The Company's records reflect that Hunter was absent and tardy on more than one (1) occasion during that first 90 days." Plaintiff's Opposition Brief at p. 4-5.

**Response:** The records referred to by Plaintiff reflect that Plaintiff was absent or tardy on **17 occasions** during her three (3) months service as a temporary employee placed by Multi-Staffing, a fact to which Plaintiff's witness, Ms. Womack testified. Womack Depo. at p. 42, l. 20 – p. 43, l. 18; *see also* Plaintiff Depo. at Def. Ex. 9, Multi-Staffing Records, attached hereto as Ex. O.

**Statement/Allegation:** "From June through August, 2006, Mr. Kim approved Ms. Hunter to have partial day and full absences." Plaintiff's Opposition Brief at p. 7.

**Response:** The reader could infer from Plaintiff's statement that Mr. Kim "waived" or "excused" absences as opposed to merely approving them. There is absolutely no evidence that Mr. Kim ever waived or excused absences for a probationary

employee such that they would not count.  Moreover, Ms. Riedler testified that under MOBIS' no fault attendance system, no one has the authority to approve an absence in the sense that it would not count as an attendance occurrence.  Riedler Depo. at p. 51, l. 17 - p. 51, l. 23.

**Statement/Allegation:**  "When I - when I made the decision to terminate her, I asked Tracy, do we have some policy or something like that out of our handbook if somebody will have, you know, bad tardiness or bad attendance, how can we do that or something like that."  Plaintiff's Opposition Brief at p. 11.

**Response:**  This testimony was preceded by the following testimony:

*Q.*     *Who made the decision to terminate Ms. Hunter?*

*A.*     *I already explained, you know, I made a decision.  I made a decision at first.  And then I wanted to discuss with Tracy because I don't really want to be the right -- you know, the legal thing, whatever, something.  I am a foreigner.  So I don't want, you know, to make some trouble in the USA.  So I need Tracy, you know, to help.  I need Tracy's help.*

Kim's Depo. p. 82, l. 23 to p. 83, l. 9.  The testimony Plaintiff cites was immediately followed by the following testimony:

*A.*     *. . . She explained we have the right -- ninety-day probation or something like that.  So Tracy explained to me, Tarsha, okay.  So I showed, you know, this statement to Tracy because -- because I don't want to -- I didn't want to mix -- write this -- you now, the legal issues or something like that.*

Kim's Depo. p. 87, l. 24 to p. 88, l. 5.  What is clear from this testimony in its entirety is that after receiving the 90 Day Review Form from Human Resources, Mr. Kim consulted

Ms. Riedler because Plaintiff's attendance had been unsatisfactory during her 90 day probationary period, and he wanted to ensure that the termination was in accordance with MOBIS' policies and the law. Ms. Riedler told Mr. Kim that terminating Plaintiff was required by MOBIS' attendance policy.

**Statement/Allegation:** "On August 14, 2006, Mr. Kim sent an email to Womack asking about the status of Ms. Hunter's attendance and requesting her to fill out an Excel spreadsheet for Ms. Hunter's absences." Plaintiff's Opposition Brief at p. 9-10.

**Response:** This could lead a reader to infer that Mr. Kim was not contemporaneously recording Plaintiff's absences on an Excel spreadsheet, and that after he learned of Plaintiff's pregnancy, he was looking for an excuse to discharge her under the guise of attendance problems or otherwise. The un-cited portion of Ms. Womack's testimony in response to questions about the email in question was that Mr. Kim would ask for that type of information on all his employees because he always wanted to keep up with attendance, and that he sent the email to her, she thought, because he was trying to make sure that her information on Plaintiff's attendance was the same as his and that this information was complete. Womack Depo. at p. 26, l. 8 – 20 ("But I think he kind of was keeping up with something just to make sure I had the same thing.").

**Statement/Allegation:** "Ms. Hunter did not recall any absences after August 9th and was at work on August 14th." Plaintiff's Opposition Brief at p. 4. "Ms. Hunter does not know of any absences between August 9 and when she was terminated." Plaintiff's Opposition Brief at p. 9.

**Response:** Ms. Hunter was not asked whether she recalled **any** absences after August 9th, she was asked if she recalled "how many" absences she had after August 9th.

She never answered that question, but answered an intervening one.  Plaintiff Depo. p. 135, l. 9 - 13.

Further, Mr. Kim recorded Ms. Hunter absent on August 14th, even though she was at work because she submitted a request to be off on August 14th for a medical procedure and then changed the appointment to August 9th.  Plaintiff Depo. at p. 79, l. 7 – p. 80, l. 8; p. 81, l. 9 – p. 82, l. 8.  In fact, the reason for the confusion is understandable since, as Plaintiff herself explained, she submitted a written request on August 3 to reschedule a prior appointment set for August 9 to August 14.  *See* Plaintiff Depo. at Def. Ex. 14, 8/3/06 Absence Request, attached hereto as Ex. P.  After submitting this written request, Plaintiff switched to another doctor and then had the procedure on August 9 instead of on August 14 as requested in writing.  *Id.*  Additionally, there is no evidence that Mr. Kim was aware of this change, which explains why he would have recorded on his spreadsheet that she was absent on August 14.  Since the August 9th absence does not appear on Mr. Kim's spreadsheet, the net number of absences did not change.  In other words, the date mix-up did not change the number of attendance occurrences during Plaintiff's probationary period, which was at least seven (7).

Plaintiff also argues that Mr. Kim's mistake of recording Plaintiff absent on August 14 when she rescheduled her appointment and in fact was absent on August 9 is evidence of a "misrepresentation" that can be construed as "evidence of pretext."  Plaintiff's Opposition Brief at p. 27.   Plaintiff's counsel is well aware of the circumstances behind this mix-up because her client testified about it during her deposition (as cited above), and Plaintiff's counsel asked Ms. Womack about it in her deposition.  Womack Depo. at p. 22, l. 15 – p. 23, l. 5.   Ms. Womack also testified that

the Excel spreadsheet prepared by Mr. Kim appeared to be correct with the exception of the completely understandable mix-up between the August 14 and August 9 dates. *Id.* at p. 49, l. 7-23. The Court should disregard Plaintiff's attempt to characterize the date mix-up as some sort of misrepresentation that could be used as evidence of pretext, and Plaintiff's attempt to characterize it as such can only be described as disingenuous.

Plaintiff also clearly recalls being out of work after August 9 since she was off for part of the day on August 11th, a Friday, a day that was listed on Mr. Kim's Excel spreadsheet and a day that she requested off in writing. Plaintiff Depo. at Def. Ex. 13, Absence Request, attached hereto as Ex. Q; Kim Depo. at Pl. Ex. 10, Excel Spreadsheet, attached hereto as Ex. R. That is the day she had a minor surgical procedure performed. Plaintiff Depo. p. 159, l. 21 - 23. Plaintiff was also out of work for several hours on August 16th, but neither Mr. Kim nor Ms. Womack made a record of it, which is not consistent with Plaintiff's portrayal of Kim as a person watching her every move after August 9th. Plaintiff was treated by Physicians for Women, located in Mitylene, with respect to her pregnancy. Their certified records show that Plaintiff came in for lab work on August 16th at 3:35 p.m. *See* 8/16/06 Certified Records, attached hereto as Ex. S. MOBIS is located in extreme West Montgomery past Dannelly Field, and according to "MapQuest" this is approximately 22 miles, so Plaintiff would have had to leave work sometime around 3:00 p.m. This would have been attendance occurrence number eight (8), and the second attendance occurrence after August 9.

The misstatements above do not create any issues of fact for purposes of summary judgment. MOBIS has provided clarification on these issues to illustrate the baseless nature of Plaintiff's allegations. Rather than relying on this distorted version of the facts

to support her conclusory allegations of discrimination, Plaintiff must come forward with evidence demonstrating "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable fact finder could find them unworthy of credence." *Combs v. Plantation Patterns,* 106 F .3d 1519, 1543 (11th Cir.1997). Plaintiff's Opposition Brief utterly fails to create an issue of fact for purposes of summary judgment. Therefore, MOBIS is entitled to judgment as a matter of law.

## CONCLUSION

In conclusion, Plaintiff has failed to prove her *prima facie* case. Plaintiff has not shown that she was a victim of discrimination, only that she did not receive preferential treatment. Hunter's attendance and dependability were not acceptable the entire time she was an employee at MOBIS, and she was not treated any differently than any other similarly-situated employee. MOBIS terminated Hunter's employment for reasons that are objectively legitimate, nondiscriminatory and non-pretextual. For the foregoing reasons, MOBIS submits that this Court should enter summary judgment in its favor as to all counts against it contained in Hunter's Complaint, dismiss the Complaint and all claims in this lawsuit against MOBIS with prejudice, and tax costs against Plaintiff.


Respectfully submitted,


/s/ Henry C. Barnett, Jr.
**HENRY C. BARNETT, JR. (BAR 037)**
*ATTORNEY FOR DEFENDANTS*

**OF COUNSEL:**
CAPELL & HOWARD, P.C.
150 South Perry Street
Post Office Box 2069
Montgomery, AL  36102-2069
Telephone:  (334) 241-8000
Facsimile:   (334) 241-8259


## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing instrument was served upon the following via CM/ECF Electronic Filing System on this the 13th day of May, 2008.

Heather N. Leonard
Heather N. Leonard, P.C.
2108 Rocky Ridge road
Suite 1
Birmingham, Alabama 35216

/s/ Henry C. Barnett, Jr.
OF COUNSEL

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE MIDDLE DISTRICT OF ALABAMA**
**NORTHERN DIVISION**

| | | |
|---|---|---|
| **TARSHA NICKOL HUNTER,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **Civil Action No.: 2:07-CV-427-WHA** |
| **vs.** | ) | |
| | ) | |
| **MOBIS ALABAMA, LLC,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**<u>SUMMARY OF EXHIBITS</u>**

| Ex. No. | Description |
|---|---|
| A | Tracy Riedler's Supplemental Affidavit |
| B | Affidavit of Tracy Riedler |
| C | Affidavit of Jaekwang (Jay) Kim |
| D | Deposition Excerpts of Tracy Riedler |
| E | Deposition Excerpts of Jay Kim |
| F | Supplemental Affidavit of Jaekwang (Jay) Kim |
| G | Deposition Excerpts of Plaintiff |
| H | Tracy Riedler Deposition, Plaintiff's Exhibit 5 |
| I | Deposition Excerpts of Sonechka L. Womack |
| J | Plaintiff Deposition, Defendant's Exhibit 16 |
| K | Plaintiff Deposition, Defendant's Exhibit 17 and 18 |
| L | Deposition Excerpts of Ruth B. Heard |
| M | Email from Sonechka Womack to Tarsha Hunter, dated August 14, 2006 |

N          Tracy Riedler Deposition, Plaintiff's Exhibit 1

O          Plaintiff's Deposition, Defendant's Exhibit 9

P          Plaintiff's Deposition, Defendant Exhibit 14

Q          Plaintiff's Deposition, Defendant Exhibit 13

R          Jay Kim Deposition, Plaintiff's Exhibit 10

S          Certified Records from Physicians for Women


                                   Respectfully submitted,


                                   /s/ Henry C. Barnett, Jr.
                                   **HENRY C. BARNETT, JR. (BAR 037)**
                                   *ATTORNEY FOR DEFENDANTS*


**OF COUNSEL:**
CAPELL & HOWARD, P.C.
150 South Perry Street
Post Office Box 2069
Montgomery, AL  36102-2069
Telephone:  (334) 241-8000
Facsimile:   (334) 241-8259


### CERTIFICATE OF SERVICE

     I hereby certify that a copy of the foregoing instrument was served upon the following via CM/ECF Electronic Filing System on this the 13th day of May, 2008.

                         Heather N. Leonard
                         Heather N. Leonard, P.C.
                         2108 Rocky Ridge road
                         Suite 1
                         Birmingham, Alabama 35216


                                   /s/ Henry C. Barnett, Jr.
                                   OF COUNSEL

# EXHIBIT

# A

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

TARSHA NICKOL HUNTER,        )
                                 )
        Plaintiff,           )
                                 )     Civil Action No.: 2:07-CV-427-WHA
vs.                            )
                                 )
MOBIS ALABAMA, LLC,        )
                                 )
        Defendant.       )

## TRACY RIEDLER'S SUPPLEMENTAL AFFIDAVIT

**STAT E OF ALABAMA**    )

**COUNTY OF ELMORE**    )

**BEFORE ME**, the undersigned authority, personally appeared Tracy Riedler who, after being first duly sworn, states as follows:

1.     My name is Tracy Riedler.  I reside in Montgomery, Alabama.  I am over 19 years of age and have first-hand knowledge of the matters stated in this affidavit.

2.     I have been employed by MOBIS as its Senior Human Resources Manager since January 20, 2004.  As MOBIS' Senior Human Resources Manager, I oversee all human resources, payroll, recruiting, compensation, benefits, environmental health and safety and general administrative functions.  I have been asked to supplement my affidavit in support of MOBIS' Motion for Summary Judgment to cover new issues, or clarify ones addressed before, in response to Plaintiff's Opposition Brief.

3.     MOBIS hired Lorenza Daniels ("Daniels") on August 14, 2004, as a probationary, hourly paid Material Handler.  Daniels worked in Assembly under the immediate supervision of Jeff

Reinhart ("Reinhart"), whose title was Assembly Supervisor. Reinhart reported to Johnny Sung ("Sung"), whose title was Assembly Department Manager.

4.     Like all new MOBIS employees, Daniels was required to serve a ninety (90) day probationary period. During Daniels' probationary period, Reinhart observed that Daniels was moody, his performance erratic, and that his attendance was unsatisfactory. Reinhart planned to terminate Daniels' employment at the end of his probationary period; however, Sung did not want to terminate Daniels because he thought Daniels had the potential to be a good employee.

5.     A compromise was agreed upon between Reinhart and Sung whereby MOBIS extended Daniels' probationary period for an additional ninety (90) days to commence on November 15, 2004. It was made clear at that time that he would have no attendance issues and Mr. Daniels agreed to those terms.

6.     Daniels' attendance was not satisfactory during the extended probationary period, so on or about February 3, 2005, Reinhart and I met with Daniels to inform him that MOBIS was terminating his employment for failure to adhere to the terms of his extended probation. Daniels filed a charge of discrimination against MOBIS less than a month later alleging disparate treatment based on race, age and gender. The EEOC subsequently issued a "No Cause" finding and Daniels filed suit in federal court. MOBIS moved for summary judgment, and Daniels voluntarily dismissed his suit.

7.     MOBIS had been in production for less than a year when Daniels filed his EEOC charge, and we learned from Daniels' claims that subjectivity in an attendance policy can be problematic. Consequently, on March 21, 2005, I, after consulting with legal counsel, amended MOBIS' policy for probationary employees to provide an objective standard: Any probationary employee who accrues three (3) or more absentee occurrences (tardy, early out and/or all day

2

absence) will be terminated. This is a no fault policy, meaning that there are just a few exceptions, such as military leave, jury duty, bereavement and the like.

8.    The policy for probationary employees in effect throughout Daniels' entire employment at MOBIS did not provide for a specific number of absentee occurrences that would lead to a probationary employee's termination. In other words, MOBIS' original attendance policy for probationary employees was subjective as to what was satisfactory.

9.    When MOBIS revised its probationary policy in March of 2005, I also revised the 90 Day Review Sheet Form. The revised form requires the supervisor to state the specific number of days the probationary employee has been absent, late or left early if he/she (the supervisor) wants MOBIS to offer regular employment. My purpose in revising the form was to ensure that all probationary employees received the same objective treatment with respect to attendance, and that no one with three (3) or more attendance occurrences would be retained for regular employment. The new form also requires more specificity about why the supervisor is recommending that the probationary employee be hired for regular employment.

10.    Similarly the new form requires a supervisor who has "recommended" termination to explain the reasons for the recommendation.[1] This change was made to reduce the possibility that a probationary employee would be terminated unfairly or for impermissible reasons. I must approve all terminations, so in that respect, I am the ultimate or final decision maker on terminations.

11.    Daniels was never subject to the revised objective attendance policy, which went into effect in March of 2005, and remained in effect throughout Plaintiff's employment at MOBIS.

12.    MOBIS hired Tamika Lee ("Lee") on December 6, 2004, as a Purchasing Assistant in the Purchasing Department. Lee reported to Johnny Yun ("Yun"), MOBIS' Senior Manager of

---

[1] Daniels and Plaintiff's 90 Day Review Sheet forms are attached for comparison as composite Exhibit "1".

Purchasing. Lee never reported to Mr. Kim. Mr. Yun and Mr. Kim are not in the same department, although their departments were in close physical proximity.

13.     Lee's probationary period expired on or about March 6, 2005, before MOBIS revised its attendance policy to include the objective three (3) occurrence standard. Mr. Yun, not Mr. Kim, would have been the person to decide whether Lee had "acceptable" attendance during her probationary period.

14.     As I stated in my deposition testimony, the progressive discipline policy in MOBIS' handbook does not apply to salaried employees or to any issues concerning attendance, and did not apply to salaried employees at any time during Plaintiff's employment at MOBIS. The progressive discipline policy does not apply to absences during a probationary period.

15.     If Mr. Kim had stated on Plaintiff's 90 Day Review Sheet that she should be retained as a regular employee, Plaintiff would have been terminated anyway. The revised 90 Day Review Sheet requires the supervisor to state how many absenteeism occurrences the probationary employee has had. If Mr. Kim had submitted the form stating that Plaintiff had "successfully passed the probationary period . . ." and stating that she had seven (7) absentee occurrences, the matter would have been out of Mr. Kim's hands, and I would have terminated Plaintiff under the objective provisions of revised attendance policy irrespective of Kim's preferences.

16.     There have been no exceptions made for probationary employees with three (3) or more absentee occurrences since the revised policy went into effect in March 2005. We have made no exceptions to the three (3) occurrence rule, and to my knowledge no supervisor has submitted a 90 Day Review Form with incorrect attendance data. With regard to hourly employees, there is little or no possibility of this happening since MOBIS uses an automated time keeping system and Human Resources monitors attendance for hourly employees on a continuing basis.

17.     As I testified in my deposition, I did not catch the error in MOBIS' response to Plaintiff's EEOC Charge which was prepared by MOBIS' counsel and reviewed by me.  This happened because I was not at that time clear about when Mr. Kim learned that Plaintiff was pregnant as compared to when he first consulted me about Plaintiff's attendance problems, approximately one (1) week prior to her termination on August 25, 2006.  I did, in fact, tell Mr. Kim that Plaintiff had to be terminated before I learned of her pregnancy from Ms. Womack.  MOBIS did not intentionally mislead the EEOC.

18. The evaluation process at the end of an employee's ninety (90) day probation period is automatic.    Prior  to  the  end  of  a  ninety  (90)  day  probationary  period,  Human  Resources automatically sends the 90 Day Review Form to the supervisor.  The supervisor is required to complete the form and return it to Human Resources prior to the end of the probationary period. This process is specified in paragraphs 2.3 and 3.1 of the Probationary Period Policy and Procedures section of MOBIS' Handbook.

19.     MOBIS has not made exceptions for ill, injured or temporarily disabled employees with respect to the three (3) occurrence rule instituted under the revised attendance policy for probationary employees.  Consequently, if MOBIS had made an exception for Plaintiff due to her pregnancy as Ms. Womack wanted, she would have been receiving preferential treatment as compared to other employees.

20.     On August 25, 2006, I received a message that I was needed in Jay Kim's office.  I immediately went to Mr. Kim's office and joined a meeting with him, Sonechka Womack and Plaintiff.  Plaintiff was challenging the explanation Mr. Kim had given her for her termination. Approximately one week earlier when Mr. Kim first consulted me, I had reviewed Mr. Kim's Excel spreadsheet along with doctors' notes, requests for time off and other documents he had kept concerning her attendance.

21.    I explained to Plaintiff that she was being terminated because she had exceeded the two (2) absentee occurrences allowed under MOBIS' attendance policy for probationary employees. Plaintiff did not challenge or disagree with my statement that she had accrued more than two (2) occurrences. Plaintiff also stated to me that she was aware of the policy. I declare under penalty of perjury that the foregoing is true and correct.

Executed on May 9TH, 2008.

_____
**TRACY RIEDLER**

Sworn to and subscribed before me on this the 9TH day of May, 2008 .

Notary Public

My Commission Expires

NOTARY PUBLIC STATE OF ALABAMA AT LARGE
MY COMMISSION EXPIRES: Oct 13, 2010
BONDED THRU NOTARY PUBLIC UNDERWRITERS

[SEAL]

6

# EXHIBIT
# 1

# TRACY RIEDLER'S
# SUPPLEMENTAL
# AFFIDAVIT

## 90 DAY WORK PERFORMANCE REVIEW SHEET

Employee Name                     Lorenza Daniels

Title                             Material Handler

Department                        Assembly

Division                          Plastics

Manager/Supervisor                Jeff Rinehart

Date of Hire                      August 16, 2004

Date 90 Day Probationary Period Expires    November 14, 2004

**Check One**

_____  The employee has successfully passed the probationary period for their present job.

- ◆  Attendance is satisfactory
- ◆  Performance in job is satisfactory

_____  The employee is not qualified for his/her present job but is recommended for transfer elsewhere within the company, only if a job is currently available.

___✓___  The employee should be terminated based on unsatisfactory performance.

✱ RECommend AN ADDITIONAL 90 DAY Probation.

Additional Comments

_At times, Lorenza is an excellent worker. However, attendance is poor and on occasion has difficulty in receiving orders and working w/ team._

Supervisor/Manager Signature    _Jeffrey C Rinehart_

Sr. Manager Human Resources

President

_Jeff and I met w/ Lorenza 11/10. we told him we were extending his probation 90 more days. If more absences, etc tardies during this time he would be fired_

## 90 DAY WORK PERFORMANCE REVIEW SHEET

Team Member Name _____ Tarsha Hunter _____

Title _____ Accounting Specialist _____

Department _____ Accounting and Finance _____

Division _____ Module _____

Manager/Supervisor _____ Sonechka Womack _____

Date of Hire _____ 06/05/06 _____

Date 90 Day Probationary Period Expires _____ 09/02/06 _____

### Check One

_____ **A:** **The employee has successfully passed the probationary period for their present job.**

❖ Attendance is satisfactory. How many days has the team member been absent, late or left early?

_____

❖ What are the team member's strengths?

_____

❖ What are areas the team member could improve on?

_____

__X__ **B:** **The employee should be terminated based on unsatisfactory performance.**

❖ Explain why you recommend termination

Tarsha's attendance and dependability was unstable while she was a temporary employee. I delayed hiring her for this very reason. I had several conversations with Tarsha and her supervisor expressing my concern. Tarsha ensured me this problem would not continue after she was hired. I told her that I would continue to evaluate her performance, to include attendance, during her 90 day probationary period. She has not improved. Her mannerism is not congenial to our department. And her lack of dependability has placed strain on our department as when she is not here her work must be performed by her supervisor who has responsibilities of her own. I cannot continue with this situation.

Supervisor/Manager Signature _____ _[signature]_ 8/25/06

Sr. Manager Human Resources _____ _[signature]_ 8/25/06

Executive Vice President _____ _[signature]_ 08-25-06

President _____

HUNTER V. MOBIS
00114

# EXHIBIT

# B

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

TARSHA NICKOL HUNTER,              )
                                   )
        Plaintiff,                 )
                                   )        Civil Action No.: 2:07-CV-427-WHA
vs.                                )
                                   )
MOBIS ALABAMA, LLC,                )
                                   )
        Defendant.                 )

## AFFIDAVIT OF TRACY RIEDLER

STAT E OF ALABAMA    )

COUNTY OF ELMORE     )

BEFORE ME, the undersigned authority, personally appeared Tracy Riedler who, after being first duly sworn, states as follows:

1.      My name is Tracy Riedler.  I reside in Montgomery, Alabama.  I am over 19 years of age and have first-hand knowledge of the matters stated in this affidavit.

2.      MOBIS Alabama, LLC ("MOBIS") is a Tier One supplier of cockpit and chassis module assemblies, plastic bumpers and door trim molding to Hyundai Motor Manufacturing Company ("Hyundai").  MOBIS' headquarters and manufacturing plant are located at 1395 Mitchell Young Road, Montgomery, Alabama. MOBIS commended production in 2005 and has approximately 800 employees.

3.      I have been employed by MOBIS as its Senior Human Resources Manager since January 20, 2004.  Prior to that, I was employed by Thermalex, Inc. in Human Resources for

approximately nine (9) years. Before my employment at Thermalex, I was employed in Human Resources at CH2M Hill for approximately eight and one half (8 ½) years.

4.     As MOBIS' Senior Human Resources Manager, I oversee all human resources, payroll, recruiting, compensation, benefits, environmental health and safety and general administrative functions. I have a staff of nineteen (19) individuals comprising four (4) departments under the umbrella of Human Resources: General Administration; HR Functions; Environmental, Health, and Safety; and Team Relations.

5.     I have a B.S. Degree in Business Administration (Management) from Troy State University and a Masters Degree in Human Resources Management also from Troy.

6.     I am familiar with Title VII of the Civil Rights Act of 1964, including what is known as the "Pregnancy Discrimination Act."

7.     I have reviewed Plaintiff's personnel file, which is maintained under my supervision and which shows that Plaintiff first worked at MOBIS on March 6, 2006 as a temporary employee ("Temp") furnished to MOBIS by Multi-Staffing, a local employment agency. Plaintiff was assigned to work in the Accounting Department ("Accounting") as an Accounting Specialist Treasury. A copy of Plaintiff's job description is attached hereto as Exhibit "1."

8.     Plaintiff's time records from Multi-Staffing for the ninety (90) day period she worked as a Temp are attached as Exhibit "2." I prepared the cover chart summarizing Plaintiff's attendance using the Multi-Staffing records. Multi-Staffing's records show that Plaintiff was absent, tardy or left early seventeen (17) times in the course of only ninety (90) days.

2

9.    MOBIS' agreement with Multi-Staffing allows MOBIS to hire Temps furnished by that agency without paying a fee after the Temp has worked at MOBIS for three hundred sixty (360) hours or nine (9) weeks.

10.    On June 5, 2006, MOBIS offered Plaintiff probationary employment.  All new employees at MOBIS, including those who have worked as Temps served a ninety (90) day probationary period during which their suitability for working in MOBIS' fast paced environment is evaluated.  The probationary period also gives the employee an opportunity to decide whether he/she would be happy working long term at MOBIS.

11.    Plaintiff attended a full day orientation program, during which MOBIS' Employee Handbook and specifically MOBIS' policy on probationary employees were reviewed and explained. Copies of MOBIS' Attendance Policy for Probationary Employees and Plaintiff's Handbook Acknowledgement are attached hereto as Exhibits "3" and "4."

12.    MOBIS is Hyundai's largest Tier I supplier, and must meet the requirements of Hyundai's "just in time" inventory delivery system.  For this reason, probationary employees are evaluated in terms of their reliability and attendance.

13.    The policy for probationary employees provides that such employees are to be terminated after three (3) attendance occurrences.  An occurrence is defined as an absence for all or part of the day, a tardy, or an early departure from work. This is a "no fault" policy, meaning that probationary employees are allowed two (2) incidences and are terminated after their third, no matter what the reason for the incident.  The only exceptions are for jury duty, bereavement and the like.

14.    MOBIS does not have a sick leave policy that excuses absences or missed work for sickness or injury prior to the time the employee become eligible for leave pursuant to the

3

Family Medical Leave Act ("FMLA"). Probationary employees are not covered by FMLA because they have not yet worked for the required one (1) year. MOBIS treats pregnancy the same as it treats any illness or injury during the first year of employment. After the first year of employment, MOBIS complies with FMLA including its provisions requiring leave for pregnancy and pregnancy related conditions such as morning sickness.

15.    The Human Resources Department does not keep attendance records on probationary employees. Such records are kept by the employee's supervisor. It is well known that Mr. Kim is a stickler for punctuality, attendance and timely completion of work by his staff.

16.    MOBIS' Human Resources Department automatically sends a "90 Day Work Performance Review Sheet" ("Review Sheet") to the appropriate department head or supervisor prior to the end of an employee's probationary period. Review Sheets are routinely sent well in advance of expiration of the probationary period so that a decision can be made prior to the end of ninety (90) days.

17.    Approximately one (1) week before Plaintiff was terminated, MOBIS' Human Resources Department sent to Mr. Kim a Review Sheet for him to complete regarding Plaintiff. Shortly after Mr. Kim received the Review Sheet, he consulted with me. Mr. Kim told me that he did not think he could keep Plaintiff as a regular employee because of her poor attendance record. I asked Mr. Kim what he meant by "poor attendance." Mr. Kim then retrieved and showed to me a computer spreadsheet that showed that Plaintiff had seven (7) attendance occurrences as a probationary employee. I reviewed the spreadsheet with Mr. Kim and told him that Plaintiff had to be terminated because she had violated MOBIS' attendance policy for probationary employees by having more than two (2) occurrences. I also instructed Mr. Kim that

4

Plaintiff needed to be terminated at that time, not at the end of ninety (90) days, which in Plaintiff's case would have been on or about September 2, 2006.

18.    Mr. Kim explained to me that he was not aware of the specific limitation on the number of absences probationary employees are allowed to have. Mr. Kim's confusion could well have resulted from the fact that MOBIS' original policy on probationary employees did not specify that such employees must be terminated after the third attendance occurrence. That policy did not come into affect until March 2005. (See Exhibit "3", paragraph 2.5). Prior to March 2005, no specified limit of attendance incidence was stated in the policy.

19.    My meeting with Mr. Kim about Plaintiff's attendance took place approximately one (1) week prior to Plaintiff's termination, and was my first substantive involvement with Plaintiff's employment. I did not know that Plaintiff was pregnant when I made the decision that Plaintiff's employment had to be terminated. Pregnancy was not discussed during my meeting with Mr. Kim. In fact, it was not Mr. Kim who informed me of Plaintiff's pregnancy, but rather Plaintiff's direct supervisor, Ms. Womack, who told me that Plaintiff was pregnant on or about August 24, 2006, a day or so before MOBIS terminated Plaintiff.

20.    I made the final decision to terminate Plaintiff's employment, and I had no knowledge of Plaintiff's pregnancy at the time that I made the decision. I based my decision to terminate Plaintiff's employment on the fact that Plaintiff was absent three times in addition to four other occurrences of either being late to work or leaving work early which exceeded the occurrences allowable in the policy.

21.    I am aware that Plaintiff asked for a meeting on August 25, 2006 with Mr. Kim and Ms. Womack. The meeting became contentious, and Mr. Kim was concerned that the meeting was getting out of control, so he summoned me to join the participants. I reiterated to

Plaintiff the attendance policy for probationary employees and informed her that MOBIS could not offer her regular employment and that she was terminated. Plaintiff stated that she was aware of the policy regarding attendance during the probationary period. She said she just didn't think that was the reason for her termination. Plaintiff said that she understood and left.

22.    During discovery, I learned that Plaintiff, and possibly Ms. Womack, suspected that MOBIS terminated two pregnant employees for discriminatory reasons. I know this to be untrue. The two women in question are LaJarra Jefferson and Shalonda Gordon, both of whom were pregnant when terminated. Ms. Jefferson was terminated for taking FMLA leave without submitting a proper medical certification that she needed to be on leave. MOBIS warned Ms. Jefferson that her unexcused absences were counting against her under MOBIS' "no fault" attendance policy for regular hourly employees, and that she would be terminated unless she provided proper medical certification. Ms. Jefferson refused to return to work and did not furnished a medical certification stating that she had a medical need for leave. To the contrary, her first two physicians recommended work restrictions that MOBIS told Jefferson it could accommodate. Eventually, Jefferson went to a third doctor, who provided a medical certification that designated a start date for Jefferson's leave, which was after Jefferson had been terminated for attendance points.

23.    Shalonda Gordon was terminated for improper and destructive work techniques. Specifically, she was jerking wires instead of unplugging them and damaging the connections on sensitive diagnostic equipment used to conduct quality tests on cockpit (dashboard) assemblies. The supplemental restraint system (airbags) is among the components involved in the testing. For obvious reasons, Gordon's work techniques posed potential quality and safety issues. MOBIS warned Gordon on several occasions about her misconduct before terminating her.

6

24.    It was also evident during depositions that Plaintiff believed or suspected that a former Accounting employee, LaToya Williams, was a similarly situated female probationary employee who was not pregnant, had violated the attendance policy, but was not terminated. This is not the case.  Ms. Williams, an accounting clerk, came to work at MOBIS through a temporary agency like Plaintiff.  She also had attendance problems as a Temp.  Due to those attendance problems, MOBIS, on Mr. Kim's recommendation, never offered probationary employment to Ms. Williams, so as it turns out Plaintiff, was given more favorable consideration than Ms. Williams because Mr. Kim gave Plaintiff probationary employment despite her attendance problems as a Temp and his reluctance to hire her.

25.    MOBIS has had many employees that have taken FMLA leave for pregnancy and returned to their former positions without incident.  MOBIS treats pregnancy the same as any other illness or sickness with regard to its attendance policies.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on March 28 , 2008.

_____

**TRACY RIEDLER**

Sworn to and subscribed before me on this the 28 day of March, 2008 .

Notary Public _____

My Commission Expires_____

[SEAL]

# EXHIBIT 1
# TRACY RIEDLER
# AFFIDAVIT



**MOBIS Alabama, LLC**

# JOB DESCRIPTION

| Job Title: | Accounting Specialist Treasury | **Minimum education, skills, and/or experience required:**<br>- Bachelor's degree in accounting or related field |
|---|---|---|
| Report to: | Assistant Manager Treasury | - Excellent communication skills (oral & written)<br>- Experience in manufacturing environment will be plus |
| Dept: | Accounting and Finance | - Advance knowledge in computer software for windows<br>- Familiar with General accounting duties<br>- Computer skills - Excel(Must), SAP (Preferred) |

**KEY DUTIES AND RESPONSIBILITIES (Not limited to)**

1. Daily fund and demand schedule - checks and wires.
2. Maintain vendor payment file.
3. Set up vendors for payment.
4. Ensure payment date is correct in SAP.
5. Ensure documents are approved in SAP.
6. Assist with check payments.
7. Handle a variety of Accounts Payable issues such as Aging Report Status, proposal list, outgoing payment clearing (wires, online transfers, ACH files, etc.
8. Handles a variety of Accounts Receivable issues such as Aging Reports, sending collection letters and statements, incoming payment clearing, customer maintenance.
9. Any additional duties associated with collections.
10. Maintaining G/L Entries.
11. Make Bank Deposits.
12. Opening and posting incoming checks.
13. Handling phone calls, faxes and e-mail from supplier regarding to payment.
14. Maintaining files for the Accounting department.
15. All other duties as assigned.

# EXHIBIT 2
# TRACY RIEDLER
# AFFIDAVIT

TARSHA HUNTER'S ATTENDANCE
RECORD WITH MULTI STAFFING

| | Date | In | Out | | Date | In | Out |
|---|---|---|---|---|---|---|---|
| Mon | 3/6/2006 | 8:00 AM | 5:00 PM | Mon | 4/24/2006 | 8:00 AM | 5:00 PM |
| Tue | 3/7/2006 | 8:00 AM | 5:00 PM | Tue | 4/25/2006 | 8:00 AM | 12:00 PM |
| Wed | 3/8/2006 | 8:00 AM | 5:00 PM | Wed | 4/26/2006 | 8:00 AM | 5:15 PM |
| Thu | 3/9/2006 | 8:00 AM | 5:00 PM | Thu | 4/27/2006 | 8:00 AM | 5:00 PM |
| Fri | 3/10/2006 | 8:00 AM | 5:00 PM | Fri | 4/28/2006 | 9:00 AM | 11:30 AM |
| Sat | 3/11/2006 | | | Sat | 4/29/2006 | | |
| Sun | 3/12/2006 | | | Sun | 4/30/2006 | | |
| Mon | 3/13/2006 | 8:00 AM | 5:00 PM | Mon | 5/1/2006 | 8:00 AM | 5:00 PM |
| Tue | 3/14/2006 | 8:30 AM | 5:00 PM | Tue | 5/2/2006 | 8:00 AM | 5:10 PM |
| Wed | 3/15/2006 | 8:00 AM | 5:00 PM | Wed | 5/3/2006 | 8:15 AM | 5:15 PM |
| Thu | 3/16/2006 | 8:00 AM | 5:00 PM | Thu | 5/4/2006 | 8:00 AM | 5:15 PM |
| Fri | 3/17/2006 | 8:00 AM | 5:00 PM | Fri | 5/5/2006 | 8:00 AM | 5:00 PM |
| Sat | 3/18/2006 | | | Sat | 5/6/2006 | | |
| Sun | 3/19/2006 | | | Sun | 5/7/2006 | | |
| Mon | 3/20/2006 | 8:00 AM | 5:10 PM | Mon | 5/8/2006 | Out sick all day | |
| Tue | 3/21/2006 | 8:00 AM | 5:00 PM | Tue | 5/9/2006 | 8:00 AM | 5:15 PM |
| Wed | 3/22/2006 | 8:00 AM | 3:40 PM | Wed | 5/10/2006 | 8:00 AM | 5:00 PM |
| Thu | 3/23/2006 | 8:00 AM | 5:00 PM | Thu | 5/11/2006 | 8:00 AM | 5:00 PM |
| Fri | 3/24/2006 | Out all day | | Fri | 5/12/2006 | 8:00 AM | 5:00 PM |
| Sat | 3/25/2006 | | | Sat | 5/13/2006 | | |
| Sun | 3/26/2006 | | | Sun | 5/14/2006 | | |
| Mon | 3/27/2006 | 8:00 AM | 5:05 PM | Mon | 5/15/2006 | 8:00 AM | 5:00 PM |
| Tue | 3/28/2006 | 8:00 AM | 5:00 PM | Tue | 5/16/2006 | 8:06 AM | 5:06 PM |
| Wed | 3/29/2006 | 12:00 PM | 5:00 PM | Wed | 5/17/2006 | 8:10 AM | 5:08 PM |
| Thu | 3/30/2006 | 8:00 AM | 5:00 PM | Thu | 5/18/2006 | 8:00 AM | 5:08 PM |
| Fri | 3/31/2006 | 8:00 AM | 5:00 PM | Fri | 5/19/2006 | 8:00 AM | 5:00 PM |
| Sat | 4/1/2006 | | | Sat | 5/20/2006 | | |
| Sun | 4/2/2006 | | | Sun | 5/21/2006 | | |
| Mon | 4/3/2006 | 9:00 AM | 5:00 PM | Mon | 5/22/2006 | 8:00 AM | 5:05 PM |
| Tue | 4/4/2006 | 8:00 AM | 5:10 PM | Tue | 5/23/2006 | 8:00 AM | 5:06 PM |
| Wed | 4/5/2006 | 8:00 AM | 5:00 PM | Wed | 5/24/2006 | 8:00 AM | 5:00 PM |
| Thu | 4/6/2006 | 8:00 AM | 5:00 PM | Thu | 5/25/2006 | 8:00 AM | 5:00 PM |
| Fri | 4/7/2006 | 8:00 AM | 5:00 PM | Fri | 5/26/2006 | 8:02 AM | 5:00 PM |
| Sat | 4/8/2006 | | | Sat | 5/27/2006 | | |
| Sun | 4/9/2006 | | | Sun | 5/28/2006 | | |
| Mon | 4/10/2006 | 12:00 PM | 5:00 PM | Mon | 5/29/2006 | Holiday | |
| Tue | 4/11/2006 | 8:00 AM | 5:00 PM | Tue | 5/30/2006 | 8:03 AM | 5:00 PM |
| Wed | 4/12/2006 | Out sick all day | | Wed | 5/31/2006 | 8:00 AM | 5:15 PM |
| Thu | 4/13/2006 | 8:00 AM | 5:00 PM | Thu | 6/1/2006 | 8:00 AM | 5:15 PM |
| Fri | 4/14/2006 | Holiday | | Fri | 6/2/2006 | 8:00 AM | 5:00 PM |
| Sat | 4/15/2006 | | | Sat | 6/3/2006 | | |
| Sun | 4/16/2006 | | | Sun | 6/4/2006 | | |
| Mon | 4/17/2006 | 8:00 AM | 5:00 PM | | | | |
| Tue | 4/18/2006 | 8:15 AM | 5:00 PM | | | | |
| Wed | 4/19/2006 | 8:00 AM | 5:00 PM | | | | |
| Thu | 4/20/2006 | 8:00 AM | 5:00 PM | | | | |
| Fri | 4/21/2006 | 8:05 AM | 5:00 PM | | | | |
| Sat | 4/22/2006 | | | | | | |
| Sun | 4/23/2006 | | | | | | |

MAR-28-2008  10:05        MOBIS                              P.002
Aug 08 2007 9:19AM   MULTI STAFFING SERVICES      334 271 3815      P.0

MAR-10-2006  16:16        MOBIS ALABAMA LLC           334 387 4900   P.001

PLEASE CALL YOUR SERVICE REPRESENTATIVE AS SOON AS YOUR ASSIGNMENT ENDS.

# MULTI-STAFFING SERVICES    EMPLOYEE TIME SHEET

| WEEK ENDING | SOCIAL SECURITY NUMBER | | EMP. # | EMPLOYEE LAST NAME | FIRST | MIDDLE |
|---|---|---|---|---|---|---|
| 3/12/06 | 421 | 81 19323 | | Hunter | Torsha | Nickol |

| | DATE | TIME STARTED | TIME FINISHED | LESS LUNCH | HOURS WORKED |
|---|---|---|---|---|---|
| MON | 3/6/06 | 8:00 | 5:00 | 1 hr. | 8 |
| TUE | 3/7/06 | 8:00 | 5:00 | 1 hr. | 8 |
| WED | 3/8/06 | 8:00 | 5:00 | 1 hr. | 8 |
| THU | 3/9/06 | 8:00 | 5:00 | 1 hr. | 8 |
| FRI | 3/10/06 | 8:00 | 5:00 | 1 hr. | 8 |
| SAT | 3/11/06 | | | | |
| SUN | 3/13/06 | | | | |

EMPLOYEES WORKING AT MORE THAN ONE COMPANY DURING THE WEEK (MONDAY - SUNDAY) MAY NOT EXCEED 40 HOURS EXCEPT WITH MULTI-STAFFING SERVICES PERMISSION. ARE YOU RETURNING  ☐ Yes  ☐ No

I UNDERSTAND THAT I AM TO CONTACT THE MULTI-STAFFING SERVICES OFFICE AFTER COMPLETING THIS ASSIGNMENT, AND IF I DO NOT DO SO, MULTI-STAFFING SERVICES MAY ASSUME THAT I AM NOT THEN AVAILABLE FOR WORK. I CERTIFY THAT I HAVE WORKED THE HOURS LISTED ON THIS TIME SHEET.

I CERTIFY THAT I HAVE NOT BEEN INVOLVED IN AN ACCIDENT OR INJURY WHILE WORKING ON THIS ASSIGNMENT UNLESS NOTED IN THE COMMENTS.

I CERTIFY THAT I HAVE NOT WITNESSED ANY ACCIDENTS OR INJURIES THIS WEEK UNLESS NOTED IN THE COMMENTS.

EMPLOYEE SIGNATURE X _Torsha Hunter_

COMMENTS:

TOTAL HOURS FOR WEEK
TO NEAREST QUARTER HOUR
4 HOUR MINIMUM PER DAY PER EMPLOYEE

CLIENT APPROVAL/AGREEMENT
CLIENT AGREES THAT ITS UTILIZATION OF THE ABOVE NAMED MULTI-STAFFING SERVICES EMPLOYEE HAS BEEN MADE AVAILABLE AS A RESULT OF THE TEMPORARY PERSONNEL SERVICE RENDERED BY MULTI-STAFFING SERVICES.

CLIENT CERTIFIES THAT THE ABOVE HOURS WORKED ARE CORRECT AND THAT ALL WORK WAS PERFORMED IN A SATISFACTORY MANNER. CLIENT'S SIGNATURE BELOW CONSTITUTES ACCEPTANCE OF THE TERMS AND CONDITIONS IDENTIFIED ON THE REVERSE OF THIS DOCUMENT.

CLIENT COMPANY NAME:
_Mobis Alabama LLC_

SUPERVISOR'S NAME
_HOSANG HWANG_

CLIENT SIGNATURE                    TITLE

DO NOT WRITE BELOW THIS LINE
FOR ACCOUNTING USE ONLY

| TOTAL HOURS | PAY RATE | O.T. HOURS | BILLING HOURS | BILLING RATE |
|---|---|---|---|---|
| | | | | |

MULTI-STAFFING SERVICES
P.O. BOX 160343
Chattanooga                  MOBILE, AL 36616-2343      Gulfport
FAX (423) 954-1104      FAX (251) 343-3915      FAX (228)896-0092
Montgomery                                    Hattiesburg
FAX (334)271-3815                              FAX (601)544-0773

HOME OFFICE COPY - WHITE    LEAVE W/CLIENT - CANARY    EMPLOYEE COPY - PINK

mobis

TOTAL P.001

# MULTI-STAFFING SERVICES    EMPLOYEE TIME SHEET

PLEASE CALL YOUR SERVICE REPRESENTATIVE AS SOON AS YOUR ASSIGNMENT ENDS.

| WEEK ENDING | SOCIAL SECURITY NUMBER | EMP. # |
|---|---|---|
| 3/19/06 | 421 121 1973 | |

EMPLOYEE LAST NAME: Hunter
FIRST: Tarsha
MIDDLE: N

| DATE | TIME STARTED | TIME FINISHED | LESS LUNCH | HOURS WORKED |
|---|---|---|---|---|
| MON 3/13 | 8:00 | 5:00 | 1 hr | 8 hrs |
| TUE 3/13 | 8:30 | 5:00 | 30 min | 8 hrs |
| WED 3/14 | 8:00 | 5:00 | 1 hr | 8 hrs |
| THU 3/15 | 8:00 | 6:00 | 1 hr | 8 hrs |
| FRI 3/16 | 8:00 | 5:00 | 1 hr 20 min | 6:50 |
| SAT 3/1 | | | | |
| SUN 3/18 | | | | |

TOTAL HOURS FOR WEEK
TO NEAREST QUARTER HOUR
( HOUR MINIMUM PER DAY PER EMPLOYEE )   38:00

EMPLOYEES WORKING AT MORE THAN ONE COMPANY DURING THE WEEK ( MONDAY - SUNDAY ) MAY NOT EXCEED 40 HOURS EXCEPT WITH MULTI-STAFFING SERVICES PERMISSION. ARE YOU RETURNING  ☐ Yes  ☐ No

I UNDERSTAND THAT I AM TO CONTACT THE MULTI-STAFFING SERVICES OFFICE AFTER COMPLETING THIS ASSIGNMENT, AND IF I DO NOT DO SO, I AM INFORMING SERVICES MAY ASSUME THAT I AM NOT THEN AVAILABLE FOR WORK.

I CERTIFY THAT I HAVE WORKED THE HOURS LISTED ON THIS TIME SHEET.

I CERTIFY THAT I HAVE NOT BEEN INVOLVED IN AN ACCIDENT OR INJURY WHILE WORKING ON THIS ASSIGNMENT UNLESS NOTED IN THE COMMENTS.

I CERTIFY THAT I HAVE NOT WITNESSED ANY ACCIDENTS OR INJURIES THIS WEEK UNLESS NOTED IN THE COMMENTS.

EMPLOYEE SIGNATURE: X _Tarsha Hunter_

COMMENTS:

CLIENT APPROVAL/AGREEMENT
CLIENT AGREES THAT ITS UTILIZATION OF THE ABOVE NAMED MULTI-STAFFING SERVICES EMPLOYEE HAS BEEN MADE AVAILABLE AS A RESULT OF THE TEMPORARY PERSONNEL SERVICE RENDERED BY MULTI-STAFFING SERVICES.

CLIENT CERTIFIES THAT THE ABOVE HOURS WORKED ARE CORRECT AND THAT ALL WORK WAS PERFORMED IN A SATISFACTORY MANNER. CLIENT'S SIGNATURE BELOW CONSTITUTES ACCEPTANCE OF THE TERMS AND CONDITIONS REFERENCED ON THE REVERSE OF THIS DOCUMENT.

CLIENT SIGNATURE: X _____
TITLE: _____

CLIENT COMPANY NAME: _Mobis Alabama LLC_

SUPERVISOR'S NAME: _No Sang Hwang_

| TOTAL HOURS | PAY RATE | O.T. HOURS | BILLING HOURS | BILLING RATE |
|---|---|---|---|---|

DO NOT WRITE BELOW THIS LINE
FOR ACCOUNTING USE ONLY

MULTI-STAFFING SERVICES
P.O. BOX 160349
MOBILE, AL 36616-2343
FAX (251) 343-3915

Chattanooga
FAX (423) 954-4104
Montgomery
FAX (334) 271-3915

Gulfport
FAX (228) 868-0082
Hattiesburg
FAX (601) 544-0776

HOME OFFICE COPY - WHITE    LEAVE W/CLIENT - CANARY    EMPLOYEE COPY - PINK

MAR-28-2008  10:06     MOBIS     334 271 3615     P.004

03/06/2006  05:88     2713615     MULTI STAFFING     PAGE  01

**PLEASE CALL YOUR SERVICE REPRESENTATIVE AS SOON AS YOUR ASSIGNMENT ENDS.**

# MULTI-STAFFING SERVICES     EMPLOYEE TIME SHEET

| WEEK ENDING | SOCIAL SECURITY NUMBER | | EMP. # | EMPLOYEE LAST NAME | FIRST | MIDDLE |
|---|---|---|---|---|---|---|
| 3/26/06 | 421·21·9023 | | | Hunter | Tarsha | N. |

| | DATE | TIME STARTED | TIME FINISHED | LESS LUNCH | HOURS WORKED |
|---|---|---|---|---|---|
| MON | 3/20 | 8:00 | 5:10 | 1 hr. | 8.10 hr |
| TUE | 3/21 | 8:00 | 5:00 | 1 hr. | 8.00 hr |
| WED | 3/22 | 8:00 | 3:40 | 1 hr. | 6.40 hr |
| THU | 3/23 | 8:00 | 5:00 | 1 hr. | 8 hr |
| FRI | 3/24 | 0:00 | | | |
| SAT | 3/25 | | | | |
| SUN | 3/26 | | | | |

EMPLOYEES WORKING AT MORE THAN ONE COMPANY DURING THE WEEK (MONDAY - SUNDAY) MAY NOT EXCEED 40 HOURS EXCEPT WITH MULTI-STAFFING SERVICES PERMISSION. ARE YOU RETURNING ☐ Yes ☐ No

I UNDERSTAND THAT I AM TO CONTACT THE MULTI-STAFFING SERVICES OFFICE AFTER COMPLETING THIS ASSIGNMENT, AND IF I DO NOT DO SO, MULTI-STAFFING SERVICES MAY ASSUME THAT I AM NOT THEN AVAILABLE FOR WORK.

I CERTIFY THAT I HAVE WORKED THE HOURS LISTED ON THIS TIME SHEET.

I CERTIFY THAT I HAVE NOT BEEN INVOLVED IN AN ACCIDENT OR INJURY WHILE WORKING ON THIS ASSIGNMENT UNLESS NOTED IN THE COMMENTS.

I CERTIFY THAT I HAVE NOT WITNESSED ANY ACCIDENTS OR INJURIES THIS WEEK UNLESS NOTED IN THE COMMENTS.

EMPLOYEE SIGNATURE x *Tarsha Hunter*

COMMENTS:

| TOTAL HOURS FOR WEEK TO NEAREST QUARTER HOUR 4 HOUR MINIMUM PER DAY PER EMPLOYEE | |
|---|---|

CLIENT APPROVAL/AGREEMENT
CLIENT AGREES THAT ITS UTILIZATION OF THE ABOVE-NAMED MULTI-STAFFING SERVICES EMPLOYEE HAS BEEN MADE AVAILABLE AS A RESULT OF THE TEMPORARY PERSONNEL SERVICE RENDERED BY MULTI-STAFFING SERVICES.

CLIENT CERTIFIES THAT THE ABOVE HOURS WORKED ARE CORRECT AND THAT ALL WORK WAS PERFORMED IN A SATISFACTORY MANNER. CLIENT'S SIGNATURE BELOW CONSTITUTES ACCEPTANCE OF THE TERMS AND CONDITIONS IDENTIFIED ON THE REVERSE OF THIS DOCUMENT.

CLIENT SIGNATURE x _____  TITLE _____

CLIENT COMPANY NAME *Mobis Alabama*

SUPERVISOR'S NAME *Na Sung Hwang*

**MULTI-STAFFING SERVICES**
P.O. BOX 160343
MOBILE, AL 38616-2345
FAX (251) 343-3915

Chattanooga FAX (423) 954-1184
Montgomery FAX (334) 271-3815
Gulfport FAX (228)696-0087
Hattiesburg FAX (601)544-0775

HOME OFFICE COPY - WHITE     LEAVE W/CLIENT - CANARY     EMPLOYEE COPY - PINK

DO NOT WRITE BELOW THIS LINE FOR ACCOUNTING USE ONLY

| TOTAL HOURS | PAY RATE | O.T. HOURS | BILLING HOURS | BILLING RATE |
|---|---|---|---|---|
| | | | | |

MAR-24-2006  17:00     MOBIS ALABAMA LLC     334 397 4900     P.001/001

MAR-28-2008  10:06        MOBIS                           334 271 3615                P.006

PLEASE CALL YOUR SERVICE REPRESENTATIVE AS SOON AS YOUR ASSIGNMENT ENDS.

# MULTI-STAFFING SERVICES    EMPLOYEE TIME SHEET

| WEEK ENDING | SOCIAL SECURITY NUMBER | | | EMP. # | EMPLOYEE LAST NAME | FIRST | MIDDLE |
|---|---|---|---|---|---|---|---|
| 4/02/06 | 421 121 19223 | | | | Hunter | Tarsha | Nickol |

| | DATE | TIME STARTED | TIME FINISHED | LESS LUNCH | HOURS WORKED |
|---|---|---|---|---|---|
| MON | 3/27 | 8:00 | 5:05 | 1 hr | 8:05 |
| TUE | 3/28 | 7:00 | 5:00 | 1 hr | 8:00 |
| WED | 3/29 | 12:00 | 0:00 | | 5.00 |
| THU | 3/30 | 8:00 | 5:00 | 1 hr | 8:00 |
| FRI | 3/31 | 8:00 | 5:00 | 1 hr | 8:00 |
| SAT | | | | | |
| SUN | | | | | |

EMPLOYEE WORKING AT MORE THAN ONE COMPANY DURING THE WEEK (MONDAY - SUNDAY) MAY NOT EXCEED 40 HOURS EXCEPT WITH MULTI-STAFFING SERVICES PERMISSION. ARE YOU RETURNING?  ☐ Yes  ☐ No

I UNDERSTAND THAT I AM TO CONTACT THE MULTI-STAFFING SERVICES OFFICE AFTER COMPLETING THIS ASSIGNMENT, AND IF I DO NOT DO SO, MULTI-STAFFING SERVICES MAY ASSUME THAT I AM NOT THEN AVAILABLE FOR WORK.

I CERTIFY THAT I HAVE WORKED THE HOURS LISTED ON THIS TIME SHEET.

I CERTIFY THAT I HAVE NOT BEEN INVOLVED IN AN ACCIDENT OR INJURY WHILE WORKING ON THIS ASSIGNMENT UNLESS NOTED IN THE COMMENTS.

I CERTIFY THAT I HAVE NOT WITNESSED ANY ACCIDENTS OR INJURIES THIS WEEK UNLESS NOTED IN THE COMMENTS.

EMPLOYEE SIGNATURE x *Tarsha Hunter*

COMMENTS:

| TOTAL HOURS FOR WEEK TO NEAREST QUARTER HOUR 4 HOUR MINIMUM PER DAY PER EMPLOYEE | 37.10 |
|---|---|

CLIENT APPROVAL/AGREEMENT
CLIENT AGREES THAT ITS UTILIZATION OF THE ABOVE NAMED MULTI-STAFFING SERVICES EMPLOYEE HAS BEEN MADE AVAILABLE AS A RESULT OF THE TEMPORARY PERSONNEL SERVICE RENDERED BY MULTI-STAFFING SERVICES.

CLIENT CERTIFIES THAT THE ABOVE HOURS WORKED ARE CORRECT AND THAT ALL WORK WAS PERFORMED IN A SATISFACTORY MANNER. CLIENT'S SIGNATURE BELOW CONSTITUTES ACCEPTANCE OF THE TERMS AND CONDITIONS IDENTIFIED ON THE REVERSE OF THIS DOCUMENT.

CLIENT SIGNATURE                    TITLE

CLIENT COMPANY NAME
*Mobis  Alabama  LLC*
SUPERVISOR'S NAME
*Ho Sang Hwang*

DO NOT WRITE BELOW THIS LINE
FOR ACCOUNTING USE ONLY

| TOTAL HOURS | PAY RATE | O.T. HOURS | BILLING HOURS | BILLING RATE |
|---|---|---|---|---|
| | | | | |

MULTI-STAFFING SERVICES
P.O. BOX 160343
MOBILE, AL 36616-2343
Chattanooga FAX (423) 854-1134
Montgomery FAX (334) 271-3615    Mobile FAX (251) 343-3915
Gulfport FAX (228) 865-0032
Hattiesburg FAX (601) 544-0775

HOME OFFICE COPY - WHITE    LEAVE W/CLIENT - CANARY    EMPLOYEE COPY - PINK

MAR-31-2006 16:16    MOBIS ALABAMA LLC    334 387 4900    P.001/001

MAR-28-2008  10:07    MOBIS  STAFFING SERVICES    334 271 3010    P.006

APR-07-2006  16:39    MOBIS ALABAMA LLC    334 387 4900    P.001/001

**PLEASE CALL YOUR SERVICE REPRESENTATIVE AS SOON AS YOUR ASSIGNMENT ENDS.**

# MULTI-STAFFING SERVICES    EMPLOYEE TIME SHEET

| WEEK ENDING | SOCIAL SECURITY NUMBER | EMP. # | EMPLOYEE LAST NAME | FIRST | MIDDLE |
|---|---|---|---|---|---|
| 04/9/06 | 421 121 19223 | | Hunter | Tarsha | Nickol |

| | DATE | TIME STARTED | TIME FINISHED | LESS LUNCH | HOURS WORKED |
|---|---|---|---|---|---|
| MON | 4/3 | 9:00 | 5:00 | 30min | 7.70 |
| TUE | 4/4 | 8:00 | 5:10 | 1hr. | 8.10 |
| WED | 4/5 | 8:00 | 5:00 | 1hr. | 8.00 |
| THU | 4/6 | 8:00 | 5:00 | 1hr. | 8.00 |
| FRI | 4/7 | 8:00 | 5:00 | 1hr. | 8.00 |
| SAT | 4/8 | | | | |
| SUN | 4/9 | | | | |

EMPLOYEES WORKING AT MORE THAN ONE COMPANY DURING THE WEEK (MONDAY - SUNDAY) MAY NOT EXCEED 40 HOURS EXCEPT WITH MULTI-STAFFING SERVICES PERMISSION. ARE YOU RETURNING  ☐ Yes  ☐ No

I UNDERSTAND THAT I AM TO CONTACT THE MULTI-STAFFING SERVICES OFFICE AFTER COMPLETING THIS ASSIGNMENT, AND IF I DO NOT DO SO, MULTI-STAFFING SERVICES MAY ASSUME THAT I AM NOT THEN AVAILABLE FOR WORK.
I CERTIFY THAT I HAVE WORKED THE HOURS LISTED ON THIS TIME SHEET.

I CERTIFY THAT I HAVE NOT BEEN INVOLVED IN AN ACCIDENT OR INJURY WHILE WORKING ON THIS ASSIGNMENT UNLESS NOTED IN THE COMMENTS.

I CERTIFY THAT I HAVE NOT WITNESSED ANY ACCIDENTS OR INJURIES THIS WEEK UNLESS NOTED IN THE COMMENTS.

EMPLOYEE SIGNATURE  x _Tarsha Hunter_

COMMENTS:

**TOTAL HOURS FOR WEEK TO NEAREST QUARTER HOUR**
4 HOUR MINIMUM PER DAY PER EMPLOYEE

CLIENT APPROVAL/AGREEMENT
CLIENT AGREES THAT ITS UTILIZATION OF THE ABOVE-NAMED MULTI-STAFFING SERVICES EMPLOYEE HAS BEEN MADE AVAILABLE AS A RESULT OF THE TEMPORARY PERSONNEL SERVICE RENDERED BY MULTI-STAFFING SERVICES.

CLIENT CERTIFIES THAT THE ABOVE HOURS WORKED ARE CORRECT AND THAT ALL WORK WAS PERFORMED IN A SATISFACTORY MANNER. CLIENT'S SIGNATURE BELOW CONSTITUTES ACCEPTANCE OF THE TERMS AND CONDITIONS IDENTIFIED ON THE REVERSE OF THIS DOCUMENT.

| CLIENT SIGNATURE | TITLE |
|---|---|

CLIENT COMPANY NAME  MOBIS ALABAMA LLC
SUPERVISOR'S NAME  MOSANG HWANG

**MULTI-STAFFING SERVICES**
P.O. BOX 160343
MOBILE, AL 36616-2343

Chattanooga FAX (423) 854-1104
Montgomery FAX (334) 271-2918
Gulfport FAX (228) 396-0092
Hattiesburg FAX (601) 544-0775

**DO NOT WRITE BELOW THIS LINE FOR ACCOUNTING USE ONLY**

| TOTAL HOURS | PAY RATE | O.T. HOURS | BILLING HOURS | BILLING RATE |
|---|---|---|---|---|

HOME OFFICE COPY - WHITE    LEAVE W/CLIENT - CANARY    EMPLOYEE COPY - PINK

TOTAL P.001

mobi

APR-13-2006  16:43     MOBIS ALABAMA LLC                    334 387 4900     P.001/001

PLEASE CALL YOUR SERVICE REPRESENTATIVE AS SOON AS YOUR ASSIGNMENT ENDS.

# MULTI-STAFFING SERVICES     EMPLOYEE TIME SHEET

| WEEK ENDING | SOCIAL SECURITY NUMBER | EMP. # | EMPLOYEE LAST NAME | FIRST | MIDDLE |
|---|---|---|---|---|---|
| 4/16/06 | 421 21 1972 | | Hunter | Tarsha | Nickol |

| | DATE | TIME STARTED | TIME FINISHED | LESS LUNCH | HOURS WORKED | |
|---|---|---|---|---|---|---|
| MON | 4/10 | 12:00 | 5:00 | | 5.00 | EMPLOYEES WORKING AT MORE THAN ONE COMPANY DURING THE WEEK (MONDAY - SUNDAY) MAY NOT EXCEED 40 HOURS EXCEPT WITH MULTI-STAFFING SERVICES PERMISSION. ARE YOU RETURNING ☐ Yes ☐ No |
| TUE | 4/11 | 8:00 | 5:00 | hr | 8.00 | I UNDERSTAND THAT I AM TO CONTACT THE MULTI-STAFFING SERVICES OFFICE AFTER COMPLETING THIS ASSIGNMENT, AND IF I DO NOT DO SO, MULTI-STAFFING SERVICES MAY ASSUME THAT I AM NOT THEN AVAILABLE FOR WORK. I CERTIFY THAT I HAVE WORKED THE HOURS LISTED ON THIS TIME SHEET. |
| WED | 4/12 | Out Sick | | | | |
| THU | 4/13 | 8:00 | 5:00 | hr | 8.00 | I CERTIFY THAT I HAVE NOT BEEN INVOLVED IN AN ACCIDENT OR INJURY WHILE WORKING ON THIS ASSIGNMENT UNLESS NOTED IN THE COMMENTS. |
| FRI | 4/14 | Holiday | | | | I CERTIFY THAT I HAVE NOT WITNESSED ANY ACCIDENTS OR INJURIES THIS WEEK UNLESS NOTED IN THE COMMENTS. |
| SAT | 4/15 | | | | | EMPLOYEE SIGNATURE X Tarsha Hunter |
| SUN | 4/16 | | | | | COMMENTS: |

| TOTAL HOURS FOR WEEK. TO NEAREST QUARTER HOUR 4 HOUR MINIMUM PER DAY PER EMPLOYEE | 21.00 |
|---|---|

CLIENT APPROVAL/AGREEMENT
CLIENT AGREES THAT ITS UTILIZATION OF THE ABOVE NAMED MULTI-STAFFING SERVICES EMPLOYEE HAS BEEN MADE AVAILABLE AS A RESULT OF THE TEMPORARY PERSONNEL SERVICE RENDERED BY MULTI-STAFFING SERVICES.

CLIENT CERTIFIES THAT THE ABOVE HOURS WORKED ARE CORRECT AND THAT ALL WORK WAS PERFORMED IN A SATISFACTORY MANNER. CLIENT'S SIGNATURE BELOW CONSTITUTES ACCEPTANCE OF THE TERMS AND CONDITIONS IDENTIFIED ON THE REVERSE OF THIS DOCUMENT.

CLIENT COMPANY NAME:
Mobis Alabama, LLC.

SUPERVISOR'S NAME:
Ho Sang Hwang

| CLIENT SIGNATURE | | | TITLE | | |
|---|---|---|---|---|---|
| X | | | CFO | | |

MULTI-STAFFING SERVICES
P.O. BOX 160543
MOBILE, AL  36616-2343
FAX (251) 343-8915

Chattanooga
FAX (423) 954-1104

Montgomery
FAX (334) 271-3515

Auburn
FAX (228) 896-0052

Hattiesburg
FAX (601) 544-0775

DO NOT WRITE BELOW THIS LINE FOR ACCOUNTING USE ONLY

| TOTAL HOURS | PAY RATE | O.T. HOURS | BILLING HOURS | BILLING RATE |
|---|---|---|---|---|
| | | | | |

HOME OFFICE COPY - WHITE     LEAVE W/CLIENT - CANARY     EMPLOYEE COPY - PINK

TOTAL P.001

03/06/2006  05:08    2713615              MULTI STAFFING              PAGE  01

PLEASE CALL YOUR SERVICE REPRESENTATIVE AS SOON AS YOUR ASSIGNMENT ENDS.

# MULTI-STAFFING SERVICES          EMPLOYEE TIME SHEET

| WEEK ENDING | SOCIAL SECURITY NUMBER | | | EMP. # | EMPLOYEE LAST NAME | FIRST | MIDDLE |
|---|---|---|---|---|---|---|---|
| 4/23/06 | 421 21 19223 | | | | Hunter | Tarsha | Nickol |

EMPLOYEES WORKING AT MORE THAN ONE COMPANY DURING THE WEEK (MONDAY - SUNDAY) MAY NOT EXCEED 40 HOURS EXCEPT WITH MULTI-STAFFING SERVICES PERMISSION. ARE YOU RETURNING  ☐ Yes  ☐ No

| | DATE | TIME STARTED | TIME FINISHED | LESS LUNCH | HOURS WORKED |
|---|---|---|---|---|---|
| MON | 4/17 | 7:50 | 5:00 | 30 min | 8.40 |
| TUE | 4/18 | 8:15 | 5:00 | 1 hr. | 7.45 |
| WED | 4/19 | 7:50 | 5:00 | | 9.10 |
| THU | 4/20 | 8:00 | 5:00 | 1 hr. | 8.00 |
| FRI | 4/21 | 8:05 | 5:00 | 1 hr. | 7.55 |
| SAT | 4/22 | | | | |
| SUN | 4/23 | | | | |

I UNDERSTAND THAT I AM TO CONTACT THE MULTI-STAFFING SERVICES OFFICE AFTER COMPLETING THIS ASSIGNMENT, AND IF I DO NOT DO SO, MULTI-STAFFING SERVICES MAY ASSUME THAT I AM NOT THEN AVAILABLE FOR WORK.
I CERTIFY THAT I HAVE WORKED THE HOURS LISTED ON THIS TIME SHEET.

I CERTIFY THAT I HAVE NOT BEEN INVOLVED IN AN ACCIDENT OR INJURY WHILE WORKING ON THIS ASSIGNMENT UNLESS NOTED IN THE COMMENTS.

I CERTIFY THAT I HAVE NOT WITNESSED ANY ACCIDENTS OR INJURIES THIS WEEK UNLESS NOTED IN THE COMMENTS.

EMPLOYEE SIGNATURE X _Tarsha Hunter_

COMMENTS:

| TOTAL HOURS FOR WEEK TO NEAREST QUARTER HOUR 4 HOUR MINIMUM PER DAY PER EMPLOYEE | 40.50 |
|---|---|

**CLIENT APPROVAL/AGREEMENT**
CLIENT AGREES THAT ITS UTILIZATION OF THE ABOVE-NAMED MULTI-STAFFING SERVICES EMPLOYEE HAS BEEN MADE AVAILABLE AS A RESULT OF THE TEMPORARY PERSONNEL SERVICE RENDERED BY MULTI-STAFFING SERVICES.

CLIENT CERTIFIES THAT THE ABOVE HOURS WORKED ARE CORRECT AND THAT ALL WORK WAS PERFORMED IN A SATISFACTORY MANNER. CLIENT'S SIGNATURE BELOW CONSTITUTES ACCEPTANCE OF THE TERMS AND CONDITIONS IDENTIFIED ON THE REVERSE OF THIS DOCUMENT.

CLIENT COMPANY NAME:
Mobis Alabama, LLC.

SUPERVISOR'S NAME:
HO Song Hwang

CLIENT SIGNATURE          TITLE
X _____ Asst Mgr

MULTI-STAFFING SERVICES
P.O. BOX 160343
MOBILE, AL 36616-2343
FAX (251) 343-3915

Chattanooga FAX (423) 954-1134
Montgomery FAX (334) 271-3815
Gulfport FAX (228) 896-0092
Hattiesburg FAX (501) 544-0775

DO NOT WRITE BELOW THIS LINE
FOR ACCOUNTING USE ONLY

| TOTAL HOURS | PAY RATE | O.T. HOURS | BILLING HOURS | BILLING RATE |
|---|---|---|---|---|
| | | | | |

HOME OFFICE COPY - WHITE      LEAVE W/CLIENT - CANARY      EMPLOYEE COPY - PINK

Mobi

MAR-28-2008 10:08    MOBIS                                    P.009

MAY-01-2006 10:57    MOBIS ALABAMA LLC              334 397 4900    P.001/001

PLEASE CALL YOUR SERVICE REPRESENTATIVE AS SOON AS YOUR ASSIGNMENT ENDS.

# MULTI-STAFFING SERVICES   EMPLOYEE TIME SHEET

| WEEK ENDING | SOCIAL SECURITY NUMBER | EMP. # | EMPLOYEE LAST NAME, | FIRST | MIDDLE |
|---|---|---|---|---|---|
| 4 30 06 | 421 121 1922 | | Hunter | Torsha | Nickol |

| | DATE | TIME STARTED | TIME FINISHED | LESS LUNCH | HOURS WORKED |
|---|---|---|---|---|---|
| MON | 4 24 | 8:00 | 5:00 | 1 hc. | 8.00 |
| TUE | 4 25 | 7:50 | 12:00 | Ø | 4.10 |
| WED | 4 26 | 8:00 | 5:15 | Ø | 9.15 |
| THU | 4 27 | 8:00 | 5:00 | Ø | 9.00 |
| FRI | 4 28 | 9:00 | 11:30 | Ø | 2.30 |
| SAT | 4 29 | | | | |
| SUN | 4 30 | | | | |

EMPLOYEES WORKING AT MORE THAN ONE COMPANY DURING THE WEEK (MONDAY - SUNDAY) MAY NOT EXCEED 40 HOURS EXCEPT WITH MULTI-STAFFING SERVICES PERMISSION. ARE YOU RETURNING ☐ Yes ☐ No

I UNDERSTAND THAT I AM TO CONTACT THE MULTI-STAFFING SERVICES OFFICE AFTER COMPLETING THIS ASSIGNMENT, AND IF I DO NOT DO SO, MULTI-STAFFING SERVICES MAY ASSUME THAT I AM NOT THEN AVAILABLE FOR WORK.

I CERTIFY THAT I HAVE WORKED THE HOURS LISTED ON THIS TIME SHEET.

I CERTIFY THAT I HAVE NOT BEEN INVOLVED IN AN ACCIDENT OR INJURY WHILE WORKING ON THIS ASSIGNMENT UNLESS NOTED IN THE COMMENTS.

I CERTIFY THAT I HAVE NOT WITNESSED ANY ACCIDENTS OR INJURIES THIS WEEK UNLESS NOTED IN THE COMMENTS.

EMPLOYEE SIGNATURE X *Torsha Hunter*

| TOTAL HOURS FOR WEEK TO NEAREST QUARTER HOUR 4 HOUR MINIMUM PER DAY PER EMPLOYEE | 32.55 |
|---|---|

COMMENTS: *Family Emergency / Death in the family.*

CLIENT APPROVAL AGREEMENT
CLIENT AGREES THAT ITS UTILIZATION OF THE ABOVE-NAMED MULTI-STAFFING SERVICES EMPLOYEE HAS BEEN MADE AVAILABLE AS A RESULT OF THE TEMPORARY PERSONNEL SERVICE RENDERED BY MULTI-STAFFING SERVICES.

CLIENT CERTIFIES THAT THE ABOVE HOURS WORKED ARE CORRECT AND THAT ALL WORK WAS PERFORMED IN A SATISFACTORY MANNER. CLIENTS SIGNATURE BELOW CONSTITUTES ACCEPTANCE OF THE TERMS AND CONDITIONS IDENTIFIED ON THE REVERSE OF THIS DOCUMENT.

CLIENT COMPANY NAME
*Mobis Alabama, LLC.*

SUPERVISOR'S NAME
*Ho Sang Hwang*

CLIENT SIGNATURE
X

MULTI-STAFFING SERVICES
P.O. BOX 160343
MOBILE, AL 36616-2343
FAX (251) 343-3915

Chattanooga FAX (423) 899-7104
Montgomery FAX (334)271-3815

Nashville FAX (228)896-0032
Hattiesburg FAX (601)544-0775

DO NOT WRITE BELOW THIS LINE FOR ACCOUNTING USE ONLY

| TOTAL HOURS | PAY RATE | O.T. HOURS | BILLING HOURS | BILLING RATE |
|---|---|---|---|---|

HOME OFFICE COPY - WHITE      LEAVE W/CLIENT - CANARY      EMPLOYEE COPY - PINK

TOTAL P.001    mobis

MAR-28-2008  10:08     MOBIS                               334 271 3815          P.010
AUG 08 2007 9:00AM     MULTI STAFFING SERVICES             334 271 3815          P.9

MAY-05-2008  16:18     MOBIS ALABAMA LLC                   334 387 4900          P.001/001

PLEASE CALL YOUR SERVICE REPRESENTATIVE AS SOON AS YOUR ASSIGNMENT ENDS.

# MULTI-STAFFING SERVICES     EMPLOYEE TIME SHEET

| WEEK ENDING | SOCIAL SECURITY NUMBER | | EMP. # | EMPLOYEE LAST NAME | FIRST | MIDDLE |
|---|---|---|---|---|---|---|
| 05/7/06 | 421 | 121 19223 | | Hunter | Tarsha | Nickol |

| | DATE | TIME STARTED | TIME FINISHED | LESS LUNCH | HOURS WORKED |
|---|---|---|---|---|---|
| MON | 5/1 | 8:00 | 5:00 | 0 | 9.00 |
| TUE | 5/2 | 8:00 | 5:10 | 1hr | 8.10 |
| WED | 5/3 | 8:15 | 5:15 | 1hr | 8.00 |
| THU | 5/4 | 8:00 | 5:15 | 1hr | 8.15 |
| FRI | 5/6 | 8:00 | 5:00 | 1hr. | 8.00 |
| SAT | 5/7 | | | | |
| SUN | 5/8 | | | | |

EMPLOYEES WORKING AT MORE THAN ONE COMPANY DURING THE WEEK (MONDAY - SUNDAY) MAY NOT EXCEED 40 HOURS EXCEPT WITH MULTI-STAFFING SERVICES PERMISSION. ARE YOU RETURNING  ☐ Yes  ☐ No

I UNDERSTAND THAT I AM TO CONTACT THE MULTI-STAFFING SERVICES OFFICE AFTER COMPLETING THIS ASSIGNMENT, AND IF I DO NOT DO SO, MULTI-STAFFING SERVICES MAY ASSUME THAT I AM NOT THEN AVAILABLE FOR WORK.
I CERTIFY THAT I HAVE WORKED THE HOURS LISTED ON THIS TIME SHEET.

I CERTIFY THAT I HAVE NOT BEEN INVOLVED IN AN ACCIDENT OR INJURY WHILE WORKING ON THIS ASSIGNMENT UNLESS NOTED IN THE COMMENTS.

I CERTIFY THAT I HAVE NOT WITNESSED ANY ACCIDENTS OR INJURIES THIS WEEK UNLESS NOTED IN THE COMMENTS.

EMPLOYEE SIGNATURE  *Tarsha Hunter*

COMMENTS:

| TOTAL HOURS FOR WEEK TO NEAREST QUARTER HOUR 4 HOUR MINIMUM PER DAY PER EMPLOYEE | |
|---|---|

CLIENT APPROVAL/AGREEMENT
CLIENT AGREES THAT ITS UTILIZATION OF THE ABOVE-NAMED MULTI-STAFFING SERVICES EMPLOYEE HAS BEEN MADE AVAILABLE AS A RESULT OF THE TEMPORARY PERSONNEL SERVICE RENDERED BY MULTI-STAFFING SERVICES.

CLIENT CERTIFIES THAT THE ABOVE HOURS WORKED ARE CORRECT AND THAT ALL WORK WAS PERFORMED IN A SATISFACTORY MANNER. CLIENT'S SIGNATURE BELOW CONSTITUTES ACCEPTANCE OF THE TERMS AND CONDITIONS IDENTIFIED ON THE REVERSE OF THIS DOCUMENT.

CLIENT COMPANY NAME  *Mobis Alabama, LLC*
SUPERVISOR'S NAME  *Jay Rice*

| CLIENT SIGNATURE | | TITLE |
|---|---|---|
| X | | |

MULTI-STAFFING SERVICES
*Chattanooga* FAX (423) 894-1104
P.O. BOX 160343
MOBILE, AL  36616-2343
FAX (251) 342-3915
*Gulfport* FAX (228) 896-0092
*Montgomery* FAX (334)271-3615
*Hattiesburg* FAX (601)544-0775

HOME OFFICE COPY - WHITE     LEAVE W/CLIENT - CANARY     EMPLOYEE COPY - PINK

| DO NOT WRITE BELOW THIS LINE FOR ACCOUNTING USE ONLY | | | | |
|---|---|---|---|---|
| TOTAL HOURS | PAY RATE | O.T. HOURS | BILLING HOURS | BILLING RATE |
| | | | | |

TOTAL P.001
mobis

MAR-28-2008  10:09      MOBIS                        334 271 3815      P.011

MAY-15-2006  10:05      MOBIS ALABAMA LLC                    334 387 4900  P.001/001

**PLEASE CALL YOUR SERVICE REPRESENTATIVE AS SOON AS YOUR ASSIGNMENT ENDS.**

# MULTI-STAFFING SERVICES    EMPLOYEE TIME SHEET

| WEEK ENDING | SOCIAL SECURITY NUMBER | | EMP. # | EMPLOYEE LAST NAME | FIRST | MIDDLE |
|---|---|---|---|---|---|---|
| 5/14/06 | 421 21 19223 | | | HUNTER | TARSHA | Nickol |

| | DATE | TIME STARTED | TIME FINISHED | LESS LUNCH | HOURS WORKED | |
|---|---|---|---|---|---|---|
| MON | Out | Sick | — | | | EMPLOYEES WORKING AT MORE THAN ONE COMPANY DURING THE WEEK (MONDAY - SUNDAY) MAY NOT EXCEED 40 HOURS EXCEPT WITH MULTI-STAFFING SERVICES PERMISSION. ARE YOU RETURNING ☐ Yes ☐ No |
| TUE | 5/9 | 8:00 | 5:15 | 1 hr | 8.15 | I UNDERSTAND THAT I AM TO CONTACT THE MULTI-STAFFING SERVICES OFFICE AFTER COMPLETING THIS ASSIGNMENT, AND IF I DO NOT DO SO, MULTI-STAFFING SERVICES MAY ASSUME THAT I AM NOT THEN AVAILABLE FOR WORK. I CERTIFY THAT I HAVE WORKED THE HOURS LISTED ON THIS TIME SHEET. |
| WED | 5/10 | 8:00 | 5:00 | 1 hr | 8.00 | I CERTIFY THAT I HAVE NOT BEEN INVOLVED IN AN ACCIDENT OR INJURY WHILE WORKING ON THIS ASSIGNMENT UNLESS NOTED IN THE COMMENTS. |
| THU | 5/11 | 8:00 | 5:00 | 1 hr | 8.00 | I CERTIFY THAT I HAVE NOT WITNESSED ANY ACCIDENTS OR INJURIES THIS WEEK UNLESS NOTED IN THE COMMENTS. |
| FRI | 5/12 | 8:00 | 5:00 | 1 hr | 8:00 | EMPLOYEE SIGNATURE X *Tarsha Hunter* |
| SAT | | | | | | |
| SUN | | | | | | COMMENTS: |

**TOTAL HOURS FOR WEEK**
TO NEAREST QUARTER HOUR
1 HOUR MINIMUM PER DAY PER EMPLOYEE

**CLIENT APPROVAL/AGREEMENT**
CLIENT AGREES THAT ITS UTILIZATION OF THE ABOVE NAMED MULTI-STAFFING SERVICES EMPLOYEE HAS BEEN MADE AVAILABLE AS A RESULT OF THE TEMPORARY PERSONNEL SERVICE RENDERED BY MULTI-STAFFING SERVICES.

CLIENT CERTIFIES THAT THE ABOVE HOURS WORKED ARE CORRECT AND THAT ALL WORK WAS PERFORMED IN A SATISFACTORY MANNER. CLIENT'S SIGNATURE BELOW CONSTITUTES ACCEPTANCE OF THE TERMS AND CONDITIONS IDENTIFIED ON THE REVERSE OF THIS DOCUMENT.

CLIENT SIGNATURE X *J. M. Kim*    TITLE *CFE*

CLIENT COMPANY NAME *Mobis Alabama, LLC*

SUPERVISOR'S NAME *JAY KIM*

**MULTI-STAFFING SERVICES**
P.O. BOX 160345
MOBILE, AL 36616-2343
FAX (251) 343-3815

*Chickasaw* FAX (423) 824-1104    *Gulfport* FAX (228)896-0002
*Montgomery* FAX (334)271-3815    *Hattiesburg* FAX (601)544-0775

| DO NOT WRITE BELOW THIS LINE FOR ACCOUNTING USE ONLY | | | | |
|---|---|---|---|---|
| TOTAL HOURS | PAY RATE | O.T. HOURS | BILLING HOURS | BILLING RATE |

HOME OFFICE COPY - WHITE    LEAVE W/CLIENT - CANARY    EMPLOYEE COPY - PINK

TOTAL P.001

*Mobis*

MAY-19-2006  16:38    MOBIS ALABAMA LLC    334 387 4900    P.001/001

PLEASE CALL YOUR SERVICE REPRESENTATIVE AS SOON AS YOUR ASSIGNMENT ENDS.

# MULTI-STAFFING SERVICES    EMPLOYEE TIME SHEET

| WEEK ENDING | SOCIAL SECURITY NUMBER | | EMP. # | EMPLOYEE LAST NAME | FIRST | MIDDLE |
|---|---|---|---|---|---|---|
| 5|21|06 | 421 1 21 19223 | | | Hunter | Tarsha | Nickol |

| | DATE | TIME STARTED | TIME FINISHED | LESS LUNCH | HOURS WORKED |
|---|---|---|---|---|---|
| MON | 5/15 | 8:00 | 5:05 | 1hr. | 8.05 |
| TUE | 5/16 | 8:06 | 5:06 | 1hr. | 8.00 |
| WED | 5/17 | 8.10 | 5:08 | 1hr. | 7.58 |
| THU | 5/18 | 8:00 | 5:08 | 1hr. | 8.08 |
| FRI | 5/19 | 8:00 | 5:00 | 1hr. | 8.00 |
| SAT | 5/20 | | | | |
| SUN | 5/21 | | | | |

EMPLOYEES WORKING AT MORE THAN ONE COMPANY DURING THE WEEK (MONDAY - SUNDAY) MAY NOT EXCEED 40 HOURS EXCEPT WITH MULTI-STAFFING SERVICES PERMISSION. ARE YOU RETURNING ☐ Yes ☐ No

I UNDERSTAND THAT I AM TO CONTACT THE MULTI-STAFFING SERVICES OFFICE AFTER COMPLETING THIS ASSIGNMENT, AND IF I DO NOT DO SO, MULTI-STAFFING SERVICES MAY ASSUME THAT I AM NOT THEN AVAILABLE FOR WORK. I CERTIFY THAT I HAVE WORKED THE HOURS LISTED ON THIS TIME SHEET.

I CERTIFY THAT I HAVE NOT BEEN INVOLVED IN AN ACCIDENT OR INJURY WHILE WORKING ON THIS ASSIGNMENT UNLESS NOTED IN THE COMMENTS.

I CERTIFY THAT I HAVE NOT WITNESSED ANY ACCIDENTS OR INJURIES THIS WEEK UNLESS NOTED IN THE COMMENTS.

EMPLOYEE SIGNATURE x _Tarsha Hunter_

COMMENTS: _Wednesday 5/17 Car Problems._

**TOTAL HOURS FOR WEEK TO NEAREST QUARTER HOUR** 4 HOUR MINIMUM PER DAY PER EMPLOYEE — 39.71

CLIENT APPROVAL/AGREEMENT
CLIENT AGREES THAT ITS UTILIZATION OF THE ABOVE NAMED MULTI-STAFFING SERVICES EMPLOYEE HAS BEEN MADE AVAILABLE AS A RESULT OF THE TEMPORARY PERSONNEL SERVICE RENDERED BY MULTI-STAFFING SERVICES.

CLIENT CERTIFIES THAT THE ABOVE HOURS WORKED ARE CORRECT AND THAT ALL WORK WAS PERFORMED IN A SATISFACTORY MANNER. CLIENT'S SIGNATURE BELOW CONSTITUTES ACCEPTANCE OF THE TERMS AND CONDITIONS IDENTIFIED ON THE REVERSE OF THIS DOCUMENT.

CLIENT SIGNATURE
x _____    TITLE _Fis_

CLIENT COMPANY NAME _Mobis Alabama_
SUPERVISOR'S NAME _Snehka_

DO NOT WRITE BELOW THIS LINE
FOR ACCOUNTING USE ONLY

| TOTAL HOURS | PAY RATE | O.T. HOURS | BILLING HOURS | BILLING RATE |
|---|---|---|---|---|
| | | | | |

MULTI-STAFFING SERVICES
P.O. BOX 160343
MOBILE, AL 38616-2243
Chattanooga FAX (423) 954-1164    FAX (251) 343-3915    Gulfport FAX (228)488-0592    Hattiesburg FAX (601)544-4775
Montgomery FAX (334)271-3616

HOME OFFICE COPY - WHITE    LEAVE W/CLIENT - CANARY    EMPLOYEE COPY - PINK

TOTAL P.001
mobis

MAY-26-2006  15:58    MOBIS ALABAMA LLC    334 387 6900    P.001/001

PLEASE CALL YOUR SERVICE REPRESENTATIVE AS SOON AS YOUR ASSIGNMENT ENDS.

# MULTI-STAFFING SERVICES    EMPLOYEE TIME SHEET

| WEEK ENDING | SOCIAL SECURITY NUMBER | | | EMP. # | EMPLOYEE LAST NAME | FIRST | MIDDLE |
|---|---|---|---|---|---|---|---|
| 5/28/06 | 421-121-19223 | | | | HUNTER | TARSHA | N |

| | DATE | TIME STARTED | TIME FINISHED | LESS LUNCH | HOURS WORKED | |
|---|---|---|---|---|---|---|
| MON | 5/22 | 7:55 | 5:05 | 30 min | 8.40 | EMPLOYEES WORKING AT MORE THAN ONE COMPANY DURING THE WEEK (MONDAY - SUNDAY) MAY NOT EXCEED 40 HOURS EXCEPT WITH MULTI-STAFFING SERVICES PERMISSION. ARE YOU RETURNING ☐ Yes ☐ No |
| TUE | 5/23 | 7:08 | 5:06 | 1 hr. | 8.08 | I UNDERSTAND THAT I AM TO CONTACT THE MULTI-STAFFING SERVICES OFFICE AFTER COMPLETING THIS ASSIGNMENT, AND IF I DO NOT DO SO, MULTI-STAFFING SERVICES MAY ASSUME THAT I AM NOT THEN AVAILABLE FOR WORK. I CERTIFY THAT I HAVE WORKED THE HOURS LISTED ON THIS TIME SHEET. |
| WED | 5/24 | 8:00 | 5:00 | 30 min | 8.30 | I CERTIFY THAT I HAVE NOT BEEN INVOLVED IN AN ACCIDENT OR INJURY WHILE WORKING ON THIS ASSIGNMENT UNLESS NOTED IN THE COMMENTS. |
| THU | 5/25 | 8:00 | 5:00 | 1 hr. | 8:00 | I CERTIFY THAT I HAVE NOT WITNESSED ANY ACCIDENTS OR INJURIES THIS WEEK UNLESS NOTED IN THE COMMENTS. |
| FRI | 5/26 | 8:02 | 5:00 | 1 hr. | 7:58 | EMPLOYEE SIGNATURE x *Tarsha Hunter* |
| SAT | 5/27 | | | | | |
| SUN | 5/28 | | | | | COMMENTS: |

| TOTAL HOURS FOR WEEK TO NEAREST QUARTER HOUR 4 HOUR MINIMUM PER DAY PER EMPLOYEE | 40.36 |
|---|---|

CLIENT APPROVAL/AGREEMENT
CLIENT AGREES THAT ITS UTILIZATION OF THE ABOVE-NAMED MULTI-STAFFING SERVICES EMPLOYEE HAS BEEN MADE AVAILABLE AS A RESULT OF THE TEMPORARY PERSONNEL SERVICE RENDERED BY MULTI-STAFFING SERVICES.

CLIENT CERTIFIES THAT THE ABOVE HOURS WORKED ARE CORRECT AND THAT ALL WORK WAS PERFORMED IN A SATISFACTORY MANNER. CLIENT'S SIGNATURE BELOW CONSTITUTES ACCEPTANCE OF THE TERMS AND CONDITIONS IDENTIFIED ON THE REVERSE OF THIS DOCUMENT.

CLIENT COMPANY NAME *Mobis (Alabama) LLC*
SUPERVISOR'S NAME *Jay Kim*

CLIENT SIGNATURE x _____  TITLE ____

MULTI-STAFFING SERVICES
P.O. BOX 150343
MOBILE, AL 36618-2343
FAX (251) 343-3815

Challenge FAX (423) 894-1184
Montgomery FAX (334)271-3815
Gulfport FAX (228)896-0082
Hattiesburg FAX (601)544-0775

| DO NOT WRITE BELOW THIS LINE FOR ACCOUNTING USE ONLY | | | | |
|---|---|---|---|---|
| TOTAL HOURS | PAY RATE | O.T. HOURS | BILLING HOURS | BILLING RATE |

HOME OFFICE COPY - WHITE    LEAVE W/CLIENT - CANARY    EMPLOYEE COPY - PINK

TOTAL P.001
40.36

MAR-28-2008 10:10     MOBIS     P.014

JUN-02-2006 15:19     MOBIS ALABAMA LLC     334 387 4900     P.001/001

PLEASE CALL YOUR SERVICE REPRESENTATIVE AS SOON AS YOUR ASSIGNMENT ENDS.

# MULTI-STAFFING SERVICES     EMPLOYEE TIME SHEET

| WEEK ENDING | SOCIAL SECURITY NUMBER | EMP. # | EMPLOYEE LAST NAME | FIRST | MIDDLE |
|---|---|---|---|---|---|
| 06/04/06 | 421 121 9223 | | Hunter | Tarsha | Nicke |

| | DATE | TIME STARTED | TIME FINISHED | LESS LUNCH | HOURS WORKED |
|---|---|---|---|---|---|
| MON | 5/29 | Holiday | | | |
| TUE | 5/30 | 8:03 | 5:00 | 1 hr. | 7:57 |
| WED | 5/31 | 8:00 | 5:15 | 1 hr. | 8.15 |
| THU | 6/1 | 8:00 | 5:15 | 1 hr. | 8.15 |
| FRI | 6/2 | 7:55 | 5:00 | 1 hr. | 8.00 |
| SAT | 6/3 | | | | |
| SUN | 6/4 | | | | |

TOTAL HOURS FOR WEEK
TO NEAREST QUARTER HOUR
4 HOUR MINIMUM PER DAY PER EMPLOYEE     **31.87**

EMPLOYEES WORKING AT MORE THAN ONE COMPANY DURING THE WEEK (MONDAY - SUNDAY) MAY NOT EXCEED 40 HOURS EXCEPT WITH MULTI-STAFFING SERVICES PERMISSION. ARE YOU RETURNING  ☑ Yes  ☐ No

I UNDERSTAND THAT I AM TO CONTACT THE MULTI-STAFFING SERVICES OFFICE AFTER COMPLETING THIS ASSIGNMENT, AND IF I DO NOT DO SO MULTI-STAFFING SERVICES MAY ASSUME THAT I AM NOT THEN AVAILABLE FOR WORK.
I CERTIFY THAT I HAVE WORKED THE HOURS LISTED ON THIS TIME SHEET.

I CERTIFY THAT I HAVE NOT BEEN INVOLVED IN AN ACCIDENT OR INJURY WHILE WORKING ON THIS ASSIGNMENT UNLESS NOTED IN THE COMMENTS.

I CERTIFY THAT I HAVE NOT WITNESSED AN ACCIDENT OR INJURIES THIS WEEK UNLESS NOTED IN THE COMMENTS.

EMPLOYEE SIGNATURE X _Tarsha Hunter_

COMMENTS: _____

CLIENT APPROVAL/AGREEMENT
CLIENT AGREES THAT ITS UTILIZATION OF THE ABOVE NAMED MULTI-STAFFING SERVICES EMPLOYEE HAS BEEN MADE AVAILABLE AS A RESULT OF THE TEMPORARY PERSONNEL SERVICE RENDERED BY MULTI-STAFFING SERVICES.

CLIENT CERTIFIES THAT THE ABOVE HOURS WORKED ARE CORRECT AND THAT ALL WORK WAS PERFORMED IN A SATISFACTORY MANNER. CLIENT'S SIGNATURE BELOW CONSTITUTES ACCEPTANCE OF THE TERMS AND CONDITIONS IDENTIFIED ON THE REVERSE OF THIS DOCUMENT.

| CLIENT SIGNATURE | TITLE |
|---|---|
| X _J. B. Ku_ | CFO |

CLIENT COMPANY NAME
_Mobis Alabama, LLC_

SUPERVISOR'S NAME
_Jay Kim_

DO NOT WRITE BELOW THIS LINE
FOR ACCOUNTING USE ONLY

| TOTAL HOURS | PAY RATE | O.T. HOURS | BILLING HOURS | BILLING RATE |
|---|---|---|---|---|
| | | | | |

MULTI-STAFFING SERVICES
P.O. BOX 160343
MOBILE, AL 36616-2343
FAX (251) 343-3915

Chattahoochee
FAX (423) 894-4104

Rinton
FAX (228)988-0092

Montgomery
FAX (334)271-3915

Hattiesburg
FAX (601)544-0775

HOME OFFICE COPY - WHITE     LEAVE W/CLIENT - CANARY     EMPLOYEE COPY - PINK

# EXHIBIT 3
# TRACY RIEDLER
# AFFIDAVIT



# MOBIS Alabama, LLC

## ORIENTATION (PROBATIONARY) PERIOD
## POLICY AND PROCEDURES

1.    **PURPOSE**

1.1    It is our policy at MOBIS Alabama, LLC (MOBIS), to help all new Team Members feel a part of our company as quickly as possible and to help them learn more about MOBIS and what we expect from them as a member of our organization. If at any point during the first 90 days of employment, it becomes obvious that continued employment is pointless, the supervisor should recommend termination proceedings. Due to Alabama being an "employment at will" State, an employer can terminate with or without cause at any time. Ninety (90) days is an acceptable amount of time to be able to fairly evaluate a person's performance.

2.    **POLICY**

2.1    The first ninety (90) days of employment are considered an orientation period. This is a critical period in a Team Member's development and success with MOBIS. The orientation period is a trial period during which the supervisor will determine whether the Team Member has proved that he or she can handle their job satisfactorily.

2.2    There is no reason for the supervisor to endure 90 days of unsatisfactory progress on a new hire. At any point during the 90 days, if it becomes obvious that continued employment is pointless, the supervisor should recommend termination proceedings.

2.3    Before the end of the Team Member's orientation period, the HR Department will send the supervisor a Performance Review Sheet, on which the supervisor will indicate the Team Member status.

2.4    During this orientation period, any Team Member's who have three (3) absenteeism occurrences will be terminated. The occurrences can include a tardy, early out, and/or an all day absence. (03/21/05)

Effective Date:    07/20/04, 01/04/05, 03/21/05, 04/24/06
Revision Number:  1, 2, 3, 4
Policy:                Orientation (Probationary) Period



# MOBIS Alabama, LLC

## ORIENTATION (PROBATIONARY) PERIOD
## POLICY AND PROCEDURES

3.  **PROCEDURE**

   3.1   The Supervisor must complete the Performance Review Sheet and return it to the HR Department prior to the end of the 90-Day Orientation Period.

   3.2   This procedure does not alter the employment-at-will relationship. A Team Member can terminate his or her employment at any time with or without reason, and MOBIS has the same right.

Effective Date:    07/20/04, 01/04/05, 03/21/05, 04/24/06
Revision Number: 1, 2, 3, 4
Policy:               Orientation (Probationary) Period

# EXHIBIT 4
# TRACY RIEDLER
# AFFIDAVIT



# MOBIS Alabama, LLC

### EMPLOYEE HANDBOOK ACKNOWLEDGEMENT

The employee handbook describes important information about MOBIS Alabama, LLC, and I understand that I should consult my supervisor or the Human Resources Department regarding any questions or clarifications about the handbook.

My employment with MOBIS is "at will." I may voluntarily leave employment, and may be terminated by MOBIS at any time, and for any reason permitted by law. The contents of this Handbook are not intended to establish a contract or bind the company or the employee to any enforceable relationship. Any verbal or written statements or promises to the contrary are hereby null and void and should not be relied upon by any prospective or existing employees.

Since the information, policies, rules and benefits described here are necessarily subject to change, I understand that revisions to the handbook may occur. All such changes will be communicated through official notices, and I understand that revised information may supersede, modify, or eliminate existing policies. Only the Senior Manager of Human Resources has the right to adopt any revisions to the policies in this handbook.

Furthermore, I acknowledge that this handbook is neither a contract of employment nor a legal document. I have received the handbook, and I understand that it is my responsibility to read and comply with the policies contained in this handbook and any revisions made to it. A copy of this ACKNOWLEDGEMENT FORM will be placed in my personnel file.

Also, I acknowledge that this handbook is the property of MOBIS and that the handbook must be returned upon my termination.

Your signature below indicates that you have agreed to abide by MOBIS' Policies and Procedures.

Employee Name (Please Print)    _Tarsha Nickol Hunter_

Employee Signature    _Tarsha N. Hunter_

SSN    _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_

Date    _June 5, 2006_

Effective Date:    10/04/04
Revision Number:    1
Policy:    Employee Handbook Acknowledgement

HUNTER V. MOBIS
00138

# EXHIBIT

# C

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

TARSHA NICKOL HUNTER,       )
                            )
    Plaintiff,              )
                            )       Civil Action No.: 2:07-CV-427-WHA
vs.                         )
                            )
MOBIS ALABAMA, LLC,         )
                            )
    Defendant.              )

## AFFIDAVIT OF JAEKWANG (JAY) KIM

STAT E OF ALABAMA    )

COUNTY OF ELMORE    )

**BEFORE ME**, the undersigned authority, personally appeared Jaekwang (Jay) Kim who, after being first duly sworn, states as follows:

My name is Jaekwang (Jay) Kim. I am over the age of eighteen (18) years and have first-hand knowledge of the contents of this affidavit. I reside in Montgomery, Alabama, with my wife and two (2) children. I am a native of Korea.

1.    I have been employed by MOBIS Alabama, LLC ("MOBIS") as its Chief Financial Officer ("CFO") since February 10, 2003. My duties as MOBIS' CFO include overall responsibility for the Accounting Department. Before that I was employed by MOBIS, or affiliates of MOBIS, in Korea, for a total of twenty (20) years.

2.    Before moving from Korea to Alabama, I received training on anti-discrimination laws in the United States, including discrimination on the basis of sex and pregnancy. I have worked very hard to succeed at MOBIS and I would never risk my accomplishments by engaging in discrimination. I did not discriminate against Tarsha Hunter on the basis of her sex

1

or pregnancy.

3.     Plaintiff first came to work in MOBIS' Accounting Department on March 6, 2006 as a temporary employee ("Temp").   She was assigned to MOBIS by her employer, Multi-Staffing.  While working as a Temp, Plaintiff recorded her daily arrival and departure times and submitted that information to Multi-Staffing so that she could be paid.  I did not keep records of Plaintiff's attendance while she was a Temp, but I knew that it was poor.  I have since learned from Multi-Staffing's records that she was absent, tardy or left work early seventeen (17) times in ninety (90) days.

4.     Plaintiff's title was Accounting Specialist Treasury.  Her job description is attached to Ms. Riedler's Affidavit as Exhibit "1."  Accounting is a relatively small department and at the time we had only seven (7) or eight (8) employees. It was very important for Plaintiff's duties to be completed accurately and on time.  This was particularly important at month's end when we closed out the books.  In addition, I submit daily reports to MOBIS' headquarters in Korea, so Accounting must be current at all times.

5.     Due to Plaintiff's poor attendance as a Temp, I was not willing to offer her employment with MOBIS at the end of three hundred sixty (360) hours or nine (9) weeks  which could have been done under the terms of MOBIS' agreement with Multi-Staffing.  Instead, I decided to wait and see if Plaintiff's attendance improved.

6.     Plaintiff continued to miss work during the next thirty (30) days so I did not favor hiring her, and had decided against it, but Plaintiff's supervisor Sonechka Womack, who worked as MOBIS' Assistant Manager of Treasury, wanted to hire Plaintiff.  Ms. Womack was Plaintiff's immediate supervisor and she in turn reported to me.  Ms. Womack and Plaintiff are both African American females.

2

7.    Ms. Womack felt that Plaintiff's work was good except for the attendance problems, and did not want to train another employee to perform Plaintiff's job since we had had turn over in the Accounting Department.    Ms. Womack persuaded me to offer Plaintiff probationary employment with MOBIS on the condition that Plaintiff would correct her attendance and punctuality problems.  Although my better judgment was against hiring Plaintiff as an employee of MOBIS, I agreed to do so in deference to Ms. Womack. I spoke directly with Ms. Womack and Plaintiff and told them that Plaintiff must have no more attendance problems if she was to stay employed at MOBIS.  Plaintiff assured me that she would have no more such problems.

8.    On June 5, 2006, Plaintiff became a probationary employee.  At that time, I knew that all new employees at MOBIS, including those who had worked as Temps, must serve a ninety (90) day probationary period during which MOBIS and the employee determine the employee's suitability for long term employment at MOBIS.  What I did not realize at that time was that MOBIS' policy for probationary employees required that such employees are to be terminated after three (3) attendance occurrences.  For this reason, I allowed Plaintiff to accrue more than three (3) attendance occurrences during her probationary period.

9.    After Plaintiff became a probationary employee, and I started keeping attendance records on her, I only recorded absences and significant time away from work. I did not keep track of minor tardies, which Plaintiff was prone to have.  I only kept up with absences from work for several hours.

10.    Plaintiff's attendance record as a probationary employee shows that she had two (2) absences and was away from work for three and a half (3 1/2) hours or longer on five (5) occasions for a total of seven (7) occurrences between June 15, 2006 and August 11, 2006. A

3

copy of the spreadsheet I maintained on Plaintiff's attendance is attached to this Affidavit as Exhibit "1."

11.    I now understand that Plaintiff should have been terminated on July 27, 2006 after her third attendance occurrence, but she was not terminated because I was not familiar with the number of attendance incidences allowed for probationary employees. As a result, Plaintiff remained employed one (1) month longer than she should have.

12.    I discussed Plaintiff's poor attendance with Plaintiff and with Ms. Womack on several occasions.  Several emails were generated regarding Plaintiff's attendance, which are attached to this Affidavit as composite Exhibit "2".  Ms. Womack told Plaintiff in an email dated August 14, 2006 that I had been more than reasonable about Plaintiff's attendance and that more problems would jeopardize her employment with MOBIS.  See E-mail dated August 14, 2006 at Ex. 2.

13.    In about mid-August 2006, MOBIS' Human Resources Department sent to me a "90 Day Work Performance Review Sheet" to be filled out on Plaintiff.  A copy of the Review Sheet I filled out on Tarsha Hunter is attached to this Affidavit as Exhibit "3."  The purpose of the Review Sheet is to determine whether the employee should be offered regular employment at the end of the ninety (90) day probationary period.

14.    Soon after receiving the Review Sheet, I contacted Tracy Riedler in Human Resources and told her that I did not think that I could keep Tarsha Hunter because of her poor attendance.  Ms. Riedler asked me what I meant by "poor attendance," so I gave her a copy of my attendance record on Plaintiff.  When Ms. Riedler saw that Plaintiff had more than two (2) attendance occurrences, she told me that Plaintiff had to be terminated and that I had no choice in the matter.  Ms. Riedler explained that probationary employees are not allowed to have more

4

than two (2) attendance occurrences and that Plaintiff should have been terminated on her third occurrence. She also told me that Plaintiff needed to be terminated soon and that I could not wait until the end of her probationary period which would have been in early September.

15.    This was the first time I had a full understanding of the specific requirements of the attendance policy for probationary employees. When I first started working for MOBIS, there was no specific attendance policy for probationary employees. I have learned that the policy was changed in March 2005 to require termination upon the third attendance incident. The fact that Plaintiff was pregnant at the time made no difference to me and did not influence my decision to speak with Ms. Riedler. I did not mention Plaintiff's pregnancy to Ms. Riedler, and I have no reason to believe that Mrs. Riedler was aware that Plaintiff was pregnant when she told me that she had to be terminated for attendance.

16.    Plaintiff's employment was terminated on August 25, 2006. Some time prior to that date (I believe it was the day before, or perhaps two days before), I informed Ms. Womack that Plaintiff was going to be terminated for attendance. Ms. Womack was very upset, but I told her that the rules had to be followed.

17.    On August 25, 2006, Plaintiff asked for a meeting with me and Ms. Womack, so we met with her. During the meeting, I thanked Plaintiff for her contributions to the Accounting Department and told her that her employment was being terminated due to attendance. Plaintiff became very loud, argumentative and insubordinate. She accused me of not giving her the real reason for her termination. I was concerned that the meeting was getting out of control, so I sent word for Ms. Riedler to join the meeting. Ms. Riedler joined the meeting and explained to Plaintiff the attendance policy for probationary employees and told Plaintiff that MOBIS could not offer her regular employment, and that she was terminated. Plaintiff told Ms. Riedler that

5

she was aware of the policy regarding attendance during the probationary period. She said she just didn't think that was the reason for her termination. After that, Plaintiff left the meeting.

18.    I am aware that Plaintiff contends in this lawsuit that she was terminated because she was pregnant. This is not true as I have previously explained.

19.    In early August 2006, Plaintiff brought an ultrasound picture to work, and I saw her showing it around to employees in the Accounting Department. She showed me the ultrasound picture and told me that she was pregnant. I congratulated Plaintiff on her pregnancy. I am also aware that Plaintiff alleges that I treated her differently after learning of her pregnancy. I do not think that is true because I prefer to communicate with Accounting Department employees through their supervisors rather than directly. That has always been my preference. If my behavior towards Plaintiff changed in any respect, it was not conscious on my part. I did not purposely treat Plaintiff any differently after I found out she was pregnant.

20.    I am aware that Plaintiff alleged that I said that I "can't take care of a person like [Hunter]." If I used that phrase, it had nothing to do with Plaintiff's pregnancy. That is a phrase I use to convey my expectations that my staff keep up with their responsibilities without falling behind or unnecessarily involving others. If I used that phrase with reference to Plaintiff, it meant that I did not want to work with her in Accounting and Finance because she was an unreliable employee due to her attendance problems.

21.    During my deposition, I was asked about former MOBIS employee SuJin Lee. MOBIS hired Ms. Lee in 2006 at my recommendation. I knew that Ms. Lee was newly pregnant at the time MOBIS hired her and told her that I was very happy for her. Ms. Lee voluntarily left MOBIS after a few months because her husband wanted to return to Korea to pursue business opportunities there.

6

22.     I have never supervised and did not know LaJarra Jefferson or Shalonda Gordon. I was not involved in the terminations of their employment, nor do I know anything about the circumstances of their terminations.

23.     I have a family of my own with two (2) children that I love very much. I feel that pregnancy is a natural and wonderful thing. I have no problem with pregnancy in the work place.

24.     To my knowledge, I have supervised three (3) pregnant employees since becoming MOBIS' CFO: SuJin Lee, Plaintiff and Sacouya Robertson, who is currently pregnant and working in Accounting. I did not discriminate against any of these women due to their sex or pregnancy.

25.     My understanding of written English is good. I have more difficulty understanding spoken English, and Americans sometimes have difficulty understanding me until they have worked with me for a while.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on March 28th, 2008.

_____
**JAEKWANG (JAY) KIM**

Sworn to and subscribed before me on this the 28th day of March, 2008 .

Notary Public _____
My Commission Expires: NOTARY PUBLIC STATE OF ALABAMA AT LARGE
MY COMMISSION EXPIRES:  Oct 13, 2010
BONDED THRU NOTARY PUBLIC UNDERWRITERS

[SEAL]

7

# EXHIBIT 1
# JAY KIM
# AFFIDAVIT

## 2006 Absense Record - Tarsha Hunter

| Date | # of Days | Hrs taken | Accum. Hrs | Note |
|------|-----------|-----------|------------|------|
| 06/15/2006 | 1 | 8 | 8 | Sick |
| 07/25/2006 | 1 | 3.5 | 11.5 | Doctor's appointment |
| 07/27/2006 | 1 | 3.5 | 15 | Doctor's appointment |
| 07/31/2006 | 1 | 6 | 21 | Sick |
| 08/01/2006 | 1 | 8 | 29 | Sick |
| 08/11/2006 | 1 | 4 | 33 | Doctor's appointment |
| 08/14/2006 | 1 | 4 | 37 | Doctor's appointment |

HUNTER V. MOBIS
00115

# EXHIBIT 2
# JAY KIM
# AFFIDAVIT

sonechka.womack@mobis-america.com

| | |
|---|---|
| **From:** | Jay Kim [jay.kim@mobis-america.com] |
| **Sent:** | Wednesday, July 26, 2006 8:25 AM |
| **To:** | 'Tarsha Hunter' |
| **Cc:** | sonechka.womack@mobis-america.com |
| **Subject:** | Notification (July 26,2006) |
| **Importance:** | High |

Tarsha,

This is a notification for tardiness.
On Wednesday the 26th you were noted as being tardy, this was not a first time during 90-day probationary.
I need for you to keep the starting time for business, everyday.

When you return from doctor's office, please submit the doctor's note and schedule for make-up time.
In addition, you are reminded that you are still serving out your probationary period and that attendance is very important.
Please make every effort to correct these deficiencies as your long term employment may be in jeopardy.

Thanks.

*Jay K. (Jae-kwang) Kim / CFO*

MOBIS Alabama,LLC.
1395 Mitchell Young Road,
Montgomery, AL 36108

Tel : 334-387-4802
Fax : 334-387-4900
E-mail : *jay.kim@mobis-america.com*

7/26/2006

HUNTER V. MOBIS
00172

sonechka.womack@mobis-america.com

| | |
|---|---|
| **From:** | Jay Kim [jay.kim@mobis-america.com] |
| **Sent:** | Wednesday, August 02, 2006 8:18 AM |
| **To:** | 'Tarsha Hunter' |
| **Cc:** | sonechka.womack@mobis-america.com |
| **Subject:** | Check out pending works |
| **Importance:** | High |

Tarsha,

I hope that you are getting better.

We are on the month end closing. Please check pending works and reorganize your desk.
There were a bunch of documents which should have been filed.

And, I need for you to submit doctor's note and make-up schedule for your absence.

Thanks.

*Jay K. (Jae-kwang) Kim / CFO*

MOBIS Alabama,LLC.
1395 Mitchell Young Road,
Montgomery, AL 36108

Tel : 334-387-4802
Fax : 334-387-4900
E-mail : *jay.kim@mobis-america.com*

8/2/2006

HUNTER V. MOBIS
00173

**sonechka.womack@mobis-america.com**

| | |
|---|---|
| **From:** | sonechka.womack@mobis-america.com |
| **Sent:** | Wednesday, August 02, 2006 10:35 AM |
| **To:** | 'Tarsha Hunter' |
| **Cc:** | 'Jay Kim' |
| **Subject:** | Invoices/Statements, etc. |

Hello Tarsha,

Please remember to make sure that all invoices are entered into SAP on the day received. It is very important that the invoices are entered and then distributed to the responsible person in a timely manner. There is a small timeframe that the responsible person has to complete their task and return the invoice to our department for payment. The President holds each person liable if the invoice is not processed on time. If they receive the invoice late, they will report to it Jay and the President that accounting did not give it to them on time.

I understand that sometimes you will run into some problems, but please try to have the invoices entered everyday before you leave. Let me know if you run into any problems.

Also, regarding statements from vendors, please review the statement to see if the invoices listed have been paid/accounting document generated/received by MOBIS. After doing so, please submit the statement with documentation of your research to me and then I will forward it to Jay.

I completely understand that you are juggling a lot of work. Jay is working on hiring more people in our department. But in the meantime, please continue to do your best because everything we do reflects our job evaluation.

Thank you for your hard work! I appreciate everything that you do!

Sonechka Womack
General Accounting
Assistant Manager
MOBIS Alabama, LLC
334-387-4845 (T)
334-387-4900 (Fax)

8/2/2006

HUNTER V. MOBIS
00174

**sonechka.womack@mobis-america.com**

| | |
|---|---|
| **From:** | Tarsha Hunter [Tarsha.Hunter@mobis-america.com] |
| **Sent:** | Wednesday, August 09, 2006 10:49 PM |
| **To:** | sonechka.womack@mobis-america.com |
| **Subject:** | RE: Attendance Issues |

When I returned on the 3rd of August , I didn't take a lunch break, that's a hour, today I came in @ 7:30, so tha t's 30 min. and I can stay until 7:00 pm today and starting Monday stay in for lunch thru Wed. and Sat. Aug. 19, come in for 4 hours.

*Tarsha N. Hunter .Account Specialist*
*Mobis Alabama, LLC.*
*1395 Mitchell Young Road*
*Montgomery, AL 36108*
*Ph: 334-387-4878*
*Fx: 334-387-4900*
*Tarsha.Hunter@Mobis-America.com*

**From:** sonechka.womack@mobis-america.com [mailto:sonechka.womack@mobis-america.com]
**Sent:** Thursday, August 10, 2006 10:06 AM
**To:** 'Tarsha Hunter'
**Cc:** 'Jay Kim'
**Subject:** RE: Attendance Issues

Tarsha,
As cited from the below email, please submit a schedule of time that you will be able to make up for your absences.  We c ompletely understand you current health condition, but this policy has been set for us to comply with when away from the office numerous times.  This is not to discourage you; this is just to keep fairness throughout this department.

Thank you,
Sonechka

**From:** sonechka.womack@mobis-america.com [mailto:sonechka.womack@mobis-america.com]
**Sent:** Tuesday, May 09, 2006 10:29 AM
**To:** 'Tarsha Hunter'
**Subject:** FW: Attendance Issues
**Importance:** High

8/10/2006

HUNTER V. MOBIS
00175

**From:** Jay Kim [mailto:jay.kim@mobis-america.com]

**Sent:** Wednesday, April 26, 2006 2:43 PM

**To:** nicole.boswell@mobis-america.com; sonechka.womack@mobis-america.com; 'Stephanie Perez'; 'Sandra Goodin'; hosang.hwang@mobis-america.com

**Subject:** Attendance Issues

**Importance:** High

To all of staffs

First of all, I appreciate all of your effort and hard working.

I looked trough the status of individual attendance in accounting department up to now.

And, I asked and discussed with HR department to manage it more effectively.

1. Regular duty hours are 8 AM till 5 PM. Employees are expected to arrive to work in ready to start by 8 AM.

2. Employees are expected to remain at work (Except during the lunch break) until 5 PM.

3. Scheduled appointments outside MOBIS Alabama.

  A. Doctor's appointments

    1) From time to time we expect that employees must request time away from work in order to attend a Doctor's appointment.

      Personnel are expected to give ample notification (Minimum 24 Hours notification) prior to the appointment.

      Personnel are expected to schedule appointments for a time period that the results in the least amount of time away from work.

    2) If due to a health condition, you are required to be away from work multiple times during any given month,

        we should have an understanding that this time should be made up if you wish not to use your vacation allotment.

        This can be accomplished in many different ways, some examples include; staying late on regular work days to make up the number of hours missed, work on

          Saturday, etc.

    3) As salaried employees it is expected that some time in addition to schedule work hours, may be necessary at times.

      Like-wise we need to have an understanding that we must both work together to accomplish the job.

      Please do not take advantage of my cooperative nature as I still have to ensure that the work is completed.

  B. All other situations are adequately covered by company policy such as; Maternity, Family medical Leave, Bereavement leave, Jury Duty etc.

As you are aware of, Closing is very important and primary issue in accounting department.

8/10/2006

HUNTER V. MOBIS
00176

And we should close every each month-end just in time to analysis and report it to the top management group in the head quarters.

Regarding the vacation days, if you want to take vacation days, if possible, please do not use it consecutively over the 3 b usiness days and avoid the month-end closing period, otherwise first or second weeks of every month.

Your great assistance would be much appreciated.

Jay Kim

*Jay K. (Jae-kwang)  Kim / CFO*

MOBIS Alabama,LLC.
1395 Mitchell Young Road,
Montgomery, AL 36108

Tel : 334-387-4802
Fax : 334-387-4900
E-mail : *jay.kim@mobis-america.com*

HUNTER V. MOBIS
00177

## Jay Kim

보낸 사람: Jay Kim [jay.kim@mobis-america.com]
보낸 날짜: 2006년 8월 14일 월요일 오전 7:47
받는 사람: 'sonechka.womack@mobis-america.com'
제목:    RE: Attendance Issues
중요도:   높음
첨부 파일: Tarsha Sonechka.xls

관리:    받는 사람                        읽음
        'sonechka.womack@mobis-america.com' 읽음: 2006-08-14 오전 8:34

Sonechka,

I need to know about the status of her attendance since she has been started permanent employee otherwise

during 90-day probationary in company.

**Please fill out the attachment correctly and submit it to me by today.**

**And also, you need to submit it for you to me.**

Jay Kim

---

**From:** sonechka.womack@mobis-america.com [mailto:sonechka.womack@mobis-america.com]
**Sent:** Thursday, August 10, 2006 12:59 PM
**To:** 'Jay Kim'
**Subject:** FW: Attendance Issues

---

**From:** Tarsha Hunter [mailto:Tarsha.Hunter@mobis-america.com]
**Sent:** Wednesday, August 09, 2006 10:49 PM
**To:** sonechka.womack@mobis-america.com
**Subject:** RE: Attendance Issues

When I returned on the 3rd of August , I didn't take a lunch break, that's a hour, today I came in @ 7:30, so that's 30 min. and I can stay until 7:00 pm today and starting Monday stay in for lunch thru Wed. and Sat. Aug. 19, come in for 4 hours.

*Tarsha N. Hunter ,Account Specialist*

2006-08-24

HUNTER V. MOBIS
00180

Mobis Alabama. LLC.
1395 Mitchell Young Road
Montgomery. AL 36108
Ph: 334-387-4878
Fx: 334-387-4900
Tarsha.Hunter@Mobis-America.com

---

**From:** sonechka.womack@mobis-america.com [mailto:sonechka.womack@mobis-america.com]
**Sent:** Thursday, August 10, 2006 10:06 AM
**To:** 'Tarsha Hunter'
**Cc:** 'Jay Kim'
**Subject:** RE: Attendance Issues

Tarsha,

As cited from the below email, please submit a schedule of time that you will be able to make up for your absences. We completely understand you current health condition, but this policy has been set for us to comply with when away from the office numerous times. This is not to discourage you; this is just to keep fairness throughout this department.

Thank you,
Sonechka

---

**From:** sonechka.womack@mobis-america.com [mailto:sonechka.womack@mobis-america.com]
**Sent:** Tuesday, May 09, 2006 10:29 AM
**To:** 'Tarsha Hunter'
**Subject:** FW: Attendance Issues
**Importance:** High

---

**From:** Jay Kim [mailto:jay.kim@mobis-america.com]
**Sent:** Wednesday, April 26, 2006 2:43 PM
**To:** nicole.boswell@mobis-america.com; sonechka.womack@mobis-america.com; 'Stephanie Perez'; 'Sandra Goodin'; hosang.hwang@mobis-america.com
**Subject:** Attendance Issues
**Importance:** High

2006-08-24

HUNTER V. MOBIS
00181

To all of staffs

First of all, I appreciate all of your effort and hard working.

I looked trough the status of individual attendance in accounting department up to now.
And, I asked and discussed with HR department to manage it more effectively.

1. Regular duty hours are 8 AM till 5 PM. Employees are expected to arrive to work in ready to start by 8 AM.

2. Employees are expected to remain at work (Except during the lunch break) until 5 PM.

3. Scheduled appointments outside MOBIS Alabama.

A. Doctor's appointments

1) From time to time we expect that employees must request time away from work in order to attend a Doctor's appointment.

Personnel are expected to give ample notification (Minimum 24 Hours notification) prior to the appointment.

Personnel are expected to schedule appointments for a time period that the results in the least amount of time away from work.

2) If due to a health condition, you are required to be away from work multiple times during any given month,

we should have an understanding that this time should be made up if you wish not to use your vacation allotment.

This can be accomplished in many different ways, some examples include; staying late on regular work days to make up the number of hours missed, work on

Saturday, etc.

3) As salaried employees it is expected that some time in addition to schedule work hours, may be necessary at times.

Like-wise we need to have an understanding that we must both work together to accomplish the job.

Please do not take advantage of my cooperative nature as I still have to ensure that the work is completed.

B. All other situations are adequately covered by company policy such as; Maternity, Family medical Leave, Bereavement leave, Jury Duty etc.

As you are aware of, Closing is very important and primary issue in accounting department.
And we should close every each month-end just in time to analysis and report it to the top management group in the headquarters.
Regarding the vacation days, if you want to take vacation days, if possible, please do not use it consecutively over the 3 business days and avoid the month-end closing period, otherwise first or second weeks of every month.

Your great assistance would be much appreciated.

2006-08-24

HUNTER V. MOBIS
00182

Jay Kim,

*Jay K. (Jae-kwang)  Kim / CFO*

MOBIS Alabama,LLC.
1395 Mitchell Young Road,
Montgomery, AL 36108

Tel : 334-387-4802
Fax : 334-387-4900
E-mail : *jay.kim@mobis-america.com*

2006-08-24

HUNTER V. MOBIS
00183

**sonechka.womack@mobis-america.com**

| | |
|---|---|
| **From:** | sonechka.womack@mobis-america.com |
| **Sent:** | Monday, August 14, 2006 9:05 AM |
| **To:** | 'Tarsha Hunter' |
| **Subject:** | Attendance |

Good morning Tarsha,

I received your voicemail regarding you will not be able to drop off your child before 7:30 am. I understand it completely. However, because of the company policy it may be hard to allow you to come in late. I have already spoken to Jay and it is hard for him to understand. I recommend that you get a written letter from your child's school and speak to Jay about this.

There have been quite a few instances that Jay has excused. We all know that Jay is very strict when it comes to tardiness and attendance. I feel that he has been more than understanding for everything (considering this is Jay I am talking about). I really want you to succeed here at MOBIS, so I hope you can do you best to meet the standards of this company. You are getting close to your 90 day probation ending so please try to leave a great impression so that you will be able to continue your employment here at MOBIS. I am here to help you.

Thanks,

Sonechka Womack
General Accounting
Assistant Manager
MOBIS Alabama, LLC
334-387-4845 (T)
334-387-4900 (Fax)

8/14/2006

HUNTER V. MOBIS
00178

## tracy.riedler@mobis-america.com

| | |
|---|---|
| **From:** | tracy.riedler@mobis-america.com |
| **Sent:** | Wednesday, August 23, 2006 4:13 PM |
| **To:** | 'Jay Kim' |
| **Subject:** | RE: 90 DAY Work Performance Review Sheet |

**Tracking:** **Recipient    Read**

'Jay Kim'    Read: 8/23/2006 4:29 PM

Sounds good.  I will wait to hear word from you.

---

**From:** Jay Kim [mailto:jay.kim@mobis-america.com]
**Sent:** Wednesday, August 23, 2006 3:24 PM
**To:** tracy.riedler@mobis-america.com
**Subject:** RE: 90 DAY Work Performance Review Sheet
**Importance:** High

Tracy,
I am contacting headquarters to cancel my business trip to Korea due to purchasing member's interest from C & A.
But, I am not sure that they would approve it or not.
I need to contact them this evening again.

My concerning for termination of Tarsha is Sonechka wants to keep her.
Because of she might be not like any kind of changes.
Then I do not want to take care of Tarsha anymore.
If I will be stayed in the next week, I need your help to terminate her.
I will let you know whether I am available or not.

Thanks.

---

**From:** tracy.riedler@mobis-america.com [mailto:tracy.riedler@mobis-america.com]
**Sent:** Wednesday, August 23, 2006 10:20 AM
**To:** 'Jay Kim'
**Subject:** 90 DAY Work Performance Review Sheet
**Importance:** High

Here is the 90 Day Performance Review Form.  Please make comments, sign and return to me.  Do you want to terminate her prior to your trip to Korea?  You will interview two Accounting candidates this week.  Please let me know and I will help you with the termination meeting.

8/9/2007

HUNTER V. MOBIS
00198

# EXHIBIT 3
# JAY KIM
# AFFIDAVIT

## 90 DAY WORK PERFORMANCE REVIEW SHEET

| | |
|---|---|
| Team Member Name | Tarsha Hunter |
| Title | Accounting Specialist |
| Department | Accounting and Finance |
| Division | Module |
| Manager/Supervisor | Sonechka Womack |
| Date of Hire | 06/05/06 |
| Date 90 Day Probationary Period Expires | 09/02/06 |

**Check One**

_____**A:**    The employee has successfully passed the probationary period  for their present job.

❖ Attendance is satisfactory.  How many days has the team member been absent, late or left early?

_____

❖ What are the team member's strengths?

_____

❖ What are areas the team member could improve on?

_____

**X_____B:**    The employee should be terminated based on unsatisfactory performance.

❖ Explain why you recommend termination

Tarsha's attendance and dependability was unstable while she was a temporary employee.
I delayed hiring her for this very reason.  I had several conversations with Tarsha and
her supervisor expressing my concern.  Tarsha ensured me this problem would not continue
after she was hired.  I told her that I would continue to evaluate her performance, to include
attendance, during her 90 day probationary period.  She has not improved.  Her mannerism
is not congenial to our department.  And her lack of dependability has placed strain on our
department as when she is not here her work must be performed by her supervisor
who has responsibilities of her own.  I cannot continue with this situation.

| | | |
|---|---|---|
| Supervisor/Manager Signature | _(signature)_ | 8/25/06 |
| Sr. Manager Human Resources | _(signature)_ | 8/25/06 |
| Executive Vice President | _(signature)_ | 08-25-06 |
| President | | |

HUNTER V. MOBIS
00114

# EXHIBIT

# D

Deposition of TRACY RIEDLER
January 31, 2008

Page 51

1      Q.   Is there a different handbook for

2  employees that are probationary and salary and

3  probationary and hourly?  In other words --

4      A.   No.  Same thing.

5      Q.   Does the attendance policy you just

6  described for a probationary employee differ

7  among a salaried employee and an hourly

8  employee?

9      A.   The three occurrences is the same

10  with hourly and with salary.

11      Q.   So with respect to the application

12  of the attendance policy for a probationary

13  employee, that employee status is either

14  hourly or salary and would have no effect on

15  its application?

16      A.   No.

17      Q.   Who has the authority to approve an

18  employee's absence from work during their

19  probationary period?

20          MR. BARNETT:  Object to the form.

21      A.   We have a no-fault system.  So

22  supervisors or managers are not supposed to be

23  giving permission for employees to be out.

24      Q.   Okay.

25      A.   A no-fault system being there are

Deposition of TRACY RIEDLER
January 31, 2008

1      A.  And can I actually clarify

2  something, too?  We spent a lot of time this

3  morning talking about certain policies,

4  progressive discipline and attendance

5  policies.  And I just kind of drew -- I just

6  did this at lunchtime.

7      Q.  We'll make this an exhibit just so

8  we'll know -- put this little sticky on it.

9          We're marking your notes as

10  Plaintiff's Exhibit 1.  If you can, tell us

11  what that is.

12          (Plaintiff's Exhibit Number 1 was

13          marked for identification.  A copy

14          is attached.)

15      A.  This is just to clarify progressive

16  discipline and attendance as far as to who it

17  relates to.

18          The progressive discipline policy

19  is nonattendance-related issues.  Okay.  An

20  then the attendance policy is attendance-

21  related issues only.

22      Q.  Okay.

23      A.  Then for progressive discipline and

24  attendance are hourly only, and then

25  progressive discipline is probation and

Deposition of TRACY RIEDLER
January 31, 2008

Page 91

1  nonprobation employees because there are more

2  misconduct or quality-related issues and

3  things.  And then attendance is

4  nonprobationary.

5       Q.  All right.

6       A.  So that's just --

7       Q.  Let me give this to Elaine so I

8  don't run off with it.

9            She'll be attaching that to your

10 deposition so that when we're looking at it,

11 we'll be able to see the exhibit.  So that's

12 why she holds on to them.

13           What is Multi-Staffing?

14      A.  Multi-Staffing is an employment

15 agency that we sometimes use for temporary

16 work force.  It could be a temp to perm, and

17 in Tarsha's case, yes.

18      Q.  Did Multi-Staffing assign

19 Ms. Hunter to work at Mobis?

20      A.  Yes.

21      Q.  Do you know when Multi-Staffing

22 assigned her to begin working at Mobis?

23      A.  When?

24      Q.  That's correct.  I'm going to look

25 and see if we've got -- I don't see where I've

Deposition of TRACY RIEDLER
January 31, 2008

Page 112

1   person.   And she sent the cover letter,

2   prepared and sent the cover letter to

3   Ms. Hunter.

4        Q.   And you said that the information

5   contained on this document came from Mr. Kim

6   as reported to the human resources department?

7        A.   We will report the reason why a

8   person is let go.

9        Q.   And I apologize if I ask this

10  again -- if I'm being repetitive.   I think

11  I've asked this, but I need to make sure.

12        Do you have any personal knowledge

13  of Tarsha Hunter's attendance during the time

14  she was a full-time employee with Mobis?

15        A.   No, not prior -- just prior to her

16  termination only.

17        Q.   When you say just prior to her

18  termination only, at what period in time are

19  you talking about?

20        A.   Roughly, I'd say about a week

21  earlier.

22        Q.   So a week prior to her termination

23  what happened?

24        A.   Mr. Kim had her ninety-day

25  performance review.   And he had received it

Deposition of TRACY RIEDLER
January 31, 2008

Page 113

1    from our department.  And he came to my

2    office, had the performance review in his hand

3    and said, you know, I do not believe that I

4    can keep Tarsha.

5              Q.  Okay.

6              A.  I said, What's the problem?

7                   And he said, She is very

8    unreliable; very undependable.  She is out all

9    the time.

10                  I said, Out?  What do you mean

11   out?

12                  And he said that she is absent, not

13   here or --

14                  And so I told him, I said, Well, I

15   mean, how many times has she been out, Jay?

16                  He said, I have her attendance

17   record.

18             Q.  Is that document Exhibit 2?

19             A.  Yes.

20             Q.  Okay.

21             A.  And that is something that he

22   keeps.

23             Q.  All right.

24             A.  And so I followed him to his office

25   and looked at this record.  And I said, Jay,

Deposition of TRACY RIEDLER
January 31, 2008

Page 114

1    you can't keep her.  You can't keep her.  I

2    said, The ninety-day probationary period is

3    that a person can only have three occurrences

4    of any kind, and I clarified what the

5    occurrences were for him.

6         Q.  Okay.  Anything else?

7         A.  No.

8         Q.  Okay.  What happened next?

9         A.  I mean, that was basically our

10   conversation.  At that time, we knew that

11   Tarsha would not be able to be a full-time

12   employee.

13        Q.  Then what happened?

14        A.  What happened over the next few

15   days, I was not involved in.  I believe that

16   Jay and Sonechka had many meetings, many

17   discussions because Sonechka did want to keep

18   Ms. Hunter.  And I believe that she was asking

19   Jay if she could keep her.

20        Q.  Okay.

21        A.  But otherwise, specifically, I have

22   no idea.

23        Q.  All right.  Can you recall anything

24   else that Mr. Kim talked to you about with

25   respect to Ms. Hunter's attendance?

Deposition of TRACY RIEDLER
January 31, 2008

Page 115

1              MR. BARNETT:  Objection.  No time

2      frame.

3              Q.  Prior to August 26, 2006, have you

4      told me everything you can recall Mr. Kim

5      discussing with you regarding Ms. Hunter's

6      attendance?

7              A.  That's correct.  That's the only

8      thing I can think of.

9              Q.  And you trusted that the attendance

10     record Mr. Kim showed you was truthful and

11     accurate, correct?

12             A.  Yes.

13             Q.  So in making your decision, you

14     relied on Mr. Kim's representations?

15             A.  Yes.

16             Q.  At the time that Mr. Kim presented

17     you with Plaintiff's Exhibit 2, were you aware

18     that Ms. Hunter was pregnant?

19             A.  My recollection is that I found out

20     a day or two before she was terminated.  So at

21     this time, when we were discussing this, no.

22             Q.  How did you find out she was

23     pregnant?

24             A.  From Sonechka.

25             Q.  What did Sonechka tell you?

Deposition of TRACY RIEDLER
January 31, 2008

Page 116

1      A.   Sonechka was upset that she was not

2  going to be able to keep Tarsha.  And she came

3  to my office and she basically was stating

4  that she wanted -- did want to keep her and --

5  and she was crying.  And she said that Tarsha

6  was pregnant.

7           And, you know, I told her I was

8  sorry, but unfortunately we had to actually --

9  we have to be consistent.  We have to stick to

10 our policies and everything to be fair to

11 everyone else.

12     Q.   Did Ms. Womack share with you or

13 say to you anything along the lines that

14 Ms. Hunter's pregnancy may have been affecting

15 the decision to terminate her?

16     A.   I don't recall anything like that,

17 no.

18     Q.   If she had said something like

19 that, would you have remembered it?

20     A.   I just can't remember in detail

21 what -- our conversation was not long.  I just

22 remember her being visibly upset that she did

23 want to keep her.

24     Q.   If it's her testimony tomorrow that

25 she discussed with you that she felt that

Deposition of TRACY RIEDLER
January 31, 2008

Page 117

1   Ms. Hunter was being terminated because of her

2   pregnancy, would you have any reason to

3   disagree with her testimony?

4        A.   I think that I would actually

5   remember if that occurred.  So I would have

6   reasonable belief to doubt if she were to

7   actually say that.

8        Q.   At the time that Ms. Womack told

9   you that Ms. Hunter was pregnant, did it raise

10  any concerns in your mind that maybe you

11  should investigate whether Ms. Hunter's

12  pregnancy was motivating her termination?

13       A.   No.

14       Q.   Did you take any steps to

15  investigate whether Ms. Hunter's pregnancy had

16  influenced Mr. Kim's decision to terminate

17  her?

18       A.   No.

19       Q.   There's another document I want to

20  you flip to in that big stack.  It's document

21  179.  I'm going to give you a sticky to put on

22  it.  We're going to mark that as Plaintiff's

23  Exhibit 4.

24       A.   179?

25       Q.   Yes, ma'am.  We're going to mark

Deposition of TRACY RIEDLER
January 31, 2008

Page 118

1    that as Plaintiff's Exhibit 4.

2              (Plaintiff's Exhibit Number 4 was

3              marked for identification.  A copy

4              is attached.)

5         Q.   What is Plaintiff's Exhibit 4?

6         A.   It appears -- this is, of course,

7    something else that Jay has kept up with.  And

8    the top part is vacation information, and the

9    bottom part is absenteeism information.

10        Q.   Okay.

11        A.   The only thing I can assume on here

12   is that this was copied from another employee

13   because all of this information is incorrect

14   on Ms. Hunter.  Everything.

15        Q.   So you're saying everything on

16   Exhibit --

17        A.   On the top -- on the top part of

18   this form, all of that.

19        Q.   Specify what is at the top.

20        A.   The vacation.  The vacation status

21   information on Ms. Hunter is incorrect on this

22   form.

23        Q.   So on that form, at least the part

24   of the information maintained by Mr. Kim you

25   recognize as being incorrect?

Deposition of TRACY RIEDLER
January 31, 2008

Page 122

1  think about whether those e-mails constituted

2  discipline.  Is that because you're not sure

3  the e-mails are clear that they're

4  disciplinary actions?

5        A.  No.  I was actually just in my own

6  mind -- earlier you were talking about what I

7  consider discipline and what I don't.  So I

8  was just thinking about warnings or

9  nonwarnings.

10       Q.  Did any of the e-mails to

11  Ms. Hunter inform her that those e-mails

12  constitute disciplinary action?

13       A.  In that exact word, disciplinary

14  action, I'd have to look at them again.  But I

15  don't know.

16       Q.  All right.  Who made the decision

17  to terminate Ms. Hunter?

18       A.  Myself.

19       Q.  Anyone else?

20       A.  After my conversation with Mr. Kim

21  regarding her attendance during the ninety-day

22  probationary period, I was the one that

23  informed him that we could no longer employ

24  her based on the ninety-day policy.

25       Q.  On what date was the decision to

Deposition of TRACY RIEDLER
January 31, 2008

Page 123

1    terminate Ms. Hunter made?

2         A.   I could not be exact, but roughly a

3    week before her termination date.

4         Q.   So if her termination date was

5    August 25th, then we're looking somewhere

6    around August 18th?

7         A.   Perhaps, yes.

8         MR. BARNETT:   You're entitled to

9    look at any document you want to.

10        Q.   That's why all the documents are

11   here.

12        A.   Yeah, I know.  I know.  But my

13   recollection --

14        MR. BARNETT:  Don't guess.  Don't

15   guess.  Look at the document.

16        Q.   I promise you, Henry will put

17   documents in front of you at trial.  I don't

18   want to be surprised.

19        A.   But my recollection is a week prior

20   anyway.  I'm not sure there's a document that

21   actually will clear that date up for me.

22        Q.   Okay.

23        MR. BARNETT:   Look.  Let me just

24   ask you to look at the documents then.

25        THE WITNESS:  Which document would

Deposition of TRACY RIEDLER
January 31, 2008

Page 127

1      Q.   Give me each and every reason that
2  Ms. Hunter was fired.
3      A.   Attendance as I know it.
4      Q.   Any other reason?
5      A.   No.
6      Q.   Identify each and every attendance
7  incident or occurrence which was considered in
8  terminating Ms. Hunter.
9      A.   Being absent three times and having
10  doctor's appointments which would consist of
11  either coming in to work late or leaving
12  before the shift was over four times.
13      Q.   I notice you're looking at Exhibit
14  Number 4 in answering this question.
15          Are you saying that the dates that
16  are reflected on the bottom of Number 4 are
17  the attendance dates that were used to justify
18  terminating Ms. Hunter?
19      A.   That's correct.
20      Q.   What policy or policies did
21  Ms. Hunter violate that led to her
22  termination?
23      A.   The ninety-day policy in that a
24  person is only able to have three -- actually,
25  only able to have two occurrences.  On the

# EXHIBIT

# E

Deposition of JAY KIM
January 31, 2008

Page 14

1       A.   No.

2       Q.   -- which may keep you from -- there

3   we go.

4            In front of you is Mobis Alabama's

5   employee handbook.  Have you ever reviewed any

6   of the employee handbooks from Mobis?

7       A.   Not whole page and details.

8            MR. BARNETT:  I'm sorry.  I didn't

9   hear that.

10           MS. LEONARD:  I think he said not

11  whole thing -- page -- not the whole thing but

12  page and detail.

13           MR. BARNETT:  Is that what you got?

14           MS. RIEDLER:  Not everything in

15  detail.  Not the whole page.

16           THE WITNESS:  Not everything.

17      Q.   With respect to a salaried employee

18  who is in their first ninety days of

19  employment with Mobis, what is your

20  understanding of Mobis's attendance policy as

21  it applies to that employee?

22      A.   Actually, I did not clearly know

23  about, you know -- about your question --

24  about your question.

25      Q.   I'll rephrase it.  That's what I

Deposition of JAY KIM
January 31, 2008

Page 15

1   want you to do.

2           MR. BARNETT:  I think he's

3   testifying.  He's not saying --

4           MS. RIEDLER:  He's not saying he

5   doesn't understand.  He didn't clearly

6   understand the ninety-day question.

7       Q.  Okay.  So is it your testimony that

8   you did not clearly understand the attendance

9   policy for ninety-day probationary employees?

10      A.  Yes.

11      Q.  Do you understand that policy now?

12      A.  Yes.

13      Q.  What is your understanding now of

14  that policy?

15      A.  Can I see, you know, the policy?

16      Q.  Absolutely.  If Ms. Riedler wants

17  to help you --

18          MS. RIEDLER:  Yeah.  I can actually

19  help find -- I'm actually getting pretty good

20  at finding things in this stuff.

21          MR. BARNETT:  I thought you would

22  get one out to give him.

23      A.  Yes, ma'am.

24      Q.  What is your understanding of the

25  policy today?

Deposition of JAY KIM
January 31, 2008

Page 16

1        A.    Today?

2        Q.    What's your understanding of the

3    policy now?

4        A.    During the, you know, the probation

5    ninety -- ninety-day probationary period --

6            THE COURT REPORTER:  I missed that.

7    Would you repeat the first part?

8        A.    During the ninety-day probationary

9    period, any problems that we have to -- three

10   absenteeism occurrences will be terminated.

11            (A discussion was held off the

12            record.)

13       Q.    When did you come to understand the

14   attendance policy for probationary period

15   employees that are salaried?

16       A.    When Tarsha, you know, was

17   terminated.

18       Q.    How did you come to gain that

19   understanding?

20       A.    How did you?  I can just understand

21   what it was in here.

22       Q.    Okay.  Did anyone like Ms. Riedler

23   or another employee review the policy with

24   you?

25       A.    I'm sorry?

Deposition of JAY KIM
January 31, 2008

Page 17

1      Q.  I think you might see where my
2 question is going.  Did someone explain the
3 attendance policy to you?
4      A.  To me?
5      Q.  Yes, sir.
6      A.  Yes, when I start the work in here.
7      Q.  When you say in here, do you mean
8 with respect to Ms. Hunter?
9      A.  Okay.  Let me explain again.
10        MR. BARNETT:  Tracy -- let me say,
11 do you mind if Tracy helps out when there's a
12 lack of communication?  Tracy and Jay speak
13 with each other.
14        MS. RIEDLER:  All the time.
15        MS. LEONARD:  That's fine.
16        MS. RIEDLER:  Yeah.
17        MS. LEONARD:  Just as long as you
18 don't tell him what to say, we're fine.
19        MS. RIEDLER:  You've read policies
20 basically, but when did you gather better
21 knowledge of what ninety-day policy meant?
22 When did you become more familiar?
23      A.  When I start to work in Mobis, I
24 don't have previous -- plenty -- so many -- so
25 many team members.  So I don't care about, you

Deposition of JAY KIM
January 31, 2008

Page 18

1    know, the -- I don't think about the policy.

2              However, the business -- you know,

3    the scale has been growing up, and then I

4    just, you know, check out the policy to

5    administer my team members.

6         Q.  All right.

7              MS. RIEDLER:  When did you become

8    more familiar though with specifically ninety-

9    day probationary period?

10        A.  August 20 -- around the 24th or

11   25th -- after the 25th, 2006.

12              (Plaintiff's Exhibit Number 10 was

13              marked for identification.  A copy

14              is attached.)

15        Q.  I'm going to show you a document

16   that I've marked as Exhibit Number 10.  Have

17   you seen the form that is Plaintiff's Exhibit

18   Number 10?

19        A.  Actually, I made the original of

20   this form to keep -- to keep for my records

21   only.

22        Q.  Okay.

23        A.  My records only.  It's not

24   officially, you know, the provided -- you

25   know, the format from HR department.

Deposition of JAY KIM
January 31, 2008

Page 34

1          Q.   -- did you have any problems with

2    her attendance?

3          A.   I think so.

4          Q.   Tell me what problems you had with

5    her attendance.

6          A.   So many tardy and doctors'

7    appointment or something like that.

8          Q.   Any other problems?

9          A.   Yeah, I have -- I had a problem.

10   As I explain it, I have only seven or eight --

11   few peoples in accounting.

12          So if one employee -- one team

13   member will not take care of, you know, their

14   work just in a timely manner, accounting

15   department will make a harder situation.

16   Because as you know, accounting has to close

17   the months and every -- each month.  But if

18   somebody will not take care of their work just

19   in a timely manner, it will impact on the

20   accounting department.

21          For instance, I have to report it

22   to -- the financial result to headquarters

23   every -- each month after closing out just in

24   time.

25          Q.   Did you have any other problems

Deposition of JAY KIM
January 31, 2008

Page 38

1          A.   In March 2006, if you see

2     organizational chart for accounting and

3     finance department, I have two, you know, the

4     different -- you know, the parts.  One is for

5     general accounting and taxes -- taxes.  The

6     other one is treasury.

7               Treasury has been handled by

8     Sonechka with Tarsha.  But the other partner,

9     Ho Sang Hwang, he is no longer employed with

10    Mobis Alabama.  He has been taking care of the

11    general accounting and the taxes.  So it's

12    different.

13         Q.   All right.  Did you discuss with

14    anyone bringing Ms. Hunter into permanent

15    employment or full-time employment with Mobis

16    when she was a temporary employee?

17         A.   Please --

18         Q.   How did Ms. Hunter go from being a

19    temporary employee to a full-time employee?

20         A.   Oh, yeah.  Let me explain.  As a

21    matter of fact, I wanted to -- I don't want --

22    wanted to hire Tarsha during the temporary

23    employees because I have seen, you know, so

24    many, you know, tardy and attendance issues.

25               And so I talked to Sonechka,

Deposition of JAY KIM
January 31, 2008

Page 39

1    assistant manager, I don't want her to

2    start -- I don't want Tarsha to start, you

3    know, the permanent employee.

4            However, Sonechka told me and

5    persuaded me -- persuaded me --

6            MR. BARNETT:  Persuade?

7            THE WITNESS:  Persuade.

8        A.  Yeah, persuaded me.  We will

9    keep -- we will keep Tarsha a little bit more

10   period and then -- and then if Tarsha will

11   not -- Tarsha's tardy and attendance issue

12   will not be improved, at that point we will

13   make a decision or something.

14           She asked me and she persuaded me.

15   So I accepted it.  I accepted it.

16           Okay.  We will see and we will

17   monitor and then -- during the ninety-day

18   probationary.  And then Tarsha's attendance

19   issue will not be improved, I will not, you

20   know, hire her or something.  I told her very

21   strongly.

22       Q.  Okay.  How many times did you talk

23   to Ms. Hunter about her attendance?

24       A.  I couldn't remember.  However, if I

25   have some issues, I talk to Sonechka.

Deposition of JAY KIM
January 31, 2008

Page 40

1          Q.   Okay.

2          A.   Sometimes I talk to Tarsha

3     directly.

4          Q.   All right.

5          A.   But I could not remember how many

6     times did I do this.  I don't know.

7          Q.   Do you remember any of the

8     conversations with Ms. Hunter where you talked

9     about her attendance throughout any time she

10    worked for Mobis?

11         A.   Yeah.  As I explained, I had a

12    time, a couple of times where -- I cannot

13    remember, but I have been talked to Tarsha.  I

14    have been talked to Tarsha.

15         Q.   Did you do anything to -- did you

16    write anything or type anything to show you

17    talked to Ms. Hunter?

18         A.   No.  I just e-mailed her.

19         Q.   Okay.  Would the e-mails in this

20    case reflect when you talked to Ms. Hunter?

21         A.   Sometimes I talk to Tarsha without

22    e-mail.  But sometimes I just e-mailed her --

23    e-mailed her.  But I -- I cannot remember.  I

24    cannot remember clearly.

25         Q.   Did you discuss with Ms. Womack or

Deposition of JAY KIM
January 31, 2008

Page 41

1    Ms. Hunter buying out Ms. Hunter's contract
2    with Multi-Staffing?
3         A.  No.
4         Q.  Who made the decision to hire
5    Ms. Hunter as a Mobis employee?
6         A.  As I explained a few minutes ago, I
7    really don't want to hire Tarsha, but
8    Sonechka, you know, asked me and persuaded me
9    to hire her.  Because, as I explained, you
10   know, I have just a few peoples in
11   accounting.  So if somebody would leave --
12   would leave, you know, that person has to take
13   care of the other -- the left person's -- the
14   work or something.  I'm not sure.
15        Q.  What did Sonechka say to you to
16   persuade you to hire Ms. Hunter?
17        A.  I don't really remember that, but
18   in my understanding, if -- if Tarsha will
19   leave, Sonechka will make harder situation
20   because -- because Sonechka has to take care
21   of, you know, two person's work -- two
22   person's work.
23             So in my understanding -- and I
24   remember, you know, okay, we can just, you
25   know, wait during the ninety-day period --

Deposition of JAY KIM
January 31, 2008

Page 51

1          MS. LEONARD:  He asked for the

2    handbook.

3          MR. BARNETT:  Do you want to see

4    the attendance policy?

5          THE WITNESS:  Yeah.

6          MS. RIEDLER:  Probationary policy?

7          MS. LEONARD:  I believe it's the

8    stack below.

9          MS. RIEDLER:  Sorry.

10        A.  Attendance, in my -- in my

11   knowledge -- attendance means they are bad

12   tardy or late, didn't show up or -- tardiness

13   or unexcused -- for instance, unexcused off or

14   something like that.

15        Q.  What was lacking in Ms. Hunter's

16   dependability?

17        A.  As I explained, you know, the -- we

18   have, you know -- accounting has, you know,

19   the time deadline or something like that.

20             So if somebody will not take care

21   of -- will not finish, you know, their

22   assigned work in a timely manner -- just in a

23   timely manner, that will impact on the

24   accounting department.

25             I am, you know, the responsible

Deposition of JAY KIM
January 31, 2008

Page 54

1  know, the -- if I have some issues, I have to

2  talk to assistant manager.

3       Q.  Did anyone complain to you about

4  Tarsha?

5       A.  I don't -- I don't know.  I don't

6  know.

7       Q.  So you don't remember anyone

8  complaining about Ms. Hunter?

9       A.  The assistant manager Ho Sang -- Ho

10  Sang Hwang -- I don't remember that name, but

11  he sometimes told me -- told me I did not

12  receive them or something or on time or

13  whatever.

14       Q.  Did Sonechka complain about

15  Ms. Hunter?

16       A.  Sonechka, you know, did take, you

17  know -- told me when Tarsha left early or

18  something she has to -- had to take care of

19  Tarsha's work -- Tarsha's work.

20            So she has been worked over 5:00

21  o'clock until sometimes 7:00 o'clock.

22            So when she work to you, you know,

23  over five, six, sometimes seven, I have to

24  talk to -- ask her, What's wrong?  What

25  happened?

Deposition of JAY KIM
January 31, 2008

Page 57

1          MS. LEONARD:  Work stuff or
2     something like that.
3          A.  That work performance anyway.
4          MR. BARNETT:  Okay.
5          Q.  I'm going to make this document an
6     exhibit since you referenced it, which is the
7     ninety-day performance review.
8               (Plaintiff's Exhibit Number 13 was
9               marked for identification.  A copy
10              is attached.)
11         Q.  Is this Exhibit Number 13 the
12    performance -- ninety-day performance review
13    the only performance review that you did of
14    Ms. Hunter?
15         A.  Yes.
16         Q.  Did you do any performance
17    evaluation of her when she was hired as a
18    full-time employee?
19         A.  No.
20         Q.  Who monitored Ms. Hunter's
21    attendance?
22         A.  My understanding, Sonechka has to
23    do.
24         Q.  Okay.
25         A.  I had her to do it.

Deposition of JAY KIM
January 31, 2008

Page 58

1        Q.   Did you personally monitor

2   Ms. Hunter's attendance?

3        A.   I think in my memory probably

4   Sonechka has, you know, the -- some kind of,

5   you know, Excel spreadsheet.

6        Q.   I'm showing you what's been marked

7   as Plaintiff's Exhibit 2.

8        A.   Okay.

9        Q.   Is this the spreadsheet you're

10  talking about?

11       A.   Yes.

12       Q.   So Sonechka created Exhibit 2?

13       A.   No.  I made that -- you know, the

14  Excel spreadsheet.  And then I -- in my memory

15  I forwarded that papers.

16       Q.   So you did Exhibit 2 based on your

17  memory?

18       A.   I'm sorry?

19       Q.   Sure.  I'm going to come back to

20  this.

21            Who monitored when Ms. Hunter would

22  come in early or leave early or come in late?

23       A.   Normally, you know, the -- I have

24  checked out each employee's, you know, their

25  tardiness -- their tardiness.  So I have, you

Page 59

1  know, the other data for the other guys, not

2  just for Tarsha.

3              MR. BARNETT:  I didn't hear that.

4        Q.  Let me rephrase my question.  Did

5  you monitor Ms. Hunter's attendance?

6        A.  Yes.  Just -- not just for Tarsha

7  only.

8        Q.  And I wasn't implying that.

9        A.  Okay.

10       Q.  What did you do to monitor Tarsha's

11 attendance?

12       A.  Normally, I have been -- start work

13 7:00 o'clock in the morning, every morning.

14 So I can easily find out their -- my team

15 members, you know, their tardiness because by

16 their office is, you know, in front of the

17 main, you know, door.

18            So if I were to sit down on my --

19 on my desk, I can easily find out, you know,

20 the -- some guys -- every guy's tardiness.

21       Q.  All right.  When Tarsha was tardy,

22 what would you do to document her being tardy,

23 if anything?

24       A.  Document?  What document do you

25 mean?

Deposition of JAY KIM
January 31, 2008

Page 60

1        Q.  *Would you make a note that she was
2    late?
3        A.  Yeah.  I made, you know, that
4    this -- this late person.
5        Q.  You were touching Exhibit 2.  Is
6    Exhibit 2 where you would document if she was
7    late or absent or left early?
8        A.  Yes.
9        Q.  Did you document her attendance
10   anywhere else other than Exhibit 2?
11       A.  Yeah, of course.  If I will --
12   have, you know, the business people or
13   something, I cannot -- I could not check off
14   them all.  It's not -- I think that it's not
15   all of the -- all of my records.
16       Q.  Where did you get the information
17   on Exhibit 2?
18       A.  Where?
19       Q.  Yes, sir.  How do you know that on
20   June 15th, 2006, Ms. Hunter took eight hours
21   because she was sick?  How do you know that?
22       A.  She showed me probably the -- the
23   absence -- you know, the form.
24       MR. BARNETT:  The form.
25       A.  Form and doctor's excuse.

Deposition of JAY KIM
January 31, 2008

Page 61

1          Q.   When did you make Exhibit 2?

2          A.   From 2005.

3          Q.   When did you type the information

4    into the chart on Exhibit 2?

5          A.   Exactly on the happened date, the

6    occurrence date.

7          Q.   Okay.

8          A.   Or the day after the occurrence

9    date.

10         Q.   All right.

11         A.   To keep my records in order

12   correctly.

13         Q.   All right.  And you base this on

14   your attendance sheets like Exhibit 10?

15         A.   Not just with this.  Sometimes, you

16   know, the -- the team members will ask me

17   about, you know, their -- you know, their

18   appointment, doctor's appointment or something

19   by verbal.  Sometimes, you know, we get the

20   form.  They maybe get the form.

21              MR. BARNETT:  Did you get the

22   verbal, the word verbal?

23              THE COURT REPORTER:  Yes.

24         Q.   And I'm not talking about everybody

25   else.

Deposition of JAY KIM
January 31, 2008

Page 62

1        A.   Okay.

2        Q.   I'm talking about Tarsha.   Where

3   did you get the information in this chart on

4   Exhibit 2?

5            MR. BARNETT:   He's already

6   answered, but we'll let him answer one more

7   time.   He's already said verbal --

8            MS. LEONARD:   Hold on.   He can

9   answer again.   I don't want to hear your

10  summary of his testimony.   I want to hear his

11  testimony.

12           MR. BARNETT:   Well, I mean, this is

13  the third time and he's answered it.

14           MS. LEONARD:   And I've gotten

15  different answers every time.

16       A.   I already -- I already talked to

17  you.

18       Q.   Tell me again.

19       A.   I gathered that information from

20  Tarsha or Sonechka.

21       Q.   Okay.

22       A.   I did not make it by myself.

23       Q.   All right.

24       A.   On this question.

25       Q.   Okay.   I'm going to show you

Deposition of JAY KIM
January 31, 2008

Page 64

1    Exhibit 4 is wrong?

2            A.   Yeah.   This is wrong.

3            Q.   All right.

4            MR. BARNETT:   Let the record show

5    that he is --

6            MS. LEONARD:   The top part.

7            MR. BARNETT:   He's pointed out that

8    the date of -- that starts with 1-13-2006 and

9    goes out one, two, three, four columns is

10   incorrect, or it doesn't apply to her.

11           Q.   When did you find out Tarsha was

12   pregnant?

13           A.   I cannot really remember the exact

14   dates.

15           Q.   How did you find out she was

16   pregnant?

17           A.   In the partition area.   When I

18   passed, you know, the -- Tarsha's, you know --

19   beside the IT department, at that point some

20   of, you know, the employees gather in the

21   partition area.

22           Q.   Okay.

23           A.   So I -- but I didn't know about,

24   you know, the pregnancy, even though, you

25   know, there's several employees gathered at

Deposition of JAY KIM
January 31, 2008

Page 65

1   her desk.

2          But when I returned to my office --

3   office, she brought -- in my memory, she

4   brought the small picture.

5          Q.  Ultrasound?

6          A.  Yes, ultrasound.

7          Q.  You can call it a picture.

8          A.  Yeah, ultrasound.  Yeah, I saw that

9   picture.

10         Q.  Did Tarsha sit down and tell you

11  she was pregnant?

12         A.  Probably she did.

13         Q.  How long before she was fired did

14  you find out she was pregnant?

15         A.  I really don't understand --

16  remember the exact date -- the exact date.

17         Q.  I'm not asking for an exact date.

18  Do you have an opinion as to whether it was a

19  week, two weeks, three weeks, a month, or more

20  than a month before she was fired that you

21  knew she was pregnant?

22         A.  Probably before, you know -- when

23  was her termination?

24         Q.  August 25th.

25         A.  25th.  I --

Deposition of JAY KIM
January 31, 2008

Page 66

1          MR. BARNETT:  If you don't know,

2    you can't answer.

3          A.  I don't really remember that.

4          Q.  Do you have an opinion as to

5    whether it was more than two weeks?

6          A.  I don't know.

7          Q.  If Ms. Hunter testified that she

8    told you in early August, around August 9th,

9    that she was pregnant, do you have any reason

10   to disagree with her?

11         A.  I don't know when is the exact

12   date.

13         Q.  So you couldn't say if it was the

14   day before she was fired or two months before

15   she was fired?

16         A.  I don't know what -- what you're

17   saying.

18         Q.  You couldn't tell me if a short

19   amount of time or a large amount of time

20   passed between when you found out she was

21   pregnant and she was fired?

22         MR. BARNETT:  Object to the form.

23   She wants to know whether you found out about

24   the pregnancy days before Tarsha was

25   terminated or weeks before, if you know.

Deposition of JAY KIM
January 31, 2008

Page 67

1      A.   Not a week.

2           MR. BARNETT:  It's clear he's not

3   understanding.

4      Q.   Which came first, your decision to

5   fire Tarsha or finding out she was pregnant?

6      A.   Okay.  Let me explain.

7      Q.   Okay.

8      A.   As I already explained, you know, I

9   don't want -- want to hire, you know, Tarsha,

10  even though during the probate -- temporary

11  employee, I already made a decision during

12  that period.  I made a decision.

13          Actually, I don't -- I don't want

14  to work with her during the probationary

15  employee.  But as I already explained a minute

16  ago, Sonechka, her supervisor, asked me and

17  persuaded me -- persuaded me to keeping her.

18          That's the reason, you know, her

19  starting -- her starting.

20     Q.   That's not my question.  I'll break

21  it down.

22          When was the decision to end

23  Tarsha's employment made?

24     A.   I made a decision in

25  probationary -- temporary employment.  I had

Deposition of JAY KIM
January 31, 2008

Page 68

1   already made a decision at that point.

2         Q.  Why not keep her on as a temporary

3   employee then?

4         A.  Okay.  I'll explain.  I don't want

5   her to start, you know, the permanent

6   employee.

7         Q.  That's my question.

8         A.  Yeah.  I don't want her, you know,

9   to start a permanent employee even though, you

10  know, she complete -- finished the temporary

11  employment.  But I didn't want her to start

12  the permanent employee.

13        Q.  Could you have left her as a

14  temporary employee?

15        A.  I'm sorry?

16        Q.  Could Tarsha have remained a

17  temporary employee?

18        A.  I don't understand what you're

19  asking.

20        Q.  When Tarsha -- she was a temporary

21  employee first, correct?

22        A.  Yes.  Yes.

23        Q.  What do you understand by a

24  temporary employee?  What is a temp?

25        A.  What is a temp?

Deposition of JAY KIM
January 31, 2008

Page 69

1     Q.   Yes.

2     A.   A temp has to be controlled by the

3   outsourcing, you know, the company like Multi-

4   Staffing or something like that.

5     Q.   Why couldn't you have kept her

6   working through Multi-Staffing?

7     A.   I don't know.  Multi-Staffing -- we

8   have used several, you know, different -- the

9   outsourcing company for employment.  But I do

10  not remember Multi -- Multi-Staffing or the

11  other company.

12    Q.   Were you up against any type of

13  deadline when she was hired as full time?  Was

14  her assignment through Multi-Staffing ending?

15    A.   I don't know.  What -- what do you

16  mean?

17    Q.   Was Multi-Staffing going to take

18  Tarsha away?  When Tarsha was a temporary

19  employee --

20    A.   Right.

21    Q.   -- was there a set date her

22  assignment would end?

23    A.   I don't know.

24    Q.   When you hire a temporary employee,

25  a temp comes, how long are they going to be

Deposition of JAY KIM
January 31, 2008

Page 70

1    there?

2         A.   Okay.   I did not hire, you know,

3    the temporary employee.   I just, you know, got

4    a temporary employee from HR.   I didn't

5    arrange anything.

6              MS. RIEDLER:   May I?

7              MS. LEONARD:   I'm going to try to

8    rephrase it.   I'm going to ask it a different

9    way.

10             MS. RIEDLER:   Can you draw a

11   picture of the time line?

12             MS. LEONARD:   Wait a second.

13        Q.   Tarsha became a Mobis employee in

14   June 2006, correct?

15             MR. BARNETT:   Object to the form.

16   That's when she started her probationary

17   period.

18        Q.   She was a full-time -- I'm using

19   the term full-time employee to mean she was

20   employed by Mobis.

21             Tarsha became employed by Mobis in

22   June 2006, correct?

23        A.   Probably, right.

24        Q.   At the time she became a Mobis

25   employee, was Multi-Staffing going to assign

Deposition of JAY KIM
January 31, 2008

Page 71

1  her to a new job away from Mobis?

2         A.   Away from Mobis?

3         Q.   At the time Mobis hired her, had

4  Mobis not hired her in June, what would have

5  happened to Tarsha?

6         A.   I don't know.

7         Q.   Would she have stayed as a

8  temporary employee?

9         A.   I'm sorry.  I'm not, you know, the

10 expert here in the field of hiring or

11 something like that.

12        Q.   Okay.  That's fine.

13        A.   It's not my business, I think.

14        Q.   When Mobis hired Tarsha in June, is

15 it your testimony that you never intended her

16 to work more than ninety days?

17        A.   I don't know.  What is your exact

18 question?

19        Q.   In June 2006, had you decided to

20 fire Tarsha?

21        A.   I think that you -- you have some

22 misunderstanding due to my, you know,

23 incorrect expression.

24        Q.   When did you decide to fire Tarsha?

25        A.   I didn't make her, you know, the --

Deposition of JAY KIM
January 31, 2008

Page 72

1   okay.  I just want to revise my expression, my

2   expression correctly.

3         She was a temporary employee.

4         Q.  Okay.

5         A.  But -- during the two or three

6   months.  But during that period, I was not

7   very pleased with, you know, her attendance

8   and tardy or something.

9         So I did not want her to start the

10  Mobis employee -- Mobis employee.  Yeah.  That

11  is my opinion.

12        Q.  All right.  I'm showing you an

13  e-mail --

14        A.  Yes.

15        Q.  -- that is Exhibit 5 to

16  Ms. Riedler's deposition that's an e-mail

17  exchanged between you and Ms. Riedler around

18  August 23rd, 2006.

19        A.  Yes.

20        Q.  Before this e-mail, had you talked

21  to Tracy about firing Tarsha?

22        A.  I had, you know, the meeting with

23  Tracy before August the 23rd, yeah.

24        Q.  On what day did you have that

25  meeting?

Deposition of JAY KIM
January 31, 2008

Page 73

1        A.   I don't remember the exact date.

2        Q.   How could I find out that date?

3        A.   I'm sorry?

4        Q.   How could I find out that date?

5        A.   I don't know.

6        Q.   In this e-mail, do you reference an

7   earlier meeting?

8        A.   Yeah.  Yes.

9        Q.   What did you mean by -- I'm reading

10  upside down.  It's not as easy.  Why were you

11  canceling your trip to Korea?

12       A.   I clearly remembered -- why did I

13  cancel my business trip?  Actually, we were

14  supposed to merge -- achieve, you know, the

15  membership interest from the CNA -- CNA.  It

16  was an up-beat deal in Mobis Alabama.

17       Q.   It had nothing to do with

18  Ms. Hunter?

19       A.   I'm sorry?

20       Q.   Did you cancel your trip because of

21  Ms. Hunter?

22       A.   No.

23       Q.   That's all I care about.

24       A.   No.  No.

25       Q.   I don't need to know all of Mobis's

Deposition of JAY KIM
January 31, 2008

Page 75

1  work in Mobis Alabama.  That was my, you know,

2  opinion.

3       Q.  Had you talked to Sonechka about

4  firing Tarsha?

5       A.  I don't remember, but I talked to

6  her verbal.  Probably I told her -- I was not

7  pleased with, you know, her -- Tarsha's

8  attendance and tardiness or whatever.

9       Q.  What did you mean when you wrote, I

10 do not want to take care of Tarsha anymore?

11      A.  Okay.  That's, you know, the

12 different language barrier or something like

13 that.

14           I read, you know, that that -- I

15 read this sentence.  Normally, I have been

16 wrong about -- taking care of them means keep

17 or something like that.

18           Of course, you know, taking care of

19 them has, you know, several different

20 meanings, but I did not know about that.  I

21 didn't know about it.

22           In this exact sentence, that means

23 I don't want to work with her in accounting

24 and financing.  I just wrote, you know, this

25 word with that meaning.  But I'm not sure how

Deposition of JAY KIM
January 31, 2008

Page 76

1  the other person -- how can they, you know,

2  understand this wording, this idioms?

3           I just, you know, wrote that word.

4  Okay.  I will not -- don't want, you know, to

5  work continuously or something like that.  I

6  just wrote that idioms with that meaning.

7           Q.  All right.  What did you mean when

8  you wrote, I need your help to terminate her?

9           A.  Okay.  I clearly remember the why

10  did, you know, I write this sentence.

11           Even though I can speak English,

12  but it's very hard for me to explain about,

13  you know, the detail or something like that

14  with the correct word and idioms.

15           So I need -- I wanted Tracy to

16  understand what -- what I am -- what I was

17  thinking -- what I was thinking.

18           Q.  So you wanted her to help

19  verbalize?

20           A.  Broken English or something.

21           Q.  So you wanted her to help speak for

22  you?

23           A.  Speak or -- and I want -- I want

24  Tracy to understand that with my broken

25  English -- broken English -- not to, you know,

Deposition of JAY KIM
January 31, 2008

Page 77

1   the -- with her like in this occasion,

2   projecting.

3         Q.  Who was hired to replace

4   Ms. Hunter?

5         A.  I'm sorry?

6         Q.  Who did you hire to replace her?

7   Who replaced her?

8             MR. BARNETT:  Who took her job when

9   she left?

10        A.  I don't remember that.

11        Q.  How long did it take to replace

12  her?

13        A.  I have no idea.

14        Q.  Now I thought you said --

15        A.  You say my -- you know, the folder

16  or something in my desk.  I can remember, but

17  right now I don't remember that.

18        Q.  Who did her work until you hired

19  someone to replace her?

20        A.  I don't remember that.

21        Q.  Did it cause any problems after you

22  terminated Ms. Hunter in getting the work done

23  in the department?

24        A.  I think so, because the other

25  person has to take care of all the -- Tarsha's

Deposition of JAY KIM
January 31, 2008

Page 78

1   work.

2            Q.   Have you seen Exhibit 8 before?

3            A.   I thought, you know, that this --

4   the letter, but I did not, you know,

5   completely, you know, read the letter.

6            Q.   Okay.   That's fine.

7            A.   I have - I have seen this -- this

8   one.

9            Q.   Referring to Exhibit 2?

10           A.   Yes.

11           Q.   Did Ms. Hunter ask you or Sonechka

12  if she could be off work on June 15th, 2006?

13           A.   Yes.

14           Q.   Who did she ask?

15           A.   Who?

16           Q.   Who did she ask if she could be off

17  work?

18           A.   I could not really remember what

19  happened exactly on June 15th.   However, I

20  just put eight hours.   That means one day.

21           Q.   Okay.

22           A.   Probably Tarsha was not show up on

23  that date, I think.

24           Q.   Had she asked permission to be off

25  on that day?

Deposition of JAY KIM
January 31, 2008

Page 82

1    doctor.  That is common.  That's normal.  Then

2    how can I say to, you know, my people, Hey,

3    please sit down and you have to work.  You

4    have to complete this work.  I didn't say.  I

5    didn't say it.  How can I say that?

6         Q.  Did you tell --

7         A.  If I'm sick, I have to go to see a

8    doctor.  And I also have to report it to my

9    immediate supervisor, like, you know,

10   Mr. Kim.  I have to let him know I am very

11   sick.  I have to go see a doctor.

12        Then how, Mr. Kim, tell me, Please,

13   sit down and you have to complete this work by

14   today or something.  It's the common thing,

15   right?

16        Q.  Did you --

17        A.  Let me explain even though the

18   other team members in accounting, if they

19   have, you know, some sickness or something, I

20   always told -- told them, hey, go -- please go

21   to see a doctor.  That's normal, right?

22   That's a common thing.

23        Q.  Who made the decision to terminate

24   Ms. Hunter?

25        A.  I already explained, you know, I

Page 83

1  made a decision.  I made a decision at first.

2  And then I wanted to discuss with Tracy

3  because I don't really want to be the right --

4  you know, the legal thing, whatever,

5  something.

6              I am a foreigner.  So I don't want,

7  you know, to make some trouble in the USA.  So

8  I need Tracy, you know, to help.  I need

9  Tracy's help.

10      Q.  Okay.  And so the record is clear

11  so that Henry and I don't have to jump

12  throughout your transcript, why did you

13  terminate, or why did you make the decision to

14  terminate Ms. Hunter?

15          MR. BARNETT:  I don't think that's

16  a fair characterization of his testimony.

17          MS. LEONARD:  Elaine, can you read

18  back his testimony?

19          MR. BARNETT:  I just -- I think

20  it's too many inferences that could be drawn

21  from that given his understanding of what

22  you're trying to ask him.

23          MS. LEONARD:  And your objection is

24  noted for the record.

25      Q.  Why did you make the decision to

Deposition of JAY KIM
January 31, 2008

Page 86

1    from his testimony when the decision to

2    terminate her was made.

3           MR. BARNETT:  Well, we knew going

4    in there were going to be communication

5    problems.

6           MS. LEONARD:  These are fundamental

7    questions that can be anticipated.  When he's

8    called in in a case dealing with her

9    termination when we allege it's due to

10   pregnancy, I don't think it's off the wall for

11   him to anticipate I'm going to ask him when

12   the decision to terminate her was made and why

13   she was going to be terminated.

14           A.  Can I explain?

15           Q.  Yes.

16           A.  I remember, you know, when I saw

17   the ultrasound picture, I told Tarsha,

18   Congratulations.  That's normal.  That's

19   common.  It's great, you know.

20           I clearly, you know, explained --

21   clearly explained why should I make a decision

22   to terminate her.

23           Q.  Okay.

24           A.  Her bad tardiness and attendance,

25   and that --

Deposition of JAY KIM
January 31, 2008

Page 87

1          MS. RIEDLER:  The ninety-day
2   performance review sheet.  That's where.
3          MS. LEONARD:  Hold on.  We just
4   made it an exhibit.
5          A.  Yeah.  Attendance and dependability
6   issue.  That's it.  It's not related, you
7   know, to pregnancy -- pregnancy.  It's not
8   related to pregnancy.
9          Q.  Did you consider any absences other
10  than what is on Exhibit 2 or any attendance
11  issues other than what's on Exhibit 2?
12         A.  Yes.
13         Q.  What else did you consider?
14         A.  I'm sorry?
15         Q.  What else did you consider?  Is
16  this everything you considered on her
17  attendance, Exhibit 2?
18         A.  Uh-huh.  When I -- when I made a
19  decision to terminate her, I asked Tracy, Do
20  we have some policy or something like that out
21  of our handbook if somebody will have, you
22  know, bad tardiness or bad attendance, how can
23  we do that or something like that.
24             She explained we have the right --
25  ninety-day probation or something like that.

Deposition of JAY KIM
January 31, 2008

Page 88

1          So Tracy explained to me, Tarsha,

2  okay.  So I showed, you know, this statement

3  to Tracy because -- because I don't want to --

4  I didn't want to mix -- write this -- you

5  know, the legal issues or something like that.

6       Q.  Tell me what you remember about the

7  day Ms. Hunter was fired.

8       A.  August 25th.  August the 25th.

9       Q.  Why was that day the day she was

10  fired?

11       A.  I'm sorry?

12       Q.  Why did you fire her on the 25th as

13  opposed to the 23rd or the 24th?

14       A.  There is not a reason.  There was

15  not a reason.

16       Q.  All right.  And tell me what you

17  remember about how Ms. Hunter was terminated

18  on that day.

19       MR. BARNETT:  What happened?  She

20  wants to know what happened on the 25th.

21       A.  On the 25th?

22       Q.  Uh-huh.

23       A.  In my memory, I had a meeting with

24  Tarsha and Sonechka.

25       Q.  Did you record the meeting?

Deposition of JAY KIM
January 31, 2008

Page 94

1    you remembered anything else about that

2    meeting.

3                THE WITNESS:  No, because, you

4    know, I had a brief, you know, meeting.

5         Q.  Have you told me everything that

6    you remember about the reasons Ms. Hunter was

7    terminated?

8                Have you told me everything you

9    remember about why Tarsha was fired?

10        A.  Yeah, I told you, you know.

11        Q.  I'm not asking you to say it

12   again.

13               MR. BARNETT:  Just say yes.

14        A.  Yes.

15        Q.  Have you had any employees that

16   were pregnant work for you?

17        A.  Right -- currently?

18        Q.  At Mobis.

19               MR. BARNETT:  Have you had any

20   employees at Mobis who were pregnant while

21   they were working for you?

22        A.  Yeah.  Currently, you know --

23   currently, you know -- at this point I have

24   one girl that -- assistant, she has a

25   pregnancy now.

EDMONDSON REPORTING & VIDEO, INC.
Email:  Edmondsonrpting@bellsouth.net    Phone 205.324.2333  Fax 205.324.2377

Deposition of JAY KIM
January 31, 2008

Page 95

1          Q.   Okay.

2          A.   One or two months along.

3          Q.   All right.

4          A.   So --

5               MS. RIEDLER:   Really, who is

6     pregnant?

7               THE WITNESS:   Sacouya.

8               MS. RIEDLER:   Okay.

9          A.   So really, you know, when I heard

10    from, you know, that person, that employee, at

11    that point I told her, Congratulations or

12    something.   It's her second baby.   So --

13         Q.   How long has she worked for you?

14         A.   Almost two -- two months.

15         Q.   Okay.

16         A.   Two or three months.

17         Q.   All right.   Is she going to --

18         A.   I'm sorry.   She just, you know,

19    completed, you know, the ninety-day probation

20    in my memory.   So almost three or four months

21    right now, I think.

22         Q.   All right.   And this is going on

23    now while Ms. Hunter's lawsuit is pending,

24    correct?

25         A.   I'm sorry?

Deposition of JAY KIM
January 31, 2008

Page 96

1          Q.  The employee you're talking about

2     works for you now, today, as we're -- you're

3     giving this deposition?  She's working for you

4     now?

5          A.  Yeah, she is working for now.

6          Q.  I just want to make sure.

7          A.  Yeah.

8          Q.  And she's two months, three months

9     pregnant right now?

10          A.  I couldn't remember but, yeah, but

11     maybe.

12          Q.  Okay.  Other than her and Tarsha,

13     any other employees that have been pregnant

14     who have worked for you?

15          A.  Currently or --

16          Q.  At any time.

17          MS. RIEDLER:  Ever.

18          A.  Okay.  Okay.  I remember the one

19     Korean, Korean lady, she has -- worked 2006 in

20     my memory.

21          Q.  All right.

22          A.  She was the assistant like Tarsha.

23     But she left Mobis Alabama after two or three

24     months.  She is not working.

25          Q.  Okay.

# EXHIBIT

# F

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

TARSHA NICKOL HUNTER,     )
          )
    **Plaintiff,**       )
          )    **Civil Action No.: 2:07-CV-427-WHA**
**vs.**            )
          )
**MOBIS ALABAMA, LLC,**    )
          )
    **Defendant.**      )

## SUPPLEMENTAL AFFIDAVIT OF JAEKWANG (JAY) KIM

STAT E OF ALABAMA   )

COUNTY OF ELMORE   )

**BEFORE ME,** the undersigned authority, personally appeared Jaekwang (Jay) Kim who, after being first duly sworn, states as follows:

My name is Jaekwang (Jay) Kim. I am over the age of eighteen (18) years and have first-hand knowledge of the contents of this affidavit. I reside in Montgomery, Alabama, with my wife and two (2) children. I am a native of Korea.

1.    I have been employed by MOBIS Alabama, LLC ("MOBIS") as its Chief Financial Officer ("CFO) since February 10, 2003. My duties as MOBIS' CFO include overall responsibility for the Accounting Department. Before that I was employed by MOBIS, or affiliates of MOBIS, in Korea, for a total of twenty (20) years.

2.    I have been asked to supplement my affidavit in support of MOBIS' Motion for Summary Judgment to cover new issues, or clarify ones addressed before, in response to Plaintiff's Opposition Brief.

1

3.    I knew that MOBIS had an attendance policy when I first met with Ms. Riedler about Plaintiff's attendance issues about one week before Plaintiff was terminated, but I did not know that it stated that a probationary employee had to be terminated after three (3) occurrences. I thought the standard was flexible.

4. I had consulted Ms. Riedler in person on other occasions in the past when I was not sure of company human resources policies.

5. I reluctantly agreed to offer Plaintiff probationary employment because Ms. Womack felt strongly that she needed her. I did not want Plaintiff in my department because her attendance was so poor during her temporary period, but I did not want to burden Ms. Womack with more work and having to train a new employee.

6. I was never optimistic that Plaintiff's attendance would improve enough during her probation that she would become a regular employee, but agreed with Ms. Womack to give Plaintiff a chance.

7. I have attached a chart showing the attendance records of my current staff in Accounting during their probationary periods (See attached Ex. 1).

Executed on May _9th_, 2008.

_____

**JAEKWANG (JAY) KIM**

Sworn to and subscribed before me on this the 9ᵗʰ day of May, 2008 .

Notary Public
My Commission Expires: NOTARY PUBLIC STATE OF ALABAMA AT LARGE
MY COMMISSION EXPIRES: Oct 13, 2010
BONDED THRU NOTARY PUBLIC UNDERWRITERS

[SEAL]

2

# EXHIBIT 1

# SUPPLEMENTAL AFFIDAVIT OF JAEKWANT (JAY) KIM

**ACCOUNTING AND FINANCE DEPARTMENT**
**ABSENTEEISM RECORD DURING 90 DAY PROBATION**

| Last Name | First Name | Start Date | End of 90 Day Probation | Date of Absence, Tardy, E/O | Reason for Absence, Tardy, E/O | Length of time out |
|---|---|---|---|---|---|---|
| Perez | Stephanie | 2/14/2005 | 5/14/2005 | None | | |
| Owens | Madeline | 10/2/2006 | 1/2/2007 | None | | |
| Ismail | Rebecca | 12/11/2006 | 3/11/2007 | None | | |
| Kim | Sogong | 2/12/2007 | 5/12/2007 | 03/27/2007 | Doctor for daughter | 2.5 |
| | | | | 04/19/2007 | Home Repair | 0.83 |
| Robertson | Sacouya | 7/16/2007 | 10/15/2007 | None | | |
| Hillary | Darrius | 1/22/2008 | 4/22/2008 | 1/30/2008 | Illness | 8 |
| | | | | 1/31/2008 | Illness | 8 |
| Allesandro | McCray | 3/24/2008 | 6/22/2008 | None | | |

# EXHIBIT

# G

73

1   Q.   And what page again?

2   A.   131.

3   Q.   Did you read this section of the handbook

4        about probationary period policies and

5        procedures?

6   A.   Yes.

7   Q.   Did you read the part under policy about the

8        ninety days of employment are considered --

9        the first ninety days are considered a

10       probationary period?

11  A.   Yes.

12  Q.   Did you read the part under section 2.5 about

13       any employee who has three absentee

14       occurrences would be terminated?

15  A.   Yes.

16  Q.   And you understood that applied to you,

17       right?  I'm sorry, your answer?

18  A.   Repeat that again.

19  Q.   You knew that this policy applied to you for

20       the first ninety days after June 5th, 2006?

21  A.   Yes.

22  Q.   So you knew that if you had three occurrences

23       you would be terminated?

74

1    A.    By what the handbook states, yes.

2    Q.    Did anybody tell you anything different at any

3          time?

4    A.    No.

5    Q.    So we don't have a disagreement about the fact

6          that you read this policy on page 131?

7    A.    No.

8    Q.    And you acknowledge that you knew it applied

9          to you once you became a regular employee on

10         June 5th or 6th, right?  You knew it applied

11         to you?

12   A.    Yes.

13   Q.    And you knew about section 2.5?

14   A.    Yes.

15   Q.    And nobody told you anything different from

16         what this piece of paper says that's on page

17         131 and 132?

18   A.    Correct.

19   Q.    And whoever the man was that talked to y'all

20         during the orientation didn't tell you

21         anything different from this policy --

22   A.    Correct.

23   Q.    -- did he?

79

1           for identification.)

2           MS. SMITH:  That's 13.

3           MR. BARNETT:  Yes.

4    Q.    Let me show you Exhibit 13.  Have you seen

5          that document before?

6    A.    Only through my attorney.

7    Q.    This shows seven attendance incidents.  And my

8          question to you is if you have cause to

9          disagree with any of those as either not

10         having occurred or that you were charged with

11         too much or too little time off.

12   A.    The only thing that stands out is 8/14/06.

13   Q.    Right.

14   A.    The other days I would have to go back to my

15         records.

16   Q.    What stands out about 8/14?

17   A.    I was there at work.  I didn't take off.

18   Q.    All day?

19   A.    Yes.

20   Q.    And what is it that makes that so clear in

21         your memory?

22   A.    Because that was the day that I was supposed

23         to go to my first doctor's appointment for

1      pregnancy, and I had to switch it to another

2      day.

3  Q.  Did you put in a slip for the 14th?

4  A.  Yes, I did.

5  Q.  Do you remember what day you switched it to?

6  A.  Yes, August the 9th.

7  Q.  Well, did you move it up you're saying?

8  A.  It was rescheduled from the 14th to the 9th.

9  Q.  Let me show you 17.

10              MS. LEONARD:  Did you mean to skip

11                  from 13 to 17?

12              MR. BARNETT:  Yes, I did.

13              MS. SMITH:  13.

14              MR. BARNETT:  Let's not do that.

15                  Maybe we shouldn't do that.

16              MS. LEONARD:  That's all right.  I

17                  just want to make sure.

18              MR. BARNETT:  Listen, anybody that

19                  sees me doing something dumb

20                  like that is invited to correct

21                  me.

22              MS. LEONARD:  I just didn't want us

23                  to get into trouble later

looking for three exhibits that

may not exist.

(Off-the-record discussion.)

(Defendant's Exhibit Number 14 marked

for identification.)

MR. BARNETT:  All right.  Is it 14?

MS. LEONARD:  Correct.

MS. SMITH:  Yes.

Q.    All right.  Did you turn this in, Ms. Hunter?

A.    Yes, I did.

Q.    And so your testimony is that after the 3rd

when you turned this in you rescheduled for an

earlier day on the 9th?

A.    On the 9th, correct.

Q.    I'm just not understanding.  Will you read the

reason for absence there.

A.    I submitted a request for August the 9th, but

the appointment has been rescheduled to August

the 14th, nine-thirty a.m.  I still need a

half a day.

Q.    Well -- and I'm not arguing with you.  But

this reads to me like you scheduled it for the

9th and then rescheduled for the 14th?

82

1  A.    On this sheet of paper, that's correct.

2  Q.    Well, what happened after that?  Did something

3        else happen?

4  A.    Yes.

5  Q.    What was that?

6  A.    The doctor that I was going to see on --

7        during this time, the 9th and the 14th, was

8        another doctor.  And I changed my doctor.

9  Q.    Okay.  Who were you going to go see?

10  A.    Zimmerman.  Dr. Zimmerman.

11  Q.    All right.  Did you ever see Dr. Zimmerman

12        with respect to the pregnancy that we're

13        talking about now?

14  A.    No.

15  Q.    Did you read the complaint that your lawyer

16        filed on behalf of you in this lawsuit before

17        it was filed?

18  A.    I would have to look at it to be familiarized.

19              MS. SMITH:  That's 15.

20              (Defendant's Exhibit Number 15 marked

21              for identification.)

22  Q.    (Mr. Barnett continuing) Do you recognize this

23        document, Exhibit 15?

1    and just said uh-huh (positive response).  And

2    at the time when I was talking to him, I was

3    telling him about the procedure that I needed

4    to have done, which was on that Friday, the

5    11th, and just working out my schedule for the

6    rest of the week.

7    Q.    Didn't he say congratulations to you?

8    A.    No.

9    Q.    He never did?

10   A.    I don't remember.

11   Q.    Did you ever take an ultrasound to work?

12   A.    Yes.

13   Q.    When was that?

14   A.    That was after -- I think it was that -- that

15         day, the 9th.

16   Q.    How many ultrasounds did you have during this

17         pregnancy?

18   A.    I cannot recollect, but it was more than

19         three.

20   Q.    All done by Physicians for Women?

21   A.    Yes.

22   Q.    More than three?

23   A.    As well as the abortion clinic.

115

1   A.   Nothing.  He made a grunt and just looked at

2        me.

3   Q.   Had y'all had problems in the office with

4        month-end closeouts before August 9th?

5   A.   Problems?

6   Q.   Getting it done.

7   A.   I remember Jay always talking about month-end

8        closing.

9   Q.   Had you been told that your absences during

10       your probationary period were causing problems

11       in the accounting department before

12       August 9th?

13  A.   No.

14  Q.   Did you know that you had more than three

15       absences, tardies, or leave earlies before

16       August 9th?

17  A.   Yes.

18  Q.   Did you wonder why you had not been terminated

19       in view of the policy?

20  A.   No.

21  Q.   Did you ask anybody that?

22  A.   No.

23            MR. BARNETT:  Did you find the

122

1 Q. Pardon?  Let me try it another way.

2 A. Okay.

3 Q. If the records show that Mobis has had many

4   women get pregnant, take FMLA leave, and

5   return to work, would you have any reason to

6   disbelieve those records?

7 A. No.

8 Q. You said Jay Kim grunted when you told him --

9 A. Yes.

10 Q. -- that you were pregnant.  Did he say any

11   words?

12 A. "What?"

13 Q. What?

14 A. Yes, as if in a dismayed sort of way.

15 Q. What else did he say?

16 A. Nothing else to the pregnancy, just the fact

17   as far as I asked him if I could work Friday

18   and then take the rest of the day off to have

19   a procedure.

20 Q. And what did he say?

21 A. He said yes.

22 Q. What did he say when you left the room?

23 A. Nothing.

HAISLIP, RAGAN, GREEN, STARKIE & WATSON, P.C.
(334) 263-4455

129

Q.   And that was based on those two other women
     we've talked about multiple times?

A.   Correct.

Q.   Other than those two women, do you know of any
     person who -- have you heard of any person who
     has been the victim of pregnancy
     discrimination at Mobis?

A.   Unh-unh (negative response).

Q.   Or even allegedly so?

A.   I haven't heard.

Q.   If Mobis takes the position in this lawsuit
     that they treat people with pregnancy -- they
     treat pregnancies exactly the same as they
     treat illness and injury when it comes to
     attendance policies, would you have any basis
     for disagreeing with that statement?

A.   Yes.

Q.   All right.  And what would the facts be that
     support your disagreement?

A.   Due to the fact that it was several people as
     far as attendance issues in the same office.
     No, she was not pregnant, but she had the same
     attendance issues, where she was tardy.  And

135

```
 1              him it's because she's pregnant?
 2    A.        Yes.
 3    Q.        Do you know of any occasion that they spoke to
 4              him on that subject before the 24th?
 5    A.        No.
 6    Q.        Do you know if Jay Kim had had any training or
 7              education about discrimination?
 8    A.        I'm not aware of it.
 9    Q.        Do you know how many more absences you had
10              between the 9th and the time Jay Kim decided
11              to terminate you?  Well, do you know when
12              Jay Kim decided to terminate you?
13    A.        No, I do not.
14    Q.        But you heard on the 24th that he had decided?
15    A.        After the fact I told him I was pregnant,
16              correct.
17    Q.        Well, you told him on the 9th, and you found
18              out on the 24th?
19    A.        Uh-huh (positive response).
20    Q.        Do you have any reason for the Court as to why
21              Jay Kim would have waited from the 9th to the
22              25th to terminate your employment if it was
23              because you were pregnant?
```

```
 1   Q.   Did you understand that he was warning you

 2        that your long-term employment could be in

 3        jeopardy if you continued to miss work during

 4        your probationary period?

 5   A.   Yes.

 6   Q.   How late were you on the 26th?

 7   A.   I don't remember.

 8   Q.   Do you remember why you were late?

 9   A.   No, I'm not sure.  I do remember the 26th.

10        That is the day that -- that's the same day

11        that I went in and I gave him the information

12        as far as with my daughter's schoolwork -- not

13        schoolwork, but information for the school.

14   Q.   Was it some information prepared by the school

15        in a booklet?

16   A.   The handbook, yes.

17   Q.   The school handbook?

18   A.   Yes.

19   Q.   So do you now remember how late you were?

20   A.   It was about eight fifteen, I believe, when I

21        got there.

22                  (Defendant's Exhibit Number 17 marked

23                  for identification.)
```

1   A.   It was prior to this e-mail.  I don't remember

2         when, even before August the 9th.

3   Q.   Did Sonechka tell you on or about August the

4         14th that Jay Kim had asked her to, basically,

5         tally up your attendance since you became a

6         ninety-day probationary employee?

7   A.   No, I don't remember.

8   Q.   Did you know that -- well, you knew, of

9         course, your ninety-day probationary period

10        was coming up sometime around -- well, after

11        ninety days, after June 6th, right?

12   A.   Correct.

13   Q.   Were all of the times you missed work during

14        your probationary period necessary?

15   A.   Yes.

16   Q.   Did you ever discuss with any of your doctors

17        coming in early or late so that it wouldn't

18        count against you at work?

19   A.   No.

20               (Off-the-record discussion.)

21   Q.   What day did you have that procedure done, the

22        stitch procedure, the cerclage?

23   A.   August the 11th, on Friday.

1    A.    Correct.

2    Q.    Where?

3    A.    In Jay's office.

4    Q.    All right.  Tell me everything that was said

5          in there.

6    A.    I asked Jay why had he been so different

7          towards me, why hasn't he been talking to me

8          as he stated -- talked to me before?  What was

9          the problem?  And Jay replied -- he just said,

10         I don't know what's up.  I don't know.  What's

11         up with you?  I said, what's going on, Jay?

12         He said, I don't know what's up.  And when I

13         asked him -- I said, okay, what's going on

14         with you as far as your demeanor towards me?

15         You've changed.  You won't come my way.  You

16         won't look at me.  You won't talk to me.

17         Everything is by Sonechka only.

18              And then he -- he sat there for a

19         minute.  And then he said, I can't afford to

20         take care of an employee like you.

21   Q.    I can't what?

22   A.    Take care of a -- I can't take care of an

23         employee like you.

179

1    Q.    Okay.

2    A.    I asked him what that meant.  He just

3           (indicating).  I can't -- I don't know.  I

4           just can't afford to take care of an employee

5           like you.

6    Q.    What else did you say and what else did he

7           say?

8    A.    Then, once again, I asked him to explain.  And

9           then that's when Sonechka started speaking.

10    Q.    I'm sorry.  I missed the first part.  Who

11           asked who to explain?

12    A.    I asked him to explain what he meant by that.

13           And he ignored the question.  And Sonechka

14           started speaking with him, also said in his

15           face that it was only just because I was

16           pregnant.  And all Jay could do is just get up

17           and go to Tracy's office.  And then the next

18           time him and Tracy came back.

19    Q.    You were raising your voice at him, weren't

20           you?

21    A.    No, I was not.

22    Q.    Did it become a heated discussion?

23    A.    No.

1    as how Jay Kim has been as far as towards her,

2    different situations, and other Mobis

3    employees.

4  Q.   Who is he discriminating against, according to

5       Nicole Boswell?

6  A.   It was talked about even before I left and

7       after I left as far as their -- Korean's

8       demeanor on women regardless.

9  Q.   Even Korean women?

10  A.   Yes.

11  Q.   So that would be -- did Jay Kim have a

12       demeanor problem with women?  Is that what

13       you're saying?

14  A.   Yes.

15  Q.   All women?

16  A.   He would always state as far as his country,

17       how his culture would react in a situation as

18       far as with -- towards women or towards a

19       particular situation.

20  Q.   Did he ever say anything degrading about

21       women?

22  A.   No.  I never heard him say anything degrading.

23  Q.   Okay.  He just talked about the differences in

193

1          his culture and this culture about women?

2     A.   Correct.

3     Q.   Did he ever mention pregnancy?

4     A.   No.

5     Q.   But he never said anything -- well, what did

6          he say about his culture and women?

7     A.   Women had no place to speak.

8     Q.   Did he endorse that?  Did he think that was

9          good?  Did he say one way or the other?

10    A.   He wouldn't say.  I just remember his

11         reactions towards Sonechka and the difference

12         between Sonechka and Hosang, how he would

13         relate to them.  And they were both managers.

14    Q.   Yes.  And Sonechka was not pregnant, was she?

15    A.   No.

16    Q.   Anything else between you and Nicole Boswell

17         about --

18    A.   No.

19    Q.   -- your discussions about -- that she might

20         testify to or that she knows?

21    A.   No.

22    Q.   Okay.  Have you spoken with Dean Seales since

23         you left Mobis?

# EXHIBIT

# H

**tracy.riedler@mobis-america.com**

| | |
|---|---|
| **From:** | tracy.riedler@mobis-america.com |
| **Sent:** | Wednesday, August 23, 2006 4:13 PM |
| **To:** | 'Jay Kim' |
| **Subject:** | RE: 90 DAY Work Performance Review Sheet |

**Tracking:** **Recipient Read**

       'Jay Kim'   Read: 8/23/2006 4:29 PM

Sounds good.  I will wait to hear word from you.

---

**From:** Jay Kim [mailto:jay.kim@mobis-america.com]
**Sent:** Wednesday, August 23, 2006 3:24 PM
**To:** tracy.riedler@mobis-america.com
**Subject:** RE: 90 DAY Work Performance Review Sheet
**Importance:** High

Tracy,
I am contacting headquarters to cancel my business trip to Korea due to purchasing member's interest from C &
A.
But, I am not sure that they would approve it or not.
I need to contact them this evening again.

My concerning for termination of Tarsha is Sonechka wants to keep her.
Because of she might be not like any kind of changes.
Then I do not want to take care of Tarsha anymore.
f I will be stayed in the next week, I need your help to terminate her.
 will let you know whether I am available or not.

Thanks.

---

**From:** tracy.riedler@mobis-america.com [mailto:tracy.riedler@mobis-america.com]
**Sent:** Wednesday, August 23, 2006 10:20 AM
**To:** 'Jay Kim'
**Subject:** 90 DAY Work Performance Review Sheet
**Importance:** High

Here is the 90 Day Performance Review Form.  Please make comments, sign and return to me.  Do you want to
erminate her prior to your trip to Korea?  You will interview two Accounting candidates this week.  Please let me
now and I will help you with the termination meeting.



PENSAD 800-631-6989
PLAINTIFF'S
EXHIBIT
5

/9/2007

# EXHIBIT

# I

Deposition of SONECHKA L. WOMACK
February 1, 2008

Page 12

```
1         Q.   Generally though, who had the
2    authority to terminate employees in the
3    accounting department?
4         A.   Jay Kim.
5         Q.   All right.  Who was responsible for
6    monitoring Ms. Hunter's attendance?
7         A.   Myself, and Jay would do it as
8    well.
9         Q.   Okay.  What would y'all do to track
10   for attendance?
11        A.   I think Jay kept an Excel
12   spreadsheet or something like that.
13        Q.   All right.  I'm going to show you a
14   document that has been an exhibit in another
15   deposition.  It's been previously marked as
16   Plaintiff's Exhibit Number 10.  Have you ever
17   seen a form like --
18        A.   That's it.
19        Q.   Okay.
20        A.   I forgot about that.
21        Q.   That's all right.  When you say
22   that's it, what do you mean?
23        A.   That's the page.  I mean, he would
24   keep up with Excel, but I -- but this is an
25   absentee request.
```

Deposition of SONECHKA L. WOMACK
February 1, 2008

Page 13

1    Q.  So absences or tardies or leaving

2  earlies would be documented on forms like

3  Plaintiff's Exhibit Number 10?

4    A.  Absentees, and I don't know for

5  sure about tardies.  I think he would just

6  keep that on his spreadsheet or whatever.

7    Q.  The section at the bottom that says

8  manager's approval, who typically would

9  approve -- would fill that out?

10    A.  Sometimes I would sign it or Jay

11  or --

12    Q.  All right.  I'm going to actually

13  show you a document that I'm going to mark as

14  Plaintiff's Exhibit 15, which is Defendant's

15  Bates number 184.

16         (Plaintiff's Exhibit Number 15 was

17         marked for identification.  A copy

18         is attached.)

19    A.  Okay.

20    Q.  Have you ever seen that document

21  before?

22    MR. BARNETT:  I'm going to look

23  with you, if that's all right.

24    A.  Just this one in -- just this one

25  specifically?

Deposition of SONECHKA L. WOMACK
February 1, 2008

Page 22

1    pregnancy?

2         A.  She may have in the beginning.  I

3    can't really --

4         Q.  That's all right.

5         A.  I can't really remember.

6         Q.  Do you remember how long after she

7    started as a full-time Mobis employee that

8    Ms. Hunter shared with you that was pregnant?

9         A.  I'm not -- I'm not sure.  I mean,

10   it wasn't like toward the end, but I guess I

11   would say I knew for more than maybe -- I

12   don't know.

13        Q.  That's all right.

14        A.  I'll just say that.

15        Q.  That's all right.  Do you remember

16   any occasion in August where Ms. Hunter may

17   have put in an absence request form for a

18   doctor's appointment and then later come to

19   you to let you know that she no longer needed

20   to be off on that day, that the appointment

21   had changed?

22        A.  Wait.  Could you repeat that

23   question?

24        Q.  Sure.  Do you remember any

25   circumstance in August of 2006 where

Deposition of SONECHKA L. WOMACK
February 1, 2008

1  Ms. Hunter had requested to be off on one day

2  for a doctor's appointment for a procedure and

3  then came to you to let you know that the

4  doctor had changed the date for the procedure?

5       A.  I think so.

6       Q.  All right.  And to the best of your

7  knowledge, did -- I don't know how to ask that

8  question.  So I'll come up with a different

9  one.

10       Do you know if Ms. Hunter ever

11  shared with Mr. Kim that she was pregnant?

12       A.  Yes.

13       Q.  Tell me what you know about that.

14       A.  It may have been after an

15  appointment or whatever.  She had to be out

16  for an appointment, and then she came back

17  with a -- with a sonogram.

18       Q.  Okay.

19       A.  And showed it to him.

20       Q.  All right.  Were you present when

21  she did that?

22       A.  I wasn't in there, but she -- I

23  think she told me that she showed it to him, I

24  think.

25       Q.  I'm going to show you another

Deposition of SONECHKA L. WOMACK
February 1, 2008

Page 26

1    referenced?

2            A.   Probably that Excel spreadsheet.

3            Q.   Okay.  I'm going to show you what's

4    been previously marked as Plaintiff's Exhibit

5    Number 2.  Does that appear to be the Excel

6    spreadsheet?

7            A.   Yes.  Uh-huh.

8            Q.   What was Mr. Kim asking you to do

9    in that August 14th e-mail?

10           A.   Just to fill out the times that

11   she's been absent.

12           Q.   All right.  Can you tell from that

13   e-mail whether Mr. Kim was keeping information

14   on Ms. Hunter's attendance prior to that date?

15           A.   He would ask, like -- he would

16   ask -- because for everybody he's always

17   wanted to keep up with that.  But I think he

18   kind of was keeping up with something just to

19   make sure I had the same thing.

20           Q.   Okay.

21           A.   I'm not --

22           Q.   That's all right.

23           A.   I'm not sure.

24           Q.   That's fine.  I'm trying to go

25   through -- you've answered some questions.  So

Deposition of SONECHKA L. WOMACK
February 1, 2008

Page 27

1   I'm trying to delete them out real quick.

2          Do you know if during the time you

3   worked for Mr. Kim if there were any other

4   pregnant employees in the department other

5   than Ms. Hunter?

6          A.  No.

7          MR. BARNETT:  I'm sorry, what was

8   the answer?

9          A.  No.

10         Q.  Did you observe any changes in the

11   way Mr. Kim treated Ms. Hunter after he

12   learned that she was pregnant from the way he

13   treated her before?

14         A.  He's kind of moody.  So, like, if

15   anybody was absent or whatever, he kind of

16   would be distant or whatever.  And so after

17   the pregnancy --

18         Q.  I'll rephrase.  Did he appear to be

19   more distant from Ms. Hunter after he learned

20   that she was pregnant than he had been with

21   her before he learned that she was pregnant?

22         A.  I can't -- it would just be in

23   spurts.  So maybe that kind of brought him

24   back to being distant, you know.

25         Q.  Okay.  Based on your observation --

Deposition of SONECHKA L. WOMACK
February 1, 2008

Page 28

1          MR. BARNETT:  I'm sorry, I didn't

2    hear the answer.  Could you read it to me?

3          (Court Reporter reads back.)

4          Q.  Did you find that after Mr. Kim

5    learned Ms. Hunter was pregnant, he

6    communicated to her through you more than he

7    had prior to that point?

8          A.  That -- that may have been my

9    feeling just because I knew the situation.

10   But like I said, he's kind of like that when

11   anything --

12         Q.  Okay.

13         A.  Any kind of changes occur like

14   absence or tardies or anything.  So whatever

15   comes up that doesn't go along with how -- you

16   know, so --

17         Q.  But it was your feeling or

18   perception --

19         A.  My feeling or perception.

20         Q.  -- that he was talking to

21   Ms. Hunter through you more after he learned

22   that she was pregnant?

23         A.  Yes.

24         Q.  At some time in August 2006, did

25   someone make the decision Ms. Hunter would be

EDMONDSON REPORTING & VIDEO, INC.
Email:  Edmondsonrpting@bellsouth.net        Phone 205.324.2333  Fax 205.324.2377

Deposition of SONECHKA L. WOMACK
February 1, 2008

Page 36

1    reason.

2              Q.   Were you present in the meeting

3    where Ms. Hunter was terminated?

4              A.   Yes.

5              Q.   Tell me what you recall about that

6    meeting.

7              A.   I think Tracy, Jay and I and Tarsha

8    was in the meeting.

9              Q.   Okay.  And tell me what you recall

10   happening.  I appreciate that it was almost

11   two years ago.  So I'm not going to expect you

12   to reenact the meeting.  But just tell us what

13   you can recall.

14             A.   Just that she was being terminated.

15             Q.   Did -- I'm sorry.  You go ahead.

16             A.   Go ahead.

17             Q.   Don't let me interrupt you.

18             A.   That was pretty much it.

19             Q.   Did he give her a reason as to why

20   she was being terminated?

21             A.   It had to have been because of the

22   tardies, because that's what he kept telling

23   me, because of the absentees and the tardies

24   and things.

25             Q.   Do you recall in that meeting

Deposition of SONECHKA L. WOMACK
February 1, 2008

Page 37

1    Mr. Kim saying anything to Ms. Hunter along
2    the lines of, I can't take care of a person
3    like you?
4          A.   I can't remember that, but -- I
5    could hear -- I mean, I can hear it -- I mean,
6    you know, I can imagine it being said.
7          Q.   How long after Ms. Hunter was fired
8    did someone come in to replace her, if you
9    remember?
10          A.   I'm not sure.  It wasn't -- I don't
11    think it was a long period.
12          Q.   Okay.
13          A.   I don't think.
14          Q.   Do you remember an employee named
15    Latoya Williams?
16          A.   Yes.
17          Q.   What job did Ms. Williams do?
18          A.   I think she was clerk, accounting
19    clerk, temporary.
20          Q.   Did she work under you or Mr. Hwang
21    or someone else?
22          A.   Supposedly me.
23          Q.   Okay.  And she came to you guys
24    through Multi-Staffing, correct?
25          A.   Yes.

Deposition of SONECHKA L. WOMACK
February 1, 2008

Page 42

1          A.  Okay.

2          Q.  I'll ask you some questions before

3  I ask you about this.

4              During a temporary employment, how

5  does Multi-Staffing know how many hours a

6  temporary employee has worked?

7          A.  I think they have to fill out a

8  time sheet, and then have someone sign it.

9          Q.  The temporary employee fills it

10  out?

11          A.  Yes.

12          Q.  And then has somebody from Mobis

13  sign it?

14          A.  Yes.

15          Q.  And then it goes to Multi-Staffing?

16          A.  Yes.

17          Q.  As far as you know, that's how they

18  know how much to pay that employee?

19          A.  Yes.

20          Q.  Now, as I say, we compiled

21  Defendant's 9 from Multi-Staffing's records

22  based on what Ms. Hunter turned into them.

23  And we've highlighted in yellow tardies,

24  absences and so forth.

25              What was Ms. Hunter's regular start

Deposition of SONECHKA L. WOMACK
February 1, 2008

Page 43

1  time in the morning?

2          A.   8:00 o'clock.

3          Q.   Now, I'm just going to ask you to

4  look at this   You can pay it as much

5  attention as you want to or as little.

6              But do you have any reason to

7  believe that she was absent, tardy, or late

8  significantly less times or fewer times than

9  is shown on Defendant's 9?  I think there are

10  one, two, three, four, five -- seventeen

11  incidents on here.

12          A.   That may be correct.

13              THE COURT REPORTER:  I'm sorry?

14  That may be --

15              THE WITNESS:  That may be correct.

16          Q.   Nothing jumps out at you as being

17  substantially overstated or understated?

18          A.   That looks correct.

19          Q.   What did -- how did Mr. Kim

20  communicate to you his decision to go ahead

21  and give her a ninety-day probationary period?

22          A.   I think he called us both -- we

23  discussed it, and then he called us, me and

24  Tarsha, in his office and stated that he

25  was -- she was on probation but, you know,

Page 44

1    please don't -- he didn't want her to be out

2    and tardy.

3        Q.   Did he say, you know, something to

4    the effect that you're going to be

5    probationary now, but your attendance needs to

6    improve?

7        A.   Right.

8        Q.   Did you tell Tarsha the same thing?

9        A.   Yes.

10       Q.   Do you remember a young lady named

11   Su Jin Lee?

12       A.   Yes.

13       Q.   Are you aware that she was pregnant

14   when she was hired?

15       A.   Not when she -- not when she first

16   started.

17       Q.   How did you find out she was

18   pregnant?

19       A.   She told me.

20       Q.   Did she tell you how far along she

21   was?

22       A.   She may have been -- just been --

23   kind of just found out she was pregnant.

24       Q.   When she was hired?

25       A.   Not when she was hired, but --

Deposition of SONECHKA L. WOMACK
February 1, 2008

Page 46

1  let me stop -- did she work in that same

2  general open office area that you all worked

3  in?

4      A.  Yes.

5      Q.  Do you recall whether she became

6  pregnant while she was at Mobis?

7      A.  Yes.

8      Q.  Do you recall whether she took

9  family medical leave?

10     A.  I don't think I was there when she

11 had the baby.

12     Q.  Did you feel that you were free to

13 speak your mind with Jay Kim about work

14 issues?

15     A.  Yes.

16     Q.  Did he ever say anything to you --

17 never mind.

18         Do you have any reason to believe

19 that Mr. Kim is a bad person?  I didn't ask

20 you if he was easy to work for.

21     A.  I could tell he has a soft heart,

22 but sometimes it's hard to see past -- see

23 that.

24     Q.  Did you keep any notes of anything

25 that happened at Mobis relating to Ms. Hunter

Deposition of SONECHKA L. WOMACK
February 1, 2008

Page 47

1    that you took with you?

2         A.   No.

3         Q.   Did you leave any notes there about

4    her that you know about, other than these

5    forms like Exhibit 15, Plaintiff's Exhibit

6    15?  If you did those.  I'm not saying you

7    did.

8         A.   I know I didn't do those, but

9    maybe, like, other little request sheets.  I

10   know I had a file.

11        Q.   Do you recall that Mr. Kim used the

12   phrase take care of a person?

13        A.   Yes.

14        Q.   Was it something that he said on

15   several occasions?

16        A.   Yes.

17        Q.   Did you understand what -- did you

18   have an understanding of what he meant by

19   taking care of a person?

20        A.   Some -- yes.

21        Q.   What did you think he meant?

22        A.   Just their work.  That's how I

23   interpreted it, even though it sounds like

24   baby-sitting or -- you know, but work wise.

25        Q.   Did Ms. Hunter share with you any

Deposition of SONECHKA L. WOMACK
February 1, 2008

Page 49

1      A.   No.

2      Q.   Did Ms. Hunter ever tell you or

3   confide in you that she might -- that she

4   might be thinking about leaving her job at

5   Mobis?

6      A.   Not -- not that I know of.

7      Q.   Let me show you Exhibit 13,

8   Defendant's Exhibit 13.

9           I believe you saw this earlier as

10  one of Ms. Leonard's exhibits.  Do you

11  remember looking at that?

12     A.   Yes.

13     Q.   Other than Ms. Leonard's question

14  about an appointment being scheduled and then

15  rescheduled that you testified you had a

16  memory about, looking at Exhibit 13 here, does

17  anything appear to be inaccurate or

18  overstated --

19          MS. LEONARD:  Object.

20     Q.   -- as far as her attendance record?

21          MS. LEONARD:  Object to the form.

22  Foundation.  You can answer.

23     A.   It looks correct.

24     Q.   Does there appear to be anything on

25  there that he recorded relating to Ms. Hunter

Deposition of SONECHKA L. WOMACK
February 1, 2008

Page 53

1          A.   Well, other than that, uh-huh.

2     Everyone was permanent.

3          Q.   Do you know what prompted Mr. Kim

4     to send this e-mail to his staff?  Well, it

5     now says, To all of staff.

6               So do you know what prompted him to

7     send this e-mail?

8          A.   Probably because someone may have

9     been tardy or something.

10         Q.   Is it fair to say that Mr. Kim was

11    a stickler about attendance?

12         A.   Yes.

13         Q.   And about arriving at work on time?

14         A.   Yes.

15         Q.   Now, it looks to me as though you

16    sent or forwarded this e-mail to Tarsha Hunter

17    with a copy to Jay Kim on or about August

18    10th, '06.  Do you see that?

19         A.   Yes.

20         Q.   Do you remember why you forwarded

21    that e-mail to her?  That would be several

22    weeks later after Jay sent it out.

23         A.   Do you mean this May the -- May

24    9th?

25         Q.   It's hard for me to tell.  It looks

Deposition of SONECHKA L. WOMACK
February 1, 2008

Page 54

1    like you may have sent it to her on May 9th

2    and then again on August 10th.  I'm just

3    asking you.

4            A.  Oh, okay.

5            Q.  Read what you say right here.

6            A.  As cited from the below e-mail,

7    please submit a schedule of time that you'll

8    be able to make up for your absences.  We

9    completely understand your current health

10   condition, but this policy has been set for us

11   to comply with.  You've been away from the

12   office numerous times.  This is not to

13   discourage you.  This is just to keep fairness

14   throughout this department.

15           Q.  Right.  Now, does that give you

16   any -- does that refresh your recollection as

17   to whether you forwarded this -- pages 76 and

18   77 -- 176 and 177 to Tarsha Hunter on August

19   10th?

20           A.  Yes.

21           Q.  Look below that.  On May 9th, it

22   looks like you forwarded something without any

23   comment.

24           A.  Uh-huh.

25           Q.  Do you know what you were

Deposition of SONECHKA L. WOMACK
February 1, 2008

Page 55

1    forwarding to her at that point in time?  What

2    I'm trying to find out is whether you may have

3    forwarded that memorandum to her on two

4    occasions.

5          A.  Yes.  I think this one may have

6    been -- Jay may have wanted me to send it --

7          Q.  This one being?

8          A.  In May, because I don't know when

9    she became a permanent employee.

10         Q.  She became permanent on or about

11   June the 5th.

12         A.  Okay.  He may have told me to

13   submit that to her.

14         Q.  Let me show you Exhibit 19 -- once

15   again, Defendant's Exhibit 19 from a prior

16   deposition.

17              Did you recall sending this e-mail

18   to Tarsha on or about August 14th?

19         A.  Yes.

20         Q.  When you say there had been quite a

21   few instances that Jay has excused, what were

22   you referring to?

23         A.  Being tardy.

24         Q.  Did you feel that considering --

25   well, you stated here that I feel that he,

# EXHIBIT

# J

sonechka.womack@mobis-america.com

| | |
|---|---|
| **From:** | Jay Kim [jay.kim@mobis-america.com] |
| **Sent:** | Wednesday, July 26, 2006 8:25 AM |
| **To:** | 'Tarsha Hunter' |
| **Cc:** | sonechka.womack@mobis-america.com |
| **Subject:** | Notification (July 26,2006) |
| **Importance:** | High |

Tarsha,

This is a notification for tardiness.
On Wednesday the 26th you were noted as being tardy, this was not a first time during 90-day probationary.
I need for you to keep the starting time for business, everyday.

When you return from doctor's office, please submit the doctor's note and schedule for make-up time.
In addition, you are reminded that you are still serving out your probationary period and that attendance is very important.
Please make every effort to correct these deficiencies as your long term employment may be in jeopardy.

Thanks.

**Jay K. (Jae-kwang)  Kim / CFO**

MOBIS Alabama,LLC.
1395 Mitchell Young Road,
Montgomery, AL 36108

Tel : 334-387-4802
Fax : 334-387-4900
E-mail : *jay.kim@mobis-america.com*

DEFENDANT'S
EXHIBIT
16

PENGAD 800-631-6989

7/26/2006

**HUNTER V. MOBIS**
**00172**

# EXHIBIT

# K

sonechka.womack@mobis-america.com

| | |
|---|---|
| **From:** | sonechka.womack@mobis-america.com |
| **Sent:** | Wednesday, August 02, 2006 10:35 AM |
| **To:** | 'Tarsha Hunter' |
| **Cc:** | 'Jay Kim' |
| **Subject:** | Invoices/Statements, etc. |

Hello Tarsha,

Please remember to make sure that all invoices are entered into SAP on the day received. It is very important that the invoices are entered and then distributed to the responsible person in a timely manner. There is a small timeframe that the responsible person has to complete their task and return the invoice to our department for payment. The President holds each person liable if the invoice is not processed on time. If they receive the invoice late, they will report to it Jay and the President that accounting did not give it to them on time.

I understand that sometimes you will run into some problems, but please try to have the invoices entered everyday before you leave. Let me know if you run into any problems.

Also, regarding statements from vendors, please review the statement to see if the invoices listed have been paid/accounting document generated/received by MOBIS. After doing so, please submit the statement with documentation of your research to me and then I will forward it to Jay.

I completely understand that you are juggling a lot of work. Jay is working on hiring more people in our department. But in the meantime, please continue to do your best because everything we do reflects our job evaluation.

Thank you for your hard work! I appreciate everything that you do!

Sonechka Womack
General Accounting
Assistant Manager
MOBIS Alabama, LLC
334-387-4845 (T)
334-387-4900 (Fax)



DEFENDANT'S
EXHIBIT
17

PENGAD 800-631-6989

8/2/2006

HUNTER V. MOBIS
00174

sonechka.womack@mobis-america.com

**From:**      Jay Kim [jay.kim@mobis-america.com]
**Sent:**      Wednesday, August 02, 2006 8:18 AM
**To:**        'Tarsha Hunter'
**Cc:**        sonechka.womack@mobis-america.com
**Subject:**   Check out pending works
**Importance:** High

Tarsha,
I hope that you are getting better.

We are on the month end closing. Please check pending works and reorganize your desk.
There were a bunch of documents which should have been filed.

And, I need for you to submit doctor's note and make-up schedule for your absence.

Thanks.

*Jay K. (Jae-kwang)  Kim / CFO*

MOBIS Alabama,LLC.
1395 Mitchell Young Road,
Montgomery, AL 36108

Tel : 334-387-4802
Fax : 334-387-4900
E-mail : *jay.kim@mobis-america.com*



HUNTER V. MOBIS
00173

# EXHIBIT

# L

Deposition of RUTH B. HEARD
February 1, 2008

Page 21

1   And I forgot to mention, if you do need a

2   break, this is not an endurance contest.

3       A.  It just fell.

4       Q.  Do you -- are you in a position to

5   have any knowledge about whether Mobis has

6   waived its probationary period for any

7   employees who have come to it through a

8   temporary service?

9           My first question is not whether

10  it's been waived, but would you be able to

11  know that?

12      A.  I would hope I would.

13      Q.  This may sound silly, but as

14  lawyers, we have to make sure that, first, you

15  have the knowledge --

16      A.  Right.

17      Q.  -- of a subject before I ask you

18  about it.  So that's why some of these

19  questions are being asked this way.

20          Are you aware then of Mobis ever

21  waiving its probationary period for an

22  employee that it has brought on from a

23  temporary service?

24      A.  I am aware that we have not.

25      Q.  How many employees have been hired

# EXHIBIT

# M

sonechka.womack@mobis-america.com

**From:**    sonechka.womack@mobis-america.com
**Sent:**    Monday, August 14, 2006 9:05 AM
**To:**      'Tarsha Hunter'
**Subject:** Attendance

Good morning Tarsha,

I received your voicemail regarding you will not be able to drop off your child before 7:30 am. I understand it completely. However, because of the company policy it may be hard to allow you to come in late. I have already spoken to Jay and it is hard for him to understand. I recommend that you get a written letter from your child's school and speak to Jay about this.

There have been quite a few instances that Jay has excused. We all know that Jay is very strict when it comes to tardiness and attendance. I feel that he has been more than understanding for everything (considering this is Jay I am talking about). I really want you to succeed here at MOBIS, so I hope you can do you best to meet the standards of this company. You are getting close to your 90 day probation ending so please try to leave a great impression so that you will be able to continue your employment here at MOBIS. I am here to help you.

Thanks,

Sonechka Womack
General Accounting
Assistant Manager
MOBIS Alabama, LLC
334-387-4845 (T)
334-387-4900 (Fax)

# EXHIBIT

# N

## Progressive discipline

non-Attendance related issues
Hourly employees only
probation/non probation employees

## Attendance

Attendance issues only
Hourly employees only
non-probationary employees

PENGAD 800-631-6989

PLAINTIFF'S
EXHIBIT

# EXHIBIT

# O

## TARSHA HUNTER'S ATTENDANCE RECORD WITH MULTI STAFFING

| | Date | In | Out |
|---|---|---|---|
| Mon | 3/6/2006 | 8:00 AM | 5:00 PM |
| Tue | 3/7/2006 | 8:00 AM | 5:00 PM |
| Wed | 3/8/2006 | 8:00 AM | 5:00 PM |
| Thu | 3/9/2006 | 8:00 AM | 5:00 PM |
| Fri | 3/10/2006 | 8:00 AM | 5:00 PM |
| Sat | 3/11/2006 | | |
| Sun | 3/12/2006 | | |
| Mon | 3/13/2006 | 8:00 AM | 5:00 PM |
| Tue | 3/14/2006 | 8:30 AM | 5:00 PM |
| Wed | 3/15/2006 | 8:00 AM | 5:00 PM |
| Thu | 3/16/2006 | 8:00 AM | 5:00 PM |
| Fri | 3/17/2006 | 8:00 AM | 5:00 PM |
| Sat | 3/18/2006 | | |
| Sun | 3/19/2006 | | |
| Mon | 3/20/2006 | 8:00 AM | 5:10 PM |
| Tue | 3/21/2006 | 8:00 AM | 5:00 PM |
| Wed | 3/22/2006 | 8:00 AM | 3:40 PM |
| Thu | 3/23/2006 | 8:00 AM | 5:00 PM |
| Fri | 3/24/2006 | Out all day | |
| Sat | 3/25/2006 | | |
| Sun | 3/26/2006 | | |
| Mon | 3/27/2006 | 8:00 AM | 5:05 PM |
| Tue | 3/28/2006 | 8:00 AM | 5:00 PM |
| Wed | 3/29/2006 | 12:00 PM | 5:00 PM |
| Thu | 3/30/2006 | 8:00 AM | 5:00 PM |
| Fri | 3/31/2006 | 8:00 AM | 5:00 PM |
| Sat | 4/1/2006 | | |
| Sun | 4/2/2006 | | |
| Mon | 4/3/2006 | 9:00 AM | 5:00 PM |
| Tue | 4/4/2006 | 8:00 AM | 5:10 PM |
| Wed | 4/5/2006 | 8:00 AM | 5:00 PM |
| Thu | 4/6/2006 | 8:00 AM | 5:00 PM |
| Fri | 4/7/2006 | 8:00 AM | 5:00 PM |
| Sat | 4/8/2006 | | |
| Sun | 4/9/2006 | | |
| Mon | 4/10/2006 | 12:00 PM | 5:00 PM |
| Tue | 4/11/2006 | 8:00 AM | 5:00 PM |
| Wed | 4/12/2006 | Out sick all day | |
| Thu | 4/13/2006 | 8:00 AM | 5:00 PM |
| Fri | 4/14/2006 | Holiday | |
| Sat | 4/15/2006 | | |
| Sun | 4/16/2006 | | |
| Mon | 4/17/2006 | 8:00 AM | 5:00 PM |
| Tue | 4/18/2006 | 8:15 AM | 5:00 PM |
| Wed | 4/19/2006 | 8:00 AM | 5:00 PM |
| Thu | 4/20/2006 | 8:00 AM | 5:00 PM |
| Fri | 4/21/2006 | 8:05 AM | 5:00 PM |
| Sat | 4/22/2006 | | |
| Sun | 4/23/2006 | | |

| | Date | In | Out |
|---|---|---|---|
| Mon | 4/24/2006 | 8:00 AM | 5:00 PM |
| Tue | 4/25/2006 | 8:00 AM | 12:00 PM |
| Wed | 4/26/2006 | 8:00 AM | 5:15 PM |
| Thu | 4/27/2006 | 8:00 AM | 5:00 PM |
| Fri | 4/28/2006 | 9:00 AM | 11:30 AM |
| Sat | 4/29/2006 | | |
| Sun | 4/30/2006 | | |
| Mon | 5/1/2006 | 8:00 AM | 5:00 PM |
| Tue | 5/2/2006 | 8:00 AM | 5:10 PM |
| Wed | 5/3/2006 | 8:15 AM | 5:15 PM |
| Thu | 5/4/2006 | 8:00 AM | 5:15 PM |
| Fri | 5/5/2006 | 8:00 AM | 5:00 PM |
| Sat | 5/6/2006 | | |
| Sun | 5/7/2006 | | |
| Mon | 5/8/2006 | Out sick all day | |
| Tue | 5/9/2006 | 8:00 AM | 5:15 PM |
| Wed | 5/10/2006 | 8:00 AM | 5:00 PM |
| Thu | 5/11/2006 | 8:00 AM | 5:00 PM |
| Fri | 5/12/2006 | 8:00 AM | 5:00 PM |
| Sat | 5/13/2006 | | |
| Sun | 5/14/2006 | | |
| Mon | 5/15/2006 | 8:00 AM | 5:00 PM |
| Tue | 5/16/2006 | 8:06 AM | 5:06 PM |
| Wed | 5/17/2006 | 8:10 AM | 5:08 PM |
| Thu | 5/18/2006 | 8:00 AM | 5:08 PM |
| Fri | 5/19/2006 | 8:00 AM | 5:00 PM |
| Sat | 5/20/2006 | | |
| Sun | 5/21/2006 | | |
| Mon | 5/22/2006 | 8:00 AM | 5:05 PM |
| Tue | 5/23/2006 | 8:00 AM | 5:06 PM |
| Wed | 5/24/2006 | 8:00 AM | 5:00 PM |
| Thu | 5/25/2006 | 8:00 AM | 5:00 PM |
| Fri | 5/26/2006 | 8:02 AM | 5:00 PM |
| Sat | 5/27/2006 | | |
| Sun | 5/28/2006 | | |
| Mon | 5/29/2006 | Holiday | |
| Tue | 5/30/2006 | 8:03 AM | 5:00 PM |
| Wed | 5/31/2006 | 8:00 AM | 5:15 PM |
| Thu | 6/1/2006 | 8:00 AM | 5:15 PM |
| Fri | 6/2/2006 | 8:00 AM | 5:00 PM |
| Sat | 6/3/2006 | | |
| Sun | 6/4/2006 | | |



DEFENDANT'S EXHIBIT
9
PENGAD 800-631-6989

# EXHIBIT

# P

# MOBIS Alabama, LLC

## Absence Request

| Absence Information |
| --- |

Employee Name: _Tarsha Hunter_

Employee Number: _3103490_     Department: _Accounting + Finance_

Manager: _Sonechka Womack_

Type of Absence Requested:

Sick          (Appointment)          Bereavement          Time Off Without Pay

Military          Jury Duty          Maternity/Paternity          Other

Dates of Absence:  From: _August 14, 2006_     To: _____

Reason for Absence:

_I submitted a request for August 9, but that appointment has been rescheduled until August 14, 2006 @ 9:30 am. Still need 1/2 a day._

*You must submit requests for absences, other than sick leave, two days prior to the first day you will be absent.*

_Tarsha Hunter_                                    _8/3/06_
Employee Signature                                    Date

| Manager Approval |
| --- |

☑ Approved

☐ Rejected

Comments:

_SWn_     _8/3_          _(signature)_          _8/3/06_
Manager  Signature                                    Date

DEFENDANT'S
EXHIBIT
_14_

PENGAD 800-631-6989

**HUNTER V. MOBIS**
**00189**

# EXHIBIT

# Q

## 2006 Absense Record - Tarsha Hunter

| Date | # of Days | Hrs taken | Accum. Hrs | Note |
|------|-----------|-----------|------------|------|
| 06/15/2006 | 1 | 8 | 8 | Sick |
| 07/25/2006 | 1 | 3.5 | 11.5 | Doctor's appointment |
| 07/27/2006 | 1 | 3.5 | 15 | Doctor's appointment |
| 07/31/2006 | 1 | 6 | 21 | Sick |
| 08/01/2006 | 1 | 8 | 29 | Sick |
| 08/11/2006 | 1 | 4 | 33 | Doctor's appointment |
| 08/14/2006 | 1 | 4 | 37 | Doctor's appointment |



DEFENDANT'S EXHIBIT
13
PENGAD 800-631-6989

HUNTER V. MOBIS
00115

# EXHIBIT

# R

# MOBIS Alabama, LLC

## Absence Request

### Absence Information

Employee Name: _Taisha Hunter_

Employee Number: _____ Department: _Accounting & Finance_

Manager: _Sonechka Womack_

Type of Absence Requested:

Sick          (Appointment)          Bereavement          Time Off Without Pay

Military          Jury Duty          Maternity/Paternity          Other

Dates of Absence: From: _8/11/06_          To: _8/11/06_

Reason for Absence:

_I have a Procedure (surgical) appointment is scheduled @ 1:00 pm. I will return on Monday. I will make up time during next week for 4 hours._

*You must submit requests for absences, other than sick leave, two days prior to the first day you will be absent.*

_Taisha Hunter_          _8/10/06_
*Employee Signature*          *Date*

### Manager Approval

☐ Approved

☐ Rejected

Comments:

_____          _____
*Manager  Signature*          *Date*



PLAINTIFF'S
EXHIBIT
10

PENGAD 800-631-6989

# EXHIBIT

# S

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

TARSHA NICKOL HUNTER,          )
                               )
        Plaintiff,             )
                               )
vs.                            )        CASE NO.:  2:07-cv-427-WHA
                               )
MOBIS ALABAMA, LLC,            )
                               )
        Defendant.             )

## CERTIFICATION OF DOCUMENTS

My name is _Amanda Hacklen_ and I certify that I am the Records

Custodian for PHYSICIANS FOR WOMEN and that the attached records are true and accurate

copies of records maintained under my care, custody, and control in the ordinary course of

business, and consist of _____ pages.

_Amanda Hacklen_
Records Custodian
PHYSICIANS FOR WOMEN

Sworn to and subscribed before me
this 15 day of January, 2008

_April W Taylor_
Notary Public

My Commission Expires:

APRIL W. TAYLOR
NOTARY PUBLIC
ALABAMA STATE AT LARGE
MY COMMISSION EXPIRES SEPT. 20, 2011

Med Rec Cert- POU FAMILY MEDICINE.doc

## OBSTETRICAL RECORD

| | | | | | |
|---|---|---|---|---|---|
| Name _Tasha Hunter_ | Age _28_ | Race _B_ | GRAVIDA _2_ | LMP _May '06_ | EDC |
| Husband | Age | Health _0_ | | | Sonar |
| FAMILY HISTORY | Heart _0_ | HTN _Mom, Mom's side_ | | Thyroid _pt, Mom's side_ | |
| Lung _0_ | Renal _0_ | Diabetes _Dad_ | | CA _GF, aunt_ | |
| Genetic _0_ | | | | | |
| PAST HISTORY | CHD _chicken pox_ | Medical _0_ | | Usual Wt. _40_ | |
| Allergies _Codeine_ | Surgical _cerclage_ | | Transfusions _0_ | |

| SOCIAL HISTORY | | Smoke _0_ | | Alcohol _0_ | | HSV | |
|---|---|---|---|---|---|---|---|
| Obstetrical | Year | Sex | Wt. | | | | |
| vaginal | '98 | F | 6·8 | Cerclage (diff ffttkr) | | EDC 10 FEB 2007 | |

## PHYSICAL EXAM

| | | |
|---|---|---|
| HEENT _nml PERRLA_ | Lungs _CTA (B)_ |
| Breasts _sym -lm_ | Heart |
| Abdomen _soft, nontn_ | Scars _C_ |
| | Extremities _-t_ |
| Pelvic _NTFG_  Vulva   BSU | Varices _-t_   Vagina |
| Cervix _TD/one sml_  Uterus _13-14w_ | Adnexa |
| Cystocele   Rectocele   Prolapse   Perineum | Rectal |

## LABORATORY

8/06

| | | | | |
|---|---|---|---|---|
| Blood Type & RH _O+_ | Rubella _Imm_ | Serology _NR_ | Hepatitis _NR_  PAP _WNL_ |
| Husband Type & RH | AFP _neg_ | Glucola _158 700k_ | HCT _36.3_  HIV _NR_ |
| Hospital _EAST South_ | Anesthesia _LLE_ | Vitamins _Prenate 1_ | Medicine |
| Pediatrician | Nursing Plans _Bottle_ | Irons _0_   Sickle cell neg | |

SB doesn't smoke - SB AA

## URINE

| Date | Wt. | BP | Fundus | Position-Descent | FHT | Edema | Alb. | Sugar | Nitrite | Leuk. | Cum. Wt. | Wks. Gest | Medicine & Remarks |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 9·06 | 133 | 110/64 | — | (+) FHR (+) FM | — | 0 | 0 | 0 | 0 | | 13+4 | Cerclage Friday |
| ·16 | 135 | | — | (+) PT | — | | | | | +2 | 14° | Cerclage today 2nd |
| | 880 | 139 | 110/60 | — | (+) FM | — | 0 | 0 | 0 | 0 | +6 | 16³ | FM 3m. |
| 1·20 | 142 | 98/64 | — | (+) FHR (+) FM | | 0 | 0 | 0 | 0 | +9 | 19+4 | FM 4Ea |
| 10·18 | 153 | 110/60 | 23 | (+) GR (+) PT | — | 0 | 0 | 0 | 0 | +20 | 23⁴ | 10·16 - 158 |
| 1·15 | 156 | 110/60 | 27 | (+) GR (+) PT | — | 0 | 0 | 0 | 0 | +23 | 27⁴ | Rec planta |
| 1·29 | 157 | 119/60 | 29 | (+) vx (+) PT | — | 0 | 0 | 0 | 0 | +24 | 29⁴ | NO problems ALL |
| 2·13 | 159 | 98/50 | 31 | (+) GR (+) PT | — | 0 | 0 | 0 | t | +26 | 31·4 | FM 2nde long/short |
| 2·27 | 162 | 100/60 | 33 | (+) GR (+) PT | — | 0 | 0 | 0 | 2t | +28 | 33·4 | FM 2nd normberd |
| 10·07 | 161 | 98/60 | 75 | (+) GR (+) PT | TR | 0 | 0 | 2t | +28 | 35⁴ | FC -lm |
| 18·07 | 146 | 102/62 | 37 | (+) GR (+) PT | TR | 0 | 0 | 2t | +33 | 36.5 | FM 4 |
| 2307 | 169 | 104/78 | 39 | (+) GR (+) PT | TR | 0 | 0 | 0 | +86 | 37³ | CFM |
| ·30·07 | 169 | 109/70 | 38 | (+) GR (+) PT | TR | 0 | 0 | +86 | 38·3 | Induc monly |

* recd Cerclage * - 2 stitches -

DNS PG

QUEST DIAGNOSTICS INCORPORATED
CLIENT SERVICE 770.934.9205

PATIENT INFORMATION
**HUNTER, TARSHA**

REPORT STATUS    **Final**

ORDERING PHYSICIAN
**LAWHON, BYRON P**

DOB: 03/21/1978   Age: 28
GENDER: F

SPECIMEN INFORMATION
SPECIMEN:    AT106008R
REQUISITION: 0324953
LAB REF NO:

ID: 1640
PHONE:

CLIENT INFORMATION
7187652
PHYSICIANS FOR WOMEN
287 MITYLENE PARK DR
MONTGOMERY, AL 36117-3547

COLLECTED:  08/16/2006    15:35
RECEIVED:   08/16/2006    17:45
REPORTED:   08/18/2006    12:47

| Test Name | In Range | Out of Range | Reference Range | Lab |
|---|---|---|---|---|
| OBSTETRIC PANEL | | | | |
| CBC (INCLUDES DIFF/PLT) | | | | AT |
| WHITE BLOOD CELL COUNT | 9.0 | | 3.8-10.8 THOUS/MCL | |
| RED BLOOD CELL COUNT | 3.80 | | 3.80-5.10 MILL/MCL | |
| HEMOGLOBIN | 12.0 | | 11.7-15.5 G/DL | |
| HEMATOCRIT | 36.3 | | 35.0-45.0 % | |
| MCV | 95.4 | | 80.0-100.0 FL | |
| MCH | 31.7 | | 27.0-33.0 PG | |
| MCHC | 33.2 | | 32.0-36.0 G/DL | |
| RDW | 13.9 | | 11.0-15.0 % | |
| PLATELET COUNT | 200 | | 140-400 THOUS/MCL | |
| ABSOLUTE NEUTROPHILS | 6831 | | 1500-7800 CELLS/MCL | |
| ABSOLUTE LYMPHOCYTES | 1755 | | 850-3900 CELLS/MCL | |
| ABSOLUTE MONOCYTES | 333 | | 200-950 CELLS/MCL | |
| ABSOLUTE EOSINOPHILS | 54 | | 15-500 CELLS/MCL | |
| ABSOLUTE BASOPHILS | 27 | | 0-200 CELLS/MCL | |
| NEUTROPHILS | 75.9 | | % | |
| LYMPHOCYTES | 19.5 | | % | |
| MONOCYTES | 3.7 | | % | |
| EOSINOPHILS | 0.6 | | % | |
| BASOPHILS | 0.3 | | % | |
| ANTIBODY SCREEN, RBC W/REFL ID, TITER AND AG | NO ANTIBODIES DETECTED | | | AT |

THIS TEST IS INTENDED AS A SCREEN TO DETECT THOSE IGG
ANTIBODIES IMPLICATED IN HEMOLYTIC DISEASES OF THE NEWBORN
IT DOES NOT ROUTINELY DETECT IGM ANTIBODIES AND THUS IS NOT
SUITABLE FOR SCREENING FOR IRREGULAR ANTIBODIES PRIOR TO
TRANSFUSION.

| | | | | |
|---|---|---|---|---|
| ABO GROUP & RH TYPE | | | | AT |
| ABO GROUP | O | | | |
| RH TYPE | RH (D) POSITIVE | | | |
| RPR (DX) W/REFL TITER AND CONFIRMATORY TESTING | NON-REACTIVE | | NON-REACTIVE | AT |
| HEPATITIS B SURFACE ANTIGEN W/ CONFIRMATION | | | | AT |
| HEPATITIS B SURFACE ANTIGEN | NON-REACTIVE | | NON-REACTIVE | |