**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION**

| | | |
|---|---|---|
| TARSHA NICKOL HUNTER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No.: 2:07-cv-427-WHA |
| | ) | |
| | ) | (WO) |
| MOBIS ALABAMA, LLC., | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

**I. INTRODUCTION**

This case is before the court on a Motion for Summary Judgment (Doc. # 16) filed by the Defendant, Mobis Alabama, L.L.C., ("Mobis") on March 31, 2008. The plaintiff, Tarsha Nickol Hunter ("Hunter") filed a complaint on May 15, 2007, in which she alleged that her employer, Mobis, unlawfully discriminated against her in violation of the Pregnancy Discrimination Act, Title VII of the Civil Rights Act of 1964, amended as 42 U.S.C. § 2000e(k). Specifically, Hunter claims that she was singled out for unfavorable treatment and terminated due to her pregnancy. (Compl. ¶¶ 26-28.)

For the reasons to be discussed, the Motion for Summary Judgment is due to be DENIED.

**II. JURISDICTION AND VENUE**

Based upon 28 U.S.C. §§ 1331 and 1343, this Court properly exercises subject matter jurisdiction over this action. The parties do not contest personal jurisdiction or venue. Furthermore, Hunter has fulfilled the jurisdictional prerequisites for filing a Title VII claim in

federal district court.  Hunter timely filed a charge with the EEOC, wherein she asserted a claim of sex-based discrimination. (Doc. # 1-2, Exh.1.)  After more than 180 days had passed, the EEOC terminated processing of the charge and issued a "right to sue" letter on April 5, 2007, and Hunter filed the instant action on May 15, 2007.  (Doc. # 1-3, Exh. 2.)

### III.  SUMMARY JUDGMENT STANDARD

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the 'pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Id.* at 323.  The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing, or pointing out to, the district court that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof.  *Id.* at 322-24.

Once the moving party has met its burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'"  *Id.* at 324.  To avoid summary judgment, the nonmoving party "must do more

than show that there is some metaphysical doubt as to the material facts." *Matsushita Elec.*

*Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). On the other hand, the evidence of

the nonmovant must be believed and all justifiable inferences must be drawn in its favor. *See*

*Anderson v. Liberty Lobby*, 477 U.S. 242, 255 (1986). After the nonmoving party has responded

to the motion for summary judgment, the court must grant summary judgment if there is no

genuine issue of material fact and the moving party is entitled to judgment as a matter of law.

FED. R. CIV. P. 56(c).

The summary judgment rule is to be applied in employment discrimination cases as in

any other case. *Chapman v. AI Transport*, 229 F.3d 1012, 1026 (11th Cir. 2000) (*en banc*).

## IV. FACTS

The submissions of the parties establish the following facts, construed in a light most

favorable to the non-movant:

On March 6, 2006, Hunter was assigned to Mobis's accounting department as a

temporary employee by a temporary staffing agency. On or around June 5, 2006, after the three

month period of temporary employment required by the temp agency had expired, Hunter was

given an open position in the accounting department as a full-time employee, subject to a 90-day

probationary period. (Riedler Depo. 95:14-96:6).[1] As CFO of Mobis and the supervising

---

[1] In her Brief in Opposition, Hunter claims that Mobis did not communicate to her that
she was considered a probationary employee. (Br. in Opp. at 6; Hunter Depo. 71:4-72:14.)
Further, she claims that Kim told her that "her temporary service might count as her probationary
period, and he would try to have the probationary period waived." *Id.* There is no evidence
presented that Kim was successful in this attempt, however, and Hunter concedes that she was
aware the probationary policy applied to her. (Br. in Supp. at 15; Hunter Depo. 73:3-74:22;
141:18-23;142:1-5.) Specifically, she says that she was made aware of her probationary status
by Kim around the third week of June 2006, (Hunter Depo. 71:1-14.) At that point, she had only
incurred one of the seven absences that Mobis claims led to her termination. (*See* Br. in Supp. at

authority over the accounting department, Jaekwang Kim ("Kim") would have had the final approval over any decision to hire Hunter. (Reidler Depo. 98:17-22.)  As a general accounting specialist, Hunter's direct supervisor was Sonechka Womack ("Womack"), who reported to Kim. (Womack Depo. 10:24-11:3.)  According to Hunter, Mobis did not maintain any type of attendance records for salaries, and the only existing records of when an employee arrives or leaves would be the result of the employee's security badge registering on a security panel on the company's doors. (Br. in Opp. at 3 (*citing* Riedler Depo. 25:11-26:16, 29:12-20)).[2]  It was unclear who had the responsibility of monitoring Hunter's attendance: Kim testified that Womack was responsible, whereas Womack testified that she thought Kim was responsible. (Kim Depo: 57:20-25; Womack Depo. 12:5-13:6.)

Even though Mobis considers its employees to be "at will," the handbook sets out a 90 day probationary period of employment. (Riedler Depo. 58:13-59:14; 70:4-16.)  Kim testified that he was unconcerned about the probationary policy when he first started with Mobis, and that he did not become familiar with it until August 24th or 25th of 2006. (Kim Depo. 17:19-18:11.)

*Hunter's First 90 Days (March - June 2006)*

---

8.)  Even taking all of Hunter's factual allegations as true, therefore, Hunter incurred the subsequent 4-6 absences with knowledge of her probationary status and the applicable "three strikes" attendance policy. See Part V, Discussion, *infra.*

[2]  The defendant contends that Womack and Kim did monitor Hunter's attendance, at least after she became a probationary employee, and that Kim kept a spreadsheet. (Br. in Supp. at 7; Womack Depo. at 12:5-12.).  Hunter points out that, in response to Hunter's EEOC charge, Mobis admitted to keeping no documentation, and Hunter further claims that the 8/14 absence cited in the spreadsheet is false, seeming to intimate that the spreadsheet may have been created after the fact for the purposes of litigation. In reviewing a motion for summary judgment, however, the court must resolve all factual inferences in favor of Hunter.  As discussed *infra,* however, Hunter does not dispute absences other than the 8/14 absence.

During Hunter's first 90 days working with Mobis, her attendance records were kept by the temporary staffing agency. The company's records show that Hunter was absent and tardy on more than one occasion during those first 90 days. Hunter's tardies during this period resulted from the drop-off schedule at her daughter's school, and once she brought the issue to Kim's attention, Kim agreed to work with her as long as she got to work as soon as she could after dropping off her daughter. (Hunter Depo. Exh's 19, 21; Kim Depo. 42:8-43:14; Womack Dep. 19:20-20:13.) In mid-May 2006, upon Womack's insistence, Kim decided to offer Hunter a full-time position, despite knowing that Hunter had been absent and tardy during her first 90 days. (Womack Depo. 17:7-21; Kim Depo. 34:4-7.)

*Hunter's Final 90 Days (June 2006-August 2006)*

According to Mobis's records, it hired Hunter on June 5, 2006. (Riedler Depo. 94:18-95:5.) Hunter claims that Mobis did not communicate to her at that time that she was considered a probationary employee; instead, Kim told her that her temporary service might count as her probationary period, and that he would try to have the probationary period waived. (Br. in Opp. at 6; *see supra* note 1.)

*Hunter Learns of Pregnancy*

When Hunter went to take a drug test as required by Mobis in early June, she simultaneously took a pregnancy test (of her own accord), and discovered she was pregnant. (Hunter Depo. 83:6-9.) Hunter told her supervisor, Womack, on June 5 or 6; Womack and other employees advised her not to tell Kim, because "other employees who [had] revealed their pregnancies were fired." (Hunter Depo. 95:17–96:20.) In fear for her job due to these

expressions of concern, Hunter kept her pregnancy a secret from Kim and Tracy Riedler

("Riedler"), Mobis's Human Resources Manager. (Hunter Depo. 101:8-102:18; 120:5-16.)

### Kim Approves Absences

Although Mobis's attendance policy was a "no fault" policy, Kim represented to Hunter

that necessary absences for doctor's appointments or other health concerns would be approved.

(Hunter Depo., Exh. 10; Kim Depo. 81:6-82:22.)  Hunter claims that from June through

August 2006, Hunter's probationary period, Kim approved Hunter to have partial day and full

day absences. (Hunter Depo. Exhs. 14, 19.)  Hunter also claims she made up for the time she

missed from work. (Womack Depo: 14:13-19; Hunter Depo: 63:16-20; Depo Exh. 10.)[3]  Kim

testified that he would not deny medical absence requests, because he understood that such

absences were "common" and "normal." (Kim Depo. 81:24-82:22.)

### Hunter informs Kim of Pregnancy

On Wednesday, August 9, 2006, after she learned that she would need a medical

procedure, Hunter told Kim about her pregnancy, and informed him that she would need time

---

[3]  Exhibit 10, relied on by Hunter, shows an email written by Hunter to Womack explaining how she will make up for her absences. (Exh. 10.)  Through a combination of skipped lunch breaks, coming early and staying late, Hunter explained how she could make up for 10 hours and 30 minutes. (Exh. 13.)  Hunter's absence record, however, showed an accumulated 37 hours due to absences and tardinesses because of either sickness or a doctor's appointment between June 15, 2006 and August 14, 2006. Exhibit 14 shows an absence request signed by Kim for a doctor's appointment on August 14; assuming this 4 hour absence was excused, that makes 33 accumulated hours. Exhibit 9, a retroactive absence request for an absence from July 31, 2006 to August 1, 2006, explains that Hunter left work July 31st due to illness and returned August 2nd.  It was signed, but neither approved nor rejected. (Exh. 9, Doc. 22-17.) Additionally, the part of Hunter's deposition upon which she relies doesn't state that she made up the time, but rather that Womack had told her to begin giving information about how the time would be made up, prompting the email which is marked Exhibit 10. (Hunter Depo. 63:16-20.)

off for the procedure. (Hunter Depo. 103:4-105:11; 110:19-111:18.) Hunter claims that Kim "grunted and said 'what' 'as if in a dismayed sort of way' but allowed her the time off for the procedure." (Hunter Depo. 114:23-115:2; 122:8-23.)

Hunter claims that she does not know of any absences between August 9, when she told Kim of her pregnancy, and when she was terminated.[4] The next day, Womack acknowledged that "we completely understand you [sic] current health condition" in a forwarded email to Hunter whereby Kim had explained the type of absences that would be approved or excused. (Womack Depo. Exh 12.)

Following Hunter's disclosure of her pregnancy, Hunter claims that Kim began to distance himself, communicating only through Womack and never speaking directly to Hunter; he would not look at Hunter, and would walk away from her when he saw her.[5] (Hunter Depo. 77:8-20; 131:1-12; 134:2-19; Womack Depo. 27:10-28:23.) Hunter claims that Kim did not treat other employees in a similar manner. (Hunter Depo. 77:8-20.) On August 14, Kim emailed Womack to ask about Hunter's attendance status and to request that Womack fill out a spreadsheet for Hunter's absences. (Kim Depo, Exh 12; Womack Depo. 25:8-26:11.)

*Kim Decides to Terminate Hunter*

---

[4] The Absence Record, Def.'s Exh. 13 (Doc. # 22-9), shows a four hour absence for a Doctor's appointment on both August 11 and August 14. Since both say "Doctor's appointment" as opposed to other absences that merely say "Sick," Hunter may have been implying unexcused absences.

[5] Mobis explains that it is part of Kim's management style to "communicate with employees in Accounting through their supervisor when practical, and that nothing changed in that regard after Mr. Kim learned of Hunter's pregnancy." (Br. in Supp. at 2.)

Hunter claims that Kim complimented her performance, calling her an "asset to their team" prior to her pregnancy. (Hunter Depo. 77:2-7.)  With respect to her absences, Hunter claims that Kim did not communicate any complaints to her, and "committed to working with her on her work schedule as it related to taking her daughter to school in the mornings." (Hunter Depo. 161:19-162:11; 165:18-166:23.)  Additionally, Hunter received no discipline for alleged attendance problems. (Reidler Depo. 32:14-20; Def.'s Disc. Resp. to Request for Admission One).  Hunter was not told, moreover, that her absences would lead to termination, or that they were causing a problem prior to Kim learning that she was pregnant. (Hunter Depo. 115:9-13; 134:2-19; 161:19-162:11; 165:18-166:23.)

On August 23, 2006, Kim emailed Riedler, "I do not want to take care of Tarsha anymore . . . I need your help to terminate her." (Riedler Depo. 125:5-17; id. Exh. 5).  Kim testified that "[w]hen I – when I made the decision to terminate her, I asked Tracy [if] we have some policy or something like that out of our handbook if somebody will have, you know, bad tardiness or bad attendance, how can we do that or something like that." (Kim Depo. 87:18-23).

The next day, Womack informed Hunter that Kim planned to terminate her. *Id.* Womack thought Hunter did a good job and did not want Hunter to be terminated, and complained to both Kim and Reidler that she "felt like [Hunter] was being terminated because she was pregnant." (Womack Depo. 35:12-36:1.).

Despite Womack's complaint, however, Riedler did not investigate whether Hunter's pregnancy motivated Kim's decision. She merely reviewed the "absence forms that were signed by Ms. Hunter, Sonec[h]ka, and/or Jay." (Riedler Depo: 120:14-19).  Riedler testified

8

that the termination was due to Hunter's full or partial absences on June 15th, July 25th, 27th,

30th, August 1st, 11th, and 14th. (Riedler Depo. 127:1-19; *id.* Exh. 4.)   Hunter did not recall

any absences after August 9th, and was at work on August 14th. (Hunter Depo. 135:9-13.)

On August 25, 2006, Kim informed Hunter that he was terminating her. (Hunter Depo. 178:4-

181:22.)   In a meeting with Womack, Hunter asked Kim why his demeanor towards her had

changed, to which he responded that "I can't afford to take care of an employee like you." *Id.*

*Mobis Responds to Post-Employment Issues*

       After her termination, Hunter applied for unemployment benefits. (Dept. of Industrial

Relations ("DIR") Records, Pl.'s Exh. 6, 179-180, 246-47.)   In opposition to her application

for unemployment benefits, Mobis stated that it terminated Hunter for unacceptable

performance. *Id.*   Mobis further stated that Hunter had attendance problems, but Mobis

provided no specifics because "[they] don't know b/c [they] don't keep documentation." *Id.*

On November 16, 2006, Mobis responded to Hunter's EEOC charge by stating that Kim's

decision to terminate Hunter could not have been motivated by her pregnancy, because he

communicated his decision to Riedler prior to learning of Hunter's pregnancy. (Pl.'s Exh. 10,

Def.'s EEOC Position Statement).

       Hunter claims that the spreadsheet submitted by Mobis documenting Hunter's absences

"contain[s] false information" by showing Hunter as absent on at least one day when she had

worked. (Hunter Depo. 79:4-80:8; 160:1-6.)   Kim testified that he gathered information from

either Hunter or Womack in making the chart, but Womack believed Kim maintained the

attendance records. (Kim Depo. 62:2-22.)   Additionally, Mobis concedes that, contrary to the

statement contained in their EEOC response,   Kim *did* know about Hunter's pregnancy when

the decision to terminate was made, and that the error was not an attempt to mislead but rather

an inadvertent error and miscommunication. (Reply Br. at 20-23.)

## V. <u>DISCUSSION</u>

Title VII of the Civil Rights Act of 1964 provides that "it shall be an unlawful

employment practice for an employer (1) to fail or refuse to hire or to discharge or otherwise to

discriminate against any individual with respect to [her] compensation, terms, conditions, or

privileges of employment, because of such individual's race, color, religion, sex, or national

origin . . . ." 42 U.S.C. 2000e-2(a)(1) (2007).  In 1978, Congress amended Title VII of the Civil

Rights Act of 1964 to include the Pregnancy Discrimination Act (PDA), which expands the

Act's definition section to encompass pregnancy-based discrimination under the definition of sex

discrimination:

> The terms "because of sex" or "on the basis of sex" include, but are not limited to,
> because or on the basis of pregnancy, childbirth, or related medical conditions; and
> women affected by pregnancy, childbirth, or related medical conditions shall be
> treated the same for all employment related purposes . . . .

42 U.S.C. § 2000e(k) (2007).  The analysis required to prove a pregnancy discrimination claim

mirrors that of Title VII sex discrimination claims. *Maddox v. Grandview Care Center, Inc.,* 780

F.2d 987, 989 (11th Cir. 1986).

Generally, plaintiffs may establish employment discrimination under Title VII using the

direct evidence framework, *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989), or the

circumstantial framework, *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973)*; Texas

Dep't of Comm'y Affairs v. Burdine*, 450 U.S. 248 (1981).  In either case, the plaintiff bears the

burden of showing that the employer purposefully took adverse action against her because of her

pregnancy. *Hipp v. Liberty Nat. Life Ins. Co.,* 252 F.3d 1208, 1230 n.34 (11th Cir. 2001). Here, Mobis argues that no direct evidence of discrimination exists. (Br. in Supp. at 18-19.) Hunter does not contend that she possesses any direct evidence of discrimination, and argues only that sufficient circumstantial evidence exists under *McDonnell Douglas-Burdine* to survive summary judgment. (Br. in Opp. at 16 ("Ms. Hunter's claim for pregnancy discrimination is based on circumstantial evidence. The familiar *McDonnell Douglas* burden shifting framework, therefore, applies to the analysis of her claims.").)

Under the *McDonnell Douglas-Burdine* framework, a plaintiff must first establish a prima facie case of sex discrimination. *McDonnell Douglas*, 411 U.S. at 802; *Burdine*, 450 U.S. at 252-53. The burden then shifts to defendant to articulate a legitimate, nondiscriminatory reason for its action. *Burdine,* 450 U.S. at 253. If the defendant successfully articulates such a reason, then the burden shifts once again to the plaintiff, who may avoid summary judgment only by producing "sufficient evidence for a reasonable factfinder to conclude that each of the employer's proffered nondiscriminatory reasons is pretextual." *Chapman v. AI Transport,* 229 F.3d 1012, 1037 (11th Cir. 2000). To show pretext, a plaintiff must demonstrate "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." *Combs v. Plantation Patterns*, 106 F.3d 1519, 1538 (11th Cir. 1997) (quotation omitted). Ultimately, if "the proffered reason is one that might motivate a reasonable employer, [the plaintiff] must meet that reason head on and rebut it. *Chapman,* 229 F.3d at 1030. Here, Mobis argues that Hunter was terminated because of her excessive absenteeism, tardiness, and

11

other attendance problems in violation of the absence policy for probationary employees. (Br. in Supp. at 6-9.)

A. *Prima facie case*

In employment discrimination cases, "[m]ore than one formulation of the elements of a prima facie case exist." *Rioux v. City of Atlanta,* 520 F.3d 1269, 1275 (11th Cir. Mar. 18, 2008). Because of the fact-specific nature of such cases "[t]he facts necessarily will vary in Title VII cases, and the specification . . . of the prima facie proof required . . . is not necessarily applicable in every respect to differing factual situations." *McDonnell Douglas*, 411 U.S. at 802 n.13. "Demonstrating a prima facie case is not onerous; it requires only that the plaintiff establish facts adequate to permit an inference of discrimination." *Holifield v. Reno,* 115 F.3d 1555, 1562 (11th Cir. 1997)(internal citations omitted). Moreover, "[t]he methods of presenting a prima facie case are not fixed; they are flexible and depend to a large degree upon the employment situation." *Wilson v. B/E Aerospace, Inc.,* 376 F.3d 1079, 1087 (11th Cir. 2004) (*citing Nix v. WLCY Radio/Rahall Communications,* 738 F.2d 1181, 1185 (11th Cir. 1984)).

The parties assert a prima facie formulation whereby Hunter must show that she: (1) was a member of a protected class; (2) was qualified for the job she held; (3) suffered an adverse employment action; and (4) suffered from a differential application of work or disciplinary rules. *Spivey v. Beverly Enters., Inc.,* 196 F.3d 1309, 1312 (11th Cir. 1999). Here, it is undisputed that Hunter was (1) pregnant and thus protected by her class; (2) qualified for her job; and (3) was terminated. Mobis argues that Hunter has failed to satisfy the fourth element, a differential application of work or disciplinary rules, because she has "has not identified a non-pregnant employee who had more than three attendance occurrences during their probationary period and

12

was hired as a regular employee." (Br. in Supp. at 21.)  The court agrees that Hunter has failed to sufficiently identify any employees who are both similarly situated and treated more favorably than she was, and thus fails to carry her prima facie burden under this formulation.

In her Brief in Opposition, however, Hunter argues that "[c]omparative evidence is not the only method for proving a prima facie case of discrimination." (Br. in Opp. at 22) (*citing Rioux*, 520 F.3d at 1275-1278).  Indeed, the Eleventh Circuit has held that, absent an example of a similarly situated employee, "summary judgment is appropriate *where no other evidence of discrimination is present*," *Holifield*, 115 F.3d at 1563 (emphasis added), and *Rioux* held that the plaintiff had come forward with other evidence "from which an inference of discrimination could be found," *Rioux* at 1277.  Hunter argues that she has presented such "other evidence of discrimination" as to survive summary judgment. (Br. in Opp. at 22.)  In *Rioux*, the plaintiff's evidence was found to be sufficient, despite lack of comparative evidence, because Rioux's replacement was outside of his protected class, and he had other circumstantial evidence of discrimination. *Rioux*, 520 F.3d at 1277.

In *Corbin v. Southland Int'l Trucks, Inc.,* the plaintiff sued his employer claiming that he had been terminated due to his age. 25 F.3d 1545 (11th Cir. 1994).  The district court granted summary judgment, concluding that Corbin had failed to make out a prima facie case of age discrimination because he had failed to prove that he was replaced. *Id.* at 1548. The Eleventh Circuit reversed and remanded, holding that the prima facie case could be met by showing "(1) that he was in a protected age group at the time of his termination, (2) that he was qualified for his current position at the time of his termination, and (3) evidence from which a fact finder could reasonably conclude that the employer intended to discriminate on the basis of age." *Id.* at

13

1549. Several age discrimination suits, particularly reductions-in-force and position eliminations, have forgone the need for comparator evidence when "other [circumstantial] evidence of discrimination" exists. *See, e.g.*, *Chapman*, 180 F.3d at 1248 (11th Cir. 1999); *Mitchell v. Worldwide Underwriters. Ins. Co.*, 967 F.2d 565, 567-68 (11th Cir. 1992); *Benson v. Tocco*, 113 F.3d 1203, 1207 (11th Cir. 1997); *Verbraeken v. Westinghouse Elec. Corp.,* 881 F.2d 1041, 1045-46 (11th Cir. 1989).

Even outside of the realm of age discrimination and reductions-in-force, courts have occasionally found, in certain circumstances, a prima facie burden to be met despite the absence of comparator evidence. In race and sex discrimination cases, courts have found a prima facie burden for an unlawful termination claim to be sufficiently met even though the plaintiff was replaced by a member of his own protected class. *Howard v. Roadway Enterprises, Inc.,* 726 F.2d 1529, 1534 (11th Cir. 1984) ("[P]roof that the employer replaced the fired minority employee with a non-minority employee is not the *only* way to create such an inference.") (*citing Jones v. Western Geophysical Co. of Am.,* 669 F.2d 280 (5th Cir. 1982)). In a gender-based denial of promotion claim, another judge of this district did not require proof that a male was given the promotion that the female plaintiff was denied to satisfy the prima facie burden, but rather required only that the plaintiff was (1) a member of the protected class; (2) qualified for the sought-after position, (3) was denied the promotion; and "(4) some additional factor that would allow an inference of discrimination." *White v. Verizon South, Inc.*, 299 F. Supp. 2d 1235, 1241 (M.D. Ala. 2003)(Thompson, J.).

In other words, the lack of a similarly situated comparator should not defeat Hunter's prima facie case when there is otherwise sufficient circumstantial evidence of discriminatory

intent.  "The importance of *McDonnell Douglas* lies, not in its specification of the discrete

elements of proof there required, but in its recognition of the general principle that any Title VII

plaintiff must carry the initial burden of offering evidence adequate to create an inference that an

employment decision was based on [an illegal] discriminatory criterion . . . ." *Teamsters v.*

*United States*, 431 U.S. 324, 358 (1977).  Hunter therefore carries her prima facie burden if she

has provided sufficient evidence to permit a reasonable trier of fact to infer that her termination

was based on discriminatory intent.  This court finds that sufficient evidence exists.

　　　　First, there are Kim's comments.  Although ambiguous comments merely *suggesting*

discrimination do not furnish direct evidence, their ability to allow the trier of fact to *infer*

discrimination based on the evidence allows them to be considered as circumstantial evidence.

*Alphin v. Sears, Roebuck & Co.,* 940 F.2d 1497, 1500-01 (11th Cir. 1991).  On August 23, 2006,

Kim emailed Riedler, "I do not want to take care of [Hunter] anymore . . I need your help to

terminate her." (Riedler Depo. 125:5-17, Pl.'s Exh. 5.)  Kim testified that he asked Tracy if there

were some policy or something from the handbook that could be used in this situation. (Kim

Depo. 87:18-23.)   In his termination meeting, Hunter asked Kim why his demeanor towards him

had changed, to which he had responded, "I can't afford to take care of an employee like you."

(Hunter Depo. 178:4-181:22.)  Although Kim's comments, which were made shortly after Kim

became aware that Hunter was pregnant, are subject to interpretation, a reasonable factfinder

could infer discriminatory intent, and thus they constitute circumstantial evidence in support of

such an inference.

　　　　Second, there is the testimony of Womack, Hunter's supervisor, that "I had heard – I

don't know specifically, but I just kind of heard, like, rumors or whatever that other people had

been – and I'm not saying it was because of being pregnant, but it just so happened the person

was pregnant." (Depo. Womack 21:14-19.)  There is Hunter's testimony that, upon informing

Womack of her pregnancy, that Womack had told her, "[D]o not tell Jay Kim . . . [b]ecause of a

previous employee that was fired in regards to being pregnant." (Hunter Depo. 96:7-11), and that

other employees had also told her not to tell (Hunter Depo. 97:15-16).  All of these comments

permit an inference of a discriminatory animus, and thus constitute circumstantial evidence that

her termination was based on such bias.

Finally, there is the fact that Hunter was hired as a probationary employee despite

numerous absences, and that Kim "did not care about" the policy until after Hunter's pregnancy,

around the time of her termination. (Kim Depo. 17:25-18:11; 16:13-17.)  In other words, a

reasonable finder of fact could find it significant that Kim did not bother to familiarize himself

with the probationary attendance policy until he suddenly needed to terminate Hunter and asked

Riedler if there was a policy or something from the handbook that could be used in this situation.

(Kim Depo. 87:18-23.)  Again, although subject to differing interpretations, this coincidence

certainly permits an inference of discriminatory intent by a reasonable factfinder.

Under the totality of these circumstances, this court finds that Hunter has provided that

"additional factor" of sufficient evidence adequate to permit an inference of discriminatory intent

by the reasonable factfinder. *White*, 299 F. Supp. 2d at 1241; *Howard*, 726 F.2d at 1534.

Therefore, in accordance with Eleventh Circuit law, even in the absence of a sufficient

comparator, this court finds that Hunter has carried her prima facie burden with respect to an

unlawful termination claim.

B. *Legitimate, Nondiscriminatory Reason*

As its legitimate, nondiscriminatory reason, Mobis argues that it terminated Hunter for her excessive absences and tardies, and not because she was pregnant. As evidence, Mobis provides a record of approximately seven absences during her probationary period, the testimony of Riedler and Kim, and copies of the "three strikes" attendance policy. Hunter concedes that she was aware, at some point during her employment, that the probationary attendance policy applied to her. Mobis has carried its burden of production under *McDonnell Douglas-Burdine*, and so the burden now falls back upon Hunter to provide "sufficient evidence to create a genuine issue of material fact regarding whether . . . the defendant employer's articulated reason[] is pretextual . . . ." *Chapman,* 229 F.3d at 1024-25 (citations omitted).

## C. Pretext

To show pretext, Hunter must demonstrate "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." *Combs v. Plantation Patterns*, 106 F.3d 1519, 1538 (11th Cir. 1997) (quotation omitted). Ultimately, if "the proffered reason is one that might motivate a reasonable employer, [the plaintiff] must meet that reason head on and rebut it. *Chapman,* 229 F.3d at 1030. To avoid summary judgment, the plaintiff must introduce "significantly probative evidence." *Clark v. Coats & Clark, Inc.,* 990 F.2d 1217, 1228 (11th Cir. 1993) (citation omitted). The court must avoid "weighing conflicting evidence or making credibility determinations" for "the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [her] favor." *Damon v. Fleming Supermarkets of Florida, Inc.,* 196 F.3d 1354, 1361 (11th Cir. 1999), *cert. denied,* 529 U.S. 1109 (2000). Finally, in meeting its burden of producing evidence of pretext, the plaintiff may include

17

the previously produced prima facie evidence, provided the totality of evidence is "sufficient to permit a reasonable fact finder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision." *Chapman*, 229 F.3d at 1024. (citations omitted).  Consequently, cases such this one are "only infrequently resolved on summary judgment because the credibility of the witnesses and the weight of the evidence, quintessential jury questions, are so central to any ultimate determination." *Strickland v. Prime Care of Dothan*, 108 F. Supp.2d 1329, 1332 (M.D. Ala. 2000) (*citing Hairston v. Gainesville Sun Publ'g Co.,* 9 F.3d 913, 918 (11th Cir. 1993)).

First, Hunter argues that the inconsistencies and misrepresentations made by Kim demonstrate evidence of pretext. (Br. in Opp. at 26-27.)  In its EEOC Position Statement, Mobis stated that "it is not possible that [Hunter's] pregnancy was a motivating factor in Mr. Kim's decision" because he communicated the decision "well before he was aware of [Hunter's] pregnancy." (Reply Br., Pl.'s Exh 18.)  In its Reply Brief, however, Mobis concedes that Kim knew of Hunter's pregnancy when he "communicated his decision not to retain [Hunter]," but that the inadvertently false claim in the Position Statement arose from miscommunication and the fact that Kim did not read the EEOC Position Statement before it was submitted. (Reply Br. at 20-22.)

Second, Hunter argues that inconsistencies regarding her attendance record demonstrate evidence of  pretext. (Br. in Opp. at 31-33.)  Specifically, Kim admittedly knew of Hunter's poor attendance record as a temporary employee at the time she was granted probationary status. (Kim Depo. 34:4-7.)  Kim testified that he did not "care about" or "think about" the policy until around Hunter's termination date at the end of August. (Kim Depo. 17:25-18:11.)  Hunter's

absences were in excess of what would have warranted automatic termination under the no fault attendance policy, and yet she was not automatically terminated after her third absence or tardy. (Riedler Depo. 113:5-114:5.)

Finally, Hunter has pointed to statements by Kim which, as stated above, may be evidence of pretext. (Br. in Opp. at 28-30.) The Eleventh Circuit has held that ambiguous remarks, when interpreted in the light most favorable to the plaintiff, may support an inference of discrimination. *Alphin,* 940 F.2d at 1501; *B /E Aerospace, Inc.,* 376 F.3d at 1091 ("Language not amounting to direct evidence, but showing some [discriminatory] animus, may be significant evidence of pretext once a plaintiff has set out the prima facie case." (internal citations omitted)). As discussed above in the prima facie discussion, Kim's comments about not wanting to "take care" of Hunter and wanting to find a way to terminate her may be subject to interpretation. When interpreting the comments in the light most favorable to Hunter, however, these comments provide perhaps the strongest circumstantial evidence of pretext in the case.

The court finds that Hunter has provided sufficient evidence such that a reasonable factfinder could infer that Mobis's proffered reason for terminating Hunter was pretextual under these specific circumstances. Because Hunter has carried her burden of providing sufficient evidence of pretext, this court agrees with Hunter that a jury should resolve the underlying factual disputes in this matter to determine Mobis's true motivation in deciding to terminate her.

## VI. <u>CONCLUSION</u>

The ultimate question in this case is whether the true motivation for Hunter's termination arose from her admittedly poor attendance or from her pregnancy. Hunter has presented sufficient evidence such that a reasonable juror could conclude that her termination

was motivated by discriminatory animus, and that Mobis's proffered reason of poor attendance is pretextual. Therefore, resolution of this ultimate question is most properly placed before a jury, and the Defendant's Motion for Summary Judgment is due to be DENIED. For the foregoing reasons, it is hereby Ordered that:

1. Defendant's Motion for Summary Judgment is DENIED.

2. This case shall proceed on Hunter's claim of unlawful termination on the basis of pregnancy in violation of Title VII.

Done this 2nd day of June, 2008.

/s/ W. Harold Albritton
W. HAROLD ALBRITTON
SENIOR UNITED STATES DISTRICT JUDGE

A copy of this checklist is available at the website for the USCA, 11th Circuit at www.ca11.uscourts.gov
Effective on April 9, 2006, the new fee to file an appeal will increase from $255.00 to $455.00.

## CIVIL APPEALS JURISDICTION CHECKLIST

1.   **Appealable Orders:** Courts of Appeals have jurisdiction conferred and strictly limited by statute:

    (a)   **Appeals from final orders pursuant to 28 U.S.C. § 1291:** Only final orders and judgments of district courts, or final orders of bankruptcy courts which have been appealed to and fully resolved by a district court under 28 U.S.C.§ 158, generally are appealable. A final decision is one that "ends the litigation on the merits and leaves nothing for the court to do but execute the judgment." Pitney Bowes, Inc. v. Mestre, 701 F.2d 1 365, 1 368 ( 11th Ci r. 1 983). A magistrate judge's report and recommendation is not final and appealable until judgment thereon is entered by a district court judge. 28 U.S.C. § 636(c).

    (b)   **In cases involving multiple parties or multiple claims,** a judgment as to fewer than all parties or all claims is not a final, appealable decision unless the district court has certified the judgment for immediate review under Fed.R.Civ.P. 54(b). Williams v. Bishop, 732 F.2d 885, 885- 86 (11th Cir. 1984). A judg ment which resolves all issues except matters, such as attorneys' fees and costs, that are collateral to the merits, is immediately appealable. Budinich v. Becton Dickinson & Co., 486 U.S.196, 201, 108 S.Ct. 1717, 1721-22, 100 L .Ed.2d 178 (1988); LaChance v. Duffy's Draft House, Inc., 146 F.3d 832, 837 (11th Cir. 1998).

    (c)   **Appeals pursuant to 28 U.S.C. § 1292(a):** Appeals are permitted from orders "granting, continuing, modifying, refusing or dissolving injunctions or refusing to dissolve or modify injunctions . . ." and from "[i]nterlocutory decrees . . . determining the rights and liabilities of parties to admiralty cases in which appeals from final decrees are allowed." Interlocutory appeals from orders denying temporary restraining orders are not permitted.

    (d)   **Appeals pursuant to 28 U.S.C. § 1292(b) and Fed.R.App.P. 5**: The certification specified in 28 U.S.C. § 1292(b) must be obtained before a petition for permission to appeal is filed in the Court of Appeals. The district court's denial of a motion for certification is not itself appealable.

    (e)   **Appeals pursuant to judicially created exceptions to the finality rule:** Limited exceptions are discussed in cases including, but not limited to: Cohen v. Beneficial Indus. Loan Corp., 337 U.S. 541, 546, 69S.Ct. 1221, 1225-26, 93 L.Ed. 1528 (1949); Atlantic Fed. Sav. & Loan Ass'n v. Blythe Eastman Paine Webber, Inc., 890 F.2d 371, 376 (11th Cir. 1989); Gillespie v. United States Steel Corp., 379 U.S. 148, 157, 85 S.Ct. 308, 312, 13 L.Ed.2d 199 (1964).

2.    __Time for Filing__: The timely filing of a notice of appeal is mandatory and jurisdictional. <u>Rinaldo v. Corbett</u>, 256 F.3d 1276, 1278 (11th Cir. 2001). In civil cases, Fed.R.App.P. 4(a) and (c) set the following time limits:

(a)    **Fed.R.App.P. 4(a)(1):** A notice of appeal in compliance with the requirements set forth in Fed.R.App.P. 3 must be filed in the district court within 30 days after the entry of the order or judgment appealed from. However, if the United States or an officer or agency thereof is a party, the notice of appeal must be filed in the district court within 60 days after such entry. **THE NOTICE MUST BE RECEIVED AND FILED IN THE DISTRICT COURT NO LATER THAN THE LAST DAY OF THE APPEAL PERIOD – no additional days are provided for mailing.** Special filing provisions for inmates are discussed below.

(b)    **Fed.R.App.P. 4(a)(3):** "If one party timely files a notice of appeal, any other party may file a notice of appeal within 14 days after the date when the first notice was filed, or within the time otherwise prescribed by this Rule 4(a), whichever period ends later."

(c)    **Fed.R.App.P. 4(a)(4):** If any party makes a timely motion in the district court under the Federal Rules of Civil Procedure of a type specified in this rule, the time for appeal for all parties runs from the date of entry of the order disposing of the last such timely filed motion.

(d)    **Fed.R.App.P. 4(a)(5) and 4(a)(6):** Under certain limited circumstances, the district court may extend the time to file a notice of appeal. Under Rule 4(a)(5), the time may be extended if a motion for an extension is filed within 30 days after expiration of the time otherwise provided to file a notice of appeal, upon a showing of excusable neglect or good cause. Under Rule 4(a)(6), the time may be extended if the district court finds upon motion that a party did not timely receive notice of the entry of the judgment or order, and that no party would be prejudiced by an extension.

(e)    **Fed.R.App.P. 4(c):** If an inmate confined to an institution files a notice of appeal in either a civil case or a criminal case, the notice of appeal is timely if it is deposited in the institution's internal mail system on or before the last day for filing. Timely filing may be shown by a declaration in compliance with 28 U.S.C. § 1746 or a notarized statement, either of which must set forth the date of deposit and state that first-class postage has been prepaid.

3.    __Format of the notice of appeal:__ Form 1, Appendix of Forms to the Federal Rules of Appellate Procedure, is a suitable format. <u>See</u> also Fed.R.App.P. 3(c). A <u>pro se</u> notice of appeal must be signed by the appellant.

4.    __Effect of a notice of appeal:__ A district court loses jurisdiction (authority) to act after the filing of a timely notice of appeal, except for actions in aid of appellate jurisdiction or to rule on a timely motion of the type specified in Fed.R.App.P. 4(a)(4).