IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| TARSHA NICKOL HUNTER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No.: 2:07-CV-427-WHA |
| vs. | ) | |
| | ) | |
| MOBIS ALABAMA, LLC, | ) | |
| | ) | |
| Defendant. | ) | |

DEFENDANT MOBIS' MEMORANDUM OF LAW IN
SUPPORT OF MOTION TO RECONSIDER ORDER
DENYING MOBIS' MOTION FOR SUMMARY JUDGMENT

**COMES NOW** the Defendant MOBIS Alabama, LLC (hereinafter "MOBIS") and respectfully submits the following Memorandum of Law in Support of Motion to Reconsider Order Denying MOBIS' Motion for Summary Judgment (Doc. no. 27).

In addition to the arguments presented in MOBIS' Motion for Summary Judgment and Memorandum of Law in Support thereof and its Memorandum of Law in Reply to Plaintiff's Opposition thereto (Doc. nos. 16, 17 & 25), MOBIS respectfully requests that the Court revisit several undisputed facts and legal principles that, even considered in the light most favorable to Plaintiff, compel summary judgment in MOBIS' favor. This Court should apply the long-standing *prima facie* case standard for pregnancy discrimination cases rather than compromising that paradigm by drawing analogies to clearly distinguishable cases. Additionally, Plaintiff's circumstantial "evidence" is comprised of unsubstantiated allegations, and does not create a genuine issue of fact for purposes of summary judgment. Plaintiff cannot rely on conclusory allegations or suspicions of discrimination, but must come forward with evidence

demonstrating "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable fact finder could find them unworthy of credence." *Chapman v. AI Transport,* 229 F.3d 1012, 1037 (11th Cir. 2000) (en banc); *Combs v. Plantation Patterns,* 106 F.3d 1519, 1543 (11th Cir. 1997).

## ARGUMENT

A.    **IT IS UNDISPUTED THAT PLAINTIFF WAS ABSENT AT LEAST 7 TIMES DURING HER PROBATIONARY PERIOD IN VIOLATION OF MOBIS' ATTENDANCE POLICY AND THAT PLAINTIFF KNEW THAT THE ATTENDANCE POLICY APPLIED TO HER.**

As noted by the Court, it is undisputed that Plaintiff incurred the last three of her seven absences with full "knowledge of her probationary status and the applicable 'three strikes' attendance policy." 6/2/08 Order (Doc. no. 27) at fn. 1. Plaintiff admitted that she read and understood the attendance policy governing probationary employees and also acknowledged that no one ever told her she was exempt from the probationary policy or that it would not apply to her in all respects. Plaintiff Depo. at p. 73, l. 3 – p. 74, l. 22; p. 142, l. 1-5 (Plaintiff Depo. Excerpts attached as Ex. A). It is also undisputed that not a single person with three (3) or more attendance occurrences has been converted from probationary status to regular employment since MOBIS revised its probationary attendance policy (and the related 90 Day Review Form) in March 2005 for purposes of implementing an objective, no fault attendance system. There is, therefore, no evidence that any other employee[s] were treated differently than Plaintiff (i.e. no differential application of the rules to Plaintiff). Consequently, Plaintiff is actually seeking preferential treatment due to her pregnancy, something not required by the PDA. Riedler Supple. Aff. at ¶ 19, attached as Ex. B.

Plaintiff has created no genuine factual dispute that Plaintiff's termination came about as a result of the automatic review process for probationary employees whereby MOBIS' Human Resources Department sends a 90 Day Review Sheet to the employee's supervisor prior to the end of the 90 day period. Assuming for demonstrative purposes only that Ms. Womack had again succeeded in persuading Mr. Kim to retain Plaintiff when he received the 90 Day Review Sheet from Human Resources, Mr. Kim still would have had to fill out the 90 Day Review Sheet and include Plaintiff's seven (7) absenteeism occurrences. The form requires disclosure of the specific number of absences, etc. The form would have then been submitted to Human Resources and the decision would have been out of Mr. Kim's hands, just as it was in the actual facts before the Court. Ms. Riedler would have terminated Plaintiff anyway under the objective provisions of the revised Attendance Policy. Ex. B at ¶¶ 9, 10, 15.

If Ms. Riedler had made an exception for Plaintiff due to her pregnancy, or otherwise, as Ms. Womack strongly advocated, Plaintiff would have been the first and only probationary employee offered regular employment after MOBIS changed its attendance policy on March 21, 2005. *See* Ex. B at ¶ 16. Ms. Riedler reviews every 90 Day Review Sheet. She has reviewed her records and confirms in her supplemental Affidavit that no salaried employee with three (3) or more attendance occurrences during their probationary period has been offered regular employment since the new policy went into effect. *Id.*

Thus, MOBIS either had to apply the objective attendance rule to Plaintiff or make an exception. MOBIS implemented the attendance rule to avoid this very situation and crafted it to be automatic and objective. The only reason that Plaintiff was not

3

terminated sooner was because Mr. Kim, who had been with MOBIS since its inception in Alabama and before the attendance policy was revised in 2005, was not familiar with the new attendance rule. MOBIS should not be penalized for enforcing a legitimate, nondiscriminatory attendance policy simply because Plaintiff informed Mr. Kim that she was pregnant shortly before the end of her probationary period. Such a result puts an unreasonable burden on large employers to administer objective attendance policies with perfection and immediacy. MOBIS has submitted an unrebutted and entirely non-pretextual explanation for the delay in Plaintiff's case.

B.    **MOBIS' EVIDENCE AND ARGUMENT THAT MS. RIEDLER, WHO WAS NOT SHOWN TO HAVE ANY BIAS TOWARDS PREGNANCY, WAS AN INTERVENING DECISION MAKER WHO BROKE THE CHAIN OF CAUSATION BETWEEN MR. KIM AND PLAINTIFF SHOULD HAVE BEEN DISPOSITIVE.**

Ms. Riedler is the gatekeeper on all terminations at MOBIS. Plaintiff could not have been terminated without her approval. Ms. Riedler was the ultimate decision maker who advised Mr. Kim of the changed attendance policy, as well as the fact that MOBIS could not retain Plaintiff as an employee since she was in clear violation of the policy. Ex. B at ¶ 10; Riedler Aff. at ¶ 20, attached as Ex. C. As described in detail in MOBIS' first brief, Ms. Riedler's first substantive involvement with Plaintiff's employment was the meeting with Mr. Kim, which took place approximately one week prior to Plaintiff's termination. Riedler Depo. at p. 112, l. 12 – 21 (Riedler Depo. Excerpts attached as Ex. D). Ms. Riedler did not know that Plaintiff was pregnant when she told Mr. Kim that Plaintiff had to be terminated. Riedler Depo. at p. 115, l. 16 – p. 116, l. 17; Ex. B at ¶ 19. Ms. Womack informed Ms. Riedler that Plaintiff was pregnant a day or two before

Plaintiff's termination. *Id.*[1]  In other words, Ms. Riedler was the individual who decided to terminate Plaintiff's employment, Riedler Depo. at p. 122, l. 16 – p. 123, l. 3, and she had no knowledge of Plaintiff's pregnancy.  Plaintiff has never disputed this fact and it stands unrebutted.  There is thus no genuine issue about the fact that Ms. Riedler decided to discharge Plaintiff for being absent three times in addition to four other occurrences of either being late to work or leaving work early.  Riedler Depo. at p. 127, l. 1-12; Ex. C at ¶ 20.

Thus, even if the Court were to determine, in the absence of evidence to that effect, that Mr. Kim did have a discriminatory motive when he decided that he did not want to keep Plaintiff, Ms. Riedler broke the chain of causation between Mr. Kim and Plaintiff's termination when she independently determined that Plaintiff had to be terminated for attendance reasons.[2]  The Court failed to give sufficient consideration to this pivotal fact when it ruled against MOBIS on its Motion for Summary Judgment. Controlling law on the "causal link" requirement is clear.  *See Llampallas v. Mini-Circuits Lab, Inc.*, 163 F.3d 1236 (11th Cir. 1998); *Stimpson v. City of Tuscaloosa*, 186 F.3d 1328, 1331-32 (11th Cir. 1999).

---

[1]  Specifically, Ms. Womack came to Ms. Riedler's office a day or two before Plaintiff's termination, upset because she wanted to keep Plaintiff, and told Ms. Riedler about Plaintiff's pregnancy, probably in an attempt to justify Plaintiff's attendance issues. Riedler Depo. at p. 115, l. 16 – p. 117, l. 18.  Ms. Riedler informed Ms. Womack that MOBIS had to stick to its policies to be fair to all of the employees. *Id.* While Ms. Womack believes that she told Ms. Riedler that she thought that Plaintiff's discharge had something to do with her pregnancy, Ms. Riedler does not recall any discussion along those lines. *Id.* Ms. Riedler made the ultimate decision to discharge Plaintiff based on her clear violation of the attendance policy for probationary employees. Ms. Riedler did not even know that Plaintiff was pregnant when she made that decision, and she had no reason to question the veracity of Mr. Kim's attendance records.  When Ms. Womack came to her office to tell her about Plaintiff's pregnancy, Ms. Riedler had already had the meeting with Mr. Kim about Plaintiff's performance during her 90 day probationary period, and had seen his attendance records and e-mails to Plaintiff about her attendance.  This was the only investigation necessary under the circumstances.  Ms. Riedler had no reason to revisit the issue because she knew Plaintiff was being terminated for attendance reasons.

[2] Plaintiff acknowledged in her deposition that after working for Kim for the better part of six months she is unsure whether Kim is the kind of person who would deliberately violate the law regarding pregnancy discrimination.  Plaintiff Depo. at p. 212 l. 1-23.

**C.    THE COURT HAS ACCEPTED PLAINTIFF'S UNSUPPORTED ALLEGATIONS WHEN THERE IS UNCONTROVERTED EVIDENCE THAT SUPPORTS MOBIS' POSITION.**

While the Court must consider the facts in the light most favorable to the Plaintiff, the legal standard does not require the Court to accept Plaintiff's unsupported and speculative allegations as probative evidence when MOBIS offers corroborated evidence to the contrary. For example, in its rendition of the "Facts," the Court states that "Hunter claims that Kim did not communicate any complaints to her" and that "Hunter was not told, moreover, that her absences would lead to termination, or that they were causing a problem prior to Kim learning that she was pregnant." 6/2/08 Order (Doc. no. 27) at 8.

These "facts" cited by the Court are Plaintiff's naked allegations and do not stand up to MOBIS' undisputable evidence to the contrary or create a genuine issue of fact. There is nothing in the record to support these two statements. Mr. Kim and Ms. Womack told Plaintiff in no uncertain terms when she was offered probationary employment after serving as a temp that she could have no more attendance problems or she would not be retained as a regular employee. Womack Depo. at p. 43, l. 19 - 44, l. 9 (Womack Depo. Excerpts attached as Ex. E). Plaintiff then went through MOBIS' orientation program for probationary employees and reviewed and understood the Probationary Period Policy and Procedures and the fact that she would be terminated if she had three (3) absentee occurrences. Plaintiff Depo. at p. 73, l. 3 – p. 74, l. 22; p. 142, l. 1-5. Therefore, the undisputed evidence in this case is that Mr. Kim was unhappy about Plaintiff's attendance record when she was a temporary employee, and that he reluctantly agreed, upon heavy persuasion from Ms. Womack, to hire Plaintiff as a probationary employee under the condition that she not have more attendance problems.

Kim Supple. Aff. at ¶¶ 5-6, attached as Ex. F.  Plaintiff had been warned at the outset

about her attendance issues in May by her immediate supervisor, Ms. Womack.  Womack

Depo. at p. 53, l. 15 – p. 55, l. 13.

One e-mail from Mr. Kim to Plaintiff in particular totally undermines Plaintiff's

allegations in this regard.  On July 26, 2006, approximately two weeks before Plaintiff

disclosed her pregnancy to Mr. Kim, Mr. Kim sent Plaintiff the following e-mail and

copied Ms. Womack:

> *This is a notification for tardiness.*
>
> *On Wednesday the 26th, you were noted as being tardy, this was not a first time* ***during 90 day probationary****.  I need for you to keep the starting time for business, everyday.*
>
> *When you return from doctor's office, please submit the doctor's note and schedule for make-up time.  In addition, you are* ***reminded that you are still serving out your probationary period*** *and that the attendance is very important.  Please make every effort to correct these deficiencies as* ***your long term employment may be in jeopardy****.*

Plaintiff Depo. at Def. Ex. 16 (emphasis added), 7/26/06 E-mail from Kim to Plaintiff,

attached hereto as Ex. G.  Additionally, on August 2, 2006, before Mr. Kim knew that

Plaintiff was pregnant, Plaintiff received e-mails from both Ms. Womack and Mr. Kim

referencing incomplete work, unfiled papers, and un-entered invoices from the prior

month's end.  Plaintiff Depo. at Def. Exs. 17 & 18, 8/2/06 E-mails from Kim and

Womack to Plaintiff, attached hereto as Ex. H.  Plaintiff's bald claim that her attendance

was not a serious issue with Mr. Kim before he found out that she was pregnant is simply

not supported by the record and certainly does not rise to the level of a "disputed fact" in

this case.  Plaintiff's attendance was a serious issue with Kim from day one.

D.   THE COURT DECLINED TO APPLY THIS JURISDICTION'S LONG-STANDING
     STANDARD FOR A *PRIMA FACIE* GENDER DISCRIMINATION CASE AFTER
     CONSIDERING ONLY PLAINTIFF'S UNSUBSTANTIATED ALLEGATIONS, WHICH
     SHOULD NOT CONSTITUTE "OTHER CIRCUMSTANTIAL EVIDENCE OF
     DISCRIMINATION."

A plaintiff establishes a *prima facie* case of discrimination under the PDA/Title

VII by showing: (1) she belongs to a "protected" class; (2) she was qualified to do her

job; (3) she suffered an adverse employment action; and (4) her employer treated

similarly situated employees outside her classification more favorably. *Holifield v. Reno,*

115 F.3d 1555, 1562 (11th Cir.1997) (citing *McDonnell Douglas,* 411 U.S. at 802); *see*

*also Armstrong v. Flowers Hospital,* 33 F.3d 1308, 1314 (11th Cir. 1994) (describing the

fourth prong as follows: "that she suffered from differential application of work or

disciplinary rules").  In other words, "an employer violates the PDA when it denies a

pregnant employee a benefit generally available to temporarily disabled workers holding

similar job positions." *Spivey,* 196 F.3d at 1313 (citing *Byrd v. Lakeshore Hosp.,* 30 F.3d

1380, 1383-84 (11th Cir. 1994) (finding that, even if plaintiff could not point to specific,

disabled employees who were treated better than she was treated, she could establish a

presumption of pregnancy discrimination by showing, for example, that taking advantage

of her employer's generally available sick leave policy for her pregnancy-related time off

from work was a substantial cause of her discharge)).

Even if Hunter cannot identify a comparator, the Court should still require her to

show that the attendance policy was applied differently to her.  In *Byrd v. Lakeshore*

*Hosp.,* 30 F.3d 1380, 1383-84 (11th Cir. 1994), the district court found that one of the

primary reasons for the pregnant plaintiff's discharge was her use of the sick leave

policy, which was available for all employees.  There was no factual dispute that the

plaintiff had enough sick days to cover her absences and that the employer terminated

plaintiff in part because she used her sick days to cover pregnancy-related absences. *Id.*

at 1381. Still, the district court granted summary judgment because plaintiff could not

identify a similarly-situated comparator. The Eleventh Circuit reversed the district court

because "it is a violation of the PDA for an employer to deny a pregnant employee the

benefits commonly afforded temporarily disabled workers in similar positions, or to

discharge a pregnant employee for using those benefits." *Id.* at 1383-84. The Court

analyzed the legislative history of the PDA and concluded that:

> As the House Report accompanying the Act made clear:
> This bill would prevent employers from treating pregnancy,
> child-birth and related medical conditions in a manner
> different from their treatment of other disabilities. In other
> words, this bill would require that women disabled due to
> pregnancy, childbirth or other related medical conditions *be
> provided the same benefits as those provided other disabled
> workers. This would include temporary and long-term
> disability insurance, sick leave,* and other forms of
> employee benefit programs.
>
> H.R. No. 95-948, § 1(a) (emphasis added).[FN3] The pertinent
> EEOC regulations similarly provide that "[a] woman
> unable to work for pregnancy-related reasons is entitled to
> ... sick leave on the same basis as employees unable to
> work for other medical reasons." 29 CFR Ch. XIV Pt.
> 1604, Introduction to App. (1993).
>
> FN3. **The inverse is also true: the same House Report
> indicates that the PDA "will not require an employer
> who does not provide disability benefits or paid sick
> leave to other employees to provide them for pregnant
> workers."** *Id.*

*Byrd*, 30 F.3d at 1382 (emphasis added). Thus, in the *Byrd* case, even though the

plaintiff did not identify a similarly-situated comparator, the plaintiff met her *prima facie*

case burden by presenting evidence that she was terminated in part for using sick leave

generally available to all employees. In other words, she presented evidence of a differential application of the workplace rules. In Hunter's case, she has never offered any evidence that she was not absent at least seven times during her probationary period. In contravention to the legislative intent cited above, Hunter urges this Court to penalize MOBIS because it did not give her preferential treatment because her absences were related to her pregnancy.

Rather than applying these long-standing and generally accepted principles for pregnancy discrimination and after finding that Plaintiff undisputedly failed to identify a similarly situated comparator and thus failed to "carry her burden under this formulation," this Court chose to rely on other circumstantial evidence of discrimination. 6/2/08 Order (Doc. no. 27) at 13-15. This Court overlooked the fact that Hunter failed to present any evidence of a similarly situated comparator, failed to show that any other probationary employee at MOBIS with more than three attendance occurrences has been hired as a permanent employee, and failed to dispute the unrebutted fact that MOBIS has, without exception, objectively applied its attendance policy since its inception in 2005. MOBIS does not dispute that there are cases in this jurisdiction that advocate looking for other circumstantial evidence of discrimination when comparator evidence might not be available for purposes of proving a *prima facie* case (the *Byrd* case discussed above being an obvious example), but MOBIS submits that the cases cited by this Court in support of doing so are not applicable to the case at bar. Specifically, in the context of age discrimination, reduction-in-force and position elimination cases, a court might look outside of comparator evidence because there is often not a similarly-situated comparator since the termination or position elimination may not have arisen from misconduct or a

workplace rule violation. In short, the age discrimination cases cited by the Court are factually and legally distinguishable from the case at bar. *See, e.g., Corbin v. Southland Int'l Trucks, Inc.*, 25, F3d 1545 (11th Cir. 1994) (in age discrimination case, plaintiff could not identify the age of the exact employee that replaced him, but plaintiff presented evidence that all six of the mechanics hired after he was discharged were younger than plaintiff and five of the six were under the age of 33); *Chapman v. AI Transportation*, 180 F.3d 1244 (11th Cir. 1999) (in age discrimination case, court applied *prima facie* case paradigm for an ADEA violation; the plaintiff must show that he (1) was a member of the protected age group, (2) was subject to adverse employment action, (3) was qualified to do the job, and (4) was replaced by a younger individual.); *Mitchell v. Worldwide Underwriters Ins. Co.*, 967 F.2d 565 (11th Cir. 1992) (ADEA age discrimination case involving a reduction in force); *Benson v. Tocco*, 113 F.3d 1203 (11th Cir. 1997) (ADEA age discrimination case involving a reduction in force); *Verbraeken v. Westinghouse Elec. Corp.*, 881 F.2d 1041, 1045 (11th Cir.1989) (same).

The most distinguishable case cited by the Court is *Rioux v. City of Atlanta*, 520 F.3d 1269 (11th Cir. March 18, 2008), which the Court cited for the proposition that a plaintiff without comparator evidence could avoid summary judgment with other evidence "from which an inference of discrimination could be found." 6/2/08 Order (Doc. no. 27) at 13 (citing *Rioux* at 1277). MOBIS does not dispute the validity of this formula for certain cases, but submits that the facts of the case at bar are so distinguishable from the facts of *Rioux* that it should not be applied in this case in lieu of the standard *prima facie* case paradigm for pregnancy discrimination. Specifically, *Rioux* involved a white Deputy Fire Chief alleging discriminatory demotion based on his race

after he violated certain workplace rules.  Initially, the Court acknowledge the following

*prima facie* case paradigm:

> Appellees correctly argue that one way of establishing a prima facie case of employment discrimination based on a demotion following an employee's misconduct requires the plaintiff to show that "(1) he belongs to a protected class; (2) he was qualified for the job; and (3) the misconduct for which the employer demoted him was the same or similar misconduct to that which a similarly situated employee engaged in, but was not similarly disciplined for."*Moore v. Alabama Dep't of Corr.,* 137 Fed.Appx. 235, 238 (11th Cir. 2005) (citing *Holifield,* 115 F.3d at 1562); *accord Lathem v. Dep't of Children & Youth Servs.,* 172 F.3d 786, 792 (11th Cir. 1999). Where the racial discrimination is alleged in the application of work rules to discipline an employee, and where there is no claim that the employee did not violate the work rules, as here, then plaintiff must show "that he engaged in misconduct similar to that of a person outside the protected class, and ... the disciplinary measures enforced against him were more severe than those enforced against the other persons who engaged in similar misconduct." *Id.* (citing *Jones v. Gerwens,* 874 F.2d 1534, 1540 (11th Cir. 1989)).

*Rioux,* 520 F.3d at 1275-76.  Ultimately, the district court applied, and the Eleventh

Circuit condoned, the following formulation of a *prima facie* case because Rioux was not

able to point to a viable comparator because of his senior position in the fire department:

> The district court applied the prima facie test for discriminatory demotion from *Sturniolo v. Sheaffer, Eaton, Inc.,* which differs from the test articulated by Appellants in that it requires the plaintiff to demonstrate that: (1) he is a member of a protected class; (2) he was qualified for the job; (3) he was demoted; and (4) following the demotion he was replaced by someone outside his protected class. 15 F.3d 1023, 1025 (11th Cir.1994); *see also Hinson v. Clinch County, Georgia Bd. of Educ.,* 231 F.3d 821, 828 (11th Cir.2000) (applying same standard in case involving teacher claiming discriminatory demotion).

*Rioux*, 520 F.3d at 1276.   Importantly, the Eleventh Circuit decided to apply the second test because "**it is not always possible for high-ranking employees to find suitable comparators**." *Id.* at 1277 (citing *Holifield,* 115 F.3d 1555, 1563 ("[T]here are only a limited number of potential 'similarly situated employees' when higher level supervisory positions for medical doctors are involved.") (emphasis added).   Thus, since there were no other Deputy Fire Chiefs who could be similarly situated comparators, the court ruled that Rioux established a *prima facie* case because it was undisputed that he was a member of a protected class; he was qualified for the job; he was demoted; and following the demotion, he was replaced by someone outside his protected class, an Asian American woman.[3] *Id.*

The case at bar does not involve a senior level or high-ranking executive for which there are no comparators at MOBIS.   Rather, Hunter is an entry-level employee who was hired as a probationary employee like hundreds (if not thousands) of other employees at MOBIS and who was subject to an objective, no-fault attendance policy like every other probationary employee.   The reason that Plaintiff cannot identify a similarly situated comparator is because MOBIS has applied its attendance policy without exception since it was enacted in 2005.   This case does not present a factual scenario wherein the Court should depart from the long-standing *prima facie* case formula for pregnancy discrimination.

---

[3]    The court also considered other circumstantial evidence of discrimination, such as Plaintiff's evidence that his department tried to maintain a racial balance, that the "short list" of his replacements contained three black firefighters, and that the proposed comparator who committed a similar offense was treated differently with respect to the investigation of the incident and disciplinary action taken thereafter. *Rioux*, 520 F.3d at 1277.  However, the court considered this evidence after noting the difficulty that a senior ranking employee has locating a comparator, and finding that Rioux was replaced by an employee outside of his class.

The *White* case cited by the Court is likewise inapplicable to the case at bar. This Court cited that gender-based denial of promotion case as support for the proposition that comparator evidence is not necessary since "another judge in this district did not require proof that a male was given the promotion." 6/2/08 Order (Doc. no. 27) at 14. Yet, that case was decided on the following evidence:

> There is no doubt that White has established a prima-facie case of discrimination. She is a member of a protected class; she was not offered the promotion; she was qualified for the promotion; and the promotion was filled by a candidate who was not a member of White's protected class. Verizon admits this much: "Verizon concedes that she met the minimum qualifications that were required to apply for the position."

*White v. Verison South, Inc.*, 299 F. Supp. 2d 1235, 1241 (M.D. Ala. 2003). Again, like the *Rioux* case, while the court did not find comparator evidence, it did consider evidence that the plaintiff was replaced by an employee outside of the plaintiff's class. Hunter has never made such a showing and has not created an issue of fact on that issue.

In addition to adopting a revised *prima facie* case standard, this Court also cited what Plaintiff admits are unsubstantiated "rumors" as circumstantial evidence of discrimination. 6/2/08 Order (Doc. no. 27) at 15-16. The Court relied on Plaintiff's and Ms. Womack's unsupported conjecture that they had heard about a pregnant employee getting fired in the past and determined that "these comments permit an inference of a discriminatory animus, and thus constitute circumstantial evidence that her termination was based on such bias." *Id.* at 16.

As explained by MOBIS in its first summary judgment brief, Plaintiff testified that her concerns about such rumors were based on the terminations of two pregnant employees and the departure of another pregnant employee. With regard to the women

who were terminated, neither Plaintiff nor Ms. Womack knew the terminated women or any of the circumstances of their terminations. Plaintiff Depo. at p. 96, l. 9 – p. 100, l. 1; Womack Depo. at p. 21, l. 10-19. Their only knowledge was that both women were pregnant at the time they were terminated and that there were rumors that pregnancy was the reason.

Plaintiff admits that when she told Ms. Womack that she was pregnant, and they discussed not telling Mr. Kim because of the rumors about the other pregnant employees who were terminated, Ms. Womack never said that Mr. Kim discriminated against another pregnant employee, and Plaintiff admits that she has no reason to believe that Mr. Kim discriminated against another pregnant employee. Plaintiff Depo. at p. 100, l. 9 – 21. In fact, when questioned about the rumors, Ms. Womack testified that: "I had heard - - I don't know specifically, but I just kind of heard, like, rumors or whatever that other people had been -- and *I'm not saying it was because of being pregnant, but it just so happened the person was pregnant*." Womack Depo. at p. 21, l. 10-19. The Court cited this unsupported speculation that Mr. Kim might discriminate against Plaintiff because of unsubstantiated supposition that other supervisors at MOBIS terminated other pregnant employees as "evidence to permit a reasonable trier of fact to infer that her termination was based on discriminatory intent." 6/2/08 Order (Doc. no. 27) at 15. In contrast to Plaintiff's "evidence" of discrimination in the form of unsubstantiated rumors, MOBIS presented the following unrebutted evidence.

### a) LaJarra Jefferson.

The uncontroverted evidence shows that the two women in question are LaJarra Jefferson and Shalonda Gordon, both of whom were pregnant when terminated. Ms.

Jefferson was terminated for taking FMLA leave without submitting a proper medical certification that she needed to be on leave. Riedler Depo. at p. 41, l. 15 – p. 42, l. 24. MOBIS warned Ms. Jefferson that her unexcused absences were counting against her under MOBIS' "no fault" attendance policy for regular hourly employees, and that she would be terminated unless she provided proper medical certification. Ms. Jefferson refused to return to work and did not furnished a medical certification stating that she had a medical need for leave. *Id.* To the contrary, her first two physicians recommended work restrictions that MOBIS told Jefferson it could accommodate. Eventually, Jefferson went to a third doctor, who provided a medical certification that designated a start date for Jefferson's leave, which was after Jefferson had been terminated for attendance points. *Id.*; Riedler Aff. at ¶ 22.

    b)  **SHALONDA GORDON.**

Shalonda Gordon was terminated for improper and destructive work techniques. Riedler Depo. at p. 38, l. 6 – p. 39, l. 21. Specifically, she was jerking on wires instead of unplugging them and damaging the connections on sensitive diagnostic equipment used to conduct quality tests on cockpit (dashboard) assemblies. The supplemental restraint system (airbags) is among the components involved in the testing. For obvious reasons, Gordon's work techniques posed potential quality and safety issues. MOBIS warned Gordon on several occasions about her misconduct before terminating her. *Id.*; Ex. C at ¶ 23.

    c)  **SUJIN LEE.**

The third pregnant employee to which Plaintiff alluded during depositions is former MOBIS employee SuJin Lee. The uncontroverted facts show that MOBIS hired

Ms. Lee in 2006 at Mr. Kim's recommendation. Mr. Kim knew that Ms. Lee was newly pregnant at the time that he hired her, and Mr. Kim told her that he was very happy for her. Ms. Lee voluntarily left MOBIS after a few months because her husband wanted to return to Korea to pursue business opportunities there. Kim Aff. at ¶ 21, attached as Ex. I. Additionally, Ms. Womack never observed Mr. Kim treating Ms. Lee any differently than any other employee. Womack Depo. at p. 44, l. 10 – p. 45, l. 7.    In short, the factual circumstances surrounding Ms. Lee do not support Plaintiff's allegation that Mr. Kim or MOBIS treated pregnant employees any differently.

It is undisputed that MOBIS has had many employees take FMLA leave for pregnancy and return to their former positions without incident. MOBIS treats pregnancy the same as any other illness or sickness with regard to its attendance policies. Ex. C at ¶ 25. Plaintiff's only showing in that regard is her misunderstanding based on rumors and hearsay that MOBIS had terminated the aforementioned pregnant employees. Plaintiff Depo. at p. 96, l. 9 – p. 100, l. 1. These allegations do not create an issue of fact for purposes of summary judgment, and the Court should not have considered these "rumors" to be circumstantial evidence of discrimination. In doing so, the Court focused on Plaintiff's unfounded suspicions, not on any evidence of conduct by MOBIS that could support an inference of discriminatory animous on MOBIS' part.

The other evidence cited by the Court as "evidence to permit a reasonable trier of fact to infer that her termination was based on discriminatory intent" is discussed below since it was also cited in support of the Court's finding that Plaintiff presented evidence of pretext.

E.    THE COURT DID NOT GIVE PROPER WEIGHT TO MOBIS' UNDISPUTED
      EVIDENCE WHEN IT CITED PLAINTIFF'S CIRCUMSTANTIAL ALLEGATIONS AS
      "EVIDENCE" SHOWING PRETEXT.

To show pretext, a plaintiff must " 'come forward with evidence, including the

previously produced evidence establishing the *prima facie* case, sufficient to permit a

reasonable factfinder to conclude that the reasons given by the employer were not the real

reasons for the adverse employment decision.' " *Chapman v. AI Transp.,* 229 F.3d 1012,

1024 (11th Cir. 2000) (en banc) (quoting *Combs v. Plantation Patterns,* 106 F.3d 1519,

1528 (11th Cir. 1997)).    To avoid summary judgment, Plaintiff must introduce

"*significantly probative evidence*." *Clark v. Coates & Clark, Inc.*, 990 F.2d 1217, 1228

(11th Cir. 1993) (citation omitted) (emphasis added).    Hunter did not introduce

significantly probative evidence, but rather, her "evidence" of pretext is largely

comprised of unsubstantiated allegations, and the Court failed to consider MOBIS'

undisputed evidence refuting Plaintiff's allegations.

1.    MOBIS DID NOT INTENTIONALLY MISLEAD THE EEOC, YET THE COURT
      CITES MOBIS' COUNSEL'S MISTAKE AS EVIDENCE OF PRETEXT.

This Court cited the undersigned counsel's error in the EEOC Response as

evidence showing pretext. 6/2/08 Order (Doc. no. 27) at 18. MOBIS finds no precedent

in this jurisdiction for characterizing an honest mistake made by counsel who

misunderstood his Korean client because of a language barrier as evidence of a

discriminatory motive on behalf of his client.

As explained previously, when the undersigned prepared and submitted MOBIS'

response to Plaintiff's EEOC Charge, he understood that Mr. Kim communicated his

decision not to retain Plaintiff to MOBIS' Human Resources Department before he

learned of Plaintiff's pregnancy.[4]  Mr. Kim did not, in fact, communicate with Human Resources about Plaintiff's attendance problems until he received the 90 Day Review Sheet after learning of Plaintiff's pregnancy.  The undersigned respectfully points to a deposition colloquy between Plaintiff's counsel and Mr. Kim, which illustrates how a miscommunication of this nature could easily occur.  *See* Kim Depo. p.64, l. 11 - p. 72, l. 12; p. 86, l. 16-19 (Kim Depo. excerpts attached as Ex. J); Ex. I at ¶ 19.  MOBIS is providing an excerpt below of the exchange between Mr. Kim and Plaintiff's counsel to illustrate how MOBIS' counsel could have been mistaken about when Mr. Kim made the decision to terminate Ms. Hunter in relation to finding out she was pregnant: Additionally, Mr. Kim did not read MOBIS' response to the EEOC Charge before it was submitted.  Kim Depo. at p. 78, l. 2-5.

Q.      *Which came first, your decision to fire Tarsha or finding out she was pregnant?*

A.      *Okay. Let me explain.*

Q.      *Okay.*

A.      *As I already explained, you know, I don't want -- want to hire, you know, Tarsha, even though during the probate -- temporary employee, I already made a decision during that period.  I made a decision.*

        *Actually, I don't -- I don't want to work with her during the probationary employee.  But as I already explained a minute ago, Sonechka, her supervisor, asked me and persuaded me -- persuaded me to keeping her.*

        *That's the reason, you know, her starting -- her starting.*

Q.      *That's not my question.  I'll break it down.*

        *When was the decision to end Tarsha's employment made?*

A.      *I made a decision in probationary -- temporary employment.  I had already made a decision at that point.*

---

[4]   When Kim learned of Plaintiff's pregnancy on August 9, 2006, Plaintiff had six (6) attendance occurrences, including the one for the day the ultrasound was taken (August 9, 2006).

Q.    *Why not keep her on as a temporary employee then?*

A.    *Okay. I'll explain. I don't want her to start, you know, the permanent employee.*

Q.    *That's my question.*

A.    *Yah. I don't want her, you know, to start permanent employee even though, you know, she complete -- finished the temporary employment. But I didn't want her to start the permanent employee.*

Kim Depo. at p. 67, l. 4 - p. 68, l.12.

This line of questioning continued:

Q.    *When Mobis hired Tarsha in June, is it your testimony that you never intended her to work more than ninety days?*

A.    *I don't know. What is your exact question?*

Q.    *In June 2006, had you decided to fire Tarsha?*

A.    *I think that you -- you have some misunderstanding due to my, you know, incorrect expression.*

Q.    *When did you decide to fire Tarsha?*

A.    *I didn't make her, you know, the -- okay. I just want to revise my expression, my expression correctly.*

    *She was a temporary employee.*

Q.    *Okay.*

A.    *But -- during the two or three months. But during that period, I was not very pleased with, you know, her attendance and tardy or something.*

    *So I did not want her to start the Mobis employee -- Mobis employee. Yeah. That is my opinion.*

Kim Depo. at p. p. 71, l. 14 - p. 72, l. 11. Thus, as explained by Mr. Kim, he was already

displeased with Plaintiff's performance because of her attendance issues and had decided

early on during her time as a temporary employee that he did not want her as a permanent

employee. He was persuaded by Ms. Womack to give Plaintiff another chance and keep her as a probationary employee, which he did to appease Ms. Womack. Thus, when he was questioned about whether he knew Plaintiff was pregnant when he made the decision to not recommend that she become a permanent employee, he honestly answered "no" because, in his mind, he had made the decision long before he knew about her pregnancy when her attendance during her probationary period mirrored that of her time as a temp.

In short, when the undersigned counsel drafted MOBIS' EEOC Response, he misunderstood the timing of when Mr. Kim learned of Plaintiff's pregnancy and when Mr. Kim communicated to Human Resources that he did not want to retain her. It is completely accurate, however, that Ms. Riedler was not aware of Plaintiff's pregnancy when she decided to terminate Plaintiff. Ms. Riedler did not catch the error in the EEOC response because she herself was not clear about exactly when Mr. Kim learned that Plaintiff was pregnant as compared to when he first consulted her about Plaintiff's attendance problems. Ex. B at ¶ 17. This unintentional misunderstanding should not be used as evidence of pretext on behalf of MOBIS, and MOBIS is not aware of any precedent in this jurisdiction for doing so.

    **2.**     **THE COURT FAILED TO CONSIDER MOBIS' UNDISPUTED EVIDENCE REFUTING PLAINTIFF'S ALLEGATION THAT THERE WERE "INCONSISTENCIES REGARDING HER ATTENDANCE RECORD."**

        **a)**     **THE COURT DID NOT CONSIDER MOBIS' UNDISPUTED EVIDENCE REGARDING HOW PLAINTIFF WAS HIRED AS A PROBATIONARY EMPLOYEE AFTER HAVING ATTENDANCE PROBLEMS AS A TEMPORARY EMPLOYEE, AND SHOULD NOT CONSIDER MOBIS GIVING PLAINTIFF ANOTHER CHANCE AFTER A STERN WARNING AS EVIDENCE OF PRETEXT.**

The Court found that the fact that Mr. Kim knew that Plaintiff had a bad attendance record as a temporary employee, yet agreed to hire her as a probationary

employee, was evidence of pretext. 6/2/08 Order (Doc. no. 27) at 18. Plaintiff's own witness, Ms. Womack, testified that Mr. Kim would not have hired Plaintiff as a probationary employee because of her attendance problems, that Ms. Womack persuaded Mr. Kim to hire Plaintiff, that they informed Plaintiff that her attendance had to improve while she was a probationary employee, and that Ms. Womack herself was concerned that Plaintiff would not be hired as a permanent employee at the end of her probationary period because of her continued attendance problems:

Q.      First, I want to talk about the period when Ms. Hunter was a temporary employee.

A.      Okay.

Q.      You testified early that there were issues about her attendance?

A.      Yes.

Q.      Did you and Mr. Kim discuss those issues?

A.      Yes.

Q.      You testified earlier that he went back and forth about whether to make her a probationary employee. Are you clear about what that means?

A.      Yes.

Q.      Did he go back and forth in terms of whether he wanted to give her a ninety-day probationary period?

A.      Yes.

Q.      Did he tell you why?

A.      Because of her absences and tardies.

Q.      Would it be fair to say that you were in favor of giving her the ninety-day probationary period?

A.      Yes.

Q.    *Would it be fair to say that you tried to persuade him to do that?*

A.    *Yes.*

……………………………..
Q.    *What did -- how did Mr. Kim communicate to you his decision to go ahead and give her a ninety-day probationary period?*

A.    *I think he called us both -- we discussed it, and then he called us, me and Tarsha, in his office and stated that he was -- she was on probation but, you know, please don't -- he didn't want her to be out and tardy.*

Q.    *Did he say, you know, something to the effect that you're going to be probationary now, but your attendance needs to improve?*

A.    *Right.*

Q.    *Did you tell Tarsha the same thing?*

A.    *Yes.*

……………………………..
Q.    *At any time during Ms. Hunter's ninety-day probationary period before you learned that she was going to be terminated, were you concerned she was not going to be hired on permanently at the end of that period?*

A.    *Was I concerned?*

Q.    *Yes.*

A.    *Yes.*

Q.    *And why were you concerned that she might not be kept after her ninety-day probationary period?*

A.    *Just because of some of the absentees and tardies.*

Q.    *I'll show you what's been previously marked as Defendant's Exhibit 16.*

       *Do you recall receiving Defendant's Exhibit 16?* (This email, dated July 26, 2006), is attached to this Memorandum as Ex. G.)

A.    *Yes.*

*Q.    You're shown as a copied recipient. Did you and Ms. Hunter -- let me ask you this: What did you understand Mr. Kim to be trying to impress on Ms. Hunter by this email?*

*A.    That if she continued to be tardy, she would not keep her job.*

Womack Depo. at p. 40, l. 14 - 41, l. 17; p. 43, l. 19 - 44, l. 9; p. 50, l. 18 - p. 51, l. 18.

In short, the undisputed record shows that Mr. Kim reluctantly agreed to hire Plaintiff at the end of her employment as a temporary employee, and only agreed to hire Plaintiff upon Ms. Womack's urging and only after warning Plaintiff to improve her attendance. The undisputed record also shows that Plaintiff had problems with her attendance the entire time she was employed at MOBIS, and she was informed in writing that her attendance issues could prevent her from being hired as a permanent employee before she disclosed her pregnancy. Other than naked allegations, Plaintiff has never disputed this evidence. MOBIS, however, has presented evidence in the form of the sworn testimony of Plaintiff's own witness and written communications to her from both Ms. Womack and Mr. Kim. Plaintiff has not created a genuine issue of fact on this issue, yet the Court considered it to be evidence of pretext. The Court is essentially penalizing MOBIS for reluctantly giving Plaintiff a second chance and retaining Plaintiff as a probationary employee despite Kim's doubts based on her unsatisfactory record as a Temp by considering it to be evidence of pretext. Such a holding will chill employers' willingness to give questionable temporary employees a chance to improve as regular employees (hiring through temporary agencies is now a widely used, if not predominate, practice). The safe and prudent thing to do in that instance will be to terminate the relationship if there is any doubt about the Temp.

   **b)** **THE COURT ERRONEOUSLY CITES AS EVIDENCE OF PRETEXT HIS STATEMENT THAT HE "DID NOT CARE ABOUT" THE ATTENDANCE POLICY UNTIL AROUND PLAINTIFF'S TERMINATION.**

   MOBIS has presented an unrebutted explanation of the above-cited deposition excerpt. Plaintiff provided an incomplete rendition of Mr. Kim's testimony, which must be considered in full context in light of his language difficulties. The statement in isolation could lead the reader to infer that Mr. Kim flippantly ignored MOBIS' rules. There is no evidence at all that this is the case.

   Mr. Kim's complete statement was as follows:

*A. When I start to work in Mobis, I don't have previous -- plenty-- so many -- so may team members. **So I don't care about, you know, the -- I don't think about the policy**. However, the business -- you know, the scale has been growing up, and then I just, you know, check out the policy to administer my team members.* Kim Depo. at p. 17, l. 23 - p. 18, l. 5.

   Clearly, Kim was trying to say that when he first started to work at MOBIS in 2004, more than a year before MOBIS commenced production, and approximately two (2) years before Plaintiff was hired (when MOBIS had a mere skeleton office staff), that he did not "think" about the probationary policy. He did initially use the word "care" then paused and changed his phraseology to "think." In short, Plaintiff's characterization of Mr. Kim's testimony is inaccurate, and the Court should have considered MOBIS's explanation before citing his statement as evidence of pretext. *See also* Ex. F. at ¶ 3.

c)     THE COURT SHOULD NOT HAVE CONSIDERED THE FACT THAT MOBIS DID NOT IMMEDIATELY FIRE PLAINTIFF AFTER HER THIRD ATTENDANCE OCCURANCE AS EVIDENCE OF PRETEXT.

As evidence of pretext, the Court reasoned that "Hunter's absences were in excess of what would have warranted automatic termination under the no fault attendance policy, and yet she was not automatically terminated after her third absence or tardy." 6/2/08 Order (Doc. no. 27) at 18-19.  The Court has allowed the inference that Mr. Kim knew about the attendance policy, but waited until after Plaintiff informed him of her pregnancy and after her seventh absence to enforce it because of a discriminatory animus. The uncontroverted evidence presented by MOBIS, however, shows that Mr. Kim was not familiar with the new attendance policy for probationary employees, but as soon as he informed Ms. Riedler of Plaintiff's excessive absences, Ms. Riedler informed Mr. Kim that Plaintiff had to be terminated.  Plaintiff should have been terminated on July 27, 2006 after her third attendance occurrence, but she was not terminated because Mr. Kim was not familiar with the specific number of attendance incidences allowed for probationary employees. Ex. F at ¶ 3; Ex. I at ¶¶ 8, 11.  Plaintiff's termination ultimately came about as a result of the standard review process that occurs for all probationary employees toward the end of their probationary period, and Plaintiff has never presented any evidence to contradict that fact.  *Id.* at ¶ 11.  Plaintiff has also never presented any evidence to rebut the fact that Mr. Kim was not familiar with the revised attendance policy for probationary employees until Ms. Riedler informed him of it.

3.    THE COURT DID NOT CONSIDER MOBIS' UNDISPUTED EXPLANATION
THAT MR. KIM'S STATEMENTS ABOUT "TAKING CARE OF" PLAINTIFF
ARE ATTRIBUTABLE TO HIS PECULIAR PHRASEOLOGY, AND ARE NOT
STATEMENTS THAT ARE "SUBJECT TO INTERPRETATION."

The Court reasoned that two statements made by Plaintiff's supervisor, Jaekwang

Kim, a Korean national who does not speak perfect English, "provide perhaps the

strongest circumstantial evidence of pretext in this case."  6/2/08 Order (Doc. no. 27) at

19.    The Court describes Mr. Kim's remarks as "ambiguous" and "subject to

interpretation."  *Id.*  Perhaps the statement "I do not want to take care of Tarsha anymore

. . . I need your help to terminate her" could be inferred as expressing a discriminatory

animus if it is considered in a vacuum.    But, the summary judgment standard of

considering the evidence in a light most favorable to the Plaintiff does not require the

Court to take Mr. Kim's statements out of context, as urged by the Plaintiff.    As

explained previously by MOBIS, while Mr. Kim reads and understands basic English

well, his spoken English is often peculiar, and he has a heavy accent, which can make it

difficult to understand him, particularly for someone not used to conversing with him.

1.    "I do not want to take care of Tarsha anymore" and "I need your help
to terminate her."

This Court cites as evidence of pretext Mr. Kim's email to Ms. Riedler on August

23, 2006, stating "I do not want to take care of Tarsha anymore . . . I need your help to

terminate her." 6/2/08 Order (Doc. no. 27) at 19.  However, only when viewing this

statement completely out of context could it possibly show any alleged discriminatory

animus.  The unrebutted evidence presented by MOBIS shows that, approximately a

week before August 25, 2006 (Hunter's termination date), Ms. Riedler met with Mr. Kim

after he received the review sheet for Plaintiff, reviewed Mr. Kim's spreadsheet and other

records detailing Plaintiff's absenteeism occurrences, and told Mr. Kim that Plaintiff had

to be terminated because she was in violation of the attendance policy.   Mr. Kim had

consulted Ms. Riedler in person on other occasions in the past when he was not sure of

company human resources policies.  Ex. F. at ¶ 3.  On August 23, 2006, Ms. Riedler

followed up on that meeting with an email to Mr. Kim asking if he was going to

terminate Plaintiff's employment before his upcoming trip to Korea and ending with

"Please let me know and I will help you with the termination meeting."  Riedler Depo. at

Pl. Ex. 5, 8/23/06 E-mail exchange between Riedler and Kim, attached as Ex. K.   Mr.

Kim responded several hours later that he might be out of town the following week, but

that if he was not, then "I need your help to terminate her."  In its entirety, Mr. Kim's e-

mail in response to Ms. Riedler is as follows:

> *My concerning for termination of Tarsha is Sonechka wants to keep her.*
> *Because of she might be not like any kind of changes.*
> *Then I do not want to take care of Tarsha anymore.*
> *If I will be stayed in the next week, I need your help to terminate her.*
> *I will let you know if I am available or not.*

*Id.*

In fact, Plaintiff's counsel questioned Mr. Kim about this e-mail during his

deposition and received the following unrebutted explanation:

*Q.     All right.  What did you mean when you wrote, I need your help to terminate her?*

*A.     Okay.  I clearly remember the why did, you know, I write this sentence.*

*Even though I can speak English, but it's very hard for me to explain about, you know, the details or something like that with the correct word and idioms.*

*So I need -- I wanted Tracy to understand what -- what I am -- what I was thinking -- what I was thinking.*

Q.    *So you wanted her to help verbalize?*

A.    *Broken English or something.*

Q.    *So you wanted her to help speak for you?*

A.    *Speak or -- and I want -- I want Tracy to understand that with my broken English- - broken English -- not to, you know, the -- with her like in this occasion, projecting.*

Kim Depo. at p. 76, l. 7 – p. 77, l. 2.  Clearly, Mr. Kim's reference to "I need your help to terminate her" meant that he needed help with the termination process.  In fact, Mr. Kim's statement turned out to be true since he did have to get Ms. Riedler's assistance during the termination meeting.

Q.    *Some people do it so there's no confusion about what happened.*

    *Tell me what you remember about that meeting.*

A.    *Yes.   When I was -- when I was meeting with Tarsha and Sonechka and I explained why should I make a decision to terminate Tarsha, at that point, Sonechka, you know, was very -- was not pleased with my decision or something.*

    *I tried to explain what was, you know, the reason of the termination, but -- but Tarsha and Sonechka very strongly, you know, the protested their -- you know, their situation.   But -- but I want -- I wanted to try to explain in detail what's going on. However I cannot -- I could not explain -- explain in details to make them understand that -- understand that.*

    *So I asked -- I asked the other assistant manager Mr. Hwang, Ho Sang, to let Tracy know about that, and then I asked him to -- Tracy come to my office.*

    *So Tracy just joined with us -- joined us. As I explained on my summary e-mail, **I need Tracy's help. I need Tracy's help.***

    *I wanted -- I wanted to explain to Tarsha and Sonechka.   However, I could not really, you know, fully -- fully explain to them.   So I asked Tracy to explain to them in details -- in details.*

Q.    *What did you try to tell -- do you remember what you tried to say in the meeting?*

> MR. BARNETT:  *Before Tracy was there?*
>
> MS. LEONARD:  *Yes.*

A.    *Yeah.  I could remember part -- some of the parts, but not whole thing.  Not the whole thing.*

Kim Depo. at p. 89, l. 16 – p. 91, l. 5 (emphasis added).

Q.    *Do you have any memory of what you tried to say to Sonechka and Tarsha before Tracy came in the room?*

A.    *Okay.  I could remember about that whole, you know, thing because I already, you know, found out, you know, Tarsha's attendance issues.*

*So -- so I just wanted to explain how many times, you know, that she get -- she got, what's that, the attendance issues through my, you know -- with my worksheet or paper, Excel spreadsheet.*

*But I was not very, you know, please with, you know, with them during the meeting because -- because I could not express my -- you know, the exact reason to them with -- with the limited vocabulary or something like that.*

Q.    *Do you have any memory of anything Tarsha or Sonechka said in the meeting?*

A.    *I couldn't remember.*

Q.    *All right.  Did either Sonechka --*

A.    *I remember, you know, that -- I heard, you know, Tarsha wanted to, you know -- wanted to work, you know.  And she asked me what was the exact reason of my termination, very -- she asked me very loudly or very -- attentively or something.  What was the reason of my termination, or something like that.  I clearly remember that.*

Q.    *Do you remember anything else?*

A.    *I could not remember.*

Q.    *Have you told me everything that you can recall about the meeting where Tarsha got terminated either before or after Tracy got there?*

A.    *Yeah.  You know, the -- in my memory, I had a brief meeting -- brief meeting because, you know, Tarsha and Sonechka's response was very strong, very, you know, negative or something.*

> MR. BARNETT:  *Strong or what?*

> MS. LEONARD: Negative.

A.      Negative, on my -- my explanation.  So I thought, you know, that I need to let Tracy know about that.

        And then, probably I thought Tracy can, you know, more smoothly, you know, explain to them.

        So I asked Ho Sang to, you know, to let Tracy know, and then Tracy, you know, came into my office.

Kim Depo. at p. 91, l. 11 – p. 93, l. 12

In short, Mr. Kim accepted Ms. Riedler's offer to help in terminating Plaintiff because he knew that he would have difficulty verbalizing the reasons.  His testimony concerning the contentious termination meeting illustrates how correct he was about needing Ms. Riedler's assistance.  *See also* Ex. B at ¶¶ 20-21.  Only by taking his statement in his e-mail to Ms. Riedler out of context and by neglecting to include his unrefuted, honest explanation of its meaning, is the statement "subject to interpretation."[5]

The Court also cited as evidence of pretext Mr. Kim's statement that he "can't take care of a person like [Hunter]."  6/2/08 Order (Doc. no. 27) at 19.  As explained previously, Mr. Kim uses that phrase to convey that he expects his staff to handle their responsibilities without unnecessarily involving him or others. Ex. I at ¶ 20; Kim Depo. at p. 75, l. 9 – p. 76, l. 6 ("that means I don't want to work with her in accounting and financing").  It is Mr. Kim's way of saying that he does not need an employee who is not generally self-sufficient, and frequently necessitates his involvement and that of other departmental employees. Ex. I at ¶ 20.  Most importantly, MOBIS' explanation of the meaning of Mr. Kim's statement is corroborated by Plaintiff's own witness, Ms.

---

[5] Riedler and Kim planned for Riedler to be present for the termination meeting to "help" Kim, but Plaintiff asked for a meeting with Womack and Kim, so Riedler had to be summoned after it started by HoSang. Plaintiff Depo.  p. 177, l. 10-14; Riedler Depo. p. 159, l. 2-20.

Womack, who agreed that the phrase "take care of a person" meant "just their work." Womack Depo. at p. 47, l. 11- 24. Additionally, Ms. Womack does not even recall Mr. Kim saying "I can't take care of a person like [Plaintiff]" during the termination meeting on August 25, 2006 like Plaintiff claims. *Id.* at p. 36, l. 25 – p. 37, l. 6. Also, Mr. Kim used the phrase "take care of . . ." eight times during his deposition, all with reference to getting work done. Kim Depo. at p. 34, l. 13; p. 34, l. 18; p. 38, l. 10; p. 41, l. 12-13; p. 41, l. 20-21; p. 51, l. 20-21; p. 54, l. 16-19; p. 77, l. 25.

In fact, Mr. Kim explained his use of this phrase several times when questioned by Plaintiff's attorney:

*Q.    What did you mean when you wrote, I do not want to take care of Tarsha anymore?*

*A.    Okay. That's, you know, the different language barrier or something like that.*

*I read, you know, that that -- I read this sentence. Normally, I have been wrong about -- taking care of them means keep or something like that.*

*Of course, you know, taking care of them has, you know, several different meanings, but I did not know about that. I didn't know about it.*

*In this exact sentence, it means I don't want to work with her in accounting and financing. I just wrote, you know, this word with that meaning. But I'm not sure how the other person -- how can they, you know, understand this wording, this idioms?*

*I just, you know, wrote that word.*

*Okay. I will not -- don't want, you know, to work continuously or something like that. I just wrote that idioms with that meaning.*

Kim Depo. at p. 75, l. 9 – p. 76, l. 6.

And in another line of questioning:

*Q.    During that temporary period --*

*A.    Yes.*

32

*Q.     -- did you have any problems with her attendance?*

*A.     I think so.*

*Q.     Tell me what problems you had with her attendance.*

*A.     So many tardy and doctors' appointments or something like that.*

*Q.     Any other problems?*

*A.     Yeah, I have -- I had a problem. As I explain it, I have only seven or eight -- few peoples in accounting.*

*So if one employee -- one team member **will not take care of, you know, their work** just in a timely manner, accounting department will make a harder situation. Because as you know, accounting has to close the months and every -- each month. But if somebody **will not take care of their work** just in a timely manner, it will impact on the accounting department.*

*For instance, I have to report it to -- the financial result to headquarters every -- each month after closing out just in time.*

Kim Depo. at p. 33, l. 24 -p. 34, l. 24 (emphasis added).

Therefore, the Court's reliance on Plaintiff's unsupported allegation is in contravention of MOBIS' reasonable explanation, which was corroborated not only by Ms. Womack's testimony, but a plain reading of Mr. Kim's deposition testimony. The Court failed to consider MOBIS' probative and substantiated evidence when it reasoned that Mr. Kim's statements amounted to the "strongest circumstantial evidence of pretext in the case." 6/2/08 Order (Doc. no. 27) at 19.

## CONCLUSION

In conclusion, MOBIS respectfully requests that the Court reconsider its 6/2/08 Order denying its Motion for Summary Judgment. Plaintiff has failed to prove her *prima facie* case, and the Court should not diverge from the *prima facie* case paradigm advocated by MOBIS based on such weak, speculative circumstantial evidence. Plaintiff

has not presented probative evidence that she was a victim of discrimination, only that she did not receive preferential treatment from Riedler for her pregnancy. The undisputed facts show that Plaintiff's attendance and dependability were not acceptable the entire time she was an employee at MOBIS, and that she was not treated any differently than any other similarly-situated employee. MOBIS terminated Hunter's employment for reasons that are objectively legitimate, nondiscriminatory and non-pretextual. For the foregoing reasons, MOBIS submits that this Court should reconsider its 6/2/08 Order and enter summary judgment in MOBIS' favor as to all counts against it contained in Hunter's Complaint, and dismiss the Complaint and all claims in this lawsuit against MOBIS with prejudice.

Respectfully submitted,

/s/ Henry C. Barnett, Jr.

**HENRY C. BARNETT, JR. (BAR 037)**
*ATTORNEY FOR DEFENDANTS*

**OF COUNSEL:**
CAPELL & HOWARD, P.C.
150 South Perry Street
Post Office Box 2069
Montgomery, AL 36102-2069
Telephone: (334) 241-8000
Facsimile: (334) 241-8259

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing instrument was served upon the following via CM/ECF Electronic Filing System on this the 16th day of June, 2008.

Heather N. Leonard
Heather N. Leonard, P.C.
2108 Rocky Ridge road
Suite 1
Birmingham, Alabama 35216

/s/ Henry C. Barnett, Jr.
OF COUNSEL

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| TARSHA NICKOL HUNTER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No.: 2:07-CV-427-WHA |
| vs. | ) | |
| | ) | |
| MOBIS ALABAMA, LLC, | ) | |
| | ) | |
| Defendant. | ) | |

**SUMMARY OF EXHIBITS**

| Ex. No. | Description |
|---|---|
| A | Deposition Excerpts of Plaintiff |
| B | Supplemental Affidavit of Tracy Riedler |
| C | Affidavit of Tracy Riedler |
| D | Deposition Excerpts of Tracy Riedler |
| E | Deposition Excerpts of Sonechka L. Womack |
| F | Supplemental Affidavit of Jaekwang (Jay) Kim |
| G | Plaintiff Deposition, Defendant's Exhibit 16 |
| H | Plaintiff Deposition, Defendant's Exhibit 17 and 18 |
| I | Affidavit of Jaekwang (Jay) Kim |
| J | Deposition Excerpts of Jaekwang (Jay) Kim |
| K | Tracy Riedler Deposition, Plaintiff's Exhibit 5 |

Respectfully submitted,


/s/ Henry C. Barnett, Jr.
**HENRY C. BARNETT, JR. (BAR 037)**
*ATTORNEY FOR DEFENDANTS*


**OF COUNSEL:**
CAPELL & HOWARD, P.C.
150 South Perry Street
Post Office Box 2069
Montgomery, AL  36102-2069
Telephone:  (334) 241-8000
Facsimile:   (334) 241-8259


## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing instrument was served upon the following via CM/ECF Electronic Filing System on this the 16th day of June, 2008.

Heather N. Leonard
Heather N. Leonard, P.C.
2108 Rocky Ridge road
Suite 1
Birmingham, Alabama 35216

/s/ Henry C. Barnett, Jr.
OF COUNSEL

# EXHIBIT

# A

73

| | | |
|---|---|---|
| 1 | Q. | And what page again? |
| 2 | A. | 131. |
| 3 | Q. | Did you read this section of the handbook |
| 4 | | about probationary period policies and |
| 5 | | procedures? |
| 6 | A. | Yes. |
| 7 | Q. | Did you read the part under policy about the |
| 8 | | ninety days of employment are considered -- |
| 9 | | the first ninety days are considered a |
| 10 | | probationary period? |
| 11 | A. | Yes. |
| 12 | Q. | Did you read the part under section 2.5 about |
| 13 | | any employee who has three absentee |
| 14 | | occurrences would be terminated? |
| 15 | A. | Yes. |
| 16 | Q. | And you understood that applied to you, |
| 17 | | right?  I'm sorry, your answer? |
| 18 | A. | Repeat that again. |
| 19 | Q. | You knew that this policy applied to you for |
| 20 | | the first ninety days after June 5th, 2006? |
| 21 | A. | Yes. |
| 22 | Q. | So you knew that if you had three occurrences |
| 23 | | you would be terminated? |

74

1    A.    By what the handbook states, yes.

2    Q.    Did anybody tell you anything different at any

3         time?

4    A.    No.

5    Q.    So we don't have a disagreement about the fact

6         that you read this policy on page 131?

7    A.    No.

8    Q.    And you acknowledge that you knew it applied

9         to you once you became a regular employee on

10        June 5th or 6th, right?  You knew it applied

11        to you?

12    A.    Yes.

13    Q.    And you knew about section 2.5?

14    A.    Yes.

15    Q.    And nobody told you anything different from

16        what this piece of paper says that's on page

17        131 and 132?

18    A.    Correct.

19    Q.    And whoever the man was that talked to y'all

20        during the orientation didn't tell you

21        anything different from this policy --

22    A.    Correct.

23    Q.    -- did he?

96

| | | |
|---|---|---|
| 1 | A. | The 6th -- 5th, 6th. |
| 2 | Q. | Whatever the day was right after you started |
| 3 | | probationary -- |
| 4 | | MS. RIEDLER:  6th. |
| 5 | A. | Yes. |
| 6 | Q. | All right.  And what did she say to you? |
| 7 | A. | At that time, she just told me, do not tell |
| 8 | | Jay Kim. |
| 9 | Q. | Did she say why you should not tell Jay Kim? |
| 10 | A. | Because of a previous employee that was fired |
| 11 | | in regards to being pregnant. |
| 12 | Q. | And who was that employee? |
| 13 | A. | She didn't tell me at the time. |
| 14 | Q. | Do you know now? |
| 15 | A. | No. |
| 16 | Q. | Do you have any idea who it was allegedly? |
| 17 | A. | I think I do.  I'm not sure. |
| 18 | Q. | And who is that? |
| 19 | A. | First name basis, Lajarra. |
| 20 | Q. | Lajarra Jefferson, right? |
| 21 | A. | That sounds about right. |
| 22 | Q. | Have you ever spoken with Lajarra Jefferson? |
| 23 | A. | No. |

1   Q.   Have you ever spoken with her lawyer?

2   A.   No.

3   Q.   To your knowledge, has your lawyer spoken with

4        her?

5   A.   Not to my knowledge.

6   Q.   To your knowledge, has your lawyer spoken with

7        her lawyer?

8   A.   Not to my knowledge.

9   Q.   Do you know who Lajarra -- what

10       Lajarra Jefferson's job was?

11  A.   No, I don't.

12  Q.   Do you know that she was a production worker?

13  A.   That's what they told me.

14  Q.   Who is they?

15  A.   Some of the other employees that were at Mobis

16       that told me the same thing, do not tell.

17  Q.   And who told you not to tell?

18  A.   Sonechka Womack.  I gave the information --

19       the rest of the information to my attorney.  I

20       can't -- off the top of my tongue -- I mean,

21       the top of my head I can't state their names.

22            MR. BARNETT:  Where are they?  Where

23                 are the initial disclosures?

98

MS. SMITH:  Here you go.

1

2   Q.   Tell me again what Sonechka said.  She said,

3        don't tell Jay, and what else?

4   A.   She just told me to -- well, she first said

5        congratulations.  And then she said, do not

6        tell Jay Kim.

7   Q.   And did she say why?

8   A.   Yes.

9   Q.   And that was?

10  A.   Due to the fact as far as -- because of the

11       firing of the other employee,

12       Lajarra Jefferson.

13  Q.   Other than Lajarra Jefferson, have you ever

14       heard it stated or alleged that any other

15       Mobis employee was fired or discriminated

16       against because of pregnancy?

17  A.   Yes.

18  Q.   Who?

19  A.   First name basis, they told me it was someone

20       by the name of Shundra or Shonda.

21  Q.   Shalanda?

22  A.   That sounds about right.

23  Q.   Do you know anything about Shalanda?  Have you

99

1        ever spoken with her?

2    A.    No.

3    Q.    What about Shalanda Gordon?  Does that sound

4          right?

5    A.    That sounds about right.

6    Q.    Who told you about Shalanda Gordon?

7    A.    It came up in the conversations.  I don't

8          remember exactly who, but I heard it more than

9          once.

10                   MR. BARNETT:  Where are the initial

11                      disclosures?

12   Q.    Do you know anything about the circumstances

13         of Lajarra Jefferson's termination?

14   A.    No.

15   Q.    Do you know anything about the circumstances

16         of Shanda --

17                   MS. RIEDLER:  Shalanda.

18   Q.    -- Shalanda Gordon's?

19   A.    No.

20   Q.    Any other employees that you heard about or

21         claim to know about that claimed they were

22         discriminated against on the basis of being

23         pregnant?

100

1    A.    No.

2                    (Off-the-record discussion.)

3    Q.    And to this day, you don't know of any other

4          people that you have --

5    A.    No.

6    Q.    -- any reason to believe were discriminated

7          against based on pregnancy?

8    A.    No, not that I know of.

9    Q.    Did Sonechka tell you that Jay had ever

10         discriminated against anyone on the basis of

11         pregnancy?

12   A.    No.

13   Q.    Do you have any reason to believe that Jay has

14         ever discriminated against -- I know you said

15         he did against you.  But do you know of any

16         other incidents where you suspect even that he

17         discriminated on the basis of pregnancy?

18   A.    Not that I know of.

19   Q.    And Sonechka didn't tell you that he had

20         discriminated on the basis of pregnancy?

21   A.    No, she did not.

22   Q.    And she did not tell you that she thought he

23         would discriminate on the basis of pregnancy,

142

1   Q.   Did you understand that he was warning you

2         that your long-term employment could be in

3         jeopardy if you continued to miss work during

4         your probationary period?

5   A.   Yes.

6   Q.   How late were you on the 26th?

7   A.   I don't remember.

8   Q.   Do you remember why you were late?

9   A.   No, I'm not sure.  I do remember the 26th.

10        That is the day that -- that's the same day

11        that I went in and I gave him the information

12        as far as with my daughter's schoolwork -- not

13        schoolwork, but information for the school.

14   Q.   Was it some information prepared by the school

15        in a booklet?

16   A.   The handbook, yes.

17   Q.   The school handbook?

18   A.   Yes.

19   Q.   So do you now remember how late you were?

20   A.   It was about eight fifteen, I believe, when I

21        got there.

22               (Defendant's Exhibit Number 17 marked

23               for identification.)

177

1    discuss after those meetings that you saw

2    going on --

3    A.    She just told me --

4    Q.    -- on the 24th?

5    A.    -- to just come back tomorrow and she will

6    see.  She will sit back in with him and talk

7    to him.

8    Q.    Do you know if she did?

9    A.    She went back into his office.  And then at

10   that time, I approached Sonechka and told her

11   I would like to meet with -- meet with Jay and

12   her.

13   Q.    All right.  Did she arrange that?

14   A.    Yes.

15   Q.    How long did it take for her to do that after

16   you asked?

17   A.    Not long.

18   Q.    All right.  Tell me everything that was said

19   in that meeting.  And that would be the 25th,

20   right?

21   A.    Correct.  I went --

22   Q.    Now, first it was you, Sonechka, and Jay,

23   right?

212

1    Q.    Based on your exposure to Jay Kim, would he

2          deliberately break the law, in your opinion,

3          with regard to pregnancy?

4                    MS. LEONARD:  Object to form.

5                    You can answer.

6    A.    Repeat it.

7    Q.    Based on your interactions with Jay Kim, do

8          you think that he is the type of person that

9          would deliberately break the law regarding

10         discrimination for pregnancy?

11                   MS. LEONARD:  Same objection.

12   A.    Are you asking me with my dealings with him

13         would I think he would deliberately break the

14         law --

15   Q.    Right.

16   A.    -- about pregnancy?

17   Q.    Right.

18   A.    I don't know.  I'm not sure.

19   Q.    Well, did he seem to be an honorable person to

20         you?

21                   MS. LEONARD:  Object to the form.

22                   You can answer.

23   A.    I'm not sure.

# EXHIBIT

# B

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

| | | |
|---|---|---|
| TARSHA NICKOL HUNTER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No.: 2:07-CV-427-WHA |
| vs. | ) | |
| | ) | |
| MOBIS ALABAMA, LLC, | ) | |
| | ) | |
| Defendant. | ) | |

### TRACY RIEDLER'S SUPPLEMENTAL AFFIDAVIT

STAT E OF ALABAMA    )

COUNTY OF ELMORE    )

**BEFORE ME**, the undersigned authority, personally appeared Tracy Riedler who, after being first duly sworn, states as follows:

1.    My name is Tracy Riedler.  I reside in Montgomery, Alabama.  I am over 19 years of age and have first-hand knowledge of the matters stated in this affidavit.

2.    I have been employed by MOBIS as its Senior Human Resources Manager since January 20, 2004.  As MOBIS' Senior Human Resources Manager, I oversee all human resources, payroll, recruiting, compensation, benefits, environmental health and safety and general administrative functions.  I have been asked to supplement my affidavit in support of MOBIS' Motion for Summary Judgment to cover new issues, or clarify ones addressed before, in response to Plaintiff's Opposition Brief.

3.    MOBIS hired Lorenza Daniels ("Daniels") on August 14, 2004, as a probationary, hourly paid Material Handler.  Daniels worked in Assembly under the immediate supervision of Jeff

1

Reinhart ("Reinhart"), whose title was Assembly Supervisor. Reinhart reported to Johnny Sung ("Sung"), whose title was Assembly Department Manager.

4.    Like all new MOBIS employees, Daniels was required to serve a ninety (90) day probationary period. During Daniels' probationary period, Reinhart observed that Daniels was moody, his performance erratic, and that his attendance was unsatisfactory. Reinhart planned to terminate Daniels' employment at the end of his probationary period; however, Sung did not want to terminate Daniels because he thought Daniels had the potential to be a good employee.

5.    A compromise was agreed upon between Reinhart and Sung whereby MOBIS extended Daniels' probationary period for an additional ninety (90) days to commence on November 15, 2004. It was made clear at that time that he would have no attendance issues and Mr. Daniels agreed to those terms.

6.    Daniels' attendance was not satisfactory during the extended probationary period, so on or about February 3, 2005, Reinhart and I met with Daniels to inform him that MOBIS was terminating his employment for failure to adhere to the terms of his extended probation. Daniels filed a charge of discrimination against MOBIS less than a month later alleging disparate treatment based on race, age and gender. The EEOC subsequently issued a "No Cause" finding and Daniels filed suit in federal court. MOBIS moved for summary judgment, and Daniels voluntarily dismissed his suit.

7.    MOBIS had been in production for less than a year when Daniels filed his EEOC charge, and we learned from Daniels' claims that subjectivity in an attendance policy can be problematic. Consequently, on March 21, 2005, I, after consulting with legal counsel, amended MOBIS' policy for probationary employees to provide an objective standard: Any probationary employee who accrues three (3) or more absentee occurrences (tardy, early out and/or all day

2

absence) will be terminated. This is a no fault policy, meaning that there are just a few exceptions, such as military leave, jury duty, bereavement and the like.

8.    The policy for probationary employees in effect throughout Daniels' entire employment at MOBIS did not provide for a specific number of absentee occurrences that would lead to a probationary employee's termination. In other words, MOBIS' original attendance policy for probationary employees was subjective as to what was satisfactory.

9.    When MOBIS revised its probationary policy in March of 2005, I also revised the 90 Day Review Sheet Form. The revised form requires the supervisor to state the specific number of days the probationary employee has been absent, late or left early if he/she (the supervisor) wants MOBIS to offer regular employment. My purpose in revising the form was to ensure that all probationary employees received the same objective treatment with respect to attendance, and that no one with three (3) or more attendance occurrences would be retained for regular employment. The new form also requires more specificity about why the supervisor is recommending that the probationary employee be hired for regular employment.

10.    Similarly the new form requires a supervisor who has "recommended" termination to explain the reasons for the recommendation.[1] This change was made to reduce the possibility that a probationary employee would be terminated unfairly or for impermissible reasons. I must approve all terminations, so in that respect, I am the ultimate or final decision maker on terminations.

11.    Daniels was never subject to the revised objective attendance policy, which went into effect in March of 2005, and remained in effect throughout Plaintiff's employment at MOBIS.

12.    MOBIS hired Tamika Lee ("Lee") on December 6, 2004, as a Purchasing Assistant in the Purchasing Department. Lee reported to Johnny Yun ("Yun"), MOBIS' Senior Manager of

---

[1] Daniels and Plaintiff's 90 Day Review Sheet forms are attached for comparison as composite Exhibit "1".

3

Purchasing. Lee never reported to Mr. Kim. Mr. Yun and Mr. Kim are not in the same department, although their departments were in close physical proximity.

13.    Lee's probationary period expired on or about March 6, 2005, before MOBIS revised its attendance policy to include the objective three (3) occurrence standard. Mr. Yun, not Mr. Kim, would have been the person to decide whether Lee had "acceptable" attendance during her probationary period.

14.    As I stated in my deposition testimony, the progressive discipline policy in MOBIS' handbook does not apply to salaried employees or to any issues concerning attendance, and did not apply to salaried employees at any time during Plaintiff's employment at MOBIS. The progressive discipline policy does not apply to absences during a probationary period.

15.    If Mr. Kim had stated on Plaintiff's 90 Day Review Sheet that she should be retained as a regular employee, Plaintiff would have been terminated anyway. The revised 90 Day Review Sheet requires the supervisor to state how many absenteeism occurrences the probationary employee has had. If Mr. Kim had submitted the form stating that Plaintiff had "successfully passed the probationary period . . ." and stating that she had seven (7) absentee occurrences, the matter would have been out of Mr. Kim's hands, and I would have terminated Plaintiff under the objective provisions of revised attendance policy irrespective of Kim's preferences.

16.    There have been no exceptions made for probationary employees with three (3) or more absentee occurrences since the revised policy went into effect in March 2005. We have made no exceptions to the three (3) occurrence rule, and to my knowledge no supervisor has submitted a 90 Day Review Form with incorrect attendance data. With regard to hourly employees, there is little or no possibility of this happening since MOBIS uses an automated time keeping system and Human Resources monitors attendance for hourly employees on a continuing basis.

4

17.    As I testified in my deposition, I did not catch the error in MOBIS' response to Plaintiff's EEOC Charge which was prepared by MOBIS' counsel and reviewed by me. This happened because I was not at that time clear about when Mr. Kim learned that Plaintiff was pregnant as compared to when he first consulted me about Plaintiff's attendance problems, approximately one (1) week prior to her termination on August 25, 2006. I did, in fact, tell Mr. Kim that Plaintiff had to be terminated before I learned of her pregnancy from Ms. Womack. MOBIS did not intentionally mislead the EEOC.

18. The evaluation process at the end of an employee's ninety (90) day probation period is automatic.   Prior to the end of a ninety (90) day probationary period, Human Resources automatically sends the 90 Day Review Form to the supervisor.  The supervisor is required to complete the form and return it to Human Resources prior to the end of the probationary period. This process is specified in paragraphs 2.3 and 3.1 of the Probationary Period Policy and Procedures section of MOBIS' Handbook.

19.    MOBIS has not made exceptions for ill, injured or temporarily disabled employees with respect to the three (3) occurrence rule instituted under the revised attendance policy for probationary employees.  Consequently, if MOBIS had made an exception for Plaintiff due to her pregnancy as Ms. Womack wanted, she would have been receiving preferential treatment as compared to other employees.

20.    On August 25, 2006, I received a message that I was needed in Jay Kim's office.  I immediately went to Mr. Kim's office and joined a meeting with him, Sonechka Womack and Plaintiff.  Plaintiff was challenging the explanation Mr. Kim had given her for her termination. Approximately one week earlier when Mr. Kim first consulted me, I had reviewed Mr. Kim's Excel spreadsheet along with doctors' notes, requests for time off and other documents he had kept concerning her attendance.

5

21.    I explained to Plaintiff that she was being terminated because she had exceeded the two (2) absentee occurrences allowed under MOBIS' attendance policy for probationary employees. Plaintiff did not challenge or disagree with my statement that she had accrued more than two (2) occurrences. Plaintiff also stated to me that she was aware of the policy. I declare under penalty of perjury that the foregoing is true and correct.

Executed on May 9th, 2008.

_____
**TRACY RIEDLER**

Sworn to and subscribed before me on this the 9th day of May, 2008 .

Notary Public

NOTARY PUBLIC STATE OF ALABAMA AT LARGE
MY COMMISSION EXPIRES: Oct 13, 2010
BONDED THRU NOTARY PUBLIC UNDERWRITERS

My Commission Expires

[SEAL]

6

# EXHIBIT
# 1

# TRACY RIEDLER'S
# SUPPLEMENTAL
# AFFIDAVIT

## 90 DAY WORK PERFORMANCE REVIEW SHEET

Employee Name                                  Lorenza Daniels

Title                                          Material Handler

Department                                     Assembly

Division                                       Plastics

Manager/Supervisor                             Jeff Rinehart

Date of Hire                                   August 16, 2004

Date 90 Day Probationary Period Expires        November 14, 2004

**Check One**

      The employee has successfully passed the probationary period for their present job.

- &#9830; Attendance is satisfactory
- &#9830; Performance in job is satisfactory

      The employee is not qualified for his/her present job but is recommended for transfer elsewhere within the company, only if a job is currently available.

&#10003;    The employee should be terminated based on unsatisfactory performance.

&#9913; *Reccomend an additional 90 day Probation.*

Additional Comments

*At times, Lorenza is an excellent worker. However, attendance is poor and on occassion has difficulty in recieving orders and working w/ Ham.*

Supervisor/Manager Signature   _Jeffry C Rinehart_

Sr. Manager Human Resources    _____

President                      _____

*Jeff and I met w/ Lorenza 11/10. We told him we were extending his probation 30 more days. During this time if he would be fired absences, ETO, tardies.*

## 90 DAY WORK PERFORMANCE REVIEW SHEET

Team Member Name                    Tarsha Hunter

Title                               Accounting Specialist

Department                          Accounting and Finance

Division                            Module

Manager/Supervisor                  Sonechka Womack

Date of Hire                        06/05/06

Date 90 Day Probationary Period Expires    09/02/06

**Check One**

_____ **A:**    The employee has successfully passed the probationary period for their present job.

❖ Attendance is satisfactory. How many days has the team member been absent, late or left early?

_____

❖ What are the team member's strengths?

_____

❖ What are areas the team member could improve on?

_____

**X** **B:**    The employee should be terminated based on unsatisfactory performance.

❖ Explain why you recommend termination

Tarsha's attendance and dependability was unstable while she was a temporary employee.
I delayed hiring her for this very reason. I had several conversations with Tarsha and
her supervisor expressing my concern. Tarsha ensured me this problem would not continue
after she was hired. I told her that I would continue to evaluate her performance, to include
attendance, during her 90 day probationary period. She has not improved. Her mannerism
is not congenial to our department. And her lack of dependability has placed strain on our
department as when she is not here her work must be performed by her supervisor
who has responsibilities of her own. I cannot continue with this situation.

Supervisor/Manager Signature          _____ 8/25/06

Sr. Manager Human Resources           _____ 8/25/06

Executive Vice President              _____ 08-25-06

President                             _____

HUNTER V. MOBIS
00114

# EXHIBIT

# C

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

TARSHA NICKOL HUNTER,⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀Plaintiff,⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)⠀⠀⠀Civil Action No.: 2:07-CV-427-WHA
vs.⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
MOBIS ALABAMA, LLC,⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀Defendant.⠀⠀⠀⠀⠀⠀⠀)

## AFFIDAVIT OF TRACY RIEDLER

STAT E OF ALABAMA⠀⠀)

COUNTY OF ELMORE⠀⠀)

⠀⠀⠀**BEFORE ME**, the undersigned authority, personally appeared Tracy Riedler who, after being first duly sworn, states as follows:

⠀⠀⠀1.⠀⠀⠀My name is Tracy Riedler. I reside in Montgomery, Alabama. I am over 19 years of age and have first-hand knowledge of the matters stated in this affidavit.

⠀⠀⠀2.⠀⠀⠀MOBIS Alabama, LLC ("MOBIS") is a Tier One supplier of cockpit and chassis module assemblies, plastic bumpers and door trim molding to Hyundai Motor Manufacturing Company ("Hyundai"). MOBIS' headquarters and manufacturing plant are located at 1395 Mitchell Young Road, Montgomery, Alabama. MOBIS commended production in 2005 and has approximately 800 employees.

⠀⠀⠀3.⠀⠀⠀I have been employed by MOBIS as its Senior Human Resources Manager since January 20, 2004. Prior to that, I was employed by Thermalex, Inc. in Human Resources for

approximately nine (9) years. Before my employment at Thermalex, I was employed in Human Resources at CH2M Hill for approximately eight and one half (8 ½) years.

4.      As MOBIS' Senior Human Resources Manager, I oversee all human resources, payroll, recruiting, compensation, benefits, environmental health and safety and general administrative functions. I have a staff of nineteen (19) individuals comprising four (4) departments under the umbrella of Human Resources: General Administration; HR Functions; Environmental, Health, and Safety; and Team Relations.

5.      I have a B.S. Degree in Business Administration (Management) from Troy State University and a Masters Degree in Human Resources Management also from Troy.

6.      I am familiar with Title VII of the Civil Rights Act of 1964, including what is known as the "Pregnancy Discrimination Act."

7.      I have reviewed Plaintiff's personnel file, which is maintained under my supervision and which shows that Plaintiff first worked at MOBIS on March 6, 2006 as a temporary employee ("Temp") furnished to MOBIS by Multi-Staffing, a local employment agency. Plaintiff was assigned to work in the Accounting Department ("Accounting") as an Accounting Specialist Treasury. A copy of Plaintiff's job description is attached hereto as Exhibit "1."

8.      Plaintiff's time records from Multi-Staffing for the ninety (90) day period she worked as a Temp are attached as Exhibit "2." I prepared the cover chart summarizing Plaintiff's attendance using the Multi-Staffing records. Multi-Staffing's records show that Plaintiff was absent, tardy or left early seventeen (17) times in the course of only ninety (90) days.

9.    MOBIS' agreement with Multi-Staffing allows MOBIS to hire Temps furnished by that agency without paying a fee after the Temp has worked at MOBIS for three hundred sixty (360) hours or nine (9) weeks.

10.    On June 5, 2006, MOBIS offered Plaintiff probationary employment. All new employees at MOBIS, including those who have worked as Temps served a ninety (90) day probationary period during which their suitability for working in MOBIS' fast paced environment is evaluated. The probationary period also gives the employee an opportunity to decide whether he/she would be happy working long term at MOBIS.

11.    Plaintiff attended a full day orientation program, during which MOBIS' Employee Handbook and specifically MOBIS' policy on probationary employees were reviewed and explained. Copies of MOBIS' Attendance Policy for Probationary Employees and Plaintiff's Handbook Acknowledgement are attached hereto as Exhibits "3" and "4."

12.    MOBIS is Hyundai's largest Tier I supplier, and must meet the requirements of Hyundai's "just in time" inventory delivery system. For this reason, probationary employees are evaluated in terms of their reliability and attendance.

13.    The policy for probationary employees provides that such employees are to be terminated after three (3) attendance occurrences. An occurrence is defined as an absence for all or part of the day, a tardy, or an early departure from work. This is a "no fault" policy, meaning that probationary employees are allowed two (2) incidences and are terminated after their third, no matter what the reason for the incident. The only exceptions are for jury duty, bereavement and the like.

14.    MOBIS does not have a sick leave policy that excuses absences or missed work for sickness or injury prior to the time the employee become eligible for leave pursuant to the

3

Family Medical Leave Act ("FMLA").  Probationary employees are not covered by FMLA because they have not yet worked for the required one (1) year.  MOBIS treats pregnancy the same as it treats any illness or injury during the first year of employment.  After the first year of employment, MOBIS complies with FMLA including its provisions requiring leave for pregnancy and pregnancy related conditions such as morning sickness.

15.     The Human Resources Department does not keep attendance records on probationary employees.  Such records are kept by the employee's supervisor.  It is well known that Mr. Kim is a stickler for punctuality, attendance and timely completion of work by his staff.

16.     MOBIS' Human Resources Department automatically sends a "90 Day Work Performance Review Sheet" ("Review Sheet") to the appropriate department head or supervisor prior to the end of an employee's probationary period.  Review Sheets are routinely sent well in advance of expiration of the probationary period so that a decision can be made prior to the end of ninety (90) days.

17.     Approximately one (1) week before Plaintiff was terminated, MOBIS' Human Resources Department sent to Mr. Kim a Review Sheet for him to complete regarding Plaintiff.  Shortly after Mr. Kim received the Review Sheet, he consulted with me.  Mr. Kim told me that he did not think he could keep Plaintiff as a regular employee because of her poor attendance record.  I asked Mr. Kim what he meant by "poor attendance." Mr. Kim then retrieved and showed to me a computer spreadsheet that showed that Plaintiff had seven (7) attendance occurrences as a probationary employee. I reviewed the spreadsheet with Mr. Kim and told him that Plaintiff had to be terminated because she had violated MOBIS' attendance policy for probationary employees by having more than two (2) occurrences.  I also instructed Mr. Kim that

4

Plaintiff needed to be terminated at that time, not at the end of ninety (90) days, which in Plaintiff's case would have been on or about September 2, 2006.

18.    Mr. Kim explained to me that he was not aware of the specific limitation on the number of absences probationary employees are allowed to have. Mr. Kim's confusion could well have resulted from the fact that MOBIS' original policy on probationary employees did not specify that such employees must be terminated after the third attendance occurrence. That policy did not come into affect until March 2005. (See Exhibit "3", paragraph 2.5). Prior to March 2005, no specified limit of attendance incidence was stated in the policy.

19.    My meeting with Mr. Kim about Plaintiff's attendance took place approximately one (1) week prior to Plaintiff's termination, and was my first substantive involvement with Plaintiff's employment. I did not know that Plaintiff was pregnant when I made the decision that Plaintiff's employment had to be terminated. Pregnancy was not discussed during my meeting with Mr. Kim. In fact, it was not Mr. Kim who informed me of Plaintiff's pregnancy, but rather Plaintiff's direct supervisor, Ms. Womack, who told me that Plaintiff was pregnant on or about August 24, 2006, a day or so before MOBIS terminated Plaintiff.

20.    I made the final decision to terminate Plaintiff's employment, and I had no knowledge of Plaintiff's pregnancy at the time that I made the decision. I based my decision to terminate Plaintiff's employment on the fact that Plaintiff was absent three times in addition to four other occurrences of either being late to work or leaving work early which exceeded the occurrences allowable in the policy.

21.    I am aware that Plaintiff asked for a meeting on August 25, 2006 with Mr. Kim and Ms. Womack. The meeting became contentious, and Mr. Kim was concerned that the meeting was getting out of control, so he summoned me to join the participants. I reiterated to

5

Plaintiff the attendance policy for probationary employees and informed her that MOBIS could not offer her regular employment and that she was terminated. Plaintiff stated that she was aware of the policy regarding attendance during the probationary period. She said she just didn't think that was the reason for her termination. Plaintiff said that she understood and left.

22.    During discovery, I learned that Plaintiff, and possibly Ms. Womack, suspected that MOBIS terminated two pregnant employees for discriminatory reasons. I know this to be untrue. The two women in question are LaJarra Jefferson and Shalonda Gordon, both of whom were pregnant when terminated. Ms. Jefferson was terminated for taking FMLA leave without submitting a proper medical certification that she needed to be on leave. MOBIS warned Ms. Jefferson that her unexcused absences were counting against her under MOBIS' "no fault" attendance policy for regular hourly employees, and that she would be terminated unless she provided proper medical certification. Ms. Jefferson refused to return to work and did not furnished a medical certification stating that she had a medical need for leave. To the contrary, her first two physicians recommended work restrictions that MOBIS told Jefferson it could accommodate. Eventually, Jefferson went to a third doctor, who provided a medical certification that designated a start date for Jefferson's leave, which was after Jefferson had been terminated for attendance points.

23.    Shalonda Gordon was terminated for improper and destructive work techniques. Specifically, she was jerking wires instead of unplugging them and damaging the connections on sensitive diagnostic equipment used to conduct quality tests on cockpit (dashboard) assemblies. The supplemental restraint system (airbags) is among the components involved in the testing. For obvious reasons, Gordon's work techniques posed potential quality and safety issues. MOBIS warned Gordon on several occasions about her misconduct before terminating her.

6

24.    It was also evident during depositions that Plaintiff believed or suspected that a former Accounting employee, LaToya Williams, was a similarly situated female probationary employee who was not pregnant, had violated the attendance policy, but was not terminated. This is not the case.  Ms. Williams, an accounting clerk, came to work at MOBIS through a temporary agency like Plaintiff.  She also had attendance problems as a Temp.  Due to those attendance problems, MOBIS, on Mr. Kim's recommendation, never offered probationary employment to Ms. Williams, so as it turns out Plaintiff, was given more favorable consideration than Ms. Williams because Mr. Kim gave Plaintiff probationary employment despite her attendance problems as a Temp and his reluctance to hire her.

25.    MOBIS has had many employees that have taken FMLA leave for pregnancy and returned to their former positions without incident.  MOBIS treats pregnancy the same as any other illness or sickness with regard to its attendance policies.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on March _28_, 2008.

_____
**TRACY RIEDLER**

Sworn to and subscribed before me on this the _28_ day of March, 2008 .

Notary Public _____
My Commission Expires: NOTARY PUBLIC STATE OF ALABAMA AT LARGE.
MY COMMISSION EXPIRES: Oct 13, 2010
BONDED THRU NOTARY PUBLIC UNDERWRITERS

[SEAL]

7

# EXHIBIT 1
# TRACY RIEDLER
# AFFIDAVIT

**MOBIS** ALABAMA

MOBIS Alabama, LLC

# JOB DESCRIPTION

| Job Title: | Accounting Specialist Treasury |
|---|---|
| Report to: | Assistant Manager Treasury |
| Dept: | Accounting and Finance |

**Minimum education, skills, and/or experience required:**
- Bachelor's degree in accounting or related field
- Excellent communication skills (oral & written)
- Experience in manufacturing environment will be plus
- Advance knowledge in computer software for windows
- Familiar with General accounting duties
- Computer skills - Excel(Must), SAP (Preferred)

**KEY DUTIES AND RESPONSIBILITIES (Not limited to)**

1. Daily fund and demand schedule - checks and wires.
2. Maintain vendor payment file.
3. Set up vendors for payment.
4. Ensure payment date is correct in SAP.
5. Ensure documents are approved in SAP.
6. Assist with check payments.
7. Handle a variety of Accounts Payable issues such as Aging Report Status, proposal list, outgoing payment clearing (wires, online transfers, ACH files, etc.
8. Handles a variety of Accounts Receivable issues such as Aging Reports, sending collection letters and statements, incoming payment clearing, customer maintenance.
9. Any additional duties associated with collections.
10. Maintaining G/L Entries.
11. Make Bank Deposits.
12. Opening and posting incoming checks.
13. Handling phone calls,faxes and e-mail from supplier regarding to payment.
14. Maintaining files for the Accounting department.
15. All other duties as assigned.

# EXHIBIT 2
# TRACY RIEDLER
# AFFIDAVIT

## TARSHA HUNTER'S ATTENDANCE
## RECORD WITH MULTI STAFFING

| | Date | In | Out |
|---|---|---|---|
| Mon | 3/6/2006 | 8:00 AM | 5:00 PM |
| Tue | 3/7/2006 | 8:00 AM | 5:00 PM |
| Wed | 3/8/2006 | 8:00 AM | 5:00 PM |
| Thu | 3/9/2006 | 8:00 AM | 5:00 PM |
| Fri | 3/10/2006 | 8:00 AM | 5:00 PM |
| Sat | 3/11/2006 | | |
| Sun | 3/12/2006 | | |
| Mon | 3/13/2006 | 8:00 AM | 5:00 PM |
| Tue | 3/14/2006 | 8:30 AM | 5:00 PM |
| Wed | 3/15/2006 | 8:00 AM | 5:00 PM |
| Thu | 3/16/2006 | 8:00 AM | 5:00 PM |
| Fri | 3/17/2006 | 8:00 AM | 5:00 PM |
| Sat | 3/18/2006 | | |
| Sun | 3/19/2006 | | |
| Mon | 3/20/2006 | 8:00 AM | 5:10 PM |
| Tue | 3/21/2006 | 8:00 AM | 5:00 PM |
| Wed | 3/22/2006 | 8:00 AM | 3:40 PM |
| Thu | 3/23/2006 | 8:00 AM | 5:00 PM |
| Fri | 3/24/2006 | Out all day | |
| Sat | 3/25/2006 | | |
| Sun | 3/26/2006 | | |
| Mon | 3/27/2006 | 8:00 AM | 5:05 PM |
| Tue | 3/28/2006 | 8:00 AM | 5:00 PM |
| Wed | 3/29/2006 | 12:00 PM | 5:00 PM |
| Thu | 3/30/2006 | 8:00 AM | 5:00 PM |
| Fri | 3/31/2006 | 8:00 AM | 5:00 PM |
| Sat | 4/1/2006 | | |
| Sun | 4/2/2006 | | |
| Mon | 4/3/2006 | 9:00 AM | 5:00 PM |
| Tue | 4/4/2006 | 8:00 AM | 5:10 PM |
| Wed | 4/5/2006 | 8:00 AM | 5:00 PM |
| Thu | 4/6/2006 | 8:00 AM | 5:00 PM |
| Fri | 4/7/2006 | 8:00 AM | 5:00 PM |
| Sat | 4/8/2006 | | |
| Sun | 4/9/2006 | | |
| Mon | 4/10/2006 | 12:00 PM | 5:00 PM |
| Tue | 4/11/2006 | 8:00 AM | 5:00 PM |
| Wed | 4/12/2006 | Out sick all day | |
| Thu | 4/13/2006 | 8:00 AM | 5:00 PM |
| Fri | 4/14/2006 | Holiday | |
| Sat | 4/15/2006 | | |
| Sun | 4/16/2006 | | |
| Mon | 4/17/2006 | 8:00 AM | 5:00 PM |
| Tue | 4/18/2006 | 8:15 AM | 5:00 PM |
| Wed | 4/19/2006 | 8:00 AM | 5:00 PM |
| Thu | 4/20/2006 | 8:00 AM | 5:00 PM |
| Fri | 4/21/2006 | 8:05 AM | 5:00 PM |
| Sat | 4/22/2006 | | |
| Sun | 4/23/2006 | | |

| | Date | In | Out |
|---|---|---|---|
| Mon | 4/24/2006 | 8:00 AM | 5:00 PM |
| Tue | 4/25/2006 | 8:00 AM | 12:00 PM |
| Wed | 4/26/2006 | 8:00 AM | 5:15 PM |
| Thu | 4/27/2006 | 8:00 AM | 5:00 PM |
| Fri | 4/28/2006 | 9:00 AM | 11:30 AM |
| Sat | 4/29/2006 | | |
| Sun | 4/30/2006 | | |
| Mon | 5/1/2006 | 8:00 AM | 5:00 PM |
| Tue | 5/2/2006 | 8:00 AM | 5:10 PM |
| Wed | 5/3/2006 | 8:15 AM | 5:15 PM |
| Thu | 5/4/2006 | 8:00 AM | 5:15 PM |
| Fri | 5/5/2006 | 8:00 AM | 5:00 PM |
| Sat | 5/6/2006 | | |
| Sun | 5/7/2006 | | |
| Mon | 5/8/2006 | Out sick all day | |
| Tue | 5/9/2006 | 8:00 AM | 5:15 PM |
| Wed | 5/10/2006 | 8:00 AM | 5:00 PM |
| Thu | 5/11/2006 | 8:00 AM | 5:00 PM |
| Fri | 5/12/2006 | 8:00 AM | 5:00 PM |
| Sat | 5/13/2006 | | |
| Sun | 5/14/2006 | | |
| Mon | 5/15/2006 | 8:00 AM | 5:00 PM |
| Tue | 5/16/2006 | 8:06 AM | 5:06 PM |
| Wed | 5/17/2006 | 8:10 AM | 5:08 PM |
| Thu | 5/18/2006 | 8:00 AM | 5:08 PM |
| Fri | 5/19/2006 | 8:00 AM | 5:00 PM |
| Sat | 5/20/2006 | | |
| Sun | 5/21/2006 | | |
| Mon | 5/22/2006 | 8:00 AM | 5:05 PM |
| Tue | 5/23/2006 | 8:00 AM | 5:06 PM |
| Wed | 5/24/2006 | 8:00 AM | 5:00 PM |
| Thu | 5/25/2006 | 8:00 AM | 5:00 PM |
| Fri | 5/26/2006 | 8:02 AM | 5:00 PM |
| Sat | 5/27/2006 | | |
| Sun | 5/28/2006 | | |
| Mon | 5/29/2006 | Holiday | |
| Tue | 5/30/2006 | 8:03 AM | 5:00 PM |
| Wed | 5/31/2006 | 8:00 AM | 5:15 PM |
| Thu | 6/1/2006 | 8:00 AM | 5:15 PM |
| Fri | 6/2/2006 | 8:00 AM | 5:00 PM |
| Sat | 6/3/2006 | | |
| Sun | 6/4/2006 | | |

MAR-28-2008 10:05    MOBIS    MULTI STAFFING SERVICES    334 271 3615    P.002

Aug 09 2007 9:19AM    MULTI STAFFING SERVICES    334 271 3615    P.0

MAR-10-2006 15:16    MOBIS ALABAMA LLC    334 387 4900    P.001

PLEASE CALL YOUR SERVICE REPRESENTATIVE AS SOON AS YOUR ASSIGNMENT ENDS.

## MULTI-STAFFING SERVICES    EMPLOYEE TIME SHEET

| WEEK ENDING | SOCIAL SECURITY NUMBER | | EMP. # | EMPLOYEE LAST NAME | FIRST | MIDDLE |
|---|---|---|---|---|---|---|
| 3/12/06 | 421 1 81 19223 | | | Hunter | Torsha | Nickol |

| | DATE | TIME STARTED | TIME FINISHED | LESS LUNCH | HOURS WORKED |
|---|---|---|---|---|---|
| MON | 3/6/06 | 8:00 | 5:00 | 1 hr. | 8 |
| TUE | 3/7/06 | 8:00 | 5:00 | 1 hr. | 8 |
| WED | 3/8/06 | 8:00 | 5:00 | 1 hr. | 8 |
| THU | 3/9/06 | 8:00 | 5:00 | 1 hr. | 8 |
| FRI | 3/10/06 | 8:00 | 5:00 | 1 hr. | 8 |
| SAT | 3/11/06 | | | | |
| SUN | 3/12/06 | | | | |

EMPLOYEES WORKING AT MORE THAN ONE COMPANY DURING THE WEEK (MONDAY - SUNDAY) MAY NOT EXCEED 40 HOURS EXCEPT WITH MULTI-STAFFING SERVICES PERMISSION. ARE YOU RETURNING ☐ Yes ☐ No

I UNDERSTAND THAT I AM TO CONTACT THE MULTI-STAFFING SERVICES OFFICE AFTER COMPLETING THIS ASSIGNMENT, AND IF I DO NOT DO SO, MULTI-STAFFING SERVICES MAY ASSUME THAT I AM NOT THEN AVAILABLE FOR WORK.
I CERTIFY THAT I HAVE WORKED THE HOURS LISTED ON THIS TIME SHEET.

I CERTIFY THAT I HAVE NOT BEEN INVOLVED IN AN ACCIDENT OR INJURY WHILE WORKING ON THIS ASSIGNMENT UNLESS NOTED IN THE COMMENTS.

I CERTIFY THAT I HAVE NOT WITNESSED ANY ACCIDENTS OR INJURIES THIS WEEK UNLESS NOTED IN THE COMMENTS.

EMPLOYEE SIGNATURE X *Torsha Hunter*

COMMENTS:

TOTAL HOURS FOR WEEK TO NEAREST QUARTER HOUR
4 HOUR MINIMUM PER DAY PER EMPLOYEE

CLIENT APPROVAL/AGREEMENT
CLIENT AGREES THAT ITS UTILIZATION OF THE ABOVE-NAMED MULTI-STAFFING SERVICES EMPLOYEE HAS BEEN MADE AVAILABLE AS A RESULT OF THE TEMPORARY PERSONNEL SERVICE RENDERED BY MULTI-STAFFING SERVICES.

CLIENT CERTIFIES THAT THE ABOVE HOURS WORKED ARE CORRECT AND THAT ALL WORK WAS PERFORMED IN A SATISFACTORY MANNER. CLIENT'S SIGNATURE BELOW CONSTITUTES ACCEPTANCE OF THE TERMS AND CONDITIONS IDENTIFIED ON THE REVERSE OF THIS DOCUMENT.

CLIENT SIGNATURE X    TITLE

MULTI-STAFFING SERVICES
P.O. BOX 150345
MOBILE, AL 36615-2343
Chattanooga FAX (423) 954-1184    Gulfport FAX (228)436-0052
Montgomery FAX (334)271-3615    Hattiesburg FAX (601)544-0775

CLIENT COMPANY NAME
Mobis Alabama LLC
SUPERVISOR'S NAME
HOSANG HWANG

DO NOT WRITE BELOW THIS LINE
FOR ACCOUNTING USE ONLY

| TOTAL HOURS | PAY RATE | O.T. HOURS | BILLING HOURS | BILLING RATE |
|---|---|---|---|---|
| | | | | |

HOME OFFICE COPY - WHITE    LEAVE W/CLIENT - CANARY    EMPLOYEE COPY - PINK

mobis

TOTAL P.001

# MULTI-STAFFING SERVICES   EMPLOYEE TIME SHEET

PLEASE CALL YOUR SERVICE REPRESENTATIVE AS SOON AS YOUR ASSIGNMENT ENDS.

| WEEK ENDING | SOCIAL SECURITY NUMBER | EMP. # | EMPLOYEE LAST NAME | FIRST | MIDDLE |
|---|---|---|---|---|---|
| 3/19/06 | 421 121 19223 | | Hunter | Tarsha | N. |

| DATE | TIME STARTED | TIME FINISHED | LESS LUNCH | HOURS WORKED |
|---|---|---|---|---|
| MON | 3/13 | 8:00 | 5:00 | 1hr | 8hrs |
| TUE | 3/3 | 8:30 | 5:00 | 30min | 8hrs |
| WED | 3/14 | 8:00 | 5:00 | 1hr | 8hrs |
| THU | 3/15 | 8:00 | 6:00 | 1hr | 8hrs |
| FRI | 3/16 | 8:00 | 5:00 | 12min | 6.50 |
| SAT | 3/1 | | | | |
| SUN | 3/18 | | | | |

**TOTAL HOURS FOR WEEK**
TO NEAREST QUARTER HOUR
( HOUR LUNCH PER DAY PER EMPLOYEE )   38.00

EMPLOYEES WORKING AT MORE THAN ONE COMPANY DURING THE WEEK (MONDAY - SUNDAY) MAY NOT EXCEED 40 HOURS EXCEPT WITH MULTI-STAFFING SERVICES PERMISSION. ARE YOU RETURNING   ☐ Yes   ☐ No

I UNDERSTAND THAT I AM TO CONTACT THE MULTI-STAFFING SERVICES OFFICE AFTER COMPLETING THIS ASSIGNMENT, AND IF I DO NOT DO SO, MULTI-STAFFING SERVICES MAY ASSUME THAT I AM NOT THEN AVAILABLE FOR WORK. I CERTIFY THAT I HAVE WORKED THE HOURS LISTED ON THIS TIME SHEET.

I CERTIFY THAT I HAVE NOT BEEN INVOLVED IN AN ACCIDENT OR INJURY WHILE WORKING ON THIS ASSIGNMENT UNLESS NOTED IN THE COMMENTS.

I CERTIFY THAT I HAVE NOT WITNESSED ANY ACCIDENT OR ACCIDENTS OR INJURIES THAT WERE LESS NOTED IN THE COMMENTS.

EMPLOYEE SIGNATURE   x _Tarsha Hunter_

COMMENTS:

CLIENT APPROVAL/AGREEMENT
CLIENT AGREES THAT THE UTILIZATION OF THE ABOVE NAMED MULTI-STAFFING SERVICES EMPLOYEE HAS BEEN MADE AVAILABLE AS A RESULT OF THE TEMPORARY PERSONNEL SERVICE RENDERED BY MULTI-STAFFING SERVICES.

CLIENT CERTIFIES THAT THE ABOVE HOURS WORKED ARE CORRECT AND THAT ALL WORK WAS PERFORMED IN A SATISFACTORY MANNER. CLIENT'S SIGNATURE BELOW CONSTITUTES ACCEPTANCE OF THIS TERMS AND CONDITIONS AS NOTED ON THE REVERSE OF THIS DOCUMENT.

CLIENT SIGNATURE
x _____   TITLE

CLIENT COMPANY NAME   _Mobis Alabama LLC_

SUPERVISOR'S NAME   _No Song Hwang_

| | MULTI-STAFFING SERVICES |
|---|---|
| Chattanooga FAX (423) 954-1904 | P.O. BOX 160343 MOBILE, AL 36616-2343 FAX (251) 343-5915 |
| Montgomery FAX (334) 271-3515 | Gulfcoast FAX (228)896-0062 Foxlwy FAX (601)544-0175 |

DO NOT WRITE BELOW THIS LINE
FOR ACCOUNTING USE ONLY

| TOTAL HOURS | PAY RATE | O.T. HOURS | BILLING HOURS | BILLING RATE |
|---|---|---|---|---|

HOME OFFICE COPY - WHITE   LEAVE W/CLIENT - CANARY   EMPLOYEE COPY - PINK

334 387 4900   P.001/001   MOBIS ALABAMA LLC   MAR-17-2006 16:44

MAR-28-2008 10:06      MOBIS                    334 271 3615        P.004
p. 1

03/06/2006  85:88   2713615              MULTI STAFFING           PAGE 01

PLEASE CALL YOUR SERVICE REPRESENTATIVE AS SOON AS YOUR ASSIGNMENT ENDS.

# MULTI-STAFFING SERVICES    EMPLOYEE TIME SHEET

| WEEK ENDING | SOCIAL SECURITY NUMBER | | EMP. # | EMPLOYEE LAST NAME | FIRST | MIDDLE |
|---|---|---|---|---|---|---|
| 3/26/06 | 421-121 | A223 | | Hunter | Tarsha | N. |

| | DATE | TIME STARTED | TIME FINISHED | LESS LUNCH | HOURS WORKED | |
|---|---|---|---|---|---|---|
| MON | 3/20 | 8:00 | 5:10 | 1 hr. | 8.10 hr | EMPLOYEES WORKING AT MORE THAN ONE COMPANY. DURING THE WEEK (MONDAY-SUNDAY) MAY NOT EXCEED 40 HOURS EXCEPT WITH MULTI-STAFFING SERVICES PERMISSION. ARE YOU RETURNING  ☐ Yes  ☐ No |
| TUE | 3/21 | 8:00 | 5:00 | 1 hr. | 8.00 hr | I UNDERSTAND THAT I AM TO CONTACT THE MULTI-STAFFING SERVICES OFFICE AFTER COMPLETING THIS ASSIGNMENT, AND IF I DO NOT DO SO, MULTI-STAFFING SERVICES MAY ASSUME THAT I AM NOT THEN AVAILABLE FOR WORK. |
| WED | 3/22 | 8:00 | 3:40 | 1 hr. | 6.40 hr | I CERTIFY THAT I HAVE WORKED THE HOURS LISTED ON THIS TIME SHEET. |
| THU | 3/23 | 8:00 | 5:00 | 1 hr. | 8 hr | I CERTIFY THAT I HAVE NOT BEEN INVOLVED IN AN ACCIDENT OR INJURY WHILE WORKING ON THIS ASSIGNMENT UNLESS NOTED IN THE COMMENTS. |
| FRI | 3/24 | 0:00 | | | | I CERTIFY THAT I HAVE NOT WITNESSED ANY ACCIDENTS OR INJURIES THIS WEEK UNLESS NOTED IN THE COMMENTS. |
| SAT | 3/25 | | | | | EMPLOYEE SIGNATURE x _Tarsha Hunter_ |
| SUN | 3/26 | | | | | COMMENTS: |

TOTAL HOURS FOR WEEK TO NEAREST QUARTER HOUR
4 HOUR MINIMUM PER DAY PER EMPLOYEE

CLIENT APPROVAL/AGREEMENT
CLIENT AGREES THAT ITS UTILIZATION OF THE ABOVE-NAMED MULTI-STAFFING SERVICES EMPLOYEE HAS BEEN MADE AVAILABLE AS A RESULT OF THE TEMPORARY PERSONNEL SERVICE RENDERED BY MULTI-STAFFING SERVICES.

CLIENT CERTIFIES THAT THE ABOVE HOURS WORKED ARE CORRECT AND THAT ALL WORK WAS PERFORMED IN A SATISFACTORY MANNER. CLIENT'S SIGNATURE BELOW CONSTITUTES ACCEPTANCE OF THE TERMS AND CONDITIONS IDENTIFIED ON THE REVERSE OF THIS DOCUMENT.

| CLIENT SIGNATURE | | TITLE |
|---|---|---|
| x | | CTO |

CLIENT COMPANY NAME
Mobis Alabama

SUPERVISOR'S NAME
No Sang Hwang

MULTI-STAFFING SERVICES
P.O. BOX 150343
MOBILE, AL 33815-2343
FAX (251) 343-3615

Chickasaw
FAX (423) 994-1194

Bayfront
FAX (228) 696-0067

Montgomery
FAX (334) 271-3615

Hattiesburg
FAX (601) 544-0775

DO NOT WRITE BELOW THIS LINE FOR ACCOUNTING USE ONLY

| TOTAL HOURS | PAY RATE | O.T. HOURS | BILLING HOURS | BILLING RATE |
|---|---|---|---|---|

HOME OFFICE COPY - WHITE     LEAVE W/CLIENT - CANARY     EMPLOYEE COPY - PINK

MAR-28-2008 10:06    MOBIS    334 271 3615    P.005

03/06/2006 05:00    2713615    MULTI STAFFING    PAGE 01
TOTAL P.001
500 P.001

PLEASE CALL YOUR SERVICE REPRESENTATIVE AS SOON AS YOUR ASSIGNMENT ENDS.

# MULTI-STAFFING SERVICES    EMPLOYEE TIME SHEET

| WEEK ENDING | SOCIAL SECURITY NUMBER | EMP. # |
|---|---|---|
| 4/02/06 | 42U . 121 . 19223 | |

EMPLOYEE LAST NAME: Hunter    FIRST: Tarsha    MIDDLE: Nickol

| | DATE | TIME STARTED | TIME FINISHED | LESS LUNCH | HOURS WORKED |
|---|---|---|---|---|---|
| MON | 3/27 | 8:00 | 5:05 | 1 hr | 8:00 |
| TUE | 3/28 | 7:00 | 5:00 | 1 hr | 8:00 |
| WED | 3/29 | 12:00 | 0:00 | | 6.00 |
| THU | 3/30 | 8:00 | 5:00 | 1 hr | 8:00 |
| FRI | 3/31 | 8:00 | 5:00 | 1 hr | 8:00 |
| SAT | | | | | |
| SUN | | | | | |

EMPLOYEES WORKING AT MORE THAN ONE COMPANY DURING THE WEEK (MONDAY - SUNDAY) MAY NOT EXCEED 40 HOURS EXCEPT WITH MULTI-STAFFING SERVICES PERMISSION. ARE YOU RETURNING ☐ Yes ☐ No

I UNDERSTAND THAT I AM TO CONTACT THE MULTI-STAFFING SERVICES OFFICE AFTER COMPLETING THIS ASSIGNMENT, AND IF I DO NOT DO SO, MULTI-STAFFING SERVICES MAY ASSUME THAT I AM NOT THEN AVAILABLE FOR WORK.
I CERTIFY THAT I HAVE WORKED THE HOURS LISTED ON THIS TIME SHEET.

I CERTIFY THAT I HAVE NOT BEEN INVOLVED IN AN ACCIDENT OR INJURY WHILE WORKING ON THIS ASSIGNMENT UNLESS NOTED IN THE COMMENTS.

I CERTIFY THAT I HAVE NOT WITNESSED ANY ACCIDENTS OR INJURIES THIS WEEK UNLESS NOTED IN THE COMMENTS.

EMPLOYEE SIGNATURE x Tarsha Hunter

COMMENTS:

| TOTAL HOURS FOR WEEK TO NEAREST QUARTER HOUR 4 HOUR MINIMUM PER DAY PER EMPLOYEE | 37.00 |
|---|---|

CLIENT APPROVAL/ACCOUNT
CLIENT AGREES THAT ITS UTILIZATION OF THE ABOVE-NAMED MULTI-STAFFING SERVICE EMPLOYEE HAS BEEN MADE AVAILABLE AS A RESULT OF THE TEMPORARY PERSONNEL SERVICE REQUESTED BY MULTI-STAFFING SERVICES.

CLIENT CERTIFIES THAT THE ABOVE HOURS WORKED ARE CORRECT AND THAT ALL WORK WAS PERFORMED IN A SATISFACTORY MANNER. CLIENT'S SIGNATURE BELOW CONSTITUTES ACCEPTANCE OF THE TERMS AND CONDITIONS IDENTIFIED ON THE REVERSE OF THE DOCUMENT.

CLIENT SIGNATURE    TITLE

CLIENT COMPANY NAME: MOBIS ALABAMA LLC
SUPERVISOR'S NAME: Ho Sang Hwang

DO NOT WRITE BELOW THIS LINE
FOR ACCOUNTING USE ONLY

| TOTAL HOURS | PAY RATE | O.T. HOURS | BILLING HOURS | BILLING RATE |
|---|---|---|---|---|
| | | | | |

MULTI-STAFFING SERVICES
P.O. BOX 160343
MOBILE, AL 36616-2343
Chattanooga FAX (423) 954-1104
Montgomery FAX (334) 271-3615
FAX (251) 343-3615
Bluford FAX (228) 696-0032
Hattiesburg FAX (601) 544-4775

HOME OFFICE COPY - WHITE    LEAVE W/CLIENT - CANARY    EMPLOYEE COPY - PINK

MAR-31-2006 15:16    MOBIS ALABAMA LLC    334 387 4900    P.001/001

MAR-28-2008 10:07   MOBIS
APR-07-2008 16:39   MOBIS ALABAMA LLC               334 387 4900   P.001/001

PLEASE CALL YOUR SERVICE REPRESENTATIVE AS SOON AS YOUR ASSIGNMENT ENDS.

## MULTI-STAFFING SERVICES    EMPLOYEE TIME SHEET

| WEEK ENDING | SOCIAL SECURITY NUMBER | | EMP. # | EMPLOYEE LAST NAME | FIRST | MIDDLE |
|---|---|---|---|---|---|---|
| 04/9/06 | 421·121·19223 | | | Hunter | Tarsha | Nickol |

| | DATE | TIME STARTED | TIME FINISHED | LESS LUNCH | HOURS WORKED | |
|---|---|---|---|---|---|---|
| MON | 4/3 | 9:00 | 5:00 | 30min | 7.70 | EMPLOYEES WORKING AT MORE THAN ONE COMPANY DURING THE WEEK (MONDAY-SUNDAY) MAY NOT EXCEED 40 HOURS EXCEPT WITH MULTI-STAFFING SERVICES PERMISSION. ARE YOU RETURNING  ☐ Yes  ☐ No |
| TUE | 4/4 | 8:00 | 5:10 | 1hr. | 8.10 | I UNDERSTAND THAT I AM TO CONTACT THE MULTI-STAFFING SERVICES OFFICE AFTER COMPLETING THIS ASSIGNMENT, AND IF I DO NOT DO SO, MULTI-STAFFING SERVICES MAY ASSUME THAT I AM NOT THEN AVAILABLE FOR WORK. I CERTIFY THAT I HAVE WORKED THE HOURS LISTED ON THIS TIME SHEET. |
| WED | 4/5 | 8:00 | 5:00 | 1hr. | 8.00 | I CERTIFY THAT I HAVE NOT BEEN INVOLVED IN AN ACCIDENT OR INJURY WHILE WORKING ON THIS ASSIGNMENT UNLESS NOTED IN THE COMMENTS. |
| THU | 4/6 | 8:00 | 5:00 | 1hr. | 8.00 | I CERTIFY THAT I HAVE NOT WITNESSED ANY ACCIDENTS OR INJURIES THIS WEEK UNLESS NOTED IN THE COMMENTS. |
| FRI | 4/7 | 8:00 | 5:00 | 1hr. | 8.00 | |
| SAT | 4/8 | | | | | EMPLOYEE SIGNATURE X _Tarsha Hunter_ |
| SUN | 4/9 | | | | | |

COMMENTS:

TOTAL HOURS FOR WEEK
TO NEAREST QUARTER HOUR
4 HOUR MINIMUM PER DAY PER EMPLOYEE

CLIENT APPROVAL/AGREEMENT
CLIENT AGREES THAT ITS UTILIZATION OF THE ABOVE-NAMED MULTI-STAFFING SERVICES EMPLOYEE HAS BEEN MADE AVAILABLE AS A RESULT OF THE TEMPORARY PERSONNEL SERVICE RENDERED BY MULTI-STAFFING SERVICES.

CLIENT CERTIFIES THAT THE ABOVE HOURS WORKED ARE CORRECT AND THAT ALL WORK WAS PERFORMED IN A SATISFACTORY MANNER. CLIENT'S SIGNATURE BELOW CONSTITUTES ACCEPTANCE OF THE TERMS AND CONDITIONS IDENTIFIED ON THE REVERSE OF THIS DOCUMENT.

CLIENT SIGNATURE                          TITLE   _Act Mgr_

CLIENT COMPANY NAME   _MOBIS ALABAMA LLC._
SUPERVISOR'S NAME   _MOSHIS HWANG_

MULTI-STAFFING SERVICES
P.O. BOX 16343
MOBILE, AL 36616-2343
FAX (251) 343-2815

Chattanooga
FAX (423) 954-1104

Gulfport
FAX (228) 396-0692

Montgomery
FAX (334) 271-2816

Hattiesburg
FAX (601) 544-0775

DO NOT WRITE BELOW THIS LINE
FOR ACCOUNTING USE ONLY

| TOTAL HOURS | PAY RATE | O.T. HOURS | BILLING HOURS | BILLING RATE |
|---|---|---|---|---|

HOME OFFICE COPY-WHITE    LEAVE W/CLIENT-CANARY    EMPLOYEE COPY-PINK

TOTAL P.001

APR-13-2006  16:43        MOBIS ALABAMA LLC              334 387 4900    P.001/001

PLEASE CALL YOUR SERVICE REPRESENTATIVE AS SOON AS YOUR ASSIGNMENT ENDS.

# MULTI-STAFFING SERVICES    EMPLOYEE TIME SHEET

| WEEK ENDING | SOCIAL SECURITY NUMBER | EMP. # | EMPLOYEE LAST NAME | FIRST | MIDDLE |
|---|---|---|---|---|---|
| 4/16/06 | 421 21 19723 | | Hunter | Tarsha | Nickol |

| | DATE | TIME STARTED | TIME FINISHED | LESS LUNCH | HOURS WORKED |
|---|---|---|---|---|---|
| MON | 4/10 | 12:00 | 5:00 | | 5.00 |
| TUE | 4/11 | 8:00 | 5:00 | hr. | 8.00 |
| WED | 4/12 | Out Sick | | | |
| THU | 4/13 | 8:00 | 5:00 | hr. | 8.00 |
| FRI | 4/14 | Holiday | | | |
| SAT | 4/15 | | | | |
| SUN | 4/16 | | | | |

EMPLOYEES WORKING AT MORE THAN ONE COMPANY DURING THE WEEK (MONDAY - SUNDAY) MAY NOT EXCEED 40 HOURS EXCEPT WITH MULTI-STAFFING SERVICES PERMISSION. ARE YOU RETURNING  ☐ Yes  ☐ No

I UNDERSTAND THAT I AM TO CONTACT THE MULTI-STAFFING SERVICES OFFICE AFTER COMPLETING THIS ASSIGNMENT, AND IF I DO NOT DO SO, MULTI-STAFFING SERVICES MAY ASSUME THAT I AM NOT THEN AVAILABLE FOR WORK. I CERTIFY THAT I HAVE WORKED THE HOURS LISTED ON THIS TIME SHEET.

I CERTIFY THAT I HAVE NOT BEEN INVOLVED IN AN ACCIDENT OR INJURY WHILE WORKING ON THIS ASSIGNMENT UNLESS NOTED IN THE COMMENTS.

I CERTIFY THAT I HAVE NOT WITNESSED ANY ACCIDENTS OR INJURIES THIS WEEK UNLESS NOTED IN THE COMMENTS.

EMPLOYEE SIGNATURE  *Tarsha Hunter*

COMMENTS:

| TOTAL HOURS FOR WEEK. TO NEAREST QUARTER HOUR 4 HOUR MINIMUM PER DAY PER EMPLOYEE | 21.00 |
|---|---|

CLIENT APPROVAL/AGREEMENT
CLIENT AGREES THAT ITS UTILIZATION OF THE ABOVE NAMED MULTI-STAFFING SERVICES EMPLOYEE HAS BEEN MADE AVAILABLE AS A RESULT OF THE TEMPORARY PERSONNEL SERVICE RENDERED BY MULTI-STAFFING SERVICES.

CLIENT CERTIFIES THAT THE ABOVE HOURS WORKED ARE CORRECT AND THAT ALL WORK HAS PERFORMED IN A SATISFACTORY MANNER. CLIENT'S SIGNATURE BELOW CONSTITUTES ACCEPTANCE OF THE TERMS AND CONDITIONS IDENTIFIED ON THE REVERSE OF THIS DOCUMENT.

CLIENT SIGNATURE  X _____  TITLE  GFD

CLIENT COMPANY NAME  Mobis Alabama, LLC.
SUPERVISOR'S NAME  Ho Sang Hwang

DO NOT WRITE BELOW THIS LINE
FOR ACCOUNTING USE ONLY

| TOTAL HOURS | PAY RATE | O.T. HOURS | BILLING HOURS | BILLING RATE |
|---|---|---|---|---|
| | | | | |

MULTI-STAFFING SERVICES
P.O. BOX 160343
MOBILE, AL  36616-2343
FAX (251) 343-8915

Chattanooga
FAX (423) 954-1154

Montgomery
FAX (334) 271-3815

Eufaula
FAX (229) 808-0682

Hattiesburg
FAX (501) 544-2775

HOME OFFICE COPY - WHITE    LEAVE W/CLIENT - CANARY    EMPLOYEE COPY - PINK

TOTAL P.001

03/06/2006  05:08  2713615  MULTI STAFFING  PAGE  01

PLEASE CALL YOUR SERVICE REPRESENTATIVE AS SOON AS YOUR ASSIGNMENT ENDS.

# MULTI-STAFFING SERVICES     EMPLOYEE TIME SHEET

| WEEK ENDING | SOCIAL SECURITY NUMBER | EMP. # | EMPLOYEE LAST NAME | FIRST | MIDDLE |
|---|---|---|---|---|---|
| 4/23/06 | 421 | 21 | 19223 | Hunter | Torsha | Nickol |

| | DATE | TIME STARTED | TIME FINISHED | LESS LUNCH | HOURS WORKED |
|---|---|---|---|---|---|
| MON | 4/17 | 7:50 | 5:00 | 30 min | 8.40 |
| TUE | 4/18 | 8:15 | 5:00 | 1 hr. | 7.45 |
| WED | 4/19 | 7:50 | 5:00 | | 9.10 |
| THU | 4/20 | 8:00 | 5:00 | 1 hr. | 8.00 |
| FRI | 4/21 | 8:05 | 5:00 | 1 hr. | 7.55 |
| SAT | 4/22 | | | | |
| SUN | 4/23 | | | | |

**TOTAL HOURS FOR WEEK TO NEAREST QUARTER HOUR**
4 HOUR MINIMUM PER DAY PER EMPLOYEE       4050

**CLIENT APPROVAL/AGREEMENT**
CLIENT AGREES THAT THE UTILIZATION OF THE ABOVE-NAMED MULTI-STAFFING SERVICES EMPLOYEE HAS BEEN MADE AVAILABLE AS A RESULT OF THE TEMPORARY PERSONNEL SERVICE RENDERED BY MULTI-STAFFING SERVICES.

CLIENT CERTIFIES THAT THE ABOVE HOURS WORKED ARE CORRECT AND THAT ALL WORK WAS PERFORMED IN A SATISFACTORY MANNER. CLIENT'S SIGNATURE BELOW CONSTITUTES ACCEPTANCE OF THE TERMS AND CONDITIONS IDENTIFIED ON THE REVERSE OF THIS DOCUMENT.

CLIENT SIGNATURE
X _____     TITLE  Asst. Mgr.

MULTI-STAFFING SERVICES
Chattanooga          P.O. BOX 160343          Gulfport
FAX (423) 954-1104   MOBILE, AL 36616-2343   FAX (228)596-0092
Montgomery           FAX (251) 343-5915       Hattiesburg
FAX (334)271-3915                              FAX (601)544-0775

EMPLOYEES WORKING AT MORE THAN ONE COMPANY DURING THE WEEK (MONDAY - SUNDAY) MAY NOT EXCEED 40 HOURS EXCEPT WITH MULTI-STAFFING SERVICES PERMISSION. ARE YOU RETURNING ☑ Yes ☐ No

I UNDERSTAND THAT I AM TO CONTACT THE MULTI-STAFFING SERVICES OFFICE AFTER COMPLETING THIS ASSIGNMENT, AND IF I DO NOT DO SO, MULTI-STAFFING SERVICES MAY ASSUME THAT I AM NOT THEN AVAILABLE FOR WORK.
I CERTIFY THAT I HAVE WORKED THE HOURS LISTED ON THIS TIME SHEET.

I CERTIFY THAT I HAVE NOT BEEN INVOLVED IN AN ACCIDENT OR INJURY WHILE WORKING ON THIS ASSIGNMENT UNLESS NOTED IN THE COMMENTS.

I CERTIFY THAT I HAVE NOT WITNESSED ANY ACCIDENTS OR INJURIES THIS WEEK UNLESS NOTED IN THE COMMENTS.

EMPLOYEE SIGNATURE X Tarsha Hunter

COMMENTS:

CLIENT COMPANY NAME  Mobis Alabama, LLC.
SUPERVISOR'S NAME  Ho Sang Hwang

**DO NOT WRITE BELOW THIS LINE FOR ACCOUNTING USE ONLY**

| TOTAL HOURS | PAY RATE | O.T. HOURS | BILLING HOURS | BILLING RATE |
|---|---|---|---|---|
| | | | | |

HOME OFFICE COPY - WHITE     LEAVE W/CLIENT - CANARY     EMPLOYEE COPY - PINK

mobi

MAR-28-2008 10:08    MOBIS                                    P.009

MAY-01-2006 10:57    MOBIS ALABAMA LLC         334 397 4900    P.001/001

PLEASE CALL YOUR SERVICE REPRESENTATIVE AS SOON AS YOUR ASSIGNMENT ENDS.

# MULTI-STAFFING SERVICES    EMPLOYEE TIME SHEET

| WEEK ENDING | SOCIAL SECURITY NUMBER | EMP. # | EMPLOYEE LAST NAME | FIRST | MIDDLE |
|---|---|---|---|---|---|
| 4/30/06 | 421-121-19283 | | Hunter | Tarsha | Nickol |

| | DATE | TIME STARTED | TIME FINISHED | LESS LUNCH | HOURS WORKED |
|---|---|---|---|---|---|
| MON | 4/24 | 8:00 | 5:00 | 1 hr. | 8.00 |
| TUE | 4/25 | 7:50 | 12:00 | Ø | 4.10 |
| WED | 4/26 | 8:00 | 5:15 | Ø | 9.15 |
| THU | 4/27 | 8:00 | 5:00 | Ø | 9.00 |
| FRI | 4/28 | 9:00 | 11:30 | Ø | 2.30 |
| SAT | 4/29 | | | | |
| SUN | 4/30 | | | | |

EMPLOYEES WORKING AT MORE THAN ONE COMPANY DURING THE WEEK (MONDAY - SUNDAY) MAY NOT EXCEED 40 HOURS EXCEPT WITH MULTI-STAFFING SERVICES PERMISSION. ARE YOU RETURNING ☐ YES ☐ NO

I UNDERSTAND THAT I AM TO CONTACT THE MULTI-STAFFING SERVICES OFFICE AFTER COMPLETING THIS ASSIGNMENT, AND IF I DO NOT DO SO, MULTI-STAFFING SERVICES MAY ASSUME THAT I AM NOT THEN AVAILABLE FOR WORK. I CERTIFY THAT I HAVE WORKED THE HOURS LISTED ON THIS TIME SHEET.

I CERTIFY THAT I HAVE NOT BEEN INVOLVED IN AN ACCIDENT OR INJURY WHILE WORKING ON THIS ASSIGNMENT UNLESS NOTED IN THE COMMENTS.

I CERTIFY THAT I HAVE NOT WITNESSED ANY ACCIDENTS OR INJURIES THIS WEEK UNLESS NOTED IN THE COMMENTS.

EMPLOYEE SIGNATURE x _Tarsha Hunter_

COMMENTS: Family Emergency / Death in the family

| TOTAL HOURS FOR WEEK TO NEAREST QUARTER HOUR 4 HOUR MINIMUM PER DAY PER EMPLOYEE | 32.55 |
|---|---|

CLIENT APPROVAL/AGREEMENT
CLIENT AGREES THAT ITS UTILIZATION OF THE ABOVE-NAMED MULTI-STAFFING SERVICES EMPLOYEE HAS BEEN MADE AVAILABLE AS A RESULT OF THE TEMPORARY PERSONNEL SERVICE RENDERED BY MULTI-STAFFING SERVICES.

CLIENT CERTIFIES THAT THE ABOVE HOURS WORKED ARE CORRECT AND THAT ALL WORK WAS PERFORMED IN A SATISFACTORY MANNER. CLIENT'S SIGNATURE BELOW CONSTITUTES ACCEPTANCE OF THE TERMS AND CONDITIONS CONTAINED ON THE REVERSE OF THIS DOCUMENT.

CLIENT COMPANY NAME: Mobis Alabama, LLC

SUPERVISOR'S NAME: Ho Sang Hwang

CLIENT SIGNATURE x _J. R. Kee_  TITLE  CFO

MULTI-STAFFING SERVICES
P.O. BOX 160343
MOBILE, AL 36616-2343
Chattanooga FAX (423) 855-7104
Montgomery FAX (334)271-3816
FAX (251) 343-3916
Gulfport FAX (228)396-0032
Hattiesburg FAX (601)544-0775

| DO NOT WRITE BELOW THIS LINE FOR ACCOUNTING USE ONLY | | | |
|---|---|---|---|
| TOTAL HOURS | PAY RATE | O.T. HOURS | BILLING HOURS | BILLING RATE |

HOME OFFICE COPY - WHITE    LEAVE W/CLIENT - CANARY    EMPLOYEE COPY - PINK

TOTAL P.001  mobis

MAR-28-2008 10:08    MOBIS
HUG 08 2007 9:04AM    MULTI STAFFING SERVICES    334 271 3815    P.010
                                                                    p.S

MAY-05-2008 16:18    MOBIS ALABAMA LLC    334 387 4900    P.001/001

PLEASE CALL YOUR SERVICE REPRESENTATIVE AS SOON AS YOUR ASSIGNMENT ENDS.

# MULTI-STAFFING SERVICES    EMPLOYEE TIME SHEET

| WEEK ENDING | SOCIAL SECURITY NUMBER | | | EMP. # | EMPLOYEE LAST NAME | FIRST | MIDDLE |
|---|---|---|---|---|---|---|---|
| 05/10 | 421 121 19223 | | | | Hunter | Tarsha | Nickol |

| | DATE | TIME STARTED | TIME FINISHED | LESS LUNCH | HOURS WORKED |
|---|---|---|---|---|---|
| MON | 5/1 | 8:00 | 5:00 | 0 | 9.00 |
| TUE | 5/2 | 8:00 | 5:10 | 1hr. | 8.10 |
| WED | 5/3 | 8:15 | 5:15 | 1hr. | 8.00 |
| THU | 5/4 | 8:00 | 5:15 | 1hr. | 8.15 |
| FRI | 5/6 | 8:00 | 5:00 | 1hr. | 8.00 |
| SAT | 5/7 | | | | |
| SUN | 5/8 | | | | |

EMPLOYEES WORKING AT MORE THAN ONE COMPANY DURING THE WEEK (MONDAY - SUNDAY) MAY NOT EXCEED 40 HOURS EXCEPT WITH MULTI-STAFFING SERVICES PERMISSION. ARE YOU RETURNING ☐ Yes ☐ No

I UNDERSTAND THAT I AM TO CONTACT THE MULTI-STAFFING SERVICES OFFICE AFTER COMPLETING THIS ASSIGNMENT, AND IF I DO NOT DO SO, MULTI-STAFFING SERVICES MAY ASSUME THAT I AM NOT THEN AVAILABLE FOR WORK.

I CERTIFY THAT I HAVE WORKED THE HOURS LISTED ON THIS TIME SHEET.

I CERTIFY THAT I HAVE NOT BEEN INVOLVED IN AN ACCIDENT OR INJURY WHILE WORKING ON THIS ASSIGNMENT UNLESS NOTED IN THE COMMENTS.

I CERTIFY THAT I HAVE NOT WITNESSED ANY ACCIDENTS OR INJURIES THIS WEEK UNLESS NOTED IN THE COMMENTS.

EMPLOYEE SIGNATURE  *Tarsha Hunter*

COMMENTS:

| TOTAL HOURS FOR WEEK TO NEAREST QUARTER HOUR  4 HOUR MINIMUM PER DAY PER EMPLOYEE | |
|---|---|

CLIENT APPROVAL/AGREEMENT
CLIENT AGREES THAT ITS UTILIZATION OF THE ABOVE NAMED MULTI-STAFFING SERVICES EMPLOYEE HAS BEEN MADE AVAILABLE AS A RESULT OF THE TEMPORARY PERSONNEL SERVICE RENDERED BY MULTI-STAFFING SERVICES.

CLIENT CERTIFIES THAT THE ABOVE HOURS WORKED ARE CORRECT AND THAT ALL WORK WAS PERFORMED IN A SATISFACTORY MANNER. CLIENTS SIGNATURE BELOW CONSTITUTES ACCEPTANCE OF THE TERMS AND CONDITIONS IDENTIFIED ON THE REVERSE OF THIS DOCUMENT.

CLIENT SIGNATURE  X _____  TITLE _____

CLIENT COMPANY NAME  *Mobis Alabama, LLC*
SUPERVISOR'S NAME  *Jay Diop*

DO NOT WRITE BELOW THIS LINE
FOR ACCOUNTING USE ONLY

| TOTAL HOURS | PAY RATE | O.T. HOURS | BILLING HOURS | BILLING RATE |
|---|---|---|---|---|
| | | | | |

MULTI-STAFFING SERVICES
P.O. BOX 160343
MOBILE, AL 36616-2343
FAX (251) 343-3615

*Chattanooga*
FAX (423) 634-1104

*Montgomery*
FAX (334) 271-3815

*Gulfport*
FAX (228) 896-0092

*Hattiesburg*
FAX (601) 544-0775

HOME OFFICE COPY - WHITE    LEAVE W/CLIENT - CANARY    EMPLOYEE COPY - PINK

TOTAL P.001

Mobis

MAR-28-2008  10:09      MOBIS                    334 271 9813         P.011

MAY-15-2005  10:05      MOBIS ALABAMA LLC         334 387 4900        P.001/001

PLEASE CALL YOUR SERVICE REPRESENTATIVE AS SOON AS YOUR ASSIGNMENT ENDS.

## MULTI-STAFFING SERVICES    EMPLOYEE TIME SHEET

| WEEK ENDING | SOCIAL SECURITY NUMBER | | EMP. # | EMPLOYEE LAST NAME | FIRST | MIDDLE |
|---|---|---|---|---|---|---|
| 5/14/04 | 421 21 19223 | | | HUNTER | TARSHA | Nickol |

| | DATE | TIME STARTED | TIME FINISHED | LESS LUNCH | HOURS WORKED |
|---|---|---|---|---|---|
| MON | Out | Sick | — | | |
| TUE | 5/9 | 8:00 | 5:15 | 1hr | 8:15 |
| WED | 5/10 | 8:00 | 5:00 | 1hr | 8:00 |
| THU | 5/11 | 8:00 | 5:00 | 1hr | 8:00 |
| FRI | 5/12 | 8:00 | 5:00 | 1hr | 8:00 |
| SAT | | | | | |
| SUN | | | | | |

EMPLOYEES WORKING AT MORE THAN ONE COMPANY DURING THE WEEK (MONDAY - SUNDAY) MAY NOT EXCEED 40 HOURS EXCEPT WITH MULTI-STAFFING SERVICES PERMISSION. ARE YOU RETURNING ☐ Yes ☐ No

I UNDERSTAND THAT I AM TO CONTACT THE MULTI-STAFFING SERVICES OFFICE AFTER COMPLETING THIS ASSIGNMENT, AND IF I DO NOT DO SO, MULTI-STAFFING SERVICES MAY ASSUME THAT I AM NOT THEN AVAILABLE FOR WORK.
I CERTIFY THAT I HAVE WORKED THE HOURS LISTED ON THIS TIME SHEET.

I CERTIFY THAT I HAVE NOT BEEN INVOLVED IN AN ACCIDENT OR INJURY WHILE WORKING ON THIS ASSIGNMENT UNLESS NOTED IN THE COMMENTS.

I CERTIFY THAT I HAVE NOT WITNESSED ANY ACCIDENTS OR INJURIES THIS WEEK UNLESS NOTED IN THE COMMENTS.

EMPLOYEE SIGNATURE X *Tarsha Hunter*

COMMENTS:

TOTAL HOURS FOR WEEK TO NEAREST QUARTER HOUR
¼ HOUR MINIMUM PER DAY PER EMPLOYEE

CLIENT APPROVAL AGREEMENT
CLIENT AGREES THAT ITS UTILIZATION OF THE ABOVE-NAMED MULTI-STAFFING SERVICES EMPLOYEE HAS BEEN MADE AVAILABLE AS A RESULT OF THE TEMPORARY PERSONNEL SERVICE RENDERED BY MULTI-STAFFING SERVICES.

CLIENT CERTIFIES THAT THE ABOVE HOURS WORKED ARE CORRECT AND THAT ALL WORK WAS PERFORMED IN A SATISFACTORY MANNER. CLIENT'S SIGNATURE BELOW CONSTITUTES ACCEPTANCE OF THE TERMS AND CONDITIONS IDENTIFIED ON THE REVERSE OF THIS DOCUMENT.

CLIENT COMPANY NAME
*Mobis Alabama, LLC*

SUPERVISOR'S NAME
JAY KIM

CLIENT SIGNATURE X                         TITLE

MULTI-STAFFING SERVICES
P.O. BOX 160343
MOBILE, AL 36616-2343
FAX (251) 343-3815

Montgomery
FAX (334)271-3815

Gulfport
FAX (228)396-0002

Hattiesburg
FAX (601)544-0775

DO NOT WRITE BELOW THIS LINE
FOR ACCOUNTING USE ONLY

| TOTAL HOURS | PAY RATE | O.T. HOURS | BILLING HOURS | BILLING RATE |
|---|---|---|---|---|

HOME OFFICE COPY - WHITE    LEAVE W/CLIENT - CANARY    EMPLOYEE COPY - PINK

TOTAL P.001

*Mobis*

MAY-19-2006  16:38        MOBIS ALABAMA LLC                    334 387 4900    P.001/001

PLEASE CALL YOUR SERVICE REPRESENTATIVE AS SOON AS YOUR ASSIGNMENT ENDS.

# MULTI-STAFFING SERVICES    EMPLOYEE TIME SHEET

| WEEK ENDING | SOCIAL SECURITY NUMBER | EMP. # | EMPLOYEE LAST NAME | FIRST | MIDDLE |
|---|---|---|---|---|---|
| 5/21/06 | 421 21 19223 | | Hunter | Tarsha | Nickol |

| | DATE | TIME STARTED | TIME FINISHED | LESS LUNCH | HOURS WORKED |
|---|---|---|---|---|---|
| MON | 5/15 | 8:00 | 5:03 | 1 hr. | 8.05 |
| TUE | 5/16 | 8:06 | 5:06 | 1 hr. | 8.00 |
| WED | 5/17 | 8:10 | 5:08 | 1 hr. | 7.58 |
| THU | 5/18 | 8:00 | 5:08 | 1 hr. | 8.08 |
| FRI | 5/19 | 8:00 | 5:00 | 1 hr. | 8.00 |
| SAT | 5/20 | | | | |
| SUN | 5/21 | | | | |

EMPLOYEES WORKING AT MORE THAN ONE COMPANY DURING THE WEEK (MONDAY - SUNDAY) MAY NOT EXCEED 40 HOURS EXCEPT WITH MULTI-STAFFING SERVICES PERMISSION. ARE YOU RETURNING ☐ Yes ☐ No

I UNDERSTAND THAT I AM TO CONTACT THE MULTI-STAFFING SERVICES OFFICE AFTER COMPLETING THIS ASSIGNMENT, AND IF I DO NOT DO SO, MULTI-STAFFING SERVICES MAY ASSUME THAT I AM NOT THEN AVAILABLE FOR WORK.
I CERTIFY THAT I HAVE WORKED THE HOURS LISTED ON THIS TIME SHEET.

I CERTIFY THAT I HAVE NOT BEEN INVOLVED IN AN ACCIDENT OR INJURY WHILE WORKING ON THIS ASSIGNMENT UNLESS NOTED IN THE COMMENTS.

I CERTIFY THAT I HAVE NOT WITNESSED ANY ACCIDENTS OR INJURIES THIS WEEK UNLESS NOTED IN THE COMMENTS.

EMPLOYEE SIGNATURE X *Tarsha Hunter*

COMMENTS: *Wednesday 5/17 Car Problems.*

| TOTAL HOURS FOR WEEK TO NEAREST QUARTER HOUR 4 HOUR MINIMUM PER DAY PER EMPLOYEE | 39.71 |
|---|---|

CLIENT APPROVAL/AGREEMENT
CLIENT AGREES THAT ITS UTILIZATION OF THE ABOVE NAMED MULTI-STAFFING SERVICES EMPLOYEE HAS BEEN MADE AVAILABLE AS A RESULT OF THE TEMPORARY PERSONNEL SERVICE RENDERED BY MULTI-STAFFING SERVICES.

CLIENT CERTIFIES THAT THE ABOVE HOURS WORKED ARE CORRECT AND THAT ALL WORK WAS PERFORMED IN A SATISFACTORY MANNER. CLIENT'S SIGNATURE BELOW CONSTITUTES ACCEPTANCE OF THE TERMS AND CONDITIONS CONTAINED ON THE REVERSE OF THIS DOCUMENT.

CLIENT SIGNATURE X _____  TITLE *GL*

CLIENT COMPANY NAME *Mobis Alabama*
SUPERVISOR'S NAME *Sinedka*

DO NOT WRITE BELOW THIS LINE
FOR ACCOUNTING USE ONLY

| TOTAL HOURS | PAY RATE | O.T. HOURS | BILLING HOURS | BILLING RATE |
|---|---|---|---|---|
| | | | | |

MULTI-STAFFING SERVICES
P.O. BOX 160345
MOBILE, AL 36616-2343
Chattanooga FAX (423) 954-7104
Starkville FAX (228)388-0582
Montgomery FAX (334)271-3618
FAX (251) 343-3915
Hattiesburg FAX (601)544-4778

HOME OFFICE COPY - WHITE     LEAVE W/CLIENT - CANARY     EMPLOYEE COPY - PINK

TOTAL P.001

*mobis*

MAY-26-2006  15:58        MOBIS ALABAMA LLC                334 387 6900    P.001/001

PLEASE CALL YOUR SERVICE REPRESENTATIVE AS SOON AS YOUR ASSIGNMENT ENDS.

# MULTI-STAFFING SERVICES    EMPLOYEE TIME SHEET

| WEEK ENDING | SOCIAL SECURITY NUMBER | EMP. # | EMPLOYEE LAST NAME | FIRST | MIDDLE |
|---|---|---|---|---|---|
| 5/28/06 | 421-121-19223 | | HUNTER | TARSHA | N |

| | DATE | TIME STARTED | TIME FINISHED | LESS LUNCH | HOURS WORKED |
|---|---|---|---|---|---|
| MON | 5/22 | 7:55 | 5:05 | 30min | 8.40 |
| TUE | 5/23 | 7:08 | 5:06 | 1hr. | 8.0 |
| WED | 5/24 | 8:00 | 5:00 | 30min | 8.30 |
| THU | 5/25 | 8:00 | 5:00 | 1hr. | 8:00 |
| FRI | 5/26 | 8:02 | 5:00 | 1hr. | 7:58 |
| SAT | 5/27 | | | | |
| SUN | 5/28 | | | | |

EMPLOYEES WORKING AT MORE THAN ONE COMPANY DURING THE WEEK (MONDAY - SUNDAY) MAY NOT EXCEED 40 HOURS EXCEPT WITH MULTI-STAFFING SERVICES PERMISSION. ARE YOU RETURNING  ☐ Yes  ☐ No

I UNDERSTAND THAT I AM TO CONTACT THE MULTI-STAFFING SERVICES OFFICE AFTER COMPLETING THIS ASSIGNMENT, AND IF I DO NOT DO SO, MULTI-STAFFING SERVICES MAY ASSUME THAT I AM NOT THEN AVAILABLE FOR WORK.

I CERTIFY THAT I HAVE WORKED THE HOURS LISTED ON THIS TIME SHEET.

I CERTIFY THAT I HAVE NOT BEEN INVOLVED IN AN ACCIDENT OR INJURY WHILE WORKING ON THIS ASSIGNMENT UNLESS NOTED IN THE COMMENTS.

I CERTIFY THAT I HAVE NOT WITNESSED ANY ACCIDENTS OR INJURIES THIS WEEK UNLESS NOTED IN THE COMMENTS.

EMPLOYEE SIGNATURE x _Tarsha Hunter_

COMMENTS

| TOTAL HOURS FOR WEEK TO NEAREST QUARTER HOUR 4 HOUR MINIMUM PER DAY PER EMPLOYEE | 40.86 |
|---|---|

CLIENT APPROVAL/AGREEMENT
CLIENT AGREES THAT ITS UTILIZATION OF THE ABOVE NAMED MULTI-STAFFING SERVICES EMPLOYEE HAS BEEN MADE AVAILABLE AS A RESULT OF THE TEMPORARY PERSONNEL SERVICE RENDERED BY MULTI-STAFFING SERVICES.

CLIENT CERTIFIES THAT THE ABOVE HOURS WORKED ARE CORRECT AND THAT ALL WORK WAS PERFORMED IN A SATISFACTORY MANNER. CLIENT'S SIGNATURE BELOW CONSTITUTES ACCEPTANCE OF THE TERMS AND CONDITIONS IDENTIFIED ON THE REVERSE OF THE DOCUMENT.

CLIENT SIGNATURE                    TITLE
x                                    OTO

CLIENT COMPANY NAME:
Mobis (Alabama) LLC

SUPERVISOR'S NAME
Jay Kim

DO NOT WRITE BELOW THIS LINE
FOR ACCOUNTING USE ONLY

| TOTAL HOURS | PAY RATE | O.T. HOURS | BILLING HOURS | BILLING RATE |
|---|---|---|---|---|
| | | | | |

MULTI-STAFFING SERVICES
P.O. BOX 160343
MOBILE, AL 36616-2343
FAX (251) 343-3815

Chattanooga
FAX (423) 855-1164

Montgomery
FAX (334)271-3815

Dothan
FAX (228)586-0082

Hattiesburg
FAX (601)544-0773

HOME OFFICE COPY - WHITE    LEAVE W/CLIENT - CANARY    EMPLOYEE COPY - PINK

TOTAL P.001
40.36

MAR-28-2008  10:10     MOBIS                                         P.014

JUN-02-2006  16:19         MOBIS ALABAMA LLC                  334 387 4900    P.001/001

PLEASE CALL YOUR SERVICE REPRESENTATIVE AS SOON AS YOUR ASSIGNMENT ENDS.

# MULTI-STAFFING SERVICES    EMPLOYEE TIME SHEET

| WEEK ENDING | SOCIAL SECURITY NUMBER | EMP. # | EMPLOYEE LAST NAME | FIRST | MIDDLE |
|---|---|---|---|---|---|
| 06/04/06 | 421 21 A223 | | Hunter | Tarsha | Nickol |

| | DATE | TIME STARTED | TIME FINISHED | LESS LUNCH | HOURS WORKED | |
|---|---|---|---|---|---|---|
| MON | 5/29 | Holiday | | | | EMPLOYEES WORKING AT MORE THAN ONE COMPANY DURING THE WEEK (MONDAY - SUNDAY) MAY NOT EXCEED 40 HOURS EXCEPT WITH MULTI-STAFFING SERVICES PERMISSION. ARE YOU RETURNING ☐Yes ☐No |
| TUE | 5/30 | 8:03 | 5:00 | 1 hr | 7:57 | I UNDERSTAND THAT I AM TO CONTACT THE MULTI-STAFFING SERVICES OFFICE AFTER COMPLETING THIS ASSIGNMENT, AND IF I DO NOT DO SO MULTI-STAFFING SERVICES MAY ASSUME THAT I AM NOT THEN AVAILABLE FOR WORK. |
| WED | 5/31 | 8:00 | 5:15 | 1 hr. | 8.15 | I CERTIFY THAT I HAVE WORKED THE HOURS LISTED ON THIS TIME SHEET. |
| THU | 6/1 | 8:00 | 5:15 | 1 hr | 8.15 | I CERTIFY THAT I HAVE NOT BEEN INVOLVED IN AN ACCIDENT OR INJURY WHILE WORKING ON THIS ASSIGNMENT UNLESS NOTED IN THE COMMENTS. |
| FRI | 6/2 | 7:55 | 5:00 | 1 hr | 8.00 | I CERTIFY THAT I HAVE NOT WITNESSED ANY ACCIDENTS OR INJURIES THIS WEEK UNLESS NOTED IN THE COMMENTS. |
| SAT | 6/3 | | | | | EMPLOYEE SIGNATURE X  *Tarsha Hunter* |
| SUN | 6/4 | | | | | COMMENTS: |

TOTAL HOURS FOR WEEK TO NEAREST QUARTER HOUR
4 HOUR MINIMUM PER DAY PER EMPLOYEE          **31.87**

CLIENT APPROVAL AGREEMENT
CLIENT AGREES THAT ITS UTILIZATION OF THE ABOVE-NAMED MULTI-STAFFING SERVICES EMPLOYEE HAS BEEN MADE AVAILABLE AS A RESULT OF THE TEMPORARY PERSONNEL SERVICE RENDERED BY MULTI-STAFFING SERVICES.

CLIENT CERTIFIES THAT THE ABOVE HOURS WORKED ARE CORRECT AND THAT ALL WORK WAS PERFORMED IN A SATISFACTORY MANNER. CLIENT'S SIGNATURE BELOW CONSTITUTES ACCEPTANCE OF THE TERMS AND CONDITIONS CONTAINED ON THE REVERSE OF THIS DOCUMENT.

CLIENT COMPANY NAME:  *Mobis Alabama, LLC*
SUPERVISOR'S NAME  *Tai Kim*

CLIENT SIGNATURE                    TITLE  *GM*

MULTI-STAFFING SERVICES
P.O. BOX 160343
MOBILE, AL 36616-2343
FAX (251) 343-3815

Chattanooga
FAX (423) 894-8194
Montgomery
FAX (334) 271-3615

Gulfport
FAX (228) 896-0052

Hattiesburg
FAX (601) 544-7775

DO NOT WRITE BELOW THIS LINE
FOR ACCOUNTING USE ONLY

| TOTAL HOURS | PAY RATE | O.T. HOURS | BILLING HOURS | BILLING RATE |
|---|---|---|---|---|
| | | | | |

HOME OFFICE COPY - WHITE     LEAVE W/CLIENT - CANARY     EMPLOYEE COPY - PINK

TOTAL P.001  *md*

TOTAL P.014

# EXHIBIT 3
# TRACY RIEDLER
# AFFIDAVIT



## MOBIS Alabama, LLC

### ORIENTATION (PROBATIONARY) PERIOD
### POLICY AND PROCEDURES

1. **PURPOSE**

   1.1    It is our policy at MOBIS Alabama, LLC (MOBIS), to help all new Team Members feel a part of our company as quickly as possible and to help them learn more about MOBIS and what we expect from them as a member of our organization. If at any point during the first 90 days of employment, it becomes obvious that continued employment is pointless, the supervisor should recommend termination proceedings. Due to Alabama being an "employment at will" State, an employer can terminate with or without cause at any time. Ninety (90) days is an acceptable amount of time to be able to fairly evaluate a person's performance.

2. **POLICY**

   2.1    The first ninety (90) days of employment are considered an orientation period. This is a critical period in a Team Member's development and success with MOBIS. The orientation period is a trial period during which the supervisor will determine whether the Team Member has proved that he or she can handle their job satisfactorily.

   2.2    There is no reason for the supervisor to endure 90 days of unsatisfactory progress on a new hire. At any point during the 90 days, if it becomes obvious that continued employment is pointless, the supervisor should recommend termination proceedings.

   2.3    Before the end of the Team Member's orientation period, the HR Department will send the supervisor a Performance Review Sheet, on which the supervisor will indicate the Team Member status.

   2.4    During this orientation period, any Team Member's who have three (3) absenteeism occurrences will be terminated. The occurrences can include a tardy, early out, and/or an all day absence. (03/21/05)

Effective Date:    07/20/04, 01/04/05, 03/21/05, 04/24/06
Revision Number:   1, 2, 3, 4
Policy:           Orientation (Probationary) Period



## MOBIS Alabama, LLC

### ORIENTATION (PROBATIONARY) PERIOD
### POLICY AND PROCEDURES

3.  **PROCEDURE**

    3.1   The Supervisor must complete the Performance Review Sheet and return it to the HR Department prior to the end of the 90-Day Orientation Period.

    3.2   This procedure does not alter the employment-at-will relationship. A Team Member can terminate his or her employment at any time with or without reason, and MOBIS has the same right.

Effective Date:    07/20/04, 01/04/05, 03/21/05, 04/24/06
Revision Number:  1, 2, 3, 4
Policy:                  Orientation (Probationary) Period

# EXHIBIT 4
# TRACY RIEDLER
# AFFIDAVIT



## MOBIS Alabama, LLC

### EMPLOYEE HANDBOOK ACKNOWLEDGEMENT

The employee handbook describes important information about MOBIS Alabama, LLC, and I understand that I should consult my supervisor or the Human Resources Department regarding any questions or clarifications about the handbook.

My employment with MOBIS is "at will." I may voluntarily leave employment, and may be terminated by MOBIS at any time, and for any reason permitted by law. The contents of this Handbook are not intended to establish a contract or bind the company or the employee to any enforceable relationship. Any verbal or written statements or promises to the contrary are hereby null and void and should not be relied upon by any prospective or existing employees.

Since the information, policies, rules and benefits described here are necessarily subject to change, I understand that revisions to the handbook may occur. All such changes will be communicated through official notices, and I understand that revised information may supersede, modify, or eliminate existing policies. Only the Senior Manager of Human Resources has the right to adopt any revisions to the policies in this handbook.

Furthermore, I acknowledge that this handbook is neither a contract of employment nor a legal document. I have received the handbook, and I understand that it is my responsibility to read and comply with the policies contained in this handbook and any revisions made to it. A copy of this ACKNOWLEDGEMENT FORM will be placed in my personnel file.

Also, I acknowledge that this handbook is the property of MOBIS and that the handbook must be returned upon my termination.

Your signature below indicates that you have agreed to abide by MOBIS' Policies and Procedures.

Employee Name (Please Print)    *Tarsha Nickol Hunter*

Employee Signature    *Tarsha N. Hunter*

SSN    *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*

Date    *June 5, 2006*

Effective Date:    10/04/04
Revision Number:    1
Policy:    Employee Handbook Acknowledgement

HUNTER V. MOBIS
00138

# EXHIBIT

# D

Deposition of TRACY RIEDLER
January 31, 2008

Page 38

1      Q.   Has anyone come to human resources

2   or their supervisor and complained about

3   pregnancy discrimination but not gone to the

4   EEOC?

5      A.   Not that I can recall.

6      Q.   What was the nature of Ms. Gordon's

7   complaint?

8      A.   Her complaint, she said that she

9   was terminated because she was pregnant.

10     Q.   When was she terminated?

11     A.   Oh, gosh.  I can't recall.

12     Q.   Was it sometime in early 2006?

13     A.   Oh, no.  I would say hers was more

14  recent.  My guess would be 2007.

15     Q.   Why was she terminated?

16     A.   Job performance.

17     Q.   Who made the decision to terminate

18  her?

19     A.   She had numerous problems with

20  making connections to the passenger air bag,

21  which is a huge safety issue in what we do.

22  That's part of the cockpit module assembly.

23  And she also -- when she -- she was an

24  assembler.  And when she was assembling her

25  parts that she was responsible for, she was --

Deposition of TRACY RIEDLER
January 31, 2008

Page 39

1    she actually dealt with wire harnesses, and

2    she was pulling wire harnesses with too much

3    force when you have to be very delicate with

4    them and was snapping them, which would also

5    cause breakage that wouldn't be found until

6    the car was on the lot.

7            This was something that she was

8    warned multiple times for the same issue.

9        Q.   Who made the determination to

10   terminate?

11       A.   Her supervisor -- or excuse me.

12   The production manager wrote her up a number

13   of times.  And then I am the final approval

14   for all terminations.

15           So it was the manager that did make

16   the decision, and then, of course, I have to

17   review that before that happens.

18       Q.   So the decision to terminate

19   Ms. Gordon was recommended by her production

20   manager and you approved the decision?

21       A.   And I approved that.  Uh-huh.

22       Q.   How far along in Ms. Gordon's

23   pregnancy was she at the time that she was

24   terminated?

25       A.   I can't be sure about that.  I

Deposition of TRACY RIEDLER
January 31, 2008

Page 41

1    been any kind of correspondence at all for

2    almost a year, I think.

3        Q.  In looking at the court

4    documents -- and you can correct me if I'm

5    wrong -- it appears that her attorney has

6    withdrawn?

7        A.  I think there hasn't been any

8    interaction from -- between the two of them.

9    So it kind of seems to be in -- what's the

10   word for it -- like hibernation, for lack of a

11   better word.

12       Q.  Not a problem.  Did you give a

13   deposition in Ms. Gordon's case?

14       A.  No.

15       Q.  Ms. Jefferson's EEOC charge, what

16   was her complaint?

17       A.  Denial of FMLA leave.

18       Q.  Specifically, was she seeking leave

19   and it was not approved?

20       A.  She was seeking leave.  She

21   actually wanted to go out on leave prior to

22   becoming eligible.  And then once she became

23   eligible, of course there are a number of

24   forms that a physician -- she needs to get a

25   physician's certification, and she did not

Deposition of TRACY RIEDLER
January 31, 2008

Page 42

1   have any documentation from a physician

2   stating that she needed to be out at that

3   time.

4        Q.   All right.

5        A.   So they did -- they did not

6   actually -- the doctor I'm referring to did

7   not put her out on medical leave.

8        Q.   How far along in her pregnancy was

9   she when she was terminated?

10       A.   Six months.

11       Q.   Who made the decision to terminate

12   her?

13       A.   She actually was not terminated.

14  She ultimately just ran out of time due to

15  absenteeism because she never returned to

16  work, never produced the documentation that we

17  had requested multiple times.

18            And so the point system -- and

19  again, she was an hourly employee.  So the

20  point system is, if you are out -- absent one

21  day, then you get a point for each day that

22  you're out.  And she reached the maximum.  So

23  it's an automatic termination.  But that

24  would -- that would ultimately be myself.

25       Q.   Is her lawsuit still pending?

Deposition of TRACY RIEDLER
January 31, 2008

Page 112

1    person.  And she sent the cover letter,

2    prepared and sent the cover letter to

3    Ms. Hunter.

4           Q.  And you said that the information

5    contained on this document came from Mr. Kim

6    as reported to the human resources department?

7           A.  We will report the reason why a

8    person is let go.

9           Q.  And I apologize if I ask this

10   again -- if I'm being repetitive.  I think

11   I've asked this, but I need to make sure.

12           Do you have any personal knowledge

13   of Tarsha Hunter's attendance during the time

14   she was a full-time employee with Mobis?

15           A.  No, not prior -- just prior to her

16   termination only.

17           Q.  When you say just prior to her

18   termination only, at what period in time are

19   you talking about?

20           A.  Roughly, I'd say about a week

21   earlier.

22           Q.  So a week prior to her termination

23   what happened?

24           A.  Mr. Kim had her ninety-day

25   performance review.  And he had received it

Deposition of TRACY RIEDLER
January 31, 2008

Page 115

1           MR. BARNETT:  Objection.  No time

2   frame.

3           Q.  Prior to August 26, 2006, have you

4   told me everything you can recall Mr. Kim

5   discussing with you regarding Ms. Hunter's

6   attendance?

7           A.  That's correct.  That's the only

8   thing I can think of.

9           Q.  And you trusted that the attendance

10  record Mr. Kim showed you was truthful and

11  accurate, correct?

12          A.  Yes.

13          Q.  So in making your decision, you

14  relied on Mr. Kim's representations?

15          A.  Yes.

16          Q.  At the time that Mr. Kim presented

17  you with Plaintiff's Exhibit 2, were you aware

18  that Ms. Hunter was pregnant?

19          A.  My recollection is that I found out

20  a day or two before she was terminated.  So at

21  this time, when we were discussing this, no.

22          Q.  How did you find out she was

23  pregnant?

24          A.  From Sonechka.

25          Q.  What did Sonechka tell you?

Deposition of TRACY RIEDLER
January 31, 2008

Page 116

1      A.   Sonechka was upset that she was not

2   going to be able to keep Tarsha.  And she came

3   to my office and she basically was stating

4   that she wanted -- did want to keep her and --

5   and she was crying.  And she said that Tarsha

6   was pregnant.

7           And, you know, I told her I was

8   sorry, but unfortunately we had to actually --

9   we have to be consistent.  We have to stick to

10  our policies and everything to be fair to

11  everyone else.

12      Q.   Did Ms. Womack share with you or

13  say to you anything along the lines that

14  Ms. Hunter's pregnancy may have been affecting

15  the decision to terminate her?

16      A.   I don't recall anything like that,

17  no.

18      Q.   If she had said something like

19  that, would you have remembered it?

20      A.   I just can't remember in detail

21  what -- our conversation was not long.  I just

22  remember her being visibly upset that she did

23  want to keep her.

24      Q.   If it's her testimony tomorrow that

25  she discussed with you that she felt that

Deposition of TRACY RIEDLER
January 31, 2008

Page 117

1  Ms. Hunter was being terminated because of her

2  pregnancy, would you have any reason to

3  disagree with her testimony?

4      A.  I think that I would actually

5  remember if that occurred.  So I would have

6  reasonable belief to doubt if she were to

7  actually say that.

8      Q.  At the time that Ms. Womack told

9  you that Ms. Hunter was pregnant, did it raise

10  any concerns in your mind that maybe you

11  should investigate whether Ms. Hunter's

12  pregnancy was motivating her termination?

13      A.  No.

14      Q.  Did you take any steps to

15  investigate whether Ms. Hunter's pregnancy had

16  influenced Mr. Kim's decision to terminate

17  her?

18      A.  No.

19      Q.  There's another document I want to

20  you flip to in that big stack.  It's document

21  179.  I'm going to give you a sticky to put on

22  it.  We're going to mark that as Plaintiff's

23  Exhibit 4.

24      A.  179?

25      Q.  Yes, ma'am.  We're going to mark

Deposition of TRACY RIEDLER
January 31, 2008

Page 122

1   think about whether those e-mails constituted

2   discipline.  Is that because you're not sure

3   the e-mails are clear that they're

4   disciplinary actions?

5           A.   No.   I was actually just in my own

6   mind -- earlier you were talking about what I

7   consider discipline and what I don't.  So I

8   was just thinking about warnings or

9   nonwarnings.

10          Q.   Did any of the e-mails to

11  Ms. Hunter inform her that those e-mails

12  constitute disciplinary action?

13          A.   In that exact word, disciplinary

14  action, I'd have to look at them again.  But I

15  don't know.

16          Q.   All right.  Who made the decision

17  to terminate Ms. Hunter?

18          A.   Myself.

19          Q.   Anyone else?

20          A.   After my conversation with Mr. Kim

21  regarding her attendance during the ninety-day

22  probationary period, I was the one that

23  informed him that we could no longer employ

24  her based on the ninety-day policy.

25          Q.   On what date was the decision to

Deposition of TRACY RIEDLER
January 31, 2008

Page 123

1    terminate Ms. Hunter made?

2        A.   I could not be exact, but roughly a

3    week before her termination date.

4        Q.   So if her termination date was

5    August 25th, then we're looking somewhere

6    around August 18th?

7        A.   Perhaps, yes.

8        MR. BARNETT:  You're entitled to

9    look at any document you want to.

10       Q.   That's why all the documents are

11   here.

12       A.   Yeah, I know.  I know.  But my

13   recollection --

14       MR. BARNETT:  Don't guess.  Don't

15   guess.  Look at the document.

16       Q.   I promise you, Henry will put

17   documents in front of you at trial.  I don't

18   want to be surprised.

19       A.   But my recollection is a week prior

20   anyway.  I'm not sure there's a document that

21   actually will clear that date up for me.

22       Q.   Okay.

23       MR. BARNETT:  Look.  Let me just

24   ask you to look at the documents then.

25       THE WITNESS:  Which document would

Deposition of TRACY RIEDLER
January 31, 2008

Page 127

1    Q.  Give me each and every reason that
2  Ms. Hunter was fired.
3    A.  Attendance as I know it.
4    Q.  Any other reason?
5    A.  No.
6    Q.  Identify each and every attendance
7  incident or occurrence which was considered in
8  terminating Ms. Hunter.
9    A.  Being absent three times and having
10  doctor's appointments which would consist of
11  either coming in to work late or leaving
12  before the shift was over four times.
13    Q.  I notice you're looking at Exhibit
14  Number 4 in answering this question.
15    Are you saying that the dates that
16  are reflected on the bottom of Number 4 are
17  the attendance dates that were used to justify
18  terminating Ms. Hunter?
19    A.  That's correct.
20    Q.  What policy or policies did
21  Ms. Hunter violate that led to her
22  termination?
23    A.  The ninety-day policy in that a
24  person is only able to have three -- actually,
25  only able to have two occurrences.  On the

Deposition of TRACY RIEDLER
January 31, 2008

Page 159

1    meeting before you became present there?

2         A.   Okay.  I was in my office, and Ho

3    Sang Hwang who at the time was an assistant

4    manager -- excuse me, he was accounting

5    manager in the department.  And he came down

6    to my office and he said, Please come to Jay's

7    office.  He needs your help

8              I said, What's going on?

9              Ho Sang said that Tarsha and

10   Sonechka were in his office and the meeting

11   was getting rather loud and he needed my help.

12        Q.   Okay.

13        A.   So I went down to Jay's office

14   immediately.  And the three of them were in

15   the meeting.

16             And when I first walked in, I

17   believe Tarsha was actually talking.  I cannot

18   remember exactly what she was saying, but, you

19   know, basically I said, you know, What's going

20   on?  I had no idea a meeting was going on.

21             And I think that Tarsha said, Jay

22   is terminating me but he won't give me a

23   reason why.

24             So I said, Well, I'm sorry,

25   Tarsha.  I actually -- during your ninety-day

# EXHIBIT

# E

Page 21

1  conversations with her about whether she

2  should tell Mr. Kim at that time that she was

3  pregnant?

4       A.  Well, she told me that she

5  wasn't -- I guess she may have spoken with

6  someone else.

7       Q.  Right.

8       A.  And she told me she wasn't going to

9  tell.  So she didn't want me to say anything.

10      Q.  Were you aware of any situations of

11  pregnant employees losing their job at Mobis

12  prior to Ms. Hunter telling you she was

13  pregnant?

14      A.  I had heard -- I don't know

15  specifically, but I just kind of heard, like,

16  rumors or whatever that other people had

17  been -- and I'm not saying it was because of

18  being pregnant, but it just so happened the

19  person was pregnant.

20      Q.  Did you and Ms. Hunter discuss any

21  of the rumors relating to employees who had

22  been pregnant who had lost their job?

23      A.  I don't recall.

24      Q.  Did Ms. Hunter ever talk with you

25  that she had considered terminating her

Deposition of SONECHKA L. WOMACK
February 1, 2008

Page 36

1    reason.

2         Q.   Were you present in the meeting

3    where Ms. Hunter was terminated?

4         A.   Yes.

5         Q.   Tell me what you recall about that

6    meeting.

7         A.   I think Tracy, Jay and I and Tarsha

8    was in the meeting.

9         Q.   Okay.  And tell me what you recall

10   happening.  I appreciate that it was almost

11   two years ago.  So I'm not going to expect you

12   to reenact the meeting.  But just tell us what

13   you can recall.

14        A.   Just that she was being terminated.

15        Q.   Did -- I'm sorry.  You go ahead.

16        A.   Go ahead.

17        Q.   Don't let me interrupt you.

18        A.   That was pretty much it.

19        Q.   Did he give her a reason as to why

20   she was being terminated?

21        A.   It had to have been because of the

22   tardies, because that's what he kept telling

23   me, because of the absentees and the tardies

24   and things.

25        Q.   Do you recall in that meeting

Deposition of SONECHKA L. WOMACK
February 1, 2008

Page 37

1    Mr. Kim saying anything to Ms. Hunter along

2    the lines of, I can't take care of a person

3    like you?

4          A.   I can't remember that, but -- I

5    could hear -- I mean, I can hear it -- I mean,

6    you know, I can imagine it being said.

7          Q.   How long after Ms. Hunter was fired

8    did someone come in to replace her, if you

9    remember?

10         A.   I'm not sure.  It wasn't -- I don't

11   think it was a long period.

12         Q.   Okay.

13         A.   I don't think.

14         Q.   Do you remember an employee named

15   Latoya Williams?

16         A.   Yes.

17         Q.   What job did Ms. Williams do?

18         A.   I think she was clerk, accounting

19   clerk, temporary.

20         Q.   Did she work under you or Mr. Hwang

21   or someone else?

22         A.   Supposedly me.

23         Q.   Okay.  And she came to you guys

24   through Multi-Staffing, correct?

25         A.   Yes.

Deposition of SONECHKA L. WOMACK
February 1, 2008

Page 43

1    time in the morning?

2         A.   8:00 o'clock.

3         Q.   Now, I'm just going to ask you to

4    look at this.  You can pay it as much

5    attention as you want to or as little.

6         But do you have any reason to

7    believe that she was absent, tardy, or late

8    significantly less times or fewer times than

9    is shown on Defendant's 9?  I think there are

10   one, two, three, four, five -- seventeen

11   incidents on here.

12        A.   That may be correct.

13        THE COURT REPORTER:  I'm sorry?

14   That may be --

15        THE WITNESS:  That may be correct.

16        Q.   Nothing jumps out at you as being

17   substantially overstated or understated?

18        A.   That looks correct.

19        Q.   What did -- how did Mr. Kim

20   communicate to you his decision to go ahead

21   and give her a ninety-day probationary period?

22        A.   I think he called us both -- we

23   discussed it, and then he called us, me and

24   Tarsha, in his office and stated that he

25   was -- she was on probation but, you know,

Deposition of SONECHKA L. WOMACK
February 1, 2008

Page 44

1    please don't -- he didn't want her to be out

2    and tardy.

3        Q.  Did he say, you know, something to

4    the effect that you're going to be

5    probationary now, but your attendance needs to

6    improve?

7        A.  Right.

8        Q.  Did you tell Tarsha the same thing?

9        A.  Yes.

10       Q.  Do you remember a young lady named

11   Su Jin Lee?

12       A.  Yes.

13       Q.  Are you aware that she was pregnant

14   when she was hired?

15       A.  Not when she -- not when she first

16   started.

17       Q.  How did you find out she was

18   pregnant?

19       A.  She told me.

20       Q.  Did she tell you how far along she

21   was?

22       A.  She may have been -- just been --

23   kind of just found out she was pregnant.

24       Q.  When she was hired?

25       A.  Not when she was hired, but --

Deposition of SONECHKA L. WOMACK
February 1, 2008

Page 45

1        Q.   When she told you?

2        A.   Right.

3        Q.   Did you ever observe Mr. Kim

4   mistreat her or treat her differently because

5   she was pregnant in an adverse way -- in a

6   negative way?

7        A.   No.  Maybe just -- no.

8        Q.   How many subordinates did you have

9   reporting to you at the time Ms. Hunter was

10  there?

11       A.   Ms. Hunter and Su Jin.  Was

12  Latoya -- I know for sure Tarsha and Su Jin.

13       Q.   When Ms. Hunter told you she had

14  become pregnant, did y'all discuss whether she

15  had intended that pregnancy, whether or not it

16  was planned?

17       A.   I don't think it was planned.

18       Q.   Do you remember a lady named Alecia

19  Gardener?

20       A.   Yes.

21       Q.   Did she work in IT?

22       A.   Yes.

23       Q.   Was Dennis Choi her supervisor?

24       A.   Yes.

25       Q.   Do you know whether she became --

Deposition of SONECHKA L. WOMACK
February 1, 2008

Page 47

1    that you took with you?

2        A.   No.

3        Q.   Did you leave any notes there about

4    her that you know about, other than these

5    forms like Exhibit 15, Plaintiff's Exhibit

6    15?  If you did those.  I'm not saying you

7    did.

8        A.   I know I didn't do those, but

9    maybe, like, other little request sheets.  I

10   know I had a file.

11       Q.   Do you recall that Mr. Kim used the

12   phrase take care of a person?

13       A.   Yes.

14       Q.   Was it something that he said on

15   several occasions?

16       A.   Yes.

17       Q.   Did you understand what -- did you

18   have an understanding of what he meant by

19   taking care of a person?

20       A.   Some -- yes.

21       Q.   What did you think he meant?

22       A.   Just their work.  That's how I

23   interpreted it, even though it sounds like

24   baby-sitting or -- you know, but work wise.

25       Q.   Did Ms. Hunter share with you any

Deposition of SONECHKA L. WOMACK
February 1, 2008

Page 53

1      A.  Well, other than that, uh-huh.
2  Everyone was permanent.
3      Q.  Do you know what prompted Mr. Kim
4  to send this e-mail to his staff?  Well, it
5  now says, To all of staff.
6          So do you know what prompted him to
7  send this e-mail?
8      A.  Probably because someone may have
9  been tardy or something.
10      Q.  Is it fair to say that Mr. Kim was
11  a stickler about attendance?
12      A.  Yes.
13      Q.  And about arriving at work on time?
14      A.  Yes.
15      Q.  Now, it looks to me as though you
16  sent or forwarded this e-mail to Tarsha Hunter
17  with a copy to Jay Kim on or about August
18  10th, '06.  Do you see that?
19      A.  Yes.
20      Q.  Do you remember why you forwarded
21  that e-mail to her?  That would be several
22  weeks later after Jay sent it out.
23      A.  Do you mean this May the -- May
24  9th?
25      Q.  It's hard for me to tell.  It looks

Deposition of SONECHKA L. WOMACK
February 1, 2008

Page 54

1  like you may have sent it to her on May 9th

2  and then again on August 10th.  I'm just

3  asking you.

4          A.  Oh, okay.

5          Q.  Read what you say right here.

6          A.  As cited from the below e-mail,

7  please submit a schedule of time that you'll

8  be able to make up for your absences.  We

9  completely understand your current health

10  condition, but this policy has been set for us

11  to comply with.  You've been away from the

12  office numerous times.  This is not to

13  discourage you.  This is just to keep fairness

14  throughout this department.

15          Q.  Right.  Now, does that give you

16  any -- does that refresh your recollection as

17  to whether you forwarded this -- pages 76 and

18  77 -- 176 and 177 to Tarsha Hunter on August

19  10th?

20          A.  Yes.

21          Q.  Look below that.  On May 9th, it

22  looks like you forwarded something without any

23  comment.

24          A.  Uh-huh.

25          Q.  Do you know what you were

Deposition of SONECHKA L. WOMACK
February 1, 2008

Page 55

1   forwarding to her at that point in time?  What

2   I'm trying to find out is whether you may have

3   forwarded that memorandum to her on two

4   occasions.

5           A.  Yes.  I think this one may have

6   been -- Jay may have wanted me to send it --

7           Q.  This one being?

8           A.  In May, because I don't know when

9   she became a permanent employee.

10          Q.  She became permanent on or about

11  June the 5th.

12          A.  Okay.  He may have told me to

13  submit that to her.

14          Q.  Let me show you Exhibit 19 -- once

15  again, Defendant's Exhibit 19 from a prior

16  deposition.

17              Did you recall sending this e-mail

18  to Tarsha on or about August 14th?

19          A.  Yes.

20          Q.  When you say there had been quite a

21  few instances that Jay has excused, what were

22  you referring to?

23          A.  Being tardy.

24          Q.  Did you feel that considering --

25  well, you stated here that I feel that he,

# EXHIBIT

# F

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

TARSHA NICKOL HUNTER,           )
                                )
        Plaintiff,              )
                                )       Civil Action No.: 2:07-CV-427-WHA
vs.                             )
                                )
MOBIS ALABAMA, LLC,             )
                                )
        Defendant.              )

## SUPPLEMENTAL AFFIDAVIT OF JAEKWANG (JAY) KIM

STAT E OF ALABAMA    )

COUNTY OF ELMORE    )

      **BEFORE ME,** the undersigned authority, personally appeared Jaekwang (Jay) Kim who, after being first duly sworn, states as follows:

      My name is Jaekwang (Jay) Kim. I am over the age of eighteen (18) years and have first-hand knowledge of the contents of this affidavit. I reside in Montgomery, Alabama, with my wife and two (2) children. I am a native of Korea.

      1.    I have been employed by MOBIS Alabama, LLC ("MOBIS") as its Chief Financial Officer ("CFO") since February 10, 2003. My duties as MOBIS' CFO include overall responsibility for the Accounting Department. Before that I was employed by MOBIS, or affiliates of MOBIS, in Korea, for a total of twenty (20) years.

      2.    I have been asked to supplement my affidavit in support of MOBIS' Motion for Summary Judgment to cover new issues, or clarify ones addressed before, in response to Plaintiff's Opposition Brief.

1

3.      I knew that MOBIS had an attendance policy when I first met with Ms. Riedler about Plaintiff's attendance issues about one week before Plaintiff was terminated, but I did not know that it stated that a probationary employee had to be terminated after three (3) occurrences. I thought the standard was flexible.

4. I had consulted Ms. Riedler in person on other occasions in the past when I was not sure of company human resources policies.

5. I reluctantly agreed to offer Plaintiff probationary employment because Ms. Womack felt strongly that she needed her. I did not want Plaintiff in my department because her attendance was so poor during her temporary period, but I did not want to burden Ms. Womack with more work and having to train a new employee.

6. I was never optimistic that Plaintiff's attendance would improve enough during her probation that she would become a regular employee, but agreed with Ms. Womack to give Plaintiff a chance.

7. I have attached a chart showing the attendance records of my current staff in Accounting during their probationary periods (See attached Ex. 1).

Executed on May _9th_, 2008.

_____
JAEKWANG (JAY) KIM

Sworn to and subscribed before me on this the _9__ day of May, 2008 .

_____
Notary Public
My Commission Expires:

NOTARY PUBLIC STATE OF ALABAMA AT LARGE
MY COMMISSION EXPIRES: Oct 13, 2010
BONDED THRU NOTARY PUBLIC UNDERWRITERS

[SEAL]

2

# EXHIBIT
# 1

# SUPPLEMENTAL AFFIDAVIT OF JAEKWANT (JAY) KIM

**ACCOUNTING AND FINANCE DEPARTMENT**
**ABSENTEEISM RECORD DURING 90 DAY PROBATION**

| Last Name | First Name | Start Date | End of 90 Day Probation | Date of Absence,Tardy, E/O | Reason for Absence,Tardy, E/O | Length of time out |
|---|---|---|---|---|---|---|
| Perez | Stephanie | 2/14/2005 | 5/14/2005 | None | | |
| Owens | Madeline | 10/2/2006 | 1/2/2007 | None | | |
| Ismail | Rebecca | 12/11/2006 | 3/11/2007 | None | | |
| Kim | Sogong | 2/12/2007 | 5/12/2007 | 03/27/2007 | Doctor for daughter | 2.5 |
| | | | | 04/19/2007 | Home Repair | 0.83 |
| Robertson | Sacouya | 7/16/2007 | 10/15/2007 | None | | |
| Hillary | Darrius | 1/22/2008 | 4/22/2008 | 1/30/2008 | Illness | 8 |
| | | | | 1/31/2008 | Illness | 8 |
| Allesandro | McCray | 3/24/2008 | 6/22/2008 | None | | |

# EXHIBIT

# G

sonechka.womack@mobis-america.com

**From:** Jay Kim [jay.kim@mobis-america.com]
**Sent:** Wednesday, July 26, 2006 8:25 AM
**To:** 'Tarsha Hunter'
**Cc:** sonechka.womack@mobis-america.com
**Subject:** Notification (July 26,2006)
**Importance:** High

Tarsha,

This is a notification for tardiness.
On Wednesday the 26th you were noted as being tardy, this was not a first time during 90-day probationary.
I need for you to keep the starting time for business, everyday.

When you return from doctor's office, please submit the doctor's note and schedule for make-up time.
In addition, you are reminded that you are still serving out your probationary period and that attendance is very important.
Please make every effort to correct these deficiencies as your long term employment may be in jeopardy.

Thanks.

*Jay K. (Jae-kwang) Kim / CFO*

MOBIS Alabama,LLC.
1395 Mitchell Young Road,
Montgomery, AL 36108

Tel : 334-387-4802
Fax : 334-387-4900
E-mail : *jay.kim@mobis-america.com*



DEFENDANT'S
EXHIBIT
160

7/26/2006

HUNTER V. MOBIS
00172

# EXHIBIT

# H

sonechka.womack@mobis-america.com

**From:** sonechka.womack@mobis-america.com
**Sent:** Wednesday, August 02, 2006 10:35 AM
**To:** 'Tarsha Hunter'
**Cc:** 'Jay Kim'
**Subject:** Invoices/Statements, etc.

Hello Tarsha,

Please remember to make sure that all invoices are entered into SAP on the day received. It is very important that the invoices are entered and then distributed to the responsible person in a timely manner. There is a small timeframe that the responsible person has to complete their task and return the invoice to our department for payment. The President holds each person liable if the invoice is not processed on time. If they receive the invoice late, they will report to it Jay and the President that accounting did not give it to them on time.

I understand that sometimes you will run into some problems, but please try to have the invoices entered everyday before you leave. Let me know if you run into any problems.

Also, regarding statements from vendors, please review the statement to see if the invoices listed have been paid/accounting document generated/received by MOBIS. After doing so, please submit the statement with documentation of your research to me and then I will forward it to Jay.

I completely understand that you are juggling a lot of work. Jay is working on hiring more people in our department. But in the meantime, please continue to do your best because everything we do reflects our job evaluation.

Thank you for your hard work! I appreciate everything that you do!

Sonechka Womack
General Accounting
Assistant Manager
MOBIS Alabama, LLC
334-387-4845 (T)
334-387-4900 (Fax)



DEFENDANT'S
EXHIBIT
17

8/2/2006

HUNTER V. MOBIS
00174

sonechka.womack@mobis-america.com

| | |
|---|---|
| **From:** | Jay Kim [jay.kim@mobis-america.com] |
| **Sent:** | Wednesday, August 02, 2006 8:18 AM |
| **To:** | 'Tarsha Hunter' |
| **Cc:** | sonechka.womack@mobis-america.com |
| **Subject:** | Check out pending works |
| **Importance:** | High |

Tarsha,

I hope that you are getting better.

We are on the month end closing. Please check pending works and reorganize your desk.
There were a bunch of documents which should have been filed.

And, I need for you to submit doctor's note and make-up schedule for your absence.

Thanks.

*Jay K. (Jae-kwang) Kim / CFO*

MOBIS Alabama,LLC.
1395 Mitchell Young Road,
Montgomery, AL 36108

Tel : 334-387-4802
Fax : 334-387-4900
E-mail : *jay.kim@mobis-america.com*



8/2/2006

# EXHIBIT

# I

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

TARSHA NICKOL HUNTER,      )
                             )
      Plaintiff,          )
                             )     Civil Action No.: 2:07-CV-427-WHA
vs.                        )
                             )
MOBIS ALABAMA, LLC,      )
                             )
      Defendant.      )

## AFFIDAVIT OF JAEKWANG (JAY) KIM

STAT E OF ALABAMA   )

COUNTY OF ELMORE   )

      BEFORE ME, the undersigned authority, personally appeared Jaekwang (Jay) Kim who, after being first duly sworn, states as follows:

      My name is Jaekwang (Jay) Kim. I am over the age of eighteen (18) years and have first-hand knowledge of the contents of this affidavit. I reside in Montgomery, Alabama, with my wife and two (2) children. I am a native of Korea.

      1.     I have been employed by MOBIS Alabama, LLC ("MOBIS") as its Chief Financial Officer ("CFO) since February 10, 2003. My duties as MOBIS' CFO include overall responsibility for the Accounting Department. Before that I was employed by MOBIS, or affiliates of MOBIS, in Korea, for a total of twenty (20) years.

      2.     Before moving from Korea to Alabama, I received training on anti-discrimination laws in the United States, including discrimination on the basis of sex and pregnancy. I have worked very hard to succeed at MOBIS and I would never risk my accomplishments by engaging in discrimination. I did not discriminate against Tarsha Hunter on the basis of her sex

1

or pregnancy.

3.    Plaintiff first came to work in MOBIS' Accounting Department on March 6, 2006 as a temporary employee ("Temp"). She was assigned to MOBIS by her employer, Multi-Staffing. While working as a Temp, Plaintiff recorded her daily arrival and departure times and submitted that information to Multi-Staffing so that she could be paid. I did not keep records of Plaintiff's attendance while she was a Temp, but I knew that it was poor. I have since learned from Multi-Staffing's records that she was absent, tardy or left work early seventeen (17) times in ninety (90) days.

4.    Plaintiff's title was Accounting Specialist Treasury. Her job description is attached to Ms. Riedler's Affidavit as Exhibit "1." Accounting is a relatively small department and at the time we had only seven (7) or eight (8) employees. It was very important for Plaintiff's duties to be completed accurately and on time. This was particularly important at month's end when we closed out the books. In addition, I submit daily reports to MOBIS' headquarters in Korea, so Accounting must be current at all times.

5.    Due to Plaintiff's poor attendance as a Temp, I was not willing to offer her employment with MOBIS at the end of three hundred sixty (360) hours or nine (9) weeks which could have been done under the terms of MOBIS' agreement with Multi-Staffing. Instead, I decided to wait and see if Plaintiff's attendance improved.

6.    Plaintiff continued to miss work during the next thirty (30) days so I did not favor hiring her, and had decided against it, but Plaintiff's supervisor Sonechka Womack, who worked as MOBIS' Assistant Manager of Treasury, wanted to hire Plaintiff. Ms. Womack was Plaintiff's immediate supervisor and she in turn reported to me. Ms. Womack and Plaintiff are both African American females.

2

7.     Ms. Womack felt that Plaintiff's work was good except for the attendance problems, and did not want to train another employee to perform Plaintiff's job since we had had turn over in the Accounting Department.     Ms. Womack persuaded me to offer Plaintiff probationary employment with MOBIS on the condition that Plaintiff would correct her attendance and punctuality problems.  Although my better judgment was against hiring Plaintiff as an employee of MOBIS, I agreed to do so in deference to Ms. Womack. I spoke directly with Ms. Womack and Plaintiff and told them that Plaintiff must have no more attendance problems if she was to stay employed at MOBIS.  Plaintiff assured me that she would have no more such problems.

8.     On June 5, 2006, Plaintiff became a probationary employee.  At that time, I knew that all new employees at MOBIS, including those who had worked as Temps, must serve a ninety (90) day probationary period during which MOBIS and the employee determine the employee's suitability for long term employment at MOBIS.  What I did not realize at that time was that MOBIS' policy for probationary employees required that such employees are to be terminated after three (3) attendance occurrences.  For this reason, I allowed Plaintiff to accrue more than three (3) attendance occurrences during her probationary period.

9.     After Plaintiff became a probationary employee, and I started keeping attendance records on her, I only recorded absences and significant time away from work. I did not keep track of minor tardies, which Plaintiff was prone to have.  I only kept up with absences from work for several hours.

10.     Plaintiff's attendance record as a probationary employee shows that she had two (2) absences and was away from work for three and a half (3 1/2) hours or longer on five (5) occasions for a total of seven (7) occurrences between June 15, 2006 and August 11, 2006. A

3

copy of the spreadsheet I maintained on Plaintiff's attendance is attached to this Affidavit as Exhibit "1."

11.    I now understand that Plaintiff should have been terminated on July 27, 2006 after her third attendance occurrence, but she was not terminated because I was not familiar with the number of attendance incidences allowed for probationary employees. As a result, Plaintiff remained employed one (1) month longer than she should have.

12.    I discussed Plaintiff's poor attendance with Plaintiff and with Ms. Womack on several occasions. Several emails were generated regarding Plaintiff's attendance, which are attached to this Affidavit as composite Exhibit "2". Ms. Womack told Plaintiff in an email dated August 14, 2006 that I had been more than reasonable about Plaintiff's attendance and that more problems would jeopardize her employment with MOBIS. See E-mail dated August 14, 2006 at Ex. 2.

13.    In about mid-August 2006, MOBIS' Human Resources Department sent to me a "90 Day Work Performance Review Sheet" to be filled out on Plaintiff. A copy of the Review Sheet I filled out on Tarsha Hunter is attached to this Affidavit as Exhibit "3." The purpose of the Review Sheet is to determine whether the employee should be offered regular employment at the end of the ninety (90) day probationary period.

14.    Soon after receiving the Review Sheet, I contacted Tracy Riedler in Human Resources and told her that I did not think that I could keep Tarsha Hunter because of her poor attendance. Ms. Riedler asked me what I meant by "poor attendance," so I gave her a copy of my attendance record on Plaintiff. When Ms. Riedler saw that Plaintiff had more than two (2) attendance occurrences, she told me that Plaintiff had to be terminated and that I had no choice in the matter. Ms. Riedler explained that probationary employees are not allowed to have more

4

than two (2) attendance occurrences and that Plaintiff should have been terminated on her third occurrence. She also told me that Plaintiff needed to be terminated soon and that I could not wait until the end of her probationary period which would have been in early September.

15.    This was the first time I had a full understanding of the specific requirements of the attendance policy for probationary employees. When I first started working for MOBIS, there was no specific attendance policy for probationary employees. I have learned that the policy was changed in March 2005 to require termination upon the third attendance incident. The fact that Plaintiff was pregnant at the time made no difference to me and did not influence my decision to speak with Ms. Riedler. I did not mention Plaintiff's pregnancy to Ms. Riedler, and I have no reason to believe that Mrs. Riedler was aware that Plaintiff was pregnant when she told me that she had to be terminated for attendance.

16.    Plaintiff's employment was terminated on August 25, 2006. Some time prior to that date (I believe it was the day before, or perhaps two days before), I informed Ms. Womack that Plaintiff was going to be terminated for attendance. Ms. Womack was very upset, but I told her that the rules had to be followed.

17.    On August 25, 2006, Plaintiff asked for a meeting with me and Ms. Womack, so we met with her. During the meeting, I thanked Plaintiff for her contributions to the Accounting Department and told her that her employment was being terminated due to attendance. Plaintiff became very loud, argumentative and insubordinate. She accused me of not giving her the real reason for her termination. I was concerned that the meeting was getting out of control, so I sent word for Ms. Riedler to join the meeting. Ms. Riedler joined the meeting and explained to Plaintiff the attendance policy for probationary employees and told Plaintiff that MOBIS could not offer her regular employment, and that she was terminated. Plaintiff told Ms. Riedler that

she was aware of the policy regarding attendance during the probationary period. She said she just didn't think that was the reason for her termination. After that, Plaintiff left the meeting.

18.    I am aware that Plaintiff contends in this lawsuit that she was terminated because she was pregnant. This is not true as I have previously explained.

19.    In early August 2006, Plaintiff brought an ultrasound picture to work, and I saw her showing it around to employees in the Accounting Department. She showed me the ultrasound picture and told me that she was pregnant. I congratulated Plaintiff on her pregnancy. I am also aware that Plaintiff alleges that I treated her differently after learning of her pregnancy. I do not think that is true because I prefer to communicate with Accounting Department employees through their supervisors rather than directly. That has always been my preference. If my behavior towards Plaintiff changed in any respect, it was not conscious on my part. I did not purposely treat Plaintiff any differently after I found out she was pregnant.

20.    I am aware that Plaintiff alleged that I said that I "can't take care of a person like [Hunter]." If I used that phrase, it had nothing to do with Plaintiff's pregnancy. That is a phrase I use to convey my expectations that my staff keep up with their responsibilities without falling behind or unnecessarily involving others. If I used that phrase with reference to Plaintiff, it meant that I did not want to work with her in Accounting and Finance because she was an unreliable employee due to her attendance problems.

21.    During my deposition, I was asked about former MOBIS employee SuJin Lee. MOBIS hired Ms. Lee in 2006 at my recommendation. I knew that Ms. Lee was newly pregnant at the time MOBIS hired her and told her that I was very happy for her. Ms. Lee voluntarily left MOBIS after a few months because her husband wanted to return to Korea to pursue business opportunities there.

6

22.     I have never supervised and did not know LaJarra Jefferson or Shalonda Gordon. I was not involved in the terminations of their employment, nor do I know anything about the circumstances of their terminations.

23.     I have a family of my own with two (2) children that I love very much. I feel that pregnancy is a natural and wonderful thing. I have no problem with pregnancy in the work place.

24.     To my knowledge, I have supervised three (3) pregnant employees since becoming MOBIS' CFO: SuJin Lee, Plaintiff and Sacouya Robertson, who is currently pregnant and working in Accounting. I did not discriminate against any of these women due to their sex or pregnancy.

25.     My understanding of written English is good. I have more difficulty understanding spoken English, and Americans sometimes have difficulty understanding me until they have worked with me for a while.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on March 28th, 2008.

_____
**JAEKWANG (JAY) KIM**

Sworn to and subscribed before me on this the 28th day of March, 2008 .

Notary Public _____
My Commission Expires: NOTARY PUBLIC STATE OF ALABAMA AT LARGE
                        MY COMMISSION EXPIRES: Oct 13, 2010
                        BONDED THRU NOTARY PUBLIC UNDERWRITERS

[SEAL]

7

EXHIBIT 1
JAY KIM
AFFIDAVIT

### 2006 Absense Record - Tarsha Hunter

| Date | # of Days | Hrs taken | Accum. Hrs | Note |
|------------|-----------|-----------|------------|----------------------|
| 06/15/2006 | 1 | 8 | 8 | Sick |
| 07/25/2006 | 1 | 3.5 | 11.5 | Doctor's appointment |
| 07/27/2006 | 1 | 3.5 | 15 | Doctor's appointment |
| 07/31/2006 | 1 | 6 | 21 | Sick |
| 08/01/2006 | 1 | 8 | 29 | Sick |
| 08/11/2006 | 1 | 4 | 33 | Doctor's appointment |
| 08/14/2006 | 1 | 4 | 37 | Doctor's appointment |

HUNTER V. MOBIS
00115

# EXHIBIT 2
# JAY KIM
# AFFIDAVIT

sonechka.womack@mobis-america.com

| | |
|---|---|
| From: | Jay Kim [jay.kim@mobis-america.com] |
| Sent: | Wednesday, July 26, 2006 8:25 AM |
| To: | 'Tarsha Hunter' |
| Cc: | sonechka.womack@mobis-america.com |
| Subject: | Notification (July 26,2006) |
| Importance: High | |

Tarsha,

This is a notification for tardiness.

On Wednesday the 26th you were noted as being tardy, this was not a first time during 90-day probationary.

I need for you to keep the starting time for business, everyday.

When you return from doctor's office, please submit the doctor's note and schedule for make-up time.

In addition, you are reminded that you are still serving out your probationary period and that attendance is very important.

Please make every effort to correct these deficiencies as your long term employment may be in jeopardy.

Thanks.

*Jay K. (Jae-kwang) Kim / CFO*

MOBIS Alabama,LLC.

1395 Mitchell Young Road,

Montgomery, AL 36108

Tel : 334-387-4802

Fax : 334-387-4900

E-mail : *jay.kim@mobis-america.com*

HUNTER V. MOBIS
00172

7/26/2006

Page 1 of 1

sonechka.womack@mobis-america.com

| | |
|---|---|
| **From:** | Jay Kim [jay.kim@mobis-america.com] |
| **Sent:** | Wednesday, August 02, 2006 8:18 AM |
| **To:** | 'Tarsha Hunter' |
| **Cc:** | sonechka.womack@mobis-america.com |
| **Subject:** | Check out pending works |

**Importance:** High

Tarsha,

I hope that you are getting better.

We are on the month end closing. Please check pending works and reorganize your desk.
There were a bunch of documents which should have been filed.

And, I need for you to submit doctor's note and make-up schedule for your absence.

Thanks.

*Jay K. (Jae-kwang)  Kim / CFO*

MOBIS Alabama,LLC.
1395 Mitchell Young Road,
Montgomery, AL 36108

Tel : 334-387-4802
Fax : 334-387-4900
E-mail : *jay.kim@mobis-america.com*

8/2/2006

HUNTER V. MOBIS
00173

sonechka.womack@mobis-america.com

| | |
|---|---|
| **From:** | sonechka.womack@mobis-america.com |
| **Sent:** | Wednesday, August 02, 2006 10:35 AM |
| **To:** | 'Tarsha Hunter' |
| **Cc:** | 'Jay Kim' |
| **Subject:** | Invoices/Statements, etc. |

Hello Tarsha,

Please remember to make sure that all invoices are entered into SAP on the day received. It is very important that the invoices are entered and then distributed to the responsible person in a timely manner. There is a small timeframe that the responsible person has to complete their task and return the invoice to our department for payment. The President holds each person liable if the invoice is not processed on time. If they receive the invoice late, they will report to it Jay and the President that accounting did not give it to them on time.

I understand that sometimes you will run into some problems, but please try to have the invoices entered everyday before you leave. Let me know if you run into any problems.

Also, regarding statements from vendors, please review the statement to see if the invoices listed have been paid/accounting document generated/received by MOBIS. After doing so, please submit the statement with documentation of your research to me and then I will forward it to Jay.

I completely understand that you are juggling a lot of work. Jay is working on hiring more people in our department. But in the meantime, please continue to do your best because everything we do reflects our job evaluation.

Thank you for your hard work! I appreciate everything that you do!

Sonechka Womack
General Accounting
Assistant Manager
MOBIS Alabama, LLC
334-387-4845 (T)
334-387-4900 (Fax)

8/2/2006

HUNTER V. MOBIS
00174

Page 1 of 5

**sonechka.womack@mobis-america.com**

| | |
|---|---|
| **From:** | Tarsha Hunter [Tarsha.Hunter@mobis-america.com] |
| **Sent:** | Wednesday, August 09, 2006 10:49 PM |
| **To:** | sonechka.womack@mobis-america.com |
| **Subject:** | RE: Attendance Issues |

When I returned on the 3rd of August , I didn't take a lunch break, that's a hour, today I came in @ 7:30, so that t's 30 min. and I can stay until 7:00 pm today and starting Monday stay in for lunch thru Wed. and Sat. Aug. 19, come in for 4 hours.

*Tarsha N. Hunter ,Account Specialist*
*Mobis Alabama, LLC.*
*1395 Mitchell Young Road*
*Montgomery, AL 36108*
*Ph: 334-387-4878*
*Fx: 334-387-4900*
*Tarsha.Hunter@Mobis-America.com*

**From:** sonechka.womack@mobis-america.com [mailto:sonechka.womack@mobis-america.com]
**Sent:** Thursday, August 10, 2006 10:06 AM
**To:** 'Tarsha Hunter'
**Cc:** 'Jay Kim'
**Subject:** RE: Attendance Issues

Tarsha,

As cited from the below email, please submit a schedule of time that you will be able to make up for your absences. We completely understand you current health condition, but this policy has been set for us to comply with when away from the office numerous times. This is not to discourage you; this is just to keep fairness throughout this department.

Thank you,
Sonechka

**From:** sonechka.womack@mobis-america.com [mailto:sonechka.womack@mobis-america.com]
**Sent:** Tuesday, May 09, 2006 10:29 AM
**To:** 'Tarsha Hunter'
**Subject:** FW: Attendance Issues
**Importance:** High

8/10/2006

HUNTER V. MOBIS
00175

Page 2 of 3

**From:** Jay Kim [mailto:jay.kim@mobis-america.com]
**Sent:** Wednesday, April 26, 2006 2:43 PM
**To:** nicole.boswell@mobis-america.com; sonechka.womack@mobis-america.com; 'Stephanie Perez'; 'Sandra Goodin';
hosang.hwang@mobis-america.com
**Subject:** Attendance Issues
**Importance:** High

To all of staffs

First of all, I appreciate all of your effort and hard working.

I looked trough the status of individual attendance in accounting department up to now.
And, I asked and discussed with HR department to manage it more effectively.

1. Regular duty hours are 8 AM till 5 PM. Employees are expected to arrive to work in ready to start by 8 AM.
2. Employees are expected to remain at work (Except during the lunch break) until 5 PM.
3. Scheduled appointments outside MOBIS Alabama.
 A. Doctor's appointments
   1) From time to time we expect that employees must request time away from work in order to attend a Doctor's appoint
ment.
    Personnel are expected to give ample notification (Minimum 24 Hours notification) prior to the appointment.
    Personnel are expected to schedule appointments for a time period that the results in the least amount of time away fr
om work.
   2) If due to a health condition, you are required to be away from work multiple times during any given month,
      we should have an understanding that this time should be made up if you wish not to use your vacation allotment.
      This can be accomplished in many different ways, some examples include; staying late on regular work days to m
ake up the number of hours missed, work on
      Saturday, etc.
   3) As salaried employees it is expected that some time in addition to schedule work hours, may be necessary at times.
    Like-wise we need to have an understanding that we must both work together to accomplish the job.
    Please do not take advantage of my cooperative nature as I still have to ensure that the work is completed.
 B. All other situations are adequately covered by company policy such as; Maternity, Family medical Leave, Bereaveme
nt leave, Jury Duty etc.

As you are aware of, Closing is very important and primary issue in accounting department.

8/10/2006

HUNTER V. MOBIS
00176

Page 5 of 5

And we should close every each month-end just in time to analysis and report it to the top management group in the head quarters.

Regarding the vacation days, if you want to take vacation days, if possible, please do not use it consecutively over the 3 b usiness days and avoid the month-end closing period, otherwise first or second weeks of every month.

Your great assistance would be much appreciated.

Jay Kim

*Jay K. (Jae-kwang)  Kim / CFO*

MOBIS Alabama,LLC.
1395 Mitchell Young Road,
Montgomery, AL 36108

Tel : 334-387-4802
Fax : 334-387-4900
E-mail : *jay.kim@mobis-america.com*

8/10/2006

HUNTER V. MOBIS
00177

Jay Kim
_____

보낸 사람: Jay Kim [jay.kim@mobis-america.com]
보낸 날짜: 2006년 8월 14일 월요일 오전 7:47
받는 사람: 'sonechka.womack@mobis-america.com'
제목:     RE: Attendance Issues
중요도:    높음
첨부 파일: Tarsha Sonechka.xls

관리:      받는 사람                    읽음
           'sonechka.womack@mobis-america.com' 읽음: 2006-08-14 오전 8:34

Sonechka,

I need to know about the status of her attendance since she has been started permanent employee otherwise

during 90-day probationary in company.

**Please fill out the attachment correctly and submit it to me by today.**

**And also, you need to submit it for you to me.**


Jay Kim

_____

**From:** sonechka.womack@mobis-america.com [mailto:sonechka.womack@mobis-america.com]
**Sent:** Thursday, August 10, 2006 12:59 PM
**To:** 'Jay Kim'
**Subject:** FW: Attendance Issues



_____

**From:** Tarsha Hunter [mailto:Tarsha.Hunter@mobis-america.com]
**Sent:** Wednesday, August 09, 2006 10:49 PM
**To:** sonechka.womack@mobis-america.com
**Subject:** RE: Attendance Issues


When I returned on the 3rd of August , I didn't take a lunch break, that's a hour, today I came in @ 7:30,

so that's 30 min. and I can stay until 7:00 pm today and starting Monday stay in for lunch thru Wed. and

Sat. Aug. 19, come in for 4 hours.

*Tarsha N. Hunter .Account Specialist*

2006-08-24

HUNTER V. MOBIS
00180

*Mobis Alabama, LLC.*
*1395 Mitchell Young Road*
*Montgomery, AL 36108*
*Ph: 334-387-4878*
*Fx: 334-387-4900*
*Tarsha.Hunter@Mobis-America.com*

**From:** sonechka.womack@mobis-america.com [mailto:sonechka.womack@mobis-america.com]
**Sent:** Thursday, August 10, 2006 10:06 AM
**To:** 'Tarsha Hunter'
**Cc:** 'Jay Kim'
**Subject:** RE: Attendance Issues

Tarsha,

As cited from the below email, please submit a schedule of time that you will be able to make up for your absences. We completely understand you current health condition, but this policy has been set for us to comply with when away from the office numerous times. This is not to discourage you; this is just to keep fairness throughout this department.

Thank you,
Sonechka

**From:** sonechka.womack@mobis-america.com [mailto:sonechka.womack@mobis-america.com]
**Sent:** Tuesday, May 09, 2006 10:29 AM
**To:** 'Tarsha Hunter'
**Subject:** FW: Attendance Issues
**Importance:** High

**From:** Jay Kim [mailto:jay.kim@mobis-america.com]
**Sent:** Wednesday, April 26, 2006 2:43 PM
**To:** nicole.boswell@mobis-america.com; sonechka.womack@mobis-america.com; 'Stephanie Perez'; 'Sandra Goodin'; hosang.hwang@mobis-america.com
**Subject:** Attendance Issues
**Importance:** High

2006-08-24

HUNTER V. MOBIS
00181

To all of staffs

First of all, I appreciate all of your effort and hard working.

I looked trough the status of individual attendance in accounting department up to now.

And, I asked and discussed with HR department to manage it more effectively.

1. Regular duty hours are 8 AM till 5 PM. Employees are expected to arrive to work in ready to start by 8 AM.

2. Employees are expected to remain at work (Except during the lunch break) until 5 PM.

3. Scheduled appointments outside MOBIS Alabama.

  A. Doctor's appointments

   1) From time to time we expect that employees must request time away from work in order to attend a Doctor's appointment.

     Personnel are expected to give ample notification (Minimum 24 Hours notification) prior to the appointment.

     Personnel are expected to schedule appointments for a time period that the results in the least amount of time away from work.

   2) If due to a health condition, you are required to be away from work multiple times during any given month,

        we should have an understanding that this time should be made up if you wish not to use your vacation allotment.

        This can be accomplished in many different ways, some examples include; staying late on regular work days to make up the number of hours missed, work on

        Saturday, etc.

   3) As salaried employees it is expected that some time in addition to schedule work hours, may be necessary at times.

     Like-wise we need to have an understanding that we must both work together to accomplish the job.

     Please do not take advantage of my cooperative nature as I still have to ensure that the work is completed.

  B. All other situations are adequately covered by company policy such as; Maternity, Family medical Leave, Bereavement leave, Jury Duty etc.

As you are aware of, Closing is very important and primary issue in accounting department.

And we should close every each month-end just in time to analysis and report it to the top management group in the headquarters.

Regarding the vacation days, if you want to take vacation days, if possible, please do not use it consecutively over the 3 business days and avoid the month-end closing period, otherwise first or second weeks of every month.

Your great assistance would be much appreciated.

2006-08-24

HUNTER V. MOBIS
00182

Jay Kim

*Jay K. (Jae-kwang)  Kim / CFO*

MOBIS Alabama,LLC.
1395 Mitchell Young Road,
Montgomery, AL 36108

Tel : 334-387-4802
Fax : 334-387-4900
E-mail : *jay.kim@mobis-america.com*

2006-08-24

HUNTER V. MOBIS
00183

Page 1 of 1

## sonechka.womack@mobis-america.com

| | |
|---|---|
| **From:** | sonechka.womack@mobis-america.com |
| **Sent:** | Monday, August 14, 2006 9:05 AM |
| **To:** | 'Tarsha Hunter' |
| **Subject:** | Attendance |

Good morning Tarsha,

I received your voicemail regarding you will not be able to drop off your child before 7:30 am. I understand it completely. However, because of the company policy it may be hard to allow you to come in late. I have already spoken to Jay and it is hard for him to understand. I recommend that you get a written letter from your child's school and speak to Jay about this.

There have been quite a few instances that Jay has excused. We all know that Jay is very strict when it comes to tardiness and attendance. I feel that he has been more than understanding for everything (considering this is Jay I am talking about). I really want you to succeed here at MOBIS, so I hope you can do you best to meet the standards of this company. You are getting close to your 90 day probation ending so please try to leave a great impression so that you will be able to continue your employment here at MOBIS. I am here to help you.

Thanks,

Sonechka Womack
General Accounting
Assistant Manager
MOBIS Alabama, LLC
334-387-4845 (T)
334-387-4900 (Fax)

8/14/2006

HUNTER V. MOBIS
00178

**tracy.riedler@mobis-america.com**

| | |
|---|---|
| **From:** | tracy.riedler@mobis-america.com |
| **Sent:** | Wednesday, August 23, 2006 4:13 PM |
| **To:** | 'Jay Kim' |
| **Subject:** | RE: 90 DAY Work Performance Review Sheet |

**Tracking:** **Recipient Read**

'Jay Kim'    Read: 8/23/2006 4:29 PM

Sounds good.  I will wait to hear word from you.

---

**From:** Jay Kim [mailto:jay.kim@mobis-america.com]
**Sent:** Wednesday, August 23, 2006 3:24 PM
**To:** tracy.riedler@mobis-america.com
**Subject:** RE: 90 DAY Work Performance Review Sheet
**Importance:** High

Tracy,
I am contacting headquarters to cancel my business trip to Korea due to purchasing member's interest from C &
A.
But, I am not sure that they would approve it or not.
I need to contact them this evening again.

My concerning for termination of Tarsha is Sonechka wants to keep her.
Because of she might be not like any kind of changes.
Then I do not want to take care of Tarsha anymore.
If I will be stayed in the next week, I need your help to terminate her.
I will let you know whether I am available or not.

Thanks.

---

**From:** tracy.riedler@mobis-america.com [mailto:tracy.riedler@mobis-america.com]
**Sent:** Wednesday, August 23, 2006 10:20 AM
**To:** 'Jay Kim'
**Subject:** 90 DAY Work Performance Review Sheet
**Importance:** High

Here is the 90 Day Performance Review Form.  Please make comments, sign and return to me.  Do you want to
terminate her prior to your trip to Korea?  You will interview two Accounting candidates this week.  Please let me
know and I will help you with the termination meeting.

8/9/2007

HUNTER V. MOBIS
00198

# EXHIBIT 3
# JAY KIM
# AFFIDAVIT

## 90 DAY WORK PERFORMANCE REVIEW SHEET

Team Member Name _____ Tarsha Hunter

Title _____ Accounting Specialist

Department _____ Accounting and Finance

Division _____ Module

Manager/Supervisor _____ Sonechka Womack

Date of Hire _____ 06/05/06

Date 90 Day Probationary Period Expires _____ 09/02/06

**Check One**

_____**A:**     The employee has successfully passed the probationary period  for their present job.

❖ Attendance is satisfactory.  How many days has the team member been absent, late or left early?

_____

❖ What are the team member's strengths?

_____

❖ What are areas the team member could improve on?

_____

**X**_____**B:**     The employee should be terminated based on unsatisfactory performance.

❖ Explain why you recommend termination

Tarsha's attendance and dependability was unstable while she was a temporary employee.
I delayed hiring her for this very reason.  I had several conversations with Tarsha and
her supervisor expressing my concern.  Tarsha ensured me this problem would not continue
after she was hired.  I told her that I would continue to evaluate her performance, to include
attendance, during her 90 day probationary period.  She has not improved.  Her mannerism
is not congenial to our department.  And her lack of dependability has placed strain on our
department as when she is not here her work must be performed by her supervisor
who has responsibilities of her own.  I cannot continue with this situation.

Supervisor/Manager Signature _____ _M. M. Lee_  8/25/06

Sr. Manager Human Resources _____ 8/25/06

Executive Vice President _____ 08-25-06

President _____

HUNTER V. MOBIS
00114

# EXHIBIT

# J

Deposition of JAY KIM
January 31, 2008

Page 34

1     Q.  -- did you have any problems with
2 her attendance?

3     A.  I think so.

4     Q.  Tell me what problems you had with
5 her attendance.

6     A.  So many tardy and doctors'
7 appointment or something like that.

8     Q.  Any other problems?

9     A.  Yeah, I have -- I had a problem.
10 As I explain it, I have only seven or eight --
11 few peoples in accounting.

12     So if one employee -- one team
13 member will not take care of, you know, their
14 work just in a timely manner, accounting
15 department will make a harder situation.
16 Because as you know, accounting has to close
17 the months and every -- each month.  But if
18 somebody will not take care of their work just
19 in a timely manner, it will impact on the
20 accounting department.

21     For instance, I have to report it
22 to -- the financial result to headquarters
23 every -- each month after closing out just in
24 time.

25     Q.  Did you have any other problems

Deposition of JAY KIM
January 31, 2008

Page 38

1          A.   In March 2006, if you see

2     organizational chart for accounting and

3     finance department, I have two, you know, the

4     different -- you know, the parts.  One is for

5     general accounting and taxes -- taxes.  The

6     other one is treasury.

7               Treasury has been handled by

8     Sonechka with Tarsha.  But the other partner,

9     Ho Sang Hwang, he is no longer employed with

10    Mobis Alabama.  He has been taking care of the

11    general accounting and the taxes.  So it's

12    different.

13         Q.   All right.  Did you discuss with

14    anyone bringing Ms. Hunter into permanent

15    employment or full-time employment with Mobis

16    when she was a temporary employee?

17         A.   Please --

18         Q.   How did Ms. Hunter go from being a

19    temporary employee to a full-time employee?

20         A.   Oh, yeah.  Let me explain.  As a

21    matter of fact, I wanted to -- I don't want --

22    wanted to hire Tarsha during the temporary

23    employees because I have seen, you know, so

24    many, you know, tardy and attendance issues.

25               And so I talked to Sonechka,

Deposition of JAY KIM
January 31, 2008

Page 41

1   Ms. Hunter buying out Ms. Hunter's contract

2   with Multi-Staffing?

3        A.  No.

4        Q.  Who made the decision to hire

5   Ms. Hunter as a Mobis employee?

6        A.  As I explained a few minutes ago, I

7   really don't want to hire Tarsha, but

8   Sonechka, you know, asked me and persuaded me

9   to hire her.  Because, as I explained, you

10  know, I have just a few peoples in

11  accounting.  So if somebody would leave --

12  would leave, you know, that person has to take

13  care of the other -- the left person's -- the

14  work or something.  I'm not sure.

15       Q.  What did Sonechka say to you to

16  persuade you to hire Ms. Hunter?

17       A.  I don't really remember that, but

18  in my understanding, if -- if Tarsha will

19  leave, Sonechka will make harder situation

20  because -- because Sonechka has to take care

21  of, you know, two person's work -- two

22  person's work.

23            So in my understanding -- and I

24  remember, you know, okay, we can just, you

25  know, wait during the ninety-day period --

Deposition of JAY KIM
January 31, 2008

Page 51

1          MS. LEONARD:  He asked for the

2   handbook.

3          MR. BARNETT:  Do you want to see

4   the attendance policy?

5          THE WITNESS:  Yeah.

6          MS. RIEDLER:  Probationary policy?

7          MS. LEONARD:  I believe it's the

8   stack below.

9          MS. RIEDLER:  Sorry.

10      A.   Attendance, in my -- in my

11   knowledge -- attendance means they are bad

12   tardy or late, didn't show up or -- tardiness

13   or unexcused -- for instance, unexcused off or

14   something like that.

15      Q.   What was lacking in Ms. Hunter's

16   dependability?

17      A.   As I explained, you know, the -- we

18   have, you know -- accounting has, you know,

19   the time deadline or something like that.

20          So if somebody will not take care

21   of -- will not finish, you know, their

22   assigned work in a timely manner -- just in a

23   timely manner, that will impact on the

24   accounting department.

25          I am, you know, the responsible

Page 54

1  know, the -- if I have some issues, I have to

2  talk to assistant manager.

3         Q.  Did anyone complain to you about

4  Tarsha?

5         A.  I don't -- I don't know.  I don't

6  know.

7         Q.  So you don't remember anyone

8  complaining about Ms. Hunter?

9         A.  The assistant manager Ho Sang -- Ho

10  Sang Hwang -- I don't remember that name, but

11  he sometimes told me -- told me I did not

12  receive them or something or on time or

13  whatever.

14         Q.  Did Sonechka complain about

15  Ms. Hunter?

16         A.  Sonechka, you know, did take, you

17  know -- told me when Tarsha left early or

18  something she has to -- had to take care of

19  Tarsha's work -- Tarsha's work.

20             So she has been worked over 5:00

21  o'clock until sometimes 7:00 o'clock.

22             So when she work to you, you know,

23  over five, six, sometimes seven, I have to

24  talk to -- ask her, What's wrong?  What

25  happened?

Deposition of JAY KIM
January 31, 2008

Page 64

1   Exhibit 4 is wrong?

2           A.   Yeah.   This is wrong.

3           Q.   All right.

4           MR. BARNETT:   Let the record show

5   that he is --

6           MS. LEONARD:   The top part.

7           MR. BARNETT:   He's pointed out that

8   the date of -- that starts with 1-13-2006 and

9   goes out one, two, three, four columns is

10  incorrect, or it doesn't apply to her.

11          Q.   When did you find out Tarsha was

12  pregnant?

13          A.   I cannot really remember the exact

14  dates.

15          Q.   How did you find out she was

16  pregnant?

17          A.   In the partition area.   When I

18  passed, you know, the -- Tarsha's, you know --

19  beside the IT department, at that point some

20  of, you know, the employees gather in the

21  partition area.

22          Q.   Okay.

23          A.   So I -- but I didn't know about,

24  you know, the pregnancy, even though, you

25  know, there's several employees gathered at

EDMONDSON REPORTING & VIDEO, INC.
Email: Edmondsonrpting@bellsouth.net     Phone 205.324.2333 Fax 205.324.2377

Page 65

1    her desk.

2            But when I returned to my office --

3    office, she brought -- in my memory, she

4    brought the small picture.

5            Q.  Ultrasound?

6            A.  Yes, ultrasound.

7            Q.  You can call it a picture.

8            A.  Yeah, ultrasound.  Yeah, I saw that

9    picture.

10           Q.  Did Tarsha sit down and tell you

11   she was pregnant?

12           A.  Probably she did.

13           Q.  How long before she was fired did

14   you find out she was pregnant?

15           A.  I really don't understand --

16   remember the exact date -- the exact date.

17           Q.  I'm not asking for an exact date.

18   Do you have an opinion as to whether it was a

19   week, two weeks, three weeks, a month, or more

20   than a month before she was fired that you

21   knew she was pregnant?

22           A.  Probably before, you know -- when

23   was her termination?

24           Q.  August 25th.

25           A.  25th.  I --

Page 66

1         MR. BARNETT:  If you don't know,
2    you can't answer.
3         A.  I don't really remember that.
4         Q.  Do you have an opinion as to
5    whether it was more than two weeks?
6         A.  I don't know.
7         Q.  If Ms. Hunter testified that she
8    told you in early August, around August 9th,
9    that she was pregnant, do you have any reason
10   to disagree with her?
11        A.  I don't know when is the exact
12   date.
13        Q.  So you couldn't say if it was the
14   day before she was fired or two months before
15   she was fired?
16        A.  I don't know what -- what you're
17   saying.
18        Q.  You couldn't tell me if a short
19   amount of time or a large amount of time
20   passed between when you found out she was
21   pregnant and she was fired?
22        MR. BARNETT:  Object to the form.
23   She wants to know whether you found out about
24   the pregnancy days before Tarsha was
25   terminated or weeks before, if you know.

Deposition of JAY KIM
January 31, 2008

Page 67

1       A.   Not a week.

2            MR. BARNETT:   It's clear he's not

3  understanding.

4       Q.   Which came first, your decision to

5  fire Tarsha or finding out she was pregnant?

6       A.   Okay.   Let me explain.

7       Q.   Okay.

8       A.   As I already explained, you know, I

9  don't want -- want to hire, you know, Tarsha,

10  even though during the probate -- temporary

11  employee, I already made a decision during

12  that period.   I made a decision.

13            Actually, I don't -- I don't want

14  to work with her during the probationary

15  employee.   But as I already explained a minute

16  ago, Sonechka, her supervisor, asked me and

17  persuaded me -- persuaded me to keeping her.

18            That's the reason, you know, her

19  starting -- her starting.

20       Q.   That's not my question.   I'll break

21  it down.

22            When was the decision to end

23  Tarsha's employment made?

24       A.   I made a decision in

25  probationary -- temporary employment.   I had

Deposition of JAY KIM
January 31, 2008

Page 68

```
 1   already made a decision at that point.
 2        Q.  Why not keep her on as a temporary
 3   employee then?
 4        A.  Okay.  I'll explain.  I don't want
 5   her to start, you know, the permanent
 6   employee.
 7        Q.  That's my question.
 8        A.  Yeah.  I don't want her, you know,
 9   to start a permanent employee even though, you
10   know, she complete -- finished the temporary
11   employment.  But I didn't want her to start
12   the permanent employee.
13        Q.  Could you have left her as a
14   temporary employee?
15        A.  I'm sorry?
16        Q.  Could Tarsha have remained a
17   temporary employee?
18        A.  I don't understand what you're
19   asking.
20        Q.  When Tarsha -- she was a temporary
21   employee first, correct?
22        A.  Yes.  Yes.
23        Q.  What do you understand by a
24   temporary employee?  What is a temp?
25        A.  What is a temp?
```

Deposition of JAY KIM
January 31, 2008

Page 69

1      Q.  Yes.

2      A.  A temp has to be controlled by the

3  outsourcing, you know, the company like Multi-

4  Staffing or something like that.

5      Q.  Why couldn't you have kept her

6  working through Multi-Staffing?

7      A.  I don't know.  Multi-Staffing -- we

8  have used several, you know, different -- the

9  outsourcing company for employment.  But I do

10  not remember Multi -- Multi-Staffing or the

11  other company.

12      Q.  Were you up against any type of

13  deadline when she was hired as full time?  Was

14  her assignment through Multi-Staffing ending?

15      A.  I don't know.  What -- what do you

16  mean?

17      Q.  Was Multi-Staffing going to take

18  Tarsha away?  When Tarsha was a temporary

19  employee --

20      A.  Right.

21      Q.  -- was there a set date her

22  assignment would end?

23      A.  I don't know.

24      Q.  When you hire a temporary employee,

25  a temp comes, how long are they going to be

Deposition of JAY KIM
January 31, 2008

Page 70

1  there?

2        A.   Okay.   I did not hire, you know,

3  the temporary employee.   I just, you know, got

4  a temporary employee from HR.   I didn't

5  arrange anything.

6             MS. RIEDLER:   May I?

7             MS. LEONARD:   I'm going to try to

8  rephrase it.   I'm going to ask it a different

9  way.

10             MS. RIEDLER:   Can you draw a

11  picture of the time line?

12             MS. LEONARD:   Wait a second.

13        Q.   Tarsha became a Mobis employee in

14  June 2006, correct?

15             MR. BARNETT:   Object to the form.

16  That's when she started her probationary

17  period.

18        Q.   She was a full-time -- I'm using

19  the term full-time employee to mean she was

20  employed by Mobis.

21             Tarsha became employed by Mobis in

22  June 2006, correct?

23        A.   Probably, right.

24        Q.   At the time she became a Mobis

25  employee, was Multi-Staffing going to assign

Deposition of JAY KIM
January 31, 2008

Page 71

1   her to a new job away from Mobis?

2          A.   Away from Mobis?

3          Q.   At the time Mobis hired her, had

4   Mobis not hired her in June, what would have

5   happened to Tarsha?

6          A.   I don't know.

7          Q.   Would she have stayed as a

8   temporary employee?

9          A.   I'm sorry.  I'm not, you know, the

10  expert here in the field of hiring or

11  something like that.

12         Q.   Okay.  That's fine.

13         A.   It's not my business, I think.

14         Q.   When Mobis hired Tarsha in June, is

15  it your testimony that you never intended her

16  to work more than ninety days?

17         A.   I don't know.  What is your exact

18  question?

19         Q.   In June 2006, had you decided to

20  fire Tarsha?

21         A.   I think that you -- you have some

22  misunderstanding due to my, you know,

23  incorrect expression.

24         Q.   When did you decide to fire Tarsha?

25         A.   I didn't make her, you know, the --

Deposition of JAY KIM
January 31, 2008

Page 72

1    okay.  I just want to revise my expression, my

2    expression correctly.

3            She was a temporary employee.

4        Q.  Okay.

5        A.  But -- during the two or three

6    months.  But during that period, I was not

7    very pleased with, you know, her attendance

8    and tardy or something.

9            So I did not want her to start the

10   Mobis employee -- Mobis employee.  Yeah.  That

11   is my opinion.

12       Q.  All right.  I'm showing you an

13   e-mail --

14       A.  Yes.

15       Q.  -- that is Exhibit 5 to

16   Ms. Riedler's deposition that's an e-mail

17   exchanged between you and Ms. Riedler around

18   August 23rd, 2006.

19       A.  Yes.

20       Q.  Before this e-mail, had you talked

21   to Tracy about firing Tarsha?

22       A.  I had, you know, the meeting with

23   Tracy before August the 23rd, yeah.

24       Q.  On what day did you have that

25   meeting?

Deposition of JAY KIM
January 31, 2008

Page 75

1  work in Mobis Alabama.  That was my, you know,

2  opinion.

3          Q.  Had you talked to Sonechka about

4  firing Tarsha?

5          A.  I don't remember, but I talked to

6  her verbal.  Probably I told her -- I was not

7  pleased with, you know, her -- Tarsha's

8  attendance and tardiness or whatever.

9          Q.  What did you mean when you wrote, I

10  do not want to take care of Tarsha anymore?

11          A.  Okay.  That's, you know, the

12  different language barrier or something like

13  that.

14          I read, you know, that that -- I

15  read this sentence.  Normally, I have been

16  wrong about -- taking care of them means keep

17  or something like that.

18          Of course, you know, taking care of

19  them has, you know, several different

20  meanings, but I did not know about that.  I

21  didn't know about it.

22          In this exact sentence, that means

23  I don't want to work with her in accounting

24  and financing.  I just wrote, you know, this

25  word with that meaning.  But I'm not sure how

Deposition of JAY KIM
January 31, 2008

Page 76

1  the other person -- how can they, you know,

2  understand this wording, this idioms?

3          I just, you know, wrote that word.

4  Okay.  I will not -- don't want, you know, to

5  work continuously or something like that.  I

6  just wrote that idioms with that meaning.

7          Q.  All right.  What did you mean when

8  you wrote, I need your help to terminate her?

9          A.  Okay.  I clearly remember the why

10  did, you know, I write this sentence.

11          Even though I can speak English,

12  but it's very hard for me to explain about,

13  you know, the detail or something like that

14  with the correct word and idioms.

15          So I need -- I wanted Tracy to

16  understand what -- what I am -- what I was

17  thinking -- what I was thinking.

18          Q.  So you wanted her to help

19  verbalize?

20          A.  Broken English or something.

21          Q.  So you wanted her to help speak for

22  you?

23          A.  Speak or -- and I want -- I want

24  Tracy to understand that with my broken

25  English -- broken English -- not to, you know,

Deposition of JAY KIM
January 31, 2008

Page 77

1   the -- with her like in this occasion,

2   projecting.

3            Q.   Who was hired to replace

4   Ms. Hunter?

5            A.   I'm sorry?

6            Q.   Who did you hire to replace her?

7   Who replaced her?

8            MR. BARNETT:   Who took her job when

9   she left?

10           A.   I don't remember that.

11           Q.   How long did it take to replace

12  her?

13           A.   I have no idea.

14           Q.   Now I thought you said --

15           A.   You say my -- you know, the folder

16  or something in my desk.   I can remember, but

17  right now I don't remember that.

18           Q.   Who did her work until you hired

19  someone to replace her?

20           A.   I don't remember that.

21           Q.   Did it cause any problems after you

22  terminated Ms. Hunter in getting the work done

23  in the department?

24           A.   I think so, because the other

25  person has to take care of all the -- Tarsha's

Deposition of JAY KIM
January 31, 2008

Page 78

1    work.

2         Q.   Have you seen Exhibit 8 before?

3         A.   I thought, you know, that this --

4    the letter, but I did not, you know,

5    completely, you know, read the letter.

6         Q.   Okay.   That's fine.

7         A.   I have - I have seen this -- this

8    one.

9         Q.   Referring to Exhibit 2?

10        A.   Yes.

11        Q.   Did Ms. Hunter ask you or Sonechka

12   if she could be off work on June 15th, 2006?

13        A.   Yes.

14        Q.   Who did she ask?

15        A.   Who?

16        Q.   Who did she ask if she could be off

17   work?

18        A.   I could not really remember what

19   happened exactly on June 15th.   However, I

20   just put eight hours.   That means one day.

21        Q.   Okay.

22        A.   Probably Tarsha was not show up on

23   that date, I think.

24        Q.   Had she asked permission to be off

25   on that day?

Page 86

1  from his testimony when the decision to

2  terminate her was made.

3          MR. BARNETT:  Well, we knew going

4  in there were going to be communication

5  problems.

6          MS. LEONARD:  These are fundamental

7  questions that can be anticipated.  When he's

8  called in in a case dealing with her

9  termination when we allege it's due to

10  pregnancy, I don't think it's off the wall for

11  him to anticipate I'm going to ask him when

12  the decision to terminate her was made and why

13  she was going to be terminated.

14          A.  Can I explain?

15          Q.  Yes.

16          A.  I remember, you know, when I saw

17  the ultrasound picture, I told Tarsha,

18  Congratulations.  That's normal.  That's

19  common.  It's great, you know.

20          I clearly, you know, explained --

21  clearly explained why should I make a decision

22  to terminate her.

23          Q.  Okay.

24          A.  Her bad tardiness and attendance,

25  and that --

# EXHIBIT

# K

## tracy.riedler@mobis-america.com

| | |
|---|---|
| **From:** | tracy.riedler@mobis-america.com |
| **Sent:** | Wednesday, August 23, 2006 4:13 PM |
| **To:** | 'Jay Kim' |
| **Subject:** | RE: 90 DAY Work Performance Review Sheet |

**Tracking:** **Recipient Read**

      'Jay Kim'  Read: 8/23/2006 4:29 PM

Sounds good. I will wait to hear word from you.

---

**From:** Jay Kim [mailto:jay.kim@mobis-america.com]
**Sent:** Wednesday, August 23, 2006 3:24 PM
**To:** tracy.riedler@mobis-america.com
**Subject:** RE: 90 DAY Work Performance Review Sheet
**Importance:** High

Tracy,
I am contacting headquarters to cancel my business trip to Korea due to purchasing member's interest from C & A.
But, I am not sure that they would approve it or not.
I need to contact them this evening again.

My concerning for termination of Tarsha is Sonechka wants to keep her.
Because of she might be not like any kind of changes.
Then I do not want to take care of Tarsha anymore.
f I will be stayed in the next week, I need your help to terminate her.
 will let you know whether I am available or not.

Thanks.

---

**From:** tracy.riedler@mobis-america.com [mailto:tracy.riedler@mobis-america.com]
**Sent:** Wednesday, August 23, 2006 10:20 AM
**To:** 'Jay Kim'
**Subject:** 90 DAY Work Performance Review Sheet
**Importance:** High

Here is the 90 Day Performance Review Form. Please make comments, sign and return to me. Do you want to erminate her prior to your trip to Korea? You will interview two Accounting candidates this week. Please let me now and I will help you with the termination meeting.



PLAINTIFF'S EXHIBIT
5
PENGAD 800-631-6989

/9/2007

HUNTER V. MOBIS
00198